THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:   (202) 393-5760

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM, <br><br> Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx) <br><br> (1) DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; <br><br> SEPARATE COVER: <br> (2) STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW; <br> (3) DECLARATION OF CAROLINE VAN NESS IN SUPPORT THEREOF; <br> (4) REQUEST FOR JUDICIAL NOTICE(and supporting documents) <br><br> Hearing Date:   August 1, 2016 <br> Time:               1:30 p.m. <br> Place:              Courtroom 16 <br> Judge:             Hon. John F. Walter <br><br> Pre-Trial Conf.:   September 9, 2016 <br> Trial:                 September 27, 2016 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 1, 2016, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 16 of the above-entitled Court, located at 312 N. Spring Street, Los Angeles, California 90012, Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corp. ("Delbert"), and J. Paul Reddam ("Reddam") (collectively, "Defendants"), will, and hereby do, move for summary judgment under Federal Rule of Civil Procedure 56(b).

The grounds for this motion are that:

(1)     while Plaintiff ("CFPB" or the "Bureau") asserts that Defendants violated the provision in the Consumer Financial Protection Act of 2010 ("CFPA" or "Act") that prohibits unfair, deceptive, or abusive acts or practices ("UDAAP"), the Bureau's discovery responses make clear those federal claims are entirely predicated on purported violations of state law, which is impermissible because Congress did not incorporate state law into the CFPA;

(2)     the loans at issue are *not* void under state law, and thus there can be no UDAAP violation  here, because the law of each Subject State,[1] and the interests of preserving tribal sovereignty, compel the application of Cheyenne River Sioux Tribe ("CRST") law and the enforcement of the choice-of-law provision in those loan agreements;

(3)     the Bureau's discovery responses make clear that it is seeking to establish a federal usury limit in direct contravention of the CFPA;

(4)     the Defendants' conduct was not unfair, deceptive, or abusive as a matter of law, given the disclosures in the borrower loan agreements and the fact that a borrower could avoid harm by not proceeding with the loan;

---

[1] The Subject States are Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio. (ECF No. 27 ¶ 18.)

1  (5)   the Defendants' conduct was not unfair, deceptive, or abusive as a

2  matter of law, because the CFPB cannot seek to end run the prohibition on

3  establishing a federal usury limit by predicating any UDAAP violations on purported

4  violations of state usury laws;

5  (6)   there cannot be any UDAAP violations where Defendants reasonably

6  believed the choice-of-law provisions in the borrower loan agreements were

7  enforceable and governed by CRST law;

8  (7)   the CFPB is violating the Defendants' due process rights by seeking to

9  penalize them for UDAAP violations without fair notice, where the CFPB has

10  offered no guidance on the type of conduct prohibited as "abusive";

11  (8)   Reddam cannot be held individually liable for any of the alleged

12  UDAAP violations by CashCall, WS Funding, or Delbert, because the Bureau cannot

13  establish corporate liability, and the record shows that Reddam did not have the

14  requisite actual knowledge of, or reckless indifference to, the purported

15  misrepresentations; and

16  (9)   the CFPB's unprecedented structure raises profound constitutional

17  concerns, as recognized in *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir., argued

18  Apr. 12, 2016).

19  / /

20  / /

21  / /

22  / /

23  / /

24  / /

25  / /

26

27

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1   This Motion is based on this Notice of Motion and Motion, the Memorandum
2   of Points and Authorities, the Statement of Undisputed Facts and Conclusions of
3   Law, the Declaration of Caroline Van Ness, all pleadings and files in this matter, all
4   matters of which this Court may take judicial notice, including those set forth in the
5   contemporaneously filed Request for Judicial Notice, and upon such other and
6   further oral or documentary evidence as may be presented to the Court at or prior to
7   the hearing on this Motion. This Motion is made following the conference of counsel
8   pursuant to L.R. 7-3, which took place on June 23, 2016.

9
10   DATED: June 30, 2016       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11                             By:  _____ */s/ Thomas J. Nolan*_____
12                                          Thomas J. Nolan
13                                          *Attorneys for Defendants*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................... 1

UNCONTROVERTED FACTS ........................................................................ 2

STANDARD OF REVIEW .............................................................................. 6

ARGUMENT ................................................................................................... 6

I.      SUMMARY JUDGMENT SHOULD BE GRANTED TO
        DEFENDANTS BECAUSE THE UNDISPUTED FACTS
        ESTABLISH THAT THE BUREAU CANNOT PREVAIL AS A
        MATTER OF LAW ................................................................................ 6

        A.      The Action Impermissibly Rests On State Law Violations........... 6

                1.      Congress Did Not Authorize The CFPB To Conjure
                        Federal Claims From State Law Violations ....................... 7

                2.      The Bureau's Approach Would Allow Impermissible
                        Federal Entanglement In State Law Determinations ......... 9

                3.      The Undisputed Facts Establish That The Bureau Is
                        Pursuing No UDAAP Claims "Under Federal Law" ....... 10

        B.      CRST Law Applies And Thus The Bureau's Claims Fail ......... 12

        C.      CFPB's Attempt To Enforce A Federal Usury Limit Is
                Precluded.................................................................................... 15

        D.      Defendants' Conduct Was Not Deceptive, Unfair, Or
                Abusive ...................................................................................... 17

        E.      The CFPB Action Violates Due Process Because
                Defendants Did Not Have Fair Notice Of Possible
                Violations ................................................................................... 21

II.     REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER
        OF LAW............................................................................................. 22

III.    THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL ............ 24

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    page(s)

*Allen v. Great American Reserve Insurance Co.*,
    766 N.E.2d 1157 (Ind. 2002).................................................................13

*Beler v. Blatt, Hasenmiller, Leibsker & Moore LLC*,
    480 F.3d 470 (7th Cir. 2007)...................................................................8

*Bond v. United States*,
    134 S. Ct. 2077 (2014) .....................................................................7, 8

*Buckley v. Seymour*,
    679 So.2d 220 (Ala. 1996) ...................................................................13

*CFPB v. Gordon*,
    819 F.3d 1179 (9th Cir. 2016)...........................................................17, 22

*CFPB v. IrvineWebWorks, Inc.*,
    SACV 14-1967 JVS (ANx),
    2016 WL 1056662 (C.D. Cal. Feb. 5, 2016) ...........................................17

*CFPB v. Morgan Drexen, Inc.*,
    60 F. Supp. 3d 1082 (C.D. Cal. 2014)...................................................25

*CFPB v. The Mortgage Law Group, LLP*,
    No. 14-CV-513-BBC,
    2016 WL 183712 (W.D. Wis. Jan. 14, 2016)...........................................7

*Century Business Services, Inc. v. Barton*,
    197 Ohio App. 3d 352 (2011) ...............................................................12

*Chamber of Commerce v. Whiting*,
    563 U.S. 582 (2011)............................................................................7

*Corporate Commission of Mille Lacs Band of Ojibwe Indians v. Money
    Centers of America, Inc.*,
    Civ. No. 12-1015 (RHK/LIB),
    2013 WL 5487419  (D. Minn. 2013)......................................................12

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012)........................................................17, 18, 19

*Evans v. Harry Robinson Pontiac-Buick, Inc.*,
    336 Ark. 155 (1999) ......................................................................13, 14

*F.T.C. v. Commerce Planet, Inc.*,
    815 F.3d 593 (9th Cir. 2016)...............................................................22

*F.T.C. v. Garvey*,
    383 F.3d 891 (9th Cir. 2004)...............................................................23

*F.T.C. v. Gill*,
    71 F. Supp. 2d 1030 (C.D. Cal. 1999)..................................................22

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*F.T.C. v. Grant Connect, LLC*,
  763 F.3d 1094 (9th Cir. 2014) ................................................................. 22

*F.T.C. v. J.K. Publications, Inc.*,
  99 F. Supp. 2d 1176 (C.D. Cal. 2000) .................................................... 22

*F.T.C. v. Medical Billers Network, Inc.*,
  543 F. Supp. 2d 283 (S.D.N.Y. 2008) .................................................... 24

*F.T.C. v. Medicor LLC*,
  No. CV011896CVMEX,
  2001 WL 765628 (C.D. Cal. June 26, 2001) ......................................... 24

*F.T.C. v. Publishers Business Services, Inc.*,
  540 F. App'x 555 (9th Cir. 2013) ........................................................... 23

*F.T.C. v. Zamani*,
  No. SACV 09-0977
  2011 WL 2222065 (C.D. Cal. June 6, 2011) ................................... 23, 24

*F.C.C. v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ............................................................................ 21

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
  561 U.S. 477 (2010) ................................................................................ 25

*Gallego v. Northland Group Inc.*,
  814 F.3d 123 (2d Cir. 2016) .................................................................. 8, 9

*Gnadt v. Durr*,
  208 Kan. 783 (1972) ................................................................................ 16

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995) ................................................................................ 20

*Hagstrom v. American Circuit Breaker Corp.*,
  518 N.W.2d 46 (Minn. Ct. App. 1994) ................................................... 13

*Hall v. Sprint Spectrum L.P.*,
  376 Ill. App. 3d 822 (2007) .................................................................... 12

*Hobin v. Coldwell Banker Residential Affiliates*,
  144 N.H. 626 (2000) ................................................................................ 12

*Hodas v. Morin*,
  442 Mass. 544 (2004) ........................................................................ 12, 13

*Illinois v. CMK Investments, Inc.*,
  No. 14 C 2783,
  2014 WL 6910519 (N.D. Ill. Dec. 9, 2014) ........................................... 16

*Kentucky National Insurance Co. v. Empire Fire & Marine Insurance Co.*,
  919 N.E.2d 565 (Ind. Ct. App. 2010) ..................................................... 13

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*In re Late Fee & Over-Limit Fee Litigation,*
        528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd,*
        741 F.3d 1022 (9th Cir. 2014) ................................................................ 18

*Leiter Minerals, Inc. v. United States,*
        352 U.S. 220 (1957) ................................................................................. 9

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.,*
        439 U.S. 299 (1978) ................................................................................ 20

*McDonnell v. United States,*
        No. 15-474,
        2016 WL 3461561 (U.S. June 27, 2016) ................................................ 21

*Mell v. Goodbody & Co.,*
        10 Ill. App. 3d 809 (1973) ...................................................................... 14

*Michigan v. Bay Mills Indian Community,*
        134 S. Ct. 2024 (2014) ............................................................................ 15

*Montana v. United States,*
        450 U.S. 544 (1981) .......................................................................... 14, 15

*Mountain States Adjustment v. Cooke,*
        Court of Appeals No. 15CA0605,
        2016 WL 2957746 (Colo. App. May 19, 2016)
        (to be published in P.3d) ................................................................... 12, 13

*North Bergen Rex Transport, Inc. v. Trailer Leasing Co.,*
        158 N.J. 561 (1999) ................................................................................ 12

*Parth v. Pomona Valley Hospital Medical Center,*
        630 F.3d 794 (9th Cir. 2010) .................................................................... 6

*Polaris Sales, Inc. v. Heritage Imports, Inc.,*
        879 So. 2d 1129 (Ala. 2003) ................................................................... 13

*Rosenfeld v. JPMorgan Chase Bank, N.A.,*
        732 F. Supp. 2d 952 (N.D. Cal. 2010) .................................................... 18

*San Diego Gas & Electric Co. v. Gilbert,*
        375 Mont. 517 (2014) ............................................................................. 13

*Seeman v. Philadelphia Warehouse Co.,*
        274 U.S. 403 (1925) ................................................................................ 14

*Shaffer v. Board of School Directors,*
        730 F.2d 910 (3d Cir. 1984) ...................................................................... 9

*Soremekun v. Thrifty Payless, Inc.,*
        509 F.3d 978 (9th Cir. 2007) .................................................................... 6

*State Farm Mutual Automobile Insurance Co. v. Hodgkiss-Warrick,*
        413 S.W.3d 875 (Ky. 2013) .................................................................... 13

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*Swanson v. Image Bank, Inc.,*
 206 Ariz. 264 (2003) ..................................................... 12

*Torres v. McClain,*
 140 N.C.App. 238 (2000) .............................................. 12

*United Brotherhood of Carpenters & Joiners of America v. Building &*
 *Construction. Trades Department, AFL-CIO,*
 770 F.3d 834 (9th Cir. 2014) ........................................... 7

*United States v. Mazurie,*
 419 U.S. 544 (1975), ..................................................... 15

*United States v. Neal,*
 776 F.3d 645 (9th Cir. 2015) ......................................... 20

*United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.,*
 108 N.M. 467 (1989) ................................................. 12, 13

*Vu Nguyen v. Aurora Loan Services, LLC,*
 614 F. App'x 881 (9th Cir. 2015) .................................... 18

*Wade v. Regional Credit Association,*
 87 F.3d 1098 (9th Cir. 1996) ........................................... 8

*Welsbach Electric Corp. v. MasTec North America, Inc.,*
 7 N.Y.3d 624 (N.Y. 2006) ......................................... 12, 13

*Williams v. Lee,*
 358 U.S. 217 (1959) ..................................................... 15

*Wilson v. Frito-Lay North America, Inc.,*
 961 F. Supp. 2d 1134 (N.D. Cal. 2013) ........................... 21

*Worcester v. Georgia,*
 31 U.S. 515 (1832) ..................................................... 15

*Young Oil Co. v. Racetrac Petroleum, Inc.,*
 757 So.2d 380 (Ala. 1999) ........................................... 16

**Statutes**

12 U.S.C. § 5481 ............................................................ 15, 20

12 U.S.C. § 5491 ................................................................. 25

12 U.S.C. § 5492 ................................................................. 20

12 U.S.C. § 5497 ................................................................. 25

12 U.S.C. § 5511 ......................................................... 8, 9, 11

12 U.S.C. § 5517 ........................................................... 16, 20

12 U.S.C. § 5531 ................................................... 8, 11, 17, 19, 20

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  12 U.S.C. § 5551 ..................................................................................... 9, 20

2  12 U.S.C. § 5565 ........................................................................................ 24

3  15 U.S.C. § 45(n) ........................................................................................ 17

4  15 U.S.C. § 1692n ......................................................................................... 9

5  Cal. Civ. Code § 1789.30 *et seq.* ............................................................... 20

6  Cal. Fin. Code § 23000 *et seq.* .................................................................. 20

7  **Other Authorities**

8  Restatement (Second) of Conflict of Laws § 187 ................................. 12, 13

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**PRELIMINARY STATEMENT**

The Bureau seeks to expand its authority by pursuing claims beyond the reach of federal law, and presses forward despite the fact that legal counsel for Defendants, Western Sky Financial, LLC ("Western Sky"), and various sophisticated investors concluded before the loan agreements at issue were enforced that they were legal and enforceable. Summary judgment should be entered for the Defendants.

First, the equivocation of the pleadings that the Bureau relied upon during the Rule 12(c) motion briefing has now been distilled, and the Bureau's discovery responses establish that its claims are predicated entirely on Defendants' purported violations of state law. The Bureau does not and cannot show any independent violation of federal law, as it contended it could do at the pleading stage. Congress did not incorporate state law into the Act from which the Bureau's claims arise, however, so the action must be dismissed. Moreover, it is now clear that the Bureau is, in fact, seeking to "establish" a federal usury limit in defiance of Congress.

Second, in its attempt to cast aside the tribal law that governs the Western Sky loans, the Bureau fatally ignores well-established choice-of-law precedent in the Subject States compelling the application of Cheyenne River Sioux Tribe ("CRST") law, as well as centuries of precedent regarding tribal sovereignty. In order to pursue a case based upon the usury laws of the Subject States to declare the loan agreements void and unenforceable, the Bureau erroneously maintains that state laws govern the loan agreements, despite a valid choice-of-law provision in the loan agreements. But as counsel for Western Sky, counsel for Defendants, and counsel for several hedge funds that made loans collateralized by the loan program all concluded, state law does not govern here, and under the CRST law that does govern, the loans at issue are *not* void. Thus, there can be no UDAAP violation here.

Third, the Bureau cannot show that Defendants engaged in deceptive, unfair, or abusive conduct. The prominent disclosures in the borrower loan agreements that CRST law governed the contract, which borrowers could avoid by simply refusing to

sign the agreement, demonstrate that the alleged conduct cannot be unfair, deceptive, or abusive. Further, the Bureau is infringing on the Defendants' due process rights, given the lack of notice as to what conduct is prohibited.

Finally, and quite clearly, Reddam cannot be held individually liable for the alleged violations by CashCall, WS Funding, or Delbert. The Bureau cannot establish corporate liability, and the record establishes that Reddam did not have the requisite actual knowledge of, or reckless indifference to, the purported misrepresentations here. Indeed, the undisputed facts establish that the opposite is true and that both the companies and Reddam sought and obtained assurances that the loan agreements were governed by CRST law and were valid and enforceable. Summary judgment in favor of Reddam is thus compelled.

## UNCONTROVERTED FACTS

CashCall is a lender to consumers and small businesses. (SS ¶ 1.)[1] Paul Reddam was the CEO and sole owner of CashCall and Delbert between January 1, 2010, and August 1, 2013. (SS ¶¶ 2, 5.) Delbert was a loan service and collection company, but is now defunct. (SS ¶ 4.) CashCall began doing business in consumer loans in 2003. (SS ¶¶ 1, 16.)

Since at least 2007, CashCall was advised by regulatory counsel, Washington, D.C. lawyer Claudia Callaway of Katten Muchin Rosenman LLP ("Katten"). (SS ¶¶ 8-14.) In 2009, Callaway recommended that CashCall purchase loans made by tribal lenders, whose loans are governed by tribal law, and have no usury limits. (SS ¶ 21.) Callaway recommended Martin A. "Butch" Webb, who is an enrolled member of the CRST, as a tribal lender. (SS ¶¶ 22-25.) Webb had engaged in

---

[1] All internal alterations, quotation marks, and citations are omitted and all emphasis is added herein, unless otherwise noted. "SS" refers to the concurrently and separately filed Defendants' Statement of Undisputed Facts and Conclusions of Law. All references to Defendants' receipt of legal advice in this matter are subject to a limited waiver of privilege only as to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by CashCall/WS Funding.

consumer lending for more than 20 years, including serving as the President of Western Dakota Bank. (SS ¶¶ 26, 28.) Webb had also originated and funded loans to residents of various states from his office on the Cheyenne River Indian Reservation in South Dakota (the "Reservation"), under the same tribal model advocated by Katten. (SS ¶ 29.)

Western Sky was created in 2009 and owned by Webb. (SS ¶¶ 30-31, 73.) All essential activities of Western Sky occurred on the Reservation. (SS ¶¶ 42, 52-61, 63-74.) Western Sky was lending under the same tribal model advocated by Katten. (SS ¶ 30.) Western Sky was licensed by the CRST and operated exclusively out of offices and call centers it maintained on the Reservation. (SS ¶¶ 32, 42, 55.)

Western Sky drafted and approved the underwriting guidelines for the loans. (SS ¶¶ 56-57, 59.) If a potential loan met the guidelines, then a borrower was directed, via e-mail from Western Sky, to the Western Sky website where Western Sky provided the borrower with disclosures about the loan, and the borrower signed loan documents electronically. (SS ¶ 74.) Customers who telephoned Western Sky heard, "We are a Native American-owned company operating on the bounds of the Cheyenne River Sioux Reservation," and were generally routed to the Western Sky call center on the Reservation. (SS ¶¶ 52-53.) The acceptance of the completed loan agreement and funding of the loan were performed on the Reservation. (SS ¶¶ 42, 58, 60, 68-73.)

Between January 2010 to August 2013, Western Sky was the one of the largest private employers on the Reservation, employing more than 100 people. (SS ¶ 43.) Given the high rates of poverty in the CRST, where the unemployment rate is 88%, the Reservation benefited greatly from Western Sky's presence. (SS ¶¶ 45-51.) Western Sky constructed new facilities, including a call center and office, and a communication infrastructure (for which CashCall paid half the cost), and Western Sky invited CashCall to the Reservation to train employees drawn from the tribal community. (SS ¶¶ 54-55, 63.)

The terms and conditions of the Western Sky loans distinguish them from loans that have been deemed to be "predatory" or "abusive" to consumers, such as payday loans. (SS ¶¶ 150, 154.) First, Western Sky loans have a longer payback period ranging from 6 to 84 months, whereas payday loans are typically two weeks. (SS ¶¶ 132, 151, 155.) Second, Western Sky loans are self-amortizing and do not contain a balloon payment, whereas payday loans contain a balloon payment of the loan balance at the end of the period. (SS ¶¶ 151, 157.) Third, Western Sky loans contain no prepayment penalties. (SS ¶ 158.) And fourth, unlike payday loans, Western Sky loans were issued in compliance with strict ability-to-repay guidelines that it imposed that considered a consumer's credit score, monthly income, monthly residual income, and employment verification. (SS ¶¶ 151, 156.)  Indeed, Western Sky approved less than ten percent of loan applicants.  (SS ¶¶ 59, 69.)

The Western Sky loans contain a choice-of-law provision, approved by Katten, which prominently stated in bold that the "Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." (SS ¶¶ 75, 83-90.) Borrowers further acknowledged "by entering into this Agreement [they] are voluntarily availing [themselves] of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation," and that the agreement "is governed by . . . the laws of the Cheyenne River Sioux Tribe." (SS ¶¶ 76-79.)

CashCall "relied heavily" on Katten and Callaway, who was "well versed in regulatory compliance and consumer lending." (SS ¶ 95.) Before purchasing loans originated and funded by Western Sky, CashCall sought and obtained advice of counsel as to whether the Western Sky loans would be subject to state law. (SS ¶¶ 21, 81-82, 86-89.) After obtaining such advice, CashCall created WS Funding, a wholly owned subsidiary of CashCall. (SS ¶ 6.) Katten issued numerous legal opinions to both CashCall and its lenders on the enforceability of the choice-of-law provision in the agreement and the protections of tribal sovereignty, concluding that

"a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements" because those states will "enforce the choice of CRST law set forth in the loan agreements," and further, "upon assignment, CashCall, as assignee, will be entitled to the . . . choice of law rights held by Western Sky." (SS ¶¶ 81-91, 102-03.)

CashCall also had "dozens of conversations" with Katten attorneys about CashCall's rights to purchase and enforce the terms of the loans. (SS ¶ 92.) Katten also repeatedly told third parties, namely CashCall lenders and their counsel, orally and in writing, that the loans were subject to tribal law, not state law. (SS ¶¶ 83-85, 90, 93.) CashCall attended conferences where Callaway spoke about the CashCall program, and explained that "the loans would be subject to tribal law and not state law, and that the tribal lender could assign the paper to CashCall and CashCall could collect it." (SS ¶ 94.) Likewise, Western Sky's counsel provided CashCall and its lenders with opinions and certificates attesting to Western Sky's ability to make the loans under CRST law and transfer the loans to CashCall without losing the applicability of CRST law. (SS ¶¶ 96-97, 100-01, 104-05.) Finally, CashCall drew "additional comfort" from the fact that "in each of our financing transactions, the lenders to CashCall had very sophisticated, very expensive counsel who drilled very deep into this" with the tribal attorney and Katten, and "came to the conclusion that the opinion was correct, and they authorized their client to participate in this financing." (SS ¶ 106.)

Reddam did not personally collect on or seek to collect on the Western Sky loans. (SS ¶¶ 107-08.) Reddam was aware of the opinions of Katten, and counsel for Western Sky and lenders, that the tribal choice-of-law provisions in the Western Sky loan agreements were legally effective. (SS ¶¶ 109-11.) His understanding was that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall. (SS ¶ 112.)

## STANDARD OF REVIEW

Summary judgment "must be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010).

## ARGUMENT

### I.   SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS BECAUSE THE UNDISPUTED FACTS ESTABLISH THAT THE BUREAU CANNOT PREVAIL AS A MATTER OF LAW

The Bureau has not alleged claims cognizable under the CFPA, and thus summary judgment must be entered for Defendants. *See Parth*, 630 F.3d at 805.

### A.   The Action Impermissibly Rests On State Law Violations

The Court denied Defendants' Rule 12(c) motion based on the Bureau's contention that "the Complaint does not allege that Defendants violated the CFPA *because* they violated state law, but because their conduct in taking and demanding payment from consumers for purported loan debts that they did not owe satisfies the requisite elements of the UDAAP prohibitions under the CFPA." ECF No. 110 at 2. But now that its claims have been distilled through discovery, the Bureau acknowledges it is pursuing no violations of the CFPA independent of the alleged state law violations. *Compare* ECF No. 107 at 12 ("Nowhere however does the Complaint allege that state-law violations are *per se* CFPA violations"), *with* SS ¶ 120 (Defendants violated UDAAP because "the loans that Defendants serviced and collected on were void under state laws or the state laws otherwise did not obligate consumers to pay"). The Bureau's discovery responses establish that its sole basis for contending the alleged violations are unfair, deceptive, or abusive hinges entirely on

purported violations of state law. Because Congress did not incorporate state law into the Act being prosecuted, the Bureau's claims fail as a matter of law.

### 1. Congress Did Not Authorize The CFPB To Conjure Federal Claims From State Law Violations

The federal government "possesses only limited powers." *Bond v. United States*, 134 S. Ct. 2077, 2086 (2014). There must be a "clear statement" from Congress to "presume" that a federal statute has transformed a violation of state law into one of federal law. *Id.* at 2090, 2093-94 (a "clear indication" from Congress is required to "intrude[] on the police power of the States"); *see also United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834, 843 (9th Cir. 2014) (no actionable RICO claim exists for a state law violation absent conduct that independently violates federal law).

Business licensing resides within a state's police power. *Chamber of Commerce v. Whiting*, 563 U.S. 582, 604 (2011) ("Regulating in-state businesses through licensing laws has never been considered . . . an area of dominant federal concern."). Indeed, the Bureau was recently found to have overstepped its bounds by attempting to prosecute attorneys for misrepresenting their services, failing to make disclosures, and collecting advance fees in violation of the CFPA and Regulation O, because "[a]n attorney's violation of a state rule of professional conduct or regarding client trust accounts does not *automatically equate* to an unfair or deceptive mortgage loan practice." *CFPB v. The Mortg. Law Grp., LLP*, --- F. Supp. 3d ---, 2016 WL 183712, at *1, *9 (W.D. Wis. Jan. 14, 2016).[2] As *Mortgage Law Group*

---

[2] The court held that the Bureau "has not shown that Congress intended [it] . . . to act as a federal version of the state bar authorities," as "regulating the general professional conduct of attorneys . . . is a task that has been reserved traditionally for state authorities." *Id.* at *10. It held, "[e]ven assuming . . . attorneys providing mortgage assistance relief services have engaged in practices that violate state licensing regulations," the Bureau "failed to explain why that correlation would justify . . . regulat[ing] attorney conduct under state law." *Id.* ("If attorneys who provide mortgage assistance relief services were more likely to fail to pay their state income tax, it would not be reasonable for [the Bureau] to seek to enforce state tax

*(cont'd)*

1 shows, Congress did not legislate that violations of state law could be predicates for
2 UDAAP claims. *To the contrary*, the Act restrictively states that it prohibits
3 "committing or engaging in an unfair, deceptive, or abusive act or practice **under**
4 **Federal law**." 12 U.S.C. §§ 5511(a), 5531(a). If Congress wanted to federally
5 prohibit conduct because it violates state law, it could, would, and needed to have
6 said so clearly. *Bond*, 134 S. Ct. at 2090.

7       The Bureau has maintained that its claims here are "directly analogous" to "a
8 debt collector's attempts to collect amounts . . . impermissible to collect under state
9 law" which violate the Fair Debt Collection Practices Act ("FDCPA"). (ECF No.
10 107 at 10.) Indeed, the Bureau has relied extensively on the FDCPA for purposes of
11 interpreting the CFPA. (*Id.* at 9-14.) But courts reject efforts to use the FDCPA to
12 enforce state statutes, because the court "must determine not whether [the defendant]
13 violated the state statute, but whether it violated the federal Act." *Wade v. Reg'l*
14 *Credit Ass'n*, 87 F.3d 1098, 1100 (9th Cir. 1996) (holding "collection efforts,
15 although apparently in violation of state law, were innocuous and not in violation of
16 the FDCPA"); *see also Beler v. Blatt, Hasenmiller, Leibsker & Moore LLC*, 480 F.3d
17 470, 473-74 (7th Cir. 2007) (FDCPA "does not so much as hint at being an
18 enforcement mechanism for other rules of state . . . law.").

19       Recently, the Second Circuit rejected FDCPA claims asserting that conduct
20 was deceptive and unfair in violation of New York City regulations because "*there is*
21 *no indication* that Congress intended" the FDCPA "to incorporate state- or local-law
22 standards of conduct." *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 127 (2d Cir.
23 2016). The court pointed to the FDCPA section entitled "Relation to State Laws,"
24 which "provides that the FDCPA preempts state laws to the extent that they are
25 'inconsistent' with the FDCPA, and further clarifies that 'a State law is not
26 inconsistent with the FDCPA if the protection such law affords any consumer is

27 _____
*(cont'd from previous page)*
28 laws against those attorneys under the authority granted by Congress regarding mortgage loans.").

greater than the protection provided by the FDCPA.'" *Id.* (quoting 15 U.S.C. § 1692n). Thus, "[i]f the FDCPA *itself incorporated applicable state and local law, that clarification would be unnecessary*." *Id.* The CFPA contains a nearly identical "Relation to State Laws" provision. 12 U.S.C. § 5551.

Finally, far from furthering Congress's purpose to create a consistent body of federal law in the CFPA, as explained in 12 U.S.C. § 5511(a), the CFPB's theory of state-law incorporation would turn the agency into the chief national (and international and tribal) enforcer of the varying laws of all 50 states—a result inconsistent with both the CFPA and core principles of federalism. In fact, the present complaint provides a demonstrative example, as the Bureau attempts to embroil this Court in a survey of state usury statutes and choice-of-law doctrines that, because of the localized nature of those laws, allowed the Bureau to allege conduct in only 16 of the 47 states where Western Sky consumers resided. (SS ¶ 44.)

## 2. The Bureau's Approach Would Allow Impermissible Federal Entanglement In State Law Determinations

The Bureau's approach would also require federal courts to resolve in the first instance questions of state law that are properly the province of state officials and state courts. *See, e.g.*, *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 229 (1957) (reiterating that "federal courts do not decide" federal questions "on the basis of preliminary guesses regarding local law"); *Shaffer v. Bd. of Sch. Dirs.*, 730 F.2d 910, 913 (3d Cir. 1984) ("[W]here the underlying issue of state law is a question of first impression with important implications . . . factors weighing in favor of state court adjudication certainly predominate."). If UDAAP claims can be predicated upon violations of state law, CFPA actions brought by the Bureau will end up forcing federal courts to adjudicate numerous questions regarding the scope and content of state laws including, at issue here, state usury and licensing laws.

3. The Undisputed Facts Establish That The Bureau Is Pursuing No
UDAAP Claims "Under Federal Law"

As discovery has established, the Bureau does not contend that Defendants violated a federal rule or regulation in how they collected the loans, what they said to borrowers on phone calls or in letters, or any other conduct that would be unlawful apart from a determination that state law applied to, and voided, the Western Sky loans. Identifying Defendants' purported unfair, abusive, and deceptive practices, the Bureau claims simply that "*[s]everal states have adopted laws* that render small-dollar loans void if they exceed the usury limit," which means "*in these states*, the lender has no legal right to collect money from consumers in repayment of the loan" but the Defendants "serviced and collected payments on void or uncollectable WS Loans made to residents of the Subject States;" and that because "[n]either CashCall nor WS Funding held the requisite license when acquiring WS Loans made to consumers in" certain states, "[n]either Western Sky, nor Defendants, *had a legal right to collect money from consumers in those states* in repayment of such loans." (SS ¶¶ 117-18.) The Bureau maintains that Defendants "engaged in the full array of collection activity on WS Loans" but "did not disclose to consumers in the Subject States that their loans were void or that, *under applicable state laws*, they were not obligated to make some or all of the payments." (SS ¶ 119.)

The only support the Bureau offers for its contention that any injury suffered by consumers was not outweighed by countervailing benefits to consumers or competition is that "consumers are harmed by paying money they did not owe to Defendants because the loans that Defendants serviced and collected on were void *under state laws or the state laws* otherwise did not obligate consumers to pay" and "Defendants' competitors were obligated to abide by licensing and usury *laws of the Subject States with which Defendants failed to comply*." (SS ¶ 120.)

The Bureau offers a similar explanation as to how "[c]onsumers in the Subject States who received WS Loans" were harmed, did not know how state usury and

1  licensing laws "impact[ed]" their loans or "understand[] that those state laws vitiated

2  Defendants' collection rights," and why consumers would find it "material" that the

3  loans "were void or not subject to a repayment obligation under the laws of the

4  Subject States." (SS ¶ 121.) Namely, because "a violation of usury limits or the

5  failure to comply with licensing requirements [in the Subject States] will render a

6  small-dollar loan void or will limit the consumer's obligation to repay the loan,"

7  Defendants "extract[ed] funds from consumers' bank accounts to pay obligations

8  that *under state law* were void." (SS ¶ 121.)

9  The CFPB also asserts that Defendants "fail[ed] to inform consumers that

10  *state law had vitiated all or part of the loans* or the consumer's obligation to repay

11  them and . . . misrepresent[ed] that the WS Loans *were not subject to state law*," and

12  that the consumers "could not have avoided financial injury because they were

13  unlikely to know or understand that Defendants' loans *violated state-usury and*

14  *licensing laws*." (SS ¶ 122.) The Bureau contends that Defendants "called, emailed,

15  and mailed letters to consumers to demand payment," but the borrowers "did not

16  understand that the loans were void or otherwise did not need to be repaid," and "[i]f

17  borrowers understood *that state law vitiated their obligation to repay . . .* , they

18  would not have paid the money to Defendants." (SS ¶ 123.)

19  In short, the Bureau has not demonstrated any "conduct in taking and

20  demanding payment from consumers for purported loan debts that they did not owe"

21  in violation "of the UDAAP prohibitions under the CFPA." ECF No. 110 at 2.

22  Instead, as discovery and the record now confirm, each of the Bureau's claims turns

23  on a predicate conclusion that the loans violated *only* state law—if they did not

24  violate state law, there is no basis for Defendants' liability. Simply put, there is no

25  claim based on an "unfair, deceptive, or abusive act or practice **under Federal law**."

26  12 U.S.C. §§ 5511(a), 5531(a).

27

28

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**B.**     <u>CRST Law Applies And Thus The Bureau's Claims Fail</u>

In addition, the Bureau's claims fail because the state laws upon which they arise do not even apply. Every loan made by Western Sky contains a choice-of-law clause, as well as the following, in bold, at the beginning of the agreement:  "**This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" (SS ¶ 75.) Other provisions also recite that CRST law governs. (SS ¶¶ 76-79.)[3]

The Subject States employ different tests to determine whether choice-of-law provisions govern. Most states follow the Restatement (Second) of Conflict of Laws ("Second Restatement"): choice-of-law provisions govern unless "[(1)] there is no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice[;] or [(2)] application of the law of the chosen state would be contrary to a *fundamental* policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." <u>Second Restatement § 187</u>.[4] A reasonable basis for the choice of law exists when parties choose the law of the place where a party has its principal place of business, or where the contract is formed so long as its formation there is not "wholly fortuitous." *Id.* <u>§ 187(2) cmt. e</u>; *accord* <u>Hodas, 442 Mass. at 550</u>

---

[3] Courts enforce and apply tribal law where the contract provides for its application. *See* <u>*Corporate Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am., Inc.*, 2013 WL 5487419, at *5 n.2 (D. Minn. 2013)</u> (choice-of-law provision).

[4] *See* <u>*Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 266-68 (2003)</u>; <u>*Mountain States Adjustment v. Cooke*, --- P.3d ---, 2016 WL 2957746, at *3-4, *6-7 (Colo. App. May 19, 2016)</u>; <u>*Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822, 825-27 (2007)</u>; <u>*Hodas v. Morin*, 442 Mass. 544, 548-53 (2004)</u>; <u>*Hobin v. Coldwell Banker Residential Affiliates*, 144 N.H. 626, 628-29 (2000)</u>; <u>*N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 568-69 (1999)</u>; <u>*Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 628-30 (2006)</u>; <u>*Torres v. McClain*, 140 N.C. App. 238, 241 (2000)</u>; <u>*Century Bus. Servs., Inc. v. Barton*, 197 Ohio App. 3d 352, 366-68 (2011)</u>. *See also* <u>*United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 108 N.M. 467, 470-71 (1989)</u> (substantively similar to Second Restatement).

1   ("place of partial performance considered to be sufficient to establish a reasonable

2   basis for the parties' choice of law"); Cooke, 2016 WL 2957746, at *3.

3       A minority of states employ other variations. Three states have adopted

4   modified versions of the Second Restatement,[5] while the remaining three use even

5   more permissive tests.[6] Thus, the law respects and defaults to the parties' choice of

6   law. See Second Restatement § 187(2) cmt. f ("Prime objectives of contract law . . .

7   may best be attained in multistate transactions by letting the parties choose the law to

8   govern the validity of the contract and the rights created thereby.").[7]

9       Applying the law of each Subject State, CRST law governs here. Every

10   Western Sky loan contains a prominent choice-of-law clause, as well as other

11

---

12   [5] See Kentucky Nat'l Ins. Co. v. Empire Fire & Marine Ins. Co., 919 N.E.2d 565, 575
13   (Ind. Ct. App. 2010) (choice-of-law applied after determining state with most
     significant relationship, including "(1) the place of contracting, (2) the place of
14   negotiation, (3) the place of performance, (4) the location of the subject matter of the
     contract, and (5) the domicil, residence, nationality, place of incorporation and place
15   of business of the parties"); State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick, 413
     S.W.3d 875, 878-80 (Ky. 2013) (same as Indiana, and considers state public policy);
16   San Diego Gas & Elec. Co. v. Gilbert, 375 Mont. 517, 520 (2014) (choice-of-law
     governs unless: "(1) but for the choice of law provision, Montana law would apply
17   under § 188 of the Restatement; (2) Montana has a materially greater interest in the
     particular issue than the parties [sic] chosen state; and (3) application of the chosen
18   state's law would contravene a Montana fundamental policy").

19   [6] See Buckley v. Seymour, 679 So. 2d 220, 225-226 (Ala. 1996) (choice-of-law
     governs unless it contravenes public policy); Evans v. Harry Robinson Pontiac-
20   Buick, Inc., 336 Ark. 155, 161-63 (1999) (choice-of-law governs if chosen state has a
     reasonable relation to parties or transaction); Hagstrom v. Am. Circuit Breaker
21   Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994) (choice-of-law governs if there is
     good faith by the parties and without intent to evade the law, and noting in such
22   circumstances that parties may agree that either state law shall govern).

23   [7] See also Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So. 2d 1129, 1133 (Ala.
     2003) ("Alabama law has long recognized the right of parties to an agreement to
24   choose a particular state's laws to govern an agreement."); Cooke, 2016 WL
     2957746, at *3 ("Choice of law provisions [in Colorado] are ordinarily given effect
25   as . . . a clear manifestation of the parties' intentions."); Allen v. Great Am. Reserve
     Ins. Co., 766 N.E.2d 1157, 1162 (Ind. 2002) ("Indiana choice of law doctrine favors
26   contractual stipulations as to governing law."); Hagstrom, 518 N.W.2d at 48
     ("Minnesota traditionally enforces parties' contractual choice of law provisions.");
27   United Wholesale, 108 N.M. at 469 (deferring to choice-of-law provision "upholds
     New Mexico's strong public policy of freedom to contract"); Welsbach Elec., 7
28   N.Y.3d at 629 ("Where an agreement is clear and unambiguous, a court is not free to
     alter it and impose its personal notions of fairness.").

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

disclosures regarding the governing tribal law. (SS ¶¶ 75-79.) It is also undisputed that Western Sky conducted all relevant activities exclusively from offices on the Reservation (SS ¶¶ 42, 52-61, 63-74), Western Sky had sole discretion to veto or refuse any condition, term, or feature of the loans (SS ¶¶ 57, 59, 64, 72), and the final approval necessary was performed on the Reservation solely by Western Sky. (SS ¶¶ 58, 68, 70-2.) Western Sky employees would also perform a final audit and fund the loan from the Reservation. (SS ¶¶ 68, 70, 73.) Thus, there is a substantial relationship between the contracting parties and the transaction to the CRST and its laws, because Western Sky operated exclusively on the CRST Reservation, and had ultimate control over the review, issuance, and funding of the loans.

As to "fundamental public policy," it is well settled that borrowers are free to contractually accept higher interest rates than permitted in their home jurisdictions. *See Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 407-08 (1925) ("[Contracts] are to be governed by the law of the place of performance, and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, *the parties may stipulate for the higher interest, without incurring the penalties of usury*. . . . If the rate of interest be higher at the place of the contract than at the place of performance the parties may lawfully contract in that case also for the higher rate.").[8]

Further, no Subject State has a materially greater interest than the CRST in the determination of the applicable interest rate. "A tribe may regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members, through . . . contracts, leases, or other arrangements." *Montana v. United States*, 450

---

[8] *See also Mell v. Goodbody & Co.*, 10 Ill. App. 3d 809, 813-14 (1973) (New York usury law applied per agreement, even though interest rate was higher than permitted by Illinois law, because "[a]ny rate per cent sanctioned by the laws of the place where the contract is made, or by the substituted laws of the place where it is to be performed, or paid, will be recognized and enforced in the courts of other governments, whose laws would make such rate usurious"); *Evans*, 336 Ark. at 161-63 (1999) (Texas law governed though interest rate was usurious in Arkansas).

U.S. 544, 565 (1981). Given the extreme poverty and unemployment on the Reservation (SS ¶¶ 45-51), it is crucial to the CRST's autonomy and economic vitality that its residents and businesses be able to transact business on an interstate basis with certainty that courts will respect the choice of the Tribe's law. "[T]ribes across the country, as well as entities and individuals doing business with them, have for many years relied on [precedent preserving tribal sovereignty], negotiating their contracts and structuring their transactions against a backdrop of [that precedent]." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 (2014).

Furthermore, to the extent there could be any dispute as to the respective interests of the CRST and the Subject States, tribal sovereignty validates that tribal law, not state law, governs here. Tribes have "sovereignty over both their members and their territory." *United States v. Mazurie*, 419 U.S. 544, 557 (1975); *Worcester v. Georgia*, 31 U.S. 515, 559 (1832). "[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220 (1959). "[U]nless and until Congress acts, the tribes retain their historic sovereign authority." *Bay Mills*, 134 S. Ct. at 2030. Congress has not acted to the contrary here. Rather, Congress' action evidences an intent not to disturb the doctrine of tribal sovereignty.[9] Given the great deference to tribes under that doctrine, such considerations weigh in favor of applying tribal law under each Subject State's choice-of-law doctrine. Implicit in the very notion of sovereignty is the authority of the sovereign to develop and enforce its own law, and disregarding the parties' choice of CRST law here would undermine tribal sovereignty.

## C.   CFPB's Attempt To Enforce A Federal Usury Limit Is Precluded

Section 5517(o) of the Act provides that "[n]o provision of this title shall be

---

[9] Indeed, the Act envisions tribes as co-equals to the states, defining "State" to include "any federally recognized Indian tribe," demonstrating a federal policy of promoting tribal self-government, sovereignty, and economic self-sufficiency. 12 U.S.C. § 5481(27).

construed as conferring authority on the Bureau to establish a usury limit." 12 U.S.C. § 5517(o). The Court's Rule 12(c) Order held "the Bureau is not seeking to establish a usury limit" in violation of Section 5517(o) but "is seeking to enforce a prohibition on collecting amounts that consumers do not owe." ECF No. 110 at 2. The Bureau's discovery responses make clear that is not the case, and thus summary judgment is in order. *See Illinois v. CMK Invs., Inc.*, 2014 WL 6910519 at *7 n.5 (N.D. Ill. Dec. 9, 2014) (Bureau cannot "challenge the account protection fee under the [CFPA] for being usurious [under Illinois law], for the [Bureau] has no authority 'to establish a usury limit applicable to an extension of credit.'").

Here, by deeming illegal any attempt to collect on a loan with an interest rate higher than the usury limit in the state where the borrower resides, the Bureau is "establishing" a usury rate as surely as promulgating a regulation stating that the usury limit for every loan originated in the United States must meet the usury limit in the borrower's home state, notwithstanding any choice-of-law provision in the loan agreement. *See Young Oil Co. v. Racetrac Petroleum, Inc.*, 757 So. 2d 380, 384 (Ala. 1999) (defining "establish" as to "confirm" or to "validate"); *Gnadt v. Durr*, 208 Kan. 783, 788 (1972) (same). Moreover, Congress considered *and rejected* an amendment to the CFPA proposing a federal usury rate that would be the same as the usury rate in the state where a borrower resided. (ECF No. 105-1 Ex. 4.)

In its discovery responses, the Bureau identified purported UDAAP violations by simply repeating that "*[s]everal states have adopted laws* that render small-dollar loans void if they exceed the usury limit," meaning "*in these states*, the lender has no legal right to collect money from consumers in repayment of the loan," and since "a violation of usury limits or the failure to comply with licensing requirements [in the Subject States] will render a small-dollar loan void or will limit the consumer's obligation to repay the loan," Defendants "extract[ed] funds from consumers' bank accounts to pay obligations that *under state law* were void." (SS ¶¶ 117, 121.)

1    Thus, the Bureau's claims depend on an initial finding that Defendants
2    violated a given interest-rate limit, which is prohibited under section 5517(o).

3    ### D.   Defendants' Conduct Was Not Deceptive, Unfair, Or Abusive

4    Courts interpreting CFPA claims asserting unfair, deceptive, and abusive
5    conduct recognize that the Federal Trade Commission Act ("FTC Act") applies a
6    "similar, if not identical standard" in analyzing unfair and deceptive conduct. *CFPB*
7    *v. IrvineWebWorks, Inc.*, 2016 WL 1056662, at *12 (C.D. Cal. Feb. 5, 2016); *CFPB*
8    *v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016). A practice is deceptive under
9    section 5 of the FTC Act and the CFPA "(1) if it is likely to mislead consumers
10   acting reasonably under the circumstances (2) in a way that is material." *Davis v.*
11   *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *Gordon*, 819 F.3d at
12   1192. And the FTC Act and the CFPA define an unfair act or practice as one that
13   "causes or is likely to cause substantial injury to consumers which is not reasonably
14   avoidable by consumers themselves and not outweighed by countervailing benefits
15   to consumers or to competition." 15 U.S.C. § 45(n); 12 U.S.C. § 5531(c)(1)(a).

16   In *Davis*, the Ninth Circuit affirmed the dismissal of claims asserting unlawful
17   conduct under the Cal. Bus. & Prof. Code § 17200 ("UCL"), predicated on violations
18   of the FTC Act's prohibition of deceptive and unfair claims. The plaintiff
19   complained that Best Buy's advertisements for a credit card did not disclose an
20   annual fee, but admitted that the terms and disclosure statement disclosed the
21   existence of the fee. *Davis*, 691 F.3d at 1158. The advertisement was not misleading
22   as a matter of law because "given the advertisement's legible disclaimer that 'other
23   restrictions may apply,' no reasonable consumer could have believed that if an
24   annual fee was not mentioned, it must not exist." *Id.* at 1162. The advertisement was
25   thus not deceptive, as "[n]o reasonable consumer would have been deceived by these
26   advertisements into thinking that no annual fee would be imposed." *Id.* at 1168.

27   The court also held that the advertisement was not "unfair." "In determining
28   whether consumers' injuries were reasonably avoidable, courts look to whether the

consumers had a free and informed choice" and "have reason to anticipate the impending harm and the means to avoid it." *Id.* The consumer's alleged injury "was certainly avoidable," as the website instructed the applicant to read the terms and disclosure statement, and the applicant was required to indicate consent to the terms and conditions "before completing the application, [which] meant that he could have aborted his application upon reading the terms and conditions," and "provided 'the means to avoid' the alleged harm." *Id.* at 1169.[10]

Here, every loan made by Western Sky contains a prominent choice-of-law clause providing, at the top of the first page, in bold, that "[t]his Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." (SS ¶ 75.) Numerous other provisions established CRST law as the governing  law. (SS ¶¶ 76-79.)  These statements are not deceptive or misleading—rather, they are open and obvious contractual provisions requiring the borrower to be governed by CRST law.

Moreover, the interest rate on each loan was clearly and prominently disclosed on the first page of the agreement. (SS ¶ 80.) And every agreement concluded with the following disclosure, in all capitals and in bold, above the signature line:

> "THIS LOAN CARRIES A VERY HIGH INTEREST RATE. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE. EVEN THOUGH THE TERM OF THE LOAN IS 47 MONTHS, WE STRONGLY ENCOURAGE

---

[10] Similarly, the court in *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014), dismissed UCL claims because "the defendant banks could not properly be deemed to have engaged in unfair or deceptive practices under the statute *by acting consistently with all existing legal interpretations of the [National Bank Act]* and with the *express disclosures of their contracts* concerning late and over-limit fees." *Id.* at 965-66. *See also Vu Nguyen v. Aurora Loan Servs., LLC*, 614 F. App'x 881, 884 (9th Cir. 2015) (defendant did not "unfairly or deceptively" place payments in suspense account where plaintiff "specifically and expressly authorized" that action pursuant to agreement); *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 973-74 (N.D. Cal. 2010) (rejecting allegations that loan terms were misrepresented and concealed where rider "clearly explains the terms of the loan and repayment").

1  YOU TO PAY OFF THE LOAN AS SOON AS POSSIBLE. YOU

2  HAVE THE RIGHT TO PAY OFF ALL OR ANY PORTION OF THE

3  LOAN AT ANY TIME WITHOUT INCURRING ANY PENALTY.

4  YOU WILL HOWEVER, BE REQUIRED TO PAY ANY AND ALL

5  INTEREST THAT HAS ACCRUED FROM THE FUNDING DATE

6  UNTIL THE PAYOFF DATE." (SS ¶¶ 159-60.)

7  The borrower could easily refuse to sign the agreement upon reading these

8  prominent disclaimers, so any injury purportedly incurred by the borrower was

9  reasonably avoidable. *Davis*, 691 F.3d at 1169; 12 U.S.C. § 5531(c)(1)(a). Thus, the

10  conduct here was neither deceptive nor unfair as a matter of law.

11  Nor was it abusive. An act is not abusive under the CFPA unless it "materially

12  interferes with the ability of a consumer to understand a term or condition of a

13  consumer financial product or service; or . . . takes unreasonable advantage of . . . a

14  lack of understanding on the part of the consumer of the material risks, costs, or

15  conditions of the product or service; . . . the inability of the consumer to protect the

16  interests of the consumer in selecting or using a consumer financial product or

17  service; or . . . the reasonable reliance by the consumer on a covered person to act in

18  the interests of the consumer." 12 U.S.C. § 5531(d). The loan agreement's

19  prominently featured disclaimers cannot "materially interfere[]" with or "take[]

20  unreasonable advantage of" a consumer's understanding of the terms and conditions

21  of a contract where they merely state and then repeat what law governs the contract

22  and its terms. The consumer could "protect [his/her] interests" by refusing to sign the

23  agreement and accept the loan. Finally, there is no evidence that these provisions are

24  taking unreasonable advantage of any "reasonable reliance" on the part of the

25  consumer that Defendants were acting in their interests. *Id.* The undisputed facts

26  show that Defendants' conduct was not deceptive, unfair, or abusive.

27  Furthermore, whatever the meaning of "unfair, deceptive or abusive" under

28  the Act may be in a particular situation, it ***cannot*** mean a violation of state usury

19

1  laws or even an indirect violation thereof, because that is specifically excluded from
2  the "unfair, deceptive or abusive" definition as a result of Congress expressly
3  declaring that "[n]o provision of this title shall be construed as conferring authority
4  on the Bureau to establish a usury limit" in 12 U.S.C. § 5517(o). *See Gustafson v.*
5  *Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) ("like every Act of Congress, [the
6  legislation] should not be read as a series of unrelated and isolated provisions");
7  *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015) (courts "must interpret the
8  statute as a whole giving effect to each word and making every effort not to interpret
9  a provision in a manner that renders other provisions of the same statute inconsistent,
10 meaningless or superfluous."). Other parts of the Act confirm this interpretation. For
11 example, the Bureau's authority was effectively the result of consolidating the
12 regulation of certain "enumerated consumer laws," *see* 12 U.S.C. § 5481(12)(A)-(R),
13 none of which previously authorized federal enforcement of state usury laws. *See*
14 *also* 12 U.S.C. § 5481(14) (defining "Federal consumer financial law"); 12 U.S.C.
15 § 5492 (defining the powers of the Bureau over the "Federal consumer financial
16 laws").[11] Further, the Bureau openly rests its case solely on the public policy of the
17 Subject States regarding interest rates and enforceability of contracts regarding
18 interest rates, but that is precluded as well. *See* 12 U.S.C. § 5531(c)(2) ("public
19 policy considerations ***may not serve as a primary basis***" for a determination that an
20 act or practice is unfair).

21 _____

22 [11] If the Bureau were correct that it could enforce the state usury laws, which it is
   not, then it would be obligated to honor Congress' definition of "State" under the
23 Act, which includes federally recognized Indian tribes (like the CRST), 12 U.S.C.
   § 5481(27), and respect the CRST's sovereign decisions on the subject of consumer
24 interest rates—as opposed to proceeding as if CRST law can be disregarded. *See* 12
   U.S.C. § 5551(b) ("No provision of this title . . . shall be construed as modifying,
25 limiting, or superseding the operation of any provision of an enumerated consumer
   law that relates to the application of law in effect in any ***State*** with respect to such
26 Federal law."). Moreover, punishing the application of CRST law leads to a *reductio
   ad absurdum* result: it defies logic that a state-authorized APR of 459 percent
27 permitted in California (*see* Cal. Civ. Code §§ 1789.30 *et seq.*; Cal. Fin. Code §§
   23000 *et seq.*) is not "unfair," "deceptive" or "abusive," but that a lower rate would
28 be "unfair," "deceptive" or "abusive." *See also Marquette Nat'l Bank of Minneapolis
   v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310-13 (1978).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1      Finally, where, as here, a UDAAP claim is predicated on the resolution of an

2 underlying legal question, such as whether the loans on which Defendants collected

3 are void, a defendant's reasonable belief on that question serves as a complete

4 defense to liability. "[I]t is not an 'unfair' practice to assert and attempt to enforce a

5 reasonable legal proposition through litigation or otherwise." (SS ¶¶ 161-63.) The

6 Bureau cannot point to anything in the Act suggesting such conduct constitutes a

7 UDAAP violation. There is also no UDAAP violation because Defendants could not

8 have reasonably understood that collecting on loans that they were advised were

9 legal, would "cause" or be "likely to cause" substantial injury to consumers. "The

10 Bureau's theory of liability in this case is unprecedented and inconsistent with the

11 principles that have defined federal regulatory enforcement in this area." (SS ¶ 163.)

12     **E.**    **The CFPB Action Violates Due Process Because Defendants Did Not Have Fair Notice Of Possible Violations**

13

14      "A fundamental principle in our legal system is that laws which regulate

15 persons or entities must give fair notice of conduct that is forbidden or required."

16 *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also*

17 *McDonnell v. United States*, 2016 WL 3461561, at *18 (U.S. June 27, 2016) (where

18 government's interpretation of statutory term was "not defined with sufficient

19 definiteness that ordinary people can understand what conduct is prohibited, or in a

20 manner that does not encourage arbitrary and discriminatory enforcement," the lack

21 of fair notice to the accused "raises the serious concern that the provision does not

22 comport with the Constitution's guarantee of due process"); *Wilson v. Frito-Lay N.*

23 *Am., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (dismissing mislabeling

24 claims due to ambiguous FDA directives: "[t]o insist that Defendant should have

25 been complying with a regulation that was not explicitly clarified . . . would buck

26 due process and Ninth Circuit precedent").

27      Here, due process is offended because the Bureau attempts to frame claims

28 based on interpretations of UDAAP for which Defendants were not on notice,

namely that, while the FTC Act has been used to interpret what CFPB means by "unfair" or "deceptive," *Gordon*, 819 F.3d at 1193 & n.7, there is no guidance as to what "abusive" conduct entails. The CFPB has not provided any instruction beyond a mere recitation of its statutory definition. (SS ¶¶ 115-16.) In addition, Defendants could not have been on notice that collecting on a loan agreement according to its terms is unfair, deceptive, or abusive. The Bureau is pursuing novel theories of liability that deny Defendants their constitutional right to fair notice of the law.

## II.   REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER OF LAW

An individual may be held liable for corporate violations of the CFPA only if he "(1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth." *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016); *Gordon*, 819 F.3d at 1193 & n.8 (same, applying FTC Act test to CFPA action). As the record makes clear, the CFPB cannot prove these essential elements.

First, corporate liability must be proven before an individual can be found liable under the CFPA. *See F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999) (courts proceed to director liability analysis "once the FTC has established corporate liability"). Here, the CFPB cannot prove that CashCall, WS Funding, or Delbert violated any federal laws, so Reddam cannot be held liable.

Second, the Bureau must prove Reddam participated directly in the purported unfair, deceptive, and abusive acts or had the authority to control them. *Gordon*, 819 F.3d at 1193; *F.T.C. v. Grant Connect, LLC*, 763 F.3d 1094, 1104 (9th Cir. 2014) (vacating summary judgment where "the evidence does not show that Kimoto controlled Vertek at the time . . . nor does it show that he directly participated in the scheme"); *F.T.C. v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1208 (C.D. Cal. 2000) (granting officer's motion for summary judgment on individual liability where "[t]he

1  FTC contends that O'Bannon's role as an officer or director *on paper*, without more,

2  sufficiently shows authority to control or, at the very least, sufficiently shows that

3  [the officer's] Motion should be denied . . . the Court disagrees.") (emphasis in

4  original). Reddam had no personal involvement in or control over CashCall's or

5  Delbert's servicing of loans or in WS Funding's affairs. (SS ¶¶ 107-08.)

6       Finally, Reddam had no actual knowledge of any alleged misrepresentations,

7  and he was neither recklessly indifferent to, nor intentionally avoided learning, the

8  truth, as required to hold him liable for any monetary relief. *F.T.C. v. Garvey*, 383

9  *F.3d 891, 901-02 (9th Cir. 2004)* (FTC failed to show participant had "actual

10 knowledge of any material misrepresentations . . . was recklessly indifferent to the

11 truth of his statements or was aware that fraud was highly probable and intentionally

12 avoided the truth" where he "had first-hand anecdotal evidence" and "information

13 that purported to present scientific bases for his claims"). The CFPB must do more

14 than point to Reddam's corporate title to prove he had knowledge of alleged unfair,

15 deceptive, or abusive acts. *See F.T.C. v. Publishers Bus. Servs., Inc.*, 540 F. App'x

16 *555, 558 (9th Cir. 2013)* (because "the FTC did not present any evidence beyond

17 Persis Dantuma's corporate titles as to her knowledge . . . it was not an abuse of

18 discretion to hold that she was not individually liable"). There are no such facts here.

19      Moreover, the CFPB cannot show how Reddam could have had any

20 knowledge that the choice-of-law provisions would not be enforced in a court of law,

21 thus rendering the loans void or partially unenforceable. To the contrary, the

22 undisputed facts establish the exact opposite, based on Reddam's awareness of the

23 legal advice provided by Katten, Western Sky's counsel, and the lenders' counsel's

24 acceptance of those opinions in extending financing. (SS ¶¶ 81-112.) Reddam did not

25 have actual knowledge of *any* UDAAP conduct because his understanding was that

26 the loan agreements and their assignment to CashCall were legal and enforceable.[12]

27 _____

28 [12] In *F.T.C. v. Zamani*, 2011 WL 2222065, at *14 (C.D. Cal. June 6, 2011)*, the court
held that the FTC failed to show that the defendant CEO "had the *mens rea* required
*(cont'd)*

1   Reddam's good faith belief in the legal integrity of the loans' CRST choice-of-

2   law provision precludes any finding of actual knowledge, reckless indifference or

3   intentional avoidance of deceptive, unfair, or abusive practices. *See, e.g.*, *F.T.C. v.*

4   *Medicor LLC*, 2001 WL 765628, at *3 (C.D. Cal. June 26, 2001) (denying motion to

5   strike good faith defenses  "[b]ecause good faith is relevant to determine whether to

6   issue a permanent injunction and whether to hold Defendants individually liable");

7   *F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008)

8   ("Because of the knowledge requirement for individual liability, a defendant's good-

9   faith belief in the truth of a representation, . . . may be relevant to whether that

10  defendant can be held individually liable for these misrepresentations."). Reddam

11  understood that the loans are subject to CRST law and valid under that law. (SS

12  ¶¶ 109-12.) This good-faith belief was buttressed by CashCall's counsel, as

13  described above. (SS ¶¶ 8-14, 21, 81-106.)

14  Thus, the undisputed facts show Reddam did not know of any purported

15  deceptive, unfair, or abusive acts by CashCall, WS Funding or Delbert, and summary

16  judgment should be entered in his favor.

17  **III.   THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL**

18  As a panel on the D.C. Circuit recently recognized, the Bureau's

19  unprecedented structure raises profound constitutional concerns. *See PHH Corp. v.*

20  *CFPB*, No. 15-1177 (D.C. Cir., argued Apr. 12, 2016). The court in *PHH* issued an

21  order a week before oral argument, on its own motion, that directed the parties to be

22  prepared to address questions regarding the novelty of the Bureau's structure and the

---

23  *(cont'd from previous page)*

24  for restitutionary liability" when the FTC "provided no reason . . . that [defendant] *should have known in advance*" that a government housing program would be so

25  unpopular as to eventually render the company's representations about its services arguably misleading. *Id.* Here, the Bureau cannot show Reddam could have had

26  knowledge that the Bureau would one day ignore the choice-of-law provision in a consumer loan agreement and seek to hold CashCall, Delbert and WS Funding liable

27  for violating federal law. Indeed, while this summary judgment motion addresses only the Defendants' liability under the CFPA, the Bureau must take their "good

28  faith" into account when determining "the appropriateness of" any penalty. 12 U.S.C. § 5565(c)(3)(A).

1  proper remedy should the court hold that the Bureau's structure violates separation-
2  of-powers principles. The *PHH* court's concerns are well-founded. "The President
3  cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the
4  faithfulness of the officers who execute them," so the Constitution "has been
5  understood to empower the President to keep [executive] officers accountable—by
6  removing them from office, if necessary." *Free Enter. Fund v. Pub. Co. Accounting*
7  *Oversight Bd.*, 561 U.S. 477, 483-84, 496 (2010) (invalidating the Public Company
8  Accounting Oversight Board's "novel structure"). The Bureau's structure presents a
9  "new situation not yet encountered" by the Supreme Court, and there are no special
10 "circumstances" justifying that structure. *See* *id.* at 483–84. <u>First</u>, the Bureau—
11 through its Director—impermissibly wields a fantastic amount of power. *See* 12
12 U.S.C. § 5491(a). Second, the Bureau houses this sweeping authority in a single all-
13 powerful Director, who is subject to removal from a 5-year term by the President
14 only for "inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(b)-
15 (c). Third, the Bureau and its Director are excepted from the congressional
16 appropriations process. *See* § 5497(a)(1)-(2).

17       These structural attributes are "contrary to Article II's vesting of the executive
18 power in the President." *Free Enter. Fund*, 561 U.S. at 484. Thus, the Bureau's
19 structure violates the Constitution's separation of powers.[13]

20 DATED: June 30, 2016

                                 SKADDEN, ARPS, SLATE, MEAGHER &
                                   FLOM LLP

                                   By:        */s/ Thomas J. Nolan*
                                           Thomas J. Nolan
                                      *Attorneys for Defendants*

---

[13] This District has rejected a challenge to the constitutionality of the Bureau, *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-92 (C.D. Cal. 2014) (Staton, J.), but Defendants submit that case was wrongly decided.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT