THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone:  (202) 371-7000
Facsimile:   (202) 393-5760

Attorneys for Defendants

UNITED STATED DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                    Plaintiff,<br><br>          v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>                    Defendants. | CASE NO.:  2:15-cv-07522-JFW (RAOx)<br><br>DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date:    August 1, 2016<br>Time:              1:30 p.m.<br>Place:             Courtroom 16<br>Judge:             Hon. John F. Walter<br>Pre-Trial Conf.:   September 9, 2016<br>Trial:             September 27, 2016 |

Pursuant to Local Rule 56-1, Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corporation ("Delbert"), and J. Paul Reddam ("Reddam") (collectively, "Defendants") submit the following Statement of Undisputed Facts and Conclusions of Law in support of their Motion for Summary Judgment.

## I.    UNDISPUTED FACTS

| | UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | CashCall, a California corporation incorporated in 2000, began doing business in consumer loans in 2003 to provide a lower cost alternative to payday loans for credit-impaired borrowers and small businesses. | Ex. 1 (Delbert Meeks Rule 30(b)(6) Deposition ("Meeks Rule 30(b)(6)")) at 8:13-9:13;[1]<br><br>Ex. 2 (Daniel Baren Deposition ("Baren")) at 27:19-28:1;<br><br>Ex. 40 (CashCall, Inc.'s State of California Certificate of Status for Domestic Corporation, dated February 8, 2006);<br><br>Ex. 37 (John Paul Reddam November 7, 2013 Declaration ("Reddam November 7, 2013 Declaration")) ¶ 6. |
| 2. | Reddam has been the CEO and sole owner of CashCall since its creation. | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 1);<br><br>Ex. 2 (Baren) at 139:1-2; 139:9-13. |
| 3. | In 2012, CashCall employed 2,400 employees.  Today, it employs 157. | Ex. 1 (Meeks Rule 30(b)(6)) at 27:7-18. |

---

[1]     Unless otherwise noted, all "Ex." references are to the Declaration of Caroline Van Ness filed in support of Defendants' Motion for Summary Judgment or the Declaration of Julia M. Nahigian filed in support of Defendants' Request for Judicial Notice.

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 4. | Delbert, now defunct, started in 2008 as a Nevada corporation as a debt collection agency collecting debts for companies throughout the 50 states. | Ex. 1 (Meeks Rule 30(b)(6)) at 41:3-7); Ex. 33 (ECF No. 41-1, Delbert Business Plan) at 3. |
| | 5. | Reddam was the CEO and sole owner of Delbert between January 1, 2010 and August 31, 2013. | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 2). |
| | 6. | In early 2010, CashCall's subsidiary WS Funding was formed to serve as a holding company for unsecured loans originated by, and then purchased from, Western Sky Financial, LLC ("Western Sky"). | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 3); Ex. 9 (John Paul Reddam Deposition ("Reddam")) at 65:11-16; Ex. 52 (Daniel Baren November 7, 2013 Declaration ("Baren Declaration")) at ¶ 8. |
| | 7. | Reddam is the President of WS Funding. | Ex. 2 (Baren) at 138:23-25. |
| | 8. | Since at least 2007, CashCall was advised by Washington, D.C., regulatory lawyer Claudia Callaway ("Callaway"), who was a partner at Manatt, Phelps & Phillips until approximately July of 2009. | Ex. 2 (Baren) at 31:16-17 ("Ms. Callaway had been our counsel for three, three and a half years" by February of 2010.); 29:18-30:4; 152:10-13. |
| | 9. | On July 22, 2009, Callaway joined Katten Muchin & Rosenman ("Katten") as a partner. | Ex. 65 (July 22, 2009 Katten Announcement) at https://www.kattenlaw.com/mobilesite/shownews.aspx?Show=5952. |

2

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 10. | From July of 2009 to the present, Callaway has been a partner at Katten, where she continues to practice regulatory litigation. | Ex. 2 (Baren) at 30:1-4;<br><br>Ex. 64 (Callaway's Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway. |
| 11. | CashCall retained Katten to provide regulatory advice relating to the Western Sky Loan Program. | Ex. 7 (Daniel Baren Rule 30(b)(6) ("Baren Rule 30(b)(6)")) at 29:19-30:8. |
| 12. | The lead Katten partner on the engagement was Callaway. | Ex. 2 (Baren) at 29:21-33:6. |
| 13. | Callaway's biography, available on Katten's website, states that she is chair of Katten's Consumer Finance Litigation practice, co-chair of Katten's Class Action and Multidistrict Litigation practice, and leads Katten's Platform Lending Initiative. | Ex. 64 (Callaway's Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway. |
| 14. | Callaway's biography on Katten's website also states:  "Having represented clients before the CFPB since it was established, Claudia understands the varying perspectives of key stakeholders involved, and helps clients navigate the hurdles, pitfalls and opportunities available to the numerous parties involved under the CFPB's jurisdiction." | Ex. 64 (Claudia Callaway Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway. |
| 15. | Daniel Baren ("Baren") has served as CashCall's general counsel from 2003 to the present. | Ex. 2 (Baren) at 11:17-19. |

3

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 16. | In 2003, CashCall began offering unsecured consumer installment loans pursuant to its California license. | Ex. 52 (Baren Declaration) at ¶ 4. |
| 17. | While initially offering loans at a 24% interest rate, CashCall found that few applicants qualified for such loans and began offering various products with interest rates of up to 135% depending on a borrower's credit rating.  The loans had no prepayment penalties. | Ex. 52 (Baren Declaration) at ¶ 4. |
| 18. | In 2009, after a non-competition agreement between Reddam and his prior company expired, CashCall began offering prime mortgage loans.  It largely resold the loans to the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, both of which never put back a CashCall mortgage for defect in representation or warranty. | Ex. 52 (Baren Declaration) at ¶ 5. |
| 19. | CashCall's mortgage business was initially successful and quickly outpaced its installment lending.  In 2003, CashCall was authorized to issue mortgage loans in over forty states. | Ex. 52 (Baren Declaration) at ¶ 5. |
| 20. | From 2003 through 2008, CashCall engaged a pair of state-chartered banks to market and service unsecured consumer installment loans nationally on terms and at interest rates available in the banks' home states.  This business model was abandoned after changes to federal | Ex. 52 (Baren Declaration) at ¶ 6. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | banking regulations. | |
| | 21. | In March of 2009, Callaway recommended that CashCall purchase loans made by a tribal lender, stating that loans originated by a tribal lender would not be subject to state licensing or usury laws or federal laws. | Ex. 2 (Baren) at 30:11-32:2 (Baren testimony that Callaway recommended a "tribal lending model" in which CashCall would "start purchasing loans that were originated by a tribal lender"; <br><br> Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14. |
| | 22. | In early 2009, Callaway introduced Baren to Martin A. "Butch" Webb ("Webb") and encouraged CashCall to enter into a business relationship with a lending entity owned by Webb. | Ex. 2 (Baren) at 29:21-30:16; 37:25-38:18; <br><br> Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14. |
| | 23. | Webb is an enrolled member of the Cheyenne River Sioux Tribe (the "CRST"). | Ex. 22 (Tawny Lawrence Declaration submitted to the Consumer Financial Protection Bureau pursuant to the Notice and Opportunity to Respond and Advise process, dated November 7, 2013 ("Lawrence Declaration")) ¶ 3; <br><br> Ex. 8 (Martin A. Webb Deposition ("Webb")) at 79:4-6. |
| | 24. | Callaway advised CashCall that Webb would be a trustworthy business partner. | Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14. |
| | 25. | Callaway also advised CashCall that she was aware of Webb's other lending activities and had represented other entities that purchased loans | Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14. |

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | from his companies. | |
| | 26. | Webb had engaged in consumer lending for more than 20 years before CashCall began working with Webb. | Ex. 8 (Webb) at 32:2-10 ("I have . . . 32 years working in the banking and lending business"); 33:4-34:4 (Webb testimony that the company he worked for "loaned out to Native Americans, primarily farmers and ranchers."). |
| | 27. | Webb previously terminated agreements he had with other lenders because he felt he did not have enough control over the business arrangement. | Ex. 8 (Webb) at 38:21-39:24. |
| | 28. | Webb was president of Western Dakota Bank from 1992 to September 2013. | Ex. 8 (Webb) at 34:10-35:7. |
| | 29. | Prior to working with CashCall, Webb had originated and funded loans to residents of various states from his office on the Cheyenne River Indian reservation (the "Reservation"), under the same tribal model advocated by Katten. | Ex. 8 (Webb) at 34:19-35:20. |
| | 30. | Western Sky was created by Webb in late 2009 and employed the same tribal model advocated by Katten. | Ex. 8 (Webb) at 45:11-12; Ex. 22 (Lawrence Declaration) ¶¶ 4, 5, 6. |
| | 31. | Western Sky was owned by Webb. | Ex. 16 (Membership Certificate for Limited Liability Company Interests in Western Sky Financial, LLC); Ex. 8 (Webb) at 96:20-21. |
| | 32. | Western Sky was licensed by the | Ex. 20 (Cheyenne River Sioux Tribe |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|---|---|
| | | CRST. | Business License for Western Sky Financial, LLC); |
| | | | Ex. 22 (Lawrence Declaration) ¶ 3 ("Western Sky is a wholly Tribal Member-owned-and-operated consumer installment lender. Specifically, it is owned by Martin A. Webb, a member of the CRST.  Its offices are located in Eagle Butte and Timber Lake, South Dakota, on the Reservation."). |
| | 33. | Cheryl Laurenz-Bogue ("Bogue"), an attorney at the law firm of Bogue & Bogue, LLP, represented Western Sky and Webb. | Ex. 8 (Webb) at 79:17-23; 115:25-116:6. |
| | 34. | Western Sky and WS Funding entered into assignment and purchase agreements by which WS Funding purchased loans originated and funded by Western Sky. | Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); <br><br> Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); <br><br> Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC). |
| | 35. | A drafting error was made in the execution of the agreements among the entities, in which "WS Financial, LLC" was meant to state, "WS Funding, LLC." | Ex. 2 (Baren) at 125:11-19. |

7

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 36. | From December of 2009 to January 31, 2010, the December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky and WS Financial, LLC was the operative agreement between Western Sky and WS Funding. | Ex. 2 (Baren) at 135:21-136:1. |
| | 37. | From February 1, 2010, the February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky and WS Funding and the October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial and WS Funding governed the relationship among the entities. | Ex. 2 (Baren) at 136:2-6. |
| | 38. | On January 9, 2010, Western Sky and CashCall entered into an Agreement for Service. | Ex. 38 (January 9, 2010 Agreement for Service between Western Sky and CashCall); Ex. 1 (Meeks Rule 30(b)(6)) at 75:4-14 (Meeks testimony that the January 9, 2010 Agreement for Service governed the servicing relationship between Western Sky and CashCall from January 9, 2010 through the end of the relationship). |
| | 39. | CashCall performed certain services for Western Sky relating to the underwriting and processing of the Western Sky loans pursuant to the terms of the Agreement for Service between Western Sky and CashCall. | Ex. 38 (January 9, 2010 Agreement for Service between Western Sky and CashCall); Ex. 1 (Meeks Rule 30(b)(6)) at 75:4-14 (Meeks testimony that the January 9, |

8

| | UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | 2010 Agreement for Service governed the servicing relationship between Western Sky and CashCall from January 9, 2010 through the end of the relationship); |
| | | Ex. 6 (WS Funding's Response to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5; |
| | | Ex. 1 (Meeks Rule 30(b)(6)) at 47:4-18 (Meeks testimony that "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls" and this was "per the . . . services agreement between Western Sky and CashCall."); |
| | | Ex. 4 (CashCall's Response to Plaintiff's Request for Admission No. 3). |
| 40. | From February 2010 to August 2013, Western Sky originated and funded unsecured consumer installment loans and sold those loans to WS Funding pursuant to a Loan Purchase Agreement. | Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); |
| | | Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); |
| | | Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC); |
| | | Ex. 2 (Baren) at 29:18-20. |

9

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 41. | The loan agreement entered into by Western Sky and borrowers was drafted by Bogue. | Ex. 8 (Webb) at 87:19-25. |
| 42. | Western Sky's offices were located in Timber Lake and Eagle Butte, on the Reservation in South Dakota. | Ex. 8 (Webb) at 121:15-122:3; 68:14-22; 71:6-72:8;<br><br>Ex. 22 (Lawrence Declaration) ¶ 3 ("Western Sky is a wholly Tribal Member-owned-and-operated consumer installment lender. Specifically, it is owned by Martin A. Webb, a member of the CRST.  Its offices are located in Eagle Butte and Timber Lake, South Dakota, on the Reservation."). |
| 43. | Between January 2010 and August 2013, Western Sky was one of the largest private employers on the Reservation, employing more than 100 employees. | Ex. 22 (Lawrence Declaration) ¶ 9;<br><br>Ex. 8 (Webb) at 70:20-25. |
| 44. | Western Sky originated loans to consumers in 47 states. | Ex. 2 (Baren) at 92:6-19. |
| 45. | According to the Bureau of Indian Affairs' 2005 American Indian Population and Labor Force Report, the unemployment on the Reservation was 88% (as compared to 3.8% for South Dakota as a whole), and prior to Western Sky's operations, 100% of those who were employed were still below the poverty line. | Ex. 54 (U.S. Dep't of the Interior, Bureau of Indian Affairs, 2005 American Indian Population and Labor Force Report 8 (2005));<br><br>Ex. 55 (U.S. Dep't of Labor, Bureau of Labor Statistics, State and Regional Unemployment, 2005 Annual Averages (2005));<br><br>Ex. 8 (Webb) at 122:4-123:4. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 46. | In 2013, the Bureau of Indian Affairs issued an updated report showing the CRST median civilian job employment rate of 44.4% in 2010. | Ex. 56 (U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, 2013 American Indian Population and Labor Force Report 41 (2014)). |
| 47. | In 2013, there was an over 96% employment rate in South Dakota. | Ex. 57 (U.S. Dep't of Labor, Bureau of Statistics, Local Area Unemployment Statistics, South Dakota). |
| 48. | 44.6% of the total population of Ziebach County, South Dakota, is below the poverty level. | Ex. 58 (U.S. Census Bureau, QuickFacts, Ziebach County, South Dakota). |
| 49. | By comparison, the National Center for Children in Poverty estimates that approximately 17% of children in South Dakota live in poverty (21% nationally). | Ex. 59 (National Center for Children in Poverty, South Dakota Demographics of Poor Children, http://www.nccp.org/profiles/state_profile.php?state=SD&id=7). |
| 50. | The per capita income for American Indians in Ziebach County is $6,999 with a family median income of $19,074, as compared to $27,334 and $62,982, respectively, for the total United States population. | Ex. 60 (U.S. Census Bureau, 2006-2010 American Community Survey Selected Economic Characteristics). |
| 51. | Approximately 15% of CRST members obtain higher education degrees. | Ex. 61 (U.S. Census Bureau, Selected Social Characteristics in the United States, 2008-2012 American Community Survey, Ziebach County, South Dakota). |

11

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 52. | Borrowers calling the toll free number to reach Western Sky were generally routed to the Western Sky call center located on the Reservation; only overflow calls would be sent to CashCall to handle on Western Sky's behalf in California. | Ex. 8 (Webb) at 74:16-75:14. |
| | 53. | Customers who called Western Sky heard the following recording:  "We are a Native American-owned company operating on the bounds of the Cheyenne River Sioux Reservation." | Ex. 2 (Baren) at 106:12-21; 114:10-19. |
| | 54. | Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. | Ex. 8 (Webb) at 61:3-13;

Ex. 8 (Webb) at 61:21-62:2 (Webb testimony that "we also constructed a building in Eagle Butte that we utilized as a call center for Western Sky and CashCall paid for half.  And I paid half.");

Ex. 8 (Webb) at 121:15-122:3 (Webb testimony that Eagle Butte was within the exterior boundaries of the Indian reservation.). |
| | 55. | Western Sky operated from a call center out of the building it constructed on the Reservation. | Ex. 8 (Webb) at 61:21-62:2 (Webb testimony that "we also constructed a building in Eagle Butte that we utilized as a call center for Western Sky and CashCall paid for half and I paid half.");

Ex. 8 (Webb) at 121:15-122:3 (Webb testimony that Eagle Butte was within the exterior boundaries of the Indian reservation.). |

12

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 56. | Western Sky drafted and revised Western Sky underwriting guidelines, with input from CashCall. | Ex. 8 (Webb) at 28:22-29:23;<br><br>Ex. 2 (Baren) at 61:12-62:7. |
| 57. | Changes to the Western Sky underwriting guidelines were made only "upon [Webb's] decision and agreement." | Ex. 8 (Webb) at 26:20-27:11. |
| 58. | The critical final steps to accept loan agreements and fund loans all occurred on the Reservation.  This included a final auditing review, performed after the borrower completed a loan application by electronically signing a loan agreement, to verify that the information provided by the prospective borrower was accurate and complete.  If the information reviewed in the final audit review was found to be inaccurate or incomplete, Western Sky would not accept the application and would deny funding of the loan.  If the information was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts.  The borrower would be sent an acceptance notice, informing him or her that the loan proceeds would be electronically disbursed. | Ex. 22 (Lawrence Declaration) ¶ 8. |
| 59. | Western Sky set the underwriting criteria by which potential borrowers were reviewed and made the ultimate decision of whether to extend a loan. | Ex. 22 (Lawrence Declaration) ¶ 8. |

13

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| 60. | | Western Sky had its own Internet server on the Reservation from January 2010 through September 2013. | Ex. 8 (Webb) at 53:16-18. |
| 61. | | Western Sky reviewed and audited monthly settlement reports provided by CashCall. | Ex. 8 (Webb) at 54:14-18. |
| 62. | | Western Sky conducted numerous due diligence visits to review CashCall's operations. | Ex. 8 (Webb) at 55:19-57:13. |
| 63. | | At Webb's request, CashCall's employees would visit the Reservation to help train the call center employees in customer service. | Ex. 8 (Webb) at 76:1-77:18. |
| 64. | | Webb construed the agreement between Western Sky and CashCall to give him "total control where [Western Sky] could sell [Western Sky loans] anywhere." | Ex. 8 (Webb) at 64:15-23. |
| 65. | | A Western Sky employee designed the logo for its website. | Ex. 8 (Webb) at 73:10-13. |
| 66. | | Western Sky participated substantially in the drafting of all marketing materials for Western Sky loans. | Ex. 2 (Baren) at 131:3-12. |

14

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 67. | Western Sky had employees in five departments: the call center department, the collections department, the fraud department, the IT department, and the building and maintenance department. | Ex. 8 (Webb) at 99:8-13. |
| 68. | Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. | Ex. 8 (Webb) at 69:10-25 (Webb testimony that "[e]very loan came through their – that office, they would open up the file on every loan and review for accuracy for the documents that were obtained.  And then if everything was in place, they would audit – or not audit – they would approve it.  Once it was approved, they also funded them from there.  In Western Sky Financial we wired the money, so they would do the wiring.");<br><br>Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands.  Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans.");<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that "Western Sky had their own system . . . [B]ased on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the |

15
DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | | determination if the loan was to be funded or not."); |
| | | Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 ("Q.  Did CashCall know the parameters by which Western Sky evaluated loans in deciding to approve them or not?  A.  We know their underwriting guidelines, but we don't know exactly why they approve or why they don't approve.  That's their call."); |
| | | Ex. 22 (Lawrence Declaration) ¶ 8. |
| 69. | Western Sky approved only five to ten percent of loan applications. | Ex. 8 (Webb) at 99:20-23. |
| 70. | The decision to fund the Western Sky loans was made by Western Sky employees located on the Reservation. | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16); |
| | | Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands.  Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans."); 169:11-16 ("[T]he final approval necessary, which was the determination of whether a loan would fund or not, was done on the reservation solely by Western Sky."); |
| | | Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that "Western Sky had their own system.  CashCall had their system.  The loan agent |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | | would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."); |
| | | Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 ("Q.  Did CashCall know the parameters by which Western Sky evaluated loans in deciding to approve them or not?  A.  We know their underwriting guidelines, but we don't know exactly why they approve or why they don't approve.  That's their call."); |
| | | Ex. 22 (Lawrence Declaration) ¶ 8 ("If the information [provided by the prospective borrower] was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts."). |
| 71. | The last acts necessary to form the Western Sky loan agreements were performed within the boundaries of the CRST, including a final auditing review, performed after the borrower completed a loan application by electronically signing a loan agreement, to verify that the information provided by the prospective borrower was accurate and complete.  If the information reviewed in the final audit review was | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16); Ex. 22 (Lawrence Declaration) ¶ 8; Ex. 8 (Webb) at 69:10-25; 68:12-22; 71:6-23; 121:15-122:3. Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's |

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | found to be inaccurate or incomplete, Western Sky would not accept the application and deny funding of the loan.  If the information was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts. | hands.  Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans."). |
| | 72. | Western Sky had discretion to veto or refuse any condition, term or feature of the loans. | Ex. 2 (Baren) at 172:7-18. |
| | 73. | The Western Sky loans were funded by Western Sky, from a funding account to which CashCall initially contributed. | Ex. 8 (Webb) at 69:22-25; <br><br> Ex. 9 (Reddam) at 122:6-10; <br><br> Ex. 1 (Meeks Rule 30(b)(6)) at 55:1-9. (Meeks testimony that Western Sky funded a Western Sky-originated loan from their funding account funded "in the beginning . . . by a loan from CashCall").); <br><br> Ex. 22 (Lawrence Declaration)  ¶ 8 ("If the information [provided by the prospective borrower] was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts."). |
| | 74. | If a potential loan met the guidelines, then a borrower was directed, via e-mail from Western Sky, to the Western Sky website where Western Sky provided the borrower with certain disclosures about the loan, and the borrower signed the loan documents electronically. | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 16; <br><br> Ex. 2 (Baren) at 69:1-71:3; <br><br> Ex. 8 (Webb) at 74:7-75:4. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 75. | The first page of every Western Sky loan agreement states, in bold: "**This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" | Exs. 41-50 (Western Sky loan agreement samples) at 1. |
| | 76. | The Governing Law provision of the ten Western Sky loan agreement iterations states: "This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe." | Exs. 41-50 (Western Sky loan agreement samples) at 3. |
| | 77. | Beginning in June of 2011 until October of 2013, the Western Sky loan agreement stated: "by entering into this Agreement you are voluntarily availing yourself of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation." | Exs. 41-50 (Western Sky loan agreement samples) at 3. |
| | 78. | Beginning in June of 2011 until August of 2013, the Western Sky loan agreement stated: "[y]ou further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation." | Exs. 46-49 (Western Sky loan agreement samples) at 1. |

19

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 79. | From August of 2013 through October of 2013, the Western Sky loan agreement stated:  "[y]ou also expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement." | Ex. 50 (Western Sky loan agreement samples) at 1. |
| 80. | The interest rate on the Western Sky loans was clearly and prominently disclosed on the first page of the agreement. | Exs. 41-50 (Western Sky loan agreement samples) at 2. |
| 81. | Before February 2010, counsel for CashCall informed CashCall that the loans would not be subject to state law. | Ex. 2 (Baren) at 160:9-161:1; Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10. |
| 82. | In approximately January of 2010, Callaway advised CashCall that tribal lender loans sold to a non-tribal entity would not be subject to the state law of the borrower's place of residence. | Ex. 2 (Baren) at 32:19-33:5 (Baren testimony that he had "a recollection of several conversations [six and a half years ago] where [Callaway] said that this was now the model that she was recommending to her clients; that – that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a nontribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation."). |
| 83. | Katten sent a formal opinion letter to Centurion Credit Resources, LLC on April 12, 2010, stating ". . . [w]e are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of | Ex. 17 (April 12, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC) at 1, 8-14. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | competent jurisdiction interpreting applicable state law . . . should conclude that the choice of law provision contained in the loan agreement is enforceable in [Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Kentucky, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Montana, Michigan, Nebraska, Nevada, New Mexico, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, and Wisconsin]." | |
| 84. | Katten sent a formal opinion letter to Centurion Credit Resources, LLC on June 23, 2010, stating ". . . we are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements . . ." and "upon assignment, CashCall, as assignee, will be entitled to the . . . choice of law rights held by Western Sky." | Ex. 39 (June 23, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC) at 1, 4. |
| 85. | On November 16, 2010 Katten sent a formal opinion letter to Bayberry Consumer Finance Fund, LLC concluding that the Western Sky loans "will not be subject to United States federal consumer protection | Ex. 24 (November 16, 2010 Opinion of Counsel letter from Katten, addressed to Bayberry Consumer Finance Fund, LLC) at 1. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | law or state law limiting interest rates" because, *inter alia*, the states will "enforce the choice of CRST law set forth in the loan agreements." | |
| 86. | In September of 2009, Katten prepared a draft of a formal opinion letter. | Ex. 27 (September 2009 draft Katten Opinion letter addressed to Jefferies & Company). |
| 87. | In November of 2009, Katten prepared a draft of a formal opinion letter that Callaway shared with Baren on November 4, 2009. | Ex. 30 (November 4, 2009 email from Callaway to Baren attaching the November 2009 draft Opinion of Counsel letter from Katten, addressed to Jefferies & Company). |
| 88. | In December of 2009, Katten prepared a draft of a formal opinion letter that Callaway shared with Baren on December 10, 2009. | Ex. 31 (December 10, 2009 email from Callaway to Baren attaching the November 2009 draft Opinion of Counsel letter from Katten, addressed to Jefferies & Company). |
| 89. | On February 26, 2010, Katten sent a formal opinion letter to Baren stating, "a court of competent jurisdiction interpreting applicable [federal and] state law . . . should conclude that the choice of law provision contained in the Loan Agreement [to be used by Western Sky] is enforceable in [Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Kansas, Kentucky, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Montana, Michigan, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Puerto Rico, | Ex. 32 (draft February 26, 2010 Opinion of Counsel letter from Katten, addressed to Baren) at 1, 8. |

22

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin].” | |
| | 90. | On July 1, 2011, Katten sent a formal opinion letter to BasePoint Specialty Finance, LLC, stating that “a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that (a) the choice of law provision contained in the Loan Agreements should be enforced, and (b) Borrower will, upon assignment, acquire all rights in such loans that are possessed by Lender as assignor in each of the states discussed below.” | Ex. 34 (July 1, 2011 Opinion of Counsel letter from Katten, addressed to BasePoint Specialty Finance, LLC) at 1. |
| | 91. | Katten’s regulatory opinions were a “very small component of the overall legal advice that Katten provided” on CashCall’s ability to enforce the Western Sky loans. | Ex. 7 (Baren Rule 30(b)(6)) at 29:22-30:2. |
| | 92. | CashCall received advice from Katten that CashCall could enforce the terms of the loan agreements “without interference from state regulators.” | Ex. 7 (Baren Rule 30(b)(6)) at 30:2-8 (Baren “had numerous, dozens of conversations, maybe hundreds of conversations, with the lawyers at Katten, including Ms. Callaway and her associates, regarding CashCall’s rights to purchase those loans and enforce the terms of those loans pursuant to the contracts and without interference from state regulators.”); Ex. 2 (Baren) at 160:13-19. |
| | 93. | Katten orally told lenders to CashCall and counsel for the lenders that the loans were subject to tribal law, not state law. | Ex. 7 (Baren Rule 30(b)(6)) at 30:9-13; 30:20-25. |

23
DEFENDANTS’ STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| 94. | | CashCall attended conferences where Callaway gave presentations that reinforced that the loans were subject only to tribal law. | Ex. 7 (Baren Rule 30(b)(6)) at 30:14-25; 31:22-32:7; 32:13-23.  (Baren testimony that "as it was set up by [Callaway], the loans would be subject to tribal law and not state law, and that the tribal lender could assign the paper to CashCall and CashCall could collect it," without ever mentioning the model was "not legal or appropriate.");  Ex. 35 (March 18, 2011 email from Callaway to Dan Pillemer, attaching a "working draft of the tribal contract enforceability white paper.") at 1. |
| 95. | | CashCall "relied heavily" on Katten and Callaway, their attorney of nearly four years, who was "well versed in regulatory compliance and consumer lending." | Ex. 2 (Baren) at 31:16-32:2; 41:9-12; 174:20-175:15. |
| 96. | | CashCall relied on legal opinions written by outside legal counsel and provided to third-party financiers. | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;  Ex. 2 (Baren) at 160:13-161:1. |
| 97. | | Webb received legal opinions from Bogue about Western Sky and its status under the laws of the CRST. | Ex. 8 (Webb) at 115:25-116-6. |
| 98. | | Based on Webb's review, research, and documentation of the commercial code, personal verification from tribal council who passed the code, and advice of counsel, Webb knew that usury was not a crime under CRST law. | Ex. 8 (Webb) at 80:8-81:5 (Webb testimony that the CRST "passed the Uniform Commercial Code in order to make it coincide with South Dakota so they could actually encourage lenders to operate on the reservation."). |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 99. | The language of the choice-of-law provision in the loan agreement (**"This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation."**) and related provisions were provided to Webb by Bogue. | Ex. 8 (Webb) at 87:19-25; Exs. 41-50 (Western Sky loan agreement samples) at 2. |
| 100. | Bogue sent a formal opinion letter to Webb on June 22, 2011, stating, "I am of the opinion . . . the Western Sky loans have been made by an entity duly and lawfully licensed by the Cheyenne River Sioux Tribe to make and issue such loans, and that such authorization was in full force and effect and had neither been suspended nor revoked at the time of the making of such loans and the fees and rates contained within are in compliance with any applicable requirements of the Cheyenne River Sioux Tribe." | Ex. 23 (June 22, 2011 Opinion of Counsel letter from Bogue, addressed to Webb). |
| 101. | CashCall took comfort from Western Sky's counsel, Bogue, who provided CashCall and its lenders opinions and certificates from Webb attesting to Western Sky's ability to make the loans under CRST law and transfer the loans to CashCall without losing the tribal exemption. | Ex. 2 (Baren) at 149:12-150:15; 160:13-19; Ex. 8 (Webb) at 108:6-18; 115:25-116:19; Ex. 53 (Officer's Certificate of Western Sky Financial, LLC, dated March 2013). |
| 102. | On Monday, May 10, 2010, Callaway sent Baren an email stating, "I have done substantail [sic] research on the 'state/federal law doesn't apply to tribal TRANSACTIONS' issue. I | Ex. 25 (May 9, 2010 email from Callaway to Baren). |

25

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | need to discuss with my opinion reviewer before I send.  There is good law on this.  I will send the draft tomorrow." | |
| | 103. | On May 20, 2010, Callaway sent Baren an email stating, "The analysis flows as follows:  the loan transaction is subject to sovereign immunity, and the initial choice of tribal law is enforceable.  Because an assignee stands in the shoes of the assignor, CashCall takes subject to all rights that the tribe has at the time the loan is made. Assignment does not invalidate choice of law." | Ex. 26 (May 20, 2010 email from Callaway to Baren). |
| | 104. | On September 15, 2009, Bogue emailed Baren, copying Webb, stating, "Western Sky is 100 percent owned by Butch Webb, an enrolled tribal member residing on his home reservation, located within South Dakota, non-public law 280 state.  He is not an arm of the tribal government or is he an employee.   Our lending model is predicated upon Public Law 280 and the Indian Commerce Clause of the US Constitution." | Ex. 29 (September 15, 2009 email from Bogue to Baren). |
| | 105. | Bogue sent a formal opinion letter to Webb on May 14, 2010, stating, "the Western Sky loans have been made by an entity duly and lawfully licensed by the Cheyenne River Sioux Tribe to make and issue such loans[.]" | Ex. 36 (May 14, 2010 Opinion of Counsel letter from Bogue, addressed to Webb). |
| | 106. | Lenders to CashCall were represented by independent counsel who had the opportunity to assess the various transactions with CashCall and the | Ex. 7 (Baren Rule 30(b)(6)) at 33:2-15;  Ex. 2 (Baren) at 160:20-161:1; 175:5-11.  (Baren testimony that he had |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | opinions of Callaway or Bogue issued in connection therewith. | "additional comfort" because "in each of [CashCall] financing transactions, the lenders had very sophisticated, very expensive counsel who drilled very deep into this" with Bogue, Callaway and other Katten attorneys, and "came to the conclusion that the opinion was correct, and they authorized their client to participate in this financing." |
| | 107. | Numerous CashCall employees other than Reddam were responsible for devising, drafting, and editing CashCall's company policies. | Ex. 1 (Meeks Rule 30(b)(6)) at 92:23-99:20 (Meeks testimony that Reddam did not have any role in approving or reviewing the employee handbook, did not review or edit the loan servicing policies and procedures, and did not review CashCall's IT policies and procedures).<br><br>Ex. 9 (Reddam) at 31:4-12 ("Q. Who was responsible for devising and implementing all major company policies in 2009?  A. Well, whoever the relative heads of whatever department we're talking about would – would develop their policies, but they would – they would report to me, and just in the course of business sometimes, and I'm sure we would have discussed them and sometimes not."). |
| | 108. | Other than instructing employees to abide by applicable laws, Reddam had no personal involvement with CashCall's or Delbert's servicing of the Western Sky loans. | Ex. 28 (John Paul Reddam April 11, 2014 Affidavit) ¶ 6 ("I have no personal involvement with CashCall's or Delbert's servicing of loans, except that I instruct CashCall and Delbert managers and supervisors to ensure that all applicable laws are obeyed."). |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 109. | Reddam reasonably relied upon advice of counsel provided to CashCall by Katten that the tribal choice-of-law provisions in the Western Sky loan agreements were legally effective. | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 42);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 43);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 44). |
| 110. | Callaway met with Reddam in March or April of 2013 and confirmed that she and Katten continued to believe the Western Sky Loan Program was legal. | Ex. 9 (Reddam) at 113:5-116:15. |
| 111. | Reddam was aware of the opinions provided by Katten, counsel for Western Sky, and counsel for third-party lenders, that the tribal choice-of-law provisions in the Western Sky loan agreements were legally effective. | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;<br><br>Ex. 9 (Reddam) at 111:17-112:10;<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 42);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 43);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 44). |
| 112. | Reddam understood at all relevant times that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall. | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;<br><br>Ex. 9 (Reddam) at 124:3-12. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 113. | Nine of the Subject States have brought actions against certain of the Defendants relating to the Western Sky loans. | *Ark. v. Western Sky Fin., LLC*, No. 60CV-13-3893 (Ark. Super. Ct., Pulaski Cty.); |
| | | *State of Colorado ex rel. Coffman v. CashCall, Inc.*, No. 2013CV35455 (Colo. Dist. Ct.); |
| | | *Indiana v. Western Sky Fin., LLC et al.*, No. 49D01-1407-PL-024699 (Ind. Cir. Ct., Marion Cty.); |
| | | *In the Matter of CashCall, Inc.*, No. SUCV2013-01616-B (Mass. Super. Ct.); |
| | | *Minnesota ex rel. Swanson v. CashCall, Inc. et al.*, No. 27-CV-13-12740 (Minn.); |
| | | *In re CashCall, Inc.*, No. 12-308 (New Hampshire Banking Dep't.); |
| | | *In the Matter of Western Sky Fin., LLC*, No. E16-016771 (New Jersey Dep't. of Banking and Ins.); |
| | | *N.C. ex rel. Cooper v. Western Sky Fin., LLC et al.*, No. 13 CVS 16487; 13CV16487 (N.C. Bus. Ct.); |
| | | *Schneiderman v. Western Sky Fin., LLC*, No. 451370-2013 (N.Y. Sup. Ct.). |
| 114. | When Western Sky closed, 100 employees lost their jobs, causing "a significant loss to the community." | Ex. 8 (Webb) at 122:4-25; Ex. 22 (Lawrence Declaration) ¶ 9. |
| 115. | The CFPB Supervision and Examination Manual, Version 2, states, "Abusive Acts or Practices[.] The Dodd-Frank Act makes it | Ex. 62 (CFPB Supervision and Examination Manual, Version 2 – October 2012) at UDAAP 9. |

29
DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | unlawful for any covered person or service provider to engage in an 'abusive act or practice.'  An abusive act or practice: [m]aterially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or [t]akes unreasonable advantage of: [a] lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; [t]he inability of the consumer to protect its interests in selecting or using a consumer financial product or service; or [t]he reasonable reliance by the consumer on a covered person to act in the interests of the consumer.  Although abusive acts also may be unfair or deceptive, examiners should be aware that the legal standards for abusive, unfair, and deceptive each are separate." | |
| 116. | The CFPB 2013-07 Bulletin: Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts states, "3. Abusive Acts or Practices[.]  The Dodd-Frank Act also prohibits conduct that constitutes an abusive act or practice.  An act or practice is abusive when it: (1) Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or (2) Takes unreasonable advantage of – (A) a consumer's lack of understanding of the material risks, costs, or conditions of the product or service; (B) a | Ex. 63 (CFPB Bulletin 2013-07: Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts (July 10, 2013)) at 4. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | consumer's inability to protect his or her interests in selecting or using a consumer financial product or service; or (C) a consumer's reasonable reliance on a covered person to act in his or her interests.  It is important to note that, although abusive acts or practices may also be unfair or deceptive, each of these prohibitions are separate and distinct, and are governed by separate legal standards." | |
| | 117. | Plaintiff's responses to CashCall's First Set of Interrogatories to Plaintiff state, "[s]everal states have adopted laws that render small-dollar loans void if they exceed the usury limit," and "in these states, the lender has no legal right to collect money from consumers in repayment of the loan" and the Defendants "serviced and collected payments on void or uncollectable WS Loans made to residents of the Subject States." | Ex. 10 (Plaintiff's First Supplemental Response to CashCall's First Set of Interrogatories ("Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories") at Supp. Resp. to Rog. 1 ¶¶ A, C; Supp. Resp. to Rog. 2 ¶¶ A, C; Resp. to Rog. 3 ¶¶ A, C; Supp. Resp. to Rog. 4 ¶¶ A, C. |
| | 118. | Plaintiff's responses to CashCall's First Set of Interrogatories state, "[n]either CashCall nor WS Funding held the requisite license when acquiring WS Loans made to consumers in" certain states, and "[n]either Western Sky, nor Defendants, had a legal right to collect money from consumers in those states in repayment of such loans," and "[c]onsumers in the Subject States who received WS Loans suffered and continue to suffer substantial financial harm as a result of Defendants' purchase, servicing, and collection of those loans." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A, E, F, G; Supp. Resp. to Rog. 2 ¶¶ E, F; Resp. to Rog. 3 ¶¶ E, F; Supp. Resp. to Rog. 4 ¶¶ E, F. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 119. | Plaintiff's responses to CashCall's First Set of Interrogatories state, Defendants "engaged in the full array of collection activity on WS Loans," "did not disclose to consumers in the Subject States that their loans were void or that, under applicable state laws, they were not obligated to make some or all of the payments," and only "referred consumers back to their loan agreements with Western Sky." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ K-M, Q-S; Supp. Resp. to Rog. 2 ¶¶ K-M, Q-S; Supp. Resp. to Rog. 4 ¶¶ K-M, Q-S. |
| | 120. | Plaintiff's responses to CashCall's First Set of Interrogatories state, "consumers are harmed by paying money they did not owe to Defendants because the loans that Defendants serviced and collected on were void under state laws or the state laws otherwise did not obligate consumers to pay" and "Defendants' competitors were obligated to abide by licensing and usury laws of the Subject States with which Defendants failed to comply." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 19. |
| | 121. | Plaintiff's responses to WS Funding's First Set of Interrogatories state, "a violation of usury limits or the failure to comply with licensing requirements [in the Subject States] will render a small-dollar loan void or will limit the consumer's obligation to repay the loan" and "Defendants "extract[ed] funds from consumers' bank accounts to pay obligations that under state law were void." | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A-C; Supp. Resp. to Rog. 3 ("Set forth all material facts RELATING TO YOUR allegation that '[c]onsumers generally do not know or understand the impact that the above-cited usury and licensing laws of the Subject States have on their loans.'") ¶¶ A, B; Supp. Resp. to Rog. 5 ("Set forth all material facts RELATING TO YOUR allegation that '[c]onsumers who obtained WS Loans in the Subject States . . . typically lacked an |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|---|
| | | understanding that those state laws vitiated Defendants' collection rights.'") ¶¶ A, B; Supp. Resp. to Rog. 7 ("Set forth all material facts RELATING TO YOUR allegation that the facts alleged in paragraph 65 of the FAC 'would have been material to consumers in the Subject States.'") ¶¶ A, B; <br><br> ECF No. 27 (FAC) ¶ 65 ("Defendants have failed to disclose that the loans, or some parts thereof, were void or not subject to a repayment obligation under the applicable laws of the Subject States. Those facts would have been material to consumers in the Subject States in deciding whether to pay those portions of the loans that Defendants had no legal right to collect or that the consumers had no obligation to pay.") |
| 122. | Plaintiff's responses to WS Funding's First Set of Interrogatories state, Defendants "fail[ed] to inform consumers that state law had vitiated all or part of the loans or the consumer's obligation to repay them and . . . misrepresent[ed] that the WS Loans were not subject to state law," the consumers "could not have avoided financial injury because they were unlikely to know or understand that Defendants' loans violated state-usury and licensing laws," and those "violations impact both the legal status of the loan and the parties' underlying rights and obligations[.]" | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A, B, E, F; Supp. Resp. to Rog. 3 ¶ E; Supp. Resp. to Rog. 5 ¶ E; Supp. Resp. to Rog. 7 ¶ E. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| 123. | | Plaintiff's responses to WS Funding's First Set of Interrogatories state that Defendants "called, emailed, and mailed letters to consumers to demand payment," borrowers "did not understand that the loans were void or otherwise did not need to be repaid," "knowledge of whether a loan is void or not subject to repayment is material to a consumer," and "[i]f borrowers understood that state law vitiated their obligation to repay . . . , they would not have paid the money to Defendants." | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 3 ¶¶ C, E, F; Supp. Resp. to Rog. 5 ¶¶ C, E, F; Supp. Resp. to Rog. 7 ¶¶ C, E, F. |
| 124. | | Plaintiff's responses to WS Funding's First Set of Interrogatories state, "consumers, though acting reasonably, could not have avoided financial injury because they were unlikely to know or understand that Defendants' loans violated state-usury and licensing laws, and that such violations vitiated all or part of the loans or the consumers' obligations to repay them." | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 3 ¶ E; Supp. Resp. to Rog. 5 ¶ E; Supp. Resp. to Rog. 7 ¶ E. |
| 125. | | Plaintiff's responses to CashCall's First Set of Interrogatories state, "[c]ompetition is harmed, and not benefited, by Defendants conduct because Defendants' competitors were obligated to abide by licensing and usury laws of the Subject States with which Defendants failed to comply." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 19. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 126. | Western Sky's loan application contained an optional question that asked the reason for which the loan was being sought, to which approximately 28% of applicants responded (over 100,000 responses). | Ex. 12 (Todd Zywicki Expert Report ("Zywicki Report")) ¶ 25. |
| | 127. | CashCall administered a survey (the "Survey") to borrowers of Western Sky loans to determine the reasons why they sought their loan and the satisfaction rate with their loan experience from Western Sky, to which 240 borrowers responded. | Ex. 12 (Zywicki Report) ¶ 25. |
| | 128. | According to data obtained at the time of the application, the most commonly stated reason provided by those seeking a loan was for an "Emergency" (41.85%). The second most commonly stated reason for a loan was "Debt Consolidation" (39.03%). And 15.02% of customers stated that they needed the money for a "One-Time Expenditure." | Ex. 12 (Zywicki Report) ¶ 26; Ex. 8 (Webb) at 100:9-20. |
| | 129. | According to the Survey, the most common reason that borrowers provided for the "purpose" of borrowing the money was to "Deal with a family emergency" (41.3%). The second most-stated purpose for borrowing the money was to "Pay off other debt" (39.2%). | Ex. 12 (Zywicki Report) ¶ 27. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 130. | The Survey results also yielded 5.8% of borrowers stating that the purpose of the loan was to "pay my rent/mortgage."  Only 6.3% of borrowers stated that the purpose of the loan was for "Extra spending money."  An additional 7.5% stated that the purpose was "other." | Ex. 12 (Zywicki Report) ¶ 28. |
| 131. | Over 85% of respondents to either the Survey or application question stated that the purpose of seeking the loan was to deal with an emergency, to consolidate other debt, or to pay rent or mortgage. | Ex. 12 (Zywicki Report) ¶ 29. |
| 132. | The APR of Western Sky loans ranged from 89.69% for an amount financed of $9,925 (plus $75 prepaid finance charge/origination fee) with a maturity of 84 months to 318.52% for an amount financed of $400 (plus $300 prepaid finance charge/origination fee) with a maturity period of 6 months. | Ex. 13 (Delbert Meeks Deposition ("Meeks") at 39:2-40:1 (Meeks testimony that there was no prepayment penalty on any Western Sky loan products); <br><br> Exs. 41-50 (Western Sky loan agreement samples) at 2 (demonstrating all iterations of Western Sky loan terms). |
| 133. | Most of the form loan agreements provide an average amount financed of approximately $2,525 at an average APR of approximately 138% with a prepaid charge/origination fee of $75 with an average maturity length of 36 months. | Ex. 12 (Zywicki Report) ¶ 33. |
| 134. | The mean Western Sky loan amount was $2,305 ($2,047 in proceeds) and the median loan amount was $2,600 ($2,525 in proceeds). | Ex. 12 (Zywicki Report) ¶ 34. |

36

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 135. | The mean credit score for loans originated by Western Sky was 600 and the median credit score was 575. | Ex. 12 (Zywicki Report) ¶ 37. |
| 136. | The average credit score for installment loan borrowers is substantially higher than the credit score for a typical payday loan borrower. | Ex. 12 (Zywicki Report) ¶ 38. |
| 137. | Western Sky's customer base seems to be overwhelmingly subprime or deep subprime in credit rating. | Ex. 12 (Zywicki Report) ¶ 39. |
| 138. | According to CashCall data, the average income of Western Sky's customers was $3,859 per month ($46,308 per year). | Ex. 12 (Zywicki Report) ¶ 40. |
| 139. | The average income for payday loan customers tends to be substantially lower than for installment loan borrowers.   This relationship between users of installment loans and payday loans appears to hold for online lenders as well. | Ex. 12 (Zywicki Report) ¶ 41. |
| 140. | In a study by Michael Flores of online lenders, Flores found that the average income for installment loan borrowers was $40,263, whereas the average income for payday loan borrowers was $30,025. | Ex. 12 (Zywicki Report) ¶ 41. |
| 141. | There is a high delinquency rate for installment loans. | Ex. 12 (Zywicki Report) ¶ 42. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| 142. | Western Sky's approval rate for Western Sky loans was 10%, approximately 90% of applications were rejected. | Ex. 12 (Zywicki Report) ¶ 44. |
| 143. | Online lenders lack many of the tools that traditional lenders have traditionally relied upon to increase performance on their loans. | Ex. 12 (Zywicki Report) ¶ 45. |
| 144. | The charge-off rate on Western Sky loans serviced by CashCall was 45.8%. | Ex. 12 (Zywicki Report) ¶ 46. |
| 145. | Western Sky's Underwriting Guidelines provided that borrowers with lower credit scores could only be approved for loans of smaller principal amounts and for shorter loan durations at a higher APR and with higher origination fees.   For example, in order to be approved for a personal loan of $5,075 for a term of 84 months at an APR of 115%, the borrower was required to have a FICO score of 600+ and verifiable monthly income of $4,000 and to not be self-employed.  To qualify for a loan of $1,500 for 24 months with an APR of 149%, by contrast, the borrower only needed a FICO score of 500+ with $1,800 monthly income. Smaller loans charged a higher APR and had lower income and credit score requirements and required less verification than larger loans. | Ex. 12 (Western Sky Underwriting Guidelines). |
| 146. | Empirical evidence has found that those consumer borrowers that are "rationed"—i.e., those borrowers | Ex. 12 (Zywicki Report) ¶ 62. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | whose demand for credit exceeds the amount of credit that they can easily obtain—generally find the size of the monthly payment to be especially important relative to the APR, as one of their highest considerations in taking a loan is how the payment obligations fit into their monthly budgets. | |
| 147. | Although non-rationed borrowers are largely responsive to changes in the interest rate on the loan, rationed borrowers are also responsive to the size of the monthly payments. | Ex. 12 (Zywicki Report) ¶ 63. |
| 148. | Consumers who use unsecured personal installment loans are typically classified as "rationed" borrowers because of their restricted access to mainstream credit and their subprime credit status. | Ex. 12 (Zywicki Report) ¶ 64. |
| 149. | Western Sky's customer base is consistent with the general understanding of installment loan customers as being subprime in nature. This suggests that many of Western Sky's customers found the APR on their loans to be of limited usefulness in appraising the cost of their loans. | Ex. 12 (Zywicki Report) ¶ 64. |
| 150. | The terms and conditions of the Western Sky loans distinguish them from loans that have been deemed to be "predatory" or "abusive" to consumers, such as payday loans. | Ex. 8 (Webb) at 124:4-9; Ex. 2 (Baren) 43:1-47:9. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| 151. | | Products such as payday loans often have an unreasonably short maturity period in light of the amount financed, such as two weeks, require a balloon payment of the entire balance at the end of that period, and are often issued with no significant underwriting standards or assessment of the borrower's ability to repay the amount financed. | Ex. 7 (Baren Rule 30(b)(6)) at 43:1-47:9;<br><br>Ex. 8 (Webb) at 39:5-24;<br><br>Ex. 12 (Zywicki Report) ¶ 78. |
| 152. | | The CFPB has expressed concern that payday loan borrowers can enter into a cycle of debt that can be harmful to many consumers. | Ex. 12 (Zywicki Report) ¶ 79. |
| 153. | | In the CFPB's White Paper on payday loans and deposit advance products, it identified several features of payday loans that it found problematic.  In particular, it identified the concern that payday loans can result in a cycle of debt to borrowers and that payday loan customers renew their loans repeatedly at high cost. | Ex. 12 (Zywicki Report) ¶ 80. |
| 154. | | The installment loans at issue in this case have none of the characteristics that the CFPB has found problematic with respect to payday loans. | Ex. 12 (Zywicki Report) ¶ 82;<br><br>Ex. 8 (Webb) at 124:4-9. |
| 155. | | The Western Sky loans at issue are fixed-term loans with fixed maturities of no less than six months. | Exs. 41-50 (Western Sky loan agreement samples) at 1;<br><br>Ex. 13 (Meeks) at 39:2-40:1. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | 156. | The Western Sky loans were extended in compliance with Underwriting Guidelines that take account of the consumer's credit score, monthly income, monthly residual income, and employment verification. | Ex. 21 (Western Sky Underwriting Guidelines). |
| | 157. | The Western Sky loans are self-amortizing and do not have a balloon payment. | Exs. 41-50 (Western Sky loan agreement samples) at 1-2. |
| | 158. | The Western Sky loans contain no prepayment penalty. | Ex. 13 (Meeks) at 39:2-40:1; Exs. 41-50 (Western Sky loan agreement samples) at 2 (every iteration of the loan agreement states, "If you pay off this loan early, you will not have to pay any penalty."). |
| | 159. | From February 2010 to July 2010, and October 2010 to August 2013, the following provision in the Western Sky agreements appeared in bold and in capital letters above the signature line:  "THIS LOAN CARRIES A VERY HIGH INTEREST RATE.  YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE.  EVEN THOUGH THE TERM OF THE LOAN IS [term of loan] MONTHS, WE STRONGLY ENCOURAGE YOU TO PAY OFF THE LOAN AS SOON AS POSSIBLE.  YOU HAVE THE RIGHT TO PAY OFF ALL OR ANY PORTION OF THE LOAN AT ANY TIME WITHOUT INCURRING ANY PENALTY.  YOU WILL HOWEVER, BE REQUIRED TO PAY ANY AND ALL INTEREST | Exs. 41, 43-49 (Western Sky loan agreement samples) at 5. |

41

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|
| | THAT HAS ACCRUED FROM THE FUNDING DATE UNTIL THE PAYOFF DATE." | |
| 160. | From July 2010 to October 2010, the following provision in the Western Sky agreements appeared in bold and in capital letters above the signature line: "PLEASE NOTE: THIS LOAN CARRIES A VERY HIGH APR. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE." | Ex. 42 (Western Sky loan agreement sample) at 5. |
| 161. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III, has stated: "In my opinion, the Bureau's action in this case is an unprecedented and inappropriate exercise of regulatory power. It does not comport with the principles that have long defined federal enforcement of the statutory prohibition on unfair or deceptive acts or practices. A company that acts in good faith on the basis of a reasonable legal argument in an area where the law is unclear has not committed an unfair or deceptive act or practice, even if a court later determines that it has violated state laws." | Ex. 15 (Dr. Howard J. Beales III Expert Report ("Beales Report")) ¶ 9. |
| 162. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III has stated: "Here, Western Sky and CashCall appear to have a perfectly reasonable and good-faith legal argument that the governing law is the law of the | Ex. 15 (Beales Report) ¶ 21. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|---|---|
| | | Cheyenne River Sioux Tribe.  The Complaint does not allege that Western Sky or CashCall ever had any reason to believe this conclusion was incorrect.  Like any other legal provision, the respondent's legal position may or may not prevail at the end of the day.  But it is not an "unfair" practice to assert and attempt to enforce a reasonable legal proposition through litigation or otherwise, any more than it was 'unfair' for First National Bank of Omaha to defend its analogous argument to a successful conclusion before the Supreme Court." | |
| | 163. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III has stated: "In summary, acting in good faith on the basis of a reasonable legal argument in an area where the law is unclear does not constitute conduct that has been or should be considered an unfair or deceptive act or practice. The Bureau's theory of liability in this case is unprecedented and inconsistent with the principles that have defined federal regulatory enforcement in this area." | Ex. 15 (Beales Report) ¶ 25. |
| | 164. | From March 3, 2011 to August 18, 2014, CashCall held an Alabama Consumer Lender License. | Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5. |
| | 165. | From July 23, 2003 to the present, CashCall has held a New Mexico Small Loan License. | Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5. |

43

## II.   CONCLUSIONS OF LAW

| | | |
|---|---|---|
| 1. | There must be a "clear statement" from Congress to "presume" that a federal statute has transformed a violation of state law into one of federal law—"a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States." | *Bond v. United States*, 134 S. Ct. 2077, 2090 (2014); *see also United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834, 843 (9th Cir. 2014) (no actionable RICO claim for state law violation absent conduct that independently violates federal law). |
| 2. | Business licensing resides within a state's police power. | *Chamber of Commerce v. Whiting*, 563 U.S. 582, 604 (2011) ("Regulating in-state businesses through licensing laws has never been considered . . . an area of dominant federal concern."). |
| 3. | Courts reject efforts to use the FDCPA, an analogous statute to the CFPA, to enforce state statutes, because the court "must determine not whether [the defendant] violated the state statute, but whether it violated the federal Act." | *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1100 (9th Cir. 1996) (holding "collection efforts, although apparently in violation of state law, were innocuous and not in violation of the FDCPA"); *see also Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 473-74 (7th Cir. 2007) (FDCPA "does not so much as hint at being an enforcement mechanism for other rules of state . . . law."); *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 127 (2d Cir. 2016) ("*[T]here is no indication* that Congress intended" the FDCPA "to incorporate state-or local-law standards of conduct," based on a section entitled "Relation to State Laws").[2] |
| 4. | The CFPA contains a nearly identical "Relation to State Laws" provision located in the FDCPA. | 12 U.S.C. § 5551; 15 U.S.C. § 1692n. |

---

[2]      All internal alterations, quotation marks, and citations are omitted and all emphasis is added herein, unless otherwise noted.

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| 5. | The CFPA states that it prohibits "committing or engaging in an unfair, deceptive, or abusive act or practice **under Federal law**." | 12 U.S.C. §§ 5511(a), 5531(a). |
| --- | --- | --- |
| 6. | To determine the validity of a choice-of-law provision in a contract, ten Subject States follow the Restatement (Second) of Conflict of Laws ("Second Restatement") § 187: choice-of-law provisions govern unless "[(1)] there is no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice[;] or [(2)] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." | Second Restatement § 187.  *See Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 266-68 (2003); *Mountain States Adjustment v. Cooke*, --- P.3d ---, 2016 WL 2957746 at *3-4, *6-7 (Colo. App. May 19, 2016); *Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822, 825-27 (2007); *Hodas v. Morin*, 442 Mass. 544, 548-53 (2004); *Hobin v. Coldwell Banker Residential Affiliates*, 144 N.H. 626, 628-29 (2000); *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 568-69 (1999); *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 628-30 (2006); *Torres v. McClain*, 140 N.C.App. 238, 241 (2000); *Century Bus. Servs., Inc. v. Barton*, 197 Ohio App. 3d 352, 366-68 (2011).  *See also United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 108 N.M. 467, 470-71 (1989) (substantively similar to Second Restatement). |
| 7. | To determine the validity of a choice-of-law provision in a contract, three Subject States have adopted modified versions of the Second Restatement. | *See Kentucky Nat'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 575 (Ind. Ct. App. 2010) (choice of law applied after determining state with most significant relationship, including "(1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicil, residence, nationality, place of incorporation and place of business of the parties"); *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878-80 (Ky. |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| | | 2013) (same as Indiana, and considers state public policy); *San Diego Gas & Elec. Co. v. Gilbert*, 375 Mont. 517, 520 (2014) (choice of law governs unless: "(1) but for the choice of law provision, Montana law would apply under § 188 of the Restatement; (2) Montana has a materially greater interest in the particular issue than the parties [sic] chosen state; and (3) application of the chosen state's law would contravene a Montana fundamental policy"). |
| 8. | To determine the validity of a choice-of-law provision in a contract, three Subject States use even more permissive tests than the Second Restatement. | *See Buckley v. Seymour*, 679 So. 2d 220, 225-226 (Ala. 1996) (choice-of-law governs unless it contravenes public policy); *Evans v. Harry Robinson Pontiac-Buick, Inc.*, 336 Ark. 155, 161-63 (1999) (choice-of-law governs if chosen state has a reasonable relation to parties or transaction); *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994) (choice-of-law governs if there is good faith by the parties and without intent to evade the law, and noting in such circumstances that parties may agree that either state law shall govern). |
| 9. | Where the parties have contracted for a choice-of-law provision, the law respects and defaults to the parties' choice of law. | *See* Second Restatement § 187(2) cmt. f ("Prime objectives of contract law . . . may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby."); *see also Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So. 2d 1129, 1133 (Ala. 2003) ("Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement."); *Cooke*, 2016 WL 2957746, at *3 ("Choice of law provisions [in |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | | |
|---|---|---|---|
| | | | Colorado] are ordinarily given effect as . . . a clear manifestation of the parties' intentions."); *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) ("Indiana choice of law doctrine favors contractual stipulations as to governing law."); *Hagstrom*, 518 N.W.2d at 48 ("Minnesota traditionally enforces parties' contractual choice of law provisions."); *United Wholesale*, 108 N.M. at 469 (deferring to choice of law provision "upholds New Mexico's strong public policy of freedom to contract"); *Welsbach Elec.*, 7 N.Y.3d at 629 ("Where an agreement is clear and unambiguous, a court is not free to alter it and impose its personal notions of fairness."). |
| | 10. | Borrowers are free to contractually accept higher interest rates than permitted in their home jurisdictions. | *See Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 407-08 (1925) ("[Contracts] are to be governed by the law of the place of performance, and if the interest allowed by the laws of the place of performance is higher than that permitted at the place of the contract, *the parties may stipulate for the higher interest, without incurring the penalties of usury*. . . . If the rate of interest be higher at the place of the contract than at the place of performance the parties may lawfully contract in that case also for the higher rate."); *Mell v. Goodbody & Co.*, 10 Ill. App. 3d 809, 813-14 (1973) (New York usury law applied per agreement, even though interest rate was higher than permitted by Illinois law, because "[a]ny rate per cent sanctioned by the laws of the place where the contract is made, or by the substituted laws of the place where it is to be performed, or paid, will be recognized and enforced in the courts of other governments, |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | | |
|---|---|---|---|
| | | | whose laws would make such rate usurious"); *Evans*, 336 Ark. at 161-63 (1999) (Texas law governed though interest rate was usurious in Arkansas). |
| | 11. | "[U]nless and until Congress acts, the tribes retain their historic sovereign authority." | *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014). *Williams v. Lee*, 358 U.S. 217, 220 (1959). |
| | 12. | The CFPA envisions tribes as co-equals to the states, defining "State" to include "any federally recognized Indian tribe," demonstrating a federal policy of promoting tribal self-government, sovereignty, and economic self-sufficiency. | 12 U.S.C. § 5481(27). |
| | 13. | The CFPA provides that "[n]o provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit." | 12 U.S.C. § 5517(o). |
| | 14. | "Establish" has been defined as to "confirm" or to "validate." | *Young Oil Co. v. Racetrac Petroleum, Inc.*, 757 So. 2d 380, 384 (Ala. 1999) (defining "establish" as to "confirm" or to "validate"); *Gnadt v. Durr*, 208 Kan. 783, 788 (1972). |
| | 15. | Courts interpreting CFPA claims asserting unfair, deceptive and abusive conduct recognize that the Federal Trade Commission Act ("FTC Act") applies a "similar, if not identical standard" in analyzing unfair and deceptive conduct. | *CFPB v. IrvineWebWorks, Inc.*, 2016 WL 1056662, at *12 (C.D. Cal. Feb. 5, 2016); *CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016). |
| | 16. | A practice is deceptive under section 5 of the FTC Act and the CFPA "(1) if it is likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." | *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *Gordon*, 819 F.3d at 1192. |

48

| 17. | An agreement cannot be deceptive under the FTC Act where a reasonable consumer would not be deceived by its terms, due to an express disclaimer therein. | *Davis*, 691 F.3d at 1168. |
|---|---|---|
| 18. | The FTC Act and the CFPA define an unfair act or practice as one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." | 15 U.S.C. § 45(n); 12 U.S.C. § 5531(c)(1)(a). |
| 19. | "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice" and "have reason to anticipate the impending harm and the means to avoid it." | *Davis*, 691 F.3d at 1168. |
| 20. | A prominent disclosure of terms and conditions in an agreement "provides the means to avoid harm" and thus cannot be unfair as a matter of law, because a consumer can reasonably avoid harm by choosing not to sign the agreement. | *Davis*, 691 F.3d at 1169. |
| 21. | An act is not abusive under the CFPA unless it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or . . . takes unreasonable advantage of  . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or | 12 USC § 5531(d). |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | | service; . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." | |
| 7<br>8<br>9<br>10<br>11<br>12<br>13 | 22. | Prominently featured disclaimers cannot "materially interfere[]" with or "take[] unreasonable advantage of" a consumer's understanding of the terms and conditions of a contract—they merely state and then repeat what law governs the contract and its terms. The consumer could clearly "protect [his/her] interests" by simply refusing to sign the agreement and accept the loan. | 12 USC § 5531(d); *see also* *Davis*, 691 F.3d at 1168-69. |
| 14<br>15<br>16 | 23. | "Public policy considerations may not serve as a primary basis" for a determination that an act or practice is unfair. | 12 U.S.C. § 5531(c)(2). |
| 17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 24. | "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." | *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also* *McDonnell v. United States*, 2016 WL 3461561, at *18 (U.S. June 27, 2016) (where government's interpretation of statutory term was "not defined with sufficient definiteness that ordinary people can understand what conduct is prohibited, or in a manner that does not encourage arbitrary and discriminatory enforcement," the lack of fair notice to the accused "raises the serious concern that the provision does not comport with the Constitution's guarantee of due process"); *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (dismissing mislabeling claims due to ambiguous |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

| | | | |
|---|---|---|---|
| | | | FDA directives: "[t]o insist that Defendant should have been complying with a regulation that was not explicitly clarified . . . would buck due process and Ninth Circuit precedent"). |
| | 25. | An individual may be held liable for corporate violations of the CFPA only if he "(1) participated directly in, or had the authority to control, the unlawful acts or practices at issue; and (2) had actual knowledge of the misrepresentations involved, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud and intentionally avoided learning the truth." | *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 600 (9th Cir. 2016); *Gordon*, 819 F.3d at 1193 & n.8. |
| | 26. | Corporate liability must be proven before an individual can be found liable under the CFPA. | *F.T.C. v. Gill,* 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999). |
| | 27. | The government must do more than point to an individual's corporate title to prove that he had knowledge of purportedly unfair, deceptive, or abusive acts. | *See F.T.C. v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555, 558 (9th Cir. 2013) (because "the FTC did not present any evidence beyond Persis Dantuma's corporate titles as to her knowledge . . . it was not an abuse of discretion to hold that she was not individually liable"). |
| | 28. | "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," so the Constitution "has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary." | *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483–84, 496 (2010). |

51

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW

DATED:  June 30, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ */s/ Thomas J. Nolan* _____
Thomas J. Nolan
*Attorneys for Defendants CashCall, Inc., WS Funding, LLC, Delbert Services Corporation, and J. Paul Reddam*

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND CONCLUSIONS OF LAW