OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted *pro hac vice*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

# INDEX TO SUMMARY JUDGMENT EXHIBITS[1]

| SJ Ex. Number: | Abbreviation: | Refers to: |
|---|---|---|
| **Depositions** | | |
| SJ Ex. 500 | Reddam Dep. | Deposition of J. Paul Reddam taken by Plaintiff CFPB on June 1, 2016 (excerpts). |
| SJ Ex. 501 | Meeks Dep. | Deposition of Delbert Meeks taken by Plaintiff CFPB on June 2, 2015 (excerpts). |
| SJ Ex. 502 | Meeks 30(b)(6) Dep. | 30(b)(6) Deposition of Delbert Meeks taken by Plaintiff CFPB on June 14, 2016 (excerpts). |
| SJ Ex. 503 | Baren Dep. | Deposition of Daniel Baren taken by Plaintiff CFPB on June 14, 2016 (excerpts). |
| SJ Ex. 504 | Baren 30(b)(6) Dep. | 30(b)(6) Deposition of Daniel Baren taken by Plaintiff CFPB on June 14, 2016 (excerpts). |
| SJ Ex. 505 | Webb Dep. | Deposition of Martin Webb taken by Plaintiff CFPB on June 22, 2016 (excerpts). |
| **Declarations/Affidavits** | | |
| SJ Ex. 25 | Barboza Aff. | Affidavit of Karen Barboza, dated June 2014 (CFPB-00024037 – CFPB-00024045). |
| SJ Ex. 33 | Baren Decl. | Declaration of Daniel Baren, dated November 7, 2013 (provided to the CFPB with the Response of CashCall, Inc., WS Funding, LLC, Delbert Services Corp., and J. Paul Reddam to October 22, 2013 Notices of the Consumer Financial Protection Bureau). |

[1] All summary judgment exhibits are authenticated in the declaration of Owen Martikan or are included in the Joint Stipulation of Authenticity in Support of Parties' Motions for Summary Judgment.

| | | |
|---|---|---|
| SJ Ex. 42 | Begin Aff. | Affidavit of Cynthia A. Begin, dated June 6, 2014 (filed in this litigation in D. Mass. on June 10, 2014). |
| SJ Ex. 26 | Ellard Decl. | Declaration of Jeremiah Ellard, dated October 22, 2015 (CFPB-00024151 – CFPB-00024156). |
| SJ Ex. 6 | Lawrence Decl. | Declaration of Tawny Lawrence, dated November 7, 2013 (provided to the CFPB with the Response of CashCall, Inc., WS Funding, LLC, Delbert Services Corp., and J. Paul Reddam to October 22, 2013 Notices of the Consumer Financial Protection Bureau). |
| SJ Ex. 27 | Melanson Aff. | Affidavit of Christine Melanson, dated June 4, 2014 (CFPB-00024247 – CFPB-00024256). |
| SJ Ex. 28 | Melo Aff. | Affidavit of John A. Melo, dated June 3, 2014 (CFPB-00024257 – CFPB-00024264). |
| SJ Ex. 29 | Viera Decl. | Declaration of Stephen J. Vieira, dated May 23, 2014 (CFPB-00024501 – CFPB-00024521). |
| **Discovery Responses** | | |
| SJ Ex. 506 | CashCall RFA | Defendant CashCall, Inc.'s Responses and Objections to Plaintiff's First Request for Admissions to Defendant CashCall, Inc. |
| SJ Ex. 507 | Reddam RFA | DefendantJ. Paul Reddam's First Amended Responses and Objections to Plaintiff's First Request for Admissions. |

| Documents | | |
|---|---|---|
| SJ Ex. 34 | Assignment Agreement | Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial and WS Funding, dated February 1, 2010 (provided to the CFPB as Exhibit A of the Declaration of Daniel Baren for the Response of CashCall, Inc., WS Funding, LLC, Delbert Services Corp., and J. Paul Reddam to October 22, 2013 Notices of the Consumer Financial Protection Bureau) (Deposition Exhibit 2). |
| SJ Ex. 35 | Services Agreement | Agreement for Service between Western Sky Financial and CashCall, Inc., dated January 9, 2010 (provided to the CFPB as Exhibit C of the Declaration of Tawny Lawrence for the Response of CashCall, Inc., WS Funding, LLC, Delbert Services Corp., and J. Paul Reddam to October 22, 2013 Notices of the Consumer Financial Protection Bureau) (Deposition Exhibit 4). |
| SJ Ex. 30 | 2011/2012 Financials | CashCall, Inc. Financial Statements, December 31, 2012 and 2011 (CFPB-00025006 – CFPB-00025034) (Deposition Exhibit 14) (excerpts). |
| SJ Ex. 37 | Loan Agreement | Western Sky Consumer Loan Agreement (provided by Martin A. Webb) (Deposition Exhibit 32). |
| SJ Ex. 31 | Baren to Webb Email | July 7, 2010 email from Dan Baren to Butch Webb regarding the "Trial program" and attaching the "Western Sky Guidelines" (CFPB-0145099) (Deposition Exhibit 17). |
| SJ Ex. 24 | Underwriting Criteria | Western Sky Financial, LLC Loan Underwriting Criteria (CC-017833509 – CC-017833511) (Deposition Exhibit 33). |

| | | |
|---|---|---|
| SJ Ex. 32 | Reddam CT Statement | J. Paul Reddam Personal and Business History Statement, Certified by Consumer Credit Division of the State of Connecticut Department of Banking (CFPB-0146028 – CFPB-0146032). |
| SJ Ex. 21 | Western Sky Loan Agreements | Western Sky Consumer Loan Agreements (provided to the CFPB as Exhibit B of the Declaration of Tawny Lawrence for the Response of CashCall, Inc., WS Funding, LLC, Delbert Services Corp., and J. Paul Reddam to October 22, 2013 Notices of the Consumer Financial Protection Bureau). |

Pursuant to Local Rule 56-1, Plaintiff Consumer Financial Protection Bureau ("Bureau"), as the moving party on the motion for partial summary judgement referred to in the Notice filed herewith, respectfully submits this Statement of Uncontroverted Facts and Conclusions of Law.

## STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW

| | | |
|---|---|---|
| **I. The Defendants** | | |
| 1. | Defendant CashCall, Inc. ("CashCall") is a California corporation with its principal place of business at 1 City Boulevard West, Suite 1900, Orange, California 92868. | Answer ¶ 5. |
| 2. | CashCall's headquarters during much of the time period covered by this lawsuit were in Anaheim, California. | Reddam Dep. 147:18-148:11. |
| 3. | As part of its business, CashCall made and serviced unsecured loans to subprime borrowers throughout the United States. | Baren 30(b)(6) Dep. 42:21-25. |
| 4. | Defendant J. Paul Reddam is the founder, CEO, sole owner and president of CashCall. | Answer ¶¶ 8, 51; Baren Decl. ¶ 3. |
| 5. | Defendant WS Funding is a wholly-owned subsidiary of CashCall. | Answer ¶¶ 6, 8. |
| 6. | CashCall formed WS Funding, LLC, to serve as a holding company for loans that WS Funding, LLC purchased from Western Sky Financial. | CashCall RFA 11. |
| 7. | Reddam was the president and manager | Answer ¶ 8. |

| | | |
|---|---|---|
| | of WS Funding. | |
| 8. | WS Funding has no books or financials – they are fully integrated with CashCall's books, records, and financials. | Meeks 30(b)(6) Dep. 38:20-39:1; 39:16-23. |
| 9. | WS Funding has no owners other than CashCall. | Answer ¶¶ 6, 8; Baren Dep. 139:6-8. |
| 10. | WS Funding has no purpose other than to purchase loans from Western Sky and pass them through to CashCall. | Meeks 30(b)(6) Dep. 40:1-8; Baren Dep. 111:22-112:7. |
| 11. | Defendant Delbert Services Corp., ("Delbert"), is a Nevada corporation with its principal place of business at 7123 Pollack Drive, Las Vegas, Nevada 89119. | Answer ¶ 7. |
| 12. | Reddam established Delbert to service debt that CashCall deemed in default, or "charged-off," and to provide collection services for other, unrelated, clients. | Meeks Dep. 71:3-12. |
| 13. | Reddam was the founder, director and sole owner of Delbert. | Answer ¶ 8; Baren Dep. 140:6-10; Baren Decl. ¶ 11. |
| **II. CashCall's Unsecured Consumer Loan Business** | | |
| 14. | Reddam formed the company that was later re-named CashCall in 2000, and its initial business was buying and selling houses. | Reddam Dep. 17:2-22. |
| 15. | In 2003, Reddam involved CashCall in unsecured consumer lending to compete with payday loan companies. | Reddam Dep. 18:17-19:11. |
| 16. | In 2003 or 2004, Reddam made a personal loan of about $21 million to CashCall. | Reddam Dep. 58:24-59:3; 2011/2012 Financials, p. 20. |

| | | |
|---|---|---|
| 17. | CashCall initially loaned only to customers in California. | Reddam 37:25-38:5. |
| 18. | The scope of CashCall's market changed in 2006, when Merrill Lynch conditioned further financing on CashCall's diversification of its default risk by expanding its lending nationwide. | Reddam Dep. 59:25-60:15; Baren Dep. 47:3-18. |
| 19. | CashCall could not expand its business by obtaining licenses to lend in additional states, because "in many of those states, the usury laws would not permit [CashCall] to make or service loans at the rates [CashCall] deemed necessary to make a profit." | Baren Dep. 48:2-14. |
| 20. | Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make loans that CashCall then purchased and serviced. | Baren Dep. 28:13-29:9. |
| 21. | This model of lending was "a smashing success" for CashCall until the two state-chartered banks withdrew from the arrangement under pressure from the FDIC. | Baren Dep. 32:4-18; 33:14-34:13. |
| **III. Replacing the rent-a-bank scheme with the tribal-lending scheme** | | |
| 22. | After CashCall lost its arrangement with the state-chartered banks, the lawyer who had designed and executed the rent-a-bank model, Claudia Callaway, told CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at | Baren Dep. 32:10-33:6. |

| | | |
|---|---|---|
| | the contract rate, and the loans would not be subject to state regulation." | |
| 23. | Baren described the tribal lending model as "almost identical to the [state-chartered] bank model." | Baren Dep. 33:1-6. |
| 24. | CashCall established the "tribal lending model" so that a tribal lender could "transfer … loans to CashCall, and CashCall could then service the loans at … higher interest rates" than otherwise allowed under state law. | Baren Dep. 49:2-13. |
| 25. | Callaway introduced Baren to Martin "Butch" Webb. | Baren Dep. 37:25-38:18. |
| 26. | Mr. Webb was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota, and who had started two or three previous payday lending companies that used the tribal lending model. | Baren Dep. 39:13-25; Answer ¶ 19. |
| 27. | The CRST has no substantial relationship to CashCall. | CashCall RFA 64-71; Baren 30(b)(6) Dep. 7:18-21. |
| 28. | CashCall's executive team met frequently to discuss CashCall business issues. | Baren Dep. 142:7-9; 143:17-144:5; Meeks Dep. 69:13-21. |
| 29. | CashCall is not controlled by the CRST. | CashCall RFA 68. |
| 30. | The CRST has never held any voting rights in CashCall. | CashCall RFA 67. |
| 31. | CashCall is not nor has ever been owned or controlled, in whole or in part, by a member of the CRST. | CashCall RFA 69-70. |
| 32. | CashCall was not established under the laws of the CRST. | CashCall RFA 71. |

| | | |
|---|---|---|
| 33. | Webb discussed forming a tribal lending entity that would eventually sell "paper," meaning loans, to CashCall. | Baren Dep. 39:9-12. |
| 34. | CashCall did not consider any other partner besides Mr. Webb for the "tribal model." | Baren Dep. 43:23-44:2. |
| 35. | Webb formed Western Sky Financial ("Western Sky") in late 2009 with CashCall in mind. | Webb Dep. 45:9-12; 45:22-46:2. |
| 36. | Western Sky was a South Dakota Limited Liability Company, and Webb was its sole owner. | Webb Dep. 96:20-22; Answer ¶ 19. |
| 37. | Webb's plan was to use the money that he made with Western Sky as venture capital to expand his own payday loan company, which was called Lakota Cash. | Webb Dep. 45:19-21. |
| 38. | Baren considered WS Funding's purchase of the loans from Western Sky as the same as CashCall purchasing the loans, since CashCall was WS Funding's parent. | Baren Dep. 119:5-20. |
| 39. | WS Funding was a wholly owned subsidiary of CashCall, and was a pass-through for Western Sky Loans. | Meeks 30(b)(6) Dep. 40:1-8. |
| **IV. The structure of CashCall's arrangement with Western Sky** | | |
| 40. | CashCall and Western Sky formalized their relationship in two agreements signed by Reddam and Webb on behalf of their companies: (1) an assignment agreement, and (2) a service agreement. | Baren Dep. 134:1-136:6. |
| 41. | There was an "Agreement for Service" ("Services Agreement") between | CashCall RFA 3; Services Agreement. |

| | | |
|---|---|---|
| | CashCall and Western Sky. | |
| 42. | The Services Agreement was signed by J. Paul Reddam on behalf of CashCall, and by Martin "Butch" Webb on behalf of Western Sky. | CashCall RFA 2. |
| 43. | The Services Agreement was in effect throughout the period of time beginning on January 9, 2010, and ending on August 31, 2013. | CashCall RFA 3. |
| 44. | There was an Assignment Agreement between WS Funding and Western Sky. | Baren Dep. 134:1-13; 135:1-136:1; Assignment Agreement. |
| 45. | Reddam signed the Assignment Agreement between Western Sky and WS Funding on February 1, 2010. | Reddam RFA 6, 7. |
| 46. | These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013. | Baren Dep. 136:2-6; Baren 30(b)(6) Dep. 7:25-8:17. |
| 47. | Under the assignment agreement, signed in February 2010, CashCall, through WS Funding, agreed to buy loans from Western Sky. | Assignment Agreement. |
| 48. | CashCall bought all of Western Sky's loans. | Reddam Dep. 81:6-17; Baren Dep. 123:23-124:1; Webb Dep. 58:19-21; Meeks 30(b)(6) Dep. 53:6-9; Assignment Agreement, ¶ 2. |
| 49. | CashCall bought Western Sky's loans before consumers made any payments on the loans. | Baren Dep. 111:17-112:7. |
| 50. | To fund the Western Sky loans, CashCall set up a reserve account for Western | Meeks 30(b)(6) Dep. 55:11-17; 72:10-23; Assignment |

| | | |
|---|---|---|
| | Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. | Agreement, ¶ 9; Webb Dep. 52:1-17. |
| 51. | The amount loaned to the borrower through Western Sky's account was held on CashCall's books as an account receivable. | Meeks 30(b)(6) Dep. 55:18-21. |
| 52. | Western Sky used this money to make loans. | Webb Dep. 52:1-17. |
| 53. | Three days after a loan was funded, Western Sky sold it to CashCall. | Meeks 30(b)(6) Dep. 55:22-56:11; Webb Dep. 46:3-17. |
| 54. | CashCall paid Western Sky for the full face value of the loans, plus 5.145%. | Assignment Agreement, Meeks 30(b)(6) Dep. 67:4-11; Webb Dep. 48:10-13. |
| 55. | CashCall also guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. | Assignment Agreement, ¶¶ 3, 5; Meeks 30(b)(6) Dep. 67:12-68-14; 69:2-7, Webb Dep. 48:17-19; 50:5-12. |
| 56. | Western Sky agreed to sell loans to CashCall before any payments on them had been made. | Assignment Agreement; Baren Dep. 111:17-112:7. |
| 57. | Borrowers who took out Western Sky loans remitted all payments to CashCall. | Baren Dep. 111:17-112:7; Baren Decl. ¶ 9. |
| 58. | Once Western Sky sold a loan to CashCall all economic risks and benefits of the transaction passed to CashCall. | Webb Dep. 46:6-8; 84:7-23. |
| 59. | The default risk, which CashCall's Chief Financial Officer identified as its most serious risk, was borne by CashCall. | Meeks Dep. 103:8-12. |
| 60. | The regulatory risk, which Reddam identified as CashCall's most serious | Reddam Dep. 58:8-10; Assignment Agreement, |

| | | |
|---|---|---|
| | risk, was also borne by CashCall, given CashCall's agreement to indemnify Western Sky for all civil, criminal, or regulatory penalties, including legal fees. | ¶ 11; Baren Dep. 184:12-21. |
| 61. | CashCall agreed to reimburse Western Sky for any repair, maintenance, and update costs associated with Western Sky's server. | Assignment Agreement, ¶ 5. |
| 62. | CashCall reimbursed Western Sky for its marketing expenses, office and personnel costs, and bank fees. | Webb Dep. 60:4-6; Meeks 30(b)(6) Dep. 70:9-19. |
| 63. | CashCall also agreed to indemnify Western Sky for any legal expenses arising out of civil, criminal, or administrative litigation, agreed to pay fines, penalties, and costs imposed in any jurisdiction, and agreed to pay Western Sky's attorney's fees in connection with such litigation. | Reddam Dep. 58:8-10; Assignment Agreement, ¶ 11; Baren 184:12-21. |
| 64. | Under the Service Agreement between CashCall and Western Sky, CashCall licensed Western Sky's name, tradename, trademarks, and logos, for purposes of advertising Western Sky loans online and in other media. | Services Agreement, p. 1. |
| 65. | CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, assignment of a toll-free phone number, and to handle electronic communications with customers. | Services Agreement, p. 2. |
| 66. | In exchange for these services, CashCall deducted 2.02% from the margin that it paid to purchase the Western Sky loans. | Services Agreement, pp. 3-4. |

| | | |
|---|---|---|
| 67. | CashCall developed underwriting criteria for its unsecured consumer loans, which guided how it would evaluate a borrower's credit before making a loan. | Reddam Dep. 42:20-43:6. |
| 68. | Webb also developed underwriting criteria for Western Sky, but in practice CashCall would not purchase a loan from Western Sky unless it met CashCall's underwriting criteria. | Meeks Dep. 40:15-22. |
| 69. | In July 2010, Baren sent Webb an email attaching underwriting guidelines, which he asked Webb to put on Western Sky letterhead if he approved them, and send back to him. | Baren Dep. 65:21-67:5; Baren to Webb Email. |
| 70. | Three days later, Webb signed underwriting criteria for a $700 loan on Western Sky letterhead and, three days after that, faxed them to Baren. | Webb Dep. 89:4-90:14; Underwriting Criteria. |
| 71. | The only dispute Webb recalls ever having with CashCall about underwriting guidelines was when Webb wanted to stop lending in Maryland because of legal action in that state, and CashCall wanted to continue lending there. | Webb Dep. 97:6-98:9. |
| 72. | In its 2011 and 2012 financial statements, CashCall did not differentiate the Western Sky loans from other unsecured consumer loans that it made without tribal involvement. | Meeks Dep. 79:21-81:12; 2011/2012 Financials. |
| **V. The Lending Process For Western Sky Loans** | | |
| 73. | Consumers applied for Western Sky loans two ways: by telephone or online. | Baren Dep. 73:3-14. |
| 74. | Consumers did not have to go to the | Baren Dep. 73:3-14. |

| | | |
|---|---|---|
| | CRST reservation in South Dakota to apply for, negotiate, or enter into loans. | |
| 75. | If a customer called a toll-free number advertised as being for Western Sky loans, they could be connected to a CashCall loan agent. | Reddam Dep. 90:24-91:6, 99:4-100:7; Baren Dep. 106:12-107:13; Ellard Decl. ¶ 4. |
| 76. | A former CashCall loan agent, Jeremiah Ellard, recalled that for a year or more after TV ads for Western Sky loans began to run, he was not aware of any functioning Western Sky entity in South Dakota. | Ellard Decl. ¶ 18. |
| 77. | All Western Sky calls during this time period appeared to go to CashCall loan officers, based in CashCall's offices. | Ellard Decl. ¶¶ 4, 19. |
| 78. | CashCall loan agents processed Western Sky loan applications in essentially the same way as other CashCall loan applications. | Ellard Decl. ¶¶ 4, 19. |
| 79. | CashCall loan agents used the same initial screening standards for CashCall and Western Sky loans, and forwarded Western Sky loans to the CashCall underwriting department. | Ellard Decl. ¶¶ 4, 19. |
| 80. | Consumers who passed an initial screening were asked to upload certain documents online for review in the underwriting process. | Baren Dep. 73:25-74:9. |
| 81. | Ellard was trained to tell loan applicants, if they asked, that he worked for CashCall and that CashCall was hired to take overflow calls for Western Sky. | Ellard Decl. ¶ 29. |
| 82. | This bothered him because he took the | Ellard Decl. ¶ 29. |

| | | |
|---|---|---|
| | majority of calls for Western Sky. | |
| 83. | Some loan applicants who Ellard spoke with were bothered to learn that he worked for CashCall, because they thought they were doing business only with Western Sky. | Ellard Decl. ¶ 29. |
| 84. | Even after Western Sky expanded its facilities and took customer phone calls at maximum capacity, most calls were still routed to CashCall loan agents, so that the total number of loan applications processed by Western Sky employees was a small fraction of the total number of Western Sky loan applications. | Ellard Decl. ¶ 30. |
| 85. | Western Sky did not have the infrastructure in place to allow for on-site underwriting, incoming call queuing, or other functions necessary for broad-scale lending. | Ellard Decl. ¶ 31. |
| 86. | Western Sky employees used CashCall's Method software system, which was located in Anaheim, California, to handle the loan approval process. | Webb Dep. 70:1-16. |
| 87. | The Western Sky website was hosted by CashCall on a server in California, using Cogility software, which is a company that CashCall contracted with. | Webb Dep. 73:10-17; Reddam Dep. 19:12-23, 22:4-20; Meeks 30(b)(6) Dep. 85:11-86:3 |
| 88. | CashCall's IT team uploaded any changes to the Western Sky website, and ensured the website was running properly. | CashCall RFA 80. |
| 89. | A potential borrower can input personal information to apply for a loan, which is uploaded to CashCall's Method software | Webb Dep. 29:18-30:4 and 74:13-15. |

| | | |
|---|---|---|
| | system, in California. | |
| 90. | If a borrower pressed this link, the information would go to CashCall or Western Sky. | Webb Dep. 74:16-75:3. |
| 91. | When Western Sky started up, all calls to these numbers went to CashCall loan agents in California. | Webb Dep. 75:17-20; Ellard Decl. ¶ 4. |
| 92. | The loan agreements purported to be governed by CRST law, and subject to CRST jurisdiction. | Webb Loan Agreement. |
| 93. | The Western Sky loan agreements stated that the loans were subject to CRST law and "no other state or federal law." | Webb Loan Agreement. |
| 94. | CashCall employees also communicated with some applicants for Western Sky loans via email. | CashCall RFA 8. |
| 95. | When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. | Baren Dep. 55:25-56:15, 57:12-58:2, 70:2-21. |
| 96. | CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. | Baren Dep. 59:8-16. |
| 97. | CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. | CashCall RFA 7. |
| 98. | According to Baren, "it would be very, very rare, in fact, probably impossible" for a loan applicant to know that CashCall was involved in the loan origination process, even though | Baren Dep. 110:23-111:6 |

| | | |
|---|---|---|
| | CashCall was always performing some tasks on behalf of Western Sky. | |
| 99. | Consumers authorized Western Sky (in fact, CashCall) to withdraw their loan payments by electronic funds transfer ("EFT") from their bank accounts. | Webb Loan Agreement, p. 5. |
| 100. | Three days after the loan was funded, the borrower received notice that the loan would be serviced by CashCall. | Baren Decl. ¶ 9. |
| 101. | CashCall and WS Funding informed borrowers that they should remit all payments to CashCall as servicer of the loans | Baren Decl. ¶ 9. |
| 102. | One loan product was a $2,600 loan with an APR of 139.34%. | Western Sky Loan Agreements, B-1. |
| 103. | A typical CashCall customer who had borrowed $2,600 would pay over $8,000 in interest and fees over the life of the loan. | Western Sky Loan Agreements, B-1, B-3, B-4, B-5, B-6, B-7, B-8, B-9, B-10. |
| 104. | Another loan product was a $700 loan with an APR of 318.52%. | Western Sky Loan Agreements, B-2. |
| 105. | The Western Sky loans also included $5,000 and $10,000 loans. | Reddam Dep. 55:14-22; Meeks 30(b)(6) Dep. 21:16-19. |
| 106. | For each loan, the origination fee was rolled into the loan principal. | Webb Loan Agreement, p. 2. |
| 107. | The typical CashCall borrower had a lower-than-average FICO score. | Baren 30(b)(6) Dep. 42:21-25. |
| 108. | Over 90% of the Western Sky loan applications were rejected, due to applicants' insufficient income or employment. | Webb Dep. 99:14-23. |

| | | |
|---|---|---|
| 109. | The loan agreement for a Western Sky loan informed the borrower that it was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." | Webb Loan Agreement, p. 1. |
| 110. | In another portion of the agreement, titled "Governing Law," the borrower was informed that "[t]his Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America." | Webb Loan Agreement, p. 3. |
| 111. | In another section the borrower is informed that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." | Webb Loan Agreement, p. 3. |
| 112. | The loan agreement identified Western Sky Funding, LLC, as the lender. | Webb Loan Agreement, p. 1. |
| 113. | If a borrower was approved for a Western Sky loan and chose to accept it, the borrower would go onto the Western Sky website and electronically sign the loan agreement. | Baren Dep. 94:1-8. |
| 114. | A person at Western Sky would then press a button and the loan proceeds would be transferred from the Western Sky's account to the borrower's account. | Baren Dep. 52:21-53:5. |

| | | |
|---|---|---|
| 115. | Western Sky disbursed loan proceeds to borrowers using CashCall's money. | Webb Dep. 19:7-19. |
| 116. | All of the Western Sky loans, as well as all of CashCall's other consumer loans, were funded electronically. | Baren Dep. 53:1-5. |
| 117. | If a Western Sky loan became so delinquent that CashCall decided to charge it off, meaning that it was heavily delinquent, the loan was transferred to Delbert for collection. | Meeks Dep. 20:21-25. |
| 118. | The charge-off date varied over time, from 120 to 150 days delinquent. | Meeks Dep. 74:19-75:1. |
| 119. | Consumers relied on the stated terms of the loans. | Viera Decl. ¶ 15; Barboza Aff. ¶ 12; Melo Aff. ¶ 12; Melanson Aff. ¶ 10. |
| 120. | CashCall's customers faced a substantial risk of default on loans. CashCall spent a great deal of time trying to minimize the risk of default. | Meeks Dep. 58:12-59:10; 66:18-67:5; 103:8-12. |
| 121. | According to CashCall's 2012 financial statement, the value of loans that CashCall charged off, meaning that CashCall assigned a value of zero to the loan because it had been in default for more than 150 days, was approximately a fifth of the value of loans funded that year. | 2011/2012 Financials, p. 15. |
| 122. | According to CashCall, most of these defaults occurred during the first six months after the loan was funded. | 2011/2012 Financials, p. 15. |

| **VI. Reddam's Involvement With The Western Sky Loans** | | |
|---|---|---|
| 123. | In a 2009 sworn filing with the Connecticut Department of Banking, which Reddam signed, he attached a resume stating that all of CashCall's department heads report directly to him. | Reddam CT Statement. |
| 124. | Reddam also stated that he "is responsible for devising and implementing all major company policies — including its various loan programs and interest rates." | Reddam CT Statement. |
| 125. | Reddam stated that he "coordinates all marketing and advertising, and determines where advertising should be directed." | Reddam CT Statement. |
| 126. | In Delbert's application for a debt collector license to the Massachusetts Division of Banks, filed in January 2010, Delbert attached a business plan that identified Reddam as its CEO, a member of its management team, and a member of Delbert's Board of Directors. | Begin Aff., Attach. G, p. 3. |
| 127. | The filing notes that Reddam and Baren "have the principal responsibility for fulfillment of the company's mission and the legal accountability for its operations." | Begin Aff., Attach. G, p. 3. |
| 128. | Reddam personally guaranteed CashCall's loans from hedge funds, which CashCall used to finance the Western Sky loans and its other consumer loans. | Reddam Dep. 136:24-137:7; 138:17-22; Meeks Dep. 106:19-108:25. |

| | | |
|---|---|---|
| 129. | Reddam hired an advertising agency that created advertising campaigns for CashCall, and also the Western Sky loans. | Reddam Dep. 33:20-34:19, 88:20-25; Webb Dep. 60:4-6. |
| 130. | Reddam was a member of CashCall's executive team, along with Baren and Meeks, which was involved in negotiating the agreement with Western Sky. | Baren Dep. 142:3-12. |
| 131. | Reddam approved CashCall's purchase of the Western Sky loans. | Reddam Dep. 82:20-83:2. |
| 132. | Reddam discussed the terms of the assignment agreement that governed Western Sky's sale of the Western Sky loans with his general counsel, Baren. | Reddam Dep. 70:4-7. |
| 133. | Reddam had the authority to approve agreements that CashCall or its subsidiaries entered into with other companies, including WS Funding's purchase of the Western Sky loans. | Reddam Dep. 76:15-77:2. |
| 134. | Reddam made the decision to wind down the Western Sky loan program in the face of "regulatory problems." | Reddam Dep. 115:12-21; 116:2-15. |
| 135. | Reddam discussed the status of CashCall's litigation over the Western Sky loans with Baren frequently. | Reddam Dep. 128:19-129:6. |
| 136. | Reddam had the authority to control all of CashCall's acts, and to decide when and whether to transfer delinquent CashCall loans to Delbert, the collection company that Reddam also founded. | Meeks Dep. 21:19-25; 41:15-16; 46:11-15; 74:19-75:12; Reddam CT Statement. |
| 137. | Reddam had the authority to approve CashCall's transaction with Western | Reddam CT Statement. |

| | | |
|---|---|---|
| | Sky, and participated in the transaction by signing the two governing agreements with Western Sky, the assignment agreement and the service agreement, on behalf of CashCall and WS Funding. Reddam claimed, in a sworn filing, that all CashCall managers reported directly to him, and that he had authority over CashCall's day-to-day activities. | |
| 138. | Reddam claimed similar authority over Delbert in another filing. | Begin Aff., Attach. G, p. 3 |
| 139. | Reddam knew that CashCall, rather than Western Sky, was the true lender behind the Western Sky loans, because he knew how the transaction between CashCall and Western Sky was created. | Reddam Dep. 55:14-22; 65:11-22; 67:6-12; 67:18-68:12; 75:1-8. |
| 140. | Reddam knew that despite what the Western Sky loan agreement said, their loan would be serviced by CashCall. | Reddam Dep. 50:9-51:2 |
| 141. | Reddam avoided lending to consumers in West Virginia, for fear of regulators there, and testified that in his view, CashCall's biggest business risk was the risk that it would be shut down by state or federal regulators. | Reddam Dep. 58:8-9; 123:13-124:2. |
| 142. | The transaction with Western Sky was structured almost exactly like the transaction Reddam had previously structured with state-chartered banks, and he was forced to terminate that transaction due to regulatory pressure. | Baren Dep. 33:1-6. |
| **VII. Scope Of The Western Sky Loan Arrangement** | | |
| 143. | At the outset, CashCall's agreement with Western Sky involved loans made to | Meeks Dep. 60:11-17 (nationwide); Baren Dep. |

| | | |
|---|---|---|
| | borrowers throughout the United States, with the exception of California (where CashCall was already making loans), South Dakota (because Webb did not want to compete with a bank that he was president of, and because he did not want to lend to anyone he knew), and West Virginia, which Baren considered a "hotbed of regulatory concern." | 86:7-88:4; Reddam Dep. 122:20-124:2; Webb Dep. 82:1-17. |
| 144. | After Reddam decided to wind down the Western Sky loan program in 2013, CashCall notified Western Sky that it would stop purchasing Western Sky loans during the first week of September 2013. | Reddam Dep. 115:12-118:1; Baren Dep. 92:23-93:4. |
| 145. | When the Western Sky loan program began, the number of loans that CashCall purchased from Western Sky was small compared to the loans that CashCall originated directly, but as the program grew, CashCall purchased more Western Sky loans, until they exceeded the number of loans that CashCall originated directly. | Meeks Dep. 37:23-38:5. |
| 146. | In its 2012 financial statement, CashCall reported funding $537,896,000 in unsecured consumer loans that year, without differentiating Western Sky and CashCall loans. | 2011/2012 Financials, p. 15. |

| | | |
|---|---|---|
| **VIII. The Subject States** | | |
| **A. Alabama** | | |
| 147. | Alabama law voids loans of $1,000 or less that are made without a license, and a lender has no right to collect, receive, or retain any principal, interest, or charges on such loans. | (Ala. Code §§ 5-18-4(a), (d)). |
| 148. | Western Sky did not hold a license in Alabama. | Answer ¶ 28. |
| 149. | CashCall did not have the license to make loans of $1,000 or less in Alabama from January 1, 2010 – March 5, 2011. | CashCall RFA 28. |
| 150. | Western Sky loans were made of $1,000 or less. | Meeks Dep. 38:6-23. |
| 151. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Alabama on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 26. |
| **B. Arizona** | | |
| 152. | Arizona law voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect, receive or retain any principal, finance charges, or other fees in connection with such loans. | Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-603(A), 6-613(B). |
| 153. | Western Sky did not hold a license in | Answer ¶ 28. |

| | | |
|---|---|---|
| | Arizona. | |
| 154. | CashCall did not have the license to make loans of $10,000 or less in Arizona from January 1, 2010 – August 31, 2013. | CashCall RFA 31. |
| 155. | Western Sky loans were made of $10,000 or less. | Meeks Dep. 38:6-23. |
| 156. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $10,000, which were applied for by borrowers who provided an address located in Arizona on their loan applications during the period of time beginning on February 1, 2010 and ending on August 31, 2013. | CashCall RFA 29. |
| **C. Arkansas** | | |
| 157. | Arkansas law provides that all contracts with an interest rate above 17% per annum are void as to principal and interest. | Ark. Const. Amendment 89, §§ 3, 6(b). |
| 158. | Collection of principal and interest on loans with interest rates exceeding the lawful limit of 17% per annum is prohibited. | Ark. Const. Amendment 89, § 6(b). |
| 159. | The Western Sky loans made in Arkansas had interest rates that exceeded 80% per annum. | CashCall RFA 13. |
| 160. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Arkansas on their loan applications during the period of time beginning on February 1, 2010 and | CashCall RFA 12. |

| | | |
|---|---|---|
| | ending on August 31, 2013. | |
| **D. Colorado** | | |
| 161. | In Colorado, a lender's or assignee's failure to obtain the requisite license removes the consumer's obligation to pay finance charges to the lender or assignee. | Colo. Rev. Stat. §§ 5-1-301(17), (47); 5-2-301(1)(a), (b). |
| 162. | Colorado law also relieves the consumer of the obligation to pay any charge excessive under the law. | Colo. Rev. Stat. § 5-5-201(2). |
| 163. | Colorado prohibits annual interest above 12% on unpaid balances for unlicensed loans. | Colo. Rev. Stat. §§ 5-1-301(46), (47); 5-2-201(1). |
| 164. | "Supervised lender" is defined as a person authorized to make or take assignments of supervised loans under a license issued by the administrator or as a supervised financial organization. | Colo. Rev. Stat. § 5-1-301 (46). |
| 165. | Colorado prohibits a "supervised lender" or "seller," which includes an assignee of the seller's right to payment, from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1,000.01 and $3,000, and 15% on unpaid balances greater than $3,000; or (b) 21% a year on unpaid balances. Colo. Rev. Stat. § 5-2-201(2). | Colo. Rev. Stat. §§ 5-1-301 (42), (46); 5-2-201(2). |
| 166. | Western Sky did not hold a license in Colorado. | Answer ¶ 28. |
| 167. | The Western Sky loans made in | CashCall RFA 25. |

| | | |
|---|---|---|
| | Colorado had interest rates that exceeded 80% per annum. | |
| 168. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Colorado on their loan applications during the period of time beginning on February 1, 2010 and ending on August 31, 2013. | CashCall RFA 24. |
| **E. Illinois** | | |
| 169. | Illinois law voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013 without a license, and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan. | 205 ILCS 670/1, 670/20(d). |
| 170. | Western Sky did not hold a license in Illinois. | Answer ¶ 28. |
| 171. | CashCall did not have the license to make loans of $40,000 or less in Illinois from January 1, 2013 – August 31, 2013. | CashCall RFA 34. |
| 172. | Western Sky loans were made of $10,000 or less. | Meeks Dep. 38:6-23. |
| 173. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Illinois on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 32. |

| | | |
|---|---|---|
| **F. Indiana** | | |
| 174. | Indiana law voids loans, except loans in an amount of not less than $50 and not more than $550 which otherwise meet the statutory definition of "small loan," if those loans are made without a license. The debtor has no obligation to pay either the principal or finance charges on such loans. | Ind. Code §§ 24-4.5-3-502(3), 24-4.5-5-202(2), 24-4.5-7-104. |
| 175. | The Western Sky loans made in Indiana had interest rates that exceeded 80% per annum. | CashCall RFA 36. |
| 176. | Western Sky did not hold a license in Indiana. | Answer ¶ 28. |
| 177. | CashCall did not hold a license to make loans in Indiana from January 1, 2010 – August 31, 2013. | CashCall RFA 37. |
| 178. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Indiana on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 35. |
| **G. Kentucky** | | |
| 179. | Kentucky law voids loans of $15,000 or less if the interest rate exceeds 8% and the loan is made without a license, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans, | Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1). |
| 180. | The Western Sky loans made in | CashCall RFA 39. |

| | | |
|---|---|---|
| | Kentucky had interest rates that exceeded 80% per annum. | |
| 181. | Western Sky did not hold a license in Kentucky. | Answer ¶ 28. |
| 182. | CashCall did not hold a license to make loans in Kentucky from January 1, 2010 – August 31, 2013. | CashCall RFA 40. |
| 183. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $15,000, which were applied for by borrowers who provided an address located in Kentucky on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 38. |
| **H. Massachusetts** | | |
| 184. | Massachusetts law voids loans of $6,000 or less if interest and expenses on the loan exceed 12% per annum and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans. | Mass. Gen. Law. ch. 140, §§ 96, 110. |
| 185. | The Western Sky loans made in Massachusetts had interest rates that exceeded 80% per annum. | CashCall RFA 42. |
| 186. | Western Sky did not hold a license in Massachusetts. | Answer ¶ 28. |
| 187. | CashCall did not hold a license to make loans in Massachusetts from January 1, 2010 – August 31, 2013. | CashCall RFA 43. |
| 188. | CashCall serviced loans funded by Western Sky and purchased by WS | CashCall RFA 41. |

| | | |
|---|---|---|
| | Funding of less than $6,000, which were applied for by borrowers who provided an address located in Massachusetts on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | |
| **I. Minnesota** | | |
| 189. | Minnesota law voids loans of $1,000 or less that are made without a license, and the borrower is not obligated to pay any amounts owing on such loans. | Minn. Stat. §§ 47.601, subdiv. 1(d), subdiv. 6(b)(1). |
| 190. | Minnesota also voids:<br>1. Consumer short term loans, which are those made to consumers in an amount under $1,000 and which require "a minimum payment within 60 days of loan origination or credit advances of more than 25 percent of the principal balance or credit advance," are "void and the borrower is not obligated to pay any amounts owing" if the effective interest rate exceeds the allowable amount or if the loan contract contains "a provision selecting a law other than Minnesota law under which the contract is construed or enforced."<br>and<br>2. Loans for which the written loan contract has an interest rate exceeding eight percent, if the loans do not meet the definition of "consumer short term loans," and except as to a holder in due course. | Minn. Stat. §§ 47.601, 1(d), 2(a)(1), 2(b), 6(b); 334.01, subdiv. 1; 334.03. |

| | | |
|---|---|---|
| 191. | The Western Sky loans made in Minnesota had interest rates and APRs that both exceeded 80% per annum. | CashCall RFA 16. |
| 192. | Western Sky did not hold a license in Minnesota. | Answer ¶ 28. |
| 193. | CashCall did not hold a license to make loans in Minnesota from January 1, 2010 – August 31, 2013. | CashCall RFA 44. |
| 194. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $1,000, which were applied for by borrowers who provided an address located in Minnesota on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 15. |
| **J. Montana** | | |
| 195. | Montana law voids loans in any amount that are made, or for which any compensation is contracted for, charged, or received directly or indirectly, by a person without a license, and the person does not have the right to collect, receive, or retain any principal, interest, fees, or other charges on such loans, | Mont. Code Ann. § 32-5-103(1), (4). |
| 196. | Western Sky did not hold a license in Minnesota. | Answer ¶ 28. |
| 197. | CashCall did not hold a license to make loans in Montana from January 1, 2010 – August 31, 2013. | CashCall RFA 46. |
| 198. | CashCall serviced more than four Western Sky loans per calendar year, which were applied for by borrowers | CashCall RFA 45. |

| | | |
|---|---|---|
| | who provided an address located in Montana on their loan application, during the period of time beginning on January 1, 2010, and ending on August 31, 2010. | |
| **K. New Hampshire** | | |
| 199. | New Hampshire law voids loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans. | N.H. Rev. Stat. §§ 399-A:1(XIV), 399-A:2(I), (IV). |
| 200. | New Hampshire law voids any "closed-end loan" to New Hampshire borrowers with an annual interest rate exceeding 36%, except loans which are the result of an accidental or bona fide error, and the lender has no right to collect any principal, charges, or recompense on such loans. | N.H. Rev. Stat. Ann. §§ 399-A:11, V; 399-A:12, I. |
| 201. | All Western Sky loans to New Hampshire borrowers fall within the definition of "Closed-end loan" as used in N.H. Rev. Stat. § 399-A:12, I. | *See* N.H. Rev. Stat. §§ 399 A:1, II, IX; 399-A:12, I. |
| 202. | Western Sky loans were made of $10,000 or less. | Meeks Dep. 38:6-23. |
| 203. | The Western Sky loans made in New Hampshire had interest rates that exceeded 80% per annum. | CashCall RFA 19. |
| 204. | Western Sky did not hold a license in New Hampshire. | Answer ¶ 28. |
| 205. | CashCall did not hold a license to make loans in New Hampshire from January 1, 2010 – August 31, 2013. | CashCall RFA 47. |

| | | |
|---|---|---|
| 206. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $10,000, which were applied for by borrowers who provided an address located in New Hampshire on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 18. |
| **L. New Jersey** | | |
| 207. | New Jersey law voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good faith error. | N.J.S.A. §§ 17:11C-2, 17-11C-3, 17-11C-33(b). |
| 208. | Western Sky loans were made of $10,000 or less. | Meeks Dep. 38:6-23. |
| 209. | Western Sky did not hold a license in New Jersey. | Answer ¶ 28. |
| 210. | CashCall did not hold a license to make loans in New Jersey from January 1, 2010 – August 31, 2013. | CashCall RFA 50. |
| 211. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $50,000, which were applied for by borrowers who provided an address located in New Hampshire on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 48. |
| **M. New Mexico** | | |

| | | |
|---|---|---|
| 212. | New Mexico law voids loans of $2,500 or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans. | N.M. Stat. Ann. § 58-15-3. |
| 213. | Western Sky loans were made of $2,500 or less. | Meeks Dep. 38:6-23. |
| 214. | Western Sky did not hold a license in New Mexico. | Answer ¶ 28. |
| 215. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $2,500, which were applied for by borrowers who provided an address located in New Mexico on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 51. |
| **N. New York** | | |
| 216. | New York law voids any loan made with an interest rate exceeding the legal limit. | N.Y. Gen. Oblig. Law §§ 5-511(1), (2); *Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void *ab initio* . . . ."). |
| 217. | New York's applicable interest-rate limit is 16% per annum. | N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1). |
| 218. | New York law also prohibits any person or corporation not licensed by the state of New York from directly or indirectly, charging, taking or receiving on a loan any interest at a rate exceeding 16% per annum, and loans that exceed the rate are void. | N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a(1). |

| | | |
|---|---|---|
| 219. | The Western Sky loans made in New York had interest rates that exceeded 80% per annum. | CashCall RFA 21. |
| 220. | Western Sky did not hold a license in New York. | Answer ¶ 28. |
| 221. | CashCall did not hold a license to make loans in New York from January 1, 2010 – August 31, 2013. | CashCall RFA 54. |
| 222. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $25,000, which were applied for by borrowers who provided an address located in New York on their loan application. | CashCall RFA 20. |
| **O. North Carolina** | | |
| 223. | North Carolina law voids loans of $15,000 or less that are made or secured for repayment without a license, except as a result of accidental or bona fide error of computation, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans. | N.C. Gen. Stat.§ 53-166(a), (d). |
| 224. | North Carolina law caps the allowable interest rate at eight percent for lenders not licensed in the state. | N.C. Gen. Stat. Ann § 24-1. |
| 225. | North Carolina law imposes a tiered set of interest-rate limits with a maximum of 30% per annum on loans below $15,000, repayable between 12 and 96 months, and made by a lender licensed in North Carolina. Loans that violate this provision are void, and the lender has no right to collect, receive, or retain any | N.C. Gen. Stat. §§ 53-166(d), 53-176(a). |

| | | |
|---|---|---|
| | principal or charges with respect to such loans. | |
| 226. | Western Sky loans were made of $10,000 or less. | Meeks Dep. 38:6-23. |
| 227. | The Western Sky loans made in North Carolina had interest rates that exceeded 80% per annum. | CashCall RFA 23. |
| 228. | Western Sky did not hold a license in North Carolina. | Answer ¶ 28. |
| 229. | CashCall did not hold a license to make loans in North Carolina from January 1, 2010 – August 31, 2013. | CashCall RFA 55. |
| 230. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $15,000, with terms between 6 and 84 months, which were applied for by borrowers who provided an address located in North Carolina on their loan application, during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 22. |
| **P. Ohio** | | |
| 231. | Ohio law voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans. | Ohio Rev. Code Ann. § 1321.02. |
| 232. | Western Sky loans were made of $5,000 or less. | Meeks Dep. 38:6-23. |
| 233. | Western Sky did not hold a license in Ohio. | Answer ¶ 28. |

| | | |
|---|---|---|
| 234. | CashCall did not hold a license to make loans in Ohio from January 1, 2010 – August 31, 2013. | CashCall RFA 58. |
| 235. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $5,000, which were applied for by borrowers who provided an address located in Ohio on their loan application, during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | CashCall RFA 56. |
| **IX. Conclusions of Law** | | |
| 236. | The substance of the Western Sky loan arrangement, rather than its form, determines whether CashCall or Western Sky was the true lender. | *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1197-1198 (N.D. Cal. 2012); *West Virginia v. CashCall, Inc.*, 605 F.Supp.2d 781, 787 (S.D.W.Va. 2009). |
| 237. | The determinative question in the true lender analysis is which entity bore the financial risk. | *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004). |
| 238. | CashCall was the true lender in the Western Sky arrangement, because it bore the financial risk of the Western Sky loans. | *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004). |
| 239. | The step transaction doctrine groups transactions that are technically separate into one transaction, to reflect their true substance. | *Comm'r v. Clark*, 489 U.S. 726, 738 (1989). |
| 240. | Under the end-result test, the court will invoke the step transaction doctrine "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from | *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994). |

| | | |
|---|---|---|
| | the outset to achieve the ultimate result." | |
| 241. | Because the Western Sky arrangement was structured to achieve a single end result — CashCall's nationwide expansion of its lending without restriction by state regulations — the step transaction requires that the arrangement be viewed as a single lending transaction, in which CashCall was the lender and Western Sky's involvement was a meaningless formality. | *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994). |
| 242. | Because CashCall was the true lender in the Western Sky arrangement, the Court will not consider the Western Sky loans as having been made by Western Sky from CRST lands, for purposes of evaluating the loans' choice-of-law provision, CashCall's tribal sovereignty claim, and CashCall's claim of tribal sovereign immunity. | *Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776, at *7 (N.D. Cal. Aug. 5, 2013). |
| 243. | CashCall, WS Funding, and Delbert are not entitled to invoke tribal sovereign immunity because they are not a tribe. | *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725 (9th Cir. 2008). |
| 244. | Because the Western Sky loans did not bear any clear relationship to tribal self-government or internal relations, CashCall, WS Funding, and Delbert are not entitled to invoke the CRST's tribal sovereignty to escape state regulation. | *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 426 (1989). |
| 245. | To evaluate the enforceability of the choice-of-law clause in the Western Sky loan agreements, the Court applies federal common law choice-of-law rules. | *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997). |

| | | |
|---|---|---|
| 246. | Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws. | *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997). |
| 247. | Courts should honor the parties' choice of law unless (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or (2) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and that state would be the state of applicable law in the absence of a choice-of-law clause. | Restatement (Second) of Conflicts of Laws § 187(2). |
| 248. | The CRST has no substantial relationship to the parties or the Western Sky loan transactions because CashCall, which has no connection to the CRST, was the true lender. | *Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776, at *7 (N.D. Cal. Aug. 5, 2013). |
| 249. | CashCall and its borrowers have no reasonable basis to choose CRST law to govern their loan contract, when neither of them is a CRST member or resides on CRST land, and a typical borrower is unlikely to have access to CRST law. | Restatement (Second) of Conflicts of Laws § 187(2). |
| 250. | Each of the Subject States has expressed a fundamental public policy favoring usury restrictions, or lending licenses, or both, by enacting statutes that render contracts that violate those provisions void. | *In re: DirectTV Early Cancellation Litigation*, 738 F.Supp.2d 1062, 1087 (C.D. Cal. 2010). |
| 251. | Each of the Subject States has a materially greater interest than the CRST | Restatement (Second) of Conflicts of Laws § 187(2); |

| | | |
|---|---|---|
| | in the determination of the validity of the Western Sky loan agreements, based on the borrowers' citizenship and CashCall's lack of interest in invoking California law in the Western Sky loan agreements. | *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1158 (9th Cir. 2015). |
| 252. | Absent a clear agreement between the parties as to the governing law, Restatement § 188 is the general provision under which choice of law is determined for a contract. | *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1211 (9th Cir. 2001). |
| 253. | The local law of the state which has the most significant relationship to the transaction and the parties provides the applicable law, based on the following five factors: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties. | *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1211 & n.2 (9th Cir. 2001). |
| 254. | The Restatement factors favor the application of the borrowers' states' laws to the Western Sky loan agreement. | Restatement (Second) of Conflicts of Laws § 188. |
| 255. | Internet loans are considered for legal purposes to have been made in the borrowers' location. | *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp.2d 323, 361 (S.D.N.Y. 2013). |
| 256. | In the context of contracts for the repayment of money lent, the law of the state where the contract requires that repayment be made governs. | Restatement (Second) of Conflict of Laws § 195. |
| 257. | In the Western Sky loan agreements, | Restatement (Second) of |

| | | |
|---|---|---|
| | because the borrower authorized withdrawal of the borrower's loan payments by electronic funds transfer from the borrower's bank account, the loan was repaid in the borrower's state. | Conflict of Laws § 195. |
| 258. | The Subject States' laws apply to the Western Sky loan agreements. | Restatement (Second) of Conflicts of Laws § 188; Restatement (Second) of Conflict of Laws § 195. |
| 259. | The interest rates on the Western Sky loans violated the usury laws of Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina. | *See* Uncontroverted Facts 157-159; 163-165; 167; 190-191; 200; 203; 216-219; and 224-227, above. |
| 260. | Because of their usurious interest rates, the Western Sky loans are void and uncollectable in Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina. | *See* Uncontroverted Facts 157-158; 161-167; 190; 200; 216-218; and 224-225, above. |
| 261. | All of the Subject States, with the exception of Arkansas, require consumer lenders to obtain a license before lending to customers who reside there. | *See* Uncontroverted Facts 147-156; 161-235, above. |
| 262. | Because CashCall did not hold a license to lend to customers in any Subject State except for Colorado and New Mexico, and Western Sky did not hold a license to lend to consumers in any of the Subject States, the Western Sky loans are void and uncollectable in the Subject States. | *See* Uncontroverted Facts 147-156; 161-235, above. |
| 263. | CashCall, WS Funding, Reddam, and Delbert Services are covered persons. | 12 U.S.C. §5481(6)(A), (15)(A)(i), and (25)(C)(1). |
| 264. | An act or practice is "deceptive" under | *CFPB v. Gordon*, 819 F.3d |

| | | |
|---|---|---|
| | the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. | 1179, 1193 (9th Cir. 2016). |
| 265. | Deception may be found based on the "net impression" created by a representation. | *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). |
| 266. | By servicing and collecting on the Western Sky loans, CashCall and Delbert created the net impression in consumers that they were servicing loans that were subject to CRST law and payable. This impression was likely to mislead customers acting reasonably under the circumstances, because it was false. | *FTC v. Natural Solutions, Inc.*, No. CV 06-6112 JFW JTLx, 2007 WL 8315533, *4 (C.D. Cal. Aug. 7, 2007). |
| 267. | CashCall's and Delbert's misleading statements were material. | *FTC v. AMG Servs., Inc.*, 29 F. Supp.3d 1338, 1372 (D. Nev. 2014). |
| 268. | An act or practice is "unfair" under the CFPA if it is (1) likely to cause consumers substantial injury; (2) which is not reasonably avoidable; and (3) which is not outweighed by countervailing benefits to consumers or to competition. | 12 U.S.C. § 5536(a)(1)(B). |
| 269. | The substantial injury prong can be satisfied, by reference to the FTC Act's analogous provision, if consumers were injured by a practice for which they did not bargain. | *F.T.C. v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). |
| 270. | The Western Sky loans were unfair because they caused consumers | 12 U.S.C. § 5536(a)(1)(B); *FTC v. Neovi, Inc.*, 604 F.3d |

| | | |
|---|---|---|
| | substantial injury, which was not reasonably avoidable, and which was not outweighed by countervailing benefits to consumers or to competition. | 1150, 1158 (9th Cir. 2010); *F.T.C. v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). |
| 271. | A practice is "abusive" if it takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of a financial product or service. | 12 U.S.C. § 5531(d)(2)(A). |
| 272. | An individual is liable for corporate violations of the CFPA if (1) he participated directly in the deceptive acts or had authority to control them, and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a high probability of fraud along with an intentional avoidance of the truth. | *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). |
| 273. | Reddam participated in CashCall's deceptive acts and had the authority to control them, and he had knowledge of CashCall's misrepresentations. Reddam was also recklessly indifferent to the truth or falsity of CashCall's misrepresentations. | *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016). |

Dated: June 30, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
E-mail: owen.martikan@cfpb.gov
Christina S. Coll (CA Bar #250712)
christina.coll@cfpb.gov
Leanne E. Hartmann (CA Bar #264787)

leanne.hartmann@cfpb.gov
Barry E. Reiferson (NY Bar #4343893)
barry.reiferson@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau