THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEPOSITION TESTIMONY OF MARTIN A. WEBB (JUNE 22, 2016) IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 9, 2016<br>Trial: September 27, 2016 |

26:20 Q. Okay. Do you know how often underwriting
26:21 guidelines changed during 2011?
26:22 A. No, I don't. It could change daily. There was
26:23 not a set time.
26:24 Q. Okay. And what would govern when it changed?
26:25 A. It changed based on when I decided there was
27:1 some collaborated effort between CashCall and myself;
27:2 however, it only changed ever upon my decision and
27:3 agreement. But example would be when a new loan product
27:4 would be put into place, then we would change the
27:5 underwriting.
27:6 Q. "New loan product" meaning a loan in a specific
27:7 amount, like, say, $5,000 or $1,500; is that --
27:8 A. Correct. Or different repayment or different
27:9 interest rate or different underwriting requirement. It
27:10 could change daily. Or if there was a state I didn't
27:11 want to loan in anymore, we changed underwriting.

28:22 Q. In 2011 when you created or revised
28:23 underwriting requirements, were those set forward in
28:24 some kind of a document?
28:25 A. Yes. They were then changed either in-house
29:1 under this underwriting by -- retyped by my staff at
29:2 Timber Lake, or they were changed at CashCall, and then
29:3 I approved it.
29:4 Q. All right. And what would the document look
29:5 like that showed a change in underwriting guidelines?
29:6 A. It would be a new document like this.

29:7 Q. All right. And you're pointing at Exhibit
29:8 No. 25?
29:9 A. Correct.
29:10 Q. Okay.
29:11 A. It was done via -- normally via e-mail.
29:12 Q. So how would it be -- I'm sorry. Could you
29:13 expand on that. How would it be done via e-mail?
29:14 A. With directions to -- "Here's what I want
29:15 changed. Here's what we're going to do." Or it was
29:16 done by my staff, retyped, and then faxed and sent to
29:17 CashCall. So it was put into the Method software.
29:18 Q. What's Method software?
29:19 A. Method software is their software that CashCall
29:20 owned and licensed it to Western Sky, and we utilized it
29:21 for an automated system where it took in the data,
29:22 analyzed the data and had a -- and then forward that on
29:23 to Timber Lake.

32:2 Q. What is your educational background?
32:3 A. My educational background. I went to
32:4 Eagle Butte, South Dakota, on the reservation from first
32:5 through twelfth grade. Graduated high school from
32:6 Eagle Butte. Went one year of college to Montana State
32:7 University in Bozeman, Montana; three years to
32:8 University of Wyoming in Laramie, Wyoming. I have a BS
32:9 degree in ag business and 32 years working in the
32:10 banking and lending business.

33:4 Indian Credit, is that the name of the company?
33:5 A. Yes.
33:6 Q. When did you work there?
33:7 A. It was -- I don't remember. It would have been
33:8 the late '80s.
33:9 Q. For how long?
33:10 A. I didn't work there. I did consulting work for
33:11 them.
33:12 Q. Oh, okay.
33:13 A. Probably a year.
33:14 Q. And you said the business was restructuring and
33:15 collecting debt?
33:16 A. Correct.
33:17 Q. Unsecured loans or different kinds of debt?
33:18 A. Well, being a banker, they were both. They may
33:19 have been secured, but they were unsecured when you got
33:20 them.
33:21 Q. Okay. Fair enough.
33:22 All right. So was that what that company did,
33:23 or was that your consulting for them?
33:24 A. The company actually was -- from my knowledge,
33:25 had money, and they loaned out to Native Americans,
34:1 primarily farmers and ranchers. When I was hired, they
34:2 were no longer functioning as a lending agency but were
34:3 more in a collection mold. So there was two of us they
34:4 hired to do that.

34:10 Q. I'm asking you now what did you do after that.
34:11 A. After the consulting, I went to work for Dewey
34:12 County Bank in Timber Lake, which eventually changed
34:13 their name to Western Dakota Bank.
34:14 Q. And was that a full-service bank?
34:15 A. Correct.
34:16 Q. How was it chartered? Was that a --
34:17 A. State chartered.
34:18 Q. State charter bank?
34:19 How long did you work at Dewey or Western
34:20 Dakota Bank?
34:21 A. July of 1990 to, I believe, September 1 of
34:22 2013.
34:23 Q. And what positions did you hold there?
34:24 A. When I started, it was senior loan -- well,
34:25 when I started, it was consulting. It went full time
35:1 shortly after senior loan officer. Within approximately
35:2 a year I was president.
35:3 Q. So you were president in 1992; is that right?
35:4 A. I would say yes.
35:5 Q. Okay. And were you president for the remainder
35:6 of your time there?
35:7 A. Yes.
35:8 Q. Is that a -- was that a bank with one branch or
35:9 more than one?
35:10 A. Two branches. Main office and two branches.
35:11 Q. Okay. What was the bulk of your business while
35:12 you were president there?

35:13 A. The bulk of the business was ag loans, some
35:14 commercial and some short-term loans.
35:15 Q. When you say "short-term loans," you mean to
35:16 people, to individuals, personal loans?
35:17 A. To individuals.
35:18 Q. And were most of your customers on the tribal
35:19 land there on the reservation, or was it --
35:20 A. Most, yes.

38:21 Q. All right. So while you were the president of
38:22 Western Dakota Bank, you had some other lending
38:23 businesses as well; is that right?
38:24 A. Yes.
38:25 Q. Okay. Can you tell me what those were, going
39:1 from the oldest to the last.
39:2 A. I can't remember all, but I can tell you --
39:3 Q. Okay.
39:4 A. -- some that I do.
39:5 The oldest that we started was a company called
39:6 High Country -- High Country Ventures and Red River
39:7 Enterprises, I believe. They were operational -- they
39:8 were short-term payday loans that were operational for
39:9 approximately 30 to 40 days.
39:10 Q. Operational -- the businesses were only
39:11 operational, or the loans --
39:12 A. Correct.
39:13 Q. Okay. What happened to that?
39:14 A. They were set up similar to what Western Sky,

39:15 but -- where I sold the paper to try to generate -- let
39:16 me back up.
39:17 The oldest was a company called Lakota Cash.
39:18 It was a company formed to make short-term loans. It
39:19 did not sell any paper. So I started the other
39:20 companies to raise, basically, venture capital to grow
39:21 Lakota Cash. So what happened with the other two is we
39:22 were lending, and at the end of 30 days it was obvious I
39:23 could not control what they were doing, it wasn't my
39:24 product, and I terminated the agreement.

45:11 When did you create Western Sky?
45:12 A. It was in late 2009.

54:14 Q. All right. So would you get -- would you
54:15 prepare a monthly settlement statement to send to
54:16 CashCall, or would you get it from CashCall?
54:17 A. Both. We'd get one from CashCall, and then my
54:18 accounting department would review and audit it.

55:19 Q. Did you ever conduct a due diligence visit and
55:20 review of CashCall's operations?
55:21 A. Yes. Numerous times.
55:22 Q. How many times?
55:23 A. I don't remember exactly. At a minimum, twice
55:24 a year.
55:25 Q. So is it fair to say twice a year from the
56:1 beginning of 2010 through the end of Western Sky's

56:2 operation?
56:3 A. Yes.
56:4 Q. Did you visit personally each time?
56:5 A. Yes.
56:6 Q. Did you take anyone with you?
56:7 A. Yes.
56:8 Q. Who?
56:9 A. I don't remember every time.
56:10 Q. Do you remember anybody?
56:11 A. Kristin -- Kristin -- I took legal counsel once
56:12 or twice. I can't remember Kristin's last name.
56:13 Q. When you say --
56:14 A. I can't remember their names. They were
56:15 individuals in the audit, the accounting department at
56:16 Timber Lake.
56:17 Q. Who did you meet with at CashCall?
56:18 A. I generally met with Dan Baren. I would meet
56:19 with Paul Reddam. I would make a point to meet with the
56:20 IT department. I would make a point to circulate
56:21 through the call center to see how they were performing.
56:22 I would meet with the fraud department to -- to try to
56:23 gain some knowledge. I think that's it.
56:24 I met with Del Whatever-his-name just to
56:25 introduce and get a feel for what he was doing. He was
57:1 in collections. I met with Shawna Parks, who was head
57:2 of their accounting. They allowed me free reign to go
57:3 where I wanted to.
57:4 I also -- for a short time we had a -- utilized

57:5 a call center in Las Vegas, and I went there to meet
57:6 with them, but that trip was by myself.
57:7 Q. Was that the Delbert Services call center?
57:8 A. No.
57:9 Q. Was it a CashCall call center --
57:10 A. Yes.
57:11 Q. -- or was it a different company?
57:12 A. No, it was a CashCall call center. I think it
57:13 was a short time. I don't remember the dates.

61:3 MR. UMHOFER: We can read it back: "Did WS
61:4 Funding reimburse the purchase of electronic equipment,
61:5 computers [sic]?"
61:6 THE WITNESS: Okay. We in Timber Lake did not
61:7 have a -- our infrastructure was almost zero. To obtain
61:8 the Internet service we needed -- because there was none
61:9 with any speed -- we built and created our own Internet
61:10 system -- wireless system with a tower. And CashCall
61:11 paid for half; Western Sky paid for half -- or I did. I
61:12 don't remember which, me or Western Sky, but they paid
61:13 for half of that.

61:21 Q. Okay. Was this a -- was this in conjunction
61:22 with the construction of any buildings as well?
61:23 A. Yes. We had a -- the Internet was not in
61:24 connection with the building, but we also constructed a
61:25 building in Eagle Butte that we utilized as a
62:1 call center for Western Sky. And CashCall paid for

62:2 half, and I paid half.

64:15 Q. So was it your plan with that money from
64:16 Longwood to start lending -- or making loans that you
64:17 would not sell to WS Funding?
64:18 A. No, it was not my plan. It was an option, but
64:19 I had no reason to quit doing business with WS Funding.
64:20 They'd done everything they said they would. For some
64:21 reason, though, it put me in the spot where I could --
64:22 or I always could, but this gave me the total control
64:23 where I could sell anywhere.

68:12 Q. I'd like to ask you some questions now about
68:13 Western Sky's facilities.
68:14 So at the time that this assignment agreement
68:15 that we've been talking about was entered into, what
68:16 were Western Sky's facilities like, physical plant?
68:17 A. Well, let's see. I bought a 1911 church for
68:18 about $5,000 that I remodeled. That's where we started.
68:19 Q. Okay. About how many square feet?
68:20 A. Probably 4,000.
68:21 Q. Is this in Timber Lake?
68:22 A. Correct.

69:10 Q. Did you have any of the same employees working
69:11 for both businesses, or were these dedicated Western Sky
69:12 employees?
69:13 A. They were dedicated Western Sky.

69:14 Q. Do you remember what their -- what they did?
69:15 A. Originally, they reviewed, audited and approved
69:16 loans.
69:17 Q. And how would they review loans made online?
69:18 A. Every loan came through their -- that office.
69:19 They would open up the file on every loan and review for
69:20 accuracy for the documents that were obtained. And then
69:21 if everything was in place, they would audit -- or not
69:22 audit -- they would approve it. Once it was approved,
69:23 they also funded them from there. In Western Sky
69:24 Financial we wired the money, so they would do the
69:25 wiring.

70:20 Q. Okay. So when did you start to expand
70:21 employment at Western Sky from the two to three people?
70:22 A. 2010 on. At the max we were approximately a
70:23 hundred people up there.
70:24 Q. When was the max?
70:25 A. In 2013.

71:6 At some time did Western Sky move from the
71:7 church to a larger facility?
71:8 A. We moved. We utilized both, yes, but we also
71:9 brought in a double-wide modular that we used.
71:10 Q. Like a trailer home?
71:11 A. Modular.
71:12 Q. Okay.
71:13 A. Modular.

71:14 Q. Sorry.
71:15 A. That's one of my pet peeves, those tin teepees.
71:16 This was a modular.
71:17 Q. Okay. Fair enough.
71:18 When did that happen?
71:19 A. I don't remember.
71:20 And then we also rented facilities in
71:21 Eagle Butte to expand the call center while we were
71:22 building the other building. We rented space in an old
71:23 café.
71:24 Q. Where is Eagle Butte?
71:25 A. We had to disinfect all our computers. They
72:1 were full of cockroaches. That's how bad it is there.
72:2 So...
72:3 Q. Wow. It was probably an improvement over the
72:4 cafe, I guess.
72:5 A. Well, that was at the cafe. I never ate there
72:6 again, though.
72:7 Q. Okay. How far is Eagle Butte from Timber Lake?
72:8 A. 40 miles.

73:10 Q. Okay. Who designed this web page?
73:11 A. Well, it was collaborated with CashCall. The
73:12 logo -- the staff at Timber Lake came up with the logo,
73:13 but they did help us create it and host it.

74:7 Q. It says, "Welcome to Western Sky. Get started
74:8 now."

74:9 So do you know -- if somebody typed their
74:10 information in there and hit "Next," where would that
74:11 go?
74:12 A. It would continue to collect data.
74:13 Q. Okay. And once the data was submitted by the
74:14 borrower, where would that data go?
74:15 A. Through the Method software.
74:16 Q. Okay. I see on the bottom of page 2 -- well,
74:17 not the bottom, but below that blank on page 2 it says,
74:18 "I want a loan agent to contact me." I guess you could
74:19 click on that.
74:20 A. Yes.
74:21 Q. So who -- where would that go?
74:22 A. It would go two places. Depending on the
74:23 overflow and depending where we were at in the building
74:24 stage, it would either be handled in the Western Sky
74:25 office there in Eagle Butte or it would go to the -- the
75:1 overflow would go to the agents in CashCall --
75:2 Q. Okay.
75:3 A. -- under that service agreement.
75:4 Q. Understood.
75:5 Now, if you could turn to page 4, which is the
75:6 "Contact Us" page, there's a list of toll-free phone --
75:7 well, not all toll-free, but a list of phone numbers.
75:8 Where, if you know, would these phone numbers
75:9 go? Like, if I called them --
75:10 A. I don't remember. The only one I can tell you
75:11 is the 605-865 would go straight to Timber Lake.

75:12 Q. Okay.
75:13 A. To the best of my recollection, the others go
75:14 to Timber Lake also.

76:1 Q. Okay. Did CashCall employees ever come out to
76:2 Western Sky to train your employees?
76:3 A. Yes, they did, at my request.
76:4 Q. Okay. When did that happen?
76:5 A. I don't remember. I believe it was in 2012,
76:6 possibly early '13, to train the -- I needed help in the
76:7 call center.
76:8 Q. So what kind of help?
76:9 A. Basically, salesmanship; speech; navigating the
76:10 computer correctly to get where you needed to go just in
76:11 order to be able to do their job. You know, we -- to
76:12 give you a little insight, where this was stationed,
76:13 unemployment is over 80 percent. We deal with a lot of
76:14 people that -- they're not all college educated; a lot
76:15 of them are not high school educated. So it was a --
76:16 basically, retraining and recreating a whole culture.
76:17 Q. So is it fair to say that that was customer
76:18 service–oriented training or something more broad than
76:19 that?
76:20 A. It would have been strictly for customer
76:21 service, yes.
76:22 Q. Were there any other kinds of training that
76:23 CashCall provided?
76:24 A. I don't remember any.

76:25 Q. Did you pay the cost of that training, or did
77:1 they provide it free of charge?
77:2 A. I don't remember.
77:3 Q. Do you remember how long the trainers stayed
77:4 out there?
77:5 A. Two to three days max.
77:6 Q. Were there any other visits that you remember
77:7 other than that one?
77:8 A. From trainers?
77:9 Q. Yes, sir.
77:10 A. I mean, I think they came two or three times --
77:11 I don't remember -- and that was it.
77:12 Q. Okay. And was each trip about that same
77:13 length?
77:14 A. Yes.
77:15 Q. Did anyone else from CashCall ever come out to
77:16 visit Western Sky facilities?
77:17 A. What I can remember, the only one there was
77:18 Dan Baren.

79:4 Q. As I understand it, you're a member of the
79:5 Cheyenne River Sioux Tribe; right?
79:6 A. Yes.

79:17 Q. What was your source of information for
79:18 questions about the law of the Cheyenne River Sioux
79:19 Tribe?
79:20 A. My legal counsel, Bogue & Bogue.

79:21 Q. And when you say "my legal counsel," is that
79:22 Western Sky's corporate counsel?
79:23 A. Yes.
79:24 Q. Also your outside counsel in all of your
79:25 businesses --

80:8 Q. So have you ever seen the Cheyenne River Sioux
80:9 Tribe's criminal usury statute?
80:10 A. No.
80:11 Q. Were you aware that usury is a crime under the
80:12 Cheyenne River Sioux Tribe law?
80:13 A. I'm aware it's not a crime. I'm aware they
80:14 don't have a usury law.
80:15 Q. And what's your information -- your source of
80:16 information?
80:17 A. I also know they passed the Uniform Commercial
80:18 Code in order to make it coincide with South Dakota so
80:19 they could actually encourage lenders to operate on the
80:20 reservation. And when they did that, that did away with
80:21 any usury law.
80:22 I'm also aware that the bank's numerous
80:23 business, even the bank we loaned to, the tribal
80:24 entities and their interest was significantly higher.
80:25 Q. And what's the source of that information that
81:1 you just told me?
81:2 A. I've actually seen the commercial code from
81:3 corporate legal counsel. I've also researched it and
81:4 documented it. I've also had personal verification from

81:5 tribal councilmen that passed that code.

87:19 The first two paragraphs about the loan being
87:20 subject to the laws of the Cheyenne River Sioux Tribe,
87:21 and then the second one, what "you" and "your" mean, do
87:22 you know where that language comes from?
87:23 A. Came from my legal counsel.
87:24 Q. And this is the same outside -- Bogue & Bogue?
87:25 A. Correct.

96:20 Q. Were you the sole owner of Western Sky
96:21 Financial?

99:8 Q. What were your departments?
99:9 A. I couldn't tell you anymore. There's the call
99:10 center. There's the collections. There's the fraud
99:11 department. There's the IT department. There's the
99:12 building and maintenance department. I don't remember
99:13 everyone.

99:20 Q. Approved as, say, a percentage of all
99:21 applications?
99:22 A. I would say it would be in that 5 to 10 percent
99:23 range.

100:9 Q. What was the most common reason for loan
100:10 applications getting denied?
100:11 A. Income -- no, that wouldn't have been it. It

100:12 was a combination. I don't know if you could take one
100:13 out specifically, because generally when you have one
100:14 reason, it's combined with ten others, because income
100:15 usually falls length of employment or length of
100:16 residency or age.
100:17 I can tell you, though, the reason most people
100:18 get a payday loan or installment loan: It's
100:19 convenience. That's probably something you never heard
100:20 before, but...

108:6 Q. Are you aware that the legal opinion written by
108:7 Cheryl Bogue was given to investors or with financing
108:8 parties as part of closing documents on financing deals
108:9 involving the Western Sky loans?
108:10 A. I don't know for a fact that they were given to
108:11 an investor. I know that she made them available to
108:12 CashCall.
108:13 Q. So you know that this letter was shared with
108:14 CashCall?
108:15 A. Yes.
108:16 Q. Did you retain Ms. Bogue to write this letter
108:17 for you?
108:18 A. Yes.

115:25 Q. Putting aside the documents in front of you,
116:1 Mr. Webb, did you receive legal opinions from
116:2 Bogue & Bogue about Western Sky and its status under the
116:3 laws of the Cheyenne River Sioux Tribe?

116:4 A. Yes.
116:5 Q. Did you receive more than one such opinion?
116:6 A. Yes.
116:7 Q. About how many would you say you received?
116:8 A. I don't remember.
116:9 Q. Did you review those opinions?
116:10 A. Yes.
116:11 Q. Did you understand them when you read them?
116:12 A. Yes.
116:13 Q. Did those legal opinions govern your operation
116:14 of Western Sky during its time when it was in business?
116:15 A. Yes.
116:16 Q. Did you share the opinions or authorize your
116:17 attorney to share the opinions of Bogue & Bogue with
116:18 Dan Baren?
116:19 A. Yes.

121:15 You've referred to two locations, Eagle Butte
121:16 and Timber Lake; is that correct?
121:17 A. Correct.
121:18 Q. Now, where are those locations --
121:19 A. Both are --
121:20 Q. -- situated in relationship to the Indian
121:21 reservation?
121:22 A. Both of them are within the exterior boundaries
121:23 of the Indian reservation. Eagle Butte is actually the
121:24 headquarters for all the travel offices.
121:25 Q. And so is it fair to say that the Western Sky

122:1 offices were located within the exterior boundaries of
122:2 the reservation?
122:3 A. Not only fair; it's correct.
122:4 Q. What impact -- let me put it another way.
122:5 What happened to the hundred or so employees
122:6 that were employed by Western Sky when you received word
122:7 that CashCall had decided to no longer purchase loans
122:8 from Western Sky?
122:9 A. The impact was significant in -- in the sense
122:10 that we took people that -- and this is not pre–thought
122:11 out or preplanned, so...
122:12 It kind of strikes home with me because this
122:13 thing basically took on a life of its own to help the
122:14 people there. Abuse, drug abuse, physical abuse,
122:15 alcohol is tremendous. You have eight, ten families
122:16 living in one house, no vehicle. The changes I seen it
122:17 make in people's lives -- because we provided them a
122:18 job, and we provided them a good job with benefits and
122:19 salary. It made such a human impact on them. The
122:20 self-esteem just -- you could just see the difference.
122:21 And it made a big impact on me. But when we
122:22 stopped, I mean, I wanted to go hide because I let these
122:23 people down. I had plans to grow this to five times as
122:24 big as we were. So, yeah, it was a significant loss to
122:25 the community.
123:1 Q. Do you know whether or not any other employer
123:2 has been able to assume the obligation to employ those
123:3 members of the Indian tribe since you left?

123:4 A. I don't know of any to that degree, no.

124:4 Q. Now, you made reference to payday lenders, but
124:5 in fact, Western Sky -- the Western Sky program and the
124:6 loans that CashCall purchased or WS Funding purchased
124:7 from Western Sky were not payday lending; they were
124:8 consumer lending; is that correct?
124:9 A. Installment loans, correct.

DATED: June 30, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: *_/s/ Thomas J. Nolan_*
Thomas J. Nolan
*Attorneys for Defendants*