THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEPOSITION TESTIMONY OF J. PAUL REDDAM (JUNE 1, 2016) IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 9, 2016<br>Trial: September 27, 2016 |

31:4 Q. Who was responsible for devising and
31:5 implementing all major company policies in October
31:6 2009?
31:7 A. Well, whoever the relative heads of
31:8 whatever department we're talking about would --
31:9 would develop their policies, but they would --
31:10 they would report to me, and just in the course of
31:11 business sometimes, and I'm sure we would have
31:12 discussed them and sometimes not.

65:11 Q. Are you aware that -- that CashCall
65:12 created a subsidiary called WS Funding?
65:13 A. Yes.
65:14 Q. When was that done?
65:15 A. I'm not exactly sure. Sometime, roughly
65:16 the beginning of 2010.

111:17 Q. Did Dan Baren ever report to you on legal
111:18 opinions that he had read by lawyers stating that
111:19 state interest rate and licensing restrictions
111:20 would not apply to Western Sky loans?
111:21 A. He discussed it, yes.
111:22 Q. Did he discuss one legal opinion with you
111:23 or more than one legal opinion?
111:24 A. Well, he's talked about Katten's opinion,
111:25 and then Western Sky had its own attorney, and she
112:1 wrote some kind of opinion. And then in going and
112:2 getting financing, the lenders would always have

112:3 their own legal counsel. And I don't know whether
112:4 Katten wrote them new opinions directly or whether
112:5 they took the opinions that Katten provided to
112:6 CashCall.
112:7 Q. Okay.
112:8 A. But one way or the other, to go forward,
112:9 they -- their regulatory counsel would have looked
112:10 at it.

113:5 Q. Okay. Did you ever talk to a Katten
113:6 lawyer personally?
113:7 MR. NOLAN: About the subject or about
113:8 this opinion? I'm sorry.
113:9 BY MR. MARTIKAN:
113:10 Q. Well, let's just -- that's fine. Okay.
113:11 About this subject, about whether state interest
113:12 rate and licensing restrictions would apply to the
113:13 Western Sky loans.
113:14 A. I'd have to ask my counsel if whether I
113:15 can discuss that.
113:16 MR. NOLAN: I know there's a question
113:17 pending. Can we just a moment to explore the
113:18 privileged question that's at hand?
113:19 MR. MARTIKAN: Explore the two of you?
113:20 MR. NOLAN: Yes.
113:21 MR. MARTIKAN: Okay.
113:22 MR. NOLAN: Clearly, he just wants to seek
113:23 advice, so --

113:24 MR. MARTIKAN: All right. You want to
113:25 just take back --
114:1 MR. NOLAN: The only reason why I said it
114:2 because you had a question pending --
114:3 MR. MARTIKAN: Yes.
114:4 MR. NOLAN: -- and I normally --
114:5 MR. MARTIKAN: That's fine; we'll go back
114:6 to it.
114:7 MR. NOLAN: Okay. Thank you. Let's just
114:8 take a moment.
114:9 MR. MARTIKAN: All right.
114:10 THE VIDEOGRAPHER: The time is 2:32 p.m.
114:11 We are off the record.
114:12 (Recess taken from 2:32 p.m. to 2:43 p.m.)
114:13 THE VIDEOGRAPHER: The time is 2:43 p.m.
114:14 We are on the record.
114:15 MR. MARTIKAN: Thank you. Ms. Court
114:16 Reporter, could you please read back the last
114:17 question?
114:18 (Reporter read back the requested text.)
114:19 BY MR. MARTIKAN:
114:20 Q. Okay. So are you prepared to answer that
114:21 question?
114:22 A. I am.
114:23 Q. Okay. And what is the answer?
114:24 A. The answer is yes.
114:25 Q. Okay. Who did you speak to?
115:1 A. Claudia Callaway.

115:2 Q. Anyone else?
115:3 A. She had a couple of members of her firm in
115:4 the meeting.
115:5 Q. Do you know their names?
115:6 A. I'm sorry, I don't.
115:7 Q. When did the meeting take place?
115:8 A. Sometime April, approximately, of 2013.
115:9 Q. Was anyone else from CashCall in the room,
115:10 in that meeting?
115:11 A. I don't believe so.
115:12 Q. Okay. And what did you discuss?
115:13 A. We discussed CashCall's Western Sky
115:14 purchase program.
115:15 Q. Okay. And what about it?
115:16 A. Well, there had started to be some
115:17 regulatory issues in a few states, and so she was
115:18 there to discuss that, and she said that the
115:19 regulatory environment was in general getting very
115:20 hostile, and so we discussed whether it would be a
115:21 good idea to wind down the program.
115:22 Q. Just -- because I forgot -- did you say it
115:23 was April 2012 or April 2013?
115:24 A. 2013.
115:25 Q. 2013?
116:1 A. Yes.
116:2 Q. Okay. And did you then decide to wind
116:3 down the program after that meeting?
116:4 A. I absorbed the advice that -- that she

116:5 gave. It was -- she went on about how the firm
116:6 still believed in the -- in the program and the
116:7 structure and so on, and -- but she thought that
116:8 given the regulatory environment -- I guess -- I
116:9 don't know if we'd been sued at that point or -- or
116:10 not. But it was her advice that we would encounter
116:11 more regulatory problems. So despite what she
116:12 thought of -- of the structure, that it was legal,
116:13 et cetera, I should think about that. And
116:14 subsequently, I decided that we should stop buying
116:15 loans from Western Sky.

122:6 Q. When the Western Sky loans were funded to
122:7 the borrower -- that is, when the borrower received
122:8 the loan proceeds -- who sent the borrower that
122:9 money?
122:10 A. Someone at Western Sky.

124:3 Q. Did Dan Baren or any other attorney report
124:4 to you on changes in the law that might affect
124:5 CashCall's ability to continue buying Western Sky
124:6 loans?
124:7 A. I don't think so.
124:8 Q. Is that something that was important to
124:9 you?
124:10 A. Well, certainly if there was some change
124:11 in the law where it was illegal for us to buy the

124:12 loans, I wouldn't want to buy them.

DATED: June 30, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: *_/s/ Thomas J. Nolan_*
Thomas J. Nolan
*Attorneys for Defendants*