THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEPOSITION TESTIMONY OF DANIEL BAREN (JUNE 14, 2016) IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 9, 2016<br>Trial: September 27, 2016 |

11:17 A. I serve as general counsel to CashCall.
11:18 Q. And how long have you held that position?
11:19 A. Since CashCall's inception in 2003.
27:19 Q. Tell me about that. Tell me about your
27:20 involvement with the consumer installment lending.
27:21 A. Well, I was general counsel for the
27:22 company, and the company was engaged in -- in fact,
27:23 started doing consumer installment lendings. So
27:24 that -- that took up a lot of time, sure.
27:25 Q. And when did the company start doing that?
28:1 A. July of 2003.

29:18 Q. And when did CashCall start purchasing
29:19 loans from Western Sky?
29:20 A. February of 2010.

29:21 Q. And how did CashCall come to purchase
29:22 loans from Western Sky?
29:23 A. CashCall was introduced to Western Sky by
29:24 our counsel at the time.
29:25 Q. Who was that?
30:1 A. The law firm was Manatt. The -- the
30:2 particular lawyer was Claudia Callaway. But by the
30:3 time that program actually started, Ms. Callaway
30:4 had moved to the law firm of Katten Muchin.
30:5 Q. And when you say that CashCall was
30:6 introduced to counsel, who specifically at CashCall
30:7 was introduced to Ms. Callaway?

30:8 A. Well, it was me.
30:9 Q. Okay. And can you tell me about that
30:10 introduction?
30:11 A. No, no, I think you have it wrong.
30:12 Ms. Callaway introduced us to Western Sky.
30:13 Q. I did have it wrong.
30:14 And who at Western Sky were you introduced
30:15 to by Ms. Callaway?
30:16 A. Martin Butch Webb.
30:17 Q. And what was the circumstance of that
30:18 introduction?
30:19 A. Ms. Callaway was recommending to CashCall
30:20 that rather than continue purchasing and servicing
30:21 loans that were originated by banks, it should
30:22 start purchasing loans that were originated by a
30:23 tribal lender. And in the course of those
30:24 discussions, I asked Ms. Callaway to recommend a
30:25 tribal lender to us, and she recommended Mr. Webb.
31:1 Q. Have you ever heard of "tribal lending"
31:2 before Ms. Callaway told you about it?
31:3 A. Very vaguely.
31:4 Q. Okay. And what do you recall about --
31:5 that you knew before Ms. Callaway?
31:6 A. I was aware that certain tribes or members
31:7 of tribes, I wasn't sure at the time -- were
31:8 originating loans. I didn't know who they were. I
31:9 didn't know what the legal basis was. It was just
31:10 something that I heard.

31:11 Q. And what was your reaction to her
31:12 recommendation that you -- or that CashCall use a
31:13 tribal lender?
31:14 MR. NOLAN: Objection. Vague and
31:15 ambiguous.
31:16 A. Well, Ms. Callaway had been our counsel
31:17 for three, three and a half years at that point. I
31:18 relied on her and her firm tremendously, and I
31:19 respected her, and I knew her to be very well
31:20 versed in regulatory compliance and in consumer
31:21 lending. So when she recommended to us that we
31:22 should stop looking for another bank partner and
31:23 instead move to a tribal lending model, I -- I
31:24 trusted her, and I believed that she knew what she
31:25 was talking about because she had brought us the
32:1 bank model, which had been a very successful model
32:2 with, at that point, no legal challenges.
32:3 BY MS. COLL:
32:4 Q. And what do you mean by -- when you say
32:5 "at that point"?
32:6 A. Subsequent to 2009, we had one state,
32:7 state of West Virginia challenge the bank model,
32:8 but that didn't really occur until 2011, 2012. And
32:9 that's the case I told you that I testified in
32:10 before. But up until that point, the bank model
32:11 for us had been a smashing success, and
32:12 Ms. Callaway was the lawyer who brought us that,
32:13 introduced us to the banks, designed the bank

32:14 model, and executed on it. So I trusted her. I
32:15 believed in her. And when she told me that -- that
32:16 she recommended doing a tribal model, I -- I
32:17 believed her. I -- I thought that was the right
32:18 call.
32:19 Q. Okay. And what specifically did she tell
32:20 you about using the tribal model? How did she
32:21 explain that would work?
32:22 A. She said -- again, this is now six and a
32:23 half years ago. I have a recollection of several
32:24 conversations where she said that this was now the
32:25 model that she was recommending to her clients;
33:1 that -- that under federal Indian law the tribal
33:2 lender could make these loans, and they could sell
33:3 the loans to a nontribal entity, and the loans
33:4 could be collected upon at the contract rate, and
33:5 the loans would not be subject to state regulation.

37:25 Q. Okay. I want to focus on the Western Sky
38:1 program starting, and I think you were beginning to
38:2 tell me about your conversations with Ms. Callaway
38:3 and her recommendation that CashCall purchase loans
38:4 originated by tribal lenders? Who -- and I think
38:5 you said she introduced you to somebody?
38:6 A. Mr. -- Mr. Webb.
38:7 Q. And can you tell me about that
38:8 introduction?
38:9 A. It started with a conference call that she

38:10 scheduled, and I think this might have been January
38:11 or February of 2009.
38:12 Q. And who was -- who participated in that
38:13 conference call?
38:14 A. Ms. Callaway, possibly one of -- one or
38:15 more of her associates at Katten, myself, Mr. Webb,
38:16 and I believe at the beginning of the call, there
38:17 was a man named John Templer on the -- on the call
38:18 as well.

41:9 from the call. And, of course, I was relying
41:10 primarily on Ms. Callaway, who suggested this to
41:11 us. She had a very good track record, and I relied
41:12 heavily on her.

61:12 Q. Were there underwriting guidelines in
61:13 place at the start of the Western Sky loan program?
61:14 A. Yes.
61:15 Q. And where did those underwriting
61:16 guidelines come from?
61:17 A. Those guidelines came from discussions
61:18 between Butch Webb and other folks at Western Sky
61:19 and me and other people at CashCall.
61:20 Q. And who drafted those guidelines?
61:21 A. Who typed up the -- I don't recall. I
61:22 know it wasn't me.
61:23 Q. Okay. Do you know if it was somebody at
61:24 CashCall?

61:25 A. I don't.
62:1 Q. Do you know if it was Mr. Webb?
62:2 A. I believe it was someone at Western Sky
62:3 because I recall Mr. Webb sending -- faxing me the
62:4 underwriting guidelines. I don't know if he
62:5 drafted them or someone drafted them for him, and
62:6 he just signed them. But the first I saw them, the
62:7 final document, came from Mr. Webb.

69:1 Q. Can you tell me, in general terms, what
69:2 you recall?
69:3 A. It was your standard loan application
69:4 where your name, address, Social Security number,
69:5 previous addresses, if you hadn't lived somewhere
69:6 for more than a few months, employer, on occasion
69:7 references. And then you would click a number of
69:8 boxes authorizing consent for the lender to run the
69:9 credit and to actually process the application.
69:10 There might be more to it than that, but those were
69:11 the primary data fields.
69:12 And then subsequent to that, if you passed
69:13 the initial automated underwriting, you would have
69:14 to send in a copy of a blank check, possibly a bank
69:15 statement, possibly a W-2 from -- from your work,
69:16 possibly a -- a utility bill to prove your
69:17 residency. It just depended on underwriting.
69:18 Q. I think you said as part of the initial
69:19 application process, the -- someone would run

69:20 credit?
69:21 A. The lender would run credit; correct.
69:22 Q. And when you say "the lender," who -- who
69:23 do you mean specifically?
69:24 A. In the Western Sky program?
69:25 Q. Yes.
70:1 A. Western Sky would run the credit.
70:2 Q. And logistically speaking, do you mean an
70:3 individual sitting on the reservation would run the
70:4 credit of the consumer?
70:5 A. No, it was done in an automated fashion.
70:6 It was the -- there were two ways an applicant
70:7 could submit an application. The first would be to
70:8 call up and give their information to a loan agent.
70:9 Some of whom were at CashCall -- most of whom were
70:10 at CashCall, some of whom were on the reservation.
70:11 And then at the bottom of that, they would
70:12 read, do you authorize me to run credit on behalf
70:13 of Western Sky? And if they said yes, of course
70:14 this is all recorded, then the loan agent,
70:15 regardless of whether they were the CashCall loan
70:16 agent or the Western Sky loan agent, would hit a
70:17 button, which would run the automated credit. It
70:18 was a Western Sky credit -- credit report, meaning
70:19 if the -- if you were to apply, and the next day
70:20 you looked at your credit report, it would show
70:21 that Western Sky ran the credit, not CashCall.
70:22 Q. Regardless of whether it was a CashCall

70:23 loan agent who ran the -- who ran the credit; is
70:24 that right?
70:25 A. Well, the CashCall agent wasn't running
71:1 the credit. The CashCall agent was pressing a
71:2 button that authorized Western Sky to run the
71:3 credit, but yes.

92:6 Q. So let's take from -- from the start,
92:7 that's helpful. So except at the beginning of the
92:8 Western Sky loan program, was -- were loans
92:9 originated to consumers in every state except West
92:10 Virginia and California?
92:11 A. Yes, but the South Dakota restriction came
92:12 in very, very early. So there might have been less
92:13 than a handful -- less than maybe five loans in
92:14 South Dakota when that was taken off the table.
92:15 Q. Okay. And then between the time that
92:16 South Dakota was excluded and New York was
92:17 excluded, was Western Sky originating loans to
92:18 consumers in every other state?
92:19 A. To the best of my recollection, yes.

102:8 Q. Once a consumer receives a condi- --
102:9 received a conditional approval, what was the next
102:10 step in the process of obtaining the loan?
102:11 A. I may be missing certain steps in here
102:12 because this is not my area of expertise.
102:13 Q. Uh-huh.

102:14 A. And there are several other people who are
102:15 probably more qualified to talk about this, but
102:16 from my understanding, the next step would be the
102:17 person would review their promissory note, and
102:18 if -- if they approved it, they would check the
102:19 boxes. There was an initial box and then a digital
102:20 signature box, and they would sign and submit the
102:21 promissory note.
102:22 Q. And if a consumer signed and submitted a
102:23 promissory note, what would happen next?
102:24 A. Again, these are really specific
102:25 production questions, and I might not -- I might be
103:1 missing a few steps, and I might not have all the
103:2 details, but the general answer is: The borrower
103:3 would have done anything he needed -- he or she
103:4 needed to do at that point, and in certain cases
103:5 underwriting would continue after that point. But
103:6 once the underwriting from CashCall's perspective
103:7 was done and the signed orig- -- and the signed
103:8 promissory note was done, the file would then go to
103:9 the reservation for the final underwriting review.
103:10 And if the lender on the reservation,
103:11 Western Sky, accepted the promissory note, then that
103:12 would go into the funding queue pending the final
103:13 review. And the funder at Western Sky would then,
103:14 like I said earlier, hit the button and form the
103:15 contract by sending the money out to the borrower at
103:16 that point.

103:17 Like I said, there are probably many other
103:18 steps in this process that I'm not aware of or that
103:19 there are others who could explain a lot better than
103:20 I just did.
103:21 Q. When you said the file would go to the
103:22 reservation for final underwriting review, what do
103:23 you mean, "go to the reservation"? How would it go
103:24 there?
103:25 A. It would be transmitted to an employee at
104:1 the reservation who would have access to the loans
104:2 that were uploaded. And once that file got to the
104:3 reservation and to Western Sky, it was out of
104:4 CashCall's hands. Meaning it was up to Western Sky
104:5 to review those final loans, make sure all the
104:6 promissory notes were -- were in order, make sure
104:7 the final underwriting was done, take it from that
104:8 site, final underwriting over to funding and fund
104:9 the loans. But at that point, CashCall was out of
104:10 the picture.

106:12 Q. When would consumers first hear about
106:13 CashCall being involved with their loan?
106:14 A. The first call they made -- assuming that
106:15 they called on the 800 number, which is one of the
106:16 two ways by which you could apply for a loan. The
106:17 first thing you hear when you dial that 800 number
106:18 was a recording, and I'm paraphrasing, "You have
106:19 reached Western Sky. We are a Native

106:20 American-owned business, operating on the Cheyenne
106:21 River Sioux reservation. We have hired a company

114:10 I talked to Cheryl and Butch and got the --
114:11 that first part, the language, "We are a Native
114:12 American-owned company operating on the bounds of the
114:13 Cheyenne River Sioux Reservation." That, I got from
114:14 Butch or Cheryl. The remainder, I probably drafted
114:15 myself.
114:16 Q. And was some -- was some form of that
114:17 recording used throughout the Western Sky loan
114:18 program?
114:19 A. Yes.

125:11 Q. Okay. I'm looking at the very top
125:12 paragraph, and it says that the agreement is
125:13 between Western Sky Financial and WS Financial.
125:14 What is WS Financial?
125:15 A. That was a drafting error. Cheryl Bogue
125:16 drafted this agreement and got the name of the
125:17 entity incorrect.
125:18 Q. And -- so what is the correct name?
125:19 A. WS Funding, LLC.

131:3 Q. And who drafted the Western Sky loan
131:4 program marketing materials?
131:5 A. It wasn't just one person. There was an
131:6 outside firm that was hired by Western Sky called

131:7 "Kovel-Fuller." It's the same firm that CashCall
131:8 used as well. There were internal people at
131:9 CashCall in the marketing department. Mr. Reddam
131:10 participated in that. There was a head of
131:11 marketing at CashCall. And then Western Sky
131:12 participated in it substantially as well.

135:21 Q. Okay. From December of 2009 to January
135:22 31st of 2010, was Exhibit 9 the operative -- one of
135:23 the two operative agreements between the two
135:24 companies between Western Sky Financial and WS
135:25 Funding?
136:1 A. Yes.
136:2 Q. And then starting on February 1st, 2010,
136:3 was the agreement that's been marked as Exhibit 2
136:4 the operative agreement between Western Sky
136:5 Financial and WS Funding?
136:6 A. One of two.

138:23 Q. And what was Mr. Reddam's role at WS
138:24 Funding?
138:25 A. He was the president.
139:1 Q. And what was his role at CashCall, if any?
139:2 A. President, CEO.

139:9 Q. Does Mr. Reddam have an ownership interest
139:10 at CashCall?
139:11 A. Yes.

139:12 Q. And what is that?
139:13 A. He's the sole owner of CashCall.

149:12 And then the third would be an opinion from
149:13 Ms. Bogue, who was an Indian attorney, regarding
149:14 Western Sky's ability to make the loans under CRST
149:15 law -- CRST is Cheyenne River Sioux Tribe -- and then
149:16 in the later transactions one of the counsel asked
149:17 for a fourth opinion, which was a second opinion from
149:18 Ms. Bogue, that opined that Western Sky could
149:19 transfer these loans to CashCall and that CashCall
149:20 could collect on the loans as well. It wouldn't lose
149:21 their exemption simply by transferring the loans to a
149:22 nontribal collector. So those are the four.
149:23 Q. Starting with the fourth one, I think you
149:24 said that that was written more recently? Do you
149:25 remember when that was?
150:1 A. It's at some point between 2010 and 2013.
150:2 One of the lenders asked Ms. Bogue to issue that
150:3 second opinion, and then it became a staple on all
150:4 subsequent transactions. Maybe 2000 -- early 2012.
150:5 And then I should also add: In addition to
150:6 the Bogue opinions and the Katten opinions, Western
150:7 Sky would provide a certificate that was issued by
150:8 Mr. Webb on behalf of Western Sky that had various
150:9 representations in it that were requested by the
150:10 lenders as to the status of Western Sky, the
150:11 authorization that Western Sky had, the license it

150:12 obtained from the tribe, the fact that the final
150:13 underwriting and funding was done on the reservation,
150:14 and a variety of other factors that the lenders asked
150:15 for.

152:10 into these closings. So there were all kinds of
152:11 conversations between lenders' counsel and my counsel
152:12 Katten, be it Mark Conley, who handled the corporate
152:13 side, or Claudia, who handled the regulatory side.

160:13 Q. Did you have any other basis than the
160:14 various legal opinions for concluding that Western
160:15 Sky loans that CashCall purchased would be governed
160:16 by tribal law?
160:17 A. I had numerous discussions with
160:18 Ms. Callaway at Katten and her associates at
160:19 Katten. I had numerous discussions with Ms. Bogue.
160:20 I know that our lenders had regulatory counsel
160:21 whose job it was to determine if these opinions
160:22 could be relied upon.
160:23 And they all concluded, as evidenced by the
160:24 fact that their clients participated in these
160:25 financings, that the opinions were accurate and could
161:1 be relied upon. That was plenty for me.

169:11 Q. And did consideration of the applications
169:12 also occur at CashCall offices?
169:13 A. Of course they did, yes. However, the

169:14 final approval necessary, which was the
169:15 determination of whether a loan would fund or not,
169:16 was done on the reservation solely by Western Sky.

172:7 Q. In the next paragraph, there is a
172:8 subsection little "a" little "a."
172:9 A. Sure.
172:10 Q. And it says, "Western Sky, in its sole
172:11 discretion, determines all of the conditions,
172:12 terms, and features of the loans."
172:13 Is that ultimately how the Western Sky loan
172:14 program worked?
172:15 A. Western Sky did, in fact, have the
172:16 discretion to veto or refuse any condition, term,
172:17 or feature. So I think that's an accurate
172:18 statement.

174:20 A. And that was Ms. Claudia's --
174:21 Ms. Callaway's specialty and Katten's specialty. I
174:22 relied on them for their legal analysis. That's
174:23 why we hired what I considered and what many people
174:24 told us were the -- you know, the national experts
174:25 in regulatory compliance back in 2005. And that's
175:1 why we continued to use Katten, a very expensive,
175:2 very well-established, well-respected firm.
175:3 So I don't recall reading the legal
175:4 analysis before any of these opinions were issued.
175:5 I'm sure I have afterward. But I had full trust in

175:6 both Katten, which was issuing the opinion, as well
175:7 as the due diligence process that had accompanied
175:8 these opinions, which was very sophisticated lenders
175:9 with very, very expensive counsel reviewing all the
175:10 documents and all of the opinions to make sure that
175:11 everything was in order.
175:12 So I kind of stayed out of that, because
175:13 Claudia Callaway understood choice of law and tribal
175:14 immunity doctrines far better and far greater than I
175:15 did. So I left that up to the experts. When these

DATED: June 30, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Thomas J. Nolan*
Thomas J. Nolan
*Attorneys for Defendants*