OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN**

28:13-29:9

13 **Q. And from whom would the company purchase**
14 **paper?**
15 A. Initially, beginning in 2006, it was two
16 state chartered federally regulated banks.
17 **Q. And did -- did who CashCall purchased**
18 **paper from change after 2006?**
19 A. Yes. This continued until November of
20 2008.
21 **Q. And when you say "this," do you mean**
22 **purchasing from the two --**
23 THE REPORTER: I'm sorry. What was the
24 answer again, this?
25 THE WITNESS: This continued until
1 November of 2008. I'm sorry.
2 THE REPORTER: That's okay. Thank you.
3 BY MS. COLL:
4 **Q. And when you say "this," do you mean**
5 **purchasing paper from the two state chartered**
6 **banks?**
7 A. Correct. The last loans that we purchased
8 from those banks would be November of 2008, but we
9 continued to service those loans after that time.

32:4-33:6

4 **Q. And what do you mean by -- when you say**

**"at that point"?**

A. Subsequent to 2009, we had one state, state of West Virginia challenge the bank model, but that didn't really occur until 2011, 2012. And that's the case I told you that I testified in before. But up until that point, the bank model for us had been a smashing success, and Ms. Callaway was the lawyer who brought us that, introduced us to the banks, designed the bank model, and executed on it. So I trusted her. I believed in her. And when she told me that -- that she recommended doing a tribal model, I -- I believed her. I -- I thought that was the right call.

**Q. Okay. And what specifically did she tell you about using the tribal model? How did she explain that would work?**

A. She said -- again, this is now six and a half years ago. I have a recollection of several conversations where she said that this was now the model that she was recommending to her clients; that -- that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a nontribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation. Almost identical to the bank model.

33:14-34:13
14 **Q. And why was that change made in November**
15 **of 2008?**
16 A. If you recall, we had that financial
17 crisis in the 2007, 2008 period. And the banks
18 were coming under increasing scrutiny from the
19 regulators for safety and soundness concerns. And
20 both banks told us that their regulator, the FDIC,
21 was putting a lot of pressure on them for them to
22 get out of the marketing partnerships, which is
23 what these were called. They were very common at
24 that period.
25 One bank, the -- a bank in South Dakota,
1 told us that they had elected to end all of their
2 relationships. And the other bank was the First
3 Bank of Delaware. They had an action brought
4 against them by the FDIC, I think, with respect to
5 their relationship with CompuCredit. It had
6 nothing to do with us.
7 And as part of the settlement in that
8 matter, I believe they agreed that they would exit
9 all of their -- their marketing partnerships at that
10 point. And so they came out to us, visited us, I
11 just want to say the summer of 2008, and begrudgingly
12 told us they would have to wind down the program and
13 stop selling loans to us by the end of November.

37:25-38:18

25 **Q. Okay. I want to focus on the Western Sky**
1 **program starting, and I think you were beginning to**
2 **tell me about your conversations with Ms. Callaway**
3 **and her recommendation that CashCall purchase loans**
4 **originated by tribal lenders? Who -- and I think**
5 **you said she introduced you to somebody?**
6 A. Mr. -- Mr. Webb.
7 **Q. And can you tell me about that**
8 **introduction?**
9 A. It started with a conference call that she
10 scheduled, and I think this might have been January
11 or February of 2009.
12 **Q. And who was -- who participated in that**
13 **conference call?**
14 A. Ms. Callaway, possibly one of -- one or
15 more of her associates at Katten, myself, Mr. Webb,
16 and I believe at the beginning of the call, there
17 was a man named John Templer on the -- on the call
18 as well.

39:3-25

3 **Q. And what was discussed on that conference**
4 **call?**
5 A. Ms. Callaway had obviously had
6 conversations with Mr. Webb because he was aware,

7 as the call started, that CashCall was interested
8 in potentially purchasing loans from a tribal
9 entity. And so the discussion focused on that
10 subject, the possibility of Mr. Webb forming a
11 tribal lending entity that would eventually sell
12 paper to CashCall.
13 **Q. Did -- at the time of that call, was Mr.**
14 **Webb already in the tribal lending business?**
15 A. Yes.
16 **Q. And what was your understanding of his**
17 **role in the tribal lending business in January of**
18 **2009?**
19 A. Mr. Webb had started two or three
20 different Payday lending companies that was -- he
21 was using a tribal model from the reservation, and
22 so that's why Ms. Claudia -- Ms. Callaway explained
23 to me she thought Mr. Webb -- one of the reasons
24 she thought Mr. Webb was a -- was an ideal
25 originator for us.

43:23-44:2

23 **Q. When you were considering purchasing loans**
24 **from a tribal lender, did you consider anyone --**
25 **did you consider working with anyone other than Mr.**
1 **Webb?**
2 A. No.

47:3-18

3 **Q. And why was it important to CashCall to**
4 **maintain geographic diversity in its -- in its**
5 **servicing portfolio?**
6 A. It was important because it was important
7 to our lenders. Back in 2006, our -- what was
8 going to be our primary lender at the time, Merrill
9 Lynch, told us that "you have a serious geographic
10 concentration problem, and if there is something
11 like a major earthquake in California or some other
12 catastrophe in California, then you are going to
13 see a significant rise in defaults. We would like
14 you -- and if we are going to participate in
15 financing you, we want you to expand your
16 geographic concentration at that point."
17 And Mr. Reddam and I had no idea how to do
18 that.

48:2-14

2 **Q. Did you consider having CashCall get**
3 **additional -- get licenses in additional states as**
4 **a means to maintain geographic diversity of the**
5 **servicing portfolio?**
6 A. Yes, we considered it.
7 **Q. And was it successful?**
8 A. Well, we didn't pursue it.
9 **Q. And why didn't you pursue it?**

10 A. Because in those states, in many of those
11 states, the usury laws would not permit you to make
12 or service loans at the rates that we deemed
13 necessary to make a profit or to not go out of
14 business.

49:2-13
2 **Q. Okay. And how did using the tribal**
3 **lending model differ from that situation?**
4 A. Well, as it was explained to me by
5 Ms. Callaway and the other lawyers, first at Manatt
6 and then at Katten, it operated the same way as the
7 bank model. Meaning the bank or the tribal lender
8 could make loans that were exempt from state usury
9 requirements and could transfer those loans to
10 CashCall, assign them to CashCall, and CashCall
11 could then service the loans at these higher
12 interest rates that CashCall itself could not make
13 those loans.

52:21-53-5
21 **Q. And when you say "funding of the loans,"**
22 **what specifically do you mean?**
23 A. Well, the last act of the transaction is
24 the lender -- and I'm -- I'm simplifying this --
25 presses a button and the loan funds go from the
1 lenders' account to the borrower's account. All of

2 the loans in this program, as well as in the
3 CashCall state-licensed program were all done
4 electronically, and the loan proceeds delivered via
5 wire.

55:25-56:15
25 **Q. What did the employment verification**
1 **entail?**
2 A. If an applicant said he worked at the
3 CFPB, we would call up your human resources
4 department and ask: Does this person really work
5 at the CFPB? It's your typical employment
6 verification for a loan.
7 **Q. When you say "we," who -- who would**
8 **actually do that employment verification?**
9 A. There were a group of people in CashCall's
10 offices. At least at the start, all of that
11 happened in CashCall's offices. By 2013, some of
12 that function could have been happening on the
13 reservation. I'm not certain. But throughout most
14 of the program that happened by a CashCall employee
15 at CashCall's offices.

57:12-58:2
12 **Q. You mentioned that a fraud-check would**
13 **also be performed?**
14 A. Correct.

15 **Q. And who would perform a fraud check?**
16 A. Several people could have -- do that. I
17 know there were -- at times that the underwriters
18 on the reservation were -- were performing that.
19 There were also employees at CashCall whose job it
20 was to perform that function as well. The loan
21 agent himself could be -- or herself could be
22 involved in that as well.
23 **Q. Who is a loan agent?**
24 A. The loan agent is the person who takes the
25 phone call, the initial phone call from the
1 borrower and takes the information from the
2 borrower.

59:8-16
8 **Q. Can you tell me what that CashCall review**
9 **would -- would be?**
10 A. Sure. Once all of the documentation on a
11 loan was obtained, and that's usually by the loan
12 agent, the loan would be passed off to someone at
13 CashCall who would review the loan to see if it met
14 program guidelines to confirm that it's a loan that
15 we would be willing to purchase in the event it got
16 funded.

65:21-67:5
21 **Q. You've been handed what's marked as**

**Exhibit 17. It's a July 7th, 2010, e-mail. It's short, but take your time to look at it.**

A. Sure.

Yes, I have.

**Q. So it's an e-mail from you to Butch Webb, the subject of which is "Forward, Trial Program."**

**Do you recall this e-mail?**

A. No.

**Q. Does -- the e-mail says, "Here are the underwriting guidelines for the trial program." Do you recall what the "underwriting guidelines for the trial programs" was?**

A. I don't recall the use of the trial program, no.

**Q. Meaning the use of that term?**

A. Use of that term. No, this -- I am sure I did at the time, but I don't know.

**Q. Do you know what underwriting guidelines this e-mail is referring to?**

A. No.

**Q. Okay. The next sentence says, "Can you review and, if approved, put these on Western Sky letterhead?"**

**Do you recall asking Mr. Webb to put underwriting guidelines on Western Sky letterhead?**

A. I don't recall asking that, but I can see it here, yes.

**Q. And why would you have asked him to put underwriting guidelines on Western Sky letterhead?**

A. Because if -- we didn't have the Western Sky letterhead, and we wanted the Western Sky guidelines on Mr. Webb's Western Sky letterhead. I didn't have access to that. So I would have asked him to do that.

70:2-21

**Q. And logistically speaking, do you mean an individual sitting on the reservation would run the credit of the consumer?**

A. No, it was done in an automated fashion. It was the -- there were two ways an applicant could submit an application. The first would be to call up and give their information to a loan agent. Some of whom were at CashCall -- most of whom were at CashCall, some of whom were on the reservation. And then at the bottom of that, they would read, do you authorize me to run credit on behalf of Western Sky? And if they said yes, of course this is all recorded, then the loan agent, regardless of whether they were the CashCall loan agent or the Western Sky loan agent, would hit a button, which would run the automated credit. It was a Western Sky credit -- credit report, meaning if the -- if you were to apply, and the next day

20 you looked at your credit report, it would show
21 that Western Sky ran the credit, not CashCall.

73:3-14
3 **Q. Mr. Baren, I think you were telling me**
4 **that there were two ways that consumers could apply**
5 **for Western Sky loans. And I think you only got to**
6 **the first one which was to call and give**
7 **information. What was the -- what's the second**
8 **way?**
9 A. The second way would be to go on your
10 computer and actually apply without actually
11 talking to anyone, be they on the reservation or at
12 CashCall, where you would access the application,
13 enter the data yourself, and then click buttons
14 that would authorize Western Sky to run credit.

73:25-74:9
25 **Q. Okay. Where would the consumer send any**
1 **documents that were required?**
2 A. It changed over time, but the consumer --
3 let's say they passed the automated underwriting.
4 They would then get a series of e-mails telling
5 them exactly what to do. And I'm sorry, my
6 technical know-how isn't -- you could upload them
7 on occasion toward the end of the program, but
8 throughout the program you could also fax them. So

there was faxing them or uploading documents.

86:7-88:9

**Q. And you had a couple of specific examples you recalled. And one was that at some point Mr. Webb requested that South Dakota be removed as one of the states where consumers could receive Cash -- excuse me, Western Sky loans; is that right?**

A. That's correct.

**Q. Do you recall if, during the duration of the Western Sky loan program, there were any other states that were removed from the underwriting guidelines?**

A. Two were removed at the start before the program even started.

**Q. Okay.**

A. One of those was West Virginia and the other was California.

**Q. And why was West Virginia removed?**

A. West Virginia was removed because at that point West Virginia was known as a hotbed of regulatory concern, and very few lenders were actually making loans in West Virginia. And, in fact, CashCall had received a subpoena related to its purchase of bank loans in West Virginia in early 2010.

**Q. So was -- was CashCall -- was -- are you**

**the one who suggested Western Sky loans not be made to consumers in West Virginia?**

A. No, I didn't suggest that.

**Q. Do you know who did?**

A. I did, but that wasn't my suggestion.

**Q. What was your suggestion?**

A. I notified Mr. Webb that we did not want to purchase any loans that were made to West Virginia consumers.

**Q. Do you know if Western Sky made loans to consumers in West Virginia?**

A. I do know.

**Q. And did they?**

A. No.

**Q. And do you know if that was based on your statement to Mr. Webb that CashCall did not want to purchase loans made to consumers in West Virginia?**

A. I would imagine it is, yes.

**Q. And then you said California was a second state that at the beginning was excluded from the underwriting guidelines. And why was that?**

A. At the time CashCall was making loans in California and had a very robust presence in California in the installment loan business, and we believed that -- that channel remain, and it was our recommendation to Mr. Webb that Western Sky not make loans in California and allow that business in

8 California to go through CashCall and not have a
9 competitor in California.

92:23-93:4

23 **Q. And when did the Western Sky loan program**
24 **end?**
25 A. CashCall notified Western Sky that it
1 would stop purchasing Western Sky loans the first
2 week of September 2013, and my understanding is
3 that Western Sky stopped originating loans right at
4 that time.

93:13-94:8

13 **Q. I want to ask what I think is a bit**
14 **related to that, which is: What communications did**
15 **consumers receive from Western Sky through the loan**
16 **application process? So before they were actually**
17 **approved for a loan?**
18 A. Sure. There was a whole host of potential
19 communications and not all applicants got all of
20 these communications. So you would have people who
21 got declined, and they would get an e-mail from
22 Western Sky stating that unfortunately their
23 application had been declined, and what's known an
24 adverse action letter would soon follow. And that
25 would generally be the end for those people.
1 For the people whose applications were

preliminarily approved, meaning the people who passed the automated underwriting, they would then get a series of e-mails directing them to send faxes in, to send documents in. And then when their -- when their file was complete, they would be directed to a promissory note online that they would be directed to access to -- or to access and review and sign.

106:12-107:23

**Q. When would consumers first hear about CashCall being involved with their loan?**

A. The first call they made -- assuming that they called on the 800 number, which is one of the two ways by which you could apply for a loan. The first thing you hear when you dial that 800 number was a recording, and I'm paraphrasing, "You have reached Western Sky. We are a Native American-owned business, operating on the Cheyenne River Sioux reservation. We have hired a company called CashCall to help us take application" -- "take applications and process information. You will be transferred to a CashCall operator. Hit 1, and you will be transferred to a CashCall operator, who will take your application."

That changed over time as more of the calls went directly to the reservation. Borrower still got the same, "Thank you for calling Western Sky. We are

a Native American-owned corporation or lender. We have hired CashCall to process some of our application calls. You may be directed to a CashCall operator, and you hit 1," because we didn't know, at that point, where that call was going to go. So anyone who was calling up, that would be their -- their -- the first communication they had. So they were aware of CashCall's involvement from the moment they started the transaction.

Now, if they applied online, you wouldn't get that -- that call or that disclaimer, but you would be notified via e-mail that CashCall was assisting Western Sky. And then throughout the process, if the Western Sky -- if the Western Sky person handling the application, there would be no mention of CashCall until the loan was -- was sold. But if CashCall was assisting in the application, then you would be notified throughout the process that CashCall was involved.

109:17-111:6

**Q. So that's a scenario that I'm trying to clarify where I may have misunderstood. If there are consumers who can go all the way through the loan application process without having CashCall involvement.**

A. It's -- well, there's always going to be

CashCall involvement because pursuant to the service -- servicing agreement, CashCall is performing some tasks on behalf of Western Sky. So those are back office tasks. Like if someone is doing an application verification, the borrower probably doesn't even know that that's happening. If someone is doing a fraud review of the documents that the borrower has provided, the borrower probably doesn't even know that that's happening. You're not calling the borrower up and saying, is this document you sent me fraudulent? I'm just doing a check. So you are doing that as part of a back office check.

**Q. Uh-huh.**

A. So in those instances, even though CashCall is doing some of the work, the borrower is not aware of that fact. But it is -- it would be very rare for an application to go all the way from start to finish without some communication from the loan agent, even if you are applying online. In some cases, if the online applications get directed, they still get a loan agent, because the loan agent has to shepherd the application through, even though you're not actually talking to them on the phone.

In most of the instances, you still might have to talk to them on the phone. Given that

CashCall is involved in that process, it would be very, very rare, in fact, probably impossible, and, again, I'm not the right person to know probability of this, that the -- an applicant would not know of CashCall's involvement in the loan origination process, regardless of the channel that they came through.

111:17-112-7

**Q. Who would track consumer payments? So, again, just going through the consumer process, we talked about the application, the funding, and then a next step in the process would be consumers repaying the loan.**

**Who would -- or which company would track consumers' payments of the loan?**

A. Well, the first payment wasn't due until at least 15 days, usually, minimum, after the loan was originated. So the loan would have been sold to CashCall at that point. So CashCall as the -- as the -- CashCall through its subsidiary as the owner and CashCall as the servicer would be the one tracking the payments.

**Q. And what subsidiary are you referring to?**

A. WS Funding.

119:5-20

**Q. I want to go back in our conversation a little bit, again. As we were talking about the consumer experience, I think you mentioned that, at some point, after the loan had been funded, CashCall purchased the loan from Western Sky; is that correct?**

A. WS Funding purchased the loan, which -- I mean, it's the same, given that CashCall was the parent company.

**Q. Okay. Let me -- let me be correct and accurate about it, then, though. So at some point after Western Sky had funded a loan, at least three days would elapse and then WS Funding would purchase the loan from Western Sky; is that correct?**

A. That's correct.

123:23-124-1

**Q. Did CashCall purchase every loan that Western Sky made through the Western Sky loan program?**

A. I'm not certain, but I believe so.

134:1-136:6

**Q. Is this the agreement that governs the relationship between Western Sky and WS Funding starting in December of 2009?**

A. This was one of two agreements, but the answer to your question is yes, with the caveat that the first loan wasn't originated until February of 2010.

**Q. And what's the second agreement that you are referring to?**

A. That would be the marketing and servicing agreement. That was between CashCall and WS Funding, the parent -- excuse me, CashCall and Western Sky.

**Q. I'm going to hand you what's been marked as Exhibit 3. And take your time in looking at it, but my question will be: Is this the second agreement that you were just referring to?**

A. Yes. But I just noticed -- and this is not the final agreement because this is between WS Funding and -- Western Sky Financial and WS Financial. When we noticed the error in both of these agreements, they were revised and amended, so that this agreement for service, the operative agreement, was between Western Sky Financial and CashCall.

And then on Exhibit 9, somewhere after December 28th of 2009, the error was caught, the Western Sky Financial error, and this agreement was amended to reflect the proper name of Western -- WS Financial, WS Funding.

So both Exhibit 9 and Exhibit 10 were shortly, after these dates, amended to correct those mistakes.

**Q. Do you recall if the amendment of both agreements changed anything besides the incorrect name of the WS Funding?**

A. It's possible they did, but I have no specific recollection.

**Q. I'm going to hand you what's been marked as Exhibit 2. And my question is: Is this the amended agreement that you are referring to?**

A. Yes.

**Q. Okay. And what is the date of this agreement?**

A. February 1st of 2010.

**Q. Okay. From December of 2009 to January 31st of 2010, was Exhibit 9 the operative -- one of the two operative agreements between the two companies between Western Sky Financial and WS Funding?**

A. Yes.

**Q. And then starting on February 1st, 2010, was the agreement that's been marked as Exhibit 2 the operative agreement between Western Sky Financial and WS Funding?**

A. One of two.

139:6-8

6 **Q. As part of a corporation, did he have an**
7 **ownership interest at WS Funding?**
8 A. CashCall was the owner of WS Funding.

140:6-10

6 **Q. Did he have some other type of role at**
7 **Delbert Services?**
8 A. He was the owner.
9 **Q. Was he the sole owner?**
10 A. Yes.

142:3-12

3 **Q. Did Mr. Reddam have final approval over**
4 **CashCall's agreements with Western Sky?**
5 A. Well, he executed the agreements, but I'm
6 not sure exactly what you mean by "final approval,"
7 because these agreements were part of a
8 collaborative process among the executive team and
9 also in discussions with Western Sky. So the
10 decision to enter into the Western Sky transaction
11 was a collaborative effort based primarily on the
12 advice we received from counsel.

143:17-144:5

**Q. Just -- we were just mentioning the**
18 **executive team. Who was on CashCall's executive**

**team? Who is currently on CashCall's executive team?**

A. Probably just Paul Reddam, Del Meeks, and myself. In certain instances Paul would bring in other people to an executive team, depending on the subject matter. And that would include head of servicing, possibly Mike Chiang at risk, possibly

144

the head of marketing. But those were made -- those decisions were made on an ad hoc basis. But I would say right now, as the company has shrunk, the core of the executive team would be those three people.

184:12-21

**Q. Did CashCall ever pay legal expenses for Western Sky?**

A. Yes.

**Q. In what situation did CashCall pay Western Sky legal expenses?**

A. CashCall agreed to indemnify Western Sky pursuant to the contracts, and so to the extent that Western Sky incurred legal fees in dealing with regulators or litigation, CashCall would reimburse Western Sky for those costs.

DATED: June 30, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov