OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS 30(b)(6) SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS 30(b)(6)**

21:16-19

16 **Q. Beginning in late 2009/early 2010, what**
17 **products did CashCall purchase from Western Sky?**
18 A. $2,600 product, $5,000 product and $10,000
19 product.

38:20-39:1

20 **Q. For financial purposes, I understand that**
21 **WS Funding's financials were included and essentially**
22 **rolled into CashCall's financials; is that true?**
23 A. Yes and no. Effectively, WS Funding has no
24 financials.
25 **Q. Okay.**
1 A. It's a pass-through entity.

39:24-40:8

24 **Q. We're going to get into the relationship**
25 **between Western Sky and WS Funding later on.**
1 **Was there any documentation or other formal**
2 **transfer between WS Funding and CashCall?**
3 A. Not that I'm aware of.
4 **Q. When loans were assigned from Western Sky to**
5 **WS Funding, was it WS Funding that owned the loan, or**
6 **was it CashCall that owned the loan, or is there no**
7 **difference in your mind?**
8 A. There's no difference.

53:6-9

6 **Q. Did CashCall ever decline to purchase a loan**
7 **from Western Sky because it did not meet CashCall's**
8 **guidelines?**
9 A. Not that I'm aware of.

55:11-56:11

11 **Q. The loan from CashCall, how much was that loan?**
12 A. It varied based on the funding.
13 **Q. Was it a line of credit?**
14 A. Per the services agreement, it averaged two
15 days of funding because on the third day we would
16 purchase loans, which means cash would then go back into
17 the funding account from purchasing of the loans.
18 **Q. And how was that funding represented on**
19 **CashCall's books, if at all?**
20 A. It would have been as a note receivable from
21 Western Sky.
22 **Q. And then would that note receivable become paid**
23 **after the three days when CashCall purchased the loan?**
24 A. It was a continual note, meaning if there were
25 three days worth of loans, they would have three days
1 worth of a note receivable on the books. Then once that
2 note was paid, for example on say on a Monday, and you
3 had Thursdays and Fridays, it took it down to two days.
4 But for whatever the note was, was for the balance of
5 loans that were funded and remaining on Western Sky's

6 books until purchased.
7 **Q. And was that settled daily?**
8 A. Yes.
9 **Q. And that's true at CashCall as well at**
10 **Western Sky?**
11 A. Yes.

67:4-68:14
4 **Q. Do you know if in fact CashCall paid**
5 **5.145 percent of the loan amount to Western Sky?**
6 A. Yes.
7 **Q. Do you know how often it made that payment?**
8 A. It was invoiced monthly.
9 **Q. Did that amount ever change from the inception**
10 **of the agreement until the end of 2013?**
11 A. Not that I recall.
12 **Q. The next part of that paragraph says,**
13 **"Regardless of notes purchased, net minimum payment**
14 **amount due and owing to Western Sky Financial from**
15 **company shall be as follows: $100,000 and no cents**
16 **payable March 1, 2010 and for each month of the**
17 **agreement thereafter."**
18 **And then I'm going to actually skip two**
19 **paragraphs and direct your attention to the last**
20 **paragraph of that Section 3. It says, "Both parties**
21 **agree that Western Sky may at its sole discretion waive**
22 **the monthly minimum payment due to the events out of the**

23 **control of the company."**
24 **Do you see that?**
25 A. Yes.
1 **Q. Do you know if Western Sky ever did in fact**
2 **unilaterally waive the minimum $100,000 minimum payment?**
3 A. I do not recall.
4 **Q. Okay. And please take a moment and review that**
5 **whole section to the extent you can read that copy.**
6 **And I'm wondering does CashCall agree to pay**
7 **$100,000 or the note amount plus 5.145 percent,**
8 **whichever is higher, or is it both?**
9 A. The $100 million is -- $100 million, excuse me.
10 MR. BARLOON: Go ahead. You may answer.
11 THE WITNESS: The $100,000 is the minimum.
12 BY MS. HARTMANN:
13 **Q. Okay. So it's whichever is more?**
14 A. Yes.

69:2-7
2 **Q. Paragraph 5 discusses "administration fee," a**
3 **"minimum monthly administration fee in the amount of**
4 **$10,000."**
5 **Did CashCall, in fact, pay the administration**
6 **fee of $10,000 to Western Sky?**
7 A. Yes.

72:10-23

10 **Q. That paragraph which is titled "Reserve**
11 **Account," explains the details of an account at a**
12 **mutually agreed upon financial institution."**
13 **Is that the Wells Fargo account that we talked**
14 **about earlier?**
15 A. Yes.
16 **Q. And is there anything that you would like to**
17 **correct or clarify in your testimony about how that**
18 **account worked based on your review of the agreement**
19 **itself?**
20 A. No.
21 **Q. Did it, in fact, work as described here in the**
22 **agreement?**
23 A. And as I described earlier, yes.

85:11-86:3

11 **Q. Okay. And was that origination system, did**
12 **CashCall have access to that origination system?**
13 A. They had a segmented part of the servers and
14 the CashCall proprietary operating system that they used
15 that they had access to.
16 **Q. Okay. And did CashCall have access to it as**
17 **well?**
18 A. No.
19 **Q. Did Western Sky have access to any other part**
20 **of CashCall's servers or system other than that**

21 **segmented --**
22 A. No.
23 Well, let me qualify. CashCall's IT provided
24 services on behalf of Western Sky to support that
25 origination system, so the IT function had access to the
1 system. Meaning, to do any code updates or any changes
2 that Western Sky desired to be made, they had that
3 access.

DATED: June 30, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov