OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 1, 2016<br>Time: 1:30pm<br>Court: Hon. John F. Walter<br>Courtroom 16 |

**EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS**

20:21-25

21 **Q. Okay. Do you know why it was created?**
22 A. Yes.
23 **Q. Can you tell me that?**
24 A. To service loans that were charged off by
25 CashCall and other third-party entities.

21:19-25

19 **Q. Can you tell me who created Delbert**
20 **Services Corporation?**
21 A. It was created -- it was owned by Paul
22 Reddam, and it was created by the executive team of
23 CashCall.
24 **Q. Are you part of that executive team?**
25 A. Yes.

37:23-38-23

23 **Q. Can you tell me, generally speaking, how**
24 **that balance changed?**
25 A. As Western Sky began originations, their
38
1 originations were small compared to the
2 CashCall-originated loans. As Western Sky grew
3 their program and originated more loans, we
4 purchased more loans, and it became at a point
5 larger than CashCall-originated loans.

6 **Q. Okay. Do you know what loan products**
7 **Western Sky originated?**
8 A. Yes.
9 **Q. Can you tell me what those were?**
10 A. They had products of 850, 1500, 2600,
11 5,000, and I believe 10,000.
12 **Q. Do you know whether they had those**
13 **products through the entire time frame in which**
14 **CashCall was purchasing loans from Western Sky?**
15 A. Not the entire, no.
16 **Q. Do you know how it changed, whether it**
17 **started with one and grew out to more or vice**
18 **versa?**
19 A. It originally started with the 26, the 5,
20 and the 10, I believe.
21 **Q. Okay.**
22 A. And the two other products were added
23 later.

40:15-22

15 **Q. Okay. Do you know who determined the**
16 **terms -- and by "terms," I mean, again, interest**
17 **rate, origination fee, other fees, and repayment**
18 **length -- for the Western Sky loans?**
19 A. Western Sky would have underwriting
20 guidelines, but CashCall would only buy those loans
21 which met our criteria that we determined on these

22 loans.

41:15-16

15 **Q. Who directed the advertising at CashCall?**
16 A. Paul Reddam.

46:11-15

11 **Q. Who comprises the executive team?**
12 A. Paul Reddam, myself, the head of
13 servicing, the head of underwriting, the head of
14 production, the head of risk, the head of
15 marketing, and the head of IT.

60:11-15

11 **Q. Do you know if Western Sky originated**
12 **loans to borrowers who lived in certain places as**
13 **opposed to across the world?**
14 A. We only purchased loans that were
15 originated by Western Sky in the United States.

69:13-21

13 **Q. Did you have other regular executive group**
14 **meetings?**
15 A. No.
16 **Q. Were your executive group meetings**
17 **essentially ad hoc, as needed?**
18 A. As needed or, like I mentioned earlier, I

19 interact with Paul on a daily basis. He can walk
20 to me very quickly, as is the case with a number of
21 the other executives.

71:1-12
1 **Q. Did it use any other either subsidiaries**
2 **or third parties for collection services?**
3 A. CashCall did use outside third parties
4 similar to Delbert to collect on loans that had
5 been charged off or were heavily delinquent.
6 **Q. What -- what parties did it use?**
7 A. I don't know the names.
8 **Q. From the period of 2010 to 2013, did**
9 **CashCall servicing department perform all**
10 **collection services up until the point of**
11 **charge-off?**
12 A. Yes.

74:18-75:12
18 **Q. The information of whether a loan was sold**
19 **to a third-party debt buyer or simply outsourced**
20 **for collection purposes but continued to be owned**
21 **by CashCall.**
22 A. That information of what debt was sold and
23 what debt was serviced is in the system. That
24 information is, but not the reasoning behind why
25 one was sold versus why one was collected.

74

**Q. Okay. That's a good clarification. I appreciate that.**

**Is it a searchable criteria?**

A. I don't know.

**Q. Who at CashCall would be responsible for determining whether a particular defaulted loan was sold versus not sold?**

A. At that time, it was Louis Ochoa.

**Q. What was Louis Ochoa's role?**

A. Head of servicing at CashCall.

**Q. And Mr. Ochoa is currently an owner of Blixum; is that right?**

A. Yes.

**Q. Does he still have a role at CashCall?**

A. No.

**Q. And at what point did he transition from CashCall, if you know?**

A. Approximately two years ago.

**Q. At some point, did the charge-off -- the date at which a loan was charged off for CashCall financial purposes change?**

A. Yes.

**Q. What was that change?**

A. We originally were, in the very beginning, at 90 days. We moved it to 120, and then we moved

75

1 it to 150. It's back to 120.
2 **Q. Do you know approximately when those**
3 **changes were made?**
4 A. I don't recall.
5 **Q. Do you know why those changes were made?**
6 A. Basically, trying to collect and increase
7 the collection rates based on the time to work or
8 modify or work with the borrower. But based on the
9 roll rates, that wasn't successful, and we went
10 back to 120.
11 **Q. Okay. Who made that decision?**
12 A. The executive team.

79:21-81:12
21 **Q. I'm looking now at Exhibit 13. It's page**
22 **2 of the financial statements. And it's the back**
23 **of the second piece of paper, exactly.**
24 **And I'm looking in the assets section of**
25 **that document -- of that page, under "Unsecured," it**
80
1 **lists consumer loans held for sale at fair value and**
2 **then consumer loans held for sale at lower cost or**
3 **market net.**
4 **What does it mean, "consumer loans held for**
5 **sale at fair value," if you know?**
6 A. Those are loans that, according to GAAP,
7 were allowed to determine if we want to record the

loans at a fair market value or lower cost to market.

**Q. So is it that a loan would be listed either in the first subheading or the second subheading and not both?**

A. For the consumer unsecured loans, yes.

**Q. What would determine whether a loan would be categorized in the first subcategory or the second, versus the second subcategory?**

A. It would be based on an evaluation and determination made by myself and the auditors at the beginning, and then those assets are recorded there from the time the election is made.

**Q. And what goes into that determination?**

A. There's -- it's of the opinion GAAP allows us to determine which one we would like to record it under. And in the unsecured loans, with a heavy interest receivable on a tail on it, fair market value allows you to take the interest strip of the future, plus charge-off, defaults, and so on, and then present-value that expected cash flow back down into the value of the loan.

Lower cost to market would assume that you are assuming a market value to that loan if you had a sellable asset. So if you had a car, you know the market value of a car. You would use market value. There is not a market, really, to sell these loans,

and so it was not easily determinable, a market value of these. So we elected to use what's called FAS 159 or fair market value accounting.

103:8-12

**Q. What do you understand the major risks to be to CashCall? We will talk about the 2010 to 2013 timeframe.**

A. The major risk to CashCall is a default on a loan.

106:19-108:25

**Q. Going back for a minute -- I apologize for the lack of organization, but to the investor side of the business, were there times when investors required a personal -- require a personal guaranty for their investment?**

A. Yes.

**Q. Do you know which investors to CashCall that was true for?**

A. Not off the top of my head.

**Q. Do you know how many investors that was a condition for their investment?**

A. Not the exact number, no.

**Q. Who provided those personal guaranties?**

A. Paul.

**Q. Mr. Reddam?**

A. Mr. Reddam.

**Q. Can you tell me how it came about that those guaranties were part of the investment criteria?**

A. They were requested by the investor.

**Q. Was there anyone else who provided any personal guaranties to any investment to CashCall?**

A. No.

**Q. Do you know how much money Mr. Reddam, overall, guaranteed?**

A. No.

**Q. Were you part of that negotiation in which that personal guaranty was devised?**

A. A little more clarity, if you would.

**Q. Sure. It's my understanding that, in large part, you interfaced with the outside investors.**

A. Yes.

**Q. And you helped to negotiate the terms of those investments; is that true?**

A. Yes.

**Q. And one of those terms, for some of these investments, was a personal guaranty by Mr. Reddam; is that right?**

A. Yes.

**Q. And you were part of that negotiation in which the guaranty was a part of the deal?**

A. I was part of those discussions.

**Q. Did you discuss those with Mr. Reddam individually?**

MR. BARLOON: Objection. Vague.

A. Those --

BY MS. HARTMANN:

**Q. When a personal guaranty was requested by the investor, did you take that request to Mr. Reddam?**

A. The investor and I, once discussing it, would then have to present it to Paul because he would have to, of course, sign off on it.

**Q. Was there ever a time when he did not agree to sign off on it?**

A. I don't recall.

DATED: June 30, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov