OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

# EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM

17:2-22

**2 Q. All right. So from May 2000 until the**
3 **present, have you been the president of CashCall,**
4 **Inc.?**
5 A. Well, I'm going to have to expand a little
6 bit on this answer. It was Relantis for a couple
7 of years and then ultimately changed its name to
8 CashCall. So it wasn't CashCall in 2000. And
9 Relantis was a company that bought and sold houses,
10 but it wasn't very active in it.
11 **Q. So was Relantis's business mortgage**
12 **lending or was it flipping houses?**
13 A. It didn't do any lending.
14 **Q. Okay. So when you bought -- did you buy**
15 **Relantis from someone else or did you found**
16 **Relantis?**
17 A. No, it was de novo when it started in
18 2000.
19 **Q. De novo meaning you started Relantis?**
20 A. Yes.
21 **Q. As a company to buy and sell houses?**
22 A. Yes.

18:17-19:23

**17 Q. Was it your idea to develop software for**
18 **loan origination and servicing?**

A. Well, I had the idea for the loans, and the people who did the software had all the ideas about how to do the software.

**Q. All right. So when you say you had ideas about the loans, what kind of loans did you have an idea about?**

A. Well, the -- at DiTech, the company did

19

second mortgage loans up to 125 percent loan-to-value. And at the time of CashCall being formed, Payday Lending had become sort of a new form of lending, and so I thought there was a big gap between second mortgage and Payday Loan, and that people would need something that was in between those two things. So that was kind of my -- the genesis of the idea.

**Q. Okay. And was the idea that those loans would be unsecured?**

A. Yes.

**Q. All right. And why did you choose to develop your own loan origination and servicing software as opposed to buying something off the shelf?**

A. Well, I don't know if there were suitable products on the shelf, but the fellow head of the development team, he had a company. I don't know what it was called at the time; it later became

20 called Cogility. But he said he had new
21 development software that was kind of a next
22 generation, and he could form the next generation
23 of -- of loan software using this Cogility product.

22:4-20
**4 Q. Okay. So did CashCall have an ongoing**
5 **contractor relationship with Cogility?**
6 A. For a while it did.
7 **Q. All right. Can you tell me what time**
8 **frame?**
9 A. Well, from 2002 up to three, four years
10 ago, approximately.
11 **Q. What kinds of things did Cogility -- what**
12 **services did Cogility perform for CashCall?**
13 A. I am still not exactly sure, because
14 listening to Matt Ghourdjian explain Cogility
15 and where he would say that it would essentially
16 write its own code, that always struck me as
17 hyperbole. But I'm not a software expert, but
18 somehow the application of the CashCall systems is
19 built on top of Cogility. It's some sort of
20 substructure.

33:20-34:19
**20 Q. So the next sentence says, "He coordinates**
21 **all marketing and advertising and determines where**

22 **advertising should be directed."**
23 **Is it true that in 2009, October 2009 to be**
24 **more specific, you coordinated all marketing and**
25 **advertising for CashCall and determined where**
34
1 **advertising should be directed?**
2 A. Well, in one sense it's true, in another
3 sense not, in that we use an outside advertising
4 agency named Kovel/Fuller, and they would actually
5 direct where advertising was done and what it
6 looked like, et cetera. And then sometimes I would
7 interface with them.
8 **Q. Did you, at CashCall, have final say over**
9 **any ad campaign that Kovel/Fuller put together?**
10 MR. NOLAN: Objection. Lack of
11 foundation. Calls for speculation.
12 A. Not exactly.
13 BY MR. MARTIKAN:
14 **Q. Did you hire Kovel/Fuller to do**
15 **advertising campaigns for CashCall?**
16 A. Yes.
17 **Q. All right. Did Kovel/Fuller develop**
18 **advertising campaigns for CashCall?**
19 A. Yes.

37:25-38:5
**25 Q. Okay. And to customers in one state or**

38
1 **more states?**
2 A. I think -- I think it was -- well,
3 certainly any lending it was doing, it was
4 California, and it might have been a couple of
5 other states, but I'm not sure.

42:20-43:6
**20 Q. Can you explain what "underwriting" is?**
21 A. Underwriting is evaluation of credit for
22 making a loan.
23 **Q. All right. And what is the importance of**
24 **underwriting to unsecured lending?**
25 A. Well, certainly at CashCall we would never
43
1 make a loan or buy a loan that hadn't been
2 underwritten, that is evaluated for the likelihood
3 that a borrower can and will repay the loan.
4 **Q. Did CashCall develop its own proprietary**
5 **underwriting criteria?**
6 A. Yes.

50:9-51:2
**9 Q. I'm only asking about CashCall.**
10 A. You're talking about loans that CashCall
11 serviced.
12 **Q. CashCall's own unsecured consumer loans?**

13 A. Loans that it owned?
14 **Q. That it owned? Loans that it serviced.**
15 A. Well, it serviced, I believe, for some
16 other customers. So I don't think I saw reports on
17 that, but CashCall-owned loans, I would have seen
18 it, yes.
19 **Q. All right. When you say "CashCall-owned,"**
20 **what does that mean to you?**
21 A. It means that the loans were somehow on
22 CashCall's balance sheet.
23 **Q. All right. Now, were the -- the loans**
24 **that were assigned to CashCall by Western Sky,**
25 **would you consider those CashCall-owned loans once**
**51**
**1 they had been assigned?**
**2 A. Once we bought them, yes.**

55:14-22
14 **Q. Well, you purchased -- CashCall purchased**
15 **a range of loan products from Western Sky; correct?**
16 A. Yes.
17 **Q. What were they?**
18 A. Well, they were -- there was a -- are we
19 talking about -- there was a 10,000 dollar --
20 approximately $10,000 loan, $5,000 loan, $2600
21 loan, $1500 loan. For a while, I think there was
22 an 850.

58:8-10

**8 Q. What was the biggest risk?**
9 A. I'm not trying to be a smart aleck, but
10 regulatory risk is the biggest risk.

58:24-59:3

24 **Q. Did you, at some point, loan -- make a**
25 **personal loan to CashCall of about $20 million?**
**59**
1 A. Yes.
**2 Q. All right. When was that loan made?**
**3 A. I think 2003 or '4, somewhere in there.**

**59:25-60:15**

**25 Q. Why?**
**60**
1 A. Well, the -- it's kind of a long answer,
2 but in 2005, at some point, Merrill Lynch was
3 considering giving CashCall a financing facility.
4 And they said they thought the biggest risk of
5 CashCall's business, at that time, was it didn't
6 have geographic diversity in its portfolio. And
7 what was behind that comment was Merrill's building
8 had been hit in the 2011 -- 2001 attack, and so
9 they were very, very focused on, well, gee, you
10 know, you have the same issues that -- that we had.

11 What if there's an attack or what if there's an
12 earthquake, et cetera. So they were very adamant
13 that CashCall had too much of its business in
14 California and ultimately should buy loans from
15 other parts of the country to diversify that risk.

65:11-22

11 **Q. Are you aware that -- that CashCall**
12 **created a subsidiary called WS Funding?**
13 A. Yes.
14 **Q. When was that done?**
15 A. I'm not exactly sure. Sometime, roughly
16 the beginning of 2010.
17 **Q. Why was that done?**
18 A. I think it was done so that when CashCall
19 purchased loans from Western Sky, the loans could
20 -- were clearly delineated for risk analysis.
21 **Q. For CashCall's risk analysis?**
22 A. Yes.

67:6-12

6 **Q. Were you aware that WS Funding entered**
7 **into an assignment agreement with Western Sky**
8 **Financial?**
9 A. I'm aware, generally, that WS Funding was
10 technically the vehicle that loans were purchased
11 into, but how the mechanics of that work, I -- I

12 wouldn't be the best one to tell you.

67:18-68:12

18 **Q. Have you ever heard of a company called**
19 **Western Sky Financial?**
20 A. Yes.
21 **Q. Okay. And do you know if that's Butch**
22 **Webb's company?**
23 A. Yes.
24 **Q. Okay. So are you aware that -- whether WS**
25 **Funding entered into an assignment agreement to**
68
1 **purchase loans from Western Sky Financial?**
2 A. Well --
3 MR. NOLAN: Same objection. Lack of
4 foundation. Best evidence is the documents
5 themselves.
6 You can answer the question, if you know.
7 A. I don't know, and because I wasn't the one
8 who designed the mechanics of -- of these loan
9 purchases. But CashCall or a subsidiary, WS
10 Funding, I suppose, would have purchased loans from
11 Western Sky, but I don't know, you know, how they
12 followed along the purchase timeline that way.

70:4-7

4 **Q. Did you ever discuss with Dan Baren the**

5 **terms of an assignment agreement between WS Funding**
6 **and Western Sky Financial?**
7 A. Yes.

75:1-8

1 **Q. Well, what is your understanding of what**
2 **the deal was between CashCall and Western Sky**
3 **Financial?**
4 MR. NOLAN: Objection. Assumes facts not
5 in evidence.
6 A. Well, that it -- from 50,000 feet that
7 CashCall would buy loans that Western Sky closed,
8 and there was pricing formulas for it.

76:15-77:2

15 **Q. Did you have the authority to approve**
16 **transactions that CashCall or CashCall subsidiaries**
17 **entered -- entered into with other companies?**
18 A. Well, yes. I would have the authority,
19 sure.
20 **Q. Did you have the authority to approve the**
21 **agreement by which WS Funding purchased loans from**
22 **Western Sky Financial?**
23 A. Well, as I said, I'm not clear about the
24 structure. But if -- if it was as I've been
25 thinking it is in this discussion, if WS Funding
77

1 was a vehicle of CashCall, then, yes, I would have
2 authority.

81:6-17
6 **Q. Do you know if the intent of the**
7 **assignment agreement was for WS Funding to purchase**
8 **all of Western Sky Financial's unsecured consumer**
9 **loans?**
10 A. Well, I believe the understanding would be
11 that if they underwrote and closed the loans
12 according to the guidelines that we had worked out
13 with them, that WS Funding/CashCall would buy the
14 loans.
15 **Q. And what were the guidelines that you had**
16 **worked out with them?**
17 A. The underwriting guidelines I mean.

82:20-83:2
20 **Q. Mr. Reddam, did you approve WS Funding's**
21 **purchase of loans from Western Sky Financial?**
22 MR. NOLAN: Objection. Vague and
23 ambiguous.
24 A. Well, and as I mentioned earlier, the
25 structuring part, I'm not entirely clear on. But
83
1 as a whole, I would have approved us buying loans
2 from Western Sky.

88:20-25

20 **Q. Agreed with. Do you know if CashCall ever**
21 **agreed to advertise on Western Sky Financial's**
22 **behalf?**
23 A. It -- I think the characterization would
24 be, did it ever help Western Sky with its
25 advertising. And the answer to that would be yes.

90:24-91:6

24 **Q. Okay. Did CashCall employees ever answer**
25 **the telephone calls for potential customers asking**
**91**
**1 for information about Western Sky loans?**
2 A. Yes.
**3 Q. And when did that happen, during which**
**4 time frame?**
5 A. Excuse me. It happened in the entire time
6 frame that you're talking about.

99:4-100:7

4 **Q. Do you know if CashCall employees ever**
5 **handled e-mail communications with customers on**
6 **behalf of Western Sky?**
7 MR. NOLAN: Objection. Lack of
8 foundation. Calls for speculation.
9 A. If you could be -- could you rephrase the

10 question?
11 BY MR. MARTIKAN:
12 **Q. What's confusing about it?**
13 A. Well, if -- if it means that they were
14 representing to a customer that they worked for
15 Western Sky, I am not aware of anything like that.
16 **Q. Okay.**
17 A. But if what that means is that the
18 customer was -- when people would call, where you
19 asked about CashCall originating earlier, people
20 called on the Western Sky advertising where
21 CashCall was helping Western Sky. First thing that
22 would happen before a CashCall employee would talk
23 to one of those customers would be that they would
24 hear a recording explaining that Western Sky had
25 outsourced this origination function to CashCall
100
1 and explain the relationship between the two.
2 So in that sense, if there was -- after
3 that disclosure, if there was -- it's possible that
4 there would have been an e-mail exchange between that
5 customer and that CashCall employee where the
6 CashCall employee was acting on behalf of Western
7 Sky, but not saying that he or she was Western Sky.

115:12-118:1
12 **Q. Okay. And what did you discuss?**

A. We discussed CashCall's Western Sky purchase program.

**Q. Okay. And what about it?**

A. Well, there had started to be some regulatory issues in a few states, and so she was there to discuss that, and she said that the regulatory environment was in general getting very hostile, and so we discussed whether it would be a good idea to wind down the program.

**Q. Just -- because I forgot -- did you say it was April 2012 or April 2013?**

A. 2013.

**Q. 2013?**

116

A. Yes.

**Q. Okay. And did you then decide to wind down the program after that meeting?**

A. I absorbed the advice that -- that she gave. It was -- she went on about how the firm still believed in the -- in the program and the structure and so on, and -- but she thought that given the regulatory environment -- I guess -- I don't know if we'd been sued at that point or -- or not. But it was her advice that we would encounter more regulatory problems. So despite what she thought of -- of the structure, that it was legal, et cetera, I should think about that. And

subsequently, I decided that we should stop buying loans from Western Sky.

**Q. When did you make that decision?**

A. In the summer of '13.

**Q. Do you remember any more specifically when in the summer? A month, maybe?**

A. No, it was -- well, the -- we got CashCall. And I think myself also got sued by the state of New York. And there was an article that came out in the Wall Street Journal following the suit. And we -- CashCall got an overnight letter from Freddie Mac saying that it was terminating

117

CashCall as a seller servicer. So that was a very bad thing for the company. And although we had a much closer relationship with Fannie Mae, generally Fannie Mae and Freddie Mac, because they had the same regulator themselves, FHFA, it was a very scary thing, and I decided that we had to stop buying Western Sky loans and -- and wind this down.

**Q. When you made the decision to stop buying Western Sky loans, how did you put it into effect? How did you put that decision into practice?**

A. Well, it was -- at that time there was about 100 employees at Western Sky. I don't know the exact number, but around that number, and that was the worst part of all this to me. So I -- I

15 don't remember the specific day or what have you,
16 but discussed it with Dan, talked to Butch, and
17 told him that, you know, to let his people know
18 within the month that we were going to have to
19 discontinue buying the loans, tried to give
20 everyone a proper notice. But I think that the
21 last day was, maybe the first business day of
22 September -- because the tricky part was too, that
23 there were borrowers for Western Sky who were, you
24 know, thinking they were getting a loan. So there
25 had to be a proper notice to stop -- for them to
118
1 stop originating.

123:13-124:2
13 **Q. Are there any other states that you're**
14 **aware of that Western Sky did not lend to -- or**
15 **that Western Sky lends -- loaned money to, but that**
16 **you did not purchase loans from?**
17 A. We did not want to buy loans from west --
18 where people were from West Virginia.
19 **Q. Is that because of ongoing litigation**
20 **there?**
21 A. We had litigation there.
22 **Q. Okay. When did that -- is that a decision**
23 **that was made at the outset or -- or somewhere**
24 **after the loan purchases began?**

25 A. I -- I think it was made somehow between
124
1 Dan and Butch before any -- any arrangement,
2 contract, purchases, et cetera, had happened.

128:19-129:6
19 **Q. Did Dan Baren report to you periodically**
20 **on the status of the litigation involving the**
21 **Western Sky loans?**
22 A. He discussed it quite a bit, yes.
23 **Q. By "quite a bit," how often?**
24 A. Well, I think for a time it would have
25 been pretty much daily. He was quite distraught
129
1 about it all.
2 **Q. Okay. And when it was daily, what time**
3 **frame are we talking about?**
4 A. I mean, I can't say for sure that it was
5 daily. It was just -- what I mean by that, it was
6 a frequent topic.

136:24-137:7
24 **Q. All right. Did you personally guarantee**
25 **CCL 2010 NLP SPE's loan of money from Bayberry**
137
1 **Consumer Finance Fund?**
2 A. Well, the document would seem to indicate

3 that. But as far as the name goes with all the
4 letters in it, as I had mentioned earlier, the
5 lending of these, a lot of these special-purpose
6 vehicles and they have all these names. And this
7 would be a very good example of that.

138:17-22

17 **Q. Well, how many loans to CashCall**
18 **special-purpose vehicles that were tied to**
19 **unsecured consumer loans did you guarantee?**
20 A. I don't know.
21 **Q. Do you remember, was it more than one?**
22 A. Well, it would have been more than one.

147:18-148:11

18 **Q. Okay. Oh, you moved. All right. So when**
19 **did you move from Anaheim to Orange?**
20 A. Well, we -- there was a period where we
21 had space in both Anaheim and Orange --
22 **Q. Okay.**
23 A. -- and I think my office moved at the
24 beginning of 2013. And ultimately after we had
25 these series of problems with having to close
148
1 buying Western Sky loans and the Freddie Mac issue,
2 and we shrunk quite a bit and eventually moved out
3 of the Anaheim office, and ultimately the landlord

leased it to someone else.
**Q. Okay. When you had office space in both Anaheim and Orange, where was your personal office?**
A. Well, for a while I was in both places.
**Q. Okay. So before -- before you opened the Orange office, was all of the management team in the Anaheim office?**
A. Yes.

DATED: June 30, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov