OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF MARTIN A. WEBB SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF MARTIN A. WEBB**

19:7-19

7 **Q. Is that the Wells Fargo account that was also**
8 **used to hold payments from CashCall for the assignment**
9 **of Western Sky loans?**
10 A. Would you restate that.
11 **Q. Sure. You said that this was an account that**
12 **was used to fund the Western Sky loans; is that right?**
13 A. Correct.
14 **Q. So -- and it appears that there were deposits**
15 **into that account from Longwood; is that right?**
16 A. Correct.
17 **Q. Were there deposits into that account from**
18 **CashCall as well?**
19 A. Yes.

29:18-30:4

18 **Q. What's Method software?**
19 A. Method software is their software that CashCall
20 owned and licensed it to Western Sky, and we utilized it
21 for an automated system where it took in the data,
22 analyzed the data and had a -- and then forward that on
23 to Timber Lake.
24 **Q. So is Method software a software product that**
25 **facilitates underwriting?**
1 A. It doesn't facilitate it. It just gathers
2 it -- gathers the data.

3 **Q. Okay.**
4 A. Somebody has to input the data.

45:9-12
9 **Q. All right. Well, if it comes to you, please**
10 **let me know. But I'd like to ask you about Western Sky.**
11 **When did you create Western Sky?**
12 A. It was in late 2009.

45:19-46:17
19 **Q. So why did you create a new one?**
20 A. I had the opportunity to expand and to generate
21 some capital venture for Lakota Cash.
22 **Q. Was your intention in creating Western Sky to**
23 **have an entity that could sell paper to a particular**
24 **customer?**
25 A. All companies could sell to anybody. I mean,
1 there was no restriction on being able to sell the
2 paper. But it was set up, yeah, with CashCall in mind.
3 **Q. Okay. Did Western Sky ever sell paper to**
4 **anyone other than WS Funding and CashCall?**
5 A. No.
6 **Q. Did Western Sky ever keep any of the loans that**
7 **it made?**
8 A. No. Three days.
9 **Q. That's what I meant is the full term.**
10 A. No.

11 **Q. So three days was the maximum length of time**
12 **that Western Sky kept a loan?**
13 A. Correct.
14 **Q. Why was it three days?**
15 A. I don't remember. But at the time there was a
16 regulatory requirement that FDIC had issued about a
17 three-day, and I just don't remember now.

48:10-13
10 **As I understand it, according to this**
11 **agreement, each loan is purchased at basically**
12 **105.145 percent of face value; is that right?**
13 A. Yes.

48:17-19
17 **Q. And there's also a minimum payment of $100,000**
18 **a month?**
19 A. Yes.

50:5-12
5 **Q. Do you remember getting a $10,000 monthly**
6 **fee -- administrative fee?**
7 A. Yes.
8 **Q. Okay. And by the way, I'm looking at page 2.**
9 A. Okay.
10 **Q. So was this fee paid monthly throughout the**
11 **life of the agreement as well?**

12 A. Yes.

52:1-17

1 **Q. So is it fair to say that this reserve account**
2 **allowed you to know that if you approved a loan on a**
3 **particular day, you had the money to fund it?**
4 A. Correct.
5 **Q. And was the money that went into that reserve**
6 **account deposited there by WS Funding or CashCall?**
7 A. Yes.
8 **Q. All right. And there's a formula here for how**
9 **much is supposed to be in there at any given time. And**
10 **again, I don't know why this is so tiny, but it says,**
11 **"Two days' purchased notes calculated on the previous**
12 **month's daily average."**
13 **Do you have any recollection of that formula?**
14 A. I don't remember.
15 **Q. Was there always enough money in that reserve**
16 **account for you to do business?**
17 A. Yes.

58:19-21

17 **Q. "Whereas Company desires to purchase some of**
18 **the loans."**
19 **Is it your memory that WS Funding purchased all**
20 **of Western Sky's loans?**
21 A. Yes.

60:1-6

1 **Q. Okay. Did WS Funding reimburse -- and I'm not**
2 **asking about this particular paragraph anymore. I'm**
3 **just asking you in general.**
4 **Did WS Funding reimburse Western Sky's**
5 **marketing expenses?**
6 A. Yes.

70:1-16

1 **Q. At the time that you had two to three employees**
2 **working on these loans, what kind of volume of loans**
3 **were you approving per day?**
4 A. It was a ramp-up phase, so it was very small.
5 I mean, I couldn't give you the exact number, but it
6 would have been under -- it would have been very
7 limited. I can't guess the number.
8 **Q. And I assume they -- well, I don't want to**
9 **assume.**
10 **Would they use some kind of software to do the**
11 **approval process?**
12 A. Yes.
13 **Q. And would they have computers that were**
14 **connected to a server in Anaheim?**
15 A. They were connected to the Method software
16 system in Anaheim.

73:10-17

10 **Q. Okay. Who designed this web page?**
11 A. Well, it was collaborated with CashCall. The
12 logo -- the staff at Timber Lake came up with the logo,
13 but they did help us create it and host it.
14 **Q. All right. So where it says at the bottom here**
15 **"Powered by Cogility Software," do you know what that**
16 **is?**
17 A. I don't know. I don't remember.

74:13-75:3

13 **Q. Okay. And once the data was submitted by the**
14 **borrower, where would that data go?**
15 A. Through the Method software.
16 **Q. Okay. I see on the bottom of page 2 -- well,**
17 **not the bottom, but below that blank on page 2 it says,**
18 **"I want a loan agent to contact me." I guess you could**
19 **click on that.**
20 A. Yes.
21 **Q. So who -- where would that go?**
22 A. It would go two places. Depending on the
23 overflow and depending where we were at in the building
24 stage, it would either be handled in the Western Sky
25 office there in Eagle Butte or it would go to the – the
1 overflow would go to the agents in CashCall --
2 **Q. Okay.**
3 A. -- under that service agreement.

75:17-21

17 **Q. Was there ever a time when phone inquiries were**
18 **handled by loan agents at CashCall?**
19 A. I believe they were at the start.
20 **Q. Do you know when that changed?**
21 A. No. I don't remember.

82:1-17

1 **Q. So, as I understood it, you testified earlier**
2 **that Western Sky did not lend to anyone in South Dakota?**
3 A. Right.
4 **Q. So the Western Sky loans, obviously, by**
5 **necessity, never went to anyone in South Dakota?**
6 A. Not that I'm aware of.
7 **Q. Okay. Or including in Indian country in**
8 **South Dakota on any tribal lands; is that right?**
9 A. We didn't exclude Indian country. We just
10 excluded the entire state because, from a technological
11 standpoint, how do you exclude certain areas?
12 **Q. Were there any other states that Western Sky**
13 **did not lend to?**
14 A. There were some we stopped lending in. We
15 didn't lend in West Virginia. We didn't lend in
16 California. And then we stopped lending in others as we
17 went.

84:7-23

7 **Q. Okay. The next paragraph says, "At the time**
8 **the notes are sold by Seller to Purchaser, Seller shifts**
9 **all of the risks and burdens associated with the**
10 **ownership of the notes and all of the benefits and**
11 **rewards associated with the notes to Purchaser."**
12 **Would you say that's a true statement about the**
13 **relationship with Western Sky loans?**
14 A. Yes.
15 **Q. The next paragraph: "Following the sale of the**
16 **notes by Seller to Purchaser, Seller has no control**
17 **rights with respect to the notes. All legal rights,**
18 **title and interest with respect to the notes vest in**
19 **Purchaser, and there is no recourse to Seller with**
20 **respect to the performance of the notes."**
21 **Would you say that's a true statement with**
22 **regard to the Western Sky loans?**
23 A. Yes.

89:4-90:14

4 **Q. Sir, do you recognize this document?**
5 A. I don't recognize it. I don't remember it
6 exactly, but I know that's my signature, and I know I've
7 done some of these before.
8 **Q. Now, is this -- would you fax underwriting**
9 **guidelines like this to Dan Baren?**
10 A. Yes.

**Q. Do you remember taking underwriting guidelines that you'd received from Dan Baren, putting them on Western Sky letterhead, and faxing them back to Dan Baren?**

**Do you remember ever doing that?**

A. I don't remember ever receiving any -- no, I don't. I remember having some on file that we would change and fax to them to update their computer, the software program.

**Q. Okay. How often would you fax underwriting guidelines like this to Dan Baren?**

A. Well, that would vary from week to week. I mean, example would be if we had a state that my legal counsel advised us that -- not to do something there, I'd fax him immediately, "Hey, we're not going to loan in this state."

It varied. There was no set time limit on it or timetable. And, you know, data was continually analyzed, so I can't give you a set timetable.

**Q. All right. I see that there's a fax -- looks like a fax address up at the top that says "Western Dakota Bank."**

**Is that where you had your office during this time?**

A. I had at both. I had an office in Western Dakota Bank as president --

**Q. Okay.**

13 A. -- but I also had an office in the other
14 building.

96:20-22
20 **Q. Were you the sole owner of Western Sky**
21 **Financial?**
22 A. Yes.

97:4-98:9
4 **Q. Okay. We talked about the underwriting process**
5 **a little bit.**
6 **Did you ever have disputes with CashCall**
7 **over -- or anyone at CashCall over underwriting**
8 **requirements for particular loan programs?**
9 A. Disputes?
10 **Q. Yes. Disagreements about what a particular**
11 **underwriting requirement should be for a loan product.**
12 A. Yes.
13 **Q. Can you tell me what those were?**
14 A. Well, I remember specifically Maryland that I
15 said, "We're dropping it." They wanted to keep lending
16 there, and I said no.
17 **Q. Okay. Why did you stop lending in Maryland --**
18 A. Because --
19 **Q. -- or want to stop lending in Maryland?**
20 A. Based on my experience whenever you enter into
21 any kind of action to cut your costs, your cheapest --

22 your first loss is your cheapest, always. So it was
23 always my policy to -- if someone started an action,
24 let's put it on hold till we get it straightened out.
25 MR. UMHOFER: By "action" you mean legal
1 action?
2 THE WITNESS: Yes.
3 BY MR. MARTIKAN:
4 **Q. Okay. Do you remember any others?**
5 MR. UMHOFER: And by that you mean other
6 disputes?
7 MR. MARTIKAN: Disagreements.
8 MR. UMHOFER: Okay.
9 THE WITNESS: No, I don't.

99:14-23
14 **Q. Okay. Do you know what percentage of loan**
15 **applications for all the Western Sky loans were**
16 **approved?**
17 A. The only complaints we ever got was because of
18 denial. So I don't know exactly, but it would be in --
19 denied or approved?
20 **Q. Approved as, say, a percentage of all**
21 **applications?**

22 A. I would say it would be in that 5 to 10 percent
23 range.

DATED: June 30, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov