OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                    Plaintiff,<br><br>          v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>                    Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>**PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:   August 1, 2016<br>Time:  1:30pm<br>Court:  Hon. John F. Walter<br>          Courtroom 16 |

1
2

# **TABLE OF CONTENTS**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ..............................................................................................2

   I. The Defendants ..........................................................................................................2

   II. CashCall's Unsecured Consumer Loan Business .....................................................2

      A. CashCall used the state-chartered rent-a-bank scheme to expand its lending......2

      B. CashCall replaced the rent-a-bank scheme with the tribal-lending scheme. ........3

      C. CashCall and Western Sky formed a business relationship.................................4

   III. CashCall directed the lending process for Western Sky loans. ...............................5

   IV. Reddam was directly involved with the Western Sky loans. ...................................8

   V. CashCall bought Western Sky loans made to consumers nationwide. .....................9

ARGUMENT AND AUTHORITIES ..............................................................................9

   I. CashCall cannot avoid state regulation because it, and not Western Sky, was the true lender..........................................................................................................................9

      A. The substance of the transaction controls CashCall's status. ..............................9

      B. The step-transaction doctrine supports the true-lender analysis. ......................11

      C. As the true lender, CashCall may not invoke tribal sovereignty. ......................12

      D. The Court should reject CashCall's sovereign-immunity defense ....................13

   II. The Western Sky loans are void under 16 states' usury and licensing laws...........13

      A. The tribal choice-of-law clause is unenforceable. .............................................14

         1. CRST has no substantial relationship to the parties...................................15

         2. Fundamental public policy disfavors the choice of CRST law....................15

      B. Absent a valid choice-of-law clause, the Subject States' laws apply. ................16

      C. Western Sky loan agreements are void under the Subject States' laws..............18

         1. The interest rates on Western Sky loans violate six states' usury laws. ........18

2. CashCall and Western Sky violated 15 states' licensing laws. .......................19

III. CashCall and Delbert violated the CFPA by servicing and collecting on loans where no payment was due. ..........................................................................19

A. CashCall and Delbert engaged in a deceptive practice. ......................................20

B. CashCall and Delbert engaged in an unfair practice. ..........................................21

C. CashCall and Delbert engaged in an abusive practice. .......................................23

IV. Reddam is individually liable for violating the CFPA. ..........................................23

CONCLUSION .................................................................................................25

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

# TABLE OF AUTHORITIES

**Cases**

*Big V Supermarkets Inc. v. Wakefern Food Corp.*, 267 B.R. 71 (Bankr. D. Del. 2001) ...................................................................................................12

*Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, (1989)..............................................................................................................12

*CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, No. 80, 2016 WL 3443971 (Md. Jun. 23, 2016)) ......................................................................3, 10

*CashCall, Inc. v. Morrissey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) ..............................................................................................3, 11

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287 (9th Cir.1997).........................14, 16

*CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) ......................................19, 24

*Colorado v. Cash Advance and Preferred Cash Loans*, 205 P.3d 389 (Colo. App. 2008) ...................................................................................................17

*Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178 (D. Colo. 2011)...................16

*Comm'r v. Clark*, 489 U.S. 726 (1989) ...................................................................12

*Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718 (9th Cir. 2008)........................13

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012). ........................22

*Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004).............................................10

*FTC v. AMG Servs., Inc.*, 29 F. Supp.3d 1338 (D. Nev. 2014) ................................20

*FTC v. Natural Solutions, Inc.*, No. CV 06-6112 JFW JTLx, 2007 WL 8315533 (C.D. Cal. Aug. 7, 2007)........................................................................20, 21

*First Intercontinental Bank v. Ahn*, 798 F.3d 1149 (9th Cir. 2015) ......................... 16

*Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003).....................................14

*Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995)...............................................20

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) .............................................12

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) ................................11

*In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057 (9th Cir.2002) ....................................14

*In re DirectTV Early Cancellation Litigation*, 738 F.Supp.2d 1062 (C.D. Cal. 2010)........................................................................................................15

*Jackson v. PayDay Fin., LLC*, 764 F.3d 765 (7th Cir. 2014)....................................11

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp.2d 323 (S.D.N.Y. 2013)...............................................................17

*Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir. 2008)...................................17

*Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001)................16, 17, 18

*Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776 (N.D. Cal. Aug. 5, 2013)..................................................................................................13, 15

*Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, (N.D. Cal. 2012)……………………..9

*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980).............................................................................................1

**Statutes**

12 U.S.C. § 5481 .....................................................................................19, 23

12 U.S.C. § 5531 ...............................................................................................23

12 U.S.C. § 5536..................................................................................1, 19, 21, 23

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

**INTRODUCTION**

The Supreme Court, in rejecting a claim that tribal sovereignty preempted a state's tax on tribal cigarette sales to non-Indians, found it "painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest" because all they were marketing was "an exemption from state taxation to persons who would normally do their business elsewhere." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155 (1980). That principle also lies at the heart of this case, in which CashCall, a non-Indian lender, paid Western Sky Financial, a South Dakota company owned by a member of an Indian tribe, to use its location on tribal land as a shield against state usury and licensing laws that would otherwise apply to the high-interest loans that CashCall made to borrowers throughout the United States.

CashCall, its subsidiary WS Funding, and its collection-affiliate Delbert Services Corp., violated the unfair, deceptive, or abusive act or practice provision of the Consumer Financial Protection Act of 2010[1] when they acquired, serviced, and collected on loans where no payments were due under the laws of 16 states. CashCall's owner and president, J. Paul Reddam, directly participated in and had the authority to control these violations through his management of CashCall, his direction of the scheme involving Western Sky, his knowledge, and his reckless indifference to the truth.

The Court should grant partial summary judgment for Plaintiff Consumer Financial Protection Bureau ("the Bureau") as to liability, and find Defendants' sovereign-immunity affirmative defense unavailable as a matter of law. The Defendants are not sovereigns and cannot cloak themselves in the immunities of others.

---

[1] 12 U.S.C. § 5536(a)(1)(B).

1

# STATEMENT OF FACTS

## I.   The Defendants

CashCall is a California corporation that made and serviced unsecured loans to subprime borrowers throughout the United States. Uncontroverted Facts ("UF") 1-3. CashCall's headquarters is in Orange County. UF 1. J. Paul Reddam is CashCall's owner and president. UF 4. WS Funding is a wholly-owned subsidiary of CashCall that was established as a holding company for loans made through CashCall's agreement with Western Sky. UF 5-6. Because WS Funding has no books (UF 8), no owners other than CashCall (UF 9), and no purpose other than to hold loans that CashCall serviced (UF 10), references to CashCall in this memorandum include WS Funding.

Delbert Services is a Nevada corporation that Reddam established to service loans that CashCall deemed in default, or "charged-off," and to provide collection services for other, unrelated, clients. UF 11-13.

## II.   CashCall's Unsecured Consumer Loan Business

### A.   CashCall used the state-chartered rent-a-bank scheme to expand its lending.

Reddam formed the company that was later re-named CashCall in 2000, and its initial business was buying and selling houses. UF 14. In 2003, Reddam involved CashCall in unsecured consumer lending to compete with payday loan companies, and loaned CashCall about $21 million. UF 15-16. CashCall initially loaned only to customers in California, but the scope of CashCall's market changed in 2006, when Merrill Lynch conditioned further financing on CashCall's diversification of its default risk by expanding its lending nationwide. UF 17-18.

CashCall could not expand its business by obtaining licenses to lend in additional states, because state usury laws would not have permitted CashCall to make or service loans at the rates CashCall deemed necessary to make a profit. UF 19. Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make

2

loans that CashCall then purchased and serviced. UF 20. This model of lending was "a smashing success" for CashCall, until the two state-chartered banks withdrew from the arrangement under pressure from the FDIC. UF 21.

The Maryland Court of Appeals recently referred to CashCall's arrangement with the state-chartered banks as a "'rent-a-bank' scheme" designed to take advantage of a federally-insured bank's exemption from state usury caps. *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, No. 80, 2016 WL 3443971, *2 n.12 (Md. Jun. 23, 2016). The court held that, despite the form of the arrangement, CashCall was the "de facto lender" because it retained "the exclusive right to collect all payments of principal, interest and fees, including the origination fee." *Id.* at *12. West Virginia's Supreme Court of Appeals examined the same arrangement and also concluded that CashCall, rather than the state-chartered banks, was the "true lender," based on the substance of the transactions, and not their "superficial appearance." *CashCall, Inc. v. Morrissey*, No. 12-1274, 2014 WL 2404300, *14-15 (W. Va. May 30, 2014).

## B. CashCall replaced the rent-a-bank scheme with the tribal-lending scheme.

After CashCall lost its arrangement with the state-chartered banks, the lawyer who had designed and executed the rent-a-bank model told CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." UF 22. Baren described this model as "almost identical to the [state-chartered] bank model." UF 23. Outside counsel introduced Baren to Martin Webb, who was a member of the Cheyenne River Sioux Tribe in South Dakota, and who had started two or three previous payday lending companies that used the tribal lending model. UF 25-26. Webb and Baren discussed forming a tribal lending entity through which Webb would sell "paper," meaning loans, to CashCall. UF 33.

3

Webb formed Western Sky in late 2009 with CashCall in mind. UF 35 Western Sky was a South Dakota limited liability company, and Webb was its sole owner. UF 36. Webb's plan was to use the money that he made with Western Sky as venture capital to expand his own payday loan company, Lakota Cash. UF 37.

CashCall formed WS Funding as a subsidiary to purchase loans from Western Sky. UF 6. Baren considered WS Funding's purchase of the loans from Western Sky as the same as CashCall purchasing the loans, since CashCall was WS Funding's parent. UF 38.

### C.   CashCall and Western Sky formed a business relationship.

CashCall and Western Sky formalized their relationship in two agreements signed by Reddam and Webb: an assignment agreement and a service agreement. These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013. UF 40.

Under the assignment agreement, CashCall bought all of Western Sky's loans. UF 47. To fund the Western Sky loans, CashCall set up a reserve account for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. UF 50. Western Sky used this money to fund consumer loans. UF 52. Three days after a loan was funded, Western Sky sold it to CashCall. UF 53. CashCall paid Western Sky for the full face value of the loans, plus 5.145%. UF 54. CashCall also guaranteed Western Sky a minimum payment of $100,000 per month, and a $10,000 monthly administrative fee. UF 55. Western Sky sold loans to CashCall before any payments on them had been made. UF 49, 56. Borrowers who took out Western Sky loans remitted all payments to CashCall. UF 57. Once Western Sky sold a loan, all economic risks and benefits of the transaction passed to CashCall. UF 58.

CashCall agreed to reimburse Western Sky for any repair, maintenance, and update costs associated with Western Sky's server. UF 61. CashCall reimbursed Western Sky for its marketing expenses, office and personnel costs, and bank fees. UF 62. CashCall also

4

agreed to indemnify Western Sky for any legal expenses arising out of civil, criminal, or administrative litigation, agreed to pay fines, penalties, and costs imposed in any jurisdiction, and agreed to pay Western Sky's attorney's fees in connection with such litigation. UF 63. Under the service agreement between CashCall and Western Sky, CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, and a toll-free phone number; and it promised to handle electronic communications with customers. UF 64.

CashCall developed underwriting criteria for its unsecured consumer loans that guided how it would evaluate a borrower's credit before making a loan. UF 67. Webb also developed underwriting criteria for Western Sky, but in practice CashCall would not purchase a loan from Western Sky unless it met CashCall's underwriting criteria. UF 68. In July 2010, Baren sent Webb an email attaching underwriting criteria, which he asked Webb to put on Western Sky letterhead if he approved them and then to send back to him. UF 69. Three days later, Webb signed underwriting criteria for a $700 loan on Western Sky letterhead and, three days after that, faxed them to Baren. UF 70.

In its 2011 and 2012 financial statements, CashCall did not differentiate the Western Sky loans from consumer loans that it made without tribal involvement. UF 72.

### III. CashCall directed the lending process for Western Sky loans.

Consumers applied for Western Sky loans in two ways: by telephone or online. UF 73. If a customer called a toll-free number advertised as being for Western Sky loans, they could be connected to a CashCall loan agent. UF 75. A former CashCall loan agent, Jeremiah Ellard, recalled that for a year or more after TV ads for Western Sky loans began to run, he was not aware of any functioning Western Sky entity in South Dakota. UF 76. All Western Sky calls during this time appeared to Ellard to go to CashCall loan officers, based in California. UF 77. CashCall loan agents processed Western Sky loan applications in essentially the same way as other CashCall loan applications. UF 78. CashCall loan agents used the same initial screening standards for CashCall and Western

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

Sky loans, and forwarded Western Sky loans to the CashCall underwriting department. UF 79. Ellard was trained to tell loan applicants, if they asked, that he worked for CashCall and that CashCall was hired to take overflow calls for Western Sky. UF 81. This bothered him because he took the majority of calls for Western Sky. UF 82.

After Western Sky expanded its facilities and took some customer phone calls, most calls were still routed to CashCall loan agents, so that the total number of loan applications processed by Western Sky employees was a small fraction of the total number of Western Sky loan applications. UF 84. Western Sky did not have the infrastructure to handle on-site underwriting, incoming call queuing, or other functions necessary for broad-scale lending. UF 85. Western Sky employees used CashCall's Method software, located in California, to handle loan approvals. UF 86.

The Western Sky website was hosted by CashCall on a server in California. UF 87. CashCall's IT team uploaded any changes to the Western Sky website, and ensured that the website was running properly. UF 88. CashCall employees also communicated with some applicants for Western Sky loans via email. UF 94.

When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. UF 95. CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. UF 96. CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. UF 97. According to Baren, "it would be very, very rare, in fact, probably impossible" for a loan applicant to know that CashCall was involved in the loan origination process, even though CashCall was always performing some tasks on behalf of Western Sky. UF 98.

The Western Sky loans included various loan products. One was a $2,600 loan with an APR of 139.34%. UF 102. Another was a $700 loan with an APR of 318.52%.

6

UF 104. Eventually, the Western Sky loans also included $5,000 and $10,000 loans. UF 105. The typical CashCall borrower had a lower-than-average FICO score. UF 107.

The loan agreement for a Western Sky loan informed the borrower that it was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." UF 109. In a portion of the agreement titled "Governing Law," the borrower was informed that:

> This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America.

UF 110. Elsewhere, the borrower was informed that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." UF 111. The loan agreement identified Western Sky Funding, LLC, as the lender. UF 112.

If a borrower was approved for a Western Sky loan and chose to accept it, the borrower would go onto the Western Sky website and electronically sign the loan agreement. UF 113. A person at Western Sky would then press a button and the loan proceeds would be transferred from the Western Sky's account to the borrower's account. UF 114. All of the Western Sky loans, as well as all of CashCall's other consumer loans, were funded electronically in this way. UF 116. Three days after a borrower received the proceeds of a Western Sky loan, the borrower would receive a notice that the loan had been assigned to WS Funding, and that all payments on the loan should be made to CashCall as servicer. UF 100-101. If a Western Sky loan became so delinquent that CashCall decided to charge it off, meaning that it was heavily delinquent, the loan was transferred to Delbert for collection. UF 117. The charge-off date varied over time, from 120 to 150 days delinquent. UF 118.

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

**IV.    Reddam was directly involved with the Western Sky loans.**

Reddam is the founder, sole owner, and president of CashCall. UF 4. He was also the president of WS Funding, CashCall's wholly-owned subsidiary established to buy the Western Sky loans. UF 7. In a 2009 sworn filing with the Connecticut Department of Banking, Reddam stated that he "is responsible for devising and implementing all major company policies – including its various loan programs and interest rates." UF 123-24. Reddam stated that he "coordinates all marketing and advertising, and determines where advertising should be directed." UF 125. Reddam also founded Delbert. UF 13. Delbert's application for a debt-collector license to the Massachusetts Division of Banks, filed in January 2010, included a business plan that identified Reddam as its CEO, a member of its management team, and a member of Delbert's Board of Directors. UF 126. The filing notes that Reddam and Baren "have the principal responsibility for fulfillment of the company's mission and the legal accountability for its operations." UF 127.

Reddam loaned CashCall about $21 million. UF 16. He personally guaranteed loans CashCall received from hedge funds, which CashCall used to finance the Western Sky loans and its other consumer loans. UF 128. Reddam hired an advertising agency that created advertising campaigns for CashCall, and also the Western Sky loans. UF 129. Reddam, along with Baren and CFO Delbert Meeks, was a member of CashCall's executive team, which was involved in negotiating the agreement with Western Sky. UF 130. They met frequently to discuss CashCall business issues. UF 28. Reddam approved CashCall's purchase of the Western Sky loans. UF 131. He discussed the terms of the assignment agreement that governed Western Sky's sale of the Western Sky loans with Baren. UF 132. He had the authority to approve agreements that CashCall or its subsidiaries entered into with other companies, including WS Funding's purchase of the Western Sky loans. UF 133. He made the decision to wind down the Western Sky loan program in the face of "regulatory problems." UF 134. And he discussed the status of CashCall's many lawsuits over the Western Sky loans with Baren frequently. UF 135.

8

**V.    CashCall bought Western Sky loans made to consumers nationwide.**

At the outset, CashCall's agreement with Western Sky involved loans made to borrowers throughout the United States, with the exception of California (where CashCall was already making loans), South Dakota (because Webb did not want to compete with a bank that he was president of, and because he did not want to lend to anyone he knew), and West Virginia, which Baren considered a "hotbed of regulatory concern." UF 143.

When the Western Sky loan program began, the number of loans that CashCall bought from Western Sky was small compared to the loans that CashCall originated directly, but as the program grew, the Western Sky loans eventually exceeded the number of loans that CashCall originated without Western Sky. UF 145. In its 2012 financial statement, CashCall reported funding $537,896,000 in unsecured consumer loans that year, without differentiating Western Sky from CashCall loans. UF 146.  CashCall stopped buying Western Sky loans in September 2013. UF 134, 144.

ARGUMENT AND AUTHORITIES

**I.    CashCall cannot avoid state regulation because it, and not Western Sky, was the true lender.**

**A. The substance of the transaction controls CashCall's status.**

With the express goal of evading state regulation, CashCall structured its consumer loan transactions to involve a company owned by a member of the Cheyenne River Sioux Tribe ("CRST"). UF 22, 24, 26, 34. The loan agreements purported to be governed by CRST law, and subject to CRST jurisdiction. UF 92. For the typical loan applicant, Baren testified that it would be "probably impossible" to discern CashCall's involvement until three days after the loan was funded, when the borrower received notice that the loan would be serviced by CashCall. UF 98.

To decide whether the Western Sky loans are nevertheless subject to state law, the Court should look to the transaction's substance rather than its form, and identify the true lender. *See, e.g.,* *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1197-1198 (N.D. Cal.

2012); *West Virginia v. CashCall, Inc.*, 605 F.Supp.2d 781, 787 (S.D.W.Va. 2009) ("If CashCall is found to be a de facto lender, then CashCall may be liable under West Virginia usury laws.").  The "determinative question" in the true lender analysis is which entity bears the financial risk. *See Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004). In this case, CashCall bore all the risk of the Western Sky loans. CashCall's money funded the reserve account that Western Sky used to fund the Western Sky loans. UF 50, 115. CashCall purchased all of the Western Sky loans three days after the loan funds were disbursed, and before any payments on the loan had been made. UF 49, 53. CashCall assumed all risks and benefits of the loans immediately upon assignment, and guaranteed Western Sky a $100,000 minimum monthly payment. UF 58. The default risk, which Meeks identified as CashCall's most serious risk, was borne by CashCall. UF 59. The regulatory risk, which Reddam identified as CashCall's most serious risk, was also borne by CashCall, given CashCall's agreement to indemnify Western Sky for all civil, criminal, and regulatory penalties, including legal fees. UF 60.

As the Ninth Circuit held in *Easter*: "A lender is one who puts money at risk." 381 F.3d at 957.  The Western Sky loan transactions are the same as the "table-funded loan" transactions that the Ninth Circuit addressed in *Easter*, where the loan originator closes the loan in its own name, and then assigns the loan to the true lender, who bears the financial risk in the transaction.  381 F.3d at 955.  CashCall put money at risk; it was the true lender.

Baren described the tribal lending model as "almost identical to the [state-chartered] bank model." UF 23. This admission is telling, given that courts have already found that CashCall was the true lender under the state-chartered bank model. Maryland's highest court held that CashCall was the de facto lender in its state-chartered bank relationship because it received the "exclusive right to collect all payments of principal, interest and fees, including the origination fee." *CashCall*, 2016 WL 3443971 at *12. That case describes a financial arrangement identical in all material respects to the

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

Western Sky relationship: the state-chartered bank disbursed loan proceeds, and assigned the loan to CashCall three days later. *Id*. at *13. The way that the origination fee was rolled into the loan principal, also described in the Maryland case, was identical to the transaction disclosed in the Western Sky loan agreement. *Id*.; UF 106.

West Virginia's highest court also found CashCall to be the true lender in the state-chartered bank arrangement, because CashCall bore all the financial risk in the transaction. *CashCall*, 2014 WL 2404300, at *14-15. The court held that in rent-a-bank cases, "most of which involve payday lenders," the proper standard to determine the true lender is the predominant economic interest test. *Id*. Here, as in *CashCall*, the party with the predominant economic interest in the transaction is CashCall, which bore all economic risk of the transaction. UF 58. Reddam guaranteed CashCall's loan obligations to the hedge funds that provided CashCall with capital to finance the loans. UF 128. CashCall promised to indemnify Western Sky for legal claims relating to the loans. UF 63. CashCall treated the loans on its financial statements the same way as loans originated without Western Sky's involvement. UF 72. Western Sky disbursed loan proceeds to borrowers with CashCall's money, and CashCall treated that expense as an account receivable on its books until CashCall purchased the loan three days later. UF 50, 51, 115. The Court should evaluate the Western Sky loans according to their substance, not their form, and conclude that CashCall, and not Western Sky, was the true lender.[2]

**B.     The step-transaction doctrine supports the true-lender analysis.**

The step-transaction doctrine, a tax concept that courts have also applied in non-tax contexts, leads to the same conclusion as the true-lender analysis. The doctrine groups

---

[2] Two circuit courts have already found provisions in Western Sky loan agreements a sham. The Fourth Circuit called the arbitration provision in the Western Sky loan agreements a "farce" and "plainly forbidden." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-75 (4th Cir. 2016). The Seventh Circuit found the forum selection clauses "a sham and an illusion," and questioned the enforceability of the choice-of-law clauses. *Jackson v. PayDay Fin., LLC*, 764 F.3d 765, 779 & n.23 (7th Cir. 2014).

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

transactions that are technically separate into one transaction, to reflect their true substance. *See Comm'r v. Clark*, 489 U.S. 726, 738 (1989). By "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," the court takes "a realistic view of the entire transaction." *Id*. (internal citation and quotation marks omitted). Courts have applied this doctrine to elevate substance over form in various non-tax contexts. *Big V Supermarkets Inc. v. Wakefern Food Corp.*, 267 B.R. 71, 91-92 (Bankr. D. Del. 2001) (citations omitted) (noting that courts have "often appl[ied] the step transaction concept in [non-tax] fields…, including disputes involving issues of corporate governance, contract interpretation, and fraudulent conveyances.").

One of the three alternate step-transaction doctrine tests, the "end-result test," is pertinent here. Under the end-result test, the court will invoke the step-transaction doctrine "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994) (citations omitted). The entire Western Sky loan transaction was structured to achieve a single end result: the origination of loans for which CashCall would assume the risks and benefits, permitting it to expand its lending nationwide without restriction by state regulations. UF 22, 24. CashCall funded Western Sky's operation, hosted its website, and funded its loans, and Western Sky sold all of its loans to CashCall before any payments had been made. UF 50, 51, 62, 87, 115. The Court should apply this test, and view CashCall's lending as a single transaction in which Western Sky's involvement was a formality included solely to evade state law.

## C.   As the true lender, CashCall may not invoke tribal sovereignty.

Once the Court considers the economic substance of the Western Sky transaction, either under the true-lender or step-transaction analysis, CashCall can lay no claim to tribal sovereignty as a ground for enforcing the CRST choice-of-law provision, or for treating the loans as if they were made from tribal territory. *See Brendale v. Confederated*

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

*Tribes & Bands of Yakima Indian Nation,* 492 U.S. 408, 426 (1989) (holding that a transaction with no clear relationship to tribal self-government or internal relations did not implicate tribal sovereignty); and *Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776, at *7 (N.D. Cal. Aug. 5, 2013) (holding that the sham lender must be ignored in evaluating a choice-of-law provision). Western Sky's involvement was a sham, and CashCall has no interest in applying CRST law to their loans other than to evade state law. And because Western Sky's assignment of the Western Sky loans to CashCall was a pre-determined formality, CashCall cannot claim to have taken any tribal rights by assignment.

> **D.     The Court should reject CashCall's sovereign-immunity defense**

For the same reasons, the Court should grant summary judgment in the Bureau's favor on CashCall's tribal-sovereign-immunity defense. Tribal sovereign immunity protects tribes.  *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725 (9th Cir. 2008). None of the Defendants is a tribe, or a member of a tribe, or owned by a tribe. UF 27, 29-32. Western Sky is neither a tribe nor an arm of the tribe; it is a South Dakota limited liability company owned by a member of a tribe. UF 26, 35, 36. Its profits do not inure to the tribe; Webb testified that he used his profits from Western Sky to fund Lakota Cash, a payday-lending company that he also owned. UF 37.  Even if the Western Sky's involvement in these loan transactions had economic substance, Western Sky would have had no sovereign-immunity rights to begin with.

**II.     The Western Sky loans are void under 16 states' usury and licensing laws.**

CashCall and Delbert serviced and collected on Western Sky loans made to borrowers in 16 states[3] (the "Subject States") that have usury laws, or lender licensing

---

[3] Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio.

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

laws, or both, the violation of which would render the loans void and uncollectible. For the reasons set forth below, the Subject States' laws apply to the Western Sky loan agreements, rendering them void.

### A.    The tribal choice-of-law clause is unenforceable.

To evaluate the enforceability of the choice-of-law clause in the Western Sky loan agreements, the Court must first decide which choice-of-law rules to apply. Because this case is based on federal-question jurisdiction, federal common law supplies the choice-of-law rules. *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997). Federal common law, in turn, follows the approach of the Restatement (Second) of Conflicts of Laws. *See id.; In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir.2002). Restatement § 187 applies where, as here, the contract at issue selects the law of a particular jurisdiction to govern disputes. *See Chan*, 123 F.3d at 1297; Restatement (Second) of Conflicts of Laws § 187.

Under Restatement § 187(2), courts should honor the parties' choice of law unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue" and that state's law would apply in the absence of a choice-of-law clause. *Id*. at § 187(2); *see also Chan*, 123 F.3d at 1297.[4]  The CRST choice-of-law provision in the Western Sky loan agreements fails both of these tests.

---

[4] Subsection (1) of Restatement § 187 applies only where the contract provides that a particular matter is to be governed by the law of the specified forum, not where – as here – the choice-of-law clause provides that the chosen law governs the entire contract. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 917 (9th Cir. 2003).

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

1            *1.       CRST has no substantial relationship to the parties.*

2          First, the CRST has no substantial relationship to the true parties to this

3    transaction: CashCall, and an out-of-state borrower. UF 27, 74. The CRST has no

4    substantial relationship to the true lender, CashCall, which is a California corporation

5    domiciled in Orange County that the CRST neither owns nor manages. UF 1, 2, 27, 31.

6    Western Sky's involvement does not give the CRST a substantial relationship to the

7    parties, as its sole function was to funnel CashCall's money to borrowers through a

8    company owned by a CRST member, and then to assign the borrower's notes back to

9    CashCall three days later.

10         The district court held in *Ubaldi* that the domicile of a party that is not the de facto

11   lender does not have a substantial relationship to the transaction under the Restatement's

12   test. *Ubaldi*, 2013 WL 4015776, at *6 ("If Plaintiffs' de facto lender allegations are true,

13   then Oklahoma does not have a substantial relationship to Sallie Mae or Plaintiffs or the

14   loans."). Also, there is no reasonable basis for CashCall and its borrowers to choose

15   CRST law to govern their loan contract, when neither of them is a CRST member or

16   resides on CRST land, and a typical borrower is unlikely to have access to CRST law.

17         *2.       Fundamental public policy disfavors the choice of CRST law.*

18         Second, each of the Subject States has expressed a fundamental public policy

19   favoring usury restrictions, or lending licenses, or both, by enacting statutes that render

20   contracts that violate those provisions void.[5] "[A] fundamental policy may be 'embodied

21   in a statute which makes one or more kinds of contracts illegal or which is designed to

22   protect a person against the oppressive use of superior bargaining power." *In re DirectTV*

---

[5] These provisions are set forth in full in the Bureau's statement of undisputed facts:
Alabama (UF 147), Arizona (UF 152), Arkansas (UF 157-58), Colorado (UF 161-65),
Illinois (UF 169), Indiana (UF 174), Kentucky (UF 179), Massachusetts (UF 184),
Minnesota (UF 189-90), Montana (UF 195), New Hampshire (UF 199-200), New Jersey
(UF 207), New Mexico (UF 212), New York (UF 216-17), North Carolina (UF 223-25),
and Ohio (UF 231).

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

1  *Early Cancellation Litigation*, 738 F.Supp.2d 1062, 1087 (C.D. Cal. 2010) (quoting

2  Restatement § 187 comment g).  CashCall, in this case, has the superior bargaining

3  power, and its use of that power to choose law that removes the other party's protections

4  is the kind of conduct that the Subject States' laws are designed to prevent.

5       Each of the Subject States has a materially greater interest than the CRST in the

6  determination of the validity of the Western Sky loan agreements. The parties'

7  citizenship is a factor in this analysis. *First Intercontinental Bank v. Ahn*, 798 F.3d 1149,

8  1158 (9th Cir. 2015). The borrowers in this case are each citizens of states that have

9  expressed a fundamental public policy of protecting citizens from usurious contracts and

10  unlicensed lenders by voiding loans that violate their usury and licensing laws. *DirectTV*,

11  738 F.Supp.2d at 1087. The CRST has no material interest in a company that is neither an

12  arm of the tribe nor the true lender of the Western Sky loans, but only a sham component

13  of a transaction involving a California corporation that has no affiliation to the CRST.

14       Moreover, the lending transaction affected borrowers in the Subject States to a

15  greater degree than the CRST. As a district court in Colorado noted in describing the

16  Western Loan transactions, "[t]he borrowers do not go to the reservation in South Dakota

17  to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing

18  defendants' website. They repay the loans and pay the financing charges from Colorado;

19  Western Sky is authorized to withdraw the funds electronically from their bank accounts.

20  The impact of the allegedly excessive charges was felt in Colorado." *Colorado v. W. Sky*

21  *Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011).

22       **B.   Absent a valid choice-of-law clause, the Subject States' laws apply.**

23       The final portion of the Restatement's fundamental policy analysis examines

24  whether the Subject States' laws would apply absent a valid choice-of-law clause. *Chan*,

25  123 F.3d at 1297. Absent a valid agreement between the parties as to the governing law,

26  Restatement § 188 is the general provision under which choice of law is determined for a

27  contract. *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1211 (9th Cir. 2001). It

28                                                                16

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

provides that the local law of the state which "has the most significant relationship to the transaction and the parties" is the applicable law, and lists five factors to guide this determination: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties. *Id. & n.2*.

Each of these factors favors the application of the borrowers' states' laws.  All of the significant steps required to get a Western Sky loan took place online, through the borrowers' actions in their home states. UF 73, 74, 80. Western Sky's involvement was rudimentary; its sole function was to take money from the reserve account that CashCall had established and disburse it to borrowers, whose loans would be sold to CashCall three days later, before any payments on them had been made. UF 49, 53. The CRST had no ownership interest in Western Sky and no profit interest in its business. UF 26, 36, 37. Western Sky bore no economic or legal risk in the transaction. UF 58-60.

Internet loans should be considered for legal purposes to have been made in the borrowers' location. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp.2d 323, 361 (S.D.N.Y. 2013) ("The undisputed facts demonstrate that the activity the State seeks to regulate is taking place in New York, off of the Tribes' lands."). The Tenth Circuit has also held, in the internet lending context, that key portions of the loan transaction occur in the borrower's state. *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308 (10th Cir. 2008). And a Colorado state appellate court, in *Colorado v. Cash Advance and Preferred Cash Loans*, 205 P.3d 389, 400 (Colo.App.2008), determined the locus of tribal lending activity by looking to "where (1) the contract was entered into; (2) the contract was negotiated; (3) performance is to occur; (4) the subject matter of the contract is located; and (5) the parties reside." The court concluded that, because "the contracts were entered into and negotiated [off-reservation]; the loans [were to be] delivered to consumers [off-reservation]; and performance [would] occur [off reservation

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

where] consumers [would] repay the principal and pay interest," the tribe's online lending operation was off-reservation activity. *Id.* at 400–01.[6]

Restatement § 195, which governs the law applied to contracts for the repayment of money lent, is consistent with this analysis. *Shannon-Vail Five*, 270 F.3d at 1211. Under § 195, the law of the state "where the contract requires that repayment be made" governs. Restatement (Second) of Conflict of Laws § 195 (1971). In the case of the Western Sky loan agreements, the borrower authorized Western Sky (in fact, CashCall) to withdraw the borrower's loan payments by electronic funds transfer ("EFT") from the borrower's bank account. UF 99. Thus, the money was to be repaid by EFT from the borrower's state to CashCall in California; the CRST was not involved.

Under this federal common-law analysis, the Court should find that the CRST choice-of-law provision is invalid, and that in the absence of this provision, the laws of the Subject States apply to the Western Sky loan agreements.

**C.    Western Sky loan agreements are void under the Subject States' laws.**

*1.    The interest rates on Western Sky loans violate six states' usury laws.*

CashCall has admitted that the interest rates that it charged on Western Sky loans in six of the Subject States – Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina – exceeded 80%. UF 159, 167, 191, 203, 219, 227. This interest rate substantially exceeds the maximum usury limits in each of these states: Arkansas's usury limit is 17% (UF 157-158); Colorado's usury limit is 12% (UF 163); Minnesota's usury limit is 8% (UF 190); New Hampshire's usury limit is 36% (UF 200); New York's usury limit is 16% (UF 217); and North Carolina's usury limit is 8% (UF 224). A loan contract that violates any of these usury limits is void.[7]

---

[6] Three Subject States expressly apply state law to loans made online, by deeming online contracts made with a borrower within the state to have been made within the state. Mass. Gen. Laws 140 § 96; see also Ariz. Rev. Stat. § 6-603; N.H. Rev. Stat. Ann. § 399-A:2(I).

[7] Arkansas (UF 157); Colorado (UF 165); Minnesota (UF 190); New Hampshire (UF 200); New York (UF 216); North Carolina (UF 225).

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

2.     *CashCall and Western Sky violated 15 states' licensing laws.*

All but one of the Subject States (Arkansas) require consumer lenders to obtain a license before lending to consumers who reside there.[8] Lending without a license in these states renders the loan contract void.[9] CashCall admitted that, with the exception of New Mexico and Colorado, it did not hold a license to lend in any of these states. UF 149, 153, 171, 177, 182, 187, 193, 197, 205, 210, 221, 229, 234. Western Sky did not hold lending licenses in any Subject State. UF 148, 153, 166, 170, 176, 181, 186, 192, 196, 204, 209, 214, 220, 228, 233. The Court should find that the Western Sky loans extended to borrowers in these states were void.

## III.     CashCall and Delbert violated the CFPA by servicing and collecting on loans where no payment was due.

Under Section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person to engage in any unfair, deceptive, or abusive act or practice. *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016). A "covered person" is "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. §5481(6)(A). The CFPA includes acquiring and servicing loans as examples of financial products or services. 12 U.S.C. §5481(15)(A)(i). CashCall, WS Funding, and Delbert Services – by acquiring and servicing consumer loans – are "covered persons."

---

[8] Alabama (UF 147); Arizona (UF 152); Colorado (UF 161-63); Illinois (UF 169); Indiana (UF 174); Kentucky (UF 179); Massachusetts (UF 184); Minnesota (UF 189); Montana (UF 195); New Hampshire (UF 199); New Jersey (UF 207); New Mexico (UF 212); New York (UF 218); North Carolina (UF 223); Ohio (UF 231).

[9] Alabama (UF 147); Arizona (UF 152); Illinois (UF 169); Indiana (UF 174); Kentucky (UF 179); Massachusetts (UF 184); Minnesota (UF 189); Montana (UF 195); New Hampshire (UF 199); New Jersey (UF 207); New Mexico (UF 212); New York (UF 218); North Carolina (UF 223); Ohio (UF 231).

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

**A.      CashCall and Delbert engaged in a deceptive practice.**

An act or practice is "deceptive" under the CFPA if (1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *Gordon*, 819 F.3d at 1193. The test is objective. Minute Order On Motion For Protective Order Re: Consumer Subpoenas, at 3 (ECF 135). Under the FTC Act, on which the CFPA was modeled, a deceptive act "does not require actual deception." *FTC v. AMG Servs., Inc.*, 29 F. Supp.3d 1338, 1365 (D. Nev. 2014). The Ninth Circuit has noted that "[s]ince 1982 the FTC has interpreted 'deception' in Section 5 of the Federal Trade Commission Act to require a showing of 'potential deception of consumers acting reasonably in the circumstances,' not just any consumers." *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995). The Court, or a jury, "employs its common sense" in determining whether a representation is deceptive. *AMG Servs.*, 29 F. Supp.3d at 1365.

Deception may be found based on the "net impression" created by a representation. *Gordon*, 819 F.3d at 1193. By servicing and collecting on the Western Sky loans, CashCall and Delbert created the net impression in consumers that they were servicing loans that were subject to CRST law and payable. This impression was likely to mislead customers acting reasonably under the circumstances, because it was false. *FTC v. Natural Solutions, Inc.*, No. CV 06-6112 JFW JTLx, 2007 WL 8315533, *4 (C.D. Cal. Aug. 7, 2007) (holding that a statement is misleading if the express or implied message conveyed in the ad is false). Given representations that the Western Sky loans were governed by CRST law, reasonable consumers had no reason to doubt that the loans would continue to be governed by CRST law until they were paid in full. Indeed, Baren thought it was "probably impossible" for loan applicants to discern CashCall's involvement before the loans were sold to CashCall. UF 98.

Finally, CashCall's and WS Funding's misleading statements were material. The district court in *AMG Servs.*, 29 F. Supp. 3d at 1372, held that the number of finance

20

charges and total amount owed are material terms of a loan contract. Here, it is beyond dispute that the enforceability and collectability of a loan contract is material to the borrower who makes payments on it. And as this Court has held, "a representation or omission is material if it is of the kind usually relied on by a reasonably prudent person." *Natural Solution*, 2007 WL 8315533, *3. A reasonably prudent borrower would rely on the state terms of a loan and representations that it was collectable; in fact, the declaration testimony of borrowers in this case indicates that they did. UF 119.

The Court should find that CashCall and Delbert engaged in a deceptive practice when they serviced and collected on the Western Sky loans.

### B. CashCall and Delbert engaged in an unfair practice.

An act or practice is "unfair" under the CFPA if it is (1) likely to cause consumers substantial injury; (2) which is not reasonably avoidable; and (3) which is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5536(a)(1)(B). The substantial injury prong can be satisfied, by reference to the FTC Act's analogous provision, if consumers were injured by a practice for which they did not bargain. *F.T.C. v. J.K. Pubs., Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). In this case, a typical CashCall customer who had borrowed $2,600 would pay over $8,000 in interest and fees over the life of the loan. UF 103. While CashCall's customers may have bargained for these terms, they could not have bargained to make payments on a loan that was void, because that aspect of the loan was never disclosed to them. Nevertheless, CashCall took money from consumers, typically via EFT, to which CashCall had no legal claim. UF 99, 101. This practice caused consumers significant financial injury.

Furthermore, CashCall's customers faced a substantial risk of default on loans that were void to begin with. For example, according to CashCall's 2012 financial statement, the value of loans that CashCall charged off that year, meaning that CashCall considered the loan a financial loss because it had been in default for more than 150 days, was about a fifth of the value of loans funded that year. UF 121. And most of these defaults

occurred during the first six months after the loan was funded. UF 122. Default on void
loans, as well as their significant interest expense, caused consumers substantial injury.
Because CashCall transferred all of its charged-off Western Sky loans to Delbert for
collection, Delbert's collection efforts also caused consumers substantial injury by
collecting on loans for which no payment was due.

In determining whether consumers' injuries were reasonably avoidable, courts look
to whether the consumers had a free and informed choice. *FTC v. Neovi, Inc.*, 604 F.3d
1150, 1158 (9th Cir. 2010). An injury is reasonably avoidable if consumers "have reason
to anticipate the impending harm and the means to avoid it," or if consumers are aware
of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury
after the fact. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir.
2012). CashCall's and Delbert's customers did not have a free and informed choice
regarding whether to make payments on the Western Sky loans, because they were not
informed of the loans' true legal status: the Western Sky loan agreements stated that they
were subject to CRST law and "no other state or federal law," and their servicing and
collection efforts represented that the loans were payable. UF 93.

CashCall's and Delbert's customers received no benefit from making payments on
a void loan. While an expensive loan might provide some benefit to a consumer in need
of funds, the question here is not whether the loan was a benefit, but whether the
consumers' payments on void contracts were a benefit that outweighed the injury from
making those unnecessary payments. Given the unenforceability of the Western Sky
loans in the Subject States, and the substantial rate of default within the first six months
of payments on those loans, CashCall's and Delbert's customers did not receive a benefit
by making payments on the Western Sky loans that outweighed the injury that those
loans caused.

The Court should find that CashCall and Delbert engaged in an unfair practice
when they serviced and collected on the Western Sky loans.

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

### C.     CashCall and Delbert engaged in an abusive practice.

A practice is "abusive" if, among other things, it takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of a financial product or service. 12 U.S.C. § 5531(d)(2)(A). In this case, a reasonable consumer would not understand either the substance of the Western Sky loan transaction, or that it was void and not payable under state law. The Western Sky loan agreement did not disclose that CashCall was the true lender, and Baren testified that it was "probably impossible" for a loan applicant to discern CashCall's involvement until the loan was sold. UF 98. The assignment provision in the loan agreement stated that Western Sky "may" assign the loan to any third party, when in fact by pre-arrangement Western Sky almost immediately assigned all loans to CashCall. UF 44-48. No reasonable consumer could know that Western Sky's involvement in the transaction was a sham created to avoid state regulations. The Court should find that CashCall and Delbert's servicing and collection of the Western Sky loans was abusive as a matter of law.

### IV.     Reddam is individually liable for violating the CFPA.

The CFPA subjects a "covered person" to liability for unfair, deceptive, or abusive acts or practices in the provision of financial services. 12 U.S.C. § 5536(a)(1)(B). The CFPA also deems a "related person," which includes directors and officers of financial services providers, to be a "covered person" for purposes of this liability. 12 U.S.C. § 5481(25)(C)(1). As an officer of CashCall and WS Funding, and as a director of Delbert, Reddam is a covered person. UF 4, 7, 13.

The Ninth Circuit recently held that an individual may be liable for corporate violations of the CFPA if "(1) he participated directly in the deceptive acts or had authority to control them, and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentations, or was aware of a

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.

high probability of fraud along with an intentional avoidance of the truth." *Gordon*, 819 F.3d at 1193 (quoting *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)).

Reddam both participated in and had the authority to control CashCall's and Delbert's deceptive acts. As the sole owner and president of CashCall, Reddam had the authority to control all of CashCall's acts, and to decide when and whether to transfer delinquent CashCall loans to Delbert, a company that Reddam also founded. UF 4, 12, 136, 138. Reddam had the authority to approve CashCall's agreement with Western Sky, and participated in the transaction by signing the two governing agreements with Western Sky on behalf of CashCall and WS Funding. UF 137. Reddam claimed, in a sworn filing, that all CashCall managers reported directly to him, and that he had authority over CashCall's day-to-day activities. UF 137. Reddam claimed similar authority over Delbert in another filing. UF 138.

Reddam made a personal loan to CashCall of about $21 million. UF 16. He personally guaranteed CashCall's loans from hedge funds, which CashCall used to finance the Western Sky loans and its other consumer loans. UF 128. Reddam hired an advertising agency that created advertising campaigns for CashCall, and also the Western Sky loans. UF 129. Reddam was a member of CashCall's executive team, which was involved in negotiating the agreement with Western Sky. UF 130. Reddam approved CashCall's purchase of the Western Sky loans. UF 131. Reddam discussed the terms of the assignment agreement that governed Western Sky's sale of the Western Sky loans with Baren. UF 132. Reddam had the authority to approve agreements that CashCall or its subsidiaries entered into with other companies, including WS Funding's purchase of the Western Sky loans. UF 133. Reddam made the decision to wind down the Western Sky loan program in the face of "regulatory problems." UF 134.

Reddam also knew about CashCall's deceptive conduct. Reddam discussed the status of CashCall's litigation over the Western Sky loans with Baren frequently. UF 135. Reddam knew that CashCall, rather than Western Sky, was the true lender behind the

24

Western Sky loans, because he knew how the transaction between CashCall and Western Sky was created and structured. UF 139. Reddam knew that despite what the Western Sky loan agreement said, all loans would be serviced by CashCall. UF 140. Reddam avoided lending to consumers in West Virginia, for fear of regulators there, and he testified that in his view, CashCall's biggest business risk was that it would be shut down by state or federal regulators. UF 141. And even if this evidence does not amount to knowledge, it amounts to reckless indifference. The transaction with Western Sky was structured almost exactly like the transaction Reddam had previously structured with state-chartered banks, and he was forced to terminate that transaction due to regulatory pressure. UF 142.

## CONCLUSION

For the reasons stated above, the Court should grant partial summary judgment in the Bureau's favor.

DATED: June 30, 2016                Respectfully submitted,


  /s/ Owen Martikan

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
e-mail: owen.martikan@cfpb.gov

CFPB MPA RE: MOT'N FOR PARTIAL SUMMARY JGMT.