1  THOMAS J. NOLAN (State Bar No. 66992)
   Thomas.Nolan@skadden.com
2  CAROLINE VAN NESS (State Bar No. 281675)
   Caroline.VanNess@skadden.com
3  KASONNI M. SCALES (State Bar No. 301871)
   Kasonni.Scales@skadden.com
4  JULIA M. NAHIGIAN (State Bar No. 307508)
   Julia.Nahigian@skadden.com
5  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
6  Los Angeles, California 90071-3144
   Telephone:  (213) 687-5000
7  Facsimile:   (213) 687-5600

8  JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
   Joseph.Barloon@skadden.com
9  AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
   Austin.Brown@skadden.com
10 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   1440 New York Avenue, N.W.
11 Washington, DC 20005
   Telephone:  (202) 371-7000
12 Facsimile:   (202) 393-5760

13 Attorneys for Defendants

14 UNITED STATES DISTRICT COURT

15 CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 16 CONSUMER FINANCIAL PROTECTION BUREAU, | CASE NO.: 2:15-cv-07522-JFW (RAOx) |
| 17                     Plaintiff, | DEFENDANTS' MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT; |
| 18               v. | |
| 19 CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM, | SEPARATE COVER: (1)     DEFENDANTS' GENUINE DISPUTES OF MATERIAL FACT IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; |
| 20 | |
| 21 | |
| 22               Defendants. | (2)     DECLARATIONS OF THOMAS J. NOLAN AND KASONNI M. SCALES; |
| 23 | (3)     DEFENDANTS' OBJECTIONS TO CFPB'S EVIDENCE; |
| 24 | (4)     DEFENDANTS' REQ. FOR JUDICIAL NOTICE (and supporting documents); and |
| 25 | (5)     [PROPOSED] ORDER. |
| 26 | Hearing Date:   August 1, 2016 Time:             1:30 p.m. |
| 27 | Place:            Courtroom 16 Judge:            Hon. John F. Walter |
| 28 | Pre-Trial Conf.:   September 9, 2016 Trial:            September 27, 2016 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF DISPUTED FACTS.................................................... 2

STANDARD OF REVIEW .................................................................... 5

ARGUMENT ......................................................................................... 6

I.  THE BUREAU CANNOT SHOW A VIOLATION OF THE
    ACT ........................................................................................... 6

    A.  The CFPB's Claims Impermissibly Rest On State Law
        Violations ......................................................................... 6

    B.  CRST Law Applies And Thus The Bureau's Claims Fail ........... 6

    C.  Tribal Sovereignty Supports The Choice-Of-Law Provision ...... 10

    D.  The "True Lender" Theory Cannot Save The CFPB's
        Claims .............................................................................. 12

        1.  A Motion For Summary Judgment Cannot Amend A
            Complaint ................................................................. 12

        2.  The CFPB's Proposed Test Must Be Rejected ................. 13

        3.  The Facts Do Not Support CFPB's "True Lender"
            Contention ................................................................ 17

        4.  The West Virginia And Maryland Decisions Do Not
            Matter Here............................................................... 18

    E.  Defendants' Conduct Was Not Unfair, Deceptive, Or
        Abusive ............................................................................ 19

        1.  Defendants' Conduct Was Not Deceptive ....................... 19

        2.  Defendants' Conduct Was Not Unfair ............................ 21

        3.  Defendants' Conduct Was Not Abusive .......................... 23

II. REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER
    OF LAW ................................................................................... 24

CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

**CASES** PAGE(S)

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................... 1, 2

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ...................................................................................... 10

*Brendale v. Confederated Tribes & Bands of Yakima Indian Nation,*
  492 U.S. 408 (1989) ...................................................................................... 11

*CashCall, Inc. v. Maryland Commissioner of Financial Regulation,*
  No. 80, Sept. Term, 2015,
  2016 WL 3443971 (Md. June 23, 2016)
  (to be published in A.3d) ............................................................................. 18

*CashCall, Inc. v. Morrissey,*
  No. 12-1274,
  2014 WL 2404300 (W. Va. May 30, 2014) .......................................... 18, 19

*Chan v. Society Expeditions, Inc.,*
  123 F.3d 1287 (9th Cir. 1997) ........................................................................ 7

*Cherokee Pump & Equipment Inc. v. Aurora Pump,*
  38 F.3d 246 (5th Cir. 1994) ............................................................................. 8

*Coleman v. Quaker Oats Co.,*
  232 F.3d 1271 (9th Cir. 2000) ...................................................................... 12

*Colorado v. Western Sky Financial, LLC,*
  845 F. Supp. 2d 1178 (D. Colo. 2011) ............................................................ 9

*Consumer Financial Protection Bureau v. Gordon,*
  819 F.3d 1179 (9th Cir. 2016) .................................................................. 20, 24

*Corona v. Time Warner Cable, Inc.,*
  CV 13-5521 PSG (VBKx),
  2014 WL 11456535 (C.D. Cal. Oct. 16, 2014) ............................................ 13

*Davis v. HSBC Bank Nevada, N.A.,*
  691 F.3d 1152 (9th Cir. 2012) .......................................................... 19, 21, 22

*In re DirecTV Early Cancellation Litigation,*
  738 F. Supp. 2d 1062 (C.D. Cal. 2010) .......................................................... 8

*Discover Bank v. Vaden,*
  489 F.3d 594 (4th Cir. 2007), *rev'd on other grounds by*
  556 U.S. 49 (2009) ................................................................................... 14, 17

*Easter v. American West Financial,*
  381 F.3d 948 (9th Cir. 2004) .................................................................... 6, 15

*Evans v. Harry Robinson Pontiac-Buick, Inc.,*
  336 Ark. 155 (1999) ........................................................................................ 7

ii

*Federal Deposit Insurance Corp. v. Lattimore Land Corp.*,
   656 F.2d 139 (5th Cir. 1981) ................................................................. 7, 17

*Federal Trade Commission v. AMG Services, Inc.*,
   29 F. Supp. 3d 1338 (D. Nev. 2014) ........................................................... 20

*Federal Trade Commission v. Grant Connect, LLC*,
   763 F.3d 1094 (9th Cir. 2014) .................................................................. 24

*Federal Trade Commission v. J.K. Publications, Inc.*,
   99 F. Supp. 2d 1176 (C.D. Cal. 2000) .............................................. 21, 24, 25

*Federal Trade Commission v. Johnson*,
   96 F. Supp. 3d 1110 (D. Nev. 2015) ........................................................... 21

*Federal Trade Commission v. Johnson*,
   Case No. 2:10–cv–02203–MMD–GWF,
   2015 WL 9592497 (D. Nev. Dec. 31, 2015)
   (to be published in F. Supp. 3d) .......................................................... 24, 25

*Federal Trade Commission v. Natural Solution, Inc.*,
   No. CV 06–6112–JFW JTLX,
   2007 WL 8315533 (C.D. Cal. Aug. 7, 2007) ................................................ 21

*Federal Trade Commission v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) .................................................................. 21

*Federal Trade Commission v. Publishers Business Services, Inc.*,
   540 F. App'x 555 (9th Cir. 2013) ............................................................... 25

*Federal Trade Commission v. Zamani*,
   No. SACV 09–0977–DOC(MLGx),
   2011 WL 2222065 (C.D. Cal. June 6, 2011) ................................................ 25

*First Intercontinental Bank v. Ahn*,
   798 F.3d 1149 (9th Cir. 2015) ..................................................................... 7

*Flores v. American Seafoods Co.*,
   335 F.3d 904 (9th Cir. 2003) ...................................................................... 7

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ....................................................................... 20

*Georgia Cash America, Inc. v. Greene*,
   734 S.E.2d 67 (Ga. Ct. App. 2012) ............................................................. 16

*Harkins Amusement Enterprise, Inc. v. General Cinema Corp.*,
   850 F.2d 477 (9th Cir. 1988) ................................................................... 6, 8

*Hayes v. Delbert Services Corp.*,
   811 F.3d 666 (4th Cir. 2016) ..................................................................... 19

*Hodas v. Morin*,
   442 Mass. 544 (2004) ................................................................................ 7

iii

*Hudson v. Ace Cash Express, Inc.*,
No. IP 01-1336-C H/S,
2002 WL 1205060 (S.D. Ind. May 30, 2002) ...................................... 14

*Jackson v. PayDay Financial, LLC*,
764 F.3d 765 (7th Cir. 2014), *cert. denied sub nom.*
*Western Sky Financial v. Jackson*,
135 S. Ct. 1894 (2015) ...................................... 19

*Klaxon Co. v. Stentor Electric Manufacturing Co.*,
313 U.S. 487 (1941) ...................................... 7

*Krispin v. May Department Stores Co.*,
218 F.3d 919 (8th Cir. 2000) ...................................... 14

*In re Lindsay*,
59 F.3d 942 (9th Cir. 1995) ...................................... 7

*Lombardi v. DirecTV, Inc.*,
549 F. App'x 617 (9th Cir. 2013) ...................................... 9

*Michigan v. Bay Mills Indian Community*,
134 S. Ct. 2024 (2014) ...................................... 11

*Midland Funding, LLC v. Madden*,
No. 15-610,
2016 WL 2997343 (U.S. May 24, 2016) ...................................... 16, 17

*Miree v. Dekalb County*,
433 U.S. 25 (1977) ...................................... 7

*Montana v. United States*,
450 U.S. 544 (1981) ...................................... 11

*Mountain States Adjustment v. Cooke*,
Court of Appeals No. 15CA0605,
2016 WL 2957746 (Colo. App. May 19, 2016)
(to be published in P.3d) ...................................... 7

*Navajo Nation v. U.S. Forest Service*,
535 F.3d 1058 (9th Cir. 2008) ...................................... 12

*Nevada v. Hall*,
440 U.S. 410 (1979) ...................................... 10

*Otoe-Missouria Tribes of Indians v. New York State Department of Financial Services*,
974 F. Supp. 2d 353 (S.D.N.Y. 2013), *aff'd*,
769 F.3d 105 (S.D.N.Y. 2013) ...................................... 10

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ...................................... 12

*Quik Payday, Inc. v. Stork*,
549 F.3d 1302 (10th Cir. 2008) ...................................... 10

iv

*Sawyer v. Bill Me Later, Inc.,*
    23 F. Supp. 3d 1359 (D. Utah 2014) ........................................................ 14, 15

*Seeman v. Philadelphia Warehouse Co.,*
    274 U.S. 403 (1925) ....................................................................................... 9

*Shannon-Vail Five, Inc. v. Bunch,*
    270 F.3d 1207 (9th Cir. 2001) .................................................................. 9, 10

*State ex rel. Suthers v. Cash Advance & Preferred Cash Loans,*
    205 P.3d 389 (Colo. App. 2008) ................................................................... 10

*Ubaldi v. SLM Corp.,*
    852 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................... 14, 16

*Volvo Construction Equipment North America Inc. v. CLM Equipment Co., Inc.,*
    386 F.3d 581 (4th Cir. 2004) .......................................................................... 8

*In re Vortex Fishing Systems, Inc.,*
    277 F.3d 1057 (9th Cir. 2001) ....................................................................... 7

*Washington v. Confederated Tribes of Colville Indian Reservation,*
    447 U.S. 134 (1980) ..................................................................................... 11

*Wertz v. Asset Acceptance, LLC,*
    5 N.E. 3d 1175 (Ind. Ct. App. 2014) ............................................................. 6

*West Virginia v. CashCall, Inc.,*
    No. 2008C1964,
    2012 WL 11875220 (W. Va. Cir. Ct. Sept. 10, 2012) .................................. 19

**STATUTES**

12 U.S.C. § 5511 ............................................................................................... 6

12 U.S.C. § 5517 ............................................................................................... 6

12 U.S.C. § 5531 ......................................................................................... 6, 23

**OTHER AUTHORITIES**

Restatement (Second) of Conflict of Laws § 186 (Am. Law Inst. 1971) ............. 7

Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971) ............. 7

Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst. 1971) ........... 10

Restatement (Second) of Conflict of Laws § 195 (Am. Law Inst. 1971) ........... 10

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

The Bureau's summary judgment motion ("Mot." or "Motion") contradicts the record and rests upon incorrect interpretations and applications of the governing law.[1] The Bureau even misrepresents the testimony of CashCall's General Counsel Dan Baren to contrive a proposition that is literally the *opposite* of the testimony. Recognizing its case collapses because of the choice-of-law provision in the Western Sky loan agreements, the Bureau attempts to improvise a new basis for its claims that was not pled, was disclaimed in discovery, and was not raised at the L.R. 7-3 conference. The Motion should be denied for several reasons.

First, the Bureau cannot show any independent violation of federal law, as it contended it would at the pleading stage. Instead, it relies entirely on the laws of the Subject States. Congress did not incorporate state law into the Act, however, so the action must be dismissed. (*See* Defs. Mot. 7-11.)

Second, the choice-of-law rules in the Subject States compel application of CRST law, so there could be no UDAAP violation anyway. The Bureau incorrectly analyzes the issue under federal common law, but the applicable *state* rules all defer to the choice-of-law contract provision here because there is a substantial relationship between CRST law and the parties, and fundamental public policy embraces an agreement to apply another jurisdiction's usury laws.

Third, the CFPB's brand new "rent-a-tribe" or "true lender" theory attempts to avoid entirely the tribal sovereignty and choice-of-law doctrines at issue in this case, but the Bureau did not plead the theory, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[1] All internal alterations, quotation marks, and citations are omitted and all emphasis is added herein, unless noted. The same defined terms and abbreviations are employed from ECF No. 139 (Defendants' Mem. Of Points And Authorities In Support of Motion for Summary Judgment ("Defs. Mot." or "Defendants' Motion")). "GDMF" refers to Defendants' Genuine Disputes Of Material Fact In Opposition To Plaintiff's Motion For Partial Summary Judgment. All references to Defendants' receipt of legal advice in this matter are subject to a limited waiver of privilege only as to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by CashCall/WS Funding.

555 (2007); effectively disclaimed it in its discovery responses (GDMF ¶¶ 327-29); and did not present it as a basis for its Motion at the Rule 7-3 conference (GDMF ¶¶ 353-56). Regardless, the argument is incorrect. The law does not support adoption of the nationwide test the CFPB advocates for determining which financial institution should be deemed the legal lender. Indeed, reflective of yet another overreach by the Bureau, the adoption of such a test would cast doubt on millions of loan transactions and significantly disrupt long-established loan purchase and servicing arrangements. Further, the CFPB disdainfully casts aside the overwhelming evidence of the activity of Western Sky on the Reservation and, in so doing, ignores concrete interests that substantially affect indigenous communities. The Bureau also attempts to dismiss the issue of tribal sovereignty by arguing that sovereign immunity is inapplicable, but, as the Bureau surely knows, tribal sovereignty is a separate legal doctrine—just as state sovereignty is different than state sovereign immunity.

Fourth, there is no UDAAP violation as a matter of law, as neither the law nor the evidence support the Bureau's allegations.

Finally, Reddam cannot be held individually liable for the alleged corporate violations. (*See* Defs. Mot. 22-24.) The undisputed facts show that he did *not* have the requisite actual knowledge of, or reckless indifference to, the purported misrepresentations. Indeed, the companies and Reddam obtained assurances the loan agreements were governed by CRST law and were valid and enforceable. Thus, Reddam cannot be held liable for any alleged UDAAP violations and, certainly, cannot be liable for money damages as the statute requires knowledge or intent.

## STATEMENT OF DISPUTED FACTS

The Bureau rests its UDAAP claims almost entirely on misrepresentations of Dan Baren's deposition testimony. According to the Bureau, Baren testified that "'it would be very, very rare, in fact, probably impossible' for a loan applicant to know that CashCall was involved in the loan origination process, even though CashCall was always performing some tasks on behalf of Western Sky." (Mot. 6.) In an effort

2

to manufacture some evidence of unfair or deceptive conduct, the Bureau asserts some variation of this misrepresentation *four times* in the Motion. (*Id.* at 6, 9, 20, 23.) ***But it is literally the opposite of what Baren said.*** The actual quote is: "Given that CashCall is involved in that process, it would be very, very rare, in fact, probably impossible . . . that the--an applicant would **not** know of CashCall's involvement in the loan origination process, regardless of the channel that they came through." (GDMF ¶¶ 98, 275.) The Bureau's misrepresentation is deliberate, as the CFPB attorney received clarification of Baren's testimony from her next question:

> "Q.      I think what you told me clarifies what I thought you were saying before. So it sounded like that there—it was possible for consumers not to know [o]f CashCall's involvement until CashCall bought the loan. ***But am I understanding you correctly that that would be a very rare occurrence, from your understanding***?

>       A.      ***High -- very highly unlikely***." (*Id.*)

Notably, this exchange occurred *after* Baren testified that customers calling the toll-free number heard a message stating that Western Sky was a "Native American-owned corporation" that hired CashCall to process applications and they might be directed to a CashCall operator, so they "were aware of CashCall's involvement from the moment they started the transaction."[2] (GDMF ¶ 275; SS ¶ 53.) Online consumers also were "notified via e-mail *that CashCall was assisting Western Sky* . . . [I]f CashCall was assisting in the application, then you would be notified throughout the process that CashCall was involved." (GDMF ¶ 275.) Thus, "*it would be very rare for an application to go all the way from start to finish without some communication from the loan agent*, even if you are applying online." (*Id.*)

Regardless of its misrepresentation, the evidence destroys the Bureau's theory.

---

[2] The CFPB cites a declaration from a borrower who spoke to a man who "identified himself as working for CashCall." (GDMF ¶ 331; GDMF ¶¶ 81, 83 (Ellard was instructed to accurately tell customers he represents CashCall, not Western Sky).)

1  Western Sky employed up to 100 people on the Reservation, in offices and a call
2  center it constructed and utilizing infrastructure it provided. (SS ¶¶ 32, 42, 43, 45-55,
3  60.) It drafted and approved the loan underwriting guidelines. (SS ¶¶ 56-57, 59;
4  GDMF ¶¶ 67-68.) If a potential loan met the guidelines, Western Sky directed a
5  borrower via e-mail to its website where it provided the borrower with disclosures
6  about the loan, and the borrower signed loan documents electronically. (SS ¶ 74;
7  GDMF ¶¶ 95-97, 293.) The acceptance of the completed loan agreement and funding
8  of the loan were performed on the Reservation. (SS ¶¶ 42, 58, 60, 68-73.)[3]

9  Pursuant to a service agreement, CashCall performed certain services for
10 Western Sky relating to the processing of the Western Sky loan applications, but
11 Western Sky performed final loan underwriting, final approval, and funding tasks on
12 the Reservation: over time, "[l]oan agents for CashCall only handled the overflow
13 for Western Sky applicants or borrowers calling in, should the staff at Western Sky
14 not be able to handle the amount of calls." (SS ¶¶ 38-39, 52.) Not all services
15 specified in the agreement were actually provided by CashCall. (GDMF ¶¶ 65, 282.)
16 The service agreement granted CashCall "a non-exclusive license, to reproduce the
17 name, trade name, trademarks, and logos of Western Sky Financial," but CashCall
18 did not use the license. (GDMF ¶¶ 64, 322.) CashCall assisted Western Sky in
19 drafting certain marketing materials, but Western Sky hired the marketing firm
20 Kovel Fuller to devise advertising and marketing materials. (GDMF ¶ 324; SS ¶ 66.)

21 CFPB's "evidence" of Western Sky's purported lack of involvement is based
22 only on a declaration from Jeremiah Ellard, a low-level laid-off former CashCall
23 loan agent. (See GDMF ¶¶ 76-79, 81-85.) Ellard states that "for a year or more after
24 TV ads for Western Sky loans began to run, he was not aware of any functioning

25
26
_____

27 [3] While a Western Sky employee on the Reservation always made the final decision
28 to fund a loan, in some very rare circumstances, a CashCall employee would affect
   disbursement of money to a borrower. (GDMF ¶ 360.)

Western Sky entity in South Dakota;"[4] "he took the majority of calls for Western Sky;" and "after Western Sky expanded its facilities and took customer phone calls at maximum capacity, most calls were still routed to CashCall loan agents, so that the total number of loan applications processed by Western Sky employees was a small fraction of the total number of Western Sky loan applications." (Mot. 5-6; GDMF ¶¶ 76, 77, 82, 84.) But Ellard does not demonstrate personal knowledge of the volume of calls directed to CashCall versus those handled by Western Sky. (GDMF ¶¶ 76, 77, 82, 84.) Nor could he. As a loan agent, he "spent most of [his] time processing applications for smaller dollar loans." (GDMF ¶ 278.) Ellard offers mere speculation contrary to the evidence. (GDMF ¶¶ 76, 77, 82, 84; SS ¶¶ 52-55.) He also claims "Western Sky did not have the infrastructure in place to allow for on-site underwriting, incoming call queuing, or other functions necessary for broad-scale lending," but that is also disputed by the evidence. (GDMF ¶ 85; SS ¶¶ 32, 42, 43, 45-55, 60.) In short, the CFPB cannot meet its burden as to Western Sky's lead role in reviewing, underwriting, approving, and funding the loans on the Reservation.

Finally, many CFPB claims regarding Reddam are unsupported by the record. The characterization that CashCall used loans guaranteed by Reddam "to finance the Western Sky loans" and other consumer loans is disputed; the Western Sky loans were originated and funded by Western Sky, and sold to CashCall's subsidiary WS Funding at a later date. (GDMF ¶ 128; SS ¶¶ 6, 34.) CashCall, not Reddam, hired an agency to create advertising campaigns for CashCall; the cited testimony does not support that Reddam hired an agency for Western Sky. (GDMF ¶¶ 129, 284.)

## STANDARD OF REVIEW

"In order to withstand summary judgment, an issue of material fact need not be conclusively resolved; rather, all that is required is that sufficient evidence

---

[4] Ellard claims Western Sky had no functioning South Dakota entity until 2012, based on a *second* building opening that year. He is unaware Western Sky had offices and employees on the Reservation as of January 2010 performing final underwriting and funding its loans from the Reservation. (GDMF ¶ 76; SS ¶ 55.)

1  supporting the claimed factual dispute be shown to require a jury or judge to resolve

2  the parties' differing versions of the truth at trial." *Harkins Amusement Enter., Inc. v.*

3  *Gen. Cinema Corp.*, 850 F.2d 477, 485 (9th Cir. 1988). "Summary judgment cannot

4  be granted where contrary inferences may be drawn from the evidence as to material

5  issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004) (cited by CFPB).

6  <u>**ARGUMENT**</u>

7  **I.     THE BUREAU CANNOT SHOW A VIOLATION OF THE ACT**

8      **A.     The CFPB's Claims Impermissibly Rest On State Law Violations**

9          The Bureau cannot demonstrate any deceptive, unfair, or abusive conduct

10  independent of state laws. (*See* Defs. Mot. 7-9.) The Act prohibits "an unfair,

11  deceptive, or abusive act or practice **under Federal law**," 12 U.S.C. §§ 5511(a),

12  5531(a), but discovery and the Motion cement that the CFPB's claims rest entirely

13  on state law violations. (Defs. Mot. 10-11; Mot. 1 (Defendants "violated the [Act]

14  when they acquired, serviced, and collected on loans where no payments were due

15  under the laws of 16 states.");[5] *id.* at 18-19 (licensing).)[6] Section 5517(o) of the Act

16  also precludes establishing a federal usury limit or predicating UDAAP violations on

17  state usury or licensing laws. 12 U.S.C. § 5517(o); Defs. Mot. 7, 15-17, 19-20.

18      **B.     CRST Law Applies And Thus The Bureau's Claims Fail**

19          <u>First</u>, the Bureau argues that federal common law "supplies the choice-of-law

20  rules" because "this case is based on federal-question jurisdiction." (Mot. 14.) This is

21  wrong. Federal common law can apply in "federal questions cases with *exclusive*

22

23

_____

24  [5] According to the CFPB, collecting on the loan documents was deceptive because

25  Defendants represented the loans were "subject to CRST law and payable" (Mot. 20-21); was "unfair" since they were void (*id.* at 21); and was "abusive" because "a

26  reasonable consumer would not understand either the substance of the Western Sky loan transaction, or that it was void and not payable under state law" (*id.* at 23).

27  [6] CashCall was licensed in Alabama, Colorado, and New Mexico (SS ¶¶ 164-65;

28  GDMF ¶¶ 149, 168, 215), and a license is not required in Indiana. *See Wertz v. Asset Acceptance, LLC*, 5 N.E.3d 1175, 1186 (Ind. Ct. App. 2014).

1  jurisdiction in federal court, such as bankruptcy."[7] *In re Lindsay, 59 F.3d 942, 948*

2  *(9th Cir. 1995)*.[8] Exclusive jurisdiction is not present here.[9]

3      <u>Second</u>, even under federal common law, each state's choice-of-law doctrine

4  is a factor as to whether a jurisdiction has a greater material interest than another.[10]

5  *Restatement (Second) Conflict of Laws § 186 cmt. b*. Ignoring each state's choice-

6  of-law doctrine is incorrect and produces erroneous results.[11] *Id. § 187(2) cmt. e (*the

7  law defaults to the choice of law); (Defs. Mot. 12-13 (citing cases)).

8      <u>Third</u>, the CRST has a substantial relationship to the transaction and a

9  reasonable basis exists for choosing CRST law. A reasonable basis exists when

10  parties choose the law of the place where a party has its principal place of business,

11  or where the contract is formed, so long as its formation there is not "wholly

12  fortuitous." *Id. § 187(2) cmt. f*; *accord* *Hodas v. Morin, 442 Mass. 544, 550 (2004)*

13  ("place of partial performance considered to be sufficient"); *Mountain State*

14  *Adjustment v. Cooke, 2016 WL 2957746, at *3 (Colo. App. May 19, 2016)*.[12] To

---

16  [7] *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)* ("It is not for the federal courts to thwart . . . local policies by enforcing an independent general law of conflict of laws."); *FDIC v. Lattimore Land Corp., 656 F.2d 139, 148 n.16 (5th Cir. 1981)* ("[I]n usury cases it [is] less desirable to have an unpredictable substantive result for the sake of applying a uniform federal conflicts rule in every case.").

19  [8] The CFPB cites only admiralty and bankruptcy cases. *Chan v. Soc'y Expeds., Inc., 123 F.3d 1287, 1296 (9th Cir. 1997)*; *Flores v. Am. Seafoods Co., 335 F.3d 904, 916 (9th Cir. 2003)*; *In re Vortex Fishing Sys., Inc., 277 F.3d 1057, 1069 (9th Cir. 2001)*.

21  [9] Further, federal common law is unwarranted if no question regarding the United States' liabilities or responsibilities under the contract is raised, nor federal interests promoted. *See Miree v. Dekalb Cty., 433 U.S. 25, 28-29 (1977)*.

23  [10] Ten of the sixteen Subject States have adopted the <u>Second Restatement § 187</u> test, while the remaining six have adopted either a modified version of this test or a uniquely permissive test. (Defs. Mot. 12-13.)

25  [11] For example, Arkansas does not "require consumer lenders to obtain a license before lending" (Mot. 19), permits contracting out of its usury rates, and defers to such provisions if there is a reasonable relation to the parties or transaction. *Evans v. Harry Robinson Pontiac-Buick, Inc., 336 Ark. 155, 161-63 (1999)*.

27  [12] The CFPB's argument that the citizenship of the party controls is misplaced. (Mot. 16.) *First Intercontinental Bank v. Ahn, 798 F.3d 1149, 1158 (9th Cir. 2015)*, concerned the unique choice-of-law rules of California, which is not a Subject State.

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  attempt to overcome the strong evidence of a substantial relationship here, the CFPB

2  asserts that Western Sky's "sole function was to funnel CashCall's money to

3  borrowers through a company owned by a CRST member" and then assign the loans

4  to CashCall. (Mot. 15.) This is factually wrong. Western Sky conducted all its

5  activities from offices on the Reservation (SS ¶¶ 42, 52-61, 63-74), had sole

6  discretion to veto or refuse any condition, term, or feature of the loans (SS ¶¶ 57, 59,

7  64, 72), and performed the final approval necessary on the Reservation. (SS ¶¶ 58,

8  68, 70-72.) Its employees performed a final audit and funded the loan from the

9  Reservation. (SS ¶¶ 68, 70, 73.) Thus, the CFPB cannot establish there is no genuine

10  issue of material fact as to whether the CRST has a substantial relationship to the

11  parties and the transaction. *Harkins*, 850 F.2d at 485.

12      <u>Fourth</u>, the CFPB maintains that "each of the Subject States has expressed a

13  fundamental public policy favoring usury restrictions, or lending licenses, or both, by

14  enacting statutes that render contracts that violate those provisions void." (Mot. 15.)

15  But "***not every statutory provision constitutes a fundamental policy of a state***."

16  *Volvo Constr. Equip. N. Am. Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 607 (4th

17  Cir. 2004); *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 252 (5th

18  Cir. 1994). "If every [statute] expressed a state's fundamental policy, contracting

19  parties would be entitled to apply the law of another state under the Second

20  Restatement *only* when the law of the chosen state was the same as that of the state

21  where the contract was made." *Volvo*, 386 F.3d at 617 n.25; *Cherokee Pump*, 38 F.3d

22  at 252 (labelling this as "ridiculous"). Instead, "[i]n assessing whether a . . . statute

23  expresses a state's fundamental policy," a court must parse through the "language of

24  the statute, relevant court decisions, and pertinent legislative history." *Volvo*, 386

25  F.3d at 607. The Bureau does not and cannot provide this analysis.[13] (Mot. 15.)

26

27  [13] The CFPB cites *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062
(C.D. Cal. 2010), for the proposition that a California statute prohibiting certain

28  contracts is a "fundamental public policy," but California is not a Subject State.
Moreover, the Ninth Circuit recognized on appeal that another policy—here, the

*(cont'd)*

1    <u>Fifth</u>, it is well settled that borrowers may contractually accept higher interest

2    rates than permitted in their home state. *See Seeman v. Philadelphia Warehouse Co.,*

3    *274 U.S. 403, 407-08 (1925)* ("[Contracts] are to be governed by the law of the place

4    of performance, and if the interest allowed by the laws of the place of performance is

5    higher than that permitted at the place of the contract, *the parties may stipulate for*

6    *the higher interest, without incurring the penalties of usury*. . . . If the rate of interest

7    be higher at the place of the contract than at the place of performance the parties may

8    lawfully contract in that case also for the higher rate."). As the CFPB's authority

9    shows, "the lack of a usury law does not mean that [one state] has a less substantial

10   concern than [another state] about interest rates; *rather, it appears to reflect a choice*

11   *to favor individual contract decisions and the free flow of capital*." *Shannon-Vail*

12   *Five Inc. v. Bunch,* 270 F.3d 1207, 1213 (9th Cir. 2001).

13   <u>Sixth</u>, the CFPB cannot show that these other states have a greater material

14   interest than the CRST. The Bureau cites *Colorado v. W. Sky Fin., LLC,* 845 F. Supp.

15   *2d 1178 (D. Colo. 2011),* to argue "the lending transaction affected borrowers in the

16   Subject States to a greater degree than the CRST." (Mot. 16.) But that case only

17   concerned whether Western Sky was "doing business in Colorado for jurisdictional

18   purposes." 845 F. Supp. 2d at 1181.

19   Here, the CFPB dishonors the CRST and its interests in having its laws

20   respected, (*see* Defs. Mot. 15), even disparagingly labelling Western Sky's

21   involvement as "rudimentary." (Mot. 17.) It illogically argues that all of the

22   "significant steps" took place online, not on the Reservation, and that Western Sky's

23   "sole function was to take money from the reserve account that CashCall had

24   established and disburse it to the borrowers." (*Id.*) But that ignores the evidence:

25   loans were reviewed, approved, and funded on the Reservation per Western Sky's

26

27   <sub>(cont'd from previous page)</sub>
     doctrine of tribal sovereignty—can preempt a state's fundamental policy. *See*

28   *Lombardi v. DirecTV, Inc.,* 549 F. App'x 617, 619 (9th Cir. 2013) (federal
     arbitration policy preempts state's fundamental policy against class action waivers).

1  guidelines; calls were routed to employees there; and Western Sky retained authority

2  to approve each application. (SS ¶¶ 42, 52-61, 63-74.)

3       Finally, the CFPB argues that CRST law does not prevail under the Second

4  Restatement § 188. (Mot. 18.) But § 188 applies only absent a choice-of-law

5  provision. *See Shannon-Vail, 270 F.3d at 1211* (no provision). Regardless, CRST

6  law *would* apply under § 188 as three of the five factors clearly support its

7  application: (a) the last act, or place of contracting, occurred on the Reservation

8  when employees at Western Sky reviewed and accepted a consumer's loan

9  application; and (d) and (e), loans were funded by Western Sky, an entity with its

10 principal place of business on the Reservation.[14] *See Second Restatement § 188 cmt.*

11 *e* (defining the five factors).[15] The remaining two factors favor neither.

12      **C.    Tribal Sovereignty Supports The Choice-Of-Law Provision**

13      The Bureau incorrectly argues tribal sovereignty is inconsequential based on

14 (1) erroneous arguments about Western Sky being a "sham" lender (discussed

15 below) and (2) the inapplicable doctrine of sovereign immunity (which the Bureau

16 attempts to confuse with tribal sovereignty).[16] The Bureau, however, cannot escape

17

18 [14] The CFPB also argues that "[u]nder § 195, the law of the state 'where the contract
   requires that repayment be made' governs." (Mot. 18.) But § 195 is "applicable *only*
19 when the contract requires that the loan be repaid in a particular state." Second
   Restatement § 195 cmt. a.   Here, the loan agreements do not identify a state of
20 repayment. (GDMF ¶ 334.)

21 [15] The CFPB's authority is unavailing: *Otoe-Missouria Tribes of Indians v. New York
   State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), and *State ex rel.*
22 *Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389 (Colo. App. 2008),
   concerned jurisdiction of entities located on tribal reservations and whether they
23 were subject to state regulation; *Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir.
   2008), concerned the constitutionality of a provision regulating loans, which is not at
24 issue here. And none of these cases involved a choice-of-law provision.

25 [16] "Sovereign immunity" precludes bringing suit against a government without its
   consent and is founded on the principle that "the King could do no wrong." *Nevada*
26 *v. Hall*, 440 U.S. 410, 410, 414-15 (1979). "Sovereignty" is the supreme and self-
   sufficient political authority to make laws over internal affairs, and to execute and
27 apply them, without foreign dictation or interference. *Boumediene v. Bush*, 553 U.S.
   723, 763 (2008). The CRST government is not a party to these proceedings, so tribal
28 sovereign immunity is not at issue; but preventing a tribal company from choosing to

*(cont'd)*

the fundamental principle of tribal sovereignty. "A tribe may regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Brendale v. Confed. Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 428 (1989) (quoting *Montana v. United States*, 450 U.S. 544, 565 (1981)); *Washington v. Confed. Tribes of Colville Indian Reserv.*, 447 U.S. 134, 153 (1980) (taxation power exercisable "over nonmembers, so far as such nonmembers may accept privileges of trade . . . to which taxes may be attached as conditions"); (Defs. Mot. 15).

Here, consumers in the Subject States freely entered into a contract with Western Sky, located on the Reservation and owned and operated by a CRST member. (SS ¶¶ 22-25, 30-31, 73.) The CRST has a strong interest in ensuring its law is respected and that its members may rely on its laws. "[T]ribes across the country, as well as entities and individuals doing business with them, have for many years relied on [precedent preserving tribal sovereignty], negotiating their contracts and structuring their transactions against a backdrop of [that precedent]." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 (2014). Dr. Clarkson opines that "the public policy consequences of disregarding tribal law would be devastating" because "American Indian economic development—whether driven by tribally-owned businesses or those owned by individual tribal members located in tribal communities—depends upon fair treatment and interpretation of contracts between American Indian entities and their partners and customers."[17] (GDMF ¶¶ 335-39.)

---

*(cont'd from previous page)*
contract under tribal law implicates tribal sovereignty, as inherent in the notion of sovereignty is the ability of a sovereign to develop and enforce its law.

[17] The Bureau's position would have a significant economic impact on all Native American tribes and their members seeking to engage in commercial dealings and contractual relationships. (Mot. 13, 16, 17, 23.) On a Reservation with extreme rates of poverty and unemployment, Western Sky was the one of the largest private employers on the Reservation. (SS ¶¶ 43, 45-51, 54-55, 63.) Dr. Clarkson advises that "[t]ribal communities are often historically disadvantaged, geographically isolated, and struggling with long-standing cycles of poverty," with over 25% "living in poverty, nearly twice the national average." (GDMF ¶¶ 336, 341.) The CRST "is in a remote rural location and suffers from extreme poverty and lack of

*(cont'd)*

### D.   The "True Lender" Theory Cannot Save The CFPB's Claims

Realizing on the eve of the cross-motions for summary judgment that the factual record from discovery dissolves its Rule 12(c) and choice-of-law theories, the Bureau desperately attempts to save itself by manufacturing a last-minute theory that requires the Court to unilaterally adopt an untenable "true lender" test that would rupture the lending markets. This approach is improper and incorrect.

#### 1.   A Motion For Summary Judgment Cannot Amend A Complaint

"After having focused on [another theory of liability] in their complaint and during discovery, the [plaintiffs] cannot turn around and surprise the [defendant] at the summary judgment stage. . . ." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-94 (9th Cir. 2000). Raising new theories in a summary judgment motion violates Rule 8 and prejudices defendants. *See id.*; *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008) ("raising [new] claim in a summary judgment motion is insufficient to present the claim to the district court"); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006).

The CFPB did not plead that CashCall was the "true lender" in loans purchased from Western Sky. Even with a charitable reading of the FAC, the closest allegation is that "WS Loans were *made in Western Sky's name*, but were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall, Delbert, or both." (ECF No. 27 ¶ 21.) But even when, out of an abundance of caution, Defendants asked in discovery about any potential "true lender" theories it might assert, the Bureau parried. When asked to admit Western Sky "was the true lender," the Bureau

_____
*(cont'd from previous page)*
opportunities," "71.9% of tribal families with children under 5 years of age are currently living below the poverty level," and life expectancy is only 48 years. (GDMF ¶¶ 342-44.) "The ability for e-commerce ventures such as Western Sky to succeed is vital to the CRST's economic well-being," as "Reservation-based entities participating in the online financial services industry have used this opportunity to create jobs and invest in tribal nation building activities, including health care, education and infrastructure improvements." (GDMF ¶¶ 345, 347.)

1   answered: "the phrase 'true lender' is not defined *and the legal definition of the*

2   *phrase 'true lender' is an evolving concept*, rendering this Request for Admission

3   *vague and unanswerable*." (GDMF ¶ 329.) And when asked if it contends that

4   CashCall or WS Funding was "the true lender" of Western Sky loans and for the

5   supporting "material facts," the CFPB, without ever supplementing, kept Defendants

6   blindfolded: "A complete answer to this interrogatory depends on merits discovery

7   of defendants, which the Bureau has yet to obtain." (GDMF ¶¶ 327-28.)

8       Furthering its "lie in the weeds" strategy, the Bureau did not mention its

9   newfound basis for its summary judgment motion at the L.R. 7-3 conference on the

10  cross-motions. The Bureau went first, outlining its arguments <u>with no mention of a</u>

11  <u>"true lender" argument</u>. (GDMF ¶ 352.) Defendants then outlined the grounds for

12  their motion, and in discussing Defendants' tribal sovereignty argument, Defendants'

13  counsel asked whether CFPB counsel had seen that day's Supreme Court opinion

14  (*Dollar General Corp. v. Mississippi Band of Choctaw Indians*); CFPB counsel

15  disclaimed knowledge of *Dollar General* but countered by noting awareness of "the

16  Maryland decision" concerning CashCall. (GDMF ¶¶ 353-56.) In the Rule 7-3

17  Report, CFPB counsel inserted that it had "referenced [a] decision concerning

18  CashCall released that day by Maryland's highest court, noting the portion of that

19  decision holding that CashCall was the de facto lender in its dealings with a state-

20  chartered bank." (ECF No. 138, at 2.) Such "reference" is clearly insufficient under

21  L.R. 7-3, much less to add a new claim or theory of liability at this stage. *See Corona*

22  *v. Time Warner Cable, Inc.*, 2014 WL 11456535, at *5-6 (C.D. Cal. Oct. 16, 2014)

23  (rejecting argument where "Plaintiff acted strategically opaque during discovery and

24  waited until the last possible moment, the L.R. 7-3 conference after the close of

25  discovery just prior to filing a summary judgment motion, to reveal his theories").

26              2.      The CFPB's Proposed Test Must Be Rejected

27      To determine the parties to the loan agreement, the Bureau urges this Court to

28  ignore the agreement itself and instead look to the "substance of the transaction" and

13

1  deem as "true lender" whichever entity "bears the financial risk" of the loan if there

2  is an assignment afterwards. (Mot. 9-10.) But the Bureau points to no precedent

3  justifying its position, and adopting the Bureau's position would cast doubt on the

4  validity of millions of loan transactions and disrupt long-established loan purchase

5  and servicing arrangements.

6           (a)    The Bureau's "economic substance" test is unprecedented

7           The Bureau points to no federal court decision adopting its "economic

8  substance" test on similar facts, because none exists. It notably does not even

9  mention the leading opinion addressing and dismissing the theory. In *Sawyer v. Bill*

10 *Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014), the plaintiff alleged that the

11 bank that extended him credit should be disregarded and that an eBay/PayPal

12 affiliate (Bill Me Later), should be deemed the "true lender" because the bank

13 assigned the credit to eBay/PayPal three days after origination. The court rejected

14 this argument at the motion-to-dismiss stage—firmly rejecting any consideration of

15 the CFPB's proposed test.[18] The *Sawyer* court noted that whether the arrangement

16 was designed "to circumvent state usury laws" is irrelevant, and that multiple federal

17 appellate courts have "rejected arguments that state usury laws should apply to

18 receivables purchased from the bank on a daily basis by a non-bank participant." *Id.*

19 at 1367; *Discover Bank v. Vaden*, 489 F.3d 594, 603 (4th Cir. 2007), *rev'd on other*

20 *grounds* 556 U.S. 49 (2009) (assignor was "real party in interest"); *Krispin v. May*

21 *Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000) (bank, not assignee, was real

22 party in interest). *Sawyer* declined to follow *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d

23 1190 (N.D. Cal. 2012), the case upon which the Bureau principally relies, noting that

24 *Ubaldi* was only the denial of a motion to dismiss and did not hold that the

25 originating bank is not the true lender. *Sawyer*, 23 F. Supp. 3d at 1369. In holding

26

27 [18] *See also Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060, at *3-4, *6 (S.D. Ind. May 30, 2002) (holding the identity of the legal lender should not be based on

28 the "subjective purpose of those engaged in the transaction" and that adoption of such a "true lender" test would lead to "uncertain and unpredictable" results).

14

1  that eBay/PayPal was not the "true lender," the court considered several factors,

2  including that the bank-originator was named as the creditor in the loan agreements,

3  disbursed the funds, and held the loans for two days before selling them. *Id*.

4      The two cases on which the Bureau relies do not support adoption of its

5  proposed test or a conclusion that CashCall was the "true lender" of the Western Sky

6  loans. *Easter* involves facts fundamentally different from this case. The *Easter*

7  plaintiffs brought claims under Washington state consumer protection laws against

8  defendants involved in the "table-funding" of residential mortgage loans, a very

9  different type of loan and transaction than the traditional purchase and sale of

10 consumer loans.[19] The key question in *Easter* was whether certain entities acted as

11 lenders or brokers in these transactions. *Easter*, 381 F.3d at 957. It is only in this

12 narrow context that the Ninth Circuit stated that "a lender is one who puts money at

13 risk" and "[t]he touchstone for decision here is whether licensed or unlicensed

14 parties were placing their own money at risk at any time during the transactions." *Id*.

15 In answering this question, the Ninth Circuit expressly relied on a three-part test

16 under the state case law in Washington, which is not a Subject State, to conclude that

17 "a broker who table-funds a loan for the actual lender is not a lender in the

18 transaction" and therefore need not be licensed. *Id*.

19      Lenders typically do not lend only their own money but obtain capital from

20 numerous investors.[20] But even if the reasoning in *Easter* applied here, the

21 "determinative question" would be whether Western Sky placed its "own money at

22 risk *at any time*." *Id*. at 955, 957. This is a fact-intensive inquiry, and the facts show

23 that Western Sky did put its own money at risk. The money used to fund the Western

24 Sky loans came from a Western Sky account maintained at Wells Fargo. (GDMF

---

26 [19]  The Office of the Comptroller of the Currency defines table-funding as:   "a practice whereby a mortgage loan is funded at settlement by an advance of loan funds and a contemporaneous assignment of the loan is made to the person advancing the funds." (GDMF ¶ 357.)

28 [20] Hedge fund investors lent funds to CashCall. (SS ¶¶ 83-85, 90, 93, 96, 106.)

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  ¶¶ 115, 288.) In addition, unlike table-funding, where loan funding and assignment

2  happen simultaneously, Western Sky held the loans for at least three days before any

3  assignment. (GDMF ¶¶ 53, 289.)

4  Likewise, *Ubaldi* involved entirely different transactions from those at issue

5  here (in *Ubaldi*, forward-purchase agreements) and had entirely different facts at

6  issue. The loan applications in *Ubaldi* listed the non-bank entity's name and

7  telephone number and directed the applicant to mail the application directly to the

8  non-bank entity, whereas here, the loan applications and instructions were directed to

9  Western Sky. *Ubaldi*, 852 F. Supp. 2d at 1192. Moreover, the court noted that it was

10  unclear whether the bank even funded the loans, and the non-bank entity in *Ubaldi*

11  used "its own underwriting policies . . . copyrighted forms, promissory notes, brands

12  and platforms, and . . . disbursed the payments," but here, Western Sky used its own

13  underwriting guidelines, used its own branded materials in communications with

14  borrowers, and disbursed payments directly to consumers. *Id.* at 1195; (SS ¶¶ 56, 70;

15  GDMF ¶ 64). The facts of this case and *Ubaldi* are—put simply—incomparable.

16  (b)  An economic substance test would disrupt markets

17  The Bureau's proposed "economic substance" test would imperil long-

18  standing principles of loan assignment and note liquidity.[21] Indeed, in a Supreme

19  Court *amicus curiae* brief filed by the Solicitor General, the United States asserted

20  that the Second Circuit had erred by holding that a valid loan originated by a bank

21  could be rendered invalid by assignment to a non-bank. *Midland Funding, LLC v.*

22  *Madden*, 2016 WL 2997343 (U.S. May 24, 2016) (Brief for U.S. as Amicus Curiae)

23  ("SG Br."). It defended the "long-established 'valid-when-made' rule": "if the

24  interest-rate term in a bank's original loan agreement was non-usurious, the loan

25

---

26  [21] The "economic substance" test would seriously disrupt lending markets and
undermine the secondary loan market. Every third-party investor in a loan program
27  could be deemed the "true lender," invoking licensing and supervisory requirements,
and necessitating consideration of state-specific standards across numerous loans.
28  *See, e.g.*, *Ga. Cash Am., Inc. v. Greene*, 734 S.E.2d 67, 72-75 (Ga. Ct. App. 2012).

---

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." *Id.* at *8. The United States explained that the principle underpins the broader right of banks to issue loans and "sell those loans to others"— and ensure the assignee can charge interest at the original rate, even if the bank "retained no control over (or financial stake in)" the assignee's "efforts to collect" the debt.[22] *See id.* at *11-12.[23] *Lattimore*, 656 F.2d at 148-49 (the "non-usurious character of a note should not change when the note changes hands."); SG Br. at *16.

### 3. The Facts Do Not Support CFPB's "True Lender" Contention

Even the amorphous "economic substance" test advanced by the CFPB is a fact-intensive inquiry, *Discover Bank*, 489 F.3d at 603 n.9, and there are material issues of fact in dispute that preclude summary judgment in the Bureau's favor.

The CFPB relies primarily on former CashCall loan agent Ellard to assert that "Western Sky did not have the infrastructure in place to allow for on-site underwriting, incoming call queuing, or other functions necessary for broad-scale lending." (GDMF ¶ 85.) But Western Sky approved and funded loans from the outset, eventually employed up to 100 individuals on the Reservation, and constructed new facilities on the Reservation to handle loan underwriting, processing, and funding. (GDMF ¶ 76; SS ¶¶ 43, 54.) It had its own Internet server on the Reservation, and its own website, application files, and SSL certificates and paid for office costs, personnel costs, and bank fees. (SS ¶ 60; GDMF ¶¶ 62, 296.)

Moreover, Western Sky played a substantial role in the development of its loan program and the origination of the loans. Its counsel drafted the loan agreement

---

[22] There is no support for adopting tax law principles to apply an "end-results" "step transaction" test to transform an agreement between Western Sky and a borrower, into an agreement between the borrower and CashCall. Such application to consumer lending would have far-reaching consequences. For example, Fannie Mae and Freddie Mac might be "true lenders" since many mortgage loans in the United States are intended at the outset to be sold to them shortly after origination.

[23] The Bureau also provides no rationale for its implicit assertion that the "true lender" determination would be a matter of federal law. Indeed, it would be impossible and improper to import one standard given the state-specific differences.

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  (SS ¶¶ 41, 99); it participated in the drafting of all marketing materials (SS ¶¶ 65,

2  66); set the underwriting criteria and made the ultimate decision of whether to extend

3  a loan (SS ¶ 59); determined if applicant information was accurate and complete; and

4  funded the loans from its bank accounts (SS ¶ 71).

5      Western Sky also bore economic risk on loans it held until sold. The purchase

6  and assignment agreement provided that WS Funding's purchase obligation was

7  conditional and "subject to the accuracy and correctness of Western Sky's

8  representations and warranties contained in this Agreement," including that

9  borrowers satisfy Western Sky's criteria. (SS ¶¶ 34-40.) CashCall also had the

10 "option" not to buy any loans. (GDMF ¶ 350.) Western Sky also bore reputational

11 and regulatory risk, as well as the risk that CashCall might go bankrupt.[24]

12          4.    The West Virginia And Maryland Decisions Do Not Matter Here

13     The CFPB focuses on state court decisions in West Virginia and Maryland that

14 held that certain bank-originated loans purchased by CashCall were subject to certain

15 state laws. Those cases do not concern the Western Sky loans or mean that state laws

16 in the Subject States apply to loans purchased from Western Sky.

17     *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, 2016 WL 3443971

18 (Md. June 23, 2016), held only that CashCall's role in the purchase and servicing of

19 bank loans placed it within the scope of a Maryland law requiring licensing as a

20 "credit services business." *Id.* at *26, 28. The court did *not* hold that CashCall was

21 the "de facto lender." In *CashCall, Inc. v. Morrissey*, 2014 WL 2404300 (W. Va.

22 May 30, 2014), the court wrongly adopted a "predominant economic interest" test

23 for West Virginia law without any statutory justification. In any event, the Bureau's

---

24  [24] Other CFPB purported facts are irrelevant or unsupported. For example, the

25 Bureau states that CashCall's CFO identified default risk as CashCall's most serious
   risk, while the CEO identified regulatory risk. (Mot. 10; GDMF ¶¶ 59, 60.) But these

26 facts do not relate to loans originated and funded by Western Sky. And while
   CashCall promised to indemnify Western Sky for legal claims relating to the loans

27 (Mot. 10; GDMF ¶ 63), such agreements are common and not dispositive as to the
   "true lender." Also, that CashCall did not differentiate on its financial statements

28 between originated loans and purchased loans (Mot. 5, 11; GDMF ¶ 72) is irrelevant.

1   assertion that the facts here are identical is unsupported and incorrect. *Id*. at *14.

2   Among other things, the *Morrissey* court relied on testimony that CashCall bore all

3   the economic risk of the bank loans, based in part on factors not present here. *Id*. at

4   *5 (prepared advertising, solicited customers, took applications, verified applicant

5   identities, and provided all adverse action notices). Here, CashCall and Western Sky

6   collaborated to prepare advertising and marketing materials and underwriting

7   guidelines (SS ¶ 66; GDMF ¶ 324); loan agents for both entities took applications

8   and performed verification services (SS ¶ 71; GDMF ¶¶ 291, 292, 323); and adverse

9   action notices were sent from the Reservation. (GDMF ¶ 332.) Moreover, in the

10   West Virginia case, unlike here (SS ¶ 34-40), Reddam was required "to personally

11   guarantee all of CashCall's financial obligations to the Bank, including the amounts

12   of the loans prior to 'purchase' by CashCall." *West Virginia v. CashCall, Inc.*, 2012

13   *WL 11875220, at *10 (W. Va. Cir. Ct. Sept. 10, 2012).*[25]

14        **E.    Defendants' Conduct Was Not Unfair, Deceptive, Or Abusive**

15        The Bureau does not and cannot contend that the loan agreements concealed

16   that CRST law governed, the interest rates, or the terms of the loan, as these were

17   prominently stated in every Western Sky loan agreement.[26] (GDMF ¶¶ 109-10; *see*

18   *also* SS ¶¶ 75-79, 80, 159-60.) The CFPB's other UDAAP claims must be rejected.

19              1.    Defendants' Conduct Was Not Deceptive

20        Conduct is not deceptive where disclosures are in the materials. *Davis v.*

21   *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) (analogous FTC

22   _____

23   [25] The *Morrissey* decision conflicts with two arbitration decisions applying the law of

24   Illinois, a Subject State, that held that the bank that originated and funded the loan
     should be treated as the lender for purposes of determining whether state law applied

25   to the loans. (GDMF ¶¶ 358-59.) Likewise, neither *Jackson v. PayDay Fin., LLC*,
     *764 F.3d 765 (7th Cir. 2014)*, nor *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th

26   Cir. 2016) (Mot. 11 n.2), is relevant as neither case required a determination of
     whether state law applied to the Western Sky loans.

27   [26]  Expert Todd J. Zywicki opined that "a reasonable consumer would likely be able

28   to understand the material terms of these installment contracts, including the choice
     of law term." (GDMF ¶ 303.)

1   Act); Defs. Mot. 17-19 (collecting cases). The CFPB's authority is unpersuasive and

2   distinguishable.[27] *Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995) (Mot. 20),

3   rejected an "unwary consumer" standard in favor of a "reasonable person" standard

4   to evaluate deceptive claims under the FTC Act, and held that sweepstakes

5   advertisements were not deceptive because "[t]he promotions expressly and

6   repeatedly state the conditions which must be met in order to win" and persons

7   "would be put on notice that this was not guaranteed simply by doing sufficient

8   reading to comply with the [entry] instructions." *Id.* at 289-90.

9       Here, the Bureau contends that "[b]y servicing and collecting on the Western

10  Sky loans, CashCall and Delbert created the net impression in consumers that they

11  were servicing loans that were subject to CRST law and payable," and "reasonable

12  consumers had no reason to doubt that the loans would continue to be governed by

13  CRST law until they were paid in full." (Mot. 20.) But its sole factual support is its

14  misrepresentation—repeated four times—of Baren's testimony to suggest loan

15  applicants could not "discern CashCall's involvement before the loans were sold to

16  CashCall." *Id. See supra* at 2. (GDMF ¶¶ 98, 275.)

17      The Bureau also contends "[a] reasonably prudent borrower would rely on the

18  state (*sic*) terms of a loan and representations that it was collectable; in fact, the

19  declaration testimony of borrowers in this case indicates that they did." (Mot. 21.)

20  But the Bureau's only evidence is a duplicative statement from four loan borrowers

21  that "I do not recall being told . . . that *my loan was void or that I was not obligated*

22

23  ───────────────

24  [27] In *FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338 (D. Nev. 2014) (Mot. 20), the
    court found a loan document was "likely to mislead because of the way the terms are

25  presented to borrowers by the document," because the key terms and conditions were
    broken up "into nine separate hyperlinks in eight or nine point font," which the
    borrower was not required to review. *Id.* at 1343-45, 1350. In *CFPB v. Gordon*, 819

26  F.3d 1179 (9th Cir. 2016), the court found the defendant advertised an affiliation
    with a government agency by using a mailer that, inter alia, "bore the Equal

27  Opportunity Housing logo" and "stated that it was a 'Notice of HUD Rights.'" *Id.* at
    1193. The defendant submitted only "bald assertions that the mailer was not

28  deceptive," so there was no triable issue of fact. *Id.*

1  *to repay all or some of the loan*." (GDMF ¶ 119.) The Bureau thus concedes that its

2  deceptive claims infirmly turn on whether the loans were void under state law.[28]

3  ## 2.  Defendants' Conduct Was Not Unfair

4  The CFPB states unfair conduct causes or is likely to cause substantial injury

5  to consumers, and is not reasonably avoidable by consumers themselves and not

6  outweighed by countervailing benefits to consumers or to competition. (Mot. 22.)

7  Conduct is *not* "unfair" as a matter of law if the consumer's alleged injury is

8  avoidable. *Davis*, 691 F.3d at 1169.[29] Here, the choice of law, interest rate, and other

9  terms were prominent in the agreements, and the CFPB *acknowledges* borrowers

10  "bargained for these terms" (Mot. 21), so they were avoidable, and thus not unfair.

11  The CFPB also concedes "an expensive loan might provide some benefit to a

12  consumer in need of funds," but inconsistently maintains the borrowers "received no

13  _____

14  [28] The CFPB suggests Defendants gave the "false" impression the loans were

15  "subject to CRST law and payable," (Mot. 20) citing *FTC v. Nat. Sol., Inc.*, 2007 WL 8315533, at *3-6 (C.D. Cal. Aug. 7, 2007), which analyzed infomercial advertising.

16  *Id.* at *1. There, the FTC was *not* proceeding on a theory that the statements were false, but that defendants "lacked a reasonable basis for asserting" the product was

17  effective. *Id.* at *4. The defendants failed to provide any evidence, so the court granted summary judgment. *Id.* at *5-6. That is not the case here. In *FTC v. Johnson*,

18  the court denied summary judgment on claims that representations regarding the income the consumers could earn were deceptive. 96 F. Supp. 3d 1110, 1149 (D.

19  Nev. 2015) ("*Johnson I*"). The defendants introduced evidence from a third party that "based on his interactions with clients and experience, . . . the earnings claims

20  are accurate." *Id.* The court held the FTC had not "carried their burden of showing that there was no reasonable basis for the claims." *Id.* at 1150. Here, the CFPB

21  cannot assert that Defendants had no reasonable basis to contend CRST law applies and the loans are "collectable." Outside counsel recommended moving "to a 'tribal

22  model,' and 'that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected

23  upon at the contract rate, and the loans would not be subject to state regulation." (Mot. 3; SS ¶¶ 8-14, 21-25.)

24  [29] The Bureau's authority is distinguishable. In *FTC v. Neovi, Inc.*, 604 F.3d 1150

25  (9th Cir. 2010), the defendant "created and delivered unverified checks at the direction of registered users," a service "extensively abused" by fraudsters to

26  withdraw more than $400 million in funds without the account holder's knowledge or authorization. *Id.* at 1152-54, 1155-59. In *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp.

27  2d 1176 (C.D. Cal. 2000), the defendants offered no evidence to contest they stole credit card numbers and charged over $40 million without the cardholders'

28  knowledge or consent. *Id.* at 1202-03. Here, borrowers were indisputably aware of the loan terms and that CRST law governed. (SS ¶¶ 75-80, 159-60.)

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

benefit from making payments on a void loan," and thus the benefit did not "outweigh[] the injury from making those unnecessary payments." (*Id.*) This is nonsense. Two expert opinions expose the Bureau's conclusions as ill-conceived. Dr. Beales, a former Director of the Bureau of Consumer Protection at the FTC, opines that the CFPB has not "allege[d] any barrier to consumer sovereignty"—that is, where "free market decisions are unjustifiably hindered"—because it "does not challenge the adequacy of the disclosure of the cost or repayment of the terms of the loans, and it alleges no barrier that prevents competing lenders from offering better terms." (GDMF ¶ 304.) Dr. Beales points out, "[f]rom the perspective of the consumer, the impact of the challenged conduct—attempting to collect on the Western Sky loans—is precisely the same in the 34 states without usury or licensing requirements the Bureau seeks to enforce, but it is not alleged to constitute substantial consumer injury in those states."[30] (GDMF ¶ 305.)

Professor Zywicki agrees that "[t]he installment loans in this case meet an important consumer need and many consumers would suffer harm if they were deprived of access to these loans." (GDMF ¶ 310.) He explains that more than 85% of Western Sky customers sought the loan to cope with an emergency, to consolidate other debt, or to pay the rent or mortgage.[31] (SS ¶¶ 126-31.) He also opines that "imposing APR ceilings on interest rates below the rate that would prevail in a competitive market tends to reduce access to credit (especially for higher-risk borrowers)" and thus "economists have reached a general consensus that usury

---

[30] Dr. Beales further states that "consumers could reasonably have avoided any injury by borrowing elsewhere, or not borrowing." (GDMF ¶ 307); *Davis*, 691 F.3d at 1169. Professor Zywicki agrees that "consumers could reasonably avoid any harm allegedly suffered by dealing with a traditional installment lender or some other type of lender offering some other loan product entirely," and that "the most plausible explanation for consumers' decisions to enter into an agreement with Western Sky is because it provided the highest quality product at the lowest possible price available to the consumer at the time of entering into the loan." (GDMF ¶¶ 308-09.)

[31] Many "who borrow from traditional installment lenders do so because they are unable to acquire additional credit from more mainstream lenders." (GDMF ¶ 311.)

---

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   regulations are welfare-reducing for consumers and generally result in net harm to

2   the very consumers that they are intended to benefit."[32] (GDMF ¶¶ 312, 314.)

3   Additionally, "CashCall reported performing Western Sky loans to credit bureaus,

4   thereby enabling the consumer to increase their credit score." (GDMF ¶ 316.)

5                      3.   Defendants' Conduct Was Not Abusive

6        The CFPB concedes an act is not abusive unless it "takes unreasonable

7   advantage of . . . a lack of understanding on the part of the consumer of the material

8   risks, costs, or conditions of the product or service." (Mot. 23 (citing 12 U.S.C. §

9   5531(d)(2)(A)).) It then contends "a reasonable consumer would not understand

10  either the substance of the Western Sky loan transaction, or that it was void and not

11  payable under state law," (*id.*) but does so without support.

12       First, the CFPB contends that "[t]he Western Sky loan agreement did not

13  disclose that CashCall was the true lender." (*Id.*) But the "true lender" theory fails.

14  (*Supra* § I.D.) In any event, the contention rests on state law, and thus is an improper

15  basis for a UDAAP violation. (*Supra* § I.A.) Second, the CFPB relies again on its

16  misrepresentation of Baren's testimony—but this is false, as shown above. (*Supra* at

17  3-4; Mot. 23; GDMF ¶ 98.) Third, the Bureau claims "[t]he assignment provision in

18  the loan agreement stated that Western Sky 'may' assign the loan to any third party,

19  when in fact by pre-arrangement Western Sky almost immediately assigned all loans

20  to CashCall" and "no reasonable consumer could know that Western Sky's

21  involvement in the transaction was a sham."[33] (Mot. 23.) But the CFPB fails to

22

---

23  [32] Professor Zywicki states that "it is well-established that increased competition in

24  consumer lending markets tends to result in lower prices and greater selection for
    consumers, including for installment loans" so that "borrowers who actually obtained

25  loans from Western Sky benefited from the increased access to lenders (as opposed
    to having to use a payday lender, for example)." (GDMF ¶ 315.)

26  [33] Each agreement stated, "We may assign or transfer this Loan Agreement or any of

27  our rights under it at any time to any party." (GDMF ¶ 351.) There is no evidence
    borrowers would find the possibility of assignment significant; the loan terms would

28  not change and there would be no impact on "the material risks, costs, or conditions"
    of the loan. 12 U.S.C. § 5531(d)(2)(A). It thus cannot be abusive.

1  explain how these contentions are undisputed or relevant, let alone "abusive."[34]

2  ## II.   REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER OF LAW

3  The CFPB cites *Gordon* for the proposition that "[a]n individual may be liable

4  for corporate violations if (1) he participated directly in the deceptive acts or had the

5  authority to control them and (2) he had knowledge of the misrepresentations, was

6  recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of

7  a high probability of fraud along with an intentional avoidance of the truth." 819

8  F.3d at 1193. But in *Gordon*, there was "no dispute of material fact" because

9  "Gordon's only attempt to dispute [the] evidence" was a "conclusory, self-serving

10 affidavit . . . insufficient to raise a triable issue of fact." *Id.* at 1193-94. Not so here.

11 Indeed, the facts establish it is Reddam who is entitled to summary judgment. (Defs.

12 Mot. 22-25.) The CFPB must first prove CashCall, WS Funding, or Delbert violated

13 federal laws, but cannot do so. (*Id.*) The CFPB also has not established Reddam

14 participated directly in the purported acts or had the authority to control them, or had

15 the requisite knowledge or reckless indifference to the truth to find him liable.

16 Summary judgment is denied if an agency has not "provided sufficient

17 evidence for the Court to conclude that, as a matter of law, [the individual] was

18 directly involved in, or had control over [the] deceptive practices, or had the requisite

19 level of knowledge to hold him responsible."[35] *FTC v. Johnson*, 2015 WL 9592497,

20 at *6 (D. Nev. Dec. 31, 2015) ("*Johnson II*"); *FTC v. Grant Connect, LLC*, 763 F.3d

21 1094, 1104 (9th Cir. 2014). An agency also must show sufficient knowledge or

22 reckless indifference to the wrongdoing. *See Johnson II*, 2015 WL 9592497, at *5

---

23

24 [34] Professor Zywicki states that "public interest organizations have touted installment
25 loans such as the ones at issue in this case as a preferred alternative to payday loans,"
   because "installment loans are welfare-improving for consumers because of their
26 lower periodic payment requirements, lack of a balloon payment, longer maturity
   periods, and self-amortizing features." (GDMF ¶ 318.)

27 [35] In *J.K. Publ'ns, Inc.*, (Mot. 21) the court granted summary judgment for an officer
   defendant who "signed and filed start-up documents" and a merchant bank
28 agreement in his capacity as officer of various corporate defendants and related
   entities. 99 F. Supp. 2d at 1207-08.

DEFENDANTS' OPPOSITION TO CFPB'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  (denying summary judgment for failing to establish knowledge of fraud); *FTC v.*
2  *Zamani*, 2011 WL 2222065, at *14 (C.D. Cal. June 6, 2011) (FTC failed to show
3  "the *mens rea* required for restitutionary liability").

4       Here, the Bureau contends Reddam is an officer or director of the companies
5  (Mot. 23), but it must do more than point to corporate titles to prove knowledge of
6  alleged unfair, deceptive, or abusive acts. *See FTC v. Publishers Bus. Servs., Inc.,*
7  *540 F. App'x 555, 558 (9th Cir. 2013)* (no liability because "the FTC did not present
8  any evidence beyond . . . corporate titles as to her knowledge"). It does not do so.[36]

9       Finally, the CFPB contends Reddam knew CashCall was the "true lender
10 behind the Western Sky loans, because he knew how the transaction between
11 CashCall and Western Sky was created," (Mot. 24-25), but the undisputed evidence
12 shows the exact opposite, as Reddam was aware of the legal advice from Katten and
13 Western Sky's counsel, and the lenders' counsel's acceptance of those opinions. (SS
14 ¶¶ 81-112.) Reddam did not have actual knowledge of *any* UDAAP conduct because
15 his understanding was that the loan agreements and their assignment to CashCall
16 were legal and enforceable. (*See* Defs. Mot. 23-24; SS ¶¶ 8-14, 21, 81-106, 109-12.)

## CONCLUSION

17
18       For these reasons, the Motion should be denied in its entirety.

19 DATED: July 11, 2016

20                          SKADDEN, ARPS, SLATE, MEAGHER &
                            FLOM LLP
21

22                          By:  _____/s/ Thomas J. Nolan_____
23                                    Thomas J. Nolan
                                  *Attorneys for Defendants*

24  _____

25 [36] The CFPB claims Reddam had authority "to transfer delinquent CashCall loans to
26 Delbert," but only cites evidence that Reddam owned Delbert, which was created by
   an "executive team" that determined when loans were "charged off for CashCall
27 financial purposes." (GDMF ¶¶ 136, 138.) The Bureau also alleges Reddam
   "participated in the transaction by signing the two governing agreements," but cites
28 no evidence of any further participation. (GDMF ¶¶ 137, 300-02.) Merely signing
   corporate agreements is not sufficient. *J.K. Publ'ns*, 99 F. Supp. 2d at 1207-08.