OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar # 264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted *pro hac vice*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>          Plaintiff,<br><br>     v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>          Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>**PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   August 1, 2016<br>Time:   1:30pm<br>Court:   Hon. John F. Walter<br>          Courtroom 16 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................... 1

I. The Court has ruled in this case that violations of state law can undergird a UDAAP violation. ............................................................. 1

 A. The Court properly held that demanding and taking money that is not owed can constitute a violation of the CFPA. ........... 2

 B. The Court properly held that the Bureau is not seeking to establish a federal usury limit, and no intervening facts or law change that conclusion. ....................................................... 3

II. CRST law does not apply to the contracts, and Defendants' argument to the contrary is unavailing. ................................................. 4

 A. CRST has no substantial relationship to the parties. ................. 6

 B. Fundamental public policy disfavors the choice of CRST law. ............................................................................................. 7

 C. Absent a valid choice-of-law clause, the Subject States' laws apply. ................................................................................. 8

 D. The choice-of-law clause is facially invalid and should be ignored. ....................................................................................... 9

III. Defendants' contention that their conduct was not unfair, deceptive, or abusive mischaracterizes the Bureau's claims. ............. 11

IV. Reddam is individually liable for UDAAP claims. ........................... 13

 A. Reddam's advice-of-counsel defense is unavailing. ............... 13

 B. The undisputed facts establish that Reddam was involved in the unfair, deceptive, and abusive acts and practices and had authority to control them. ................................................... 14

 C. The weight of evidence of Reddam's involvement undermines his advice-of-counsel claim. ................................ 17

V. Defendants had fair notice that collecting unowed debt is illegal. ...... 19

 A. Laws that impose only civil penalties and govern economic activity need meet only a minimal level of clarity to comport with the Due Process Clause. .................................... 20

 B. Defendants had fair warning that "abusive" conduct was illegal. ......................................................................................... 21

VI. The Bureau's structure is Constitutional. ........................................... 21

i

1 | CONCLUSION ................................................................................................24
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Cases**

*AINS, Inc. v. United States*, 56 Fed. Cl. 522 (Fed. Cl. 2003) ......................................23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d 405
(3d Cir. 2004) ......................................................................................................23

*Barona Band of Mission Indians v. Yee*, 528 F.3d 1184 (9th Cir. Cal. 2008)............11

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ...............................................17, 20

*CFPB v. ITT Educ. Servs., Inc.*, No. 1:14-cv-00292, 2015 WL 1013508 (S.D. Ind.
March 6, 2015) ...........................................................................................21, 22, 23

*CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082 (C.D. Cal. 2014) ...............22, 23

*CFPB v. The Mortgage Law Grp.*, --- F.Supp.3d ---, 2016 WL 183712 (W.D. Wis.
Jan. 14, 2016) ........................................................................................................3

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287 (9th Cir.1997)....................5, 8, 9, 11

*Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992)...............................13

*Chiron Corp. v. Genentech, Inc.*, 179 F. Supp. 2d 1182 (E.D. Cal. 2001) ...............13

*Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178 (D. Colo. 2011)....................8

*Confederated Tribes of Siletz Indians of Oregon v. U. S.*, 110 F.3d 688 (9th Cir.
1997) .....................................................................................................................10

*Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989) ................................10

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012) .........................12

*Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F. Supp. 1202 (C.D. Cal. 1998) .14

*Feil v. FTC*, 285 F.2d 879 (9th Cir. 1960)...............................................................13

*First Intercontinental Bank v. Ahn*, 798 F.3d 1149 (9th Cir. 2015) ...........................7

*Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003) ........................................5

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477
(2010) ...................................................................................................................23

*FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ...................13

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ..................................13

iii

1  *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ..................................13

2  *Gallego v. Northland Grp. Inc.*, 814 F.3d 123 (2d Cir. 2016) ...................................3

3  *Genentech, Inc. v. Insmed Inc.*, 442 F. Supp. 2d 838 (N.D. Cal. 2006) ....................13

4  *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) ...................................5

5  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ..........20, 21

6  *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)................................22, 23

7  *In re DirectTV Early Cancellation Litig.*, 738 F.Supp.2d 1062 (C.D. Cal. 2010) .......7

8  *In re EchoStar Communs. Corp.*, 448 F.3d 1294 (Fed. Cir. 2006) ...........................13

9  *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057 (9th Cir.2002) ...................................5

10  *Jackson v. PayDay Fin., LLC*, 764 F.3d 765 (7th Cir. 2014)......................................6

11  *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) ...........................6, 7

12  *Maring v. PG Alaska Crab Inv. Co., LLC*, 338 F. App'x 655 (9th Cir. 2009)...........14

13  *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973)...........................................10

14  *Midland Funding, LLC v. Madden*, --- S.Ct. ----, No. 15-610, 2016 WL 3461580

15     (June 27, 2016) .....................................................................................................6

16  *Morrison v. Olson*, 487 U.S. 654 (1988) ..................................................................22

17  *Nationwide Transport Fin. v. Cass Info. Systems, Inc.*, 523 F. 3d 1051 (9th Cir.

18     2008) ...................................................................................................................12

19  *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983) ................................10

20  *Rice v. Rehner*, 463 U.S. 713 (1983) .......................................................................10

21  *SEC v. Apartments Am. LLC*, 2014 WL 842819 (C.D. Cal. Mar. 3, 2014)...............17

22  *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459 (9th Cir. 1985) ............................17

23  *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001)...........................8, 9

24  *United States v. Antoinette-Bates*, 359 F. App'x 845 (9th Cir. 2009) .....................17

25  *Wash. v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980) 10

26  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980) .............................11

27  **Statutes**

28  12 U.S.C. § 5491(c)(3)...............................................................................................22

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

12 U.S.C. § 5531(a) ................................................................................4, 23

12 U.S.C. § 5531(d)(2)(A) ..............................................................................21

12 U.S.C. § 5536(a)(1)(B) ..............................................................................20

12 U.S.C. § 5564(a) ..........................................................................................4

12 U.S.C. § 85 ..................................................................................................6

15 U.S.C. § 1692(a) ........................................................................................21

15 U.S.C. § 45 (1934) ....................................................................................22

15 U.S.C. § 45(a) ............................................................................................20

**Regulations**

16 C.F.R. § 310.4 ............................................................................................21

**Rules**

Fed. R. Civ. Pro. 56(d)..............................................................................13, 14

Fed. R. Civ. Pro. 56(d)(2) ..............................................................................14

**Constitutional Provisions**

U.S. Const., Art. I § 8 cl. 3 ............................................................................10

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Defendants' summary judgment motion mischaracterizes the Bureau's claims and misapplies the governing law. They repeat arguments from their 12(c) motion that this Court has already rejected. Docket Entry (DE) 104. There, the Court found that Defendants had mischaracterized the Bureau's position and claims. DE 110. Defendants continue the mischaracterizations here. For this and other reasons set forth below, the Court should deny Defendants' Motion for Summary Judgment.

The Court need not revisit its decision denying Defendants' Rule 12(c) motion; no intervening facts or law make Defendants' arguments stand now where they fell just a few months ago. The Court should also reject Defendants' other arguments as to why they are entitled to summary judgment. Defendants misapply the choice-of-law analysis to argue that the law of the Cheyenne River Sioux Tribe (CRST) should apply to the Western Sky loan agreements. Defendants continue to misconstrue the Bureau's claims by arguing that, as a matter of law, Defendants' conduct was not unfair, deceptive, or abusive because borrowers could avoid harm by not proceeding with the loan and because the Bureau's claims violate Defendants' due-process rights. Defendants mistakenly claim that their reliance on advice of counsel should serve as a complete defense to the Bureau's claims. Finally, Defendants ignore undisputed facts that implicate Reddam's individual liability for Defendants' deceptive, unfair, and abusive conduct. The Court should deny Defendants' motion.

## I.      The Court has ruled in this case that violations of state law can undergird a UDAAP violation.

Defendants revisit their previous argument that the Bureau's claims "impermissibly rest[] on state law violations." Def. MSJ at 6-11. The Court considered these arguments and rejected them in its December 30, 2015, Order. DE 110. Defendants' claim that the Bureau's discovery responses warrant re-examination of the issue is wrong; the bases for the Bureau's claims, and the legal

issues Defendants raise about them, have not changed. For the same reasons, the Court need not revisit Defendants' argument that the Bureau is attempting to enforce a federal usury limit. Def. MSJ at 15-16.

The Court's December 30, 2015, Order was correct: the Bureau has properly alleged the Defendants violated federal law in servicing and collecting debt that was not owed. DE 110. Defendants have cited no facts or intervening law that should change that conclusion. In fact, Defendants' citation to evidence—the Bureau's responses to interrogatories—supports, rather than changes, the Bureau's claims that Defendants committed unfair, deceptive, and abusive acts and practices in taking and demanding payment from consumers that those consumers did not owe, because the loans had been rendered void or otherwise not payable under state law. Def. SS ¶¶ 117-125. Similarly, the Court's determination that the Bureau is not seeking to establish a usury limit was correct, and no facts developed in discovery or intervening law supports changing it.

**A.     The Court properly held that demanding and taking money that is not owed can constitute a violation of the CFPA.**

Defendants continue to mischaracterize the Bureau's claims in their motion for summary judgment, arguing that the Bureau is alleging that Defendants' violations of state law constitute a *per se* UDAAP violation. In fact, the First Amended Complaint alleges that Defendants' conduct—causing unavoidable injury, making misrepresentations, and taking unreasonable advantage of consumers—satisfies each element of the federal UDAAP violations brought against Defendants. It does not matter that state law is what rendered the loans void and thus not payable. *Federal* law makes it unlawful to collect or demand payment for debts that consumers do not owe. The Court decided this issue in its December 30, 2015, Order, agreeing that the Bureau has alleged "that Defendants' conduct, in taking and demanding payment from consumers for purported loan debts that they did not owe satisfies the requisite

2

1   elements of the UDAAP prohibitions under the CFPA." DE 110. Nothing in the

2   Bureau's discovery responses changes these claims.

3        The applicable law has not changed. Defendants cite two cases that were

4   decided after the Court issued its Order, but neither changes the current law or

5   warrants a different result. First, the Second Circuit held in *Gallego v. Northland*

6   *Grp. Inc.*, that a violation of local law is not a *per se* violation of the FDCPA,

7   following the cases relied on by Defendants in their 12(c) motion and rejected by the

8   Court as a mischaracterization of the Bureau's claims. *See* 814 F.3d 123, 127 (2d

9   Cir. 2016). The court's analysis of the standard federal preemption language in the

10  FDCPA, similar to that in the CFPA, does not change that result. *Id.* The second case

11  discussed by Defendants is equally inapposite. The district court's opinion in *CFPB*

12  *v. The Mortgage Law Grp.* similarly holds that a violation of state laws governing

13  the conduct of attorneys does not "automatically equate to an unfair or deceptive

14  mortgage loan practice." --- F.Supp.3d ---, 2016 WL 183712 at *9 (W.D. Wis. Jan.

15  14, 2016).

16       In the present case, the Bureau does not seek to enforce state law, or to obtain

17  a ruling that a violation of state law is a *per se* violation of federal UDAAP law.

18  Rather, the Bureau contends that Defendants' actions in taking and demanding

19  money from consumers that those consumers do not owe violates the CFPA's

20  proscription against unfair, deceptive, and abusive acts and practices. As this Court

21  has already held, these are valid UDAAPclaims.

22       **B.    The Court properly held that the Bureau is not seeking to establish**

23            **a federal usury limit, and no intervening facts or law change that**

24            **conclusion.**

25       Defendants likewise point to discovery responses to support their contention

26  that the Bureau is "deeming illegal any attempt to collect on a loan with an interest

27  rate higher than the usury limit in the state where the borrower resides," and in doing

28  so is establishing a federal usury limit. Def. MSJ at 16. To the contrary, as the

3

1  Bureau stated in its First Amended Complaint and reiterated in its discovery

2  responses—in this case because state law rendered the loan void—demanding and

3  collecting on an un-owed debt violates the CFPA. *See* Def. SS ¶¶ 117, 121.[1]

4      Defendants contend, as they did in their Rule 12(c) motion, that the Bureau is

5  violating CFPA § 1027(o) by enforcing the limits that states have established. *See*

6  Def. MSJ at 15-16. But the Bureau is not seeking to enforce any usury limits here.

7  Rather, as the Bureau has explained before, it seeks to enforce the CFPA's UDAAP

8  prohibitions, which the CFPA explicitly authorizes the Bureau to do. *See* 12 U.S.C. §

9  5531(a) ("The Bureau may take any action authorized under subtitle E to prevent a

10 covered person or service provider from committing or engaging in an unfair,

11 deceptive, or abusive act or practice . . ."); 12 U.S.C. § 5564(a) (providing authority

12 to the CFPB to commence a civil action for violations of Federal consumer laws).

13     Defendants have pointed to no additional facts or intervening law that would

14 justify the Court changing the result in its December 30, 2015, Order. Rather,

15 Defendants point to interrogatory responses that in fact support the Bureau's

16 contention: that the Bureau challenges Defendants' efforts to collect purported debts

17 that consumers do not owe because state-licensing or usury laws had rendered them

18 void, not because they are usurious. Def. SS at ¶¶ 117, 121. The Court should again

19 reject Defendants' argument that the Bureau is seeking to impose a usury cap.

20 **II.    CRST law does not apply to the contracts, and Defendants' argument to**

21 **the contrary is unavailing.**

22     Defendants next argue that choice-of-law analysis dictates application of

23 CRST law to the contracts in question. Not so. As an initial matter, Defendants apply

24 the wrong choice-of-law analysis, looking to the laws of each of the Subject States

25

26

27

---

[1] References to "Def. SS" refer to Defendants' Statement of Undisputed Facts and Conclusions of Law, filed at DE 140. Plaintiff's Statement of Genuine Disputes of Material Fact, Objections to Defendant's Statement of Undisputed Facts, and Supplemental Material Facts is filed herewith and is referred to in this Opposition as "Pl. SMF."

28

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

rather than to federal common law. Because this case is based on federal-question jurisdiction, federal common law supplies the choice-of-law rules. *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997). And federal common law applies the Restatement (Second) of Conflicts of Law (as do many of the Subject States). *See id.; In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir.2002).

Defendants also misapply Restatement § 187. That provision applies where, as here, the contract at issue selects the law of a particular jurisdiction to govern disputes. *See Chan*, 123 F.3d at 1297; Restatement (Second) of Conflicts of Laws § 187. Defendants, however, improperly truncate the Restatement analysis, looking no further than the first part of § 187 to conduct their analysis—that is, to the choice-of-law clause itself. Under Restatement § 187(2), however, courts should honor the parties' choice of law *unless* (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue" and that state's law would apply in the absence of a choice-of-law clause. *Id.* at § 187(2); *see also Chan*, 123 F.3d at 1297.[2] The CRST choice-of-law provision in the Western Sky loan agreements fails both of these tests.

In fact, two circuit courts have already found provisions in Western Sky loan agreements to be a sham. The Fourth Circuit called the arbitration provision in the Western Sky loan agreements a "farce" and "plainly forbidden." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-75 (4th Cir. 2016). The Seventh Circuit found the forum selection clauses "a sham and an illusion," and questioned the enforceability

---

[2] Subsection (1) of Restatement § 187 applies only where the contract provides that a particular matter is to be governed by the law of the specified forum, not where—as here—the choice-of-law clause provides that the chosen law governs the entire contract. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 917 (9th Cir. 2003).

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  of the choice-of-law clauses. *Jackson v. PayDay Fin., LLC*, 764 F.3d 765, 779 &

2  n.23 (7th Cir. 2014). This Court should likewise decline to enforce the choice-of-law

3  provision here.

4      **A.    CRST has no substantial relationship to the parties.**

5      Defendants' analysis fails to take into account the fact that the CRST

6  involvement in the Western Sky loans is a sham—the loans were made with

7  CashCall's money, and with the intention and commitment that they would be

8  purchased by CashCall three days after they were funded. Pl. SMF ¶ 166-168. As set

9  forth in the Bureau's Memorandum of Points and Authorities in Support of its

10  Motion for Summary Judgment (DE 159), the CRST has no substantial relationship

11  to CashCall, the true lender in the transaction, and Western Sky's involvement does

12  not give the CRST a substantial relationship to the parties, as its sole function was to

13  funnel CashCall's money to borrowers through a company owned by a CRST

14  member, and then to assign the borrower's notes back to CashCall three days later.

15  *See* Pl. MPA, DE 159, at 15. Even Western Sky's relationship to the CRST is

16  limited, as it is not a tribal entity, but a South Dakota limited-liability company

17  whose owner is a member of the CRST. Pl. SMF ¶ 169.

18      The non-application of CRST law to Defendants is not an affront to tribal

19  sovereignty for the additional reason that their collection on these loans does not

20  implicate any cognizable tribal interest. As non-tribal entities that admit to receiving

21  and then servicing the Subject Loans, Defendants cannot take advantage of any

22  CRST-based protections they allege apply to nonparty Western Sky's activities. *See*

23  *Madden v. Midland Funding, LLC*, 786 F.3d 246, 250 (2d Cir. 2015) (assignees of

24  usurious loans not allowed to take advantage of assignor's right to charge usurious

25  interest rates), *cert. denied*, --- S.Ct. ----, No. 15-610, 2016 WL 3461580 (June 27,

26  2016). In *Madden*, the Second Circuit considered a loan assignee's attempt to benefit

27  from the assignor's right, under the National Bank Act ("NBA," 12 U.S.C. § 85), to

28  "charge on any loan . . . interest at the rate allowed by the laws of the State,

6

Territory, or District where the bank is located." *See id*. The court held that the application of state usury laws to the assignee is not preempted by any national-bank exemption that might apply to the assignor. *See id* at 251 (holding that once the defendants became owners of the loans, they were acting "solely on their own behalves" and could not  assert assignor's rights).

**B.     Fundamental public policy disfavors the choice of CRST law.**

Second, each of the Subject States has expressed a fundamental public policy favoring usury restrictions, lending licenses, or both, by enacting statutes that render contracts that violate those provisions void.[3] "[A] fundamental policy may be 'embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *In re DirectTV Early Cancellation Litig.*, 738 F.Supp.2d 1062, 1087 (C.D. Cal. 2010) (quoting Restatement § 187 comment g). CashCall, in this case, has the superior bargaining power, and its use of that power to choose law that removes the other party's protections is the kind of conduct that the Subject States' laws are designed to prevent.

Each of the Subject States has a materially greater interest than the CRST in the determination of the validity of the Western Sky loan agreements. The parties' citizenship is a factor in this analysis. *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1158 (9th Cir. 2015). The borrowers in this case are each citizens of states that have expressed a fundamental public policy of protecting citizens from usurious contracts and unlicensed lenders by voiding loans that violate their usury and licensing laws. *See DirectTV*, 738 F.Supp.2d at 1087. The CRST has no material

---

[3] These provisions are set forth in full in the Bureau's statement of undisputed facts (DE 145) at UF 147 (Alabama), UF 152 (Arizona), UF 157-58 (Arkansas), UF 161-65 (Colorado), UF 169 (Illinois), UF 174 (Indiana), UF 179 (Kentucky), UF 184 (Massachusetts), UF 189-90 (Minnesota), UF 195 (Montana), UF 199-200 (New Hampshire), UF 207 (New Jersey), UF 212 (New Mexico), UF 216-17 (New York), UF 223-25 (North Carolina), and UF 231 (Ohio).

1  interest in a company that is neither an arm of the tribe nor the true lender of the

2  Western Sky loans, but only a sham component of a transaction involving a

3  California corporation that has no affiliation to the CRST.

4      Moreover, the lending transaction affected borrowers in the Subject States to a

5  greater degree than the CRST. As a district court in Colorado noted in describing the

6  Western Loan transactions, "[t]he borrowers do not go to the reservation in South

7  Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado

8  by accessing defendants' website. They repay the loans and pay the financing

9  charges from Colorado; Western Sky is authorized to withdraw the funds

10 electronically from their bank accounts. The impact of the allegedly excessive

11 charges was felt in Colorado." *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d

12 1178, 1181 (D. Colo. 2011). The same could be said, of course, for consumers in

13 each of the Subject States.

14     **C.     Absent a valid choice-of-law clause, the Subject States' laws apply.**

15     The final portion of the Restatement's fundamental-policy analysis examines

16 whether the Subject States' laws would apply absent a valid choice-of-law clause.

17 *Chan*, 123 F.3d at 1297. Absent a valid agreement between the parties as to the

18 governing law, Restatement § 188 is the general provision under which choice of law

19 is determined for a contract. *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1211

20 (9th Cir. 2001). It provides that the local law of the state which "has the most

21 significant relationship to the transaction and the parties" is the applicable law, and

22 lists five factors to guide this determination: the place of contracting; the place of

23 negotiation of the contract; the place of performance; the location of the subject

24 matter of the contract; and the domicile, residence, nationality, place of incorporation

25 and place of business of the parties. *Id.* & n.2. Each of these factors favors the

26 application of the borrowers' states' laws over the application of the laws of the

27 CRST.

28

8

1    Restatement § 195, which governs the law applied to loan contracts, is
2   consistent with this analysis. *Shannon-Vail Five*, 270 F.3d at 1211. Under § 195, the
3   law of the state "where the contract requires that repayment be made" governs.
4   Restatement (Second) of Conflict of Laws § 195 (1971). In the case of the Western
5   Sky loan agreements, the borrower authorized Western Sky (in fact, CashCall) to
6   withdraw the borrower's loan payments by electronic-funds transfer ("EFT") from
7   the borrower's bank account. Pl. SMF ¶170. Thus, the money was to be repaid by
8   EFT from the borrower's state to CashCall in California; the CRST was not
9   involved.

10    Under this federal-common-law analysis, the Court should find that the CRST
11   choice-of-law provision is invalid, and that in the absence of this provision, the laws
12   of the Subject States apply to the Western Sky loan agreements.

13    **D.    The choice-of-law clause is facially invalid and should be ignored.**

14    Even if the choice-of-law clause in each agreement could survive the
15   Restatement analysis, Defendants cannot rely on it because it is ambiguous, self-
16   contradictory, and includes a misstatement of fact. The Ninth Circuit held in *Chan*
17   that a party cannot draft an ambiguous choice-of-law clause and then claim the
18   benefit of any doubt as to its scope. *Chan*, 123 F.3d at 1296 (construing ambiguous
19   choice of law provision against the drafter). The typical provision in the loan
20   agreements is as follows:

21    This agreement is governed by the Indian Commerce Clause of the
22    Constitution of the United States of America and the laws of the
23    Cheyenne River Sioux Tribe. We do not have a presence in South
24    Dakota or any other states of the United States. Neither this
25    Agreement nor Lender is subject to the laws of any state of the United
26    States of America.

27   *See* Def. SS ¶ 76; Pl. SMF ¶ 171. The plain language of this provision's first
28   sentence states that the agreement is "governed" by the U.S. Constitution and CRST

9

1  laws. This sentence contradicts other language in the loan agreement stating that it is

2  subject "solely to the exclusive laws and jurisdiction of the CRST." Def. SS ¶ 75.

3  The reference to the Indian Commerce Clause, U.S. Const., Art. I § 8 cl. 3, is

4  confusing and meaningless because that clause gives Congress the plenary authority

5  to regulate Indian commerce, and does not necessarily limit federal or state law.[4]

6  　　　The choice-of-law provision also contains a misstatement of fact, by stating

7  that the (putative) lender "do[es] not have a presence in South Dakota or any other

8  states of the United States." This is false because (1) Western Sky is a South Dakota

9  resident company (see Pl. SMF ¶ 173); and (2) "Western Sky Funding" (presumably

10  referring to Western Sky Financial) is shown on the face of the loan agreement to

11  have a South Dakota address. Pl. SMF ¶ 174. Moreover, this statement is misleading

12  because Defendants, who are unmentioned in the loan agreement but who acted in

13  concert with Western Sky, have presences in California and Nevada, and did

14  business in numerous states. Def. SS ¶¶ 1, 2, 4-7.

15  　　　This misstatement is material to the determination of whether federal and state

16  laws apply to the loan agreements. See Barona Band of Mission Indians v. Yee, 528

17

18  _____

19  　　　[4] See, e.g., Confederated Tribes of Siletz Indians of Oregon v. U. S., 110 F.3d 688, 694 (9th Cir. 1997) ("The central function of the Indian Commerce Clause is to

20  provide Congress with the plenary power to legislate in the field of Indian affairs.") (quoting Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192 (1989)). The Clause does not limit states' sovereign authority to regulate non-Indian activity on

21  tribal land or even some Indian activity on tribal land. See, e.g., Rice v. Rehner, 463 U.S. 713, 718 (1983) ("[E]ven on reservations, state laws may be applied unless

22  such application would interfere with reservation self-government or would impair a right granted or reserved by federal law.") (alteration in original, quoting Mescalero

23  Apache Tribe v. Jones, 411 U.S. 145, 148 (1973)); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 331-332 (1983) ("Indian tribes have been implicitly divested of

24  their sovereignty in certain respects by virtue of their dependent status, [] under certain circumstances a State may validly assert authority over the activities of

25  nonmembers on a reservation, and in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members."); cf. Wash. v.

26  Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 157 (1980) ("It can no longer be seriously argued that the Indian Commerce Clause, of its own force,

27  automatically bars all state taxation of matters significantly touching the political and economic interests of the Tribes.") (internal citation omitted).

28

F.3d 1184, 1190 (9th Cir. Cal. 2008) (holding that where a state asserts authority over the conduct of non-tribal entities on tribal land, "careful attention" must be paid "to the factual setting, requiring 'a particularized inquiry into the nature of the state, federal, and tribal interests at stake'") (citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)).

Defendants cannot enforce a choice-of-law clause that is both ambiguous and misleading. *Chan*, 123 F.3d at 1296. The Court should not allow them to use this clause to evade state laws.

**III.   Defendants' contention that their conduct was not unfair, deceptive, or abusive mischaracterizes the Bureau's claims.**

Defendants next assert that the Bureau's claims for unfair, deceptive, and abusive acts or practices do not demonstrate violations under applicable law. But in doing so, Defendants (again) mischaracterize the Bureau's claims, focusing on aspects of the contracts with consumers that are irrelevant to those claims. The Bureau alleges three specific claims in its Complaint—for unfair, deceptive, and abusive acts or practices—each of which relates to collecting loan payments that consumers did not owe. Defendants highlight certain provisions of the loan agreements—the prominence of choice-of-law clauses and interest rate disclosures— that do not bear on the issue of whether the debts were owed, or whether collecting un-owed debts is unfair, deceptive, and abusive.

The number and prominence of the choice-of-law clauses in the loan agreements are irrelevant to the UDAAP claims. The question is not whether such clauses were clear to consumers; rather, it is whether the debts were owed, and whether Defendants' conduct related to the debts violated federal law. For the same reasons, Defendants' arguments about the contracts' interest-rate disclosures are misplaced: the Bureau does not challenge the accuracy or prominence of the interest rate disclosures.

1    Defendants rely heavily on *Davis v. HSBC Bank Nevada, N.A.* in support of

2 their assertion that the conduct at issue in this case was not unfair, deceptive, or

3 abusive. 691 F.3d 1152 (9th Cir. 2012). But that case is inapposite because it

4 involved a consumer who did not read all the terms and conditions of a credit-card

5 agreement. *See id.* The court determined that if he had, he should have known the

6 credit card included an annual fee. *See id.* Here, consumers could have read every

7 single one of the clauses and disclosures in the loan agreements, and Defendants'

8 collection of unowed debt would still have been unfair, deceptive, and abusive. The

9 sham structure of the Western Sky loan program made it impossible for a reasonable

10 consumer to know that CRST law did not, in fact, govern the loan agreements. And

11 in turn, no reasonable consumer would have known that the loans were void or not

12 subject to a repayment obligation under the applicable laws of the Subject States.

13 Defendants' references to the loan agreements' choice-of-law clauses and interest-

14 rate disclosures obscure what was missing from the loan agreements: a disclosure

15 regarding CashCall's, WS Funding's, and Delbert Services's involvement in the

16 servicing of the loans and the applicability of state law, either of which might have

17 alerted a reasonable consumer that the collectability of the loans was suspect.

18    Finally, Defendants suggest that when a UDAAP claim is predicated on the

19 resolution of an underlying legal question, a defendant's reasonable relief on that

20 question serves as a complete defense to liability. But instead of citing any legal

21 authority for that suggestion, Defendants refer only to the commentary offered by

22 their own expert. Put simply, Defendants' attempt to rely on a supposed expert's

23 opinion on such an issue of law is inapposite; such issues are properly the province

24 of the Court. *See Nationwide Transport Fin. v. Cass Info. Systems, Inc.*, 523 F. 3d

25 1051, 1059 (9th Cir. 2008) (affirming the district court's exclusion of expert

26 testimony that contained legal conclusions).

27

28

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## IV.    Reddam is individually liable for UDAAP claims.

The Court should reject each of the arguments Reddam makes to avoid liability.

### A.    Reddam's advice-of-counsel defense is unavailing.

Reliance on advice of counsel is not a valid defense to Reddam's individual liability, even if he could prove it against the weight of evidence.[5] Moreover, Defendants cannot maintain this defense because they have withheld as privileged relevant documents and other information,[6] and are thereby impermissibly using privilege as both a sword and a shield. *See*, *e.g.*, *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992). When a party puts at issue its legal or other advice, it impliedly waives privilege as to that advice. *See id.* This implied waiver is based on considerations of fairness to the opposing party, here the Bureau. *See*, *e.g.*, *Genentech, Inc. v. Insmed Inc.*, 442 F. Supp. 2d 838, 844 (N.D. Cal. 2006) (*citing In re EchoStar Communs. Corp.*, 448 F.3d 1294, 1303 (Fed. Cir. 2006)).

To ensure fairness, the scope of Defendants' waiver "must of necessity be somewhat broad and is, in fact, a subject matter waiver—i.e., a waiver of all communications on the same subject matter." *Chiron Corp. v. Genentech, Inc.*, 179 F. Supp. 2d 1182, 1186-87 (E.D. Cal. 2001) (citation and internal quotation marks omitted). The subject-matter waiver extends to attorney-client communications and attorney work-product, and covers all relevant information. *See id.* at 1189-90

---

[5] *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) (*citing Feil v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960) for the proposition that "whether an individual acts in good or bad faith is immaterial to liability under FTCA § 5") (internal quotation marks and additional citation omitted); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1088-1089 (C.D. Cal. 1994) (*citing* holding in *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) for the proposition that advice of counsel is not a valid defense on the issue of knowledge, and *holding* that counsel or other advisor cannot "sanction something that Defendants should have known was wrong").

[6] *See* Fed. R. Civ. Pro. 56(d) (providing for Court's denial of motion for summary judgment where facts are unavailable to the nonmoving party), and Declaration of Barry E. Reiferson in support of Rule 56(d) relief, filed herewith.

---

13

1  ("[I]invoking the advice of counsel defense is not a painless decision or a free lunch.

2  There are discovery consequences to such an assertion." The waiver is construed "to

3  the broadest extent consonant with direct relevance to the advice of counsel itself.").

4  To ensure fairness, attorney-client and work-product privilege waivers also extend to

5  trial counsel's communications and work-product, and even to information not

6  communicated to the client. *See Dunhall Pharms., Inc. v. Discus Dental, Inc.*, 994 F.

7  Supp. 1202, 1204-1206 (C.D. Cal. 1998).

8      Defendants have withheld information directly relevant to the opinion letters

9  and other information of counsel upon which they claim to have relied.

10  Pl. SMF ¶ 222. Defendants have also asserted privilege as to documents requested by

11  the Bureau through a subpoena to the law firm Katten Muchin Rosenman. Pl. SMF

12  ¶ 223. To date, Katten has not produced a single document in response to the

13  subpoena. Pl. SMF ¶ 224. To ensure fundamental fairness, the Defendants' motion

14  should be denied, to the extent it incorporates reliance on advice of counsel. *See* Fed.

15  R. Civ. P. 56(d).[7]

16      **B.    The undisputed facts establish that Reddam was involved in the**

17           **unfair, deceptive, and abusive acts and practices and had authority**

18           **to control them.**

19      Even if an advice-of-counsel claim were available, which it is not, it would

20  simply be one factor to weigh against Reddam's significant authority, involvement,

21  knowledge, and recklessness. *See Maring v. PG Alaska Crab Inv. Co., LLC*, 338 Fed.

22  Appx. 655, 658 (9th Cir. 2009)  ("[A]dvice of counsel … is not a separate defense,

23

24  ───────────────

25      [7] If the Court considers Defendants' reliance-on-counsel arguments, the
    Bureau requests an opportunity to complete discovery as allowed under Fed. R. Civ.

26  Pro. 56(d)(2). To date, Defendants have withheld relevant communications with
    counsel from discovery on privilege grounds. Pl. SMF ¶ 218. Katten, while claiming

27  privilege, has not yet provided a privilege log. Pl. SMF ¶ 225. The Bureau supports
    its request for Rule 56(d) relief with the accompanying declaration of counsel.

28

1   but rather a circumstance indicating good faith which the trier of fact is entitled to

2   consider . . .") (citation and internal quotation marks omitted).

3        The undisputed facts are not kind to Reddam in this regard. Reddam both

4   participated in and had the authority to control CashCall's and Delbert's deceptive

5   acts. As the sole owner and president of CashCall, Reddam had the authority to

6   control all of CashCall's acts, and to decide when and whether to transfer delinquent

7   CashCall loans to Delbert, a company that Reddam also founded. Pl. SMF ¶¶ 177-

8   179. Reddam had the authority to approve CashCall's agreement with Western Sky,

9   and participated in the transaction by signing the two governing agreements with

10  Western Sky on behalf of CashCall and WS Funding. Pl. SMF ¶ 180. Reddam

11  claimed, in a sworn filing under penalty of perjury, that all CashCall managers

12  reported directly to him, and that he had authority over CashCall's day-to-day

13  activities. Pl. SMF ¶ 181. In that same filing, Reddam admitted to responsibility "for

14  devising and implementing all major company policies, including its various loan

15  programs and interest rates." Pl. SMF ¶ 182. Reddam claimed similar authority over

16  Delbert in another filing. Pl. SMF ¶ 183. Reddam claimed to give significant

17  authority to those who reported to him, Pl. SMF ¶ 184, but in fact engaged with the

18  "executive team" regularly, and spoke daily to CFO Meeks and general counsel

19  Baren. Pl. SMF ¶ 185.

20        Reddam made a personal loan to CashCall of about $21 million.

21  Pl. SMF ¶ 186. He personally guaranteed CashCall's loans from hedge funds, which

22  CashCall used to finance the Western Sky loans and its other consumer loans.

23  Pl. SMF ¶ 187. Reddam hired an advertising agency that created advertising

24  campaigns for CashCall, and also the Western Sky loans. Pl. SMF ¶ 188. Reddam

25  was a member of CashCall's executive team, which was involved in negotiating the

26  agreement with Western Sky. Pl. SMF ¶ 189. Reddam approved CashCall's purchase

27  of the Western Sky loans. Pl. SMF ¶ 190. Reddam discussed the terms of the

28  assignment agreement that governed Western Sky's sale of the Western Sky loans

1  with Baren. Pl. SMF ¶ 191. Reddam had the authority to approve agreements that

2  CashCall or its subsidiaries entered into with other companies, including WS

3  Funding's purchase of the Western Sky loans. Pl. SMF ¶ 192. Reddam made the

4  decision to wind down the Western Sky loan program in the face of "regulatory

5  problems." Pl. SMF ¶ 193.

6         Reddam also knew about CashCall's deceptive conduct. Reddam discussed the

7  status of CashCall's litigation over the Western Sky loans with Baren frequently.

8  Pl. SMF ¶ 194. Reddam knew that CashCall, rather than Western Sky, was the true

9  lender behind the Western Sky loans, because he knew how the transaction between

10  CashCall and Western Sky was created and structured. Pl. SMF ¶ 195. Reddam knew

11  that despite what the Western Sky loan agreement said, all loans would be serviced

12  by CashCall. Pl. SMF ¶ 196. Reddam avoided lending to consumers in West

13  Virginia, for fear of regulators there, and he testified that in his view, CashCall's

14  biggest business risk was that it would be shuttered by government regulators. Pl.

15  SMF ¶ 197.

16         For years, Reddam was named personally, along with other Defendants, in

17  regulatory and legal actions in which the Subject Loans were deemed void by

18  various government authorities. Pl. SMF ¶ 198. CashCall detailed these various

19  actions in more than one-hundred pages of its own disclosure statement.

20  Pl. SMF ¶ 199. In June 2013, New Hampshire issued to CashCall, WS Funding, and

21  Reddam an Order to Cease and Desist, requiring them to, among other things,

22  disgorge finance charges and pay restitution, in part because Subject Loans to New

23  Hampshire residents were "void" and Defendants had no right to collect any

24  principal or interest on them. Pl. SMF ¶ 200. The instant lawsuit was commenced in

25  December 2013, clearly putting Reddam on notice that federal regulators deemed

26  collection of the Subject Loans to be illegal. DE 1. Even with these repeated

27  warnings to cease collection of void loans, Reddam and the other Defendants

28  continued to attempt collection. Pl. SMF ¶ 201.

1  The Ninth Circuit recently affirmed summary judgment on a CFPA individual
2  liability claim with a similar factual record. *CFPB v. Gordon*, 819 F.3d 1179, 1193-
3  94 (9th Cir. 2016). There, the Ninth Circuit rejected the defendant's self-serving
4  protestations of ignorance in the face of undisputed evidence that he had control over
5  the company's marketing materials and knowledge of their contents. *Id*. The Court
6  should find Reddam individually liable for participating in CashCall's deceptive,
7  unfair, and abusive conduct.

8  **C.  The weight of evidence of Reddam's involvement undermines his**
9      **advice-of-counsel claim.**

10  Against this weight of evidence that Reddam had the authority to control the
11  corporate defendants and knowledge or recklessness regarding the conduct, the
12  counterweight of reliance on counsel is only available to Reddam if he "(1) made
13  complete disclosure to counsel, (2) requested counsel's advice as to the legality of
14  the contemplated action, (3) received advice that it was legal, and (4) relied in good
15  faith on that advice." *SEC v. Apartments Am. LLC*, 2014 WL 842819, at *7 (C.D.
16  Cal. Mar. 3, 2014) (*quoting SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467
17  (9th Cir. 1985)); *accord United States v. Antoinette-Bates*, 359 F. App'x 845, 846
18  (9th Cir. 2009) ("Essential to the claim of reliance on counsel is a showing that the
19  reliance be in good faith and that the advice be obtained after full disclosure of all of
20  the facts to which the advice pertains.") (citation omitted). Defendants fail to make
21  any showing as to what information was provided or withheld from counsel; this
22  failure precludes this defense. *See id*. (Rejecting defense where defendants failed to
23  support it with the "require[d] precision in what defendants told their lawyers, what
24  advice their lawyers gave about legality of specific representations, and subsequent
25  reliance on that specific advice blessing a particular representation").

26  Despite the requirement that legal advice be sought and relied upon by
27  Reddam to support this defense, Reddam argues merely that he was aware of
28  opinions provided *to others*. *See* Def. MSJ at 23. In fact, Reddam did not rely on this

17

1   advice. Rather, he used it to obtain third-party financing of the tribal-loan program.

2   The third-party recipients of the formal opinion letters were investors in CashCall's

3   tribal loans. *See* Pl. SMF ¶ 202. Each of the third-party opinions explicitly precludes

4   reliance upon it "for any purpose whatsoever" by anyone other than the addressee.

5   *See* Pl. SMF ¶ 203. CashCall was even involved in massaging the opinions to satisfy

6   lenders' counsel. *See* Pl. SMF ¶ 204. The discussions relating to this massaging

7   included attempts to delete the warning that the issues were "not free from doubt"

8   and add a discussion of the law in each state in which Defendants did business. *See*

9   Pl. SMF ¶ 205. These attempts were unsuccessful. *See id*. In the end, the accuracy of

10  the opinions was not essential, especially given that Reddam personally guaranteed

11  the investors' funds. *See* Pl. SMF ¶ 187.

12      Reddam was well aware that the opinions were not reliable. For example, the

13  Katten opinion letters and those prepared by Bogue and Bogue state that the covered

14  issues are "not free from doubt and significant litigation risk exists." Pl. SMF ¶ 206.

15  Even that equivocal opinion was based in part on assumptions that Baren knew were

16  "entirely inaccurate." Pl. SMF ¶ 207. The opening paragraph of the opinion makes

17  another misstatement, reciting that Western Sky is "a tribal company incorporated

18  under the laws of the Cheyenne River Sioux Nation," while it is actually a South

19  Dakota LLC. Pl. SMF ¶ 208. Defendants' concern about this inconvenient fact was

20  the topic of an earlier discussion between Baren and counsel about the resulting

21  impact on counsel's advice and ability to respond to regulators, and the concern

22  among potential investors that Western Sky would not be seen as an "arm-of-the-

23  tribe." Pl. SMF ¶ 209.

24      Katten's July 1, 2011, opinion letter to BasePoint Specialty Finance contains

25  another incorrect assumption. Katten assumed, "without any independent

26  investigation or analysis," that the Subject Loans were lawful under CRST law.

27  Pl. SMF ¶ 210. But the loans were not lawful under CRST law. To the contrary, they

28  were criminal under CRST law. Pl. SMF ¶ 211. The CRST Criminal Code caps the

18

1   allowable interest rate at 24% on loans less than $100 or under one year in duration,
2   and 18% on loans greater than that amount or duration. Pl. SMF ¶ 212. Each Subject
3   Loan had an interest rate exceeding 80%. Pl. SMF ¶ 213.

4       Defendants can hardly maintain a good-faith advice-of-counsel defense after
5   admitting to making thousands of loans that would be illegal under the very law they
6   claim applies, and after turning a blind eye to assumptions that they knew were false.
7   That is particularly so in light of the disclaimer in the opinions that "[a]ny material
8   change in any fact, representation or assumption from those relied upon herein also
9   may affect our analysis and the opinions expressed herein." Pl. SMF ¶ 214.
10  Furthermore, Defendants have not produced information, and have affirmatively
11  withheld information, that would allow the Bureau to assess their reliance on
12  counsel. *See* Declaration of Barry Reiferson, filed herewith.

13      The evidence shows that correctness and completeness was less important to
14  the participants than was the *appearance* of reliance on advice.[8] As attorney Cheryl
15  Bogue put it, "even if state court jurisdiction is found, what is the remedy and how
16  can it be enforced?" Pl. SMF ¶ 215. In response, Katten further revealed the sham
17  nature of the CashCall/Western Sky relationship: "For belts and suspenders, Butch's
18  company should be a tribal corp so that we can say it's an arm of the tribe." Pl. SMF
19  ¶ 216. Webb's company never was a tribal corporation, Pl. SMF ¶ 217, but the
20  transactions proceeded anyway.

21  **V.    Defendants had fair notice that collecting unowed debt is illegal.**

22      Defendants also contend that the Bureau's claims violate due process because
23  Defendants were not on notice of the interpretations of unfair, deceptive, or abusive
24  acts or practices on which the Bureau relies. To the contrary, the Bureau's UDAAP
25

26      _____

27      [8] The Katten letters Defendants point to do not even address all the states in which Western Sky loans were made, including several Subject States. *See* Pl. SMF ¶ 219-221.
28

19

1  claims are constitutionally sound. Indeed, Defendants concede that they were on

2  notice with respect to the Bureau's CFPA claims asserting unfair and deceptive acts

3  or practices, because those claims are analogous to unfairness and deception claims

4  under the FTC Act. See Def. MSJ at 21-22 (citing *CFPB v. Gordon*, 819 F.3d 1179,

5  1193 n.7 (9th Cir. 2016) ("The term 'deceptive act or practice' has an established

6  meaning in the context of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and

7  Congress used very similar phrasing in § 5536(a)(1)(B).")." Defendants limit their

8  due-process protest to the Bureau's claim of abusive conduct. But the CFPA's

9  prohibition on abusive acts and practices also meets, if not exceeds, the

10  constitutional standard for providing fair notice to defendants.

11      **A.**    **Laws that impose only civil penalties and govern economic activity**

12          **need meet only a minimal level of clarity to comport with the Due**

13          **Process Clause.**

14      "The degree of vagueness that the Constitution tolerates—as well as the

15  relative importance of fair notice and fair enforcement—depends in part on the

16  nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455

17  U.S. 489, 498 (1982). Courts should consider two key questions with respect to the

18  vagueness doctrine: 1) does the statute impose criminal penalties or only civil

19  penalties? and 2) does the statute impact the exercise of constitutionally protected

20  rights? *Id.* at 498-499. First, less clarity is required of laws that impose only civil

21  penalties, because the consequences are less severe. *Id.* And second, courts should

22  review economic regulations with less scrutiny, because the "subject matter is often

23  more narrow" and businesses have opportunities to alleviate any lack of clarity. *Id.* at

24  498.

25      As such, the Due Process Clause demands only a minimal level of clarity for

26  non-criminal, economic regulations. The CFPA, which imposes only civil liability

27  and governs economic activity rather than protected constitutional interests like free

28  expression, is therefore not subject to heightened scrutiny for vagueness. *CFPB v.*

1  *ITT Educ. Servs., Inc.*, No. 1:14-cv-00292, 2015 WL 1013508 at *17 (S.D. Ind.
2  March 6, 2015)*.

3      **B.    Defendants had fair warning that "abusive" conduct was illegal.**

4      While the term "abusive" may be less well-established in consumer protection
5  than "unfair" or "deceptive," the CFPA is not the first time Congress has used the
6  term. The Fair Debt Collection Practices Act (FDCPA) stated its aim to correct the
7  use of "abusive, deceptive, and unfair debt collection practices" and was first enacted
8  in 1977. 15 U.S.C. § 1692(a). Also, the Federal Telemarketing Sales Rule (TSR)
9  forbids "abusive telemarketing acts or practices." 16 C.F.R. § 310.4. Both the
10  FDCPA and TSR include instructive lists of prohibited "abusive" conduct. Further,
11  the CFPA describes abusive conduct to include taking "unreasonable advantage
12  of . . . a lack of understanding on the part of the consumer of the material risks, costs,
13  or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A).

14      In *CFPB v. ITT Educ. Servs., Inc.*, the court evaluated whether the CFPA's
15  prohibition on "abusive" acts or practices is unconstitutionally vague and held that it
16  is not. 2015 WL 1013508 at *20 ("Because the CFPA itself elaborates the conditions
17  under which a business's conduct may be found abusive—and because agencies and
18  courts have successfully applied the term as used in closely related consumer
19  protection statutes and regulations—we conclude that the language in question
20  provides at least the minimal level of clarity that the due process clause demands of
21  non-criminal economic regulation.") In fact, the CFPA's prohibitions on abusive acts
22  or practices afforded Defendants sufficiently "fair warning of what is proscribed."
23  *See Hoffman Estates*, 455 U.S. at 503.

24  **VI.    The Bureau's structure is Constitutional.**

25      In a last-ditch attempt to escape liability, Defendants contend that the Bureau's
26  structure unconstitutionally interferes with the President's power to "take Care that
27  the Laws be faithfully executed" and the vesting of the executive power in the

28

1   President. Def. MSJ at 24-25. This contention—which has been rejected by every

2   court thus far to have addressed it—fails.[9]

3        Longstanding Supreme Court precedent forecloses Defendants' contention

4   that the President's ability to remove the Bureau Director only for cause, *see* 12

5   U.S.C. § 5491(c)(3), impermissibly prevents the President from faithfully executing

6   the laws. In *Humphrey's Executor v. United States*, the Supreme Court approved

7   identical for-cause removal protections for Federal Trade Commission members. 295

8   U.S. 602, 621-22, 632 (1935) . As the Court later reaffirmed, the power to remove

9   such officials for cause gives the President "ample authority to assure that the

10  [official] is competently performing his or her statutory responsibilities." *Morrison v.*

11  *Olson*, 487 U.S. 654, 692-93 (1988).

12       Defendants attempt to distinguish the Bureau Director's for-cause removal

13  protection, but those attempts fall wide of the mark. First, Defendants offer no reason

14  why the Bureau's "amount of power" (Def. MSJ at 25) distinguishes it from other

15  agencies whose heads the Supreme Court has held could properly be removable only

16  for cause. *Cf. ITT*, 2015 WL 1013508 at *10 ("find[ing] no basis for concluding that

17  the Director's powers are so great that the inability to remove him or her at whim

18  fatally undermines the President's constitutional prerogatives"). Indeed, it does not.

19  At the time of *Humphrey's Executor*, for example, the FTC had authority to prohibit

20  "unfair methods of competition in commerce" by "persons, partnerships, or

21  corporations, except banks and [certain common carriers]," 15 U.S.C. § 45 (1934)—

22  a power in some respects *broader* than the Bureau's authority to prohibit "covered

23  person[s] or service provider[s]" from engaging in "unfair, deceptive, or abusive

24  act[s] or practice[s]" relating to "consumer financial product[s] or service[s]," 12

25

26       [9] *ITT Educ. Servs., Inc.*, 2015 WL 1013508 at *7-14; *CFPB v. Morgan*

27  *Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-92 (C.D. Cal. 2014). Defendant's cite *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir.), but the court in that case has not ruled on the Bureau's constitutionality.

28

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   U.S.C. § 5531(a).  Similarly, in *Free Enterprise Fund v. Public Company*

2   *Accounting Oversight Bd.*, the Supreme Court upheld a "single level of good-cause

3   tenure" for an agency "with expansive powers to govern an entire industry." 561

4   U.S. 477, 485, 509 (2010).

5          Second, the fact that the Bureau is headed by a single Director rather than a

6   multi-member commission only *increases* the President's power—for it enables the

7   President to identify more easily the official responsible for any problems. *Accord*

8   *Morgan Drexen*, 60 F. Supp. 3d at 1088 ("[I]f the President had needed to fully

9   revamp the leadership of the FTC at that time [of *Humphrey's*], he would have been

10  required to affect five separate for cause removals, while only one is required in

11  order to change the leadership of the CFPB."). Finally, the Bureau's funding

12  mechanism likewise does not diminish the President's power. Defendants complain

13  that the Bureau is "excepted from the *congressional* appropriations process" (Def.

14  MSJ at 25 (emphasis added)), but they do not even attempt to explain how the

15  Bureau's supposed insulation from that congressional process impedes *the*

16  *President's* power to execute the law.[10]

17

18

19

20

21

22          [10] Defendants' suggestion that the Bureau is insulated from the congressional

23  appropriations power is also mistaken. Congress established the funding for the
    Bureau, 12 U.S.C. § 5497(a), and Congress retains full power to change that funding

24  pursuant to the ordinary legislative process. It is well established that Congress may
    fund agencies in this way. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor*

25  *Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress
    may . . . decide not to finance a federal entity with appropriations," but rather

26  through some other funding mechanism); *AINS, Inc. v. United States*, 56 Fed. Cl.
    522, 539 (Fed. Cl. 2003) (similar); *see also Morgan Drexen, Inc.*, 60 F. Supp. 3d at

27  1089 (approving Bureau's funding); *ITT Educ. Servs.*, 2015 WL 1013508 at *12
    (same).

28

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that this Court DENY Defendants' Motion for Summary Judgment.

Dated: July 11, 2016                    Respectfully submitted,

                                        _____/s/ Owen Martikan_____
                                        Owen Martikan (CA Bar #177104)
                                        E-mail: owen.martikan@cfpb.gov
                                        Christina S. Coll (CA Bar #250712)
                                        christina.coll@cfpb.gov
                                        Leanne E. Hartmann (CA Bar #264787)
                                        leanne.hartmann@cfpb.gov
                                        Barry E. Reiferson (NY Bar #4343893)
                                        (Admitted *pro hac vice*)
                                        barry.reiferson@cfpb.gov
                                        Consumer Financial Protection Bureau
                                        1700 G Street, NW
                                        Washington, DC 20552
                                        Telephone: (415) 844-9790
                                        Facsimile: (415) 844-9788

                                        Attorneys for Plaintiff
                                        Consumer Financial Protection Bureau

PLAINTIFF CFPB'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT