THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEPOSITION TESTIMONY OF DANIEL BAREN (JUNE 14, 2016) IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 09, 2016<br>Trial: September 27, 2016 |

28:6 Q. And how did it change?
28:7 A. It's obtained -- when it started out in
28:8 2003, it had only a California license. It
28:9 obtained several other lending licenses in 2004,
28:10 2005, and subsequent years. And then beginning in
28:11 2006, the company started purchasing paper and
28:12 servicing that paper that it did not originate.
28:13 Q. And from whom would the company purchase
28:14 paper?
28:15 A. Initially, beginning in 2006, it was two
28:16 state chartered federally regulated banks.

32:4 Q. And what do you mean by -- when you say
32:5 "at that point"?
32:6 A. Subsequent to 2009, we had one state,
32:7 state of West Virginia challenge the bank model,
32:8 but that didn't really occur until 2011, 2012. And
32:9 that's the case I told you that I testified in
32:10 before. But up until that point, the bank model
32:11 for us had been a smashing success, and
32:12 Ms. Callaway was the lawyer who brought us that,
32:13 introduced us to the banks, designed the bank
32:14 model, and executed on it. So I trusted her. I
32:15 believed in her. And when she told me that -- that
32:16 she recommended doing a tribal model, I -- I
32:17 believed her. I -- I thought that was the right
32:18 call.

33:10 Q. So I think I understood that CashCall
33:11 stopped purchasing loans from the two state
33:12 chartered banks in November 2008?
33:13 A. Correct.
33:14 Q. And why was that change made in November
33:15 of 2008?
33:16 A. If you recall, we had that financial
33:17 crisis in the 2007, 2008 period. And the banks
33:18 were coming under increasing scrutiny from the
33:19 regulators for safety and soundness concerns. And
33:20 both banks told us that their regulator, the FDIC,
33:21 was putting a lot of pressure on them for them to
33:22 get out of the marketing partnerships, which is
33:23 what these were called. They were very common at
33:24 that period.

35:14 A. The banks didn't want to originate these
35:15 loans anymore, and so if they weren't originating
35:16 the loans, there was nothing to buy from them.

46:13 A. Because if you -- at the time we had, I
46:14 believe, maybe 10 state licenses. We were only
46:15 using five or six of them to make loans. So the
46:16 vast majority of the loans in the servicing

53:16 Q. And we were talking about it in the
53:17 context of this meetings in April 2009 where you
53:18 are deciding to go into business --

53:19 A. Sure.
53:20 Q. -- with Mr. Webb. When you ultimately did
53:21 go into business with Mr. Webb, how were those
53:22 loans funded?
53:23 A. Sure. Over the next 10 months, what --
53:24 what was -- eventually Western Sky was able to open
53:25 a bank account with Wells Fargo. And the loan
54:1 funding process was through that Wells Fargo
54:2 account that was owned and operated by Western Sky.
54:3 There were initially two types of employees. There
54:4 were more than two, but for purposes of this --
54:5 this question, there's two types of employees on
54:6 the reservation employed by Western Sky. There is
54:7 the underwriters and there's the funders. The
54:8 process, at that point, was the underwriter would
54:9 review all of the loans that were set to fund on
54:10 that particular day and provide a final approval
54:11 for those loans. And that would entail moving the
54:12 loans from what was called an underwriting queue
54:13 into the funding account, funding queue.
54:14 And then subsequent to that, another
54:15 Western Sky employee who was the funder, would go
54:16 through and perform a final audit and, like I said,
54:17 press the button to move the -- move the loan from a
54:18 -- the funding queue to a funded queue, which would
54:19 instruct Wells Fargo Bank to wire $2600 to this
54:20 person's bank account.

55:25 Q. What did the employment verification
56:1 entail?
56:2 A. If an applicant said he worked at the
56:3 CFPB, we would call up your human resources
56:4 department and ask: Does this person really work
56:5 at the CFPB? It's your typical employment
56:6 verification for a loan.
56:7 Q. When you say "we," who -- who would
56:8 actually do that employment verification?
56:9 A. There were a group of people in CashCall's
56:10 offices. At least at the start, all of that
56:11 happened in CashCall's offices. By 2013, some of
56:12 that function could have been happening on the
56:13 reservation. I'm not certain. But throughout most
56:14 of the program that happened by a CashCall employee
56:15 at Cash Call's offices.

57:12 Q. You mentioned that a fraud-check would
57:13 also be performed?
57:14 A. Correct.
57:15 Q. And who would perform a fraud check?
57:16 A. Several people could have -- do that. I
57:17 know there were -- at times that the underwriters
57:18 on the reservation were -- were performing that.
57:19 There were also employees at CashCall whose job it
57:20 was to perform that function as well. The loan
57:21 agent himself could be -- or herself could be
57:22 involved in that as well.

57:23 Q. Who is a loan agent?
57:24 A. The loan agent is the person who takes the
57:25 phone call, the initial phone call from the
58:1 borrower and takes the information from the
58:2 borrower.

59:17 Q. Going back to the loan agents, were loan
59:18 agents CashCall employees?
59:19 A. It varied over time. At the beginning of
59:20 the program, all of the loan agents were CashCall
59:21 employees at CashCall. By the end of the program
59:22 in the summer of 2013, there were 75 or so loan
59:23 agents who were on the reservation as Western Sky
59:24 employees, and that number was growing.

60:12 Q. Were there any other steps related to
60:13 underwriting that would proceed the final
60:14 underwriting review?
60:15 A. Sure. Before any human looked at the
60:16 loan, there was an automated underreview -- excuse
60:17 me, automated underwriting review that was done by
60:18 the system. And those loans were underwritten
60:19 pursuant to the guidelines established by Western
60:20 Sky, obviously approved by CashCall. And if the
60:21 loan didn't meet those criteria, the loan
60:22 application would be denied immediately. And those
60:23 were instances primarily FICO scores, minimum --
60:24 insignificant minimum income.

60:25 So that was like the first line of review.
61:1 It was an electronic review. You wouldn't get to a
61:2 human underwriter either at CashCall or
61:3 subsequently on the reservation, if you didn't pass
61:4 the automated underwriting.

70:2 Q. And logistically speaking, do you mean an
70:3 individual sitting on the reservation would run the
70:4 credit of the consumer?
70:5 A. No, it was done in an automated fashion.
70:6 It was the -- there were two ways an applicant
70:7 could submit an application. The first would be to
70:8 call up and give their information to a loan agent.
70:9 Some of whom were at CashCall -- most of whom were
70:10 at CashCall, some of whom were on the reservation.
70:11 And then at the bottom of that, they would
70:12 read, do you authorize me to run credit on behalf
70:13 of Western Sky? And if they said yes, of course
70:14 this is all recorded, then the loan agent,
70:15 regardless of whether they were the CashCall loan
70:16 agent or the Western Sky loan agent, would hit a
70:17 button, which would run the automated credit. It
70:18 was a Western Sky credit -- credit report, meaning
70:19 if the -- if you were to apply, and the next day
70:20 you looked at your credit report, it would show
70:21 that Western Sky ran the credit, not CashCall.

93:13 Q. I want to ask what I think is a bit

93:14 related to that, which is: What communications did
93:15 consumers receive from Western Sky through the loan
93:16 application process? So before they were actually
93:17 approved for a loan?
93:18 A. Sure. There was a whole host of potential
93:19 communications and not all applicants got all of
93:20 these communications. So you would have people who
93:21 got declined, and they would get an e-mail from
93:22 Western Sky stating that unfortunately their
93:23 application had been declined, and what's known an
93:24 adverse action letter would soon follow. And that

99:17 A. No, with the possible exception of adverse
99:18 action letters that were sent out via U.S. mail if
99:19 the application did not list a valid e-mail
99:20 address, then the government requires you to send
99:21 them out, and those would go out via U.S. mail from
99:22 the reservation. But I am not aware of any other

105:2 Q. Once in -- in this scenario that all of
105:3 the steps that you mentioned are completed and the
105:4 loan is funded, what happens next from CashCall's
105:5 perspective?
105:6 A. After we get notification of -- of any
105:7 particular loan that is funded, over the next
105:8 couple of days, and it's usually at least three
105:9 days, the loan would then be sold to CashCall. And

106:12 Q. When would consumers first hear about
106:13 CashCall being involved with their loan?
106:14 A. The first call they made -- assuming that
106:15 they called on the 800 number, which is one of the
106:16 two ways by which you could apply for a loan. The
106:17 first thing you hear when you dial that 800 number
106:18 was a recording, and I'm paraphrasing, "You have
106:19 reached Western Sky. We are a Native
106:20 American-owned business, operating on the Cheyenne
106:21 River Sioux reservation. We have hired a company
106:22 called CashCall to help us take application" --
106:23 "take applications and process information. You
106:24 will be transferred to a CashCall operator. Hit 1,
106:25 and you will be transferred to a CashCall operator,
107:1 who will take your application."
107:2 That changed over time as more of the calls
107:3 went directly to the reservation. Borrower still got
107:4 the same, "Thank you for calling Western Sky. We are
107:5 a Native American-owned corporation or lender. We
107:6 have hired CashCall to process some of our
107:7 application calls. You may be directed to a CashCall
107:8 operator, and you hit 1," because we didn't know, at
107:9 that point, where that call was going to go. So
107:10 anyone who was calling up, that would be their --
107:11 their -- the first communication they had. So they
107:12 were aware of CashCall's involvement from the moment
107:13 they started the transaction.
107:14 Now, if they applied online, you wouldn't

107:15 get that -- that call or that disclaimer, but you
107:16 would be notified via e-mail that CashCall was
107:17 assisting Western Sky. And then throughout the
107:18 process, if the Western Sky -- if the Western Sky
107:19 person handling the application, there would be no
107:20 mention of CashCall until the loan was -- was sold.
107:21 But if CashCall was assisting in the application,
107:22 then you would be notified throughout the process
107:23 that CashCall was involved.

109:22 A. It's -- well, there's always going to be
109:23 CashCall involvement because pursuant to the
109:24 service -- servicing agreement, CashCall is
109:25 performing some tasks on behalf of Western Sky. So

110:11 Q. Uh-huh.
110:12 A. So in those instances, even though
110:13 CashCall is doing some of the work, the borrower is
110:14 not aware of that fact. But it is -- it would be
110:15 very rare for an application to go all the way from
110:16 start to finish without some communication from the
110:17 loan agent, even if you are applying online. In
110:18 some cases, if the online applications get
110:19 directed, they still get a loan agent, because the
110:20 loan agent has to shepherd the application through,
110:21 even though you're not actually talking to them on
110:22 the phone.
110:23 In most of the instances, you still might

110:24 have to talk to them on the phone. Given that
110:25 CashCall is involved in that process, it would be
111:1 very, very rare, in fact, probably impossible, and,
111:2 again, I'm not the right person to know probability
111:3 of this, that the -- an applicant would not know of
111:4 CashCall's involvement in the loan origination
111:5 process, regardless of the channel that they came
111:6 through.
111:7 Q. I think what you told me clarifies what I
111:8 thought you were saying before. So it sounded like
111:9 that there -- it was possible for consumers not to
111:10 know if CashCall's involvement until CashCall
111:11 bought the loan. But am I understanding you
111:12 correctly that that would be a very rare
111:13 occurrence, from your understanding?
111:14 A. High -- very highly unlikely. And, again,
111:15 if you asked someone in the origination side, they
111:16 probably have a much better idea than I would.

119:5 Q. I want to go back in our conversation a
119:6 little bit, again. As we were talking about the
119:7 consumer experience, I think you mentioned that, at
119:8 some point, after the loan had been funded,
119:9 CashCall purchased the loan from Western Sky; is
119:10 that correct?
119:11 A. WS Funding purchased the loan, which -- I
119:12 mean, it's the same, given that CashCall was the
119:13 parent company.

119:14 Q. Okay. Let me -- let me be correct and
119:15 accurate about it, then, though. So at some point
119:16 after Western Sky had funded a loan, at least three
119:17 days would elapse and then WS Funding would
119:18 purchase the loan from Western Sky; is that
119:19 correct?
119:20 A. That's correct.
119:21 Q. And how much would WS Funding pay to
119:22 purchase the loan from Western Sky?
119:23 A. WS Funding paid a premium of approximately
119:24 5 percent on the loans.
119:25 Q. 5 percent of what?
120:1 A. It was 5 percent of, in most cases, the --
120:2 the principal loan amount. In some cases it was
120:3 the amount disbursed to the consumer.
120:4 Q. Was there a difference between the
120:5 principal loan amount and the amount disbursed to
120:6 the consumer?
120:7 A. Sure.
120:8 Q. And what was that difference?
120:9 A. The difference was the delta between the
120:10 amount of the origination fee, the finance charge.
120:11 Q. For any -- for a specific loan, how much
120:12 would WS Funding know to pay?
120:13 A. I'm not sure I understand your question.
120:14 Q. So it sounds like you were saying that
120:15 generally WS Funding paid a premium of 5 percent
120:16 either of the principal loan amount or the amount

120:17 disbursed to the consumer?
120:18 A. Sure.
120:19 Q. What would determine the actual amount
120:20 that WS Funding paid for the loan?
120:21 A. Depending on which loan product it was.
120:22 Like on all $2600 loans, it was based on the note
120:23 amount.
120:24 Q. And in what manner did WS Funding pay
120:25 Western Sky for the loans?
121:1 A. My understanding -- and, again, Del knows
121:2 far more about this than I did -- is that at the
121:3 end of each month, there would be a reconciliation,
121:4 whereby CashCall would pay Western Sky 5 percent --
121:5 approximately 5 percent. It was slightly higher, I
121:6 think, for all the loans purchased during any given
121:7 month, and Western Sky would pay CashCall the 2
121:8 percent that CashCall earned pursuant to the
121:9 servicing agreement.
121:10 Q. For Western Sky's payment to CashCall,
121:11 what was it paying for?
121:12 A. For all of the services that are described
121:13 in the servicing agreement, and some of which we
121:14 have talked about today.
121:15 Q. For -- what of it have we talked about
121:16 today, just so I'm clear?
121:17 A. Employment verification, fraud check,
121:18 marketing assistance, customer service assistance,
121:19 assistance with advertising, assistance with

121:20 processing the loan applications. Probably the
121:21 gist of it.
121:22 Q. And I got the 2 percent part for Western
121:23 Sky's payment to CashCall, but 2 percent of what?
121:24 I think I missed that.
121:25 A. 2 percent of the loan amount.
122:1 Q. Of funded loans?
122:2 A. Yes, that's correct.

125:11 Q. Okay. I'm looking at the very top
125:12 paragraph, and it says that the agreement is
125:13 between Western Sky Financial and WS Financial.
125:14 What is WS Financial?
125:15 A. That was a drafting error. Cheryl Bogue
125:16 drafted this agreement and got the name of the
125:17 entity incorrect.
125:18 Q. And -- so what is the correct name?
125:19 A. WS Funding, LLC.

130:24 Q. Did the WS loan program use marketing
130:25 materials?
131:1 A. Western Sky loan program used marketing
131:2 materials, yes.
131:3 Q. And who drafted the Western Sky loan
131:4 program marketing materials?
131:5 A. It wasn't just one person. There was an
131:6 outside firm that was hired by Western Sky called
131:7 "Kovel-Fuller." It's the same firm that CashCall

131:8 used as well. There were internal people at
131:9 CashCall in the marketing department. Mr. Reddam
131:10 participated in that. There was a head of
131:11 marketing at CashCall. And then Western Sky
131:12 participated in it substantially as well.
131:13 Q. Who paid Kovel-Fuller for their services?
131:14 A. On the Western Sky marketing, Western Sky
131:15 paid.
131:16 Q. Did CashCall pay for any marketing
131:17 for Western's -- for the Western Sky loan program?
131:18 A. Directly, no.
131:19 Q. Did CashCall pay indirectly for any
131:20 marketing for the Western Sky loan program?
131:21 A. CashCall indemnified Western Sky, and
131:22 Western Sky would submit the bills that it paid to
131:23 Kovel-Fuller, and CashCall would reimburse them.
131:24 Q. Was that for all marketing for the Western
131:25 Sky loan program?
132:1 A. I'm not certain. I believe Western Sky
132:2 did some marketing that they did not seek
132:3 reimbursement for.

134:14 Q. I'm going to hand you what's been marked
134:15 as Exhibit 3. And take your time in looking at it,
134:16 but my question will be: Is this the second
134:17 agreement that you were just referring to?
134:18 A. Yes. But I just noticed -- and this is
134:19 not the final agreement because this is between WS

134:20 Funding and -- Western Sky Financial and WS
134:21 Financial. When we noticed the error in both of
134:22 these agreements, they were revised and amended, so
134:23 that this agreement for service, the operative
134:24 agreement, was between Western Sky Financial and
134:25 CashCall.
135:1 And then on Exhibit 9, somewhere after
135:2 December 28th of 2009, the error was caught, the
135:3 Western Sky Financial error, and this agreement was
135:4 amended to reflect the proper name of Western -- WS
135:5 Financial, WS Funding.
135:6 So both Exhibit 9 and Exhibit 10 were
135:7 shortly, after these dates, amended to correct those
135:8 mistakes.

144:6 Q. Aside from the ad hoc participants in an
144:7 executive team meeting, since 2009 have there been
144:8 any other members of the executive team for
144:9 CashCall?
144:10 A. Yes.
144:11 Q. Who is that?
144:12 A. Louis Ochoa would have been on the
144:13 executive team for some period, Hilary Holland,
144:14 Jonathan Williams, I believe.

DATED: July 11, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: *_/s/ Thomas J. Nolan_*
Thomas J. Nolan
*Attorneys for Defendants*