THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

DEPOSITION TESTIMONY OF MARTIN A. WEBB (JUNE 22, 2016) IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| Hearing Date: | August 1, 2016 |
| Time: | 1:30 p.m. |
| Place: | Courtroom 16 |
| Judge: | Hon. John F. Walter |
| Pre-Trial Conf.: | September 09, 2016 |
| Trial: | September 27, 2016 |

25:25 Q. Mr. Webb, I'd like to ask you some questions
26:1 about Exhibit No. 24.
26:2 What is that document?
26:3 A. It's the underwriting policies and procedures
26:4 for the underwriting criteria for loans with Western Sky
26:5 Financial.
26:6 Q. All right. Now, I see that that document has a
26:7 date of 2011 at the top.
26:8 Were these the underwriting policies and
26:9 procedures for just that year or for a longer period of
26:10 time?
26:11 A. All of the underwriting criteria continually
26:12 changed based on additional data, additional analysis.
26:13 So it wasn't set in stone forever; it was continually
26:14 changing.

29:18 Q. What's Method software?
29:19 A. Method software is their software that CashCall
29:20 owned and licensed it to Western Sky, and we utilized it
29:21 for an automated system where it took in the data,
29:22 analyzed the data and had a -- and then forward that on
29:23 to Timber Lake.

30:9 Q. How would you use Method software?
30:10 A. We used it --
30:11 MR. UMHOFER: Objection. Vague as to "you."
30:12 BY MR. MARTIKAN:
30:13 Q. I mean you, Mr. Webb.

30:14 A. I did not.
30:15 Q. You did not ever use it?
30:16 A. No.
30:17 Q. Okay.
30:18 A. I never applied for a loan.
30:19 Q. Who at Western Sky used it?
30:20 A. The agents that were in the call center used
30:21 it, the people that did the auditing there used it, and
30:22 the people that did the funding there in Timber Lake
30:23 used it. And I would assume the people that we had --

53:16 Q. Do you know if Western Sky had its own server
53:17 from January 2010 through September 2013?
53:18 A. Yes, they did.

53:23 Q. Do you remember if CashCall provided
53:24 Western Sky with a server?
53:25 A. I don't remember. We utilized their software
54:1 in a program down here for loan applications, so they
54:2 had a server there, but we also had servers in
54:3 Timber Lake.

59:1 THE WITNESS: It was their option that they
59:2 didn't have -- they could purchase elsewhere.
59:3 BY MR. MARTIKAN:
59:4 Q. All right.
59:5 A. That was the reason for the reserve for part of
59:6 it.

59:7 Q. The reason being that they might decide to go
59:8 elsewhere and leave you out --
59:9 A. Or not buy any --
59:10 Q. Okay.
59:11 A. -- or only one-half or a certain number.

68:23 Q. How many employees did you start with?
68:24 A. Western Sky?
68:25 Q. Let's just -- yeah. Say in January 2010.
69:1 A. Approximately two to three.
69:2 Q. Including yourself?
69:3 A. No. I was never paid.
69:4 Q. Okay. Who else? Who else was it then?
69:5 A. I don't remember the names.
69:6 Q. Now, at the time you started Western Sky, you
69:7 had -- some of your other businesses were still up and
69:8 running; right?
69:9 A. Correct.
69:10 Q. Did you have any of the same employees working
69:11 for both businesses, or were these dedicated Western Sky
69:12 employees?
69:13 A. They were dedicated Western Sky.
69:14 Q. Do you remember what their -- what they did?
69:15 A. Originally, they reviewed, audited and approved
69:16 loans.

75:5 Now, if you could turn to page 4, which is the
75:6 "Contact Us" page, there's a list of toll-free phone --

75:7 well, not all toll-free, but a list of phone numbers.
75:8 Where, if you know, would these phone numbers
75:9 go? Like, if I called them --
75:10 A. I don't remember. The only one I can tell you
75:11 is the 605-865 would go straight to Timber Lake.
75:12 Q. Okay.
75:13 A. To the best of my recollection, the others go
75:14 to Timber Lake also.

121:15 You've referred to two locations, Eagle Butte
121:16 and Timber Lake; is that correct?
121:17 A. Correct.
121:18 Q. Now, where are those locations --
121:19 A. Both are --
121:20 Q. -- situated in relationship to the Indian
121:21 reservation?
121:22 A. Both of them are within the exterior boundaries
121:23 of the Indian reservation. Eagle Butte is actually the
121:24 headquarters for all the travel offices.
121:25 Q. And so is it fair to say that the Western Sky
122:1 offices were located within the exterior boundaries of
122:2 the reservation?
122:3 A. Not only fair; it's correct.

124:4 Q. Now, you made reference to payday lenders, but
124:5 in fact, Western Sky -- the Western Sky program and the
124:6 loans that CashCall purchased or WS Funding purchased
124:7 from Western Sky were not payday lending; they were

124:8 consumer lending; is that correct?
124:9 A. Installment loans, correct.

DATED: July 11, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: *_____/s/ Thomas J. Nolan_____*
Thomas J. Nolan
*Attorneys for Defendants*