OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted *pro hac vice*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,
Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS, OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS, AND SUPPLEMENTAL MATERIAL FACTS IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

Pursuant to Local Rule 56-1 and the Court's Scheduling and Case Management Order at § 4(a) [DE 92], Plaintiff Consumer Financial Protection Bureau ("Bureau"), as the opposing party on Defendants' motion for summary judgement, respectfully submits this Statement of Genuine Disputes of Material Fact, Objections to Defendants' Statement of Undisputed Facts and Conclusions of Law, and Supplemental Material Facts.

**STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND OBJECTIONS TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

| | PROPOSED FACT BY DEFENDANTS | EVIDENTIARY SUPPORT AND CFPB'S RESPONSE/OBJECTION |
|---|---|---|
| 1. | CashCall, a California corporation incorporated in 2000, began doing business in consumer loans in 2003 to provide a lower cost alternative to payday loans for credit-impaired borrowers and small businesses. | Ex. 1 (Delbert Meeks Rule 30(b)(6) Deposition ("Meeks Rule 30(b)(6)")) at 8:13-9:13;<br><br>Ex. 2 (Daniel Baren Deposition ("Baren")) at 27:19-28:1;<br><br>Ex. 40 (CashCall, Inc.'s State of California Certificate of Status for Domestic Corporation, dated February 8, 2006);<br><br>Ex. 37 (John Paul Reddam November 7, 2013 Declaration ("Reddam November 7, 2013 Declaration")) ¶ 6.<br><br>**UNDISPUTED** |
| 2. | Reddam has been the CEO and sole owner of CashCall since | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. |

| | | |
|---|---|---|
| | its creation. | 1);<br><br>Ex. 2 (Baren) at 139:1-2; 139:9-13.<br><br>**UNDISPUTED** |
| 3. | In 2012, CashCall employed 2,400 employees. Today, it employs 157. | Ex. 1 (Meeks Rule 30(b)(6)) at 27:7-18.<br><br>**UNDISPUTED** |
| 4. | Delbert, now defunct, started in 2008 as a Nevada corporation as a debt collection agency collecting debts for companies throughout the 50 states. | Ex. 1 (Meeks Rule 30(b)(6)) at 41:3-7);<br><br>Ex. 33 (ECF No. 41-1, Delbert Business Plan) at 3.<br><br>**UNDISPUTED** |
| 5. | Reddam was the CEO and sole owner of Delbert between January 1, 2010 and August 31, 2013. | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 2).<br><br>**UNDISPUTED** |
| 6. | In early 2010, CashCall's subsidiary WS Funding was formed to serve as a holding company for unsecured loans originated by, and then purchased from, Western Sky Financial, LLC ("Western Sky"). | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 3);<br><br>Ex. 9 (John Paul Reddam Deposition ("Reddam")) at 65:11-16;<br><br>Ex. 52 (Daniel Baren November 7, 2013 Declaration ("Baren Declaration")) at ¶ 8.<br><br>**DISPUTED to the extent that the statement suggests Western Sky** |

| | | |
|---|---|---|
| | | **originated the loans.**<br><br>CashCall employees completed many of the steps of loan origination:<br><br>When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508[1] (Baren Dep.) 55:25-56:15, 57:12-58:2, and 70:2-21.<br><br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7.) |
| 7. | Reddam is the President of WS Funding. | Ex. 2 (Baren) at 138:23-25.<br><br>**UNDISPUTED** |
| 8. | Since at least 2007, CashCall was advised by Washington, D.C., regulatory lawyer | Ex. 2 (Baren) at 31:16-17 ("Ms. Callaway had been our counsel for three, three and a half years" by |

[1] Exhibits 500-507 were filed as exhibits to the June 30, 2016, Declaration of Owen Martikan. Exhibits 508-523 are filed as exhibits to the July 11, 2016, Declaration of Owen Martikan filed concurrently with this document.

| | | |
|---|---|---|
| | Claudia Callaway ("Callaway"), who was a partner at Manatt, Phelps & Phillips until approximately July of 2009. | February of 2010.); 29:18-30:4; 152:10-13.<br><br>**<u>OBJECTION</u>[2] - relevance, admissibility** |
| 9. | On July 22, 2009, Callaway joined Katten Muchin & Rosenman ("Katten") as a partner. | Ex. 65 (July 22, 2009 Katten Announcement) at https://www.kattenlaw.com/mobilesite/shownews.aspx?Show=5952.<br><br>**<u>OBJECTION</u> - relevance, admissibility, hearsay** |
| 10. | From July of 2009 to the present, Callaway has been a partner at Katten, where she continues to practice regulatory litigation. | Ex. 2 (Baren) at 30:1-4;<br><br>Ex. 64 (Callaway's Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway.<br><br>**<u>OBJECTION</u> - relevance, admissibility, hearsay** |
| 11. | CashCall retained Katten to provide regulatory advice relating to the Western Sky Loan Program. | Ex. 7 (Daniel Baren Rule 30(b)(6) ("Baren Rule 30(b)(6)")) at 29:19-30:8.<br><br>**<u>OBJECTION</u> - to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |

[2] For all facts noted as "Objection," please see the Memorandum of Plaintiff's Evidentiary Objections to Defendants' Statement of Undisputed Facts, filed concurrently.

| | | |
|---|---|---|
| 12. | The lead Katten partner on the engagement was Callaway. | Ex. 2 (Baren) at 29:21-33:6.<br><br>**<u>OBJECTION</u> - to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 13. | Callaway's biography, available on Katten's website, states that she is chair of Katten's Consumer Finance Litigation practice, co-chair of Katten's Class Action and Multidistrict Litigation practice, and leads Katten's Platform Lending Initiative. | Ex. 64 (Callaway's Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway.<br><br>**<u>OBJECTION</u> - relevance, admissibility, hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 14. | Callaway's biography on Katten's website also states: "Having represented clients before the CFPB since it was established, Claudia understands the varying perspectives of key stakeholders involved, and helps clients navigate the hurdles, pitfalls and opportunities available to the numerous parties involved under the CFPB's jurisdiction." | Ex. 64 (Claudia Callaway Biography on Katten's website) at https://www.kattenlaw.com/Claudia-Callaway.<br><br>**<u>OBJECTION</u> - relevance, admissibility, hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 15. | Daniel Baren ("Baren") has served as CashCall's general counsel from 2003 to the | Ex. 2 (Baren) at 11:17-19.<br><br>**<u>UNDISPUTED</u>** |

| | | |
|---|---|---|
| | present. | |
| 16. | In 2003, CashCall began offering unsecured consumer installment loans pursuant to its California license. | Ex. 52 (Baren Declaration) at ¶ 4.<br><br>**UNDISPUTED** |
| 17. | While initially offering loans at a 24% interest rate, CashCall found that few applicants qualified for such loans and began offering various products with interest rates of up to 135% depending on a borrower's credit rating. The loans had no prepayment penalties. | Ex. 52 (Baren Declaration) at ¶ 4.<br><br>**DISPUTED as to the reason CashCall raised interest rates.**<br><br>CashCall began offering products interest rates of up to 135% because lower rates did not allow CashCall to remain profitable. Ex. 508 (Baren Dep.) 48:2-49:13. |
| 18. | In 2009, after a non-competition agreement between Reddam and his prior company expired, CashCall began offering prime mortgage loans.<br>It largely resold the loans to the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, both of which never put back a CashCall mortgage for defect in representation or warranty. | Ex. 52 (Baren Declaration) at ¶ 5.<br><br>**UNDISPUTED** |
| 19. | CashCall's mortgage business was initially successful and quickly outpaced its installment lending. In 2003, CashCall was authorized to issue mortgage loans in over forty states. | Ex. 52 (Baren Declaration) at ¶ 5.<br><br>**UNDISPUTED** |
| 20. | From 2003 through 2008, CashCall engaged a pair of | Ex. 52 (Baren Declaration) at ¶ 6. |

| | | |
|---|---|---|
| | state-chartered banks to market and service unsecured consumer installment loans nationally on terms and at interest rates available in the banks' home states. This business model was abandoned after changes to federal banking regulations. | **<u>DISPUTED</u> as to the reason the business model was abandoned.**<br><br>This business model was abandoned after the two state-chartered banks withdrew from the arrangement under pressure from the FDIC. Ex. 508 (Baren Dep.) 32:4-18; 33:14-34:13. |
| 21. | In March of 2009, Callaway recommended that CashCall purchase loans made by a tribal lender, stating that loans originated by a tribal lender would not be subject to state licensing or usury laws or federal laws. | Ex. 2 (Baren) at 30:11-32:2 (Baren testimony that Callaway recommended a "tribal lending model" in which CashCall would "start purchasing loans that were originated by a tribal lender";<br><br>Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog.14.<br><br>**<u>DISPUTED</u> as to whether Callaway stated that loans *would* not be subject to state licensing or usury laws or federal laws.**<br><br>At least one investor requested Calloway change the language in the legal opinion to state the loans "would" not be subject those laws instead of "should" not be subject to those laws. And Calloway's partner stated that "I do not think there is enough case law that is close enough on the issue that 'would' can be given." Ex. 513 (July 30, 2012 email chain from Claudia Callaway to Mark Conley copying, among others, Dan Baren) CC-017866791. |

| | | |
|---|---|---|
| | | **<u>OBJECTION</u> – hearsay, relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 22. | In early 2009, Callaway introduced Baren to Martin A. "Butch" Webb ("Webb") and encouraged CashCall to enter into a business relationship with a lending entity owned by Webb. | Ex. 2 (Baren) at 29:21-30:16; 37:25-38:18;<br><br>Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14.<br><br>**<u>OBJECTION</u> – hearsay, relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 23. | Webb is an enrolled member of the Cheyenne River Sioux Tribe (the "CRST"). | Ex. 22 (Tawny Lawrence Declaration submitted to the Consumer Financial Protection Bureau pursuant to the Notice and Opportunity to Respond and Advise process, dated November 7, 2013 ("Lawrence Declaration")) ¶ 3;<br><br>Ex. 8 (Martin A. Webb Deposition ("Webb")) at 79:4-6.<br><br>**<u>UNDISPUTED</u>** |
| 24. | Callaway advised CashCall that Webb would be a | Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of |

| | | |
|---|---|---|
| | trustworthy business partner. | Interrogatories) at Supp. Resp. to Rog. 14.<br><br>**<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 25. | Callaway also advised CashCall that she was aware of Webb's other lending activities and had represented other entities that purchased loans from his companies. | Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14.<br><br>**<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 26. | Webb had engaged in consumer lending for more than 20 years before CashCall began working with Webb. | Ex. 8 (Webb) at 32:2-10 ("I have . . . 32 years working in the banking and lending business"); 33:4-34:4 (Webb testimony that the company he worked for "loaned out to Native Americans, primarily farmers and ranchers.").<br><br>**<u>UNDISPUTED</u>** |
| 27. | Webb previously terminated agreements he had with other lenders because he felt he did not have enough control over the business arrangement. | Ex. 8 (Webb) at 38:21-39:24.<br><br>**<u>UNDISPUTED</u>** |
| 28. | Webb was president of | Ex. 8 (Webb) at 34:10-35:7. |

| | | |
|---|---|---|
| | Western Dakota Bank from 1992 to September 2013. | **UNDISPUTED** |
| 29. | Prior to working with CashCall, Webb had originated and funded loans to residents of various states from his office on the Cheyenne River Indian reservation (the "Reservation"), under the same tribal model advocated by Katten. | Ex. 8 (Webb) at 34:19-35:20.<br><br>**DISPUTED that the testimony cited stands for the statement (Webb's cited testimony discusses prior work at a bank making "ag loans and commercial loans" and short-term loans to individuals mostly on the reservation.**<br><br>**DISPUTED that Webb's prior business was "the same tribal model advocated by Katten."**<br><br>Webb testified only of meeting Callaway *after* signing the agreement with WS Funding/CashCall. Ex. 509 Webb Dep. 105:6-16.<br><br>**OBJECTION – vagueness as to "same tribal model advocated by Katten," hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 30. | Western Sky was created by Webb in late 2009 and employed the same tribal model advocated by Katten. | Ex. 8 (Webb) at 45:11-12;<br><br>Ex. 22 (Lawrence Declaration) ¶¶ 4, 5, 6.<br><br>**DISPUTED that the testimony and support stands for the proposition** |

| | | |
|---|---|---|
| | | **cited that Western Sky "employed the same tribal model advocated by Katten."**<br><br>**<u>DISPUTED</u> that Western Sky "employed the same tribal model advocated by Katten."**<br><br>Webb testified only of meeting Callaway *after* signing the agreement with WS Funding/CashCall. Ex. 509 (Webb Dep.) 105:6-16.<br><br>**<u>OBJECTION</u> – vagueness as to "same tribal model advocated by Katten," hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 31. | Western Sky was owned by Webb. | Ex. 16 (Membership Certificate for Limited Liability Company Interests in Western Sky Financial, LLC);<br><br>Ex. 8 (Webb) at 96:20-21.<br><br>**<u>UNDISPUTED</u>** |
| 32. | Western Sky was licensed by the CRST. | Ex. 20 (Cheyenne River Sioux Tribe Business License for Western Sky Financial, LLC);<br><br>Ex. 22 (Lawrence Declaration) ¶ 3 ("Western Sky is a wholly Tribal Member-owned-and-operated consumer installment lender. Specifically, it is owned by |

| | | |
|---|---|---|
| | | Martin A. Webb, a member of the CRST. Its offices are located in Eagle Butte and Timber Lake, South Dakota, on the Reservation.”).<br><br>**<u>OBJECTION</u> – FRE 106** |
| 33. | Cheryl Laurenz-Bogue (“Bogue”), an attorney at the law firm of Bogue & Bogue, LLP, represented Western Sky and Webb. | Ex. 8 (Webb) at 79:17-23; 115:25-116:6.<br><br>**<u>OBJECTION</u> – relevance, admissibility** |
| 34. | Western Sky and WS Funding entered into assignment and purchase agreements by which WS Funding purchased loans originated and funded by Western Sky. | Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC);<br><br>Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC);<br><br>Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC).<br><br>**<u>DISPUTED</u> to the extent that the statement suggests that Western Sky originated or funded the Western Sky loans.**<br><br>CashCall employees completed many of the steps of loan origination: |

| | | |
|---|---|---|
| | | When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, 70:2-21.<br><br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7).<br><br>To fund the Western Sky loans, CashCall set up a reserve account for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 35. | A drafting error was made in the execution of the agreements among the entities, in which "WS Financial, LLC" was meant to state, "WS Funding, LLC." | Ex. 2 (Baren) at 125:11-19.<br><br>**UNDISPUTED** |
| 36. | From December of 2009 to | Ex. 2 (Baren) at 135:21-136:1. |

| | | |
|---|---|---|
| | January 31, 2010, the December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky and WS Financial, LLC was the operative agreement between Western Sky and WS Funding. | **UNDISPUTED** |
| 37. | From February 1, 2010, the February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky and WS Funding and the October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial and WS Funding governed the relationship among the entities. | Ex. 2 (Baren) at 136:2-6.<br><br>**UNDISPUTED** |
| 38. | On January 9, 2010, Western Sky and CashCall entered into an Agreement for Service. | Ex. 38 (January 9, 2010 Agreement for Service between Western Sky and CashCall);<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 75:4-14 (Meeks testimony that the January 9, 2010 Agreement for Service governed the servicing relationship between Western Sky and CashCall from January 9, 2010 through the end of the relationship).<br><br>**UNDISPUTED** |
| 39. | CashCall performed certain services for Western Sky relating to the underwriting and processing of the Western Sky | Ex. 38 (January 9, 2010 Agreement for Service between Western Sky and CashCall); |

| | | |
|---|---|---|
| | loans pursuant to the terms of the Agreement for Service between Western Sky and CashCall. | Ex. 1 (Meeks Rule 30(b)(6)) at 75:4-14 (Meeks testimony that the January 9, 2010 Agreement for Service governed the servicing relationship between Western Sky and CashCall from January 9, 2010 through the end of the relationship);<br><br>Ex. 6 (WS Funding's Response to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5;<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 47:4-18 (Meeks testimony that "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls" and this was "per the . . . services agreement between Western Sky and CashCall.");<br><br>Ex. 4 (CashCall's Response to Plaintiff's Request for Admission No. 3).<br><br>**<u>DISPUTED</u> to the extent that the statement suggests that CashCall performed services "for" Western Sky.**<br><br>CashCall was the true lender in the Western Sky arrangement, because it bore the financial risk of the Western Sky loans. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004). As such, CashCall did not perform services *for* Western Sky. |

| | | |
|---|---|---|
| 40. | From February 2010 to August 2013, Western Sky originated and funded unsecured consumer installment loans and sold those loans to WS Funding pursuant to a Loan Purchase Agreement. | Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC);<br><br>Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC);<br><br>Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC);<br><br>Ex. 2 (Baren) at 29:18-20.<br><br>**<u>DISPUTED</u> to the extent that the statement suggests that Western Sky originated or funded the Western Sky loans.**<br><br>CashCall employees completed many of the steps of loan origination:<br><br>When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, 70:2-21.<br><br>CashCall employees reviewed the documentation submitted by |

| | | |
|---|---|---|
| | | borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7).<br><br>To fund the Western Sky loans, CashCall set up a reserve account for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 41. | The loan agreement entered into by Western Sky and borrowers was drafted by Bogue. | Ex. 8 (Webb) at 87:19-25.<br><br>**<u>UNDISPUTED</u>** |
| 42. | Western Sky's offices were located in Timber Lake and Eagle Butte, on the Reservation in South Dakota. | Ex. 8 (Webb) at 121:15-122:3; 68:14-22; 71:6-72:8;<br><br>Ex. 22 (Lawrence Declaration) ¶ 3 ("Western Sky is a wholly Tribal Member-owned-and-operated consumer installment lender. Specifically, it is owned by Martin A. Webb, a member of the CRST. Its offices are located in Eagle Butte and Timber Lake, South Dakota, on the Reservation.").<br><br>**<u>DISPUTED</u> to the extent the** |

| | | |
|---|---|---|
| | | **statement suggests that Western Sky was domiciled on the reservation.**<br><br>Western Sky is a South Dakota limited liability company. Answer ¶ 19. |
| 43. | Between January 2010 and August 2013, Western Sky was one of the largest private employers on the Reservation, employing more than 100 employees. | Ex. 22 (Lawrence Declaration) ¶ 9;<br>Ex. 8 (Webb) at 70:20-25.<br><br>**<u>UNDISPUTED</u>** |
| 44. | Western Sky originated loans to consumers in 47 states. | Ex. 2 (Baren) at 92:6-19.<br><br>**<u>DISPUTED</u> to the extent the statement suggests that Western Sky originated loans.**<br><br>CashCall employees completed many of the steps of loan origination:<br><br>When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, 70:2-21.<br><br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination |

| | | |
|---|---|---|
| | | process. Ex. 506 (CashCall RFA 7). |
| 45. | According to the Bureau of Indian Affairs' 2005 American Indian Population and Labor Force Report, the unemployment on the Reservation was 88% (as compared to 3.8% for South Dakota as a whole), and prior to Western Sky's operations, 100% of those who were employed were still below the poverty line. | Ex. 54 (U.S. Dep't of the Interior, Bureau of Indian Affairs, 2005 American Indian Population and Labor Force Report 8 (2005));<br><br>Ex. 55 (U.S. Dep't of Labor, Bureau of Labor Statistics, State and Regional Unemployment, 2005 Annual Averages (2005));<br><br>Ex. 8 (Webb) at 122:4-123:4.<br><br>**OBJECTION – relevance** |
| 46. | In 2013, the Bureau of Indian Affairs issued an updated report showing the CRST median civilian job employment rate of 44.4% in 2010. | Ex. 56 (U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, 2013 American Indian Population and Labor Force Report 41 (2014)).<br><br>**OBJECTION – relevance** |
| 47. | In 2013, there was an over 96% employment rate in South Dakota. | Ex. 57 (U.S. Dep't of Labor, Bureau of Statistics, Local Area Unemployment Statistics, South Dakota).<br><br>**OBJECTION – relevance** |
| 48. | 44.6% of the total population of Ziebach County, South Dakota, is below the poverty level. | Ex. 58 (U.S. Census Bureau, QuickFacts, Ziebach County, South Dakota).<br><br>**OBJECTION – relevance** |
| 49. | By comparison, the National | Ex. 59 (National Center for Children |

| | | |
|---|---|---|
| | Center for Children in Poverty estimates that approximately 17% of children in South Dakota live in poverty (21% nationally). | in Poverty, South Dakota Demographics of Poor Children, http://www.nccp.org/profiles/state_profile.php?state=SD&id=7).<br><br>**<u>OBJECTION</u> – relevance** |
| 50. | The per capita income for American Indians in Ziebach County is $6,999 with a family median income of $19,074, as compared to $27,334 and $62,982, respectively, for the total United States population. | Ex. 60 (U.S. Census Bureau, 2006-2010 American Community Survey Selected Economic Characteristics).<br><br>**<u>OBJECTION</u> – relevance** |
| 51. | Approximately 15% of CRST members obtain higher education degrees. | Ex. 61 (U.S. Census Bureau, Selected Social Characteristics in the United States, 2008-2012 American Community Survey, Ziebach County, South Dakota).<br><br>**<u>OBJECTION</u> – relevance** |
| 52. | Borrowers calling the toll free number to reach Western Sky were generally routed to the Western Sky call center located on the Reservation; only overflow calls would be sent to CashCall to handle on Western Sky's behalf in California. | Ex. 8 (Webb) at 74:16-75:14.<br><br>**<u>DISPUTED</u>**<br><br><u>From at least August 2010 – August 2011, all Western Sky calls appeared to go to CashCall loan officers, based in the CashCall office. Ex. 521 (Ellard Decl.) ¶¶ 16-19.</u><br><br>Even after Western Sky expanded its facilities and took customer phone calls at maximum capacity, most calls were still routed to CashCall loan agents, so that the total number of loan applications processed by Western |

| | | |
|---|---|---|
| | | Sky employees was a small fraction of the total number of Western Sky loan applications. Ex. 521 (Ellard Decl.) ¶¶ 30.<br><br>When Western Sky started up, all calls to these numbers went to CashCall loan agents in California. Ex. 509 (Webb Dep.) 75:17-21; Ex. 521 (Ellard Decl.) ¶ 4.<br><br>Ex. 508 (Baren Dep.) 59:17-24 ("At the beginning of the program, all of the loan agents were CashCall employees . . . By the end of the program in the summer of 2013, there were 75 or so loan agents . . . as Western Sky employees."); 70:2-10 (mostly CashCall loan agents ran credit of consumers). |
| 53. | Customers who called Western Sky heard the following recording: "We are a Native American-owned company operating on the bounds of the Cheyenne River Sioux Reservation." | Ex. 2 (Baren) at 106:12-21; 114:10-19.<br><br>**OBJECTION – hearsay, and declarant lacks personal knowledge** |
| 54. | Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. | Ex. 8 (Webb) at 61:3-13;<br><br>Ex. 8 (Webb) at 61:21-62:2 (Webb testimony that "we also constructed a building in Eagle Butte that we utilized as a call center for Western Sky and CashCall paid for half. And I paid half.");<br><br>Ex. 8 (Webb) at 121:15-122:3 (Webb testimony that Eagle Butte was within the exterior boundaries of the Indian |

| | | |
|---|---|---|
| | | reservation.).<br><br>**<u>UNDISPUTED</u>** |
| 55. | Western Sky operated from a call center out of the building it constructed on the Reservation. | Ex. 8 (Webb) at 61:21-62:2 (Webb testimony that "we also constructed a building in Eagle Butte that we utilized as a call center for Western Sky and CashCall paid for half and I paid half.");<br><br>Ex. 8 (Webb) at 121:15-122:3 (Webb testimony that Eagle Butte was within the exterior boundaries of the Indian reservation).<br><br>**<u>UNDISPUTED</u>** |
| 56. | Western Sky drafted and revised Western Sky underwriting guidelines, with input from CashCall. | Ex. 8 (Webb) at 28:22-29:23;<br>Ex. 2 (Baren) at 61:12-62:7.<br>**<u>DISPUTED</u> to the extent the statement implies that Western Sky took the lead with respect to the underwriting guidelines.**<br><br>CashCall developed underwriting criteria for its unsecured consumer loans, which guided how it would evaluate a borrower's credit before making a loan. Ex. 512 (Reddam Dep.) 42:20-43:6.<br><br>Webb also developed underwriting criteria for Western Sky, but in practice CashCall would not purchase a loan from Western Sky unless it met CashCall's underwriting criteria.<br>Ex. 510 (Meeks Dep.) 40:15-22. |

| | | |
|---|---|---|
| 57. | Changes to the Western Sky underwriting guidelines were made only "upon [Webb's] decision and agreement." | Ex. 8 (Webb) at 26:20-27:11.<br><br>**<u>DISPUTED</u> to the extent this statement suggests that changes to the underwriting guidelines were made only at Webb's request.**<br><br>Ex. 508 (Baren Dep.) 62:17-63:10. (With respect to the underwriting guidelines, Baren acted as a liaison between Webb and CashCall employees and said "…this is what we think the program should look like.")<br><br>Ex. 510 (Meeks Dep.) 54:10-24 (CashCall would review performance of Western Sky loans and inform Western Sky that it would "not be purchasing loans unless it was under these new underwriting guidelines[,] and provide those guidelines to Western Sky . . .") |
| 58. | The critical final steps to accept loan agreements and fund loans all occurred on the Reservation. This included a final auditing review, performed after the borrower completed a loan application by electronically signing a loan agreement, to verify that the information provided by the prospective borrower was accurate and complete. If the information reviewed in the final audit review was found to be inaccurate or incomplete, Western Sky would not accept the application and would deny | Ex. 22 (Lawrence Declaration) ¶ 8.<br><br>**<u>DISPUTED</u> as to the qualification "critical."**<br><br>Ex. 521 (Ellard Decl.) ¶ 31: Western Sky did not have the infrastructure in place to allow for on-site underwriting, income call queuing, or other functions necessary for broad-scale lending. Each of these steps could be construed as "critical" to the loan process.<br><br>Ex. 509 (Webb Dep.) 69:17-70:7 (beginning in 2010, two or three Western Sky employees worked on Western Sky loans, including auditing |

| | | |
|---|---|---|
| | funding of the loan. If the information was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts. The borrower would be sent an acceptance notice, informing him or her that the loan proceeds would be electronically disbursed. | them. The number they approved per day was "very limited." The number of employees ramped up over time.)<br>Ex. 508 (Baren Dep.) 53:20-55:2 |
| 59. | Western Sky set the underwriting criteria by which potential borrowers were reviewed and made the ultimate decision of whether to extend a loan. | Ex. 22 (Lawrence Declaration) ¶ 8.<br>**DISPUTED to the extent this statement suggests that only Western Sky set the underwriting criteria and to the extent that it is unclear what Defendants mean by "the ultimate decision."**<br>Ex. 508 (Baren Dep.) 62:17-63:10. (With respect to the underwriting guidelines, Baren acted as a liaison between Webb and CashCall employees and said "…this is what we think the program should look like.")<br>Ex. 510 (Meeks Dep.) 54:10-24 (CashCall would review performance of Western Sky loans and inform Western Sky that it would "not be purchasing loans unless it was under these new underwriting guidelines[,] and provide those guidelines to Western Sky . . .") |
| 60. | Western Sky had its own Internet server on the Reservation from January 2010 | Ex. 8 (Webb) at 53:16-18.<br>**DISPUTED to the extent this suggests that Western Sky did not** |

| | | |
|---|---|---|
| | through September 2013. | **utilize other servers. Western Sky used CashCall's servers and systems to handle loan approval process and host its website.**<br><br>Ex. 509 (Webb Dep.) 70:1-16; 73:10-17; Ex. 512 (Reddam Dep.) 19:12-23, 11:4-20; Ex. 511 (Meeks 30(b)(6) Dep.) 85:11-86:3. |
| 61. | Western Sky reviewed and audited monthly settlement reports provided by CashCall. | Ex. 8 (Webb) at 54:14-18.<br><br>**UNDISPUTED** |
| 62. | Western Sky conducted numerous due diligence visits to review CashCall's operations. | Ex. 8 (Webb) at 55:19-57:13.<br><br>**UNDISPUTED** |
| 63. | At Webb's request, CashCall's employees would visit the Reservation to help train the call center employees in customer service. | Ex. 8 (Webb) at 76:1-77:18.<br><br>**UNDISPUTED** |
| 64. | Webb construed the agreement between Western Sky and CashCall to give him "total control where [Western Sky] could sell [Western Sky loans] anywhere." | Ex. 8 (Webb) at 64:15-23.<br><br>**DISPUTED as to what the Agreement meant.**<br><br>CashCall bought all of Western Sky's loans.<br><br>Ex. 512 (Reddam Dep.) 81:6-17; Ex. 508 (Baren Dep.) 123:23-124:1; Ex. 509 (Webb Dep.) 46:3-8 (Western Sky never sold any paper to anyone other than WS Funding and CashCall, nor did it keep any paper for more than three days), 58:19-21; Ex. 511 (Meeks 30(b)(6) Dep.) 53:6-9; Ex. 19 Assignment Agreement, ¶ 2. |

| | | |
|---|---|---|
| | | **<u>OBJECTION</u> – relevance** |
| 65. | A Western Sky employee designed the logo for its website. | Ex. 8 (Webb) at 73:10-13.<br><br>**<u>UNDISPUTED</u>** |
| 66. | Western Sky participated substantially in the drafting of all marketing materials for Western Sky loans. | Ex. 2 (Baren) at 131:3-12.<br><br>**<u>DISPUTED</u> to the extent that it is unclear what Defendants mean by "participated substantially."**<br><br>In at least one instance, Webb appeared to have no idea about certain advertisements Baren sent him. Ex. 520 (Baren/Webb email chain) Baren: "You will be getting a package of post cards that we want to mail from the reservation." Webb: "Have 12 boxes at post office. What are they"? Baren: "Advertising mailers. Go ahead and open one to check it out." CFPB-0144633. |
| 67. | Western Sky had employees in five departments: the call center department, the collections department, the fraud department, the IT department, and the building and maintenance department. | Ex. 8 (Webb) at 99:8-13.<br><br>**<u>UNDISPUTED</u>** |
| 68. | Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. | Ex. 8 (Webb) at 69:10-25 (Webb testimony that "[e]very loan came through their – that office, they would open up the file on every loan and review for accuracy for the documents that were obtained. And then if |

| | | |
|---|---|---|
| | | everything was in place, they would audit – or not audit – they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring.”);<br><br>Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that “once [an applicant’s file] got to the reservation and to Western Sky, it was out of CashCall’s hands. Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans.”);<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that “Western Sky had their own system . . . [B]ased on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not.”);<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 (“Q. Did CashCall know the parameters by which Western Sky evaluated loans in deciding to approve them or not? A. We know their |

| | | |
|---|---|---|
| | | underwriting guidelines, but we don't know exactly why they approve or why they don't approve. That's their call."); <br><br> Ex. 22 (Lawrence Declaration) ¶ 8. <br><br> **<u>DISPUTED</u> to the extent the statement suggests that *only* Western Sky employees reviewed, audited, and approved Western Sky Loans.** <br><br> CashCall employees completed many of the steps of loan origination: <br><br> When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, and 70:2-21. <br><br> CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16. <br><br> CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7.) |
| 69. | Western Sky approved only five to ten percent of loan applications. | Ex. 8 (Webb) at 99:20-23. <br><br> **<u>UNDISPUTED</u>** |

| | | |
|---|---|---|
| 70. | The decision to fund the Western Sky loans was made by Western Sky employees located on the Reservation. | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16); Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands. Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans."); 169:11-16 ("[T]he final approval necessary, which was the determination of whether a loan would fund or not, was done on the reservation solely by Western Sky."); <br><br> Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that "Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."); <br><br> Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 ("Q. Did CashCall know the |

| | | |
|---|---|---|
| | | parameters by which Western Sky evaluated loans in deciding to approve them or not? A. We know their underwriting guidelines, but we don't know exactly why they approve or why they don't approve. That's their call."); <br><br> Ex. 22 (Lawrence Declaration) ¶ 8 ("If the information [provided by the prospective borrower] was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts."). <br><br> **DISPUTED – Western Sky only made loans that it knew CashCall would purchase.** <br><br> Ex. 512 (Reddam Dep.) 81:6-17; Ex. 508 (Baren Dep.) 123:23-124:1; Ex. 509 (Webb Dep.) 46:3-8 (Western Sky never sold any paper to anyone other than WS Funding and CashCall, nor did it keep any paper for more than three days), 58:19-21; Ex. 511 (Meeks 30(b)(6) Dep.) 53:6-9 |
| 71. | The last acts necessary to form the Western Sky loan agreements were performed within the boundaries of the CRST, including a final auditing review, performed after the borrower completed a loan application by electronically signing a loan | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16); <br><br> Ex. 22 (Lawrence Declaration) ¶ 8; <br><br> Ex. 8 (Webb) at 69:10-25; 68:12-22; 71:6-23; 121:15-122:3. |

| | | |
|---|---|---|
| | agreement, to verify that the information provided by the prospective borrower was accurate and complete. If the information reviewed in the final audit review was found to be inaccurate or incomplete, Western Sky would not accept the application and deny funding of the loan. If the information was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts. | Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands. Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans.")<br><br>**<u>DISPUTED</u> – this is a compound fact.**<br><br>The "last acts necessary to form the Western Sky loan agreements" does not make sense. The loan agreements were already formed (See SS ¶ 41[3]). Whether the various steps set forth in the paragraph constitute the "last acts necessary" to bind a borrower is a legal conclusion, and it is unclear which "acts" to which the conclusion applies.<br><br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>The borrower electronically signs the loan agreement in the borrower's home state, which may be a "last act." |

[3] References to "SS" refer to Defendants' Statement of Undisputed Facts and Conclusions of Law, filed at DE 140.

| | | |
|---|---|---|
| | | Further, while someone at Western Sky "presses a button" to fund the loan, that causes an EFT to a borrower's bank account. Ex. 508 (Baren Dep.) 52:21-53:5. Receipt of the funds may be the "last act." |
| 72. | Western Sky had discretion to veto or refuse any condition, term or feature of the loans. | Ex. 2 (Baren) at 172:7-18.<br>**<u>DISPUTED</u> – CashCall refused to purchase any loan made outside of its underwriting parameters.**<br>Ex. 510 (Meeks Dep.) 40:15-22 |
| 73. | The Western Sky loans were funded by Western Sky, from a funding account to which CashCall initially contributed. | Ex. 8 (Webb) at 69:22-25;<br><br>Ex. 9 (Reddam) at 122:6-10;<br><br>Ex. 1 (Meeks Rule 30(b)(6)) at 55:1-9. (Meeks testimony that Western Sky funded a Western Sky-originated loan from their funding account funded "in the beginning . . . by a loan from CashCall").);<br><br>Ex. 22 (Lawrence Declaration) ¶ 8 ("If the information [provided by the prospective borrower] was satisfactory to Western Sky, Western Sky would notify its bank to fund the loan from one of Western Sky's bank accounts.").<br><br>**<u>DISPUTED</u> to the extent that the statement suggests that CashCall only "initially" contributed to the funding account.** |

| | | |
|---|---|---|
| | | To fund the Western Sky loans, CashCall set up a reserve account for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average.<br><br>Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 74. | If a potential loan met the guidelines, then a borrower was directed, via email from Western Sky, to the Western Sky website where Western Sky provided the borrower with certain disclosures about the loan, and the borrower signed the loan documents electronically. | Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 16;<br><br>Ex. 2 (Baren) at 69:1-71:3;<br><br>Ex. 8 (Webb) at 74:7-75:4.<br><br>**UNDISPUTED** |
| 75. | The first page of every Western Sky loan agreement states, in bold: "**This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" | Exs. 41-50 (Western Sky loan agreement samples) at 1.<br><br>**UNDISPUTED** |
| 76. | The Governing Law provision of the ten Western Sky loan agreement iterations states: "This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the | Exs. 41-50 (Western Sky loan agreement samples) at 3.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | laws of the Cheyenne River Sioux Tribe." | |
| 77. | Beginning in June of 2011 until October of 2013, the Western Sky loan agreement stated: "by entering into this Agreement you are voluntarily availing yourself of the laws of the Cheyenne River Sioux Tribe, a sovereign Native American Tribal Nation." | Exs. 41-50 (Western Sky loan agreement samples) at 3.<br><br>**UNDISPUTED** |
| 78. | Beginning in June of 2011 until August of 2013, the Western Sky loan agreement stated: "[y]ou further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation." | Exs. 46-49 (Western Sky loan agreement samples) at 1.<br><br>**UNDISPUTED** |
| 79. | From August of 2013 through October of 2013, the Western Sky loan agreement stated: "[y]ou also expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Sioux Tribe, and that | Ex. 50 (Western Sky loan agreement samples) at 1.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | no United States state or federal law applies to this Agreement." | |
| 80. | The interest rate on the Western Sky loans was clearly and prominently disclosed on the first page of the agreement. | Exs. 41-50 (Western Sky loan agreement samples) at 2.<br><br>**UNDISPUTED** |
| 81. | Before February 2010, counsel for CashCall informed CashCall that the loans would not be subject to state law. | Ex. 2 (Baren) at 160:9-161:1;<br><br>Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10.<br><br>**DISPUTED as to whether counsel stated that loans *would* not be subject to state law.**<br><br>The term "would" does not appear in the opinion letters with respect to whether state law "would" apply. *See, e.g.*, Ex. 17 (April 12, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC), Ex. 32 (draft February 26, 2010 Opinion of Counsel letter from Katten, addressed to Baren), and Ex. 34 (July 1, 2011, Opinion of Counsel letter from Katten, addressed to BasePoint Specialty Finance, LLC).<br><br>At least one investor requested Calloway change the language in the legal opinion to state the loans "would" not be subject those laws instead of "should" not be subject to those laws. And Calloway's partner stated that "I do not think there is enough case law that is close enough |

| | | |
|---|---|---|
| | | on the issue that 'would' can be given." Ex. 513 (July 30, 2012 email chain from Claudia Callaway to Mark Conley copying, among others, Dan Baren) CC-017866791.<br><br>**<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 82. | In approximately January of 2010, Callaway advised CashCall that tribal lender loans sold to a non-tribal entity would not be subject to the state law of the borrower's place of residence. | Ex. 2 (Baren) at 32:19-33:5 (Baren testimony that he had "a recollection of several conversations [six and a half years ago] where [Callaway] said that this was now the model that she was recommending to her clients; that – that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a nontribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation.").<br><br>**<u>DISPUTED</u> as to whether counsel stated that loans sold to a non-tribal entity *would* not be subject to the state law of the borrower's place of residence.**<br><br>The term "would" does not appear in the opinion letters with respect to whether state law "would" apply. *See, e.g.*, Ex. 17 (April 12, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC), |

| | | |
|---|---|---|
| | | Ex. 32 (draft February 26, 2010 Opinion of Counsel letter from Katten, addressed to Baren), and Ex. 34 (July 1, 2011, Opinion of Counsel letter from Katten, addressed to BasePoint Specialty Finance, LLC).<br><br>At least one investor requested Calloway change the language in the legal opinion to state the loans "would" not be subject those laws instead of "should" not be subject to those laws. And Calloway's partner stated that "I do not think there is enough case law that is close enough on the issue that 'would' can be given." Ex. 513 (July 30, 2012 email chain from Claudia Callaway to Mark Conley copying, among others, Dan Baren) CC-017866791.<br><br>**<u>OBJECTION</u> – relevance, hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 83. | Katten sent a formal opinion letter to Centurion Credit Resources, LLC on April 12, 2010, stating ". . . [w]e are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable state law . . . should conclude that the choice of law | Ex. 17 (April 12, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC) at 1, 8-14.<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |

| | | |
|---|---|---|
| | provision contained in the loan agreement is enforceable in [Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Kentucky, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Montana, Michigan, Nebraska, Nevada, New Mexico, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, and Wisconsin]." | |
| 84. | Katten sent a formal opinion letter to Centurion Credit Resources, LLC on June 23, 2010, stating ". . . we are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements . . ." and "upon assignment, CashCall, as assignee, will be entitled to the . . . choice of law rights held by Western Sky." | Ex. 39 (June 23, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC) at 1, 4.<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 85. | On November 16, 2010 Katten | Ex. 24 (November 16, 2010 Opinion |

| | | |
|---|---|---|
| | sent a formal opinion letter to Bayberry Consumer Finance Fund, LLC concluding that the Western Sky loans "will not be subject to United States federal consumer protection law or state law limiting interest rates" because, *inter alia*, the states will "enforce the choice of CRST law set forth in the loan agreements." | of Counsel letter from Katten, addressed to Bayberry Consumer Finance Fund, LLC) at 1.<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 86. | In September of 2009, Katten prepared a draft of a formal opinion<br>letter. | Ex. 27 (September 2009 draft Katten Opinion letter addressed to Jefferies & Company).<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 87. | In November of 2009, Katten prepared a draft of a formal opinion letter that Callaway shared with Baren on November 4, 2009. | Ex. 30 (November 4, 2009 email from Callaway to Baren attaching the November 2009 draft Opinion of Counsel letter from Katten, addressed to Jefferies & Company).<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 88. | In December of 2009, Katten prepared a draft of a formal opinion letter that Callaway | Ex. 31 (December 10, 2009 email from Callaway to Baren attaching the November 2009 draft Opinion of |

| | | |
|---|---|---|
| | shared with Baren on December 10, 2009. | Counsel letter from Katten, addressed to Jefferies & Company).<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 89. | On February 26, 2010, Katten sent a formal opinion letter to Baren stating, "a court of competent jurisdiction interpreting applicable [federal and] state law . . . should conclude that the choice of law provision contained in the Loan Agreement [to be used by Western Sky] is enforceable in [Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Kansas, Kentucky, Idaho, Illinois, Indiana, Iowa, Louisiana, Maine, Maryland, Montana, Michigan, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin]." | Ex. 32 (draft February 26, 2010 Opinion of Counsel letter from Katten, addressed to Baren) at 1, 8.<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 90. | On July 1, 2011, Katten sent a | Ex. 34 (July 1, 2011 Opinion of |

| | | |
|---|---|---|
| | formal opinion letter to BasePoint Specialty Finance, LLC, stating that "a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that (a) the choice of law provision contained in the Loan Agreements should be enforced, and (b) Borrower will, upon assignment, acquire all rights in such loans that are possessed by Lender as assignor in each of the states discussed below." | Counsel letter from Katten, addressed to BasePoint Specialty Finance, LLC) at 1.<br><br>**<u>OBJECTION</u> – relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 91. | Katten's regulatory opinions were a "very small component of the overall legal advice that Katten provided" on CashCall's ability to enforce the Western Sky loans. | Ex. 7 (Baren Rule 30(b)(6)) at 29:22-30:2.<br><br>**<u>DISPUTE</u> to the extent that there is no way to determine what portion of the overall legal advice from Katten was represented by the regulatory opinions, given Defendants' resistance to discovery on that issue.**<br><br>*See SMF*, *infra*, at ¶¶ 222-225.<br><br>**<u>OBJECTION</u> – to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 92. | CashCall received advice from Katten that CashCall could enforce the terms of the loan | Ex. 7 (Baren Rule 30(b)(6)) at 30:2-8 (Baren "had numerous, dozens of conversations, maybe hundreds of |

| | | |
|---|---|---|
| | agreements "without interference from state regulators." | conversations, with the lawyers at Katten, including Ms. Callaway and her associates, regarding CashCall's rights to purchase those loans and enforce the terms of those loans pursuant to the contracts and without interference from state regulators."); <br><br> Ex. 2 (Baren) at 160:13-19. <br><br> **<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 93. | Katten orally told lenders to CashCall and counsel for the lenders that the loans were subject to tribal law, not state law. | Ex. 7 (Baren Rule 30(b)(6)) at 30:9-13; 30:20-25. <br><br> **<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 94. | CashCall attended conferences where Callaway gave presentations that reinforced that the loans were subject only to tribal law. | Ex. 7 (Baren Rule 30(b)(6)) at 30:14-25; 31:22-32:7; 32:13-23. (Baren testimony that "as it was set up by [Callaway], the loans would be subject to tribal law and not state law, and that the tribal lender could assign the paper to CashCall and CashCall could collect it," without ever mentioning the model was "not legal or appropriate."); <br><br> Ex. 35 (March 18, 2011 email from Callaway to Dan Pillemer, attaching a |

| | | |
|---|---|---|
| | | "working draft of the tribal contract enforceability white paper.") at 1.<br><br>**<u>OBJECTION</u> – hearsay, relevance, vagueness, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 95. | CashCall "relied heavily" on Katten and Callaway, their attorney of nearly four years, who was "well versed in regulatory compliance and consumer lending." | Ex. 2 (Baren) at 31:16-32:2; 41:9-12; 174:20-175:15.<br><br>**<u>OBJECTION</u> – vagueness, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 96. | CashCall relied on legal opinions written by outside legal counsel and provided to third-party financiers. | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;<br><br>Ex. 2 (Baren) at 160:13-161:1.<br><br>**<u>OBJECTION</u> – hearsay, relevance, vagueness, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 97. | Webb received legal opinions from Bogue about Western Sky and its status under the laws of | Ex. 8 (Webb) at 115:25-116-6.<br><br>**<u>OBJECTION</u> – hearsay, relevance,** |

| | | |
|---|---|---|
| | the CRST. | **and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 98. | Based on Webb's review, research, and documentation of the commercial code, personal verification from tribal council who passed the code, and advice of counsel, Webb knew that usury was not a crime under CRST law. | Ex. 8 (Webb) at 80:8-81:5 (Webb testimony that the CRST "passed the Uniform Commercial Code in order to make it coincide with South Dakota so they could actually encourage lenders to operate on the reservation.").<br><br>**<u>OBJECTION</u> – relevance, impermissible legal conclusion, impermissible lay testimony, and hearsay** |
| 99. | The language of the choice-of-law provision in the loan agreement (**"This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.")** and related provisions were provided to Webb by Bogue. | Ex. 8 (Webb) at 87:19-25;<br><br>Exs. 41-50 (Western Sky loan agreement samples) at 2.<br><br>**<u>OBJECTION</u> – FRE 1002** |
| 100. | Bogue sent a formal opinion letter to Webb on June 22, 2011, stating, "I am of the opinion . . . the Western Sky loans have been made by an entity duly and lawfully licensed by the Cheyenne River Sioux Tribe to make and issue such loans, and that such | Ex. 23 (June 22, 2011 Opinion of Counsel letter from Bogue, addressed to Webb).<br><br>**<u>OBJECTION</u> – relevance, admissibility, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under** |

| | | |
|---|---|---|
| | authorization was in full force and effect and had neither been suspended nor revoked at the time of the making of such loans and the fees and rates contained within are in compliance with any applicable requirements of the Cheyenne River Sioux Tribe.” | **Federal Rule of Civil Procedure 56(c) and (d)** |
| 101. | CashCall took comfort from Western Sky’s counsel, Bogue, who provided CashCall and its lenders opinions and certificates from Webb attesting to Western Sky’s ability to make the loans under CRST law and transfer the loans to CashCall without losing the tribal exemption. | Ex. 2 (Baren) at 149:12-150:15; 160:13-19;<br><br>Ex. 8 (Webb) at 108:6-18; 115:25-116:19;<br><br>Ex. 53 (Officer’s Certificate of Western Sky Financial, LLC, dated March 2013).<br><br>**OBJECTION – vague as to how a company “took comfort,” relevance, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 102. | On Monday, May 10, 2010, Callaway sent Baren an email stating, “I have done substantail [sic] research on the ‘state/federal law doesn’t apply to tribal TRANSACTIONS’ issue. I need to discuss with my opinion reviewer before I send. There is good law on this. I will send the draft tomorrow.” | Ex. 25 (May 9, 2010 email from Callaway to Baren).<br><br>**OBJECTION – to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |

| | | |
|---|---|---|
| 103. | On May 20, 2010, Callaway sent Baren an email stating, "The analysis flows as follows: the loan transaction is subject to sovereign immunity, and the initial choice of tribal law is enforceable. Because an assignee stands in the shoes of the assignor, CashCall takes subject to all rights that the tribe has at the time the loan is made. Assignment does not invalidate choice of law." | Ex. 26 (May 20, 2010 email from Callaway to Baren).<br><br>**<u>OBJECTION</u> – to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 104. | On September 15, 2009, Bogue emailed Baren, copying Webb, stating, "Western Sky is 100 percent owned by Butch Webb, an enrolled tribal member residing on his home reservation, located within South Dakota, non-public law 280 state. He is not an arm of the tribal government or is he an employee. Our lending model is predicated upon Public Law 280 and the Indian Commerce Clause of the US Constitution." | Ex. 29 (September 15, 2009 email from Bogue to Baren).<br><br>**<u>OBJECTION</u> – relevance, admissibility, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 105. | Bogue sent a formal opinion letter to Webb on May 14, 2010, stating, "the Western Sky loans have been made by an entity duly and lawfully licensed by the Cheyenne River Sioux Tribe to make and issue such loans[.]" | Ex. 36 (May 14, 2010 Opinion of Counsel letter from Bogue, addressed to Webb).<br><br>**<u>OBJECTION</u> – relevance, admissibility, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure** |

| | | |
|---|---|---|
| | | **56(c) and (d)** |
| 106. | Lenders to CashCall were represented by independent counsel who had the opportunity to assess the various transactions with CashCall and the opinions of Callaway or Bogue issued in connection therewith. | Ex. 7 (Baren Rule 30(b)(6)) at 33:2-15;<br><br>Ex. 2 (Baren) at 160:20-161:1; 175:5-11. (Baren testimony that he had "additional comfort" because "in each of [CashCall] financing transactions, the lenders had very sophisticated, very expensive counsel who drilled very deep into this" with Bogue, Callaway and other Katten attorneys, and "came to the conclusion that the opinion was correct, and they authorized their client to participate in this financing.").<br><br>**<u>OBJECTION</u> – relevance, admissibility, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 107. | Numerous CashCall employees other than Reddam were responsible for devising, drafting, and editing CashCall's company policies. | Ex. 1 (Meeks Rule 30(b)(6)) at 92:23-99:20 (Meeks testimony that Reddam did not have any role in approving or reviewing the employee handbook, did not review or edit the loan servicing policies and procedures, and did not review CashCall's IT policies and procedures).<br><br>Ex. 9 (Reddam) at 31:4-12 ("Q. Who was responsible for devising and implementing all major company |

| | | |
|---|---|---|
| | | policies in 2009? A. Well, whoever the relative heads of whatever department we're talking about would – would develop their policies, but they would – they would report to me, and just in the course of business sometimes, and I'm sure we would have discussed them and sometimes not."). <br><br> **UNDISPUTED** |
| 108. | Other than instructing employees to abide by applicable laws, Reddam had no personal involvement with CashCall's or Delbert's servicing of the Western Sky loans. | Ex. 28 (John Paul Reddam April 11, 2014 Affidavit) ¶ 6 ("I have no personal involvement with CashCall's or Delbert's servicing of loans, except that I instruct CashCall and Delbert managers and supervisors to ensure that all applicable laws are obeyed."). <br><br> **DISPUTED with respect to Reddam's involvement.** <br><br> Reddam's involvement with CashCall's and Delbert's servicing of the Western Sky loans included, among other things, control over the company's marketing materials and knowledge of their contents. *See SMF,*[4] *infra*, at ¶¶ 180-185; 188-192. |
| 109. | Reddam reasonably relied upon advice of counsel provided to CashCall by Katten that the | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 42); |

[4] References to "SMF" refer to the Supplemental Material Facts portion of this document, below.

| | | |
|---|---|---|
| | tribal choice-of-law provisions in the Western Sky loan agreements were legally effective. | Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 43);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 44).<br><br>**<u>DISPUTED</u> as to whether Reddam's reliance was reasonable; that Katten's opinion's covered all Subject States; and that the advice of counsel was provided by Katten to CashCall (rather than to third party financers).** *See SMF, infra,* at ¶¶ 193-221.<br><br>**<u>OBJECTION</u> – impermissible lay testimony, impermissible legal conclusions, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 110. | Callaway met with Reddam in March or April of 2013 and confirmed that she and Katten continued to believe the Western Sky Loan Program was legal. | Ex. 9 (Reddam) at 113:5-116:15.<br><br>**<u>OBJECTION</u> – hearsay, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |

| | | |
|---|---|---|
| 111. | Reddam was aware of the opinions provided by Katten, counsel for Western Sky, and counsel for third party lenders, that the tribal choice-of-law provisions in the Western Sky loan agreements were legally effective. | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;<br><br>Ex. 9 (Reddam) at 111:17-112:10;<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 42);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 43);<br><br>Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 44).<br><br>**DISPUTED to the extent that the statement suggests that the tribal choice-of- law provisions in the Western Sky loan agreements were legally effective.**<br><br>*See SMF*, *infra*, at ¶¶ 193-221.<br><br>**OBJECTION – relevance, admissibility, and to the extent Defendants use this statement to support a reliance on counsel defense, it should be excluded under Federal Rule of Civil Procedure 56(c) and (d)** |
| 112. | Reddam understood at all relevant times that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to | Ex. 37 (Reddam November 7, 2013 Declaration) at ¶ 10;<br><br>Ex. 9 (Reddam) at 124:3-12.<br><br>**DISPUTED to the extent that** |

| | | |
|---|---|---|
| | CashCall. | **Reddam could not have “understood” that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall.**<br><br>*See SMF*, *infra*, at ¶¶ 206-209; 214-216. |
| 113. | Nine of the Subject States have brought actions against certain of the Defendants relating to the Western Sky loans. | *Ark. v. Western Sky Fin., LLC*, No. 60CV-13-3893 (Ark. Super. Ct., Pulaski Cty.);<br><br>*State of Colorado ex rel. Coffman v. CashCall, Inc.*, No. 2013CV35455 (Colo. Dist. Ct.);<br><br>*Indiana v. Western Sky Fin., LLC et al.*, No. 49D01-1407-PL-024699 (Ind. Cir. Ct., Marion Cty.);<br><br>*In the Matter of CashCall, Inc.*, No. SUCV2013-01616-B (Mass. Super. Ct.);<br><br>*Minnesota ex rel. Swanson v. CashCall, Inc. et al.*, No. 27-CV-13-12740 (Minn.);<br><br>*In re CashCall, Inc.*, No. 12-308 (New Hampshire Banking Dep’t.);<br><br>*In the Matter of Western Sky Fin., LLC*, No. E16-016771 (New Jersey Dep’t. of Banking and Ins.);<br><br>*N.C. ex rel. Cooper v. Western Sky* |

| | | |
|---|---|---|
| | | *Fin., LLC et al.*, No. 13 CVS 16487; 13CV16487 (N.C. Bus. Ct.);<br><br>*Schneiderman v. Western Sky Fin., LLC*, No. 451370-2013 (N.Y. Sup. Ct.).<br><br>**UNDISPUTED** |
| 114. | When Western Sky closed, 100 employees lost their jobs, causing "a significant loss to the community." | Ex. 8 (Webb) at 122:4-25;<br><br>Ex. 22 (Lawrence Declaration) ¶ 9.<br><br>**OBJECTION – vagueness as to what "a significant loss" means, relevance** |
| 115. | The CFPB Supervision and Examination Manual, Version 2, states, "Abusive Acts or Practices[.] The Dodd-Frank Act makes it unlawful for any covered person or service provider to engage in an 'abusive act or practice.' An abusive act or practice: [m]aterially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or [t]akes unreasonable advantage of: [a] lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; [t]he inability of the consumer to protect its interests | Ex. 62 (CFPB Supervision and Examination Manual, Version 2 – October 2012) at UDAAP 9.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | in selecting or using a consumer financial product or service; or [t]he reasonable reliance by the consumer on a covered person to act in the interests of the consumer. Although abusive acts also may be unfair or deceptive, examiners should be aware that the legal standards for abusive, unfair, and deceptive each are separate." | |
| 116. | The CFPB 2013-07 Bulletin: Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts states, "3. Abusive Acts or Practices[.] The Dodd-Frank Act also prohibits conduct that constitutes an abusive act or practice. An act or practice is abusive when it: (1) Materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or (2) Takes unreasonable advantage of – (A) a consumer's lack of understanding of the material risks, costs, or conditions of the product or service; (B) a consumer's inability to protect his or her interests in selecting or using a consumer financial product or service; or (C) a consumer's reasonable reliance on a covered person to act in | Ex. 63 (CFPB Bulletin 2013-07: Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts (July 10, 2013)) at 4.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | his or her interests. It is important to note that, although abusive acts or practices may also be unfair or deceptive, each of these prohibitions are separate and distinct, and are governed by separate legal standards." | |
| 117. | Plaintiff's responses to CashCall's First Set of Interrogatories to Plaintiff state, "[s]everal states have adopted laws that render small-dollar loans void if they exceed the usury limit," and "in these states, the lender has no legal right to collect money from consumers in repayment of the loan" and the Defendants "serviced and collected payments on void or uncollectable WS Loans made to residents of the Subject States." | Ex. 10 (Plaintiff's First Supplemental Response to CashCall's First Set of Interrogatories ("Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories") at Supp. Resp. to Rog. 1 ¶¶ A, C; Supp. Resp. to Rog. 2 ¶¶ A, C; Resp. to Rog. 3 ¶¶ A, C; Supp. Resp. to Rog. 4 ¶¶ A, C.<br><br>**UNDISPUTED** |
| 118. | Plaintiff's responses to CashCall's First Set of Interrogatories state, "[n]either CashCall nor WS Funding held the requisite license when acquiring WS Loans made to consumers in" certain states, and "[n]either Western Sky, nor Defendants, had a legal right to collect money from consumers in those states in repayment of such loans," and "[c]onsumers in the Subject States who received WS | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A, E, F, G; Supp. Resp. to Rog. 2 ¶¶ E, F; Resp. to Rog. 3 ¶¶ E, F; Supp. Resp. to Rog. 4 ¶¶ E, F.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | Loans suffered and continue to suffer substantial financial harm as a result of Defendants' purchase, servicing, and collection of those loans." | |
| 119. | Plaintiff's responses to CashCall's First Set of Interrogatories state, Defendants "engaged in the full array of collection activity on WS Loans," "did not disclose to consumers in the Subject States that their loans were void or that, under applicable state laws, they were not obligated to make some or all of the payments," and only "referred consumers back to their loan agreements with Western Sky." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ K-M, Q-S; Supp. Resp. to Rog. 2 ¶¶ K-M, Q-S; Supp. Resp. to Rog. 4 ¶¶ K-M, Q-S.<br><br>**UNDISPUTED** |
| 120. | Plaintiff's responses to CashCall's First Set of Interrogatories state, "consumers are harmed by paying money they did not owe to Defendants because the loans that Defendants serviced and collected on were void under state laws or the state laws otherwise did not obligate consumers to pay" and "Defendants' competitors were obligated to abide by licensing and usury laws of the Subject States with which Defendants failed to comply." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 19.<br><br>**UNDISPUTED** |
| 121. | Plaintiff's responses to WS Funding's First Set of | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of |

| | | |
|---|---|---|
| | Interrogatories state, "a violation of usury limits or the failure to comply with licensing requirements [in the Subject States] will render a small-dollar loan void or will limit the consumer's obligation to repay the loan" and "Defendants "extract[ed] funds from consumers' bank accounts to pay obligations that under state law were void." | Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A-C; Supp. Resp. to Rog. 3 ("Set forth all material facts RELATING TO YOUR allegation that '[c]onsumers generally do not know or understand the impact that the above-cited usury and licensing laws of the Subject States have on their loans.'") ¶¶ A, B; Supp. Resp. to Rog. 5 ("Set forth all material facts RELATING TO YOUR allegation that '[c]onsumers who obtained WS Loans in the Subject States . . . typically lacked an understanding that those state laws vitiated Defendants' collection rights.'") ¶¶ A, B; Supp. Resp. to Rog. 7 ("Set forth all material facts RELATING TO YOUR allegation that the facts alleged in paragraph 65 of the FAC 'would have been material to consumers in the Subject States.'") ¶¶ A, B;<br><br>ECF No. 27 (FAC) ¶ 65 ("Defendants have failed to disclose that the loans, or some parts thereof, were void or not subject to a repayment obligation under the applicable laws of the Subject States. Those facts would have been material to consumers in the Subject States in deciding whether to pay those portions of the loans that Defendants had no legal right to collect or that the consumers had no obligation to pay.")<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| 122. | Plaintiff's responses to WS Funding's First Set of Interrogatories state, Defendants "fail[ed] to inform consumers that state law had vitiated all or part of the loans or the consumer's obligation to repay them and . . . misrepresent[ed] that the WS Loans were not subject to state law," the consumers "could not have avoided financial injury because they were unlikely to know or understand that Defendants' loans violated state usury and licensing laws," and those "violations impact both the legal status of the loan and the parties' underlying rights and obligations[.]" | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 1 ¶¶ A, B, E, F; Supp. Resp. to Rog. 3 ¶ E; Supp. Resp. to Rog. 5 ¶ E; Supp. Resp. to Rog. 7 ¶ E.<br><br>**UNDISPUTED** |
| 123. | Plaintiff's responses to WS Funding's First Set of Interrogatories state that Defendants "called, emailed, and mailed letters to consumers to demand payment," borrowers "did not understand that the loans were void or otherwise did not need to be repaid," "knowledge of whether a loan is void or not subject to repayment is material to a consumer," and "[i]f borrowers understood that state law vitiated their obligation to repay . . . , they would not have paid the money to Defendants." | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 3 ¶¶ C, E, F; Supp. Resp. to Rog. 5 ¶¶ C, E, F; Supp. Resp. to Rog. 7 ¶¶ C, E, F.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| 124. | Plaintiff's responses to WS Funding's First Set of Interrogatories state, "consumers, though acting reasonably, could not have avoided financial injury because they were unlikely to know or understand that Defendants' loans violated state-usury and licensing laws, and that such violations vitiated all or part of the loans or the consumers' obligations to repay them." | Ex. 11 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 3 ¶ E; Supp. Resp. to Rog. 5 ¶ E; Supp. Resp. to Rog. 7 ¶ E.<br><br>**UNDISPUTED** |
| 125. | Plaintiff's responses to CashCall's First Set of Interrogatories state, "[c]ompetition is harmed, and not benefited, by Defendants conduct because Defendants' competitors were obligated to abide by licensing and usury laws of the Subject States with which Defendants failed to comply." | Ex. 10 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to Rog. 19.<br><br>**UNDISPUTED** |
| 126. | Western Sky's loan application contained an optional question that asked the reason for which the loan was being sought, to which approximately 28% of applicants responded (over 100,000 responses). | Ex. 12 (Todd Zywicki Expert Report ("Zywicki Report")) ¶ 25.<br><br>**OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 127. | CashCall administered a survey (the "Survey") to borrowers of Western Sky loans to determine the reasons why they | Ex. 12 (Zywicki Report) ¶ 25.<br><br>**OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and** |

| | | |
|---|---|---|
| | sought their loan and the satisfaction rate with their loan experience from Western Sky, to which 240 borrowers responded. | **improper expert testimony under *Daubert*.** |
| 128. | According to data obtained at the time of the application, the most commonly stated reason provided by those seeking a loan was for an "Emergency" (41.85%). The second most commonly stated reason for a loan was "Debt Consolidation" (39.03%). And 15.02% of customers stated that they needed the money for a "One-Time Expenditure." | Ex. 12 (Zywicki Report) ¶ 26;<br><br>Ex. 8 (Webb) at 100:9-20.<br><br>**<u>DISPUTED</u> that the testimony from Webb cited stands for the proposition offered.** (Webb testified about the most common reasons for applications getting denied, and stated (at 100:17-20) that the most common reason for a person to get a payday or installment loan is 'convenience.')<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 129. | According to the Survey, the most common reason that borrowers provided for the "purpose" of borrowing the money was to "Deal with a family emergency" (41.3%). The second most-stated purpose for borrowing the money was to "Pay off other debt" (39.2%). | Ex. 12 (Zywicki Report) ¶ 27.<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 130. | The Survey results also yielded 5.8% of borrowers stating that the purpose of the loan was to "pay my rent/mortgage." Only | Ex. 12 (Zywicki Report) ¶ 28.<br><br>**<u>OBJECTION</u> – witness lacks** |

| | | |
|---|---|---|
| | 6.3% of borrowers stated that the purpose of the loan was for "Extra spending money." An additional 7.5% stated that the purpose was "other." | **personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 131. | Over 85% of respondents to either the Survey or application question stated that the purpose of seeking the loan was to deal with an emergency, to consolidate other debt, or to pay rent or mortgage. | Ex. 12 (Zywicki Report) ¶ 29.<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 132. | The APR of Western Sky loans ranged from 89.69% for an amount financed of $9,925 (plus $75 prepaid finance charge/origination fee) with a maturity of 84 months to 318.52% for an amount financed of $400 (plus $300 prepaid finance charge/origination fee) with a maturity period of 6 months. | Ex. 13 (Delbert Meeks Deposition ("Meeks") at 39:2-40:1 (Meeks testimony that there was no prepayment penalty on any Western Sky loan products);<br><br>Exs. 41-50 (Western Sky loan agreement samples) at 2 (demonstrating all iterations of Western Sky loan terms).<br><br>**<u>OBJECTION</u> – improper expert testimony under *Daubert*.** |
| 133. | Most of the form loan agreements provide an average amount financed of approximately $2,525 at an average APR of approximately 138% with a prepaid charge/origination fee of $75 with an average maturity length of 36 months. | Ex. 12 (Zywicki Report) ¶ 33.<br><br>**<u>OBJECTION</u> – improper expert testimony under *Daubert*.** |
| 134. | The mean Western Sky loan | Ex. 12 (Zywicki Report) ¶ 34. |

| | | |
|---|---|---|
| | amount was $2,305 ($2,047 in proceeds) and the median loan amount was $2,600 ($2,525 in proceeds). | **<u>OBJECTION</u> – improper expert testimony under *Daubert*.** |
| 135. | The mean credit score for loans originated by Western Sky was 600 and the median credit score was 575. | Ex. 12 (Zywicki Report) ¶ 37.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 136. | The average credit score for installment loan borrowers is substantially higher than the credit score for a typical payday loan borrower. | Ex. 12 (Zywicki Report) ¶ 38.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 137. | Western Sky's customer base seems to be overwhelmingly subprime or deep subprime in credit rating. | Ex. 12 (Zywicki Report) ¶ 39.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 138. | According to CashCall data, the average income of Western Sky's customers was $3,859 per month ($46,308 per year). | Ex. 12 (Zywicki Report) ¶ 40.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 139. | The average income for payday loan customers tends to be | Ex. 12 (Zywicki Report) ¶ 41. |

| | | |
|---|---|---|
| | substantially lower than for installment loan borrowers. This relationship between users of installment loans and payday loans appears to hold for online lenders as well. | **OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 140. | In a study by Michael Flores of online lenders, Flores found that the average income for installment loan borrowers was $40,263, whereas the average income for payday loan borrowers was $30,025. | Ex. 12 (Zywicki Report) ¶ 41. **OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 141. | There is a high delinquency rate for installment loans. | Ex. 12 (Zywicki Report) ¶ 42. **OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 142. | Western Sky's approval rate for Western Sky loans was 10%, approximately 90% of applications were rejected. | Ex. 12 (Zywicki Report) ¶ 44. **OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 143. | Online lenders lack many of the tools that traditional lenders have traditionally relied upon to increase performance on their loans. | Ex. 12 (Zywicki Report) ¶ 45. **OBJECTION – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |

| | | |
|---|---|---|
| 144. | The charge-off rate on Western Sky loans serviced by CashCall was 45.8%. | Ex. 12 (Zywicki Report) ¶ 46.<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert.*** |
| 145. | Western Sky's Underwriting Guidelines provided that borrowers with lower credit scores could only be approved for loans of smaller principal amounts and for shorter loan durations at a higher APR and with higher origination fees. For example, in order to be approved for a personal loan of $5,075 for a term of 84 months at an APR of 115%, the borrower was required to have a FICO score of 600+ and verifiable monthly income of $4,000 and to not be self-employed. To qualify for a loan of $1,500 for 24 months with an APR of 149%, by contrast, the borrower only needed a FICO score of 500+ with $1,800 monthly income. Smaller loans charged a higher APR and had lower income and credit score requirements and required less verification than larger loans. | Ex. 12 (Western Sky Underwriting Guidelines).<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert.*** |

| | | |
|---|---|---|
| 146. | Empirical evidence has found that those consumer borrowers that are "rationed"—i.e., those borrowers whose demand for credit exceeds the amount of credit that they can easily obtain—generally find the size of the monthly payment to be especially important relative to the APR, as one of their highest considerations in taking a loan is how the payment obligations fit into their monthly budgets. | Ex. 12 (Zywicki Report) ¶ 62.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 147. | Although non-rationed borrowers are largely responsive to changes in the interest rate on the loan, rationed borrowers are also responsive to the size of the monthly payments. | Ex. 12 (Zywicki Report) ¶ 63.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 148. | Consumers who use unsecured personal installment loans are typically classified as "rationed" borrowers because of their restricted access to mainstream credit and their subprime credit status. | Ex. 12 (Zywicki Report) ¶ 64.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 149. | Western Sky's customer base is consistent with the general understanding of installment loan customers as being subprime in nature. This suggests that many of Western Sky's customers found the | Ex. 12 (Zywicki Report) ¶ 64.<br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |

| | | |
|---|---|---|
| | APR on their loans to be of limited usefulness in appraising the cost of their loans. | |
| 150. | The terms and conditions of the Western Sky loans distinguish them from loans that have been deemed to be "predatory" or "abusive" to consumers, such as payday loans. | Ex. 8 (Webb) at 124:4-9;<br><br>Ex. 2 (Baren) 43:1-47:9.<br><br>**<u>DISPUTED</u> to the extent that it is unclear what Defendants mean by "loans that have been deemed to be 'predatory' or 'abusive' to consumers, such as payday loans."**<br><br>**<u>OBJECTION</u> – vagueness, relevance, and improper legal conclusion** |
| 151. | Products such as payday loans often have an unreasonably short maturity period in light of the amount financed, such as two weeks, require a balloon payment of the entire balance at the end of that period, and are often issued with no significant underwriting standards or assessment of the borrower's ability to repay the amount financed. | Ex. 7 (Baren Rule 30(b)(6)) at 43:1-47:9;<br><br>Ex. 8 (Webb) at 39:5-24;<br><br>Ex. 12 (Zywicki Report) ¶ 78.<br><br>**<u>OBJECTION</u> – witness lacks personal knowledge of the facts, FRE 702 and 703, relevance, and improper expert testimony under *Daubert*.** |
| 152. | The CFPB has expressed concern that payday loan borrowers can enter into a cycle of debt that can be harmful to many consumers. | Ex. 12 (Zywicki Report) ¶ 79.<br><br>**<u>OBJECTION</u> – relevance, and improper expert testimony under *Daubert*.** |

| | | |
|---|---|---|
| 153. | In the CFPB's White Paper on payday loans and deposit advance products, it identified several features of payday loans that it found problematic. In particular, it identified the concern that payday loans can result in a cycle of debt to borrowers and that payday loan customers renew their loans repeatedly at high cost. | Ex. 12 (Zywicki Report) ¶ 80.<br><br>**<u>OBJECTION</u> – relevance, and improper expert testimony under *Daubert*.** |
| 154. | The installment loans at issue in this case have none of the characteristics that the CFPB has found problematic with respect to payday loans. | Ex. 12 (Zywicki Report) ¶ 82;<br><br>Ex. 8 (Webb) at 124:4-9.<br><br>**<u>DISPUTED</u> that the cited testimony from Webb supports the proposition offered (Webb states that the Western Sky loans were "installment loans").**<br><br>**<u>OBJECTION</u> – improper legal conclusion, relevance, and improper expert testimony under *Daubert*.** |
| 155. | The Western Sky loans at issue are fixed-term loans with fixed maturities of no less than six months. | Exs. 41-50 (Western Sky loan agreement samples) at 1;<br><br>Ex. 13 (Meeks) at 39:2-40:1.<br><br>**<u>UNDISPUTED</u>** |
| 156. | The Western Sky loans were extended in compliance with Underwriting Guidelines that take account of the consumer's credit score, monthly income, monthly residual income, and | Ex. 21 (Western Sky Underwriting Guidelines).<br><br>**<u>UNDISPUTED</u>** |

| | | |
|---|---|---|
| | employment verification. | |
| 157. | The Western Sky loans are self-amortizing and do not have a balloon payment. | Exs. 41-50 (Western Sky loan agreement samples) at 1-2.<br><br>**UNDISPUTED** |
| 158. | The Western Sky loans contain no prepayment penalty. | Ex. 13 (Meeks) at 39:2-40:1;<br><br>Exs. 41-50 (Western Sky loan agreement samples) at 2 (every iteration of the loan agreement states, "If you pay off this loan early, you will not have to pay any penalty.").<br><br>**UNDISPUTED** |
| 159. | From February 2010 to July 2010, and October 2010 to August 2013, the following provision in the Western Sky agreements appeared in bold and in capital letters above the signature line: "THIS LOAN CARRIES A VERY HIGH INTEREST RATE. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE. EVEN THOUGH THE TERM OF THE LOAN IS [term of loan] MONTHS, WE STRONGLY ENCOURAGE YOU TO PAY OFF THE LOAN AS SOON AS POSSIBLE. YOU HAVE THE RIGHT TO PAY OFF ALL OR ANY PORTION OF THE LOAN AT ANY TIME | Exs. 41, 43-49 (Western Sky loan agreement samples) at 5.<br><br>**UNDISPUTED** |

| | | |
|---|---|---|
| | WITHOUT INCURRING ANY PENALTY. YOU WILL HOWEVER, BE REQUIRED TO PAY ANY AND ALL INTEREST PAY ANY AND ALL INTEREST THAT HAS ACCRUED FROM THE FUNDING DATE UNTIL THE PAYOFF DATE.” | |
| 160. | From July 2010 to October 2010, the following provision in the Western Sky agreements appeared in bold and in capital letters above the signature line: “PLEASE NOTE: THIS LOAN CARRIES A VERY HIGH APR. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE.” | Ex. 42 (Western Sky loan agreement sample) at 5.<br><br>**<u>UNDISPUTED</u>** |
| 161. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III, has stated: “In my opinion, the Bureau’s action in this case is an unprecedented and inappropriate exercise of regulatory power. It does not comport with the principles that have long defined federal enforcement of the statutory prohibition on unfair or deceptive acts or practices. A company that acts in good faith on the basis of a reasonable legal argument in an | Ex. 15 (Dr. Howard J. Beales III Expert Report (“Beales Report”)) ¶ 9.<br><br>**<u>OBJECTION</u> – improper expert testimony under *Daubert*, and expert report is inadmissible hearsay under FRE 801 and 802.** |

| | | |
|---|---|---|
| | area where the law is unclear has not committed an unfair or deceptive act or practice, even if a court later determines that it has violated state laws." | |
| 162. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III has stated: "Here, Western Sky and CashCall appear to have a perfectly reasonable and good-faith legal argument that the governing law is the law of the Cheyenne River Sioux Tribe. The Complaint does not allege that Western Sky or CashCall ever had any reason to believe this conclusion was incorrect. Like any other legal provision, the respondent's legal position may or may not prevail at the end of the day. But it is not an "unfair" practice to assert and attempt to enforce a reasonable legal proposition through litigation or otherwise, any more than it was 'unfair' for First National Bank of Omaha to defend its analogous argument to a successful conclusion before the Supreme Court." | Ex. 15 (Beales Report) ¶ 21.<br><br>**OBJECTION – improper expert testimony under *Daubert*, and expert report is inadmissible hearsay under FRE 801 and 802.** |
| 163. | Former Director of the Bureau of Consumer Protection at the Federal Trade Commission Dr. Howard J. Beales III has stated: "In summary, acting in | Ex. 15 (Beales Report) ¶ 25.<br><br>**OBJECTION – improper expert testimony under *Daubert*, and expert report is inadmissible** |

| | | |
|---|---|---|
| | good faith on the basis of a reasonable legal argument in an area where the law is unclear does not constitute conduct that has been or should be considered an unfair or deceptive act or practice. The Bureau's theory of liability in this case is unprecedented and inconsistent with the principles that have defined federal regulatory enforcement in this area." | **hearsay under FRE 801 and 802.** |
| 164. | From March 3, 2011 to August 18, 2014, CashCall held an Alabama Consumer Lender License. | Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5.<br><br>**UNDISPUTED** |
| 165. | From July 23, 2003 to the present, CashCall has held a New Mexico Small Loan License. | Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5.<br><br>**UNDISPUTED** |
| **Plaintiff's Additional Undisputed Facts in Support of its Opposition to Defendants' Motion for Summary Judgment** | | |
| 166. | Western Sky loans were made with CashCall's money. | Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23;<br><br>Ex. 19 (Assignment Agreement) ¶ 9;<br><br>Ex. 509 (Webb Dep.) 52:1-17. |
| 167. | Western Sky loans were made with the intention that they would be purchased by CashCall three days | Ex. 511 (Meeks 30(b)(6) Dep.) 55:22-56:11;<br><br>Ex. 509 (Webb Dep.) 46:3-17 |

| | | |
|---|---|---|
| | after they were funded. | Ex. 19 (Assignment Agreement) |
| 168. | Western Sky loans were made with the commitment that they would be purchased by CashCall three days after they were funded. | Ex. 19 (Assignment Agreement) |
| 169. | Western Sky is a South Dakota limited liability company whose owner is a member of the CRST. | Ex. 509 (Webb Dep.) 96:20-22; Answer ¶ 19 |
| 170. | In signing Western Sky loan agreements, borrowers authorized Western Sky (in fact, CashCall) to withdraw the borrower's loan payments by electronic funds transfer ("EFT") from the borrower's bank account. | Exs. 41-50 (Western Sky loan agreement samples) at 5. |
| 171. | The typical governing law provision in the Western Sky loan agreements is as follows:<br>"This agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America." | Exs. 41-50 (Western Sky loan agreement samples) at 3. |
| 172. | The loan agreement contains an earlier preamble statement that no "state or federal law or regulation shall apply to the" loan agreement. | Exs. 41-50 (Western Sky loan agreement samples) at 1. |

| | | |
|---|---|---|
| 173. | Western Sky is a South Dakota resident company. | Answer ¶ 19 |
| 174. | "Western Sky Funding" (presumably referring to Western Sky Financial) is shown on the face of the loan agreement as having a South Dakota address. | Exs. 41-50 (Western Sky loan agreement samples) at 1. |
| 175. | All Defendants are state entities. | Answer ¶¶ 5-8. |
| 176. | As CashCall's general counsel admitted, consumers were likely to be aware that CashCall was somehow involved in the transaction, even before it purchased the loans from Western Sky. | Ex. 508 (Baren Dep.) at 111:7-16. |
| 177. | Defendant J. Paul Reddam is the founder, CEO, sole owner and president of CashCall. | Answer ¶¶ 8, 51; Ex. 508 (Baren Decl.) ¶ 3. |
| 178. | Reddam established Delbert to service debt that CashCall deemed in default, or "charged-off," and to provide collection services for other, unrelated, clients. | Ex. 510 (Meeks Dep.) 71:1-12. |
| 179. | Reddam had the authority to control all of CashCall's acts, and to decide when and whether to transfer delinquent CashCall loans to Delbert, the collection company that Reddam also founded. | Ex. 510 (Meeks Dep.) 21:19-25; 41:15-16; 46:11-15; 74:19-75:12; Ex. 522 (Reddam CT Statement). |
| 180. | Reddam had the authority to approve CashCall's agreement with Western Sky, and participated in | Ex. 522 (Reddam CT Statement). |

| | | |
|---|---|---|
| | the transaction by signing the two governing agreements with Western Sky on behalf of CashCall and WS Funding. | |
| 181. | Reddam claimed, in a sworn filing under penalty of perjury, that all CashCall managers reported directly to him, and that he had authority over CashCall's day-to-day activities. | Ex. 522 (Reddam CT Statement). |
| 182. | In that same filing, Reddam admitted to responsibility "for devising and implementing all major company policies, including its various loan programs and interest rates." | Ex. 522 (Reddam CT Statement). |
| 183. | Reddam claimed similar authority over Delbert in another filing. | Ex. 523 (Begin Aff.), Attach. G, p. 3 |
| 184. | Reddam claimed to give significant authority to those who reported to him. | Ex. 512 (Reddam Dep.) 27:17-22 (listing the department heads who reported directly to Reddam); 66:14-67:5 (Baren had authority to create subsidiaries of CashCall) |
| 185. | Reddam engaged with the "executive team" regularly, and spoke daily to CFO Meeks and general counsel Baren. | Ex. 512 (Reddam Dep.) 27:17-22 (listing the department heads who reported directly to Reddam); Ex. 510 (Meeks Dep.) 69:8-21; Ex. 508 (Baren Dep.) 146:1-10. |
| 186. | Reddam made a personal loan to CashCall of about $21 million. | Ex. 512 (Reddam Dep.) 58:24-59:3. |
| 187. | He personally guaranteed CashCall's loans from hedge funds, which CashCall used to finance the | Ex. 512 (Reddam Dep.) 136:24-137:7; 138:17-22; Ex. 510 (Meeks Dep.) 106:19-108:25. |

| | | |
|---|---|---|
| | Western Sky loans and its other consumer loans. | |
| 188. | Reddam hired an advertising agency that created advertising campaigns for CashCall, and also the Western Sky loans. | Ex. 512 (Reddam Dep.) 33:20-34:19, 88:20-25; Ex. 509 (Webb Dep.) 60:4-6. |
| 189. | Reddam was a member of CashCall's executive team, which was involved in negotiating the agreement with Western Sky. | Ex. 508 (Baren Dep.) 142:3-12. |
| 190. | Reddam approved CashCall's purchase of the Western Sky loans. | Ex. 512 (Reddam Dep.) 82:20-83:2. |
| 191. | Reddam discussed the terms of the assignment agreement that governed Western Sky's sale of the Western Sky loans with Baren. | Ex. 512 (Reddam Dep.) 70:4-7. |
| 192. | Reddam had the authority to approve agreements that CashCall or its subsidiaries entered into with other companies, including WS Funding's purchase of the Western Sky loans. | Ex. 512 (Reddam Dep.) 76:15-77:2. |
| 193. | Reddam made the decision to wind down the Western Sky loan program in the face of "regulatory problems." | Ex. 512 (Reddam Dep.) 115:12-21; 116:2-15. |
| 194. | Reddam discussed the status of CashCall's litigation over the Western Sky loans with Baren frequently. | Ex. 512 (Reddam Dep.) 128:19-129:6. |
| 195. | Reddam knew that CashCall, rather than Western Sky, was the true | Ex. 512 (Reddam Dep.) 55:14-22; 65:11-22; 67:6-12; 67:18-68:12; |

| | | |
|---|---|---|
| | lender behind the Western Sky loans, because he knew how the transaction between CashCall and Western Sky was created and structured. | 75:1-8. |
| 196. | Reddam knew that despite what the Western Sky loan agreement said, all loans would be serviced by CashCall. | Ex. 512 (Reddam Dep.) 50:9-51:2 |
| 197. | Reddam avoided lending to consumers in West Virginia, for fear of regulators there, and he testified that in his view, CashCall's biggest business risk was that it would be shut down by state or federal regulators. | Ex. 512 (Reddam Dep.) 58:8-10; 123:13-124:2. |
| 198. | For years, Reddam was named personally, along with other Defendants, in regulatory and legal actions in which the Subject Loans were deemed void by various government authorities. | Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827006-CC017827124. |
| 199. | CashCall detailed these various actions in more than one-hundred pages of its own disclosure statement. | Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827006-CC017827124. |
| 200. | In June 2013, New Hampshire issued to CashCall, WS Funding, and Reddam an Order to Cease and Desist, requiring them to, *inter alia*, disgorge finance charges and pay restitution, in part because Subject Loans to New Hampshire residents were "void" and Defendants had no right to collect | Ex. 515 (State of New Hampshire Banking Department Order to Cease and Desist issued to CashCall, Reddam, and WS Funding) CC-000159898-CC-000159907. |

| | | |
|---|---|---|
| | any principal or interest on them. | |
| 201. | Even with these repeated warnings to cease collection of void loans, Reddam and the other Defendants continued to attempt collection. | Ex. 516 (April 13, 2015 letter from Delbert Service Corp. to the Consumer Financial Protection Bureau regarding consumer complaint) ("…on November 19, 2014, the owner of the loan has transferred the servicing of the loan to CashCall") CC-008084169- CC-008084174. |
| 202. | The third-party recipients of the formal opinion letters were investors in CashCall's tribal loans. | Exs. 17, 24, 34, 39. |
| 203. | Each of the third-party opinions explicitly precludes reliance upon it "for any purpose whatsoever" by anyone other than the addressee. | Exs. 17, 24, 34, 39. |
| 204. | CashCall was even involved in massaging the opinions to satisfy lenders' counsel. | Ex. 513 (July 30, 2012 email chain from Claudia Callaway to Mark Conley copying, among others, Dan Baren) CC-017866791. |
| 205. | The discussions relating to this massaging included attempts to delete the warning that the issues were "not free from doubt" and add a discussion of the law in each state in which Defendants did business. These attempts were unsuccessful. | Ex. 513 (July 30, 2012 email chain from Claudia Callaway to Mark Conley copying, among others, Dan Baren) CC-017866791. |
| 206. | The Katten opinion letters and those prepared by Bogue and Bogue state that the covered issues are "not free from doubt and significant litigation risk exists." | Exs. 17, 23, 24, 34, 36, 39. |

| | | |
|---|---|---|
| 207. | Even the equivocal opinion expressed in the opinion letters was based in part on assumptions Baren deemed "entirely inaccurate." | Ex. 508 (Baren Dep.) 164:18-23 (referring to the following incorrect assumptions: "Western Sky was organized by the CRST to engage in the business of lending for the benefit of the CRST. One or more CRST tribal officers is an owner or director of Western Sky, and the CRST has the ability to remove directors.") |
| 208. | The opening paragraph of the opinion makes a similar misstatement, reciting that Western Sky is "a tribal company incorporated under the laws of the Cheyenne River Sioux Nation," while it is actually a South Dakota LLC. | *See, e.g.* Ex. 17 at 1; Ex. 509 (Webb Dep.) 96:20-22; Answer ¶ 19 (Western Sky is a South Dakota LLC). |
| 209. | Defendants' concern about the fact that Western Sky was a South Dakota LLC was the topic of an earlier discussion between Baren and counsel about the resulting impact on counsel's advice and ability to respond to regulators, and the concern among potential investors that Western Sky would not be seen as an "arm-of-the-tribe." | Ex. 517 (March 2010 email chain among Claudia Callaway, Dan Baren, and Cheryl Bogue) CC-017867031-CC-017867032. |
| 210. | Katten's July 1, 2011, opinion letter to BasePoint Specialty Finance contains another incorrect assumption. Katten assumed, "without any independent investigation or analysis," that the Subject Loans were lawful under | Ex. 34 (July 1, 2011, Katten letter) at 2. |

| | | |
|---|---|---|
| | CRST law. | |
| 211. | The loans were not lawful under CRST law. To the contrary, they were criminal under CRST law. | Law & Order Code, CRST, 1978 ("CRST Criminal Code," relevant portions attached to Request for Judicial Notice).[5] |
| 212. | The CRST Criminal Code caps the allowable interest rate at twenty-four percent on loans less than $100 or under one year in duration, and eighteen percent on loans greater than that amount or duration. | *See* CRST Criminal Code § 3-4-52, Criminal Usury. |
| 213. | Each Subject Loan had an interest rate exceeding eighty percent. | Ex. 506 (CashCall RFA 13, 16, 19, 21, 23, 25, 36, 39, 42). |
| 214. | The legal opinions to third party investors contained the disclaimer in the opinions that "[a]ny material change in any fact, representation or assumption from those relied upon herein also may affect our analysis and the opinions expressed herein." | *See, e.g.*, Ex. 17 p. 16; Exs. 24, 34, 39. |
| 215. | Attorney Cheryl Bogue asked in an email, "even if state court jurisdiction is found, what is the remedy and how can it be | Ex. 518 (October 2009 email chain among Claudia Callaway, Dan Baren, and Cheryl Bogue) CC-017867101-CC-017867102. |

[5] The cited portion of the Law & Order Code of the Cheyenne River Sioux Tribe, 1978 Revision, is self-authenticating or subject to judicial notice. *See* Fed. R. Evid. 702 (3), (5); *Thatcher v. OakBend Med. Ctr.*, 2016 WL 51244, at *4 (S.D. Tex. Jan. 5, 2016); *cf. Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("[A]t the summary- judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

| | | |
|---|---|---|
| | enforced?” | |
| 216. | In response, Katten further revealed the sham as follows: “For belts and suspenders, Butch’s company should be a tribal corp so that we can say it’s an arm of the tribe.” | Ex. 518 (October 2009 email chain among Claudia Callaway, Dan Baren, and Cheryl Bogue) CC-017867101-CC-017867102. |
| 217. | Webb’s company never was a tribal corporation. | Ex. 509 (Webb Dep.) 96:20-22; Answer ¶ 19. |
| 218. | To date, Defendants have withheld relevant communications with counsel. | Ex. 519 (April 2012 email chain, with redactions in content of emails between Katten partners and Dan Baren) CC-017834241-CC-017834245. |
| 219. | Katten’s April 12, 2010, formal opinion letter to Centurion Credit Resources, LLC, did not address the enforceability of the Western Sky choice of law provision as it relates to Massachusetts, Minnesota, or New Hampshire. | Ex. 17 (April 12, 2010 Opinion of Counsel letter from Katten, addressed to Centurion Credit Resources, LLC) at 1, 8-14. |
| 220. | Katten’s February 26, 2010, formal opinion letter to Baren did not address the enforceability of the Western Sky choice of law provision as it relates to Massachusetts, Minnesota, New Hampshire, or New Jersey. | Ex. 32 (draft February 26, 2010 Opinion of Counsel letter from Katten, addressed to Baren) at 1, 8. |
| 221. | Katten’s July 1, 2011, formal opinion letter to BasePoint Specialty Finance, LLC, did not address the enforceability of the Western Sky choice of law provision as it relates to Colorado, Massachusetts, Minnesota, or New Hampshire. | Ex. 34 (July 1, 2011 Opinion of Counsel letter from Katten, addressed to BasePoint Specialty Finance, LLC) at 1. |

| | | |
|---|---|---|
| 222. | Defendants have withheld information directly relevant to the opinion letters and other information of counsel upon which they claim to have relied. | Reiferson Decl. ¶¶ 9, 13, 14. |
| 223. | Defendants have also asserted privilege as to documents requested by the Bureau through a subpoena to the law firm Katten Muchin Rosenman. | Reiferson Decl. ¶ 10, 17. |
| 224. | To date, Katten has not produced a single document in response to the subpoena. | Reiferson Decl. ¶ 19. |
| 225. | Defendants have asked Katten to assert privilege in response to the Bureau's subpoena to Katten, including as to the details of any legal engagement, but has not yet provided even a categorical privilege log or identified documents falling within the scope of the privilege assertion or waiver. | Reiferson Decl. ¶ 17, 18. |

Dated: July 11, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
E-mail: owen.martikan@cfpb.gov
Christina S. Coll (CA Bar #250712)
christina.coll@cfpb.gov
Leanne E. Hartmann (CA Bar #264787)
leanne.hartmann@cfpb.gov
Barry E. Reiferson (NY Bar #4343893)
barry.reiferson@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW

Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau