OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN SUPPORTING OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN**

32:4-18

4 **Q. And what do you mean by -- when you say**
5 **"at that point"?**
6 A. Subsequent to 2009, we had one state,
7 state of West Virginia challenge the bank model,
8 but that didn't really occur until 2011, 2012. And
9 that's the case I told you that I testified in
10 before. But up until that point, the bank model
11 for us had been a smashing success, and
12 Ms. Callaway was the lawyer who brought us that,
13 introduced us to the banks, designed the bank
14 model, and executed on it. So I trusted her. I
15 believed in her. And when she told me that -- that
16 she recommended doing a tribal model, I -- I
17 believed her. I -- I thought that was the right
18 call.

33:14-34:13

14 **Q. And why was that change made in November**
15 **of 2008?**
16 A. If you recall, we had that financial
17 crisis in the 2007, 2008 period. And the banks
18 were coming under increasing scrutiny from the
19 regulators for safety and soundness concerns. And
20 both banks told us that their regulator, the FDIC,
21 was putting a lot of pressure on them for them to

22 get out of the marketing partnerships, which is
23 what these were called. They were very common at
24 that period.
25 One bank, the -- a bank in South Dakota,
1 told us that they had elected to end all of their
2 relationships. And the other bank was the First
3 Bank of Delaware. They had an action brought
4 against them by the FDIC, I think, with respect to
5 their relationship with CompuCredit. It had
6 nothing to do with us.
7 And as part of the settlement in that
8 matter, I believe they agreed that they would exit
9 all of their -- their marketing partnerships at that
10 point. And so they came out to us, visited us, I
11 just want to say the summer of 2008, and begrudgingly
12 told us they would have to wind down the program and
13 stop selling loans to us by the end of November.

48:2-49:13
2 **Q. Did you consider having CashCall get**
3 **additional -- get licenses in additional states as**
4 **a means to maintain geographic diversity of the**
5 **servicing portfolio?**
6 A. Yes, we considered it.
7 **Q. And was it successful?**
8 A. Well, we didn't pursue it.
9 **Q. And why didn't you pursue it?**

A. Because in those states, in many of those states, the usury laws would not permit you to make or service loans at the rates that we deemed necessary to make a profit or to not go out of business.

**Q. And how did -- did then using the tribal lending model allow you to make loan -- to purchase loans that wouldn't make business sense for CashCall to make itself?**

A. I'm not sure I understand that question.

**Q. Sure. So I was asking you why CashCall itself didn't attempt to get more licenses to make loans, and you said that usury laws would not permit you to make loans at a high enough interest rate to make business sense for CashCall; is that right?**

**49**

A. Correct.

**Q. Okay. And how did using the tribal lending model differ from that situation?**

A. Well, as it was explained to me by Ms. Callaway and the other lawyers, first at Manatt and then at Katten, it operated the same way as the bank model. Meaning the bank or the tribal lender could make loans that were exempt from state usury requirements and could transfer those loans to

10 CashCall, assign them to CashCall, and CashCall
11 could then service the loans at these higher
12 interest rates that CashCall itself could not make
13 those loans.

52:21-53:5
21 **Q. And when you say "funding of the loans,"**
22 **what specifically do you mean?**
23 A. Well, the last act of the transaction is
24 the lender -- and I'm -- I'm simplifying this --
25 presses a button and the loan funds go from the
53
1 lenders' account to the borrower's account. All of
2 the loans in this program, as well as in the
3 CashCall state-licensed program were all done
4 electronically, and the loan proceeds delivered via
5 wire.

53:20-55:2
20 **Q. -- with Mr. Webb. When you ultimately did**
21 **go into business with Mr. Webb, how were those**
22 **loans funded?**
23 A. Sure. Over the next 10 months, what --
24 what was -- eventually Western Sky was able to open
25 a bank account with Wells Fargo. And the loan
54
1 funding process was through that Wells Fargo

2 account that was owned and operated by Western Sky.
3 There were initially two types of employees. There
4 were more than two, but for purposes of this --
5 this question, there's two types of employees on
6 the reservation employed by Western Sky. There is
7 the underwriters and there's the funders. The
8 process, at that point, was the underwriter would
9 review all of the loans that were set to fund on
10 that particular day and provide a final approval
11 for those loans. And that would entail moving the
12 loans from what was called an underwriting queue
13 into the funding account, funding queue.
14 And then subsequent to that, another
15 Western Sky employee who was the funder, would go
16 through and perform a final audit and, like I said,
17 press the button to move the -- move the loan from a
18 -- the funding queue to a funded queue, which would
19 instruct Wells Fargo Bank to wire $2600 to this
20 person's bank account.
21 They were all done in one fell swoop at --
22 I think it was 1:00 or 1:30 p.m. Mountain Time. But
23 they got loaded from underwriting into funding and
24 then someone on the reservation had the authority to
25 press the button to fund those loans. I'm
55
1 simplifying it, but that was my understanding of how
2 it got done.

55:25-56:15

25 **Q. What did the employment verification**

56

1 **entail?**

2 A. If an applicant said he worked at the

3 CFPB, we would call up your human resources

4 department and ask: Does this person really work

5 at the CFPB? It's your typical employment

6 verification for a loan.

7 **Q. When you say "we," who -- who would**

8 **actually do that employment verification?**

9 A. There were a group of people in CashCall's

10 offices. At least at the start, all of that

11 happened in CashCall's offices. By 2013, some of

12 that function could have been happening on the

13 reservation. I'm not certain. But throughout most

14 of the program that happened by a CashCall employee

15 at CashCall's offices.

57:12-58:2

12 **Q. You mentioned that a fraud-check would**

13 **also be performed?**

14 A. Correct.

15 **Q. And who would perform a fraud check?**

16 A. Several people could have -- do that. I

17 know there were -- at times that the underwriters

18 on the reservation were -- were performing that.
19 There were also employees at CashCall whose job it
20 was to perform that function as well. The loan
21 agent himself could be -- or herself could be
22 involved in that as well.
23 **Q. Who is a loan agent?**
24 A. The loan agent is the person who takes the
25 phone call, the initial phone call from the
58
1 borrower and takes the information from the
2 borrower.

59:8-16
8 **Q. Can you tell me what that CashCall review**
9 **would -- would be?**
10 A. Sure. Once all of the documentation on a
11 loan was obtained, and that's usually by the loan
12 agent, the loan would be passed off to someone at
13 CashCall who would review the loan to see if it met
14 program guidelines to confirm that it's a loan that
15 we would be willing to purchase in the event it got
16 funded.

59:17-24
17 **Q. Going back to the loan agents, were loan**
18 **agents CashCall employees?**
19 A. It varied over time. At the beginning of

20 the program, all of the loan agents were CashCall
21 employees at CashCall. By the end of the program
22 in the summer of 2013, there were 75 or so loan
23 agents who were on the reservation as Western Sky
24 employees, and that number was growing.

62:17-63:10
17 **Q. Okay. What input did you give as far as**
16 **the products that were to be offered?**
17 A. I'm not sure I gave input. I communicated
18 with Mr. Webb, so I would take input from the
19 CashCall team, and I was the liaison to Mr. Webb.
20 So I would -- I would meet with our people and say,
21 "Well, this is what we think the program should
22 look like," and I would have conversations with him
23 where he would give me his input. And at the end
24 of the day, you come up with an agreement.
25 **Q. And what input do you recall giving at**
**63**
1 **that time?**
2 A. I remember suggesting to Mr. Webb that we
3 should use almost the same loans that the bank
4 program used because we had learned over three
5 years that these were -- it was a successful
6 program, and the default rates were not
7 significantly high to where you were going to lose
8 money. And Mr. Webb agreed with that and offered

9 his own thoughts and -- and comments on -- on our
10 proposal.

70:2-21

2 **Q. And logistically speaking, do you mean an**
3 **individual sitting on the reservation would run the**
4 **credit of the consumer?**
5 A. No, it was done in an automated fashion.
6 It was the -- there were two ways an applicant
7 could submit an application. The first would be to
8 call up and give their information to a loan agent.
9 Some of whom were at CashCall -- most of whom were
10 at CashCall, some of whom were on the reservation.
11 And then at the bottom of that, they would
12 read, do you authorize me to run credit on behalf
13 of Western Sky? And if they said yes, of course
14 this is all recorded, then the loan agent,
15 regardless of whether they were the CashCall loan
16 agent or the Western Sky loan agent, would hit a
17 button, which would run the automated credit. It
18 was a Western Sky credit -- credit report, meaning
19 if the -- if you were to apply, and the next day
20 you looked at your credit report, it would show
21 that Western Sky ran the credit, not CashCall.

111:7-16

7 **Q. I think what you told me clarifies what I**

8 **thought you were saying before. So it sounded like**
9 **that there -- it was possible for consumers not to**
10 **know if CashCall's involvement until CashCall**
11 **bought the loan. But am I understanding you**
12 **correctly that that would be a very rare**
13 **occurrence, from your understanding?**
14 A. High -- very highly unlikely. And, again,
15 if you asked someone in the origination side, they
16 probably have a much better idea than I would.

123:23-124-1

23 **Q. Did CashCall purchase every loan that**
24 **Western Sky made through the Western Sky loan**
25 **program?**
1 A. I'm not certain, but I believe so.

142:3-12

3 **Q. Did Mr. Reddam have final approval over**
4 **CashCall's agreements with Western Sky?**
5 A. Well, he executed the agreements, but I'm
6 not sure exactly what you mean by "final approval,"
7 because these agreements were part of a
8 collaborative process among the executive team and
9 also in discussions with Western Sky. So the
10 decision to enter into the Western Sky transaction
11 was a collaborative effort based primarily on the
12 advice we received from counsel.

146:1-10

1 **Q. And how often currently does the executive**
2 **team meet?**
3 A. Well, it depends. It's -- there's really
4 no set meetings. There is no "We are meeting at
5 9:30 on the third Thursday of every month." Most
6 of the meetings are just very impromptu. A lot of
7 times I will just go in Paul's office; Paul will
8 come into my office; Del will come into my office;
9 Del will go into to Paul's office. It's very rare
10 that we have a prescheduled meeting.

164:18-23

18 **Q. So just focusing on Exhibit 18 that you**
19 **have in front of you, under "Assumption of Facts,"**
20 **is there anything inaccurate in that first full**
21 **paragraph?**
22 A. Yes. Both sentences are entirely
23 inaccurate.

DATED: July 11, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov