OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS 30(b)(6) SUPPORTING OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS 30(b)(6)**

53:6-9

6 **Q. Did CashCall ever decline to purchase a loan**
7 **from Western Sky because it did not meet CashCall's**
8 **guidelines?**
9 A. Not that I'm aware of.

55:11-56:17

11 **Q. The loan from CashCall, how much was that loan?**
12 A. It varied based on the funding.
13 **Q. Was it a line of credit?**
14 A. Per the services agreement, it averaged two
15 days of funding because on the third day we would
16 purchase loans, which means cash would then go back into
17 the funding account from purchasing of the loans.

55:22-26:11

22 **Q. And then would that note receivable become paid**
23 **after the three days when CashCall purchased the loan?**
24 A. It was a continual note, meaning if there were
25 three days worth of loans, they would have three days
56
1 worth of a note receivable on the books. Then once that
2 note was paid, for example on say on a Monday, and you
3 had Thursdays and Fridays, it took it down to two days.
4 But for whatever the note was, was for the balance of
5 loans that were funded and remaining on Western Sky's

6 books until purchased.
7 **Q. And was that settled daily?**
8 A. Yes.
9 **Q. And that's true at CashCall as well at**
10 **Western Sky?**
11 A. Yes.

72:10-23
10 **Q. That paragraph which is titled "Reserve**
11 **Account," explains the details of an account at a**
12 **mutually agreed upon financial institution."**
13 **Is that the Wells Fargo account that we talked**
14 **about earlier?**
15 A. Yes.
16 **Q. And is there anything that you would like to**
17 **correct or clarify in your testimony about how that**
18 **account worked based on your review of the agreement**
19 **itself?**
20 A. No.
21 **Q. Did it, in fact, work as described here in the**
22 **agreement?**
23 A. And as I described earlier, yes.

85:11-86:3
11 **Q. Okay. And was that origination system, did**
12 **CashCall have access to that origination system?**
13 A. They had a segmented part of the servers and

the CashCall proprietary operating system that they used that they had access to.

**Q. Okay. And did CashCall have access to it as well?**

A. No.

**Q. Did Western Sky have access to any other part of CashCall's servers or system other than that segmented --**

A. No.

Well, let me qualify. CashCall's IT provided services on behalf of Western Sky to support that origination system, so the IT function had access to the system. Meaning, to do any code updates or any changes that Western Sky desired to be made, they had that access.

DATED: July 11, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov