OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS SUPPORTING OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DELBERT MEEKS**

21:19-25

19 **Q. Can you tell me who created Delbert**
20 **Services Corporation?**
21 A. It was created -- it was owned by Paul
22 Reddam, and it was created by the executive team of
23 CashCall.
24 **Q. Are you part of that executive team?**
25 A. Yes.

40:15-22

15 **Q. Okay. Do you know who determined the**
16 **terms -- and by "terms," I mean, again, interest**
17 **rate, origination fee, other fees, and repayment**
18 **length -- for the Western Sky loans?**
19 A. Western Sky would have underwriting
20 guidelines, but CashCall would only buy those loans
21 which met our criteria that we determined on these
22 loans.

54:10-24

10 **Q. Okay. And do you know if at any point in**
11 **time CashCall changed the guidelines for the loans**
12 **that it would buy from Western Sky?**
13 A. Yes.
14 **Q. Can you tell me how? Explain those**
15 **changes.**

16 A. Based on the performance of the loans that
17 were purchased from Western Sky, CashCall would
18 then inform Western Sky that we would not be
19 purchasing loans unless it was under these new
20 underwriting guidelines and provide those
21 guidelines to Western Sky, who would then either
22 originate those loans to that and sell them to us
23 or they had the option of originating the loans,
24 how they wanted to sell to others.

69:8-21

8 **Q. Okay. If you need to discuss the**
9 **underwriting guidelines and any changes that are**
10 **needed, would the entire executive team typically**
11 **participate in that meeting?**
12 A. Yes.
13 **Q. Did you have other regular executive group**
14 **meetings?**
15 A. No.
16 **Q. Were your executive group meetings**
17 **essentially ad hoc, as needed?**
18 A. As needed or, like I mentioned earlier, I
19 interact with Paul on a daily basis. He can walk
20 to me very quickly, as is the case with a number of
21 the other executives.

71:1-12

1 **Q. Did it use any other either subsidiaries**
2 **or third parties for collection services?**
3 A. CashCall did use outside third parties
4 similar to Delbert to collect on loans that had
5 been charged off or were heavily delinquent.
6 **Q. What -- what parties did it use?**
7 A. I don't know the names.
8 **Q. From the period of 2010 to 2013, did**
9 **CashCall servicing department perform all**
10 **collection services up until the point of**
11 **charge-off?**
12 A. Yes.

106:19-108:25

19 **Q. Going back for a minute -- I apologize for**
20 **the lack of organization, but to the investor side**
21 **of the business, were there times when investors**
22 **required a personal -- require a personal guaranty**
23 **for their investment?**
24 A. Yes.
25 **Q. Do you know which investors to CashCall**
**107**
1 **that was true for?**
2 A. Not off the top of my head.
3 **Q. Do you know how many investors that was a**
4 **condition for their investment?**
5 A. Not the exact number, no.

6 **Q. Who provided those personal guaranties?**
7 A. Paul.
8 **Q. Mr. Reddam?**
9 A. Mr. Reddam.
10 **Q. Can you tell me how it came about that**
11 **those guaranties were part of the investment**
12 **criteria?**
13 A. They were requested by the investor.
14 **Q. Was there anyone else who provided any**
15 **personal guaranties to any investment to CashCall?**
16 A. No.
17 **Q. Do you know how much money Mr. Reddam,**
18 **overall, guaranteed?**
19 A. No.
20 **Q. Were you part of that negotiation in which**
21 **that personal guaranty was devised?**
22 A. A little more clarity, if you would.
23 **Q. Sure. It's my understanding that, in**
24 **large part, you interfaced with the outside**
25 **investors.**
108
1 A. Yes.
2 **Q. And you helped to negotiate the terms of**
3 **those investments; is that true?**
4 A. Yes.
5 **Q. And one of those terms, for some of these**
6 **investments, was a personal guaranty by Mr. Reddam;**

**is that right?**
A. Yes.
**Q. And you were part of that negotiation in which the guaranty was a part of the deal?**
A. I was part of those discussions.
**Q. Did you discuss those with Mr. Reddam individually?**
MR. BARLOON: Objection. Vague.
A. Those --
BY MS. HARTMANN:
**Q. When a personal guaranty was requested by the investor, did you take that request to Mr. Reddam?**
A. The investor and I, once discussing it, would then have to present it to Paul because he would have to, of course, sign off on it.
**Q. Was there ever a time when he did not agree to sign off on it?**
A. I don't recall.

DATED: July 11, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov