OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM SUPPORTING OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM**

19:12-19:23

12 **Q. All right. And why did you choose to**
13 **develop your own loan origination and servicing**
14 **software as opposed to buying something off the**
15 **shelf?**
16 A. Well, I don't know if there were suitable
17 products on the shelf, but the fellow head of the
18 development team, he had a company. I don't know
19 what it was called at the time; it later became
20 called Cogility. But he said he had new
21 development software that was kind of a next
22 generation, and he could form the next generation
23 of -- of loan software using this Cogility product.

22:4-20

4 **Q. Okay. So did CashCall have an ongoing**
5 **contractor relationship with Cogility?**
6 A. For a while it did.
7 **Q. All right. Can you tell me what time**
8 **frame?**
9 A. Well, from 2002 up to three, four years
10 ago, approximately.
11 **Q. What kinds of things did Cogility -- what**
12 **services did Cogility perform for CashCall?**
13 A. I am still not exactly sure, because
14 listening to Matt Ghourdjian explain Cogility

15 and where he would say that it would essentially
16 write its own code, that always struck me as
17 hyperbole. But I'm not a software expert, but
18 somehow the application of the CashCall systems is
19 built on top of Cogility. It's some sort of
20 substructure.

27:17-22
17 **Who reported to you in 2009, directly?**
18 A. Well, the CFO, Del Meeks; the head of
19 servicing, Louis Ochoa; the head of operations for
20 consumer lending, Hilary Holland; Jay Marx, head of
21 mortgage operations; Dan Baren, head of legal.
22 That's all that comes to mind at the moment.

33:20-34:19
**20 Q. So the next sentence says, "He coordinates**
21 **all marketing and advertising and determines where**
22 **advertising should be directed."**
23 **Is it true that in 2009, October 2009 to be**
24 **more specific, you coordinated all marketing and**
25 **advertising for CashCall and determined where**
34
1 **advertising should be directed?**
2 A. Well, in one sense it's true, in another
3 sense not, in that we use an outside advertising
4 agency named Kovel/Fuller, and they would actually

5 direct where advertising was done and what it
6 looked like, et cetera. And then sometimes I would
7 interface with them.
8 **Q. Did you, at CashCall, have final say over**
9 **any ad campaign that Kovel/Fuller put together?**
10 MR. NOLAN: Objection. Lack of
11 foundation. Calls for speculation.
12 A. Not exactly.
13 BY MR. MARTIKAN:
14 **Q. Did you hire Kovel/Fuller to do**
15 **advertising campaigns for CashCall?**
16 A. Yes.
17 **Q. All right. Did Kovel/Fuller develop**
18 **advertising campaigns for CashCall?**
19 A. Yes.

42:20-43:6
20 **Q. Can you explain what "underwriting" is?**
21 A. Underwriting is evaluation of credit for
22 making a loan.
23 **Q. All right. And what is the importance of**
24 **underwriting to unsecured lending?**
25 A. Well, certainly at CashCall we would never
43
1 make a loan or buy a loan that hadn't been
2 underwritten, that is evaluated for the likelihood
3 that a borrower can and will repay the loan.

4 **Q. Did CashCall develop its own proprietary**
5 **underwriting criteria?**
6 A. Yes.

50:9-51:2

**9 Q. I'm only asking about CashCall.**
10 A. You're talking about loans that CashCall
11 serviced.
12 **Q. CashCall's own unsecured consumer loans?**
13 A. Loans that it owned?
14 **Q. That it owned? Loans that it serviced.**
15 A. Well, it serviced, I believe, for some
16 other customers. So I don't think I saw reports on
17 that, but CashCall-owned loans, I would have seen
18 it, yes.
19 **Q. All right. When you say "CashCall-owned,"**
20 **what does that mean to you?**
21 A. It means that the loans were somehow on
22 CashCall's balance sheet.
23 **Q. All right. Now, were the -- the loans**
24 **that were assigned to CashCall by Western Sky,**
25 **would you consider those CashCall-owned loans once**
**51**
**1 they had been assigned?**
**2 A. Once we bought them, yes.**

55:14-22

14 **Q. Well, you purchased -- CashCall purchased**
15 **a range of loan products from Western Sky; correct?**
16 A. Yes.
17 **Q. What were they?**
18 A. Well, they were -- there was a -- are we
19 talking about -- there was a 10,000 dollar --
20 approximately $10,000 loan, $5,000 loan, $2600
21 loan, $1500 loan. For a while, I think there was
22 an 850.

58:8-10
**8 Q. What was the biggest risk?**
9 A. I'm not trying to be a smart aleck, but
10 regulatory risk is the biggest risk.

58:24-59:3
24 **Q. Did you, at some point, loan -- make a**
25 **personal loan to CashCall of about $20 million?**
**59**
1 A. Yes.
**2 Q. All right. When was that loan made?**
**3 A. I think 2003 or '4, somewhere in there.**

65:11-22
11 **Q. Are you aware that -- that CashCall**
12 **created a subsidiary called WS Funding?**
13 A. Yes.

14 **Q. When was that done?**
15 A. I'm not exactly sure. Sometime, roughly
16 the beginning of 2010.
17 **Q. Why was that done?**
18 A. I think it was done so that when CashCall
19 purchased loans from Western Sky, the loans could
20 -- were clearly delineated for risk analysis.
21 **Q. For CashCall's risk analysis?**
22 A. Yes.

66:14-67:12
14 **Q. Don't speculate. Did anyone at CashCall**
15 **have the authority to create a corporate subsidiary**
16 **of CashCall without your approval?**
17 A. Well, that would be something that Dan
18 Baren would do, sure.
19 **Q. Could he do that without your approval?**
20 A. Well, sure.
21 **Q. Did Dan Baren create WS Funding without**
22 **your approval?**
23 MR. NOLAN: Objection. Lack of
24 foundation. Also calls for speculation.
25 You can answer if you know.
67
1 A. I -- I don't know. I mean, I wouldn't
2 have -- had it come up to me, I wouldn't have
3 disapproved it. I wouldn't have said, "Oh, I think

4 that's a bad idea," or something. This would be
5 part of his standard job.
6 **Q. Were you aware that WS Funding entered**
7 **into an assignment agreement with Western Sky**
8 **Financial?**
9 A. I'm aware, generally, that WS Funding was
10 technically the vehicle that loans were purchased
11 into, but how the mechanics of that work, I -- I
12 wouldn't be the best one to tell you.

67:18-68:12
18 **Q. Have you ever heard of a company called**
19 **Western Sky Financial?**
20 A. Yes.
21 **Q. Okay. And do you know if that's Butch**
22 **Webb's company?**
23 A. Yes.
24 **Q. Okay. So are you aware that -- whether WS**
25 **Funding entered into an assignment agreement to**
68
1 **purchase loans from Western Sky Financial?**
2 A. Well --
3 MR. NOLAN: Same objection. Lack of
4 foundation. Best evidence is the documents
5 themselves.
6 You can answer the question, if you know.
7 A. I don't know, and because I wasn't the one

8 who designed the mechanics of -- of these loan
9 purchases. But CashCall or a subsidiary, WS
10 Funding, I suppose, would have purchased loans from
11 Western Sky, but I don't know, you know, how they
12 followed along the purchase timeline that way.

70:4-7

4 **Q. Did you ever discuss with Dan Baren the**
5 **terms of an assignment agreement between WS Funding**
6 **and Western Sky Financial?**
7 A. Yes.

75:1-8

1 **Q. Well, what is your understanding of what**
2 **the deal was between CashCall and Western Sky**
3 **Financial?**
4 MR. NOLAN: Objection. Assumes facts not
5 in evidence.
6 A. Well, that it -- from 50,000 feet that
7 CashCall would buy loans that Western Sky closed,
8 and there was pricing formulas for it.

76:15-77:2

15 **Q. Did you have the authority to approve**
16 **transactions that CashCall or CashCall subsidiaries**
17 **entered -- entered into with other companies?**
18 A. Well, yes. I would have the authority,

19 sure.
20 **Q. Did you have the authority to approve the**
21 **agreement by which WS Funding purchased loans from**
22 **Western Sky Financial?**
23 A. Well, as I said, I'm not clear about the
24 structure. But if -- if it was as I've been
25 thinking it is in this discussion, if WS Funding
77
1 was a vehicle of CashCall, then, yes, I would have
2 authority.

81:6-17
6 **Q. Do you know if the intent of the**
7 **assignment agreement was for WS Funding to purchase**
8 **all of Western Sky Financial's unsecured consumer**
9 **loans?**
10 A. Well, I believe the understanding would be
11 that if they underwrote and closed the loans
12 according to the guidelines that we had worked out
13 with them, that WS Funding/CashCall would buy the
14 loans.
15 **Q. And what were the guidelines that you had**
16 **worked out with them?**
17 A. The underwriting guidelines I mean.

82:20-83:2
20 **Q. Mr. Reddam, did you approve WS Funding's**

21 **purchase of loans from Western Sky Financial?**
22 MR. NOLAN: Objection. Vague and
23 ambiguous.
24 A. Well, and as I mentioned earlier, the
25 structuring part, I'm not entirely clear on. But
83
1 as a whole, I would have approved us buying loans
2 from Western Sky.

88:20-25
20 **Q. Agreed with. Do you know if CashCall ever**
21 **agreed to advertise on Western Sky Financial's**
22 **behalf?**
23 A. It -- I think the characterization would
24 be, did it ever help Western Sky with its
25 advertising. And the answer to that would be yes.

115:12-21
12 **Q. Okay. And what did you discuss?**
13 A. We discussed CashCall's Western Sky
14 purchase program.
15 **Q. Okay. And what about it?**
16 A. Well, there had started to be some
17 regulatory issues in a few states, and so she was
18 there to discuss that, and she said that the
19 regulatory environment was in general getting very
20 hostile, and so we discussed whether it would be a

21 good idea to wind down the program.

116:2-15

2 **Q. Okay. And did you then decide to wind**
3 **down the program after that meeting?**
4 A. I absorbed the advice that -- that she
5 gave. It was -- she went on about how the firm
6 still believed in the -- in the program and the
7 structure and so on, and -- but she thought that
8 given the regulatory environment -- I guess -- I
9 don't know if we'd been sued at that point or -- or
10 not. But it was her advice that we would encounter
11 more regulatory problems. So despite what she
12 thought of -- of the structure, that it was legal,
13 et cetera, I should think about that. And
14 subsequently, I decided that we should stop buying
15 loans from Western Sky.

123:13-124:2

13 **Q. Are there any other states that you're**
14 **aware of that Western Sky did not lend to -- or**
15 **that Western Sky lends -- loaned money to, but that**
16 **you did not purchase loans from?**
17 A. We did not want to buy loans from west --
18 where people were from West Virginia.
19 **Q. Is that because of ongoing litigation**
20 **there?**

21 A. We had litigation there.
22 **Q. Okay. When did that -- is that a decision**
23 **that was made at the outset or -- or somewhere**
24 **after the loan purchases began?**
25 A. I -- I think it was made somehow between
124
1 Dan and Butch before any -- any arrangement,
2 contract, purchases, et cetera, had happened.

128:19-129:6
19 **Q. Did Dan Baren report to you periodically**
20 **on the status of the litigation involving the**
21 **Western Sky loans?**
22 A. He discussed it quite a bit, yes.
23 **Q. By "quite a bit," how often?**
24 A. Well, I think for a time it would have
25 been pretty much daily. He was quite distraught
129
1 about it all.
2 **Q. Okay. And when it was daily, what time**
3 **frame are we talking about?**
4 A. I mean, I can't say for sure that it was
5 daily. It was just -- what I mean by that, it was
6 a frequent topic.

136:24-137:7
24 **Q. All right. Did you personally guarantee**

25 **CCL 2010 NLP SPE's loan of money from Bayberry**
137
1 **Consumer Finance Fund?**
2 A. Well, the document would seem to indicate
3 that. But as far as the name goes with all the
4 letters in it, as I had mentioned earlier, the
5 lending of these, a lot of these special-purpose
6 vehicles and they have all these names. And this
7 would be a very good example of that.

138:17-22
17 **Q. Well, how many loans to CashCall**
18 **special-purpose vehicles that were tied to**
19 **unsecured consumer loans did you guarantee?**
20 A. I don't know.
21 **Q. Do you remember, was it more than one?**
22 A. Well, it would have been more than one.

DATED: July 11, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov