THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted *Pro Hac Vice*)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted *Pro Hac Vice*)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT;<br><br><u>SEPARATE COVER:</u><br>(1) DEFENDANTS' COMBINED STATEMENT OF FACTS;<br>(2) DECLARATIONS OF THOMAS J. NOLAN AND CAROLINE VAN NESS;<br>(3) DEFENDANTS' EVIDENTIARY OBJS. TO PLAINTIFF'S GENUINE DISPUTES OF MATERIAL FACT AND PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS;<br>(4) DEFENDANTS' RESPONSES TO PLAINTIFF'S EVIDENTIARY OBJS.; and<br>(5) DEFENDANTS' REQ. FOR JUDICIAL NOTICE (and supporting documents).<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 9, 2016<br>Trial: September 27, 2016 |

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 1

I. THE BUREAU CANNOT PREVAIL AS A MATTER OF LAW ........ 1

A. The CFPB's Claims Impermissibly Rest On State Law Violations ........ 1

B. CRST Law Applies And Thus The Bureau's Claims Fail ........ 3

C. Defendants' Conduct Was Not Unfair, Deceptive, Or Abusive ........ 6

D. Defendants Did Not Have Fair Notice Of Possible CFPA Violations ........ 8

II. REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER OF LAW ........ 8

III. THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL ........ 11

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*In re Aiken County*, 645 F.3d 428 (D.C. Cir. 2011) ....................12

*CFPB v. ITT Educational Services, Inc.*, No. 1:14–cv–00292–SEB–TAB, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) ....................8

*CFPB v. The Mortgage Law Group, LLP*, No. 14-CV-513-BBC, --- F. Supp. 3d ---, 2016 WL 183712 (W.D. Wis. Jan. 14, 2016) ....................2

*Colorado v. Western Sky Financial, LLC*, 845 F. Supp. 2d 1178 (D. Colo. 2011) ....................4

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012) ....................7

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) ....................8

*FTC v. American Standard Credit Systems, Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ....................9

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ....................9

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) ....................8

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010) ....................12

*Gallego v. Northland Group Inc.*, 814 F.3d 123 (2d Cir. 2016) ....................2

*Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016) ....................3

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ....................8

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ....................12

*Jackson v. PayDay Financial, LLC*, 764 F.3d 765 (7th Cir. 2014) ....................3

*Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) ....................5

*In re Maring*, 338 F. App'x 655 (9th Cir. 2009) ....................9

*Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343 (U.S. May 24, 2016)........5

*New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983)........4

*Rice v. Rehner*, 463 U.S. 713 (1983)........4

*SEC v. Apartments America, LLC*, No. SA CV 12-0754 DOC (ANx), 2014 WL 842819 (C.D. Cal. Mar. 3, 2014)........9

*Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2013)........6

*United States v. Antoinette-Bates*, 359 F. App'x 845 (9th Cir. 2009)........9

*Volvo Construction Equipment North America, Inc. v. CLM Equipment Co.*, 386 F.3d 581 (4th Cir. 2004)........4

*Wilson v. Frito-Lay North America, Inc.*, 961 F. Supp. 2d 1134 (N.D. Cal. 2013)........8

**STATUTES**

12 U.S.C. § 5491........12

12 U.S.C. § 5511........1

12 U.S.C. § 5517........2

12 U.S.C. § 5564........3, 5

12 U.S.C. § 5565........9

12 U.S.C. § 5531........1

28 C.F.R. § 0.20........5

**OTHER AUTHORITIES**

Restatement (Second) Conflict of Laws § 186........3

Restatement (Second) Conflict of Laws § 187........3, 4

Restatement (Second) Conflict of Laws § 188........6

Restatement (Second) Conflict of Laws § 195........6

## PRELIMINARY STATEMENT

The Opposition (Dkt 167) does not counter the law or facts supporting Defendants' Motion for Summary Judgment (Dkt 139, or "Motion").[1] Rather, in what is now a familiar pattern, the Bureau ignores Defendants' points and authorities and instead contests non-existent arguments of its own framing, and responds with distorted factual or legal support, or no support at all. For example, the CFPB spends pages refuting an "advice of counsel" defense that was not made in the Motion, in an effort to dodge Defendants' showing that Reddam cannot be individually liable without knowledge of wrongdoing, and still cannot show a violation of state law or UDAAP. For the reasons set forth herein, and in Defendants' Opposition to the CFPB's summary judgment motion (Dkt 163), the Motion should be granted.

## ARGUMENT

### I. THE BUREAU CANNOT PREVAIL AS A MATTER OF LAW

#### A. The CFPB's Claims Impermissibly Rest On State Law Violations

The Motion establishes that summary judgment must be granted because UDAAP claims cannot be based on co-opted state laws, and the Bureau's discovery responses show it cannot prove an "unfair, deceptive, or abusive act or practice ***under Federal law***." Dkt 139 at 7-11 (citing 12 U.S.C. §§ 5511(a), 5531(a)). The cross-motions are confirmatory. Dkt 159 at 18-19; Dkt 167 at 2 (UDAAP "*because the loans had been rendered void or otherwise not payable under state law*").

Citing no authority, the Bureau insists that Defendants "mischaracterize" its claims because "[i]t does not matter that state law is what rendered the loans void and thus not payable." Dkt 167 at 2. But Defendants showed there must be a "clear

[1] All internal alterations, quotation marks, and citations are omitted and all emphasis is added herein, unless noted. The same defined terms and abbreviations are employed from Dkt 139, except references to documents in this case now reflect the ECF docket number ("Dkt"). "CSF" refers to Defendants' Combined Statement Of Facts. All references to Defendants' receipt of legal advice in this matter are subject to a limited waiver of privilege only as to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by CashCall/WS Funding.

statement" from Congress to "presume" that a federal statute has transformed a violation of state law into one of federal law, Dkt 139 at 7-9 (collecting cases), and the Bureau makes no effort to distinguish that authority. Nor does it address Defendants' cases decided *since* the Rule 12(c) Order (Dkt 110), which confirm that the CFPB has overstepped its bounds by predicating its claims on state law violations.[2] Instead, the Bureau wrongly asserts, without explanation, that those cases do not change the result of the Rule 12(c) Order. Dkt 167 at 3.

The Bureau's reliance on the Rule 12(c) Order is misplaced, however, as it ignores the fundamental difference between a Rule 12(c) motion, where the Court's consideration is confined to the *allegations* of the complaint, and summary judgment, which requires the Bureau to dispute the facts and law establishing that its UDAAP claims are precluded by the CFPA. Dkt 110 at 2 ("judgment on the pleadings is improper when the district court goes beyond the pleadings"). The Bureau points to neither facts nor law demonstrating a violation of ***federal*** law.[3]

Defendants further established that the Act precludes establishing a federal usury limit or predicating UDAAP violations on state usury laws. 12 U.S.C. § 5517(o); Dkt 139 at 15-17, 19-20. The Bureau ignores these arguments and simply recites that it is "not seeking to enforce any usury limits." Dkt 167 at 4. Instead, it relies on its pre-discovery arguments at the pleading stage and runs from the record.

---

[2] *Gallego v. Northland Grp. Inc.*, 814 F.3d 123 (2d Cir. 2016) rejected an FDCPA claim based on a violation of a city regulation, and noted that the "Relation To State Laws" provision in the FDCPA would be "unnecessary" if the FDCPA incorporated state or local law; the CFPA contains the same provision. Dkt 139 at 8-9. *CFPB v. The Mortg. Law Grp., LLP*, --- F. Supp. 3d ---, 2016 WL 183712 (W.D. Wis. Jan. 14, 2016) found the Bureau overreached, as "[e]ven assuming . . . attorneys providing mortgage assistance relief services have engaged in practices that violate state licensing regulations," it "failed to explain why that correlation would justify . . . regulat[ing] attorney conduct under state law" as violating the CFPA. *Id.* at *10.

[3] According to the CFPB, it can prosecute federal UDAAP violations whenever a contract can be challenged under one or more state's laws; for example, if it is unenforceable due to procedural or substantive unconscionability, bilingual requirements, adhesion theories, or the statute of frauds. It is simply preposterous to suggest that Congress authorized the Bureau—particularly by use of the phrase "under federal law"—to prosecute the entire body of the state law of contracts.

**B. CRST Law Applies And Thus The Bureau's Claims Fail**

As Defendants demonstrate in their Opposition to the CFPB's Motion, the Bureau's arguments fail to show that any law other than CRST law applies.

First, the CFPB ignores each state's choice-of-law rules and argues federal common law "supplies the choice-of-law rules" as "this case is based on federal-question jurisdiction." Dkt 167 at 4-5. But there is no exclusive federal jurisdiction here, so the states' rules apply. Dkt 163 at 6-7; *see also* 12 U.S.C. § 5564(f) (CFPA action may be brought in federal *or* state court, "and such court shall have jurisdiction"). Moreover, even under federal common law, each state's choice-of-law doctrine is a factor as to whether a jurisdiction has a greater material interest than another. Restatement (Second) Conflict of Laws § 186 cmt. b; Dkt 163 at 7.

Second, the CFPB argues that Defendants "improperly truncate the Restatement analysis." Dkt 167 at 5. Yet the Bureau applies the same test that Defendants analyzed in the Motion. *Id.*; Dkt 139 at 12. And the Bureau admits Second Restatement § 187 "applies where, *as here*, the contract at issue selects the law of a particular jurisdiction to govern disputes."[4] Dkt 167 at 5.

Third, the CFPB argues another red herring—whether there is a "substantial relationship" between CashCall and the CRST Reservation.[5] The issue is the relationship between the chosen law and "the parties *or* the transaction"—and the CFPB entirely ignores the evidence establishing a substantial relationship between

---

[4] The CFPB misconstrues *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 674-75 (4th Cir. 2016), and *Jackson v. PayDay Fin., LLC*, 764 F.3d 765, 779 & n.23 (7th Cir. 2014), as invalidating the choice-of-law provision. Dkt 167 at 5-6. Neither case determined whether such a provision was valid under Second Restatement § 187. *Hayes* concerned the enforceability of an arbitration provision, 811 F.3d at 676, and *Jackson* addressed the validity of a forum-selection clause, 764 F.3d at 778-79.

[5] The CFPB also argues that the Defendants "fail[] . . . to account . . . that the CRST involvement in the Western Sky loans is a sham" because CashCall is the "true lender." Dkt 167 at 6-8. This is wrong. The CFPB cannot raise a new "true lender" theory of liability with no prior notice at the motion for summary judgment phase. Dkt 163 at 12-13. Moreover, the CFPB's new theory has no precedential support, and implicates tremendous financial policy considerations. *Id*. at 13-19.

Western Sky and the Reservation. Dkt 139 at 12-14. The CFPB also fails to discuss, and therefore concedes, that there is a "reasonable basis" for Western Sky, a tribal lender, and its borrowers to choose CRST law, as the undisputed facts demonstrate that contract formation occurred on the Reservation, and Western Sky's principal place of business was the Reservation. *Id.*; Second Restatement § 187(2) cmt. f.[6]

Fourth, the CFPB replicates its Motion arguments that "each of the Subject States has expressed a fundamental public policy favoring usury restrictions, or lending licenses, or both, by enacting statutes that render contracts that violate those provisions void." Dkt 167 at 7. But "*not every statutory provision constitutes a fundamental policy of a state*." Dkt 163 at 8, 14 (quoting *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 607 (4th Cir. 2004)). Instead, "[i]n assessing whether a . . . statute expresses a state's fundamental policy," a court must parse the "language of the statute, relevant court decisions, and pertinent legislative history." *Volvo*, 386 F.3d at 607. The Bureau does not and cannot provide this analysis. Nor can it demonstrate that any of the states have a greater material interest than the CRST, as it fails to identify any law or fact contra to those that Defendants cite, and fails to counter the significant deference given under the doctrine of tribal sovereignty. Instead, the CFPB shifts focus from the Section 187 analysis by arguing that "[t]he CRST has no material interest in a company that is [not] an arm of the tribe." Dkt 167 at 7-8. This is demonstrably false and irrelevant. As a sovereign, the CRST has a significant interest in a company whose operations substantially impact the Reservation.[7] Dkt 139 at 14-15; Dkt 163 at 10-11. The CFPB points to no law—

---

[6] The CFPB cites *Colo. v. W. Sky Fin., LLC*, 845 F. Supp. 2d 1178 (D. Colo. 2011), to argue "the lending transaction affected borrowers in the Subject States to a greater degree than the CRST," but that case only concerned whether Western Sky was "doing business in Colorado for jurisdictional purposes." *Id.* at 1181; Dkt 167 at 8.

[7] The Indian Commerce Clause discussion is another red herring, and overlooks that Congressional action pursuant to it reflects policy considerations that give deference to indigenous communities. *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335-36 (1983); *Rice v. Rehner*, 463 U.S. 713, 718 (1983); Dkt 167 at 20 & n.4.

because there is none—requiring a business to be an "arm of the tribe" before a material interest can be found. Dkt 163 at 9-10; Dkt 139 at 14-15.

In keeping with its deliberate disregard of the substantial activity occurring on the Reservation, the CFPB does not address the authority or public policy of tribal sovereignty that compels application of the choice-of-law provision. Dkt 139 at 14-15. It erroneously states only: "[t]he non-application of CRST law to Defendants is not an affront to tribal sovereignty" because "their collection on these loans does not implicate any cognizable tribal interest." Dkt 167 at 6. As support, it cites *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), for the proposition that CashCall, as the assignee, cannot "take advantage of [an] assignor's right to charge usurious interest rates." *Id*. But *Madden* concerned preemption under the National Bank Act, not tribal sovereignty, and acknowledged that a Delaware choice-of-law provision could preclude the plaintiff's New York usury claims. 786 F.3d at 253.

Further, the CFPB's interpretation of *Madden* is diametrically opposed to the position the Solicitor General ("SG") advocated to the Supreme Court in that *same* case. Dkt 163 at 16-17; *Midland Funding, LLC v. Madden*, 2016 WL 2997343, at *8 (U.S. May 24, 2016) (Brief for U.S. as Am. Curiae) ("[I]f the interest-rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate."). Arguing *Madden* was wrongly decided, the SG recognized the right of banks not only to issue loans, but to "sell those loans to others" and ensure that the assignee may continue to charge interest at the original rate, even if the bank "retained no control over (or financial stake in)" the assignee's "efforts to collect" the debt. *Id.* at *12. Thus, the clear error of the CFPB's interpretation is vividly highlighted by the fact that its position is not even shared by the United States. *See generally* 28 C.F.R. § 0.20 (SG is responsible for positions of the United States in the Supreme Court and for decisions regarding appeals); 12 U.S.C. § 5564(e) (CFPB's capacity to represent itself in the Supreme Court is subject to the approval of the Attorney General).

Fifth, the CFPB ignores the authority cited by Defendants demonstrating that "it is well settled that borrowers may contractually accept higher interest rates than permitted in their home jurisdictions." Dkt 139 at 14; Dkt 167 at 9. The CFPB's authority, in fact, is in accord: "the lack of a usury law does not mean that [one state] has a less substantial concern than [another state] about interest rates; *rather, it appears to reflect a choice to favor individual contract decisions and the free flow of capital*." *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2013).

Sixth, the CFPB argues that under Restatement §§ 188 and 195, "the Court should find that the CRST choice-of-law provision is invalid, and that in the absence of this provision, the laws of the Subject States apply to the Western Sky loan agreements." Dkt 167 at 8-9. But neither section applies when there is a valid choice-of-law provision, and where the contract does not expressly identify a particular state of repayment.[8] Dkt 163 at 10. Moreover, CRST law applies even under Restatement § 188, as the majority of factors favor application of CRST law. *Id.*

Finally, the CFPB argues that "Defendants cannot enforce a choice-of-law clause that is both ambiguous and misleading."[9] Dkt 167 at 11. But the clause here is unambiguous, prominent, and specific. Dkt 139 at 12; CSF ¶ 75.

### C. Defendants' Conduct Was Not Unfair, Deceptive, Or Abusive

Defendants established that their conduct was not unfair, deceptive or abusive as a matter of law, because of, *inter alia*, the prominent contractual provisions disclosing the interest rates and requiring the agreement to be governed by CRST

---

[8] The CFPB asserts that "[u]nder § 195, the law of the state 'where the contract requires that repayment be made' governs." Dkt 167 at 9. But § 195 is "applicable *only* when the contract requires that the loan be repaid in a particular state." Second Restatement § 195 cmt. a. That is not the case here. Dkt 163-3 ¶ 334.

[9] The CFPB argues that there are also two "misstatement[s] of fact:" that "Western Sky is a South Dakota resident company," and that "Western Sky Funding . . . is shown on the face of the loan agreement to have a South Dakota address." Dkt 167 at 10. Not so. Western Sky was both licensed by the CRST and conducted substantial activity on the Reservation, such that its principal place of business was the CRST Reservation. Dkt 140 ¶ 32; Dkt 139 at 13-14. And Timber Lake, South Dakota is *within* the CRST Reservation. Dkt 140 ¶¶ 42, 174; CSF ¶ 174.

law. Dkt 139 at 17-21 (citing *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) and other authority). The Bureau admits it "does not challenge the accuracy or prominence of the interest rate disclosures" or "[t]he number and prominence of the choice-of-law clauses in the loan agreements." Dkt 167 at 11; CSF ¶¶ 75-80. Instead, in an effort to distinguish *Davis*, the Bureau claims that "consumers could have read every single one of the clauses and disclosures in the loan agreements, and Defendants' collection of unowed debt would still have been unfair, deceptive, and abusive" because they did not *also* disclose Defendants' "involvement in the servicing of the loans and the applicability of state law, either of which might have alerted a reasonable consumer that the collectability of the loans was suspect." Dkt 167 at 11-12. But the CFPB's contention regarding CashCall's involvement is at odds with its ***admission*** that "consumers ***were likely to be aware*** that CashCall was somehow involved in the transaction, even before it purchased the loans from Western Sky." CSF ¶ 176.[10] As the Bureau also concedes, the agreement discloses it is governed by tribal law and not "subject to the laws of any state" (Dkt 167 at 9; CSF ¶¶ 75-80)—putting reasonable consumers on notice that they were forgoing the protections of their own state law in favor of CRST law.

As *Davis* shows, such disclosures mean a borrower could "abort[] his application upon reading the terms and conditions," and thus any purported harm from signing the agreement is "certainly avoidable." *Davis*, 691 F.3d at 1169. As the Bureau offers no other support for its claims, summary judgment is compelled.[11]

---

[10] The CFPB's inclusion of Additional Undisputed Fact ¶ 176, which is cited nowhere in its Opposition, is notably contrary to its blatant misquoting and misuse of the same testimony *four times* in its Motion to claim: "'it would be very, very rare, in fact, probably impossible' for a loan applicant to know that CashCall was involved in the loan origination process, even though CashCall was always performing some tasks on behalf of Western Sky." Dkt 163 at 2-3; Dkt 163-3 ¶¶ 98, 275.

[11] The CFPB quibbles with Defendants' reliance on former FTC Director Beales' opinion regarding its inability to predicate liability on "resolution of an underlying legal question" of state law, but cites no authority to contradict that opinion. Dkt 167 at 12; Dkt 140 ¶¶ 161-63; Dkt 163-3 ¶¶ 304-05. Indeed, the law is in accord. *See*

*(cont'd)*

### D. Defendants Did Not Have Fair Notice Of Possible CFPA Violations

The CFPB does not address the law cited by Defendants requiring fair notice before an entity or individual can be penalized. Dkt 139 at 21-22; Dkt 167 at 19-21. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) is not to the contrary: "the principal inquiry is whether the law affords fair warning." *Id.* at 503. CFPB also relies on the non-binding *CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015), which held that based on the definition of "abusive" in the CFPA and the use of the term in other consumer protection statutes, that "the language in question provides at least the minimal level of clarity that the due process clause demands[.]" *Id.* at *20. The *ITT* decision is incorrect.[12]

## II. REDDAM IS NOT INDIVIDUALLY LIABLE AS A MATTER OF LAW

Defendants established that Reddam cannot be held liable because the CFPB cannot show that he participated directly in or had authority to control the purported UDAAP violations, and that he had actual knowledge of, was recklessly indifferent to, or intentionally avoided learning the truth about the violations. Dkt 139 at 22. The CFPB does not distinguish Defendants' authority, and deliberately misconstrues the law and Defendants' argument to frame yet another "straw man" response.

First, the CFPB duplicates its Motion, reproducing its argument and undisputed facts as purported "additional" factual support virtually verbatim. Its arguments can be rejected for the reasons stated in Defendants' Opposition. Dkt 163 at 24-25; Dkt 167 at 15-17; Dkt 159 at 23-25; Dkt 163-3 ¶¶ 126-42; CSF ¶¶ 177-201.

---

*(cont'd from previous page)*
*FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010) (parties acting without "ill intentions" can cause injury only "if the injury ***was a predictable consequence***").

[12] The *ITT* court did not consider the dearth of CFPB guidance clarifying how and when its "abusive" standard applies. Dkt 140 ¶¶ 115-16. Indeed, the law is clear that fair notice is denied where agencies fail to provide guidance on how they intend to apply and enforce their regulations. *See FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2319 (2012) ("An isolated and ambiguous [agency] statement . . . does not suffice for the fair notice required when the Government intends to impose over a $1 million fine[.]"); *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1147 (N.D. Cal. 2013) (before FDA provided clarification on labelling regulations, "Defendant was simply not on notice . . . that its labels did not comply").

Second, the CFPB is unable to evade the law establishing that it cannot show the requisite knowledge required to hold Reddam liable for any monetary relief. Thus, the Bureau devotes pages to assailing an "advice of counsel" defense ***that Reddam did not assert in the motion for summary judgment***. Dkt 167 at 13-14, 17-19. That is, the CFPB perverts Defendants' argument and authority explaining that there can be no *liability* here because Reddam's awareness of and belief in the legal integrity of the loans' CRST choice-of-law provision precludes any finding of actual knowledge, reckless indifference or intentional avoidance of deceptive, unfair, or abusive practices. Dkt 139 at 23-24 (collecting authority).

Although the "advice of counsel" could be applicable in other phases of this case, it was not raised in the Motion. Dkt 139 at n.12 (citing 12 U.S.C. § 5565(c)(3)(A)).[13] The issue presented was *not* whether Reddam relied on the advice of counsel, but whether he "*should have known [a representation] was wrong*." *FTC v. Am. Std. Credit Sys., Inc.*, 874 F. Supp. 1080, 1088-89 (C.D. Cal. 1994).[14] Reddam was indisputably aware that Katten, Western Sky's counsel, and counsel for third-party investors agreed that CRST law governed, so the CFPB cannot show that he

---

[13] The Bureau's invocation of Fed. R. Civ. P. 56(d), complaining about implied waiver of privilege and alleged withholding of documents, is rife with misrepresentations, and both irrelevant and baseless. *Compare* Dkt 167 at 13-14 *with* CSF ¶¶ 218, 222-25. The CFPB's cases describing the "disclosure" required to assert such a defense in wholly unrelated contexts are likewise unavailing. Dkt 167 at 17, citing *SEC v. Apartments Am., LLC*, 2014 WL 842819, at *7 (C.D. Cal. Mar. 3, 2014) (advice of counsel in Securities Act case) and *United States v. Antoinette-Bates*, 359 F. App'x 845 (9th Cir. 2009) (advice of counsel for asset concealment).

[14] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006), is distinguishable because the only evidence of defendant's "reasonable basis" to believe his conduct was not deceptive was an affidavit attesting he had been assured by his co-founder that "the solicitation checks had been approved by an attorney." *Id.* at 1202 n.4. Here, the Bureau concedes the myriad opinions from Katten and Western Sky's counsel, as well as affirmations by counsel for third-party investors, all of which provided Reddam with the understanding that the loan agreements and their assignment to CashCall were legal and enforceable. Dkt 167 at 18; Dkt 139 at 23-24; Dkt 140 ¶¶ 8-14, 21, 81-106, 110-12; CSF ¶¶ 202-10. *In re Maring* concerned a debtor's discharge from bankruptcy, noting that "[g]enerally, a debtor who acts in reliance [in good faith] on the advice of his attorney lacks the intent required to deny him a discharge[.]" 338 F. App'x 655, 658 (9th Cir. 2009).

"should have known" CRST law would not govern. Dkt 139 at 23-25.

In short, Reddam is not arguing that he relied on advice of counsel as a defense to the UDAAP claims; he is arguing that he did not, and could not, have known or been recklessly indifferent to the loans' purported invalidity under state law, because he *knew* the opposite was true. The fact that this knowledge was based on information provided by not only CashCall's regulatory counsel, but Western Sky's counsel, and affirmed by the lawyers for the investors who approved the financing, does not implicate an "advice of counsel" defense.[15]

<u>Third</u>, unable to dispute the facts establishing Reddam's lack of knowledge of the purported UDAAP violations, the CFPB again resorts to distorting the record. The Bureau claims "CashCall was even involved in massaging the opinions to satisfy lenders' counsel," but the evidence it cites reflects communications between Katten and lender's counsel, and demonstrates only that *lender's counsel* sought revisions to the letter; CashCall counsel Dan Baren was carbon copied, but in no way participated, in those communications.[16] CSF ¶¶ 204-05. The Bureau also claims that "the accuracy of the opinions was not essential" to the lenders, but nothing in the record supports such an absurd statement.[17] CSF ¶ 187.

---

[15] This is why the CFPB's argument that Reddam's "aware[ness] of opinions provided *to others*" cannot support an advice-of-counsel defense for Reddam, misses the point. Dkt 167 at 17 (emphasis in original). The fact that Reddam's belief that the loans were valid and CRST law applied was informed by CashCall's regulatory counsel, Western Sky's counsel, and counsel for the investors, in no way undermines his lack of knowledge, or transforms it into an "advice of counsel" defense.

[16] Moreover, misconstruing "belts and suspenders," the Bureau trumpets that a Katten email suggesting "[f]or belts and suspenders, Butch's company should be a tribal corp so that we can say it's an arm of the tribe" exposes the "sham nature of the CashCall/Western Sky relationship" because Western Sky was not a tribal corporation. Dkt 167 at 19. On its face the email shows Katten was proposing an additional avenue of protection for the established valid use of CRST law—not that the existing model was a "sham," and somehow invalid. CSF ¶ 216.

[17] The Bureau further asserts that only the third-party lenders were entitled to "rel[y]" on the Katten opinions, but again, "reliance" is not at issue here because the point is not advice of counsel, and the Bureau cannot point to any evidence that Reddam did not know about those opinions. Dkt 167 at 18.

The Bureau also misstates the evidence in asserting that "Reddam was well aware that the opinions were not reliable" purportedly because *Baren*—not Reddam—"knew" the opinions contained "entirely inaccurate" assumptions. Dkt 167 at 18. Once again, the Bureau misstates Baren's testimony, which actually says that "the assumptions in th[e] initial opinion" *were* correct, that he did not review the later Katten opinion containing erroneous assumptions before it was distributed because "that's something that if [he] had read, [he] definitely would have caught," and, when he did see the language, he notified Katten of the error. CSF ¶ 207.

The Bureau also contends the opinions were inaccurate because the loans purportedly violated a 1978 CRST criminal code imposing an 18% interest rate on loans over $100. Dkt 167 at 18-19. The Bureau points to no evidence that Reddam was purportedly aware of this statute, nor can it; Western Sky counsel's opinions assured that "the form of the documents evidencing or securing such loans and the fees and rates contained within are in compliance with any applicable requirements of the [CRST]." CSF ¶¶ 211-12. Significantly, the Bureau has never claimed that the loans were void *under CRST law*, as it knows that is false. The tribal council adopted the Uniform Commercial Code in 1997 and enacted CRST UCC § 16-3-112, endorsing the interest rate negotiated by the parties to the loan as stated in the loan agreement and rendering the usury statute cited by the CFPB null and void. *Id.*

## III. <u>THE BUREAU'S STRUCTURE IS UNCONSTITUTIONAL</u>

As Defendants explained—and as a panel on the D.C. Circuit recently appreciated, *see PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir., argued Apr. 12, 2016)—the unprecedented structure of the Bureau casts grave doubt on its constitutionality under bedrock separation-of-powers principles. Despite its purported reliance on "[l]ongstanding Supreme Court precedent," Dkt 167 at 22, the Bureau offers not one historical example of an agency with a structure approximating that of the Bureau: an agency exempt from the normal congressional appropriations process whose sweeping authority is housed in a single director, who,

in turn, enjoys a five-year term and is removable only for "inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3). And, as the Supreme Court made clear in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010)—a decision that the Bureau all but ignores—an agency's "novel structure" can be sustained in the face of a separation-of-powers challenge only where the government establishes special "circumstances" justifying that structure. *See id.* at 483, 496. The Bureau here has not even attempted to justify its singular structure. This, without more, dooms its efforts to ward off constitutional attack.

Rather than enumerating the "circumstances" that support the Bureau's unique organization, the Bureau instead seeks to defend each element of the Bureau's unprecedented structure in isolation.[18] The Bureau's efforts to silo the constitutional inquiry into an element-by-element analysis run headlong into *Free Enterprise Fund*.[19] *Id.* at 483, 496. Segmenting the separation-of-powers analysis ignores the need to consider all facets of an agency's structure to determine whether there are historical analogues and adequate reasons to justify the structure.

DATED: July 18, 2016

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Thomas J. Nolan*
Thomas J. Nolan
*Attorneys for Defendants*

---

[18] The Bureau also downplays the significance of its extraordinary features. First, that a single Director is in charge *heightens* the constitutional problem. Whereas one official on a multi-member commission whose views diverge from the President's is not able to control that agency's agenda, if the Bureau's Director refuses to carry out the President's priorities, there are no other officials who can counteract the Director's recalcitrance. Second, the exemption from the normal congressional appropriations process directly affects the President, as it diminishes the President's ability to reduce the Bureau's budget as a means to influence its direction.

[19] The Bureau's reliance on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) fares no better, given the clarification of the applicable standard in *Free Enterprise Fund*—which is "notably in tension with *Humphrey's Executor*," *In re Aiken Cty.*, 645 F.3d 428, 444 (D.C. Cir. 2011) (Kavanaugh, J., concurring).