THOMAS J. NOLAN (State Bar No. 66992)
Thomas.Nolan@skadden.com
CAROLINE VAN NESS (State Bar No. 281675)
Caroline.VanNess@skadden.com
KASONNI M. SCALES (State Bar No. 301871)
Kasonni.Scales@skadden.com
JULIA M. NAHIGIAN (State Bar No. 307508)
Julia.Nahigian@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

JOSEPH L. BARLOON (Admitted Pro Hac Vice)
Joseph.Barloon@skadden.com
AUSTIN K. BROWN (Admitted Pro Hac Vice)
Austin.Brown@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br><br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>DEFENDANTS' EVIDENTIARY OBJECTIONS TO (1) PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND (2) PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date: August 1, 2016<br>Time: 1:30 p.m.<br>Place: Courtroom 16<br>Judge: Hon. John F. Walter<br><br>Pre-Trial Conf.: September 9, 2016<br>Trial: September 27, 2016 |

## DEFENDANTS' GENERAL OBJECTIONS[1]

Lacks Foundation. Defendants object to the CFPB's proffered evidence to the extent it lacks proper foundation. Evidence lacking proper foundation is not admissible. *See SG Servs. v. God's Girls Inc*, No. CV 06-989 AHM (CTx), 2007 WL 2315437, at *11 (C.D. Cal. May 9, 2007) (refusing to admit evidence for lack of foundation where there is no "factual basis for [the] opinion"); *see also Orr v. Bank of Am. NT & SA*, 285 F.3d 764, 774-77 (9th Cir. 2002) (upholding exclusion of evidence stating that the lack of foundation for exhibits cannot be cured by stating that they are "true and correct copies" of transcripts); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1998) ("We have repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment."); *Stephens v. Liberty Mut.*, No. C 05-0213 PJH, 2008 WL 480287, at *11 (N.D. Cal. Feb. 19, 2008) (excluding evidence; "[t]he statement in [counsel]'s declaration that these are 'true and correct' copies does not lay an adequate foundation for the admission of these exhibits into testimony"). Therefore, as shown below, certain of the CFPB's proffered evidence lacks proper foundation and is inadmissible.

Lack of personal knowledge (Fed. R. Evid. 602). Defendants object to CFPB's proffered evidence to the extent the declarant lacks personal knowledge. A witness may not testify without personal knowledge. *See United States ex rel. Conveyor Rental & Sales Co. v. Aetna Cas. & Sur. Co.*, 981 F.2d 448, 455 (9th Cir. 1992) (holding evidence inadmissible under Fed. R. Evid. 602 where witness did not have personal knowledge); *Stephens*, 2008 WL 480287, at *11 (excluding evidence;

[1] All internal alterations, quotation marks, and citations are omitted and all emphasis is added herein, unless noted. The same defined terms and abbreviations are employed from ECF No. 139 (Defendants' Mem. Of Points And Authorities In Support of Motion for Summary Judgment). All references to Defendants' receipt of legal advice in this matter are subject to a limited waiver of privilege only as to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by CashCall/WS Funding.

"[t]he statement in [counsel]'s declaration that these are 'true and correct' copies does not lay an adequate foundation for the admission of these exhibits into testimony"). Therefore, the CFPB's evidence in which the declarant lacks personal knowledge is inadmissible.

Hearsay (Fed. R. Evid. 802). Defendants object to the CFPB's proffered evidence to the extent it contains hearsay. Hearsay is inadmissible. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 983 n.28 (9th Cir. 2007) (upholding summary judgment; "testimony regarding the purported statements of the Union representative is inadmissible hearsay, as it is a statement by an out-of-court declarant offered for the truth of the matter asserted"); *see also Beyene*, 854 F.2d at 1183 (upholding exclusion of evidence as hearsay where documents were offered to prove the truth of the matter asserted, and the proffering witness "did not attempt to lay a foundation for any exception to the hearsay rule"); *City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 937-38 (9th Cir. 1995) (upholding exclusion of hearsay). Therefore, the CFPB's proffered evidence that contains hearsay is inadmissible.

Vague and ambiguous (Fed. R. Evid. 403). Defendants object to the CFPB's proffered evidence to the extent it is vague and ambiguous. Evidence that is vague and ambiguous is not admissible under Fed. R. Evid. 403 as it is misleading and results in "confusion of issues." Therefore, the CFPB's proffered evidence that is vague and ambiguous is inadmissible.

Mischaracterizes or Misstates Testimony or Other Evidence (Fed. R. Evid. 403). Defendants object to the CFPB's proffered evidence to the extent it mischaracterizes or misstates testimony. Factual statements which misstate or mischaracterize testimony are not admissible under Fed. R. Evid. 403 as they are misleading and result in "confusion of issues." Therefore, the CFPB's proffered statements which mischaracterize testimony are inadmissible.

Violates the Rule of Completeness (Fed. R. Evid. 106). Defendants object to the CFPB's proffered evidence to the extent it violates the rule of completeness by

excluding any "writing or recorded statement . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106; *see also* *Orr*, 285 F.3d at 775 n.15 (stating the purpose of the "'rule of completeness' of Federal Rule of Evidence 106 . . . is to avoid the misleading impression created by taking matters out of context").

Speculation (Fed. R. Evid. 403). Defendants object to the CFPB's proffered evidence to the extent it is speculative. Speculative evidence is not admissible under Fed. R. Evid. 403, as it is misleading and results in "confusion of issues." *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000) (upholding district court ruling that evidence was too speculative and excluding evidence under Fed. R. Evid. 403). Speculative testimony is also not an appropriate subject for lay opinion testimony. "It is necessary that a lay witness's opinions are based upon . . . direct perception of the event, are not speculative, and are helpful to the determination of factual issues before the jury." *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007). Therefore, the CFPB's proffered evidence which is speculative is inadmissible.

**DEFENDANTS' SPECIFIC EVIDENTIARY OBJECTIONS**

Plaintiff's Genuine Disputes of Material Facts Paragraph 6:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is taken out of context, and thus violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered testimony omits the relevant and undisputable facts that Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. *See* Ex. 8 (Martin A. Webb Deposition ("Webb")) at 69:10-25; Ex. 1 (Delbert Meeks Rule 30(b)(6) Deposition ("Meeks Rule 30(b)(6)")) at 49:17-50:1.

Defendants further object on the ground that by omitting relevant evidence, Plaintiff's proffered dispute of material fact and supporting testimony mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?

A. They were dedicated Western Sky.
Q. Do you remember what their -- what they did?
A. Originally, they reviewed, audited and approved loans.
Q. And how would they review loans made online?
A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 8 (Webb) at 69:10-25.

"THE WITNESS: The system, Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."

Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Plaintiff's Genuine Disputes of Material Facts Paragraph 17:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is vague and ambiguous as to the time period for the matters discussed therein, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object to the proffered dispute of material fact on the grounds that it lacks foundation, violates the rule of completeness as it is taken out of context and mischaracterizes the cited testimony, and thus leads to the confusion of issues. Fed. R. Evid. 106, 403. The testimony makes clear that CashCall chose not to pursue certain options available to it.

"Q. Did you consider having CashCall get additional -- get licenses in additional states as a means to maintain geographic diversity of the servicing portfolio?
A. Yes, we considered it.
Q. And was it successful?
A. Well, we didn't pursue it.
Q. And why didn't you pursue it?
A. Because in those states, in many of those states, the usury laws would not permit you to make or service loans at the rates that we deemed necessary to make a profit or to not go out of business.
Q. And how did -- did then using the tribal lending model allow you to make loan -- to purchase loans that wouldn't make business sense for CashCall to make itself?
A. I'm not sure I understand that question.
Q. Sure. So I was asking you why CashCall itself didn't attempt to get more licenses to make loans, and you said that usury laws would not permit you to make loans at a high enough interest rate to make business sense for CashCall; is that right?
A. Correct.
Q. Okay. And how did using the tribal lending model differ from that situation?
A. Well, as it was explained to me by Ms. Callaway and the other lawyers, first at Manatt and then at Katten, it operated the same way as the bank model. Meaning the bank or the tribal lender could make loans that were exempt from state usury requirements and could transfer those loans to CashCall, assign them to CashCall, and CashCall could then service the loans at these higher interest rates that CashCall itself could not make those loans."

Ex. 508 (Dan Baren Deposition ("Baren")) at 48:2-49:13.

<u>Plaintiff's Genuine Disputes of Material Facts Paragraph 20</u>:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact as the cited testimony regarding the motivations for

withdrawal by the two state-chartered banks is inadmissible hearsay. Fed. R. Evid. 801, 802.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it mischaracterizes the cited testimony, which does not support Plaintiff's stated proposition and instead states, "CashCall stopped purchasing loans from . . . two state chartered banks in November 2008" because of the financial crisis and because the banks' "regulator, the FDIC, was putting a lot of pressure on them . . . to get out of the marketing partnerships." Fed. R. Evid. 403. Ex. 68 (Baren) at 33:10-24.

"Q. And what do you mean by -- when you say 'at that point'?

A. Subsequent to 2009, we had one state, state of West Virginia challenge the bank model, but that didn't really occur until 2011, 2012. And that's the case I told you that I testified in before. But up until that point, the bank model for us had been a smashing success, and Ms. Callaway was the lawyer who brought us that, introduced us to the banks, designed the bank model, and executed on it. So I trusted her. I believed in her. And when she told me that -- that she recommended doing a tribal model, I -- I believed her. I -- I thought that was the right call."

Ex. 508 (Baren) at 32:4-18.

"Q. And why was that change made in November of 2008?

A. If you recall, we had that financial crisis in the 2007, 2008 period. And the banks were coming under increasing scrutiny from the regulators for safety and soundness concerns. And both banks told us that their regulator, the FDIC, was putting a lot of pressure on them for them to get out of the marketing partnerships, which is what these were called. They were very common at that period.

One bank, the -- a bank in South Dakota, told us that they had elected to end all of their relationships. And the other bank was the First Bank of Delaware. They had an action brought against them by the FDIC, I think, with respect to their relationship with CompuCredit. It had nothing to do with us.

And as part of the settlement in that matter, I believe they agreed that they would exit all of their -- their marketing partnerships at that point. And so they came out to us, visited us, I just want to say the summer of 2008, and begrudgingly told us they would have to wind down the program and stop selling loans to us by the end of November."

Ex. 503 (Baren) at 33:14-34:13.

Plaintiff's Genuine Disputes of Material Facts Paragraph 21:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered evidence omits the relevant and unrefuted fact that Claudia Callaway ("Callaway") stated to Defendants that loans originated by a tribal lender would not be subject to state licensing or usury laws or federal laws. Ex. 2 (Baren) at 30:11-32:2; Ex. 14 (CashCall's Supplemental Responses to Plaintiff's First Set of Interrogatories) at Supp. Resp. to Rog. 14.

Defendants further object on the ground that the proffered evidence bears on a wholly different issue than that presented in Defendants' undisputed fact. Plaintiff presents unrelated evidence describing the response by Mark Conley of Katten to changes requested by a lender to an opinion presented by Katten in the context of a 2012 financing. By putting forth evidence that does not directly bear on Defendants' undisputed fact and omitting relevant evidence, Plaintiff's proffered dispute and supporting document lack foundation as they mischaracterize the evidence and lead to the confusion of issues. Fed. R. Evid. 403.

"A. No, no, I think you have it wrong. Ms. Callaway introduced us to Western Sky.
Q. I did have it wrong. And who at Western Sky were you introduced to by Ms. Callaway?
A. Martin Butch Webb.
Q. And what was the circumstance of that introduction?
A. Ms. Callaway was recommending to CashCall that rather than continue

purchasing and servicing loans that were originated by banks, it should start purchasing loans that were originated by a tribal lender. And in the course of those discussions, I asked Ms. Callaway to recommend a tribal lender to us, and she recommended Mr. Webb.

Q. Have you ever heard of "tribal lending" before Ms. Callaway told you about it?"

A. Very vaguely.

Q. Okay. And what do you recall about -- that you knew before Ms. Callaway?

A. I was aware that certain tribes or members of tribes, I wasn't sure at the time -- were originating loans. I didn't know who they were. I didn't know what the legal basis was. It was just something that I heard.

Q. And what was your reaction to her recommendation that you -- or that CashCall use a tribal lender?

MR. NOLAN: Objection. Vague and ambiguous.

A. Well, Ms. Callaway had been our counsel for three, three and a half years at that point. I relied on her and her firm tremendously, and I respected her, and I knew her to be very well versed in regulatory compliance and in consumer lending. So when she recommended to us that we should stop looking for another bank partner and instead move to a tribal lending model, I -- I trusted her, and I believed that she knew what she was talking about because she had brought us the bank model, which had been a very successful model with, at that point, no legal challenges."

Ex. 2 (Baren) at 30:11-32:2.

Plaintiff's Genuine Disputes of Material Facts Paragraph 29:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered evidence omits relevant testimony by Webb about his "other lending businesses" which "were set up similar to . . . Western Sky." Ex. 88 (Webb) at 38:21-41:12.

Defendants further object on the ground that Plaintiff's purported dispute relating to whether Webb's prior business used "the same tribal model advocated by Katten" is manufactured, as it relies upon a fact that refers merely to the timing of when Webb met Callaway and relating to when he signed agreements between CashCall and WS Funding, and Western Sky. By putting forth evidence that does not directly bear on Defendants' undisputed fact and omitting relevant evidence, Plaintiff's proffered dispute and supporting document lacks foundation as it mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. All right. So while you were the president of Western Dakota Bank, you had some other lending businesses as well; is that right?

A. Yes.

Q. Okay. Can you tell me what those were, going from the oldest to the last.

A. I can't remember all, but I can tell you --

Q. Okay.

A. -- some that I do.

The oldest that we started was a company called High Country -- High Country Ventures and Red River Enterprises, I believe. They were operational -- they were short-term payday loans that were operational for approximately 30 to 40 days.

Q. Operational -- the businesses were only operational, or the loans --

A. Correct.

Q. Okay. What happened to that?

A. They were set up similar to what Western Sky, but -- where I sold the paper to try to generate -- let me back up.

The oldest was a company called Lakota Cash. It was a company formed to make short-term loans. It did not sell any paper. So I started the other companies to raise, basically, venture capital to grow Lakota Cash. So what happened with the other two is we were lending, and at the end of 30 days it was obvious I could not control what they were doing, it wasn't my product, and I terminated the agreement.

MR. UMHOFER: Could you specify who "they" is?
THE WITNESS: I don't remember the names. It was under High Country and Red River -- High Country Ventures and Red River Enterprises.
BY MR. MARTIKAN:
Q. So let me ask you a couple questions about that.
So High Country Ventures is an entity that you set up; is that right?
A. Correct.
Q. And High Country Ventures started selling paper to another company?
A. Correct.
Q. Do you remember what that company was?
A. No, I don't.
Q. Do you remember where they were?
A. One of them was in -- yeah, one of them was in Las Vegas, and the other one was in Park City, Utah.
Q. Were there any other companies that High Country Ventures sold paper to?
A. No.
Q. And how about Red River Enterprises? Was that a company you set up?
A. Yes.
Q. And where did Red River --
A. That one -- Red River was Las Vegas; High Country was Park City.
Q. Ah, okay. And were they set up as two different entities to split up the two separate buyers of paper?
A. Correct. Accounting purposes.
Q. And was that paper installment loans?
A. It was short-term payday loans.
Q. Oh, I'm sorry. Payday loans.
A. Yes.

Q. And were they payday loans with tribal law provisions in them?
A. Yes."

Ex. 88 (Webb) at 38:21-41:12.

Plaintiff's Genuine Disputes of Material Facts Paragraph 30:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered evidence omits relevant testimony by Webb about his "other lending businesses" which "were set up similar to . . . Western Sky." Ex. 88 (Webb) at 38:21-41:12.

Defendants further object on the ground that Plaintiff's purported dispute relating to whether Webb's prior business used "the same tribal model advocated by Katten" is manufactured, as it relies upon a fact that refers merely to the timing of when Webb met Callaway relating to when he signed agreements between CashCall and WS Funding, and Western Sky. By putting forth evidence that does not directly bear on Defendants' undisputed fact and omitting relevant evidence, Plaintiff's proffered dispute and supporting document lacks foundation as it mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. All right. So while you were the president of Western Dakota Bank, you had some other lending businesses as well; is that right?
A. Yes.
Q. Okay. Can you tell me what those were, going from the oldest to the last.
A. I can't remember all, but I can tell you --
Q. Okay.
A. -- some that I do.
The oldest that we started was a company called High Country -- High Country Ventures and Red River Enterprises, I believe. They were operational -- they were short-term payday loans that were operational for approximately 30 to 40 days.
Q. Operational -- the businesses were only operational, or the loans --

A. Correct.
Q. Okay. What happened to that?
A. They were set up similar to what Western Sky, but -- where I sold the paper to try to generate -- let me back up.
The oldest was a company called Lakota Cash. It was a company formed to make short-term loans. It did not sell any paper. So I started the other companies to raise, basically, venture capital to grow Lakota Cash. So what happened with the other two is we were lending, and at the end of 30 days it was obvious I could not control what they were doing, it wasn't my product, and I terminated the agreement.
MR. UMHOFER: Could you specify who "they" is?
THE WITNESS: I don't remember the names. It was under High Country and Red River -- High Country Ventures and Red River Enterprises.
BY MR. MARTIKAN:
Q. So let me ask you a couple questions about that.
So High Country Ventures is an entity that you set up; is that right?
A. Correct.
Q. And High Country Ventures started selling paper to another company?
A. Correct.
Q. Do you remember what that company was?
A. No, I don't.
Q. Do you remember where they were?
A. One of them was in -- yeah, one of them was in Las Vegas, and the other one was in Park City, Utah.
Q. Were there any other companies that High Country Ventures sold paper to?
A. No.
Q. And how about Red River Enterprises? Was that a company you set up?
A. Yes.
Q. And where did Red River --

A. That one -- Red River was Las Vegas; High Country was Park City.
Q. Ah, okay. And were they set up as two different entities to split up the two separate buyers of paper?
A. Correct. Accounting purposes.
Q. And was that paper installment loans?
A. It was short-term payday loans.
Q. Oh, I'm sorry. Payday loans.
A. Yes.
Q. And were they payday loans with tribal law provisions in them?
A. Yes."

Ex. 88 (Webb) at 38:21-41:12.

Plaintiff's Genuine Disputes of Material Facts Paragraph 34:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is taken out of context, and thus violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered testimony omits the relevant and undisputable facts that Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. *See* Ex. 8 (Webb) at 69:10-25; Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Defendants further object on the ground that by omitting relevant evidence, Plaintiff's proffered dispute of material fact and supporting testimony mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?
A. They were dedicated Western Sky.
Q. Do you remember what their -- what they did?
A. Originally, they reviewed, audited and approved loans.
Q. And how would they review loans made online?

A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 8 (Webb) at 69:10-25.

"THE WITNESS: The system, Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."

Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Plaintiff's Genuine Disputes of Material Facts Paragraph 39:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it is an improper argument and calls for a legal conclusion, namely, that CashCall was the "true lender." *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions.").

Plaintiff's Genuine Disputes of Material Facts Paragraph 40:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is taken out of context, and thus violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered testimony omits the relevant and undisputable facts that Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. *See* Ex. 8 (Webb) at 69:10-25; Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Defendants further object on the ground that by omitting relevant evidence, Plaintiff's proffered dispute of material fact and supporting testimony mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?

A. They were dedicated Western Sky.

Q. Do you remember what their -- what they did?

A. Originally, they reviewed, audited and approved loans.

Q. And how would they review loans made online?

A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 8 (Webb) at 69:10-25.

"THE WITNESS: The system, Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."

Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Plaintiff's Genuine Disputes of Material Facts Paragraph 42:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it is misleading, and thus results in the confusion of issues. Fed. R. Evid. 403. The fact that Western Sky is a South Dakota limited liability company provides no support to controvert the fact that Western

Sky's offices were located on the Cheyenne River Sioux Reservation ("CRST"), just as asserting evidence that an entity is incorporated in Delaware does not contravene that the entity has offices located in California.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered evidence omits relevant testimony by Webb where he establishes that "the Western Sky offices were located within the exterior boundaries of the [CRST] reservation." Ex. 8 (Webb) at 121:15-122:3.

"Q. You've referred to two locations, Eagle Butte and Timber Lake; is that correct?
A. Correct.
Q. Now, where are those locations --
A. Both are --
Q. -- situated in relationship to the Indian reservation?
A. Both of them are within the exterior boundaries of the Indian reservation. Eagle Butte is actually the headquarters for all the travel offices.
Q. And so is it fair to say that the Western Sky offices were located within the exterior boundaries of the reservation?
A. Not only fair; it's correct."

Ex. 8 (Webb) at 121:15-122:3.

Plaintiff's Genuine Disputes of Material Facts Paragraph 44:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is taken out of context, and thus violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered testimony omits the relevant and undisputable facts that Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. *See* Ex. 8 (Webb) at 69:10-25; Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Defendants further object on the ground that by omitting relevant evidence, Plaintiff's proffered dispute of material fact and supporting testimony mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?

A. They were dedicated Western Sky.

Q. Do you remember what their -- what they did?

A. Originally, they reviewed, audited and approved loans.

Q. And how would they review loans made online?

A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 8 (Webb) at 69:10-25.

"THE WITNESS: The system, Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."

Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Plaintiff's Genuine Disputes of Material Facts Paragraph 52:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the supporting Ellard Declaration ¶¶ 4, 16-19 and 30 lack foundation as the declarant, Jeremiah Ellard, lacks personal knowledge of the volume of calls directed to CashCall versus those handled by

Western Sky as a low-level CashCall loan agent who, by his own admission, "spent most of [his] time processing applications for smaller-dollar loans" (Ex. 521 (Ellard) ¶ 4). Fed. R. Evid. 602.

Defendants further object to the proffered dispute of material fact and the supporting Ellard Declaration ¶ 18 as it is speculative when it states that "[a]ll Western Sky calls *appeared* to go to CashCall" (emphasis added) (Ex. 521 (Ellard) ¶ 18). This speculative statement lacks foundation, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object that the proffered dispute of material fact violates the rule of completeness by omitting relevant testimony establishing that when a borrower called the toll free number, generally, over time, "[t]hey would go to Western Sky first. If Western Sky was not available, they then would be routed to CashCall" after hearing "a recording that would state that there was a possibility that their call would be funneled to a CashCall agent that was acting as . . . a surrogate for Western Sky." Ex. 89 (Meeks Rule 30(b)(6)) at 47:19-48:10.

"Q. In handling the overflow for Western Sky loans was there a difference in the way a CashCall agent would handle a CashCall-originated loan versus a Western Sky loan?

A. The borrower would hear a recording that would state that there was a possibility that their call would be funneled to a CashCall agent that was acting as -- that was acting as a surrogate for Western Sky.

Q. Do you know if when they would hear that recording, whether they were ultimately routed to Western Sky or to CashCall?

A. They would go to Western Sky first. If Western Sky was not available, they then would be routed to CashCall.

Q. And they would hear the recording at what point in that, if you know?

A. At the beginning of the phone call."

Ex. 89 (Meeks Rule 30(b)(6)) at 47:19-48:10.

Finally, Defendants object to the proffered dispute of material fact on the ground that it mischaracterizes the cited testimony, which does not support Plaintiff's statement that "all Western Sky calls" went to CashCall loan officers during the stated time period, and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Was there ever a time when phone inquiries were handled by loan agents at CashCall?

A. I believe they were at the start.

Q. Do you know when that changed?

A. No. I don't remember."

Ex. 509 (Webb) at 75:17-21.

"Q. Going back to the loan agents, were loan agents CashCall employees?

A. It varied over time. At the beginning of the program, all of the loan agents were CashCall employees at CashCall. By the end of the program in the summer of 2013, there were 75 or so loan agents who were on the reservation as Western Sky employees, and that number was growing."

Ex. 508 (Baren) at 59:17-24.

"Q. And logistically speaking, do you mean an individual sitting on the reservation would run the credit of the consumer?

A. No, it was done in an automated fashion. It was the -- there were two ways an applicant could submit an application. The first would be to call up and give their information to a loan agent. Some of whom were at CashCall -- most of whom were at CashCall, some of whom were on the reservation."

Ex. 508 (Baren) at 70:2-10.

Plaintiff's Genuine Disputes of Material Facts Paragraph 56:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it is vague and ambiguous with respect

to whether "Western Sky took the lead," and thus leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object on the ground that the proffered evidence bears on a wholly different issue—whether "Western Sky took the lead with respect to the underwriting guidelines"—than that presented in Defendants' undisputed fact—that "Western Sky drafted and revised [the] underwriting guidelines, with input from CashCall." By putting forth evidence that does not directly bear on Defendants' undisputed fact and omitting relevant evidence, Plaintiff's proffered dispute and supporting document lacks foundation as it mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it mischaracterizes J. Paul Reddam's testimony, which refers to underwriting guidelines developed for use on loans made by CashCall, not Western Sky.

"Q. Can you explain what 'underwriting' is?
A. Underwriting is evaluation of credit for making a loan.
Q. All right. And what is the importance of underwriting to unsecured lending?
A. Well, certainly at CashCall we would never make a loan or buy a loan that hadn't been underwritten, that is evaluated for the likelihood that a borrower can and will repay the loan.
Q. Did CashCall develop its own proprietary underwriting criteria?
A. Yes."

Ex. 512 (J. Paul Reddam Deposition ("Reddam")) at 42:20-43:6.

"Q. Okay. Do you know who determined the terms -- and by 'terms,' I mean, again, interest rate, origination fee, other fees, and repayment length -- for the Western Sky loans?
A. Western Sky would have underwriting guidelines, but CashCall would only buy those loans which met our criteria that we determined on these loans."

Ex. 510 (Delbert Meeks Deposition ("Meeks")) at 40:15-22.

Plaintiff's Genuine Disputes of Material Facts Paragraph 57:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness by taking the proffered testimony out of context, which makes clear that changes to the guidelines were made upon Webb's decision and agreement. Fed. R. Evid. 106. Ex. 90 (Baren) at 62:15-24.

"Q. Okay. What input did you give as far as the products that were to be offered?

A. I'm not sure I gave input. I communicated with Mr. Webb, so I would take input from the CashCall team, and I was the liaison to Mr. Webb. So I would -- I would meet with our people and say, 'Well, this is what we think the program should look like,' and I would have conversations with him where he would give me his input. And at the end of the day, you come up with an agreement."

Ex. 90 (Baren) at 62:15-24.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it mischaracterizes the cited testimony, which does not address Webb's authority and control of changes to underwriting guidelines but merely references loan qualifications for purchase by CashCall, and confuses the issues.

"A. I'm not sure I gave input. I communicated with Mr. Webb, so I would take input from the CashCall team, and I was the liaison to Mr. Webb. So I would -- I would meet with our people and say, 'Well, this is what we think the program should look like,' and I would have conversations with him where he would give me his input. And at the end of the day, you come up with an agreement.

Q. And what input do you recall giving at that time?

A. I remember suggesting to Mr. Webb that we should use almost the same loans that the bank program used because we had learned over three years that these were -- it was a successful program, and the default rates were not significantly high to

where you were going to lose money. And Mr. Webb agreed with that and offered his own thoughts and -- and comments on -- on our proposal."

Ex. 508 (Baren) at 62:17-63:10.

"Q. Okay. And do you know if at any point in time CashCall changed the guidelines for the loans that it would buy from Western Sky?

A. Yes.

Q. Can you tell me how? Explain those changes.

A. Based on the performance of the loans that were purchased from Western Sky, CashCall would then inform Western Sky that we would not be purchasing loans unless it was under these new underwriting guidelines and provide those guidelines to Western Sky, who would then either originate those loans to that and sell them to us or they had the option of originating the loans, how they wanted to sell to others."

Ex. 510 (Meeks) at 54:10-24.

Plaintiff's Genuine Disputes of Material Facts Paragraph 58:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the supporting Ellard Declaration ¶ 31 lacks foundation as the declarant, Jeremiah Ellard, lacks personal knowledge of the day-to-day operations of Western Sky as a low-level CashCall loan agent who, by his own admission, "spent most of [his] time processing applications for smaller dollar loans" (Ex. 521 (Ellard) ¶ 4). Fed. R. Evid. 602.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness, Fed. R. Evid. 106, by omitting testimony from Webb and Baren describing Western Sky's performance of these ultimate, critical acts. *See* Ex. 88 (Webb) at 69:5-25; Ex. 90 (Baren) at 53:12-54:20.

"Q. Now, at the time you started Western Sky, you had -- some of your other businesses were still up and running; right?

A. Correct.

Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?
A. They were dedicated Western Sky.
Q. Do you remember what their -- what they did?
A. Originally, they reviewed, audited and approved loans.
Q. And how would they review loans made online?
A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 88 (Webb) at 69:5-25.

"Q. Okay. So you said one of the things that needed to happen on the reservation was the funding of the loans.
A. Correct.
Q. And we were talking about it in the context of this meetings in April 2009 where you are deciding to go into business --
A. Sure.
Q. -- with Mr. Webb. When you ultimately did go into business with Mr. Webb, how were those loans funded?
A. Sure. Over the next 10 months, what -- what was -- eventually Western Sky was able to open a bank account with Wells Fargo. And the loan funding process was through that Wells Fargo account that was owned and operated by Western Sky. There were initially two types of employees. There were more than two, but for purposes of this -- this question, there's two types of employees on the reservation employed by Western Sky. There is the underwriters and there's the funders. The process, at that point, was the underwriter would review all of the loans that were set to fund on that particular day and provide a final approval for those loans. And that

would entail moving the loans from what was called an underwriting queue into the funding account, funding queue.

And then subsequent to that, another Western Sky employee who was the funder, would go through and perform a final audit and, like I said, press the button to move the -- move the loan from a -- the funding queue to a funded queue, which would instruct Wells Fargo Bank to wire $2600 to this person's bank account."

Ex. 90 (Baren) at 53:12-54:20.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it misstates the evidence, which merely provides the unsubstantiated assertion that, to Ellard, "[i]t did not appear that Western Sky had in place the infrastructure" (Ex. 521 (Ellard) ¶ 31), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. And how would they review loans made online?

A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring.

Q. At the time that you had two to three employees working on these loans, what kind of volume of loans were you approving per day?

A. It was a ramp-up phase, so it was very small. I mean, I couldn't give you the exact number, but it would have been under -- it would have been very limited. I can't guess the number."

Ex. 509 (Webb) at 69:17-70:7.

"Q. -- with Mr. Webb. When you ultimately did go into business with Mr. Webb, how were those loans funded?

A. Sure. Over the next 10 months, what -- what was -- eventually Western Sky was able to open a bank account with Wells Fargo. And the loan funding process was

through that Wells Fargo account that was owned and operated by Western Sky. There were initially two types of employees. There were more than two, but for purposes of this -- this question, there's two types of employees on the reservation employed by Western Sky. There is the underwriters and there's the funders. The process, at that point, was the underwriter would review all of the loans that were set to fund on that particular day and provide a final approval for those loans. And that would entail moving the loans from what was called an underwriting queue into the funding account, funding queue.

And then subsequent to that, another Western Sky employee who was the funder, would go through and perform a final audit and, like I said, press the button to move the -- move the loan from a -- the funding queue to a funded queue, which would instruct Wells Fargo Bank to wire $2600 to this person's bank account.

They were all done in one fell swoop at -- I think it was 1:00 or 1:30 p.m. Mountain Time. But they got loaded from underwriting into funding and then someone on the reservation had the authority to press the button to fund those loans. I'm simplifying it, but that was my understanding of how it got done."

Ex. 508 (Baren) at 53:20-55:2.

Plaintiff's Genuine Disputes of Material Facts Paragraph 59:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it is taken out of context and violates the rule of completeness by omitting relevant testimony by Webb regarding his control over changes to the underwriting guidelines. Fed. R. Evid. 106. The cited testimony makes clear that, while CashCall had input on the underwriting criteria utilized by Western Sky, Western Sky utilized its own set of underwriting criteria and Western Sky controlled which criteria it used. *See* Ex. 88 (Webb) at 26:20-27:3.

"Q. Okay. Do you know how often underwriting guidelines changed during 2011?

A. No, I don't. It could change daily. There was not a set time.

Q. Okay. And what would govern when it changed?

A. It changed based on when I decided there was some collaborated effort between CashCall and myself; however, it only changed ever upon my decision and agreement."

Ex. 88 (Webb) at 26:20-27:3.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it mischaracterizes the cited testimony, which makes clear that, while CashCall had input on the underwriting criteria utilized by Western Sky, Western Sky utilized its own set of underwriting criteria and controlled which criteria it used, and thus leads to the confusion of issues. Fed. R. Evid. 403.

"A. I'm not sure I gave input. I communicated with Mr. Webb, so I would take input from the CashCall team, and I was the liaison to Mr. Webb. So I would -- I would meet with our people and say, 'Well, this is what we think the program should look like,' and I would have conversations with him where he would give me his input. And at the end of the day, you come up with an agreement.

Q. And what input do you recall giving at that time?

A. I remember suggesting to Mr. Webb that we should use almost the same loans that the bank program used because we had learned over three years that these were -- it was a successful program, and the default rates were not significantly high to where you were going to lose money. And Mr. Webb agreed with that and offered his own thoughts and -- and comments on -- on our proposal."

Ex. 508 (Baren) at 62:17-63:10.

"Q. Okay. And do you know if at any point in time CashCall changed the guidelines for the loans that it would buy from Western Sky?

A. Yes.

Q. Can you tell me how? Explain those changes.

A. Based on the performance of the loans that were purchased from Western Sky, CashCall would then inform Western Sky that we would not be purchasing loans

unless it was under these new underwriting guidelines and provide those guidelines to Western Sky, who would then either originate those loans to that and sell them to us or they had the option of originating the loans, how they wanted to sell to others." Ex. 510 (Meeks) at 54:10-24.

Plaintiff's Genuine Disputes of Material Facts Paragraph 60:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the cited testimony is taken out of context, and thus violates the rule of completeness by omitting relevant testimony by Meeks confirming that the origination software "was available to [Western Sky] on Western Sky's own servers" (Ex. 89 (Meeks 30(b)(6)) at 85:3-18). Fed. R. Evid. 106.

"Q. So did Western Sky have access to the software in which the information would be gathered and a score would be spit out?

A. Yes. Yes.

Q. Okay. And was that available to them on Western Sky's own servers?

A. Yes, it was available to them through their origination system.

Q. Okay. And was that origination system, did CashCall have access to that origination system?

A. They had a segmented part of the servers and the CashCall proprietary operating system that they used that they had access to.

Q. Okay. And did CashCall have access to it as well?

A. No."

Ex. 89 (Meeks 30(b)(6)) at 85:3-18.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it misstates the cited testimony, and thus leads to the confusion of issues. Fed. R. Evid. 403. Neither Reddam's testimony (describing CashCall's proprietary software and Reddam's resume) nor Meeks's testimony (describing Western Sky's access to

CashCall's proprietary system) refutes that Western Sky had a server on the Reservation. Further, Plaintiff's reliance upon the Webb testimony is nonsensical insofar as Plaintiff attempts to use it to describe the location of a software program.

"Q. At the time that you had two to three employees working on these loans, what kind of volume of loans were you approving per day?

A. It was a ramp-up phase, so it was very small. I mean, I couldn't give you the exact number, but it would have been under -- it would have been very limited. I can't guess the number.

Q. And I assume they -- well, I don't want to assume.

Would they use some kind of software to do the approval process?

A. Yes.

Q. And would they have computers that were connected to a server in Anaheim?

A. They were connected to the Method software system in Anaheim.

Ex. 509 (Webb) at 70:1-16.

"Q. Okay. Who designed this web page?

A. Well, it was collaborated with CashCall. The logo -- the staff at Timber Lake came up with the logo, but they did help us create it and host it.

Q. All right. So where it says at the bottom here "Powered by Cogility Software," do you know what that is?

A. I don't know. I don't remember."

Ex. 509 (Webb) at 73:10-17.

"Q. All right. And why did you choose to develop your own loan origination and servicing software as opposed to buying something off the shelf?

A. Well, I don't know if there were suitable products on the shelf, but the fellow head of the development team, he had a company. I don't know what it was called at the time; it later became called Cogility. But he said he had new development software that was kind of a next generation, and he could form the next generation of -- of loan software using this Cogility product."

Ex. 512 (Reddam) at 19:12-23.

"Q. Since --- since 2000, let's put it that way.
A. I don't think I've personally prepared it, no.
Q. Okay. Do you remember ever submitting your resume to a state banking department for any reason?
A. I don't remember doing so, no.
Q. All right. Do you remember -- well, let's -- let's just go through -- what's on this document. Looking at the first page -- well, first of all, is that your name and either current or former address up there?
A. Yes.
Q. Okay. Under experience, is that an accurate, reflect your academic experience?
MR. NOLAN: So now you're referring to . . . ."

Ex. 93 (Reddam) at 11:4-20.

"Q. Okay. And was that origination system, did CashCall have access to that origination system?
A. They had a segmented part of the servers and the CashCall proprietary operating system that they used that they had access to.
Q. Okay. And did CashCall have access to it as well?
A. No.
Q. Did Western Sky have access to any other part of CashCall's servers or system other than that segmented --
A. No.
Well, let me qualify. CashCall's IT provided services on behalf of Western Sky to support that origination system, so the IT function had access to the system. Meaning, to do any code updates or any changes that Western Sky desired to be made, they had that access."

Ex. 511 (Meeks 30(b)(6)) at 85:11-86:3.

Plaintiff's Genuine Disputes of Material Facts Paragraph 64:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the CFPB's evidence confuses the issues by citing to testimony that neither addresses nor disputes the fact that Webb construed the agreement to allow him to sell Western Sky loans elsewhere. Fed. R. Evid. 403.

Plaintiff's Genuine Disputes of Material Facts Paragraph 66:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact as its statement that "Webb *appeared* to have no idea about certain advertisements" (emphasis added) is speculative, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by omitting relevant context. Fed. R. Evid. 106, 403. Webb's question is prompted by his receipt of 12 boxes at the mail box. It does not indicate that Western Sky did not participate substantially in drafting the post cards referenced in the email, or other Western Sky marketing materials. Indeed, the cited exhibit confirms the ongoing activities and operations from the Reservation. *See* Ex. 520 (Baren/Webb email chain).

Plaintiff's Genuine Disputes of Material Facts Paragraph 68:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that the proffered supporting testimony is taken out of context, and thus violates the rule of completeness. Fed. R. Evid. 106. Plaintiff's proffered testimony omits the relevant and undisputable facts that Western Sky employees reviewed, audited, and approved Western Sky loans on the Reservation. *See* Ex. 8 (Webb) at 69:10-25; Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1. Defendants further object on the ground that by omitting relevant evidence,

Plaintiff's proffered dispute of material fact and supporting testimony mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did you have any of the same employees working for both businesses, or were these dedicated Western Sky employees?

A. They were dedicated Western Sky.

Q. Do you remember what their -- what they did?

A. Originally, they reviewed, audited and approved loans.

Q. And how would they review loans made online?

A. Every loan came through their -- that office. They would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit -- or not audit -- they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."

Ex. 8 (Webb) at 69:10-25

"THE WITNESS: The system, Western Sky had their own system. CashCall had their system. The loan agent would put in the information from the application and then based on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."

Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1.

Plaintiff's Genuine Disputes of Material Facts Paragraph 70:

Defendants object to the proffered dispute of material fact on the ground that it lacks foundation as it mischaracterizes the testimony and confuses the issues. Fed. R. Evid. 403. The cited testimony relates to a topic wholly unrelated to the stated fact, leading to the confusion of issues. Fed. R. Evid. 403.

"Q. Do you know if the intent of the assignment agreement was for WS Funding to purchase all of Western Sky Financial's unsecured consumer loans?
A. Well, I believe the understanding would be that if they underwrote and closed the loans according to the guidelines that we had worked out with them, that WS Funding/CashCall would buy the loans.
Q. And what were the guidelines that you had worked out with them?
A. The underwriting guidelines I mean."

Ex. 512 (Reddam) at 81:6-17.

"Q. Did CashCall purchase every loan that Western Sky made through the Western Sky loan program?
A. I'm not certain, but I believe so."

Ex. 508 (Baren) at 123:23-124:1.

"Q. Okay. Did Western Sky ever sell paper to anyone other than WS Funding and CashCall?
A. No.
Q. Did Western Sky ever keep any of the loans that it made?
A. No. Three days."
. . .
Is it your memory that WS Funding purchased all of Western Sky's loans?
A. Yes."

Ex. 509 (Webb ) at 46:3-8, 58:19-21.

"Q. Did CashCall ever decline to purchase a loan from Western Sky because it did not meet CashCall's guidelines?
A. Not that I'm aware of."

Ex. 511 (Meeks 30(b)(6)) at 53:6-9.

<u>Plaintiff's Genuine Disputes of Material Facts Paragraph 71</u>:

Defendants object to Plaintiff's statement disputing the fact on the basis that it is "compound." Plaintiff fails to state how, or why, the purportedly compound nature of the fact renders it disputed.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness, lacks foundation as it is mischaracterized and taken out of context, and confuses the issues. "Press a button" is vague and ambiguous, and an incomplete, colloquial description of a technical process, and thus leads to confusion of issues. Fed. R. Evid. 403.

Further, Plaintiff's own Statement of Uncontroverted Facts and Conclusions of Law ("UF") concedes that Western Sky disbursed loan proceeds to borrowers (UF 115; Ex. 505 (Webb) 19:7-19) and that a Western Sky employee would effect the transfer of loan funds to the borrower's account (UF 114; Ex. 508 (Baren) at 52:21-53:5). ECF No. 145.

"Q. Is that the Wells Fargo account that was also used to hold payments from CashCall for the assignment of Western Sky loans?
A. Would you restate that.
Q. Sure. You said that this was an account that was used to fund the Western Sky loans; is that right?
A. Correct.
Q. So -- and it appears that there were deposits into that account from Longwood; is that right?
A. Correct.
Q. Were there deposits into that account from CashCall as well?
A. Yes."

Ex. 505 (Webb) 19:7-19.

"Q. And when you say 'funding of the loans,' what specifically do you mean?
A. Well, the last act of the transaction is the lender -- and I'm -- I'm simplifying this -- presses a button and the loan funds go from the lenders' account to the borrower's account. All of the loans in this program, as well as in the CashCall state-licensed program were all done electronically, and the loan proceeds delivered via wire."

Ex. 508 (Baren) at 52:21-53:5.

Plaintiff's Genuine Disputes of Material Facts Paragraph 72:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it mischaracterizes the testimony. Fed. R. Evid. 403. Plaintiff's cited evidence refers to CashCall's loan purchase criteria, not underwriting criteria. Additionally, because Plaintiff's proffered evidence does not directly bear on Defendants' undisputed fact, which addresses Western Sky's rights, Plaintiff confuses the issues. Fed. R. Evid. 403. Further, Plaintiff mischaracterizes the testimony as "our" and "we" in the testimony do not directly refer to CashCall, which leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Okay. Do you know who determined the terms -- and by 'terms,' I mean, again, interest rate, origination fee, other fees, and repayment length -- for the Western Sky loans?
A. Western Sky would have underwriting guidelines, but CashCall would only buy those loans which met our criteria that we determined on these loans."

Ex. 510 (Meeks) at 40:15-22.

Plaintiff's Genuine Disputes of Material Facts Paragraph 73:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it mischaracterizes the cited testimony. Fed. R. Evid. 403. The cited testimony relating to the Services Agreement provides no support for the stated proposition that "CashCall set up a reserve account . . . into which it deposited enough money to fund

two days of notes, calculated on the previous month's daily average." Moreover, the cited testimony was corrected, pursuant to Fed. R. Civ. P. 30(e) to reflect that no such reserve account was established, as confirmed by other evidence in the record.

"Q. The loan from CashCall, how much was that loan?
A. It varied based on the funding.
Q. Was it a line of credit?
A. Per the services agreement, it averaged two days of funding because on the third day we would purchase loans, which means cash would then go back into the funding account from purchasing of the loans.
. . .
Q. That paragraph which is titled 'Reserve Account,' explains the details of an account at a mutually agreed upon financial institution.
Is that the Wells Fargo account that we talked about earlier?
A. Yes.
Q. And is there anything that you would like to correct or clarify in your testimony about how that account worked based on your review of the agreement itself?
A. No.
Q. Did it, in fact, work as described here in the agreement?
A. And as I described earlier, yes."

Ex. 511 (Meeks 30(b)(6)) at 55:11-17; 72:10-23.

"Q. So is it fair to say that this reserve account allowed you to know that if you approved a loan on a particular day, you had the money to fund it?
A. Correct.
Q. And was the money that went into that reserve account deposited there by WS Funding or CashCall?
A. Yes.
Q. All right. And there's a formula here for how much is supposed to be in there at any given time. And again, I don't know why this is so tiny, but it says, 'Two days'

purchased notes calculated on the previous month's daily average.' Do you have any recollection of that formula?

A. I don't remember.

Q. Was there always enough money in that reserve account for you to do business?

A. Yes."

Ex. 509 (Webb) at 52:1-17.

Plaintiff's Genuine Disputes of Material Facts Paragraph 81:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it violates the rule of completeness, and lacks foundation as the cited exhibit is mischaracterized and taken out of context. Fed. R. Evid. 106, 403. Plaintiff cites to one word in an entire document, failing to provide adequate context, and thus mischaracterizes the evidence.

Defendants further object to the evidence offered by Plaintiff as each document bears a date that is *after* the time period relevant to Defendants' material fact ("[b]efore February 2010"), leading to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Genuine Disputes of Material Facts Paragraph 82:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as the cited evidence is mischaracterized and violates the rule of completeness. Fed. R. Evid. 106, 403. Plaintiff cites to one word in an entire document, failing to provide adequate context, and thus mischaracterizes the evidence.

Defendants further object to the evidence offered by Plaintiff as each document bears a date that is *after* the time period relevant to Defendants' material fact ("approximately January of 2010"), leading to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Genuine Disputes of Material Facts Paragraph 108:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it lacks foundation as it mischaracterizes the testimony and confuses the issues. Fed. R. Evid. 403. The cited testimony does not support the stated proposition that Plaintiff asserts, and relates to a wholly unrelated topic than that of the stated fact.

Plaintiff's Genuine Disputes of Material Facts Paragraph 109:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it confuses the issues. Fed. R. Evid. 403. The cited testimony does not support the stated proposition that Plaintiff asserts, and relates to a wholly unrelated topic than that of the stated fact.

Defendants further object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it is an improper argument and calls for a legal conclusion, namely, whether Reddam's reliance on advice of counsel provided by Katten was reasonable. *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions.").

Plaintiff's Genuine Disputes of Material Facts Paragraph 111:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the grounds that it confuses the issues and constitutes improper argument. The cited testimony does not support the stated proposition that Plaintiff asserts, and relates to a wholly unrelated topic than that of the stated fact, leading to the confusion of issues. Defendants object to the proffered fact on the ground that it is an improper argument because it calls for a legal conclusion, namely, that the choice of law provisions in the Western Sky loan agreements were or were not legally effective. *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions.").

Plaintiff's Genuine Disputes of Material Facts Paragraph 112:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the grounds that it confuses the issues, lacks foundation, and constitutes improper speculation. Fed. R. Evid. 403. The cited testimony does not support the stated proposition that Plaintiff asserts, and relates to a wholly unrelated topic than that of the stated fact. Defendants further object to the proffered fact on the ground that it is an improper argument because it calls for a legal conclusion, namely, that "Reddam could not have 'understood' that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall." *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions.").

Plaintiff's Genuine Disputes of Material Facts Paragraph 128:

Defendants object to the evidence offered by Plaintiff to purportedly dispute Defendants' material fact on the ground that it confuses the issues. The cited testimony, which states "the most common reason for loan applications getting denied," and Webb's opinion of the most common reason one applies for a payday loan, does not support the stated proposition that Plaintiff asserts, and relates to a wholly unrelated topic than that of the stated fact, leading to the confusion of issues (Ex. 8 (Webb) at 100:9-20). Fed. R. Evid. 403.

"Q. What was the most common reason for loan applications getting denied?

A. Income -- no, that wouldn't have been it. It was a combination. I don't know if you could take one out specifically, because generally when you have one reason, it's combined with ten others, because income usually falls length of employment or length of residency or age.

I can tell you, though, the reason most people get a payday loan or installment loan: It's convenience. That's probably something you never heard before, but . . . ."

Ex. 8 (Webb) at 100:9-20 (alteration in original).

Plaintiff's Additional Undisputed Facts Paragraph 166:

Defendants object to the proffered fact on the ground that the phrase "CashCall's money" is vague and ambiguous, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 167:

Defendants object to the proffered fact on the ground that it lacks foundation as the statement "loans were made with the intention that they would be purchased by CashCall three days after they were funded" is unsupported by the cited testimony, and thus leads to the confusion of issues. Fed. R. Evid. 403. There is no evidence that the three day time period was contemplated at the time of funding.

"Q. And then would that note receivable become paid after the three days when CashCall purchased the loan?

A. It was a continual note, meaning if there were three days worth of loans, they would have three days worth of a note receivable on the books. Then once that note was paid, for example on say on a Monday, and you had Thursdays and Fridays, it took it down to two days. But for whatever the note was, was for the balance of loans that were funded and remaining on Western Sky's books until purchased.

Q. And was that settled daily?

A. Yes.

Q. And that's true at CashCall as well at Western Sky?

A. Yes."

Ex. 511 (Meeks Rule 30(b)(6)) at 55:22-56:11.

"Q. Okay. Did Western Sky ever sell paper to anyone other than WS Funding and CashCall?

A. No.

Q. Did Western Sky ever keep any of the loans that it made?

A. No. Three days.

Q. That's what I meant is the full term.

A. No.
Q. So three days was the maximum length of time that Western Sky kept a loan?
A. Correct.
Q. Why was it three days?
A. I don't remember. But at the time there was a regulatory requirement that FDIC had issued about a three-day, and I just don't remember now."

Ex. 509 (Webb) at 46:3-17.

Plaintiff's Additional Undisputed Facts Paragraph 168:

Defendants object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the evidence, which shows that a minimum period of three days elapsed before Western Sky sold a Western Sky loan to WS Funding, and it violates the rule of completeness, because it omits that WS Funding was "only . . . obligated to purchase notes which [were] approved and executed by Western Sky Financial," and which conformed to the representations and warranties made by Western Sky pursuant to the Purchase Agreement (Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC) ¶ 3). Fed. R. Evid. 106, 403.

Defendants further object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the Purchase Agreement between Western Sky and CashCall, which speaks for itself, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 170:

Defendants object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the Western Sky loan agreements, which speak for themselves, and leads to the confusion of issues. Fed. R. Evid. 403.

Defendants further object to the proffered fact on the ground that "Western Sky (in fact, CashCall)" is vague, ambiguous, and unintelligible and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 171:

Defendants object to the proffered fact on the grounds that it lacks foundation, violates the rule of completeness as it omits that the first page of the Western Sky Loan agreements also prominently stated in bold typeface, "This Loan Agreement is subject solely to exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation," and mischaracterizes the evidence, which speaks for itself (Exs. 41-50 (Western Sky loan agreement samples) at 1). Fed. R. Evid. 106, 403. Furthermore, the phrase "typical governing law provision" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 172:

Defendants object to the proffered fact on the grounds that it lacks foundation as it mischaracterizes the Western Sky loan agreements, which speaks for themselves, and that it violates the rule of completeness as it omits that the first page of the Western Sky Loan agreements also prominently stated in bold typeface, "This Loan Agreement is subject solely to exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation" (Exs. 41-50 (Western Sky loan agreement samples) at 1). Fed. R. Evid. 106, 403. Furthermore, the phrase "earlier preamble statement" is vague and ambiguous, and thus is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 173:

Defendants object to the proffered fact on the ground that the statement "South Dakota resident company" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 174:

Defendants object to the proffered fact on the grounds that it confuses the issues in this action, lacks foundation, and mischaracterizes the evidence (as this address was not the place of business of Western Sky). Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 175:

Defendants object to the proffered fact on the ground that the phrase "state entities" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 178:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony (which does not refer to Reddam but to CashCall), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did it use any other either subsidiaries or third parties for collection services?

A. CashCall did use outside third parties similar to Delbert to collect on loans that had been charged off or were heavily delinquent.

Q. What -- what parties did it use?

A. I don't know the names.

Q. From the period of 2010 to 2013, did CashCall servicing department perform all collection services up until the point of charge-off?

A. Yes."

Ex. 510 (Meeks) at 71:1-12.

Plaintiff's Additional Undisputed Facts Paragraph 179:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony, which states only that Delbert was created by the "executive team" and owned by Reddam, and that the "executive team" determined the date at which a loan was "charged off for CashCall financial purposes," and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Can you tell me who created Delbert Services Corporation?

A. It was created -- it was owned by Paul Reddam, and it was created by the executive team of CashCall.

Q. Are you part of that executive team?

A. Yes."

Ex. 510 (Meeks) at 21:19-25.

"Q. Who directed the advertising at CashCall?
A. Paul Reddam."

Ex. 102 (Meeks) at 41:15-16.

"Q. Who comprises the executive team?
A. Paul Reddam, myself, the head of servicing, the head of underwriting, the head of production, the head of risk, the head of marketing, and the head of IT."

Ex. 102 (Meeks) at 46:11-15.

"Q. At some point, did the charge-off -- the date at which a loan was charged off for CashCall financial purposes change?
A. Yes.
Q. What was that change?
A. We originally were, in the very beginning, at 90 days. We moved it to 120, and then we moved it to 150. It's back to 120.
Q. Do you know approximately when those changes were made?
A. I don't recall.
Q. Do you know why those changes were made?
A. Basically, trying to collect and increase the collection rates based on the time to work or modify or work with the borrower. But based on the roll rates, that wasn't successful, and we went back to 120.
Q. Okay. Who made that decision?
A. The executive team."

Ex. 102 (Meeks) at 74:19-75:12.

<u>Plaintiff's Additional Undisputed Facts Paragraph 180</u>:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the evidence, as it does not speak to Reddam's "authority to approve CashCall's agreements with Western Sky," nor any purported participation

in the transaction on behalf of CashCall and WS Funding, and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 181:

Defendants object to the proffered fact on the grounds that it lacks foundation, and mischaracterizes the Reddam CT Statement, which speaks for itself, and thus leads to the confusion of issues. Fed. R. Evid. 403. Furthermore, the proffered fact is vague and ambiguous as to the time period, thus it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 182:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the Reddam CT Statement, which speaks for itself. Fed. R. Evid. 403. Furthermore, the proffered fact is vague and ambiguous as to the time period, thus it is misleading and confuses the issues in this action. Fed. R. Evid. 403. Finally, the proffered fact violates the rule of completeness, as Reddam testified that as of 2009, the referenced statement was "an exaggeration" (Ex. 93 (Reddam) at 30:3-18). Fed. R. Evid. 106.

Plaintiff's Additional Undisputed Facts Paragraph 183:

Defendants object to the proffered fact on the ground that the phrase "claimed similar authority" is vague and ambiguous and thus leads to the confusion of issues. Fed. R. Evid. 403. Defendants further object to the inaccurate characterization of the evidence as a "filing," which is unsubstantiated and thus mischaracterizes the evidence and leads to the confusion of issues. Fed. R. Evid. 403. Additionally, Defendants object to the proffered fact on the grounds that it lacks foundation, mischaracterizes and is unsupported by the cited evidence (which does not discuss Reddam's claimed authority to approve transactions) and leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 184:

Defendants object to the proffered fact on the grounds that it lacks foundation as it mischaracterizes the evidence, and violates the rule of completeness, as the testimony merely identifies individuals who reported to Reddam in 2009, and states that Baren had the authority to create a corporate subsidiary of CashCall without Reddam's approval. Fed. R. Evid. 106, 403. Furthermore, Defendants object to it on the ground that the phrases "significant authority" and "claimed" are vague and ambiguous as they are misleading and confuse the issues in this action. Fed. R. Evid. 403.

"Q. Who reported to you in 2009, directly?

A. Well, the CFO, Del Meeks; the head of servicing, Louis Ochoa; the head of operations for consumer lending, Hilary Holland; Jay Marx, head of mortgage operations; Dan Baren, head of legal. That's all that comes to mind at the moment."

Ex. 512 (Reddam) at 27:17-22.

"Q. Don't speculate. Did anyone at CashCall have the authority to create a corporate subsidiary of CashCall without your approval?

A. Well, that would be something that Dan Baren would do, sure.

Q. Could he do that without your approval?

A. Well, sure.

Q. Did Dan Baren create WS Funding without your approval?

MR. NOLAN: Objection. Lack of foundation. Also calls for speculation. You can answer if you know.

A. I -- I don't know. I mean, I wouldn't have -- had it come up to me, I wouldn't have disapproved it. I wouldn't have said, "Oh, I think that's a bad idea," or something. This would be part of his standard job."

Ex. 512 (Reddam) at 66:14-67:5.

Plaintiff's Additional Undisputed Facts Paragraph 185:

Defendants object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the evidence, as it does not establish that Reddam spoke daily to Baren or "engaged with the 'executive team' regularly," and leads to the confusion of issues. Fed. R. Evid. 403. Furthermore, the phrase "regularly" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

"Q. Who reported to you in 2009, directly?

A. Well, the CFO, Del Meeks; the head of servicing, Louis Ochoa; the head of operations for consumer lending, Hilary Holland; Jay Marx, head of mortgage operations; Dan Baren, head of legal. That's all that comes to mind at the moment."

Ex. 512 (Reddam) at 27:17-22.

"Q. Okay. If you need to discuss the underwriting guidelines and any changes that are needed, would the entire executive team typically participate in that meeting?

A. Yes.

Q. Did you have other regular executive group meetings?

A. No.

Q. Were your executive group meetings essentially ad hoc, as needed?

A. As needed or, like I mentioned earlier, I interact with Paul on a daily basis. He can walk to me very quickly, as is the case with a number of the other executives."

Ex. 510 (Meeks) at 69:8-21.

"Q. And how often currently does the executive team meet?

A. Well, it depends. It's -- there's really no set meetings. There is no 'We are meeting at 9:30 on the third Thursday of every month.' Most of the meetings are just very impromptu. A lot of times I will just go in Paul's office; Paul will come into my office; Del will come into my office; Del will go into to Paul's office. It's very rare that we have a prescheduled meeting."

Ex. 508 (Baren) at 146:1-10.

Plaintiff's Additional Undisputed Facts Paragraph 186:

Defendants object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the evidence (which states that the loan was "about $20 million"), which leads to the confusion of issues.

"Q. Did you, at some point, loan -- make a personal loan to CashCall of about $20 million?
A. Yes.
Q. All right. When was that loan made?
A. I think 2003 or '4, somewhere in there."

Ex. 512 (Reddam) at 58:24-59:3.

Plaintiff's Additional Undisputed Facts Paragraph 187:

Defendants object to the proffered fact on the grounds that it lacks foundation, mischaracterizes the evidence, and is unsupported by the cited testimony (which purports to support only the proposition that Reddam personally guaranteed "CCL 2010 NLP SPE's loan of money from Bayberry Consumer Financial Fund" and does not support the characterization that CashCall used loans personally guaranteed by Reddam "to finance the Western Sky loans and its other consumer loans"), and thus leads to the confusion of issues. Fed. R. Evid. 403. Furthermore, the proffered fact is vague and ambiguous as to the identity of "he," is misleading, and leads to the confusion of issues in this action. Fed. R. Evid. 403

"Q. All right. Did you personally guarantee CCL 2010 NLP SPE's loan of money from Bayberry Consumer Finance Fund?
A. Well, the document would seem to indicate that. But as far as the name goes with all the letters in it, as I had mentioned earlier, the lending of these, a lot of these special-purpose vehicles and they have all these names. And this would be a very good example of that."

Ex. 512 (Reddam) at 136:24-137:7.

"Q. Well, how many loans to CashCall special-purpose vehicles that were tied to unsecured consumer loans did you guarantee?
A. I don't know.
Q. Do you remember, was it more than one?
A. Well, it would have been more than one."

Ex. 512 (Reddam) at 138:17-22.

"Q. Going back for a minute -- I apologize for the lack of organization, but to the investor side of the business, were there times when investors required a personal -- require a personal guaranty for their investment?
A. Yes.
Q. Do you know which investors to CashCall that was true for?
A. Not off the top of my head.
Q. Do you know how many investors that was a condition for their investment?
A. Not the exact number, no.
Q. Who provided those personal guaranties?
A. Paul.
Q. Mr. Reddam?
A. Mr. Reddam.
Q. Can you tell me how it came about that those guaranties were part of the investment criteria?
A. They were requested by the investor.
Q. Was there anyone else who provided any personal guaranties to any investment to CashCall?
A. No.
Q. Do you know how much money Mr. Reddam, overall, guaranteed?
A. No.
Q. Were you part of that negotiation in which that personal guaranty was devised?
A. A little more clarity, if you would.

Q. Sure. It's my understanding that, in large part, you interfaced with the outside investors.
A. Yes.
Q. And you helped to negotiate the terms of those investments; is that true?
A. Yes.
Q. And one of those terms, for some of these investments, was a personal guaranty by Mr. Reddam; is that right?
A. Yes.
Q. And you were part of that negotiation in which the guaranty was a part of the deal?
A. I was part of those discussions.
Q. Did you discuss those with Mr. Reddam individually?
MR. BARLOON: Objection. Vague.
A. Those –
BY MS. HARTMANN:
Q. When a personal guaranty was requested by the investor, did you take that request to Mr. Reddam?
A. The investor and I, once discussing it, would then have to present it to Paul because he would have to, of course, sign off on it.
Q. Was there ever a time when he did not agree to sign off on it?
A. I don't recall."

Ex. 510 (Meeks) at 106:19-108:25.

<u>Plaintiff's Additional Undisputed Facts Paragraph 188</u>:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony (CashCall, not Reddam, hired the advertising agency to create advertising campaigns for CashCall and there is no support for the proposition that Reddam hired an advertising agency to create

advertising campaigns for Western Sky), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. So the next sentence says, 'He coordinates all marketing and advertising and determines where advertising should be directed.' Is it true that in 2009, October 2009 to be more specific, you coordinated all marketing and advertising for CashCall and determined where advertising should be directed?

A. Well, in one sense it's true, in another sense not, in that we use an outside advertising agency named Kovel/Fuller, and they would actually direct where advertising was done and what it looked like, et cetera. And then sometimes I would interface with them.

Q. Did you, at CashCall, have final say over any ad campaign that Kovel/Fuller put together?

MR. NOLAN: Objection. Lack of foundation. Calls for speculation.

A. Not exactly.

BY MR. MARTIKAN:

Q. Did you hire Kovel/Fuller to do advertising campaigns for CashCall?

A. Yes.

Q. All right. Did Kovel/Fuller develop advertising campaigns for CashCall?

A. Yes."

Ex. 512 (Reddam) at 33:20-34:19.

"Q. Agreed with. Do you know if CashCall ever agreed to advertise on Western Sky Financial's behalf?

A. It -- I think the characterization would be, did it ever help Western Sky with its advertising. And the answer to that would be yes."

Ex. 512 (Reddam) at 88:20-25.

"Q. Did WS Funding reimburse Western Sky's marketing expenses?

A. Yes."

Ex. 509 (Webb) at 60:4-6.

Plaintiff's Additional Undisputed Facts Paragraph 189:

Defendants object to the proffered fact on the ground that the phrase "negotiating the agreement with Western Sky" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403. Defendants further object to the proffered fact on the grounds that it lacks foundation, violates the rule of completeness as it is taken out of context and mischaracterizes the cited testimony (which states that "the decision to enter into the Western Sky transaction was a collaborative effort based primarily on the advice we received from counsel"), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403.

"Q. Did Mr. Reddam have final approval over CashCall's agreements with Western Sky?

A. Well, he executed the agreements, but I'm not sure exactly what you mean by 'final approval,' because these agreements were part of a collaborative process among the executive team and also in discussions with Western Sky. So the decision to enter into the Western Sky transaction was a collaborative effort based primarily on the advice we received from counsel."

Ex. 508 (Baren) at 142:3-12.

Plaintiff's Additional Undisputed Facts Paragraph 190:

Defendants object to the proffered fact on the grounds that it lacks foundation and violates the rule of completeness as it is taken out of context and mischaracterizes the cited testimony (wherein Reddam states that "as a whole, [he] would have approved [CashCall] buying loans from Western Sky"), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403.

"Q. Mr. Reddam, did you approve WS Funding's purchase of loans from Western Sky Financial?

MR. NOLAN: Objection. Vague and ambiguous.

A. Well, and as I mentioned earlier, the structuring part, I'm not entirely clear on. But as a whole, I would have approved us buying loans from Western Sky."

Ex. 512 (Reddam) at 82:20-83:2.

Plaintiff's Additional Undisputed Facts Paragraph 193:

Defendants object to the proffered fact on the ground that it mischaracterizes the cited testimony (which makes clear that the decision was for CashCall to stop purchasing loans from Western Sky, not "to wind down the Western Sky loan program"), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Okay. And what did you discuss?
A. We discussed CashCall's Western Sky purchase program.
Q. Okay. And what about it?
A. Well, there had started to be some regulatory issues in a few states, and so she was there to discuss that, and she said that the regulatory environment was in general getting very hostile, and so we discussed whether it would be a good idea to wind down the program."

Ex. 512 (Reddam) at 115:12-21.

"Q. Okay. And did you then decide to wind down the program after that meeting?
A. I absorbed the advice that -- that she gave. It was -- she went on about how the firm still believed in the -- in the program and the structure and so on, and -- but she thought that given the regulatory environment -- I guess -- I don't know if we'd been sued at that point or -- or not. But it was her advice that we would encounter more regulatory problems. So despite what she thought of -- of the structure, that it was legal, et cetera, I should think about that. And subsequently, I decided that we should stop buying loans from Western Sky."

Ex. 512 (Reddam) at 116:2-15.

Plaintiff's Additional Undisputed Facts Paragraph 194:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony (which states that Baren reported to Reddam on the status of the litigation involving the Western Sky loans and that

"[Baren] discussed it quite a bit" (Ex. 512 (Reddam) at 128:19-129:6)), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. Did Dan Baren report to you periodically on the status of the litigation involving the Western Sky loans?

A. He discussed it quite a bit, yes.

Q. By 'quite a bit,' how often?

A. Well, I think for a time it would have been pretty much daily. He was quite distraught about it all.

Q. Okay. And when it was daily, what time frame are we talking about?

A. I mean, I can't say for sure that it was daily. It was just -- what I mean by that, it was a frequent topic."

Ex. 512 (Reddam) at 128:19-129:6.

Plaintiff's Additional Undisputed Facts Paragraph 195:

Defendants object to the proffered fact on the grounds that it lacks foundation, calls for a legal conclusion (that CashCall was the "true lender" without any evidentiary support was not properly pled), and mischaracterizes the cited testimony (as the loans purchased from Western Sky were originated and funded by Western Sky, and Reddam testified that he "wasn't the one who designed the mechanics of . . . these loan purchases."), and thus leads to the confusion of issues. Fed. R. Evid. 403; *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions.").

"Q. Well, you purchased -- CashCall purchased a range of loan products from Western Sky; correct?

A. Yes.

Q. What were they?

A. Well, they were -- there was a -- are we talking about -- there was a 10,000 dollar -- approximately $10,000 loan, $5,000 loan, $2600 loan, $1500 loan. For a while, I think there was an 850."

Ex. 512 (Reddam) at 55:14-22.

"Q. Are you aware that -- that CashCall created a subsidiary called WS Funding?
A. Yes.
Q. When was that done?
A. I'm not exactly sure. Sometime, roughly the beginning of 2010.
Q. Why was that done?
A. I think it was done so that when CashCall purchased loans from Western Sky, the loans could -- were clearly delineated for risk analysis.
Q. For CashCall's risk analysis?
A. Yes."

Ex. 512 (Reddam) at 65:11-22.

"Q. Were you aware that WS Funding entered into an assignment agreement with Western Sky Financial?
A. I'm aware, generally, that WS Funding was technically the vehicle that loans were purchased into, but how the mechanics of that work, I -- I wouldn't be the best one to tell you."

Ex. 512 (Reddam) at 67:6-12.

"Q. Have you ever heard of a company called Western Sky Financial?
A. Yes.
Q. Okay. And do you know if that's Butch Webb's company?
A. Yes.
Q. Okay. So are you aware that -- whether WS Funding entered into an assignment agreement to purchase loans from Western Sky Financial?
A. Well --
MR. NOLAN: Same objection. Lack of foundation. Best evidence is the documents themselves. You can answer the question, if you know.
A. I don't know, and because I wasn't the one who designed the mechanics of -- of these loan purchases. But CashCall or a subsidiary, WS Funding, I suppose, would

have purchased loans from Western Sky, but I don't know, you know, how they followed along the purchase timeline that way."

Ex. 512 (Reddam) at 67:18-68:12.

"Q. Well, what is your understanding of what the deal was between CashCall and Western Sky Financial?

MR. NOLAN: Objection. Assumes facts not in evidence.

A. Well, that it -- from 50,000 feet that CashCall would buy loans that Western Sky closed, and there was pricing formulas for it."

Ex. 512 (Reddam) at 75:1-8.

Plaintiff's Additional Undisputed Facts Paragraph 196:

Defendants object to the proffered fact on the ground that it lacks foundation and mischaracterizes the cited testimony, which does not discuss Western Sky loan arrangements or Reddam's mental state regarding such agreements, and thus leads to the confusion of issues. Fed. R. Evid. 403.

"Q. I'm only asking about CashCall.
A. You're talking about loans that CashCall serviced.
Q. CashCall's own unsecured consumer loans?
A. Loans that it owned?
Q. That it owned? Loans that it serviced.
A. Well, it serviced, I believe, for some other customers. So I don't think I saw reports on that, but CashCall-owned loans, I would have seen it, yes.
Q. All right. When you say 'CashCall-owned,' what does that mean to you?
A. It means that the loans were somehow on CashCall's balance sheet.
Q. All right. Now, were the -- the loans that were assigned to CashCall by Western Sky, would you consider those CashCall-owned loans once they had been assigned?
A. Once we bought them, yes."

Ex. 512 (Reddam) 50:9-51:2.

Plaintiff's Additional Undisputed Facts Paragraph 197:

Defendants object to the proffered fact on the grounds that it lacks foundation, misstates and is unsupported by the cited testimony (Reddam states that "[w]e did not want to buy loans from . . . West Virginia" because "[w]e had litigation there"), and thus leads to the confusion of issues. Fed. R. Evid. 403. Defendant further objects to the proffered fact that "CashCall's biggest business risk was the risk that it would be shut down by state or federal regulators" on the grounds that it lacks foundation, violates the rule of completeness as it is taken out of context and mischaracterizes the cited testimony (Reddam testified that "regulatory risk" could also include "extract[ing] some penalty"), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403.

"Q. What was the biggest risk?

A. I'm not trying to be a smart aleck, but regulatory risk is the biggest risk."

Ex. 512 (Reddam) at 58:8-10.

"Q. Are there any other states that you're aware of that Western Sky did not lend to -- or that Western Sky lends -- loaned money to, but that you did not purchase loans from?

A. We did not want to buy loans from west -- where people were from West Virginia.

Q. Is that because of ongoing litigation there?

A. We had litigation there.

Q. Okay. When did that -- is that a decision that was made at the outset or -- or somewhere after the loan purchases began?

A. I -- I think it was made somehow between Dan and Butch before any -- any arrangement, contract, purchases, et cetera, had happened."

Ex. 512 (Reddam) at 123:13-124:2.

Plaintiff's Additional Undisputed Facts Paragraph 198: Defendants object to the proffered fact on the grounds that it lacks foundation as it mischaracterizes and is

unsupported by the evidence, and thus leads to the confusion of issues. Fed. R. Evid. 403.

In the Consent Judgment entered into between CashCall and the California Attorney General, Reddam was not named, and the judgment did not pertain to Western Sky loans. Further it was "entered without taking any proof and without trial or adjudication of any issue of law or fact." Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827008.

In the Consent Order between the Alaska Department of Commerce, Community, and Economic Development, Division of Banking and Securities, and CashCall, Reddam was not named, and it only addressed an application for a mortgage license and matters unrelated to the Western Sky loans. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827021.

A *complaint* filed by the Florida Office of Financial Regulation does not support Plaintiff's proffered fact that the "Subject Loans were deemed void." Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827027-CC-017827034.

In the administrative order issued by the Maryland Commissioner of Financial Regulation addressing disclosures on CashCall's mortgage lender license application, Reddam was not named, and it did not pertain to the Western Sky loans. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827037.

In the consent order entered into between CashCall, Reddam and the Kansas Office of the State Bank Commissioner and Administrator of the Kansas Uniform Credit Code, the order was described as "an economical and efficient method of resolving the issues" and CashCall "neither admit[ted] or denie[d]" the findings of the state Administrator. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827054.

The judgment in the action *West Virginia v. CashCall, Inc., et al.*, Civ. Action No. 08-C-1964 (Sept. 10, 2012) did not pertain to the Western Sky loans. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827059.

A denial of a license application submitted by CashCall by the Iowa Superintendent of Banking does not support Plaintiff's proffered fact that the "Subject Loans were deemed void." Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827089-CC-017827094.

In the Statement of Charges filed by the Iowa Superintendent of Banking against CashCall, Reddam was not named. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827096.

In the statement of charges filed by the Washington Department of Financial Institutions Division of Consumer Services against CashCall for alleged failure to comply with a subpoena, Reddam was not named. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827104.

In the cease order filed by the Massachusetts Commissioner of Banks against CashCall and WS Funding, LLC, Reddam was not named. Ex. 514 (CashCall, Inc. – Details to Disclosures) CC-017827112.

Plaintiff's Additional Undisputed Facts Paragraph 199:

Defendants object to the proffered fact on the ground that the contention "CashCall detailed these various actions" lacks foundation and mischaracterizes the evidence which merely bears a title page that states "Details to Disclosures," and thus leads to the confusion of issues. Fed. R. Evid. 403. Furthermore, the phrase "these various actions" is vague and ambiguous as it is misleading and confuses the issues in this action. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 200:

Defendants object to the proffered fact on the ground that it lacks foundation and mischaracterizes the Order to Cease and Desist issued by the State of New Hampshire Banking Department (the "Order"). Defendants further object that the fact violates the rule of completeness as it is taken out of context and mischaracterizes the cited evidence, which speaks for itself, and thus leads to the confusion of issues. Fed. R. Evid. 106, 403. In particular, Plaintiff creates a

misleading impression by taking the Order out of context and omitting that the action is still pending and there has been no determination of liability. Fed. R. Evid. 106.

Plaintiff's Additional Undisputed Facts Paragraph 201:

Defendants object to the proffered fact on the ground that it calls for a legal conclusion with respect to purportedly "void loans." *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions."). Defendants further object on the ground that the purported fact lacks foundation as it mischaracterizes the evidence (which does not provide any support for the "repeated warnings" or the statement that "Reddam and the other Defendants" were involved in servicing activities regarding the Western Sky loans), and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 202:

Defendants object to the proffered fact on the grounds that the characterization "CashCall's tribal loans" is vague, ambiguous, unsubstantiated by the proffered evidence, and mischaracterizes the Western Sky loans, thus confusing the issues. Fed. R. Evid. 403. Additionally, Defendants object on the ground that Plaintiff mischaracterizes the lenders as "investors," further confusing the issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 203:

Defendants object to the proffered fact on the grounds that it lacks foundation, violates the rule of completeness as it is taken out of context and mischaracterizes the cited evidence (to the extent it does not contain the quoted language), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403. Defendants further object to the proffered fact on the ground that "reliance of counsel" is not relevant with respect to Defendants' Motion for Summary Judgment, and thus the fact leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 204:

Defendants object to the proffered fact on the grounds that it is vague and ambiguous as to the term "massaging," and lacks foundation and mischaracterizes the evidence (which does not reflect CashCall's involvement in drafting, or changes to, the referenced opinion letter), and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 205:

Defendants object to the proffered fact on the grounds that it is vague and ambiguous as to the terms "this massaging" and "[t]he discussions," and lacks foundation and mischaracterizes the evidence (which does not reflect CashCall's involvement in drafting, or changes to, the referenced opinion letter), and thus leads to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 206:

Defendants object to the proffered fact on the grounds that it lacks foundation, violates the rule of completeness as it is taken out of context and mischaracterizes the cited evidence (which speaks for itself), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403. Regardless of the language cited by Plaintiff, all of the opinion letters present the conclusion that the loans were made by an entity duly and lawfully licensed by the CRST and that CRST law should apply to them. *See* Ex. 17 (April 12, 2010, Katten Letter) at 1, Ex. 23 (June 22, 2011, Bogue and Bogue Letter) at 1, Ex. 24 (November 16, 2010, Katten Letter) at 1, Ex. 34 (July 1, 2011, Katten Letter) at 1, Ex. 36 (May 14, 2010, Bogue and Bogue Letter) at 1, Ex. 39 (June 23, 2010, Katten Letter) at 1.

Plaintiff's Additional Undisputed Facts Paragraph 207:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony (which states that the assumptions in the Katten opinion letter from April 2010 "were actually accurate"). Furthermore, the use of the adjective "equivocal" is an argumentative mischaracterization of the

evidence and thus leads to the confusion of issues. Fed. R. Evid. 403. Defendants further object that the proffered fact is vague and ambiguous as to which opinion letters are referenced in the fact, and is thus misleading and confuses the issues in this action. Fed. R. Evid. 403.

Defendants further object on the ground that the proffered fact lacks foundation and violates the rule of completeness as it is taken out of context, and thus leads to the confusion of issues. Fed. R. Evid. 106, 403. In the testimony, Baren confirms that certain opinion letters "were actually accurate," that he likely did not read the June 23, 2010 opinion letter because if "[he] had read, [he] definitely would have caught" the cited errors, and that he and another partner at Katten notified Callaway of a factual error in the opinion. Ex. 90 (Baren) 163:17-166:01.

"Q. So, as far as you recall, was there a Katten regulatory opinion issued with the April 2010 closing?

A. I'm certain of it, yes.

Q. And do you know if there were changes to that regulatory opinion between -- that are captured in this June 23rd, 2010 opinion?

A. I don't know if there are any changes to the actual body of the opinion, but I can tell you that I'm pretty certain that the assumptions in that initial opinion are different than what I read here.

Q. And what are the differences that you know of?

A. I don't have it in front of me, but I'm pretty sure that the assumptions in there were actually accurate. I believe that it said Western Sky was formed by a member of the CRST and is licensed by the CRST as opposed to the language here that says that Western Sky was actually organized by the CRST, and the second paragraph -- excuse me, the second sentence where it says, 'One or more CRST tribal officers is an owner or director of Western Sky, and CRST has the ability to remove directors.' I'm almost certain that that also was not in the original opinion.

Q. So just focusing on Exhibit 18 that you have in front of you, under 'Assumption of Facts,' is there anything inaccurate in that first full paragraph?
A. Yes. Both sentences are entirely inaccurate.
Q. Okay. Would you have reviewed this letter from Katten before it was finalized?
A. I said it was possible, though not likely. And it's probable that I didn't because that's something that if I had read, I definitely would have caught it.
Q. And do you know why they would have included this inaccurate paragraph?
A. I have no idea. It looks like Claudia made a mistake. Katten made a mistake.
Q. I know you said you don't know if you reviewed this June 23rd, 2010 letter. Do you know if anyone within your legal department would have reviewed it before it was finalized?
A. No. I would have been the only person to review it, if, in fact, anyone reviewed it.
Q. Do you recall seeing this inaccurate paragraph at some point and it being corrected?
A. I recall seeing it at some point, and I recall both Mark Conley and I notified Ms. Callaway that she had a factual error in opinion. I don't know if it was this one, but I know that both Mark and I notified her that she did have a factual error and that she needed to amend her next opinion, or if it was a draft, amend the final opinion to reflect the actual facts. And she in essence said, oops, you're right, in response to that."

Ex. 90 (Baren) 163:17-166:01.

Plaintiff's Additional Undisputed Facts Paragraph 208:

Defendants object to the proffered fact on the grounds that it lacks foundation and misstates the cited evidence (which cites to an opinion letter that contains the correct assertion that Western Sky "is owned exclusively by an enrolled Cheyenne River Sioux Nation ('CSRN' or 'the Tribe') member"), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"WESTERN SKY was organized to engage in the business of lending. It is owned exclusively by an enrolled Cheyenne River Sioux Nation ('CRSN' or 'the Tribe') member, and is registered with the Tribe. All of its offices, officers and employees are located on CRSN tribal lands, and it has no physical or other presence (such as a registered agent or post office box) off of the CRSN reservation."

Ex. 17 (April 12, 2010, Katten Letter) at 2.

Plaintiff's Additional Undisputed Facts Paragraph 209:

Defendants object to the proffered fact on the grounds that it lacks foundation and mischaracterizes the cited testimony (which does not reflect any "concern" on the part of Defendants, but instead references "questions about this concern from our lenders"), and thus leads to the confusion of issues. Fed. R. Evid. 403. Defendants further object to the proffered fact on the ground that it mischaracterizes the "lenders" as "investors," thus leading to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 210:

Defendant objects to the proffered fact on the grounds that it calls for a legal conclusion and lacks foundation as it misstates the evidence (which states that "[Katten has] relied upon the Bogue Opinion, stating that United States state and federal law does not apply to the Loans"), and thus leads to the confusion of issues. Fed. R. Evid. 403.

"[F]or purposes of this opinion, we have assumed, without any independent investigation or analysis that (a) CRST is recognized as an Indian Tribe by the United States; (b) the Agreement and the Loan Agreements have been duly approved by the CRST tribal council; (c) the loans are lawful and valid when made; and (d) the Loan Agreements are validly assigned to Borrower. Further, we have relied upon the Bogue Opinion, stating that United States state and federal law does not apply to the Loans."

Ex. 34 (July 1, 2011, Katten Letter) at 2.

Plaintiff's Additional Undisputed Facts Paragraph 211:

Defendants object to the proffered fact on the grounds that it calls for a legal conclusion and lacks foundation as it violates the rule of completeness (since it fails to acknowledge the Uniform Commercial Code, which was later adopted by the tribal council), and thus leads to the confusion of issues. Fed. R. Evid. 106, 403; *Orr*, 285 F.3d at 783 ("To defeat summary judgment, [a party] must respond with more than mere . . . legal conclusions."). Defendants further object that the proffered fact is controverted by evidence.

Plaintiff's Additional Undisputed Facts Paragraph 212:

Defendants object to the proffered fact on the grounds that it lacks foundation as it violates the rule of completeness (since it fails to acknowledge the Uniform Commercial Code, which was later adopted by the tribal council and supersedes and renders void the cited usury statute), and thus leads to the confusion of issues. Fed. R. Evid. 106, 401, 403. Defendants further object that the proffered fact is controverted by evidence.

Plaintiff's Additional Undisputed Facts Paragraph 213:

Defendants object to the proffered fact on the ground that it is vague and ambiguous as to the term "Subject Loan," which is not defined, and on the ground that "interest rate exceeding eighty percent" is vague as to the evidence, which reflects that the *Annual Percentage Rate* exceeded eighty percent, and thus results in confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 214:

Defendants object to the proffered fact on the ground that it lacks foundation. By taking one sentence out of context of a 16 page opinion letter, which speaks for itself, the proffered fact mischaracterizes the evidence, and violates the rule of completeness. Fed. R. Evid. 106, 403.

Defendants further object to the proffered fact on the ground that it mischaracterizes the "lenders" as "investors," thus leading to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 215:

Defendants object to the proffered fact on the ground that it lacks foundation. The selective quotation eliminates the context of the email, which indicates that the cited question was rhetorical. Thus the proffered fact mischaracterizes the evidence and violates the rule of completeness. Fed. R. Evid. 106, 403.

Plaintiff's Additional Undisputed Facts Paragraph 216:

Defendants object to the proffered fact on the grounds that it lacks foundation as it mischaracterizes the evidence, which reveals that Katten was proposing additional measures to bolster the applicability of CRST law to the loans, as is facially apparent from the term "belts and suspenders" in the cited evidence. Further, the term "sham" in the proffered fact is an argumentative mischaracterization that is unsupported by the evidence. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 217:

Defendants object to the proffered fact on the ground that the terms "Webb's company" and "tribal corporation" are vague and ambiguous and lead to the confusion of issues. Fed. R. Evid. 403.

Plaintiff's Additional Undisputed Facts Paragraph 218:

Defendants object to the proffered fact on the grounds that it mischaracterizes the evidence (which is a redacted document that Defendants have since produced unredacted) and violates the rule of completeness as it purports to rely on one document to support a fact that bears on a much broader allegation. Defendants further object as the fact creates a misleading impression created by taking matters out of context, and omitting that Defendants have produced many documents reflecting communications of counsel within the scope of the limited waiver, which applies to non-litigation-related legal advice regarding the application of state law to

loans originated and funded by Western Sky and purchased by CashCall/WS Funding, thus violating the rule of completeness. Fed. R. Evid. 106, 403.

Plaintiff's Additional Undisputed Facts Paragraph 219:

Defendants object to the proffered fact on the ground that it misstates the cited evidence (which, contrary to Plaintiff's assertion, provides analysis regarding the enforcement of choice of law provisions under Massachusetts, Minnesota, and New Hampshire state law) and violates the rule of completeness by taking the cited evidence out of context. Fed. R. Evid. 106, 403.

Plaintiff's Additional Undisputed Facts Paragraph 220:

Defendants object to the proffered fact on the grounds that it violates the rule of completeness by taking the cited evidence out of context and lacks foundation as it misstates the evidence (which, contrary to Plaintiff's assertion, provides analysis regarding the enforcement of choice of law provisions under Massachusetts, Minnesota, and New Hampshire state law). Fed. R. Evid. 106, 403.

Plaintiff's Additional Undisputed Facts Paragraph 221:

Defendants object to the proffered fact on the grounds that it violates the rule of completeness by taking the cited evidence out of context and lacks foundation as it misstates the evidence (which, contrary to Plaintiff's assertion, provides analysis regarding the enforcement of choice of law provisions under Massachusetts, Minnesota, and New Hampshire state law). Fed. R. Evid. 106, 403.

Plaintiff's Additional Undisputed Facts Paragraph 222:

Defendants object to the proffered fact on the ground that it lacks foundation as it mischaracterizes the evidence. Fed. R. Evid. 403.

Defendants further object as the fact creates a misleading impression created by taking matters out of context, and omitting that Defendants have produced many documents reflecting communications of counsel within the scope of the limited waiver, which applies to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by

CashCall/WS Funding, thus violating the rule of completeness. Fed. R. Evid. 106, 403. Moreover, Defendants object to the proffered fact, as its sole support lies in the declaration of CFPB counsel Barry Reiferson, because conclusory and unsubstantiated assertions offered in a declaration by opposing counsel do not create a genuine dispute to defeat summary judgment. *Wolf v. Travolta*, --- F. Supp. 3d ---, 2016 WL 911469, at *15 (C.D. Cal. Mar. 4, 2016) ("The conclusory and unsubstantiated assertions in the declaration of plaintiffs' attorney . . . does not suffice to defeat summary judgment here").

Plaintiff's Additional Undisputed Facts Paragraph 223:

Defendants object to the proffered fact on the grounds that it violates the rule of completeness and lacks foundation as it mischaracterizes the evidence. Fed. R. Evid. 106, 403.

Defendants further object as the fact creates a misleading impression created by taking matters out of context, and omitting that Defendants have produced many documents reflecting communications of counsel within the scope of the limited waiver, which applies to non-litigation-related legal advice regarding the application of state law to loans originated and funded by Western Sky and purchased by CashCall/WS Funding, thus violating the rule of completeness. Fed. R. Evid. 106, 403. Moreover, Defendants object to the proffered fact, as its sole support lies in the declaration of CFPB counsel Mr. Reiferson, because conclusory and unsubstantiated assertions offered in a declaration by opposing counsel do not create a genuine dispute to defeat summary judgment. *Wolf*, 2016 WL 911469, at *15 ("The conclusory and unsubstantiated assertions in the declaration of plaintiffs' attorney . . . does not suffice to defeat summary judgment here").

Plaintiff's Additional Undisputed Facts Paragraph 224:

Defendants object to the proffered fact on the grounds that it lacks foundation because it mischaracterizes the evidence, violates the rule of completeness, and confuses the issues, as Mr. Reiferson fails to inform the Court that on July 5, 2016,

counsel for Katten served by email upon Mr. Reiferson its objections to the Katten Subpoena. Moreover, Katten did make a partial production of documents responsive to the Katten Subpoena on July 14, 2016. Fed. R. Evid. 106, 403. Moreover, Defendants object to the proffered fact, as its sole support lies in the declaration of CFPB counsel Mr. Reiferson, because conclusory and unsubstantiated assertions offered in a declaration by opposing counsel do not create a genuine dispute to defeat summary judgment. *Wolf*, 2016 WL 911469, at *15 ("The conclusory and unsubstantiated assertions in the declaration of plaintiffs' attorney . . . does not suffice to defeat summary judgment here").

Plaintiff's Additional Undisputed Facts Paragraph 225:

Defendants object to the proffered fact on the grounds that it lacks foundation as it mischaracterizes the evidence, violates the rule of completeness, and confuses the issues, as the assertion that "Defendants have not provided a privilege log or other information concerning the documents responsive to the Katten Subpoena" (Reiferson Decl. ¶ 18) is misleading. Fed. R. Evid. 106, 403. Defendants served privilege logs on June 13, 2016 and July 15, 2016, identifying on a per document basis every document redacted or withheld in response to Plaintiff's First of Requests For Production of Documents to Defendants CashCall, WS Funding, and Delbert. Moreover, Defendants object to the proffered fact, as its sole support lies in the declaration of CFPB counsel Mr. Reiferson, because conclusory and unsubstantiated assertions offered in a declaration by opposing counsel do not create a genuine dispute to defeat summary judgment. *Wolf*, 2016 WL 911469, at *15 ("The conclusory and unsubstantiated assertions in the declaration of plaintiffs' attorney . . . does not suffice to defeat summary judgment here").

DATED: July 18, 2016 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Thomas J. Nolan*
Thomas J. Nolan
*Attorneys for Defendants*