OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar # 264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted *pro hac vice*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>**PLAINTIFF'S REPLY BRIEF SUPPORTING MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: August 1, 2016<br>Time: 1:30pm<br>Court: Hon. John F. Walter<br>Courtroom 16 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii
INTRODUCTION .......... 1
I. Defendants have disclaimed their sovereign immunity affirmative defense. .......... 1
II. CashCall's true-lender status defeats its choice-of-law and sovereignty claims. .......... 1
A. The true-lender analysis is no surprise to Defendants. .......... 2
B. CashCall, not Western Sky, was the true lender. .......... 3
C. The step-transaction doctrine supports the true-lender analysis. .......... 6
D. CashCall's true-lender status defeats Defendants' choice-of-law and tribal-sovereignty claims .......... 6
III. The Subject States' laws apply to the Western Sky loans. .......... 8
A. Federal common law governs the Court's choice-of-law analysis. .......... 8
B. The CRST choice-of-law clause is invalid and the borrowers' states' laws should apply. .......... 8
IV. Defendants' conduct was deceptive, unfair, and abusive. .......... 10
V. Reddam is individually liable for violating the CFPA. .......... 12
CONCLUSION .......... 12

# TABLE OF AUTHORITIES

**Cases**

*Big V Supermarkets Inc. v. Wakefern Food Corp.*, 267 B.R. 71 (Bankr. D. Del. 2001) ........ 6

*CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, No. 80, 2016 WL 3443971 (Md. Jun. 23, 2016) ........ 4

*CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) ........ 3

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287 (9th Cir.1997) ........ 8

*Chevron v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir. 1992) ........ 12

*Coleman v. Quaker Oats*, 232 F.3d 1271 (9th Cir. 2000) ........ 2

*Coughlan v. NXP B.V.*, No. CIV.A. 5110-VCG, 2011 WL 5299491 (Del. Ch. Nov. 4, 2011) ........ 6

*Curry v. United States*, 396 F.2d 630 (9th Cir. 1968) ........ 3

*Easter v. Am. W. Fin.*, 381 F.3d 948 (9th Cir. 2004) ........ 2, 3, 5

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ........ 12

*Hayes v. Delbert Services Corp.*, 811 F.3d 666 (4th Cir. 2016) ........ 9

*In re DirectTV Early Cancellation Litigation*, 738 F. Supp. 2d 1062 (C.D. Cal. 2010) ........ 9

*Jackson v. Payday Financial, LLC*, 764 F.3d 765 (7th Cir. 2014) ........ 8, 9

*Kmiec v. Powerwave Techs. Inc.*, No. SA CV 12-0222 CJC/JPRX, 2014 WL 11512195 (C.D. Cal. Dec. 2, 2014) ........ 3

*Linton v. United States*, 630 F.3d 1211 (9th Cir. 2011) ........ 6

*Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008) ........ 2

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151 (9th Cir. 1996) ........ 8

*Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014) ........ 5, 6

*Shannon-Vail Five, Inc. v. Bunch*, 270 F.3d 1207 (9th Cir. 2001) ........ 8

*Shipley Co. v. Clark*, 728 F. Supp. 818 (D.Mass. 1990) ............................................8
*Sommerfield v. City of Chicago*, 251 F.R.D. 353 (N.D. Ill. 2008) ...............................3
*Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................4
*Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776 (N.D. Cal. Aug. 5, 2013) ..................................................................................6
*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980) ..................................................................................7

**Other Authorities**

*Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343 (U.S. May 24, 2016) (Brief for U.S. as Amicus Curiae) .......................................5
Restatement (Second) of Conflict of Laws § 186 (Am. Law Inst. 1971).....................8
Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971)................8, 9
Restatement (Second) of Conflict of Laws § 195 (Am. Law Inst. 1971)..................10

## INTRODUCTION

The material aspects of the CashCall/Western Sky relationship are not in dispute. CashCall deposited a minimum daily amount of funds into Western Sky's account (UF 50); Western Sky used this money to make loans to consumers (UF 50, 52), and then Western Sky sold all of these loans back to CashCall at 5.145% over their face value, before any payments on the loans were due. UF 49, 53, 54, 56. This transaction had a single purpose: to route CashCall's loans through a company on tribal lands so that CashCall could attempt to avoid state regulation. UF 22. CashCall has no substantial relationship to CRST law, and no basis to invoke tribal sovereignty. The proposition that the Court should examine the economic reality of this relationship, rather than its form, is neither new nor surprising.

In the absence of a valid choice-of-law provision, the Western Sky loan agreements are void under the Subject States' laws. By servicing and collecting on those loans, Defendants engaged in unfair, deceptive, and abusive practices. The Court should grant the Bureau's summary judgment motion.

### I. Defendants have disclaimed their sovereign immunity affirmative defense.

Defendants concede that they are not entitled to claim tribal sovereign immunity. Def. Opp. at 10 n.16. The Court should therefore grant summary judgment in the Bureau's favor on Defendants' affirmative defense asserting tribal sovereign immunity. *See* ECF 84, at 19.

### II. CashCall's true-lender status defeats its choice-of-law and sovereignty claims.

The Court should judge CashCall's relationship with Western Sky based on economic reality, and not mere form. This principle is neither new nor surprising; it is the way most courts, including the Ninth Circuit, have judged similar transactions. Defendants and Western Sky created a sham relationship to allow CashCall to make and service high-interest loans without regard to state or federal law. This sham precludes Defendants from claiming a substantial relationship, material interest, or

fundamental policy purpose in the choice-of-law clause in their adhesion contracts. It also belies their cynical invocation of tribal sovereignty.

**A. The true-lender analysis is no surprise to Defendants.**

Defendants' argument that the Bureau surprised them by arguing that CashCall was not the true lender is wrong, for four reasons. First, during the parties' Local Rule 7-3 conference, the Bureau alerted defense counsel to a Maryland case involving CashCall and Reddam that was decided that very day, and expressly noted that court's holding that CashCall was the "de facto lender" in its rent-a-bank relationship with state-chartered banks. UF 362. The parties' joint report reflects that fact. ECF 138, at 2.

Second, in their own summary-judgment motion, Defendants asserted that Western Sky was the lender to support their arguments that CRST law applied to the loans, and that the Court should respect CRST tribal sovereignty. ECF No. 139 at 3 ("Western Sky was lending under the same model advocated by Katten."), 12-15. It makes no sense for Defendants to argue that the Court should respect CRST law and tribal sovereignty because Western Sky was the true lender, but prohibit the Bureau from arguing that the Court should reach the opposite conclusion because CashCall was the true lender.

Third, the true-lender analysis is not a "claim" that must be pled, but a way for the Court to determine the true economic nature of a transaction. *See Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004). Thus, Defendants' argument that the Bureau was required to amend its complaint before asserting on summary judgment that CashCall, rather than Western Sky, was the true lender is baseless. The Ninth Circuit authority that Defendants cite disproves their position. In *Coleman v. Quaker Oats*, 232 F.3d 1271, 1292 (9th Cir. 2000), the court held that an employment discrimination plaintiff could not plead disparate treatment and then assert disparate impact on summary judgment, because the switch in theories subjected the defendant to "different burdens and defenses." And in *Navajo Nation v. U.S. Forest Service*,

535 F.3d 1058, 1080 (9th Cir. 2008), the Ninth Circuit refused to consider a distinct statutory cause of action (under the National Environmental Policy Act) raised for the first time on summary judgment. None of these concerns exist here, where the Bureau raises no new claim; but asks the Court to look at the substance of the CashCall/Western Sky relationship, as courts have traditionally done in determining the applicability of state usury laws. *E.g.*, *Easter*, 381 F.3d at 957; *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014). Moreover, to the extent that allegations in the First Amended Complaint are relevant, the Bureau alleged that Western Sky loans were made in Western Sky's name, but were marketed, financed, serviced, and collected by Defendants. ECF 27, ¶21.

Fourth, the Bureau's objection, five months ago, to a request for admission seeking a legal conclusion about whether Western Sky was the true lender, is irrelevant. Def. Opp. at 12. Without a clarifying definition of what Defendants meant by the phrase "true lender," this request was indeed objectionable. Some courts have defined the phrase differently in the National Bank Act preemption context, as Defendants note. Def. Opp. at 14. Also, requests for admission seeking broad legal conclusions are impermissible. *Sommerfield v. City of Chicago*, 251 F.R.D. 353, 355 (N.D. Ill. 2008). Similarly, the Bureau properly objected that a contention interrogatory on this issue was premature. *Kmiec v. Powerwave Techs. Inc.*, No. SA CV 12-0222 CJC/JPRX, 2014 WL 11512195, at *1 (C.D. Cal. Dec. 2, 2014). Defendants never moved to compel further answers to either discovery request, and cannot make up for that inaction here.

**B. CashCall, not Western Sky, was the true lender.**

In identifying the true lender in the CashCall/Western Sky relationship, the Court should look to the economic substance of the transaction. *Easter*, 381 F.3d at 957. The "determinative question" is which entity bore the financial risk. *Id.* at 955. As the Ninth Circuit has held, in determining for tax purposes whether a payment was a loan or a capital contribution, "a true lender is concerned with interest." *Curry*

*v. United States*, 396 F.2d 630, 634 (9th Cir. 1968). As Maryland's highest court recently held, the party that receives "the exclusive right to collect all payments of principal, interest and fees, including the origination fee," is the "de facto lender." *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, No. 80, 2016 WL 3443971, *12 (Md. Jun. 23, 2016). Applying that test, the Maryland court held that CashCall was the de facto lender. *Id.* ("This arrangement, in essence, rendered CashCall the de facto lender.").

The Court should reject Defendants' suggestion that Western Sky "put its own money at risk" because it funded loans from a Wells Fargo account and held them for three days. Def. Opp. at 15-16. The Wells Fargo account contained CashCall's money, and Webb testified that he didn't know why he held the loans for three days before selling them. UF 363. Similarly, Defendants' attempt to distinguish *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1192 (N.D. Cal. 2012), by arguing that Western Sky "used its own underwriting guidelines, used its own branded materials in communications with borrowers, and disbursed payments directly to consumers," is unavailing. Western Sky conformed its underwriting guidelines to CashCall's requirements so that CashCall would buy its loans. UF 68. CashCall paid for the "branded materials" that Western Sky used (UF 62, 64, 65), and Western Sky disbursed CashCall's money to consumers. UF 50, 52.

Defendants' claim that Western Sky "bore economic risk on loans it held until sold" is unsupported. Def. Opp. at 18. In fact, Western Sky sold the loans before any payments were due, and CashCall promised to buy the loans if they met CashCall's underwriting criteria. UF 48, 49, 56. Defendant's claim that Western Sky "bore reputational and regulatory risk, as well as the risk that CashCall might go bankrupt," reveals the weakness of Defendants' position. Def. Opp. at 18. Reputational risk was irrelevant to Western Sky, given CashCall's guarantee to pay Western Sky $100,000 per month whether or not any loans were made (UF 55), and CashCall's promise to buy all of Western Sky's loans. UF 47. CashCall assumed Western Sky's regulatory

risk by indemnifying it for civil or criminal penalties. UF 60, 63. And if the only legitimate financial risk Western Sky faced was the risk that CashCall might go bankrupt, that fact argues more strongly than any other that CashCall was the true lender.

Defendants' argument that Western Sky played a "substantial role" in the development of the Western Sky loan program because of various functions that it performed on tribal land (Def. Opp. at 17) is irrelevant to the question that the Ninth Circuit found "determinative" in the true-lender analysis: which entity bore the financial risk. *Easter*, 381 F.3d at 955. Western Sky only nominally "approved and funded loans" on the reservation because the approvals were based on underwriting criteria that CashCall found acceptable, the loans were funded with CashCall's money, and CashCall purchased the loans before any payments had been made, assuming all financial risk on those loans. UF 48, 49, 56.

Defendants rely heavily on the Utah district court's decision in *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014), but that case is both legally and factually irrelevant here. Def. Opp. at 14-15. *Sawyer* is legally irrelevant because the district court held that even accepting the truth of the plaintiff's true-lender allegation, his claim was nevertheless preempted by the National Bank Act. 23 F. Supp. 3d at 1367. *Sawyer*, like the various other National Bank Act cases that Defendants cite in their opposition brief, turned on an interpretation of that statute's preemption provision, which is not at issue here. *Id.* at 1367. Defendants cite the Solicitor General's amicus brief in *Midland Funding, LLC v. Madden*, No. 15-610, as evidence that applying a true-lender analysis here would "disrupt markets" (Def. Opp. at 16), but that brief only discussed National Bank Act preemption, not lending in general, and concerned good faith purchasers in open markets. *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, *11-12 (U.S. May 24, 2016) (Brief for U.S. as Amicus Curiae).

Finally, *Sawyer* is factually irrelevant because the district court found that, unlike here, the state-chartered bank earned interest on loans before assignment and had a financial stake in the arrangement. 23 F. Supp. 3d at 1369. This is not a National Bank Act preemption case. The Court has no reason to refer to cases interpreting that statute to determine who the true lender was.

**C. The step-transaction doctrine supports the true-lender analysis.**

The step-transaction doctrine's end-result test, under which courts examine "whether a series of steps was undertaken to reach a particular result," applies here, where Defendants and Western Sky arranged their transaction with a pre-arranged result: CashCall's ability to lend to consumers throughout the United States without regard to state law. *See* *Linton v. United States*, 630 F.3d 1211, 1224 (9th Cir. 2011). Defendants dismiss the doctrine in a footnote, speculating that its application outside the tax context would have "far-reaching consequences." Def. Opp. at 17. But notwithstanding this claim, courts have already applied the doctrine in other contexts. *See, e.g.*, *Big V Supermarkets Inc. v. Wakefern Food Corp.*, 267 B.R. 71, 91-92 (Bankr. D. Del. 2001) (corporate governance, contract interpretation, fraudulent conveyances); *Coughlan v. NXP B.V.*, No. CIV.A. 5110-VCG, 2011 WL 5299491, at *7 (Del. Ch. Nov. 4, 2011) (breach of merger agreement).

**D. CashCall's true-lender status defeats Defendants' choice-of-law and tribal-sovereignty claims**

CashCall's status as the true lender renders both the choice-of-law clause and tribal sovereignty claim inapplicable. With respect to the choice-of-law clause, the Court should ignore a sham lender's purported interest in the choice of law. *Ubaldi v. SLM Corp.*, No. C 11-01320-EDL, 2013 WL 4015776, at *7 (N.D. Cal. Aug. 5, 2013). Absent Western Sky's purported interest in CRST law, neither Defendants nor any Western Sky borrowers have any relationship at all – much less the substantial relationship required by the Restatement test – to the CRST. Neither Defendants nor the Western Sky borrowers have a reasonable basis to choose CRST

law to govern their transaction. Defendants' choice-of-law argument depends solely on Western Sky's purported interest in the application of CRST law. Def. Opp. at 7-8. With Western Sky disregarded as a sham lender, no valid interest remains.

Defendants' tribal sovereignty claim also rests on the fiction that borrowers of Western Sky loans are transacting with Western Sky, rather than CashCall. Def. Opp. at 10-11. This is a fiction because CashCall is the true lender, but the claim is legally wrong for a more basic reason: the Supreme Court has held that tribal sovereignty cannot justify a tribe's attempt to exempt itself from state tax on transactions with non-Indians "who would normally do their business elsewhere." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155 (1980). In *Colville*, an Indian tribe imposed a minimal tax on its cigarette sales to non-Indians, and invoked the Indian Commerce Clause to claim exemption from a state tax on the sale. *Id*. at 144-45, 147. The Supreme Court held that the tribe could impose its own sales tax on the sales, but also held that neither tribal sovereignty nor any other legal basis allowed the tribe to exempt those sales from the state tax. *Id*. at 153-55. Here, even if the Court were to treat Western Sky as the true lender, tribal sovereignty does not exempt states from applying non-discriminatory laws to transactions with non-Indians who (unlike the cigarette purchasers in *Colville*), have never entered onto tribal land.

Indeed, CashCall's general counsel, Baren, expressed concern in 2010 about the need to "shore up" Western Sky's apparent tribal status so that hedge funds would continue to fund the loan program. UF 364. Outside counsel, Claudia Callaway, recommended having Western Sky (a South Dakota company, UF 36) organized under CRST law to "give confidence" to hedge fund lenders and "to respond to state regulators." UF 365. It is clear from this exchange that Defendants' concern was not with tribal sovereignty, but with constructing a scheme that would preserve their access to hedge-fund capital and avoid regulatory scrutiny. The Court

should reject Defendants' cynical invocation of tribal interests and find that this case does not implicate CRST sovereignty.

## III. The Subject States' laws apply to the Western Sky loans.

### A. Federal common law governs the Court's choice-of-law analysis.

Defendants' argument that this Court must apply the choice-of-law rules of each Subject State to determine which law to apply to the Western Sky loans is wrong. Def. Opp. at 6-7. In federal-question cases, the Ninth Circuit has held that courts apply the choice-of-law rules of the forum state only where the courts have exercised pendent or supplemental jurisdiction over state-law claims. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). That is not the case here, where the Bureau has raised only federal-law claims. *See Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997).

But even if federal common law did not apply, Defendants would still be wrong because then the Court would apply the law of the transferor forum state; in this case, Massachusetts. *Shannon-Vail Five, Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001). And like federal common law, Massachusetts applies the Restatement (Second) of Conflict of Laws §187 (1971). *Shipley Co. v. Clark*, 728 F. Supp. 818, 825 (D.Mass. 1990). The Restatement makes clear that the forum state "will not apply the choice-of-law rules of another state." Restatement (Second) of Conflict of Laws § 186 cmt. (b) (1971).

### B. The CRST choice-of-law clause is invalid and the borrowers' states' laws should apply.

The Seventh Circuit, in *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 775 n.23 (7th Cir. 2014), addressed CashCall's CRST choice-of-law clause and noted (but did not decide) that "a more-than-colorable argument can be made that the loan agreements' choice of law clause should not be enforced and that Illinois law [the law of the borrower's state] ought to govern the dispute." The Seventh Circuit noted that CashCall was not a licensed lender in Illinois, and that CashCall and other loan

entities "tacitly admit that the licensure requirements may call the contract into question." *Id*. The Seventh Circuit found that the agreement's choice-of-forum clause was "unconscionable," a "sham and an illusion," and "not the product of equal bargaining." *Id*. at 777, 778, 779.

The Fourth Circuit also addressed the Western Sky choice-of-law clause and found it to be an implicit waiver of the borrowers' federal rights. *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 675 (4th Cir. 2016). The court held that "a party may not underhandedly convert a choice of law clause into a choice of no law clause," and criticized "the brazen nature" of the loan agreements' language. *Id*. at 676.

As the various federal and state cases involving Defendants or Webb illustrate, this Court does not write on a blank slate in interpreting the Western Sky loan agreements. Any apparent relationship of CRST law to these transactions is a sham. Defendants' purported expert in Native American law, Gavin Clarkson, does not mention once in his 19-page expert report how CRST law would interpret the Western Sky loan agreements. Defendants imply that the CRST has an interest in the non-application of state usury or licensing laws to the Western Sky loan agreements, yet the CRST code criminalizes usury. UF 366. Defendants offer no evidence from the CRST showing any CRST interest in the law that applies to the Western Sky loans. Western Sky's profits inured to Webb, not the CRST. UF 37. And given Western Sky's complete dependence on CashCall's pre-arranged purchase of its loans, the Court should see Western Sky as an arm of CashCall, not of the CRST.

In contrast, each of the Subject States has expressed a fundamental public policy interest in the enforcement of its usury and licensure laws by declaring contracts that violate those laws void. The Restatement has clarified that states may express their fundamental public policies, for purposes of this test, in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Restatement (Second) of Conflict of Laws § 187 cmt. g (1971); *see also In re DirectTV Early Cancellation*

*Litigation*, 738 F. Supp. 2d 1062, 1087 (C.D. Cal. 2010) (quoting Restatement § 187 comment g). The state laws here, which protect consumer borrowers from unlicensed lenders charging usurious interest rates by making such loan contracts void, are just such an expression of fundamental public policy.

Finally, section 195 of the Restatement supports application of the borrowers' states' laws, because the Western Sky loan agreements provide that repayment must be made by EFT from the borrowers' accounts. UF 99; Restatement (Second) of Conflict of Laws § 195 cmt. (1971). Defendants misquote the comment to this rule by suggesting that it requires the contract to specify the state of repayment. Def. Opp. at 10 n.14. Not so; the comment also states the place of repayment need not be explicitly stated in the contract "if it can be determined by necessary inference from the contract's terms." *Id*. The EFT requirement provides that inference. UF 99.

**IV. Defendants' conduct was deceptive, unfair, and abusive.**

By servicing and collecting money from consumers that those consumers did not owe, Defendants engaged in deceptive, unfair, and abusive conduct. Defendants argue that the Bureau's misquotation of Baren's deposition testimony in its opening brief "destroys the Bureau's theory." Def. Opp. at 3. Baren testified that it was probably impossible for a loan applicant *not* to know of CashCall's involvement in the loan origination process; the Bureau quoted Baren as testifying that it was probably impossible for a loan applicant to know of CashCall's involvement in the loan origination process. *Id*.

Defendants are correct that the Bureau inadvertently misquoted Baren, but the error does not "destroy," or even affect, the Bureau's theory. The Court should not credit Baren's testimony about what consumers knew. Whether he agrees or not, the Western Sky loan agreements represented that they were governed by CRST law, and Defendants serviced and collected on the loans as if they were legally enforceable. Defendants do not dispute these facts, which underpin the Bureau's theory. UF 101, 109.

Defendants' argument that their conduct was not deceptive because "disclosures are in the materials" makes no sense here, given that the Bureau's theory rests on the servicing and collection of money that consumers did not owe, and not on the adequacy of any disclosures in the loan agreement. Def. Opp. at 19. Critically, Defendants do not dispute borrowers' testimony that they did not know that their loans were void, or the proposition that a reasonable borrower would rely on the stated terms of a loan, and that those terms would be material to the borrower. UF 119.

Defendants argue that their conduct was not unfair because consumers bargained for their loans in a free market and could thus avoid injury, but this argument would apply to loans that are enforceable according to their terms, not servicing and collecting on loans that are void and not due. Def. Opp. at 21-22. Defendants contend that usury laws are bad policy, but that too is beside the point. Def. Opp. at 22-23. The Bureau's claim is not that Defendants serviced loans that were too expensive, but that they serviced loans for which no payment was due.

With respect to the Bureau's abuse claim, Defendants accuse the Bureau of providing no "support" for the claim that a reasonable consumer would not understand the substance of the Western Sky transaction, or that it was void and not payable under state law. Def. Opp. at 23. This is not true. The Bureau provided declarations from consumers who testified that they did not understand that their loans were void and not payable under state law, and were never told of this fact. UF 119. The loan agreements themselves suggest that they are enforceable under CRST law. UF 109. And Baren and Ellard testified that CashCall loan agents told consumers that they were "assisting" Western Sky with "overflow" telephone calls, falsely reinforcing the impression that Western Sky, and not CashCall, was the lender. UF 81, 82, 325.

**V. Reddam is individually liable for violating the CFPA.**

Reddam argues that the Bureau has done no more "than point to [his] corporate titles" to establish his individual liability. Def. Opp. at 25. Not so. The Bureau detailed Reddam's direct managerial responsibility for Defendants' conduct in its opening brief and in its opposition to Defendants' summary judgment motion. ECF 159, at 24-25; ECF 167, at 15-17. In contrast, Reddam offers only his advice-of-counsel claim, which is unavailable to him as a matter of law, and which he has waived through his refusal to produce relevant attorney-client discovery. *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006); *Chevron v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992).

Based on the undisputed facts presented in the Bureau's opening and opposition briefs, the Court should find Reddam individually liable under the CFPA as a matter of law.

**CONCLUSION**

The Court should grant the Bureau's motion for partial summary judgment.

Dated: July 18, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
Christina S. Coll (CA Bar #250712)
Leanne E. Hartmann (CA Bar #264787)
Barry E. Reiferson (NY Bar #4343893)
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau