OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted *pro hac vice*
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br>v.<br>CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,<br>Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx)<br><br>**COMBINED STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DEFENDANTS' OPPOSITION, AND PLAINTIFF'S REPLY**<br><br>Date: August 1, 2016<br>Time: 1:30pm<br>Court: Hon. John F. Walter<br>Courtroom 16 |

Pursuant to Local Rule 56-1, Plaintiff Consumer Financial Protection Bureau ("Bureau"), as the moving party on the motion for partial summary judgement (ECF 144, 159, Reply filed herewith), respectfully submits this Combined Statement of Facts with its Reply.

## COMBINED STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S MSJ, DEFENDANTS' OPPOSITION, AND PLAINTIFF'S REPLY

| **I. The Defendants** | | |
|---|---|---|
| 1. | Defendant CashCall, Inc. ("CashCall") is a California corporation with its principal place of business at 1 City Boulevard West, Suite 1900, Orange, California 92868. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 5.<br>**Defendants' Response:**<br>Undisputed. |
| 2. | CashCall's headquarters during much of the time period covered by this lawsuit were in Anaheim, California. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 147:18-148:11.<br>**Defendants' Response:**<br>Disputed in part. Defendants do not dispute that CashCall maintained an office located in Anaheim, California between 2009 and 2013, but dispute the statement as to the described time period. The phrase "much of the time period covered by this lawsuit" is vague and ambiguous as the First Amended Complaint ("FAC") does not identify a |

| | | |
|---|---|---|
| | | relevant time period. (Additional Material Fact ("AMF") ¶ 276.)[1]<br><br>**<u>Evidentiary Objection:</u>**<br><br>The cited testimony is vague and ambiguous as to which of CashCall's offices served as its headquarters for what time period. Further objection to the phrase "much of the time period covered by this lawsuit" as vague and ambiguous.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>From at least 2009 to 2013, CashCall maintained its primary office in Anaheim, California. In 2013 it moved its headquarters to Orange, California, where it is still located. *See* Ex. 533, Reddam Dep. 147:4-148:4; Ex. 535, Meeks 30(b)(6) Dep. 15:21-16:4.<br><br>The time period covered by this lawsuit is from the formation of the Western Sky agreements with WS Funding and CashCall to the present. |
| 3. | As part of its business, CashCall made and serviced unsecured loans to subprime borrowers throughout the | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 504, Baren 30(b)(6) Dep. |

[1] "Ex." references are to the exhibits filed with the declarations accompanying the parties' briefs, and set forth in the Tables of Contents of Exhibits and of Declarations, filed herewith. "UF" references are to this table of uncontroverted facts offered by Plaintiff (¶¶ 1-235, 362-366). "AMF" references are to the Additional Material Facts appearing in this document, offered by Defendants (¶¶ 274-361).

| | | |
|---|---|---|
| | United States. | 42:21-25.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. Plaintiff misstates the cited testimony, which describes the "typical CashCall borrower" as "someone with a lower-than-average FICO score, but who has the ability to repay a loan, meaning they have sufficient income, sufficient residual income." Moreover, the evidence does not support the "fact" that CashCall made loans "throughout the United States." As Daniel Baren ("Baren") testified, CashCall had "maybe 10 state licenses" and "only us[ed] five or six of them to make loans." (AMF ¶ 277.)<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation and misstates the cited testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Describing the borrower as having a "lower-than-average FICO score" or as a subprime borrower is a distinction without a difference.<br><br>Furthermore, CashCall made and serviced loans throughout the United States as the true lender of the Western Sky loans, by funding and purchasing consumer loans that were purportedly originated by Western Sky and bearing the financial risk of the Western Sky |

| | | |
|---|---|---|
| | | loans. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004).<br>To fund the Western Sky loans, CashCall deposited into Western Sky's reserve account enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 4. | Defendant J. Paul Reddam is the founder, CEO, sole owner and president of CashCall. | **Plaintiff's Evidentiary Support:**<br>Answer ¶¶ 8, 51; Ex. 52, Baren Decl. ¶ 3.<br>**Defendants' Response:**<br>Undisputed. |
| 5. | Defendant WS Funding is a wholly-owned subsidiary of CashCall. | **Plaintiff's Evidentiary Support:**<br>Answer ¶¶ 6, 8.<br>**Defendants' Response:**<br>Undisputed. |
| 6. | CashCall formed WS Funding, LLC, to serve as a holding company for loans that WS Funding, LLC purchased from Western Sky Financial. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 11.<br>**Defendants' Response:**<br>Undisputed. |
| 7. | Reddam was the president and manager of WS Funding. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 8.<br>**Defendants' Response:**<br>Undisputed. |

| | | |
|---|---|---|
| 8. | WS Funding has no books or financials – they are fully integrated with CashCall's books, records, and financials. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 502, Meeks 30(b)(6) Dep. 38:20-39:1; 39:16-23.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. The testimony cited by Plaintiff states that "WS Funding has no financials," not that "they are fully integrated with CashCall's books, records, and financials," which is incorrect.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation and misstates the cited testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants' response does not dispute the proffered fact. For further support of the fact, *see also* Ex. 535, Meeks 30(b)(6) Dep. 13:22-14:8 (testifying that WS Funding does not have its own books, that WS Funding's financial performance was included in CashCall's financial statements, and that WS Funding is not segregated out as part of those statements.)<br><br>Ex. 534, Meeks Dep. 24:13-22 ("There was no accounting for WS Funding. It was purchased the loans [*sic*]. It was an in-and-out transaction. Q [D]oes it mean that there are no expenses that would be attributable to WS Funding as opposed to CashCall . . .? A. Yes."<br><br>Ex. 501, Meeks Dep. 79:21-81:12 |

| | | |
|---|---|---|
| | | (explaining how consumer loans are reported in the financials, and making no distinction between CashCall originated loans and loans purchased from Western Sky);<br><br>Ex. 528, 2011/2012 Financials at p. 15 (making no distinction between CashCall originated loans and loans purchased from Western Sky). |
| 9. | WS Funding has no owners other than CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Answer ¶¶ 6, 8; Ex. 503, Baren Dep. 139:6-8.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. |
| 10. | WS Funding has no purpose other than to purchase loans from Western Sky and pass them through to CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 502, Meeks 30(b)(6) Dep. 40:1-8; Ex. 503, Baren Dep. 111:22-112:7.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. Plaintiff misstates the testimony, which does not support the contention that WS Funding passes through the loans to CashCall. The cited testimony confirms that CashCall owned the loans "through its subsidiary" WS Funding. CashCall formed WS Funding to serve as a holding company for loans funded by, and then purchased from, Western Sky. (AMF ¶ 331.)<br><br>**<u>Evidentiary Objection:</u>** |

| | | |
|---|---|---|
| | | Proffered fact lacks foundation and misstates the cited testimony. **<u>Plaintiff's Reply:</u>** *See also* Ex. 534, Meeks Dep. 24:2-18 (WS Funding was formed to purchase the loans from Western Sky, had no other business, and that role never changed. When asked about WS Funding's accounting, Meeks testifies: "There was no accounting for WS Funding. It was purchased loans [*sic*]. Then CashCall purchased the loans. It was an in-and-out transaction. There were no books." |
| 11. | Defendant Delbert Services Corp., ("Delbert"), is a Nevada corporation with its principal place of business at 7123 Pollack Drive, Las Vegas, Nevada 89119. | **<u>Plaintiff's Evidentiary Support:</u>** Answer ¶ 7. **<u>Defendants' Response:</u>** Undisputed. |
| 12. | Reddam established Delbert to service debt that CashCall deemed in default, or "charged-off," and to provide collection services for other, unrelated, clients. | **<u>Plaintiff's Evidentiary Support:</u>** Ex. 501, Meeks Dep. 71:3-12. **<u>Defendants' Response:</u>** Disputed in part. While CashCall established Delbert to service debt that CashCall deemed in default, or "charged-off," and to provide collection services for other, unrelated clients, Defendants dispute Plaintiff's mischaracterization of Reddam's role in the establishment of Delbert. Delbert was established by "the executive team of |

| | | |
|---|---|---|
| | | CashCall" which was comprised of Delbert Meeks ("Meeks"), Reddam, the head of servicing, the head of underwriting, the head of production, the head of risk, the head of IT, and the head of marketing. (AMF ¶ 274.) Moreover, the cited evidence provides no support for the proposition that Reddam established Delbert.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation and misstates the cited testimony.<br><br>**Plaintiff's Reply:**<br><br>*See also* Ex. 533, Reddam Dep. 96:13-19 (Q: "What was your involvement with [Delbert Services Corporation]? A. Well, I think that I owned it. It was a collection company.") |
| 13. | Reddam was the founder, director and sole owner of Delbert. | **Plaintiff's Evidentiary Support:**<br><br>Answer ¶ 8; Ex. 503, Baren Dep. 140:6-10; Ex. 52, Baren Decl. ¶ 11.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| **II. CashCall's Unsecured Consumer Loan Business** | | |
| 14. | Reddam formed the company that was later re-named CashCall in 2000, and its initial business was buying and selling houses. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 500, Reddam Dep. 17:2-22.<br><br>**Defendants' Response:**<br><br>Undisputed. |

| | | |
|---|---|---|
| 15. | In 2003, Reddam involved CashCall in unsecured consumer lending to compete with payday loan companies. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 18:17-19:11.<br>**Defendants' Response:**<br>Disputed. Plaintiff misstates the cited testimony, which states that CashCall initially became involved in unsecured consumer lending in light of a perceived "gap between second mortgage and PayDay Loan, and that people would need something in between those two things." This testimony implies that CashCall sought to create an alternative to payday lending, not to compete with it.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and misstates the cited testimony.<br>**Plaintiff's Reply:**<br>CashCall's corporate representative, Dan Baren, supports the fact as proffered: "The alternatives [for a borrower with a lower-than-average FICO] would be a secured title loan or a Payday loan . . . They are going to get the Payday loan, a secured title loan, offering their car as collateral, or they are going to take an unsecured loan by CashCall or someone like CashCall." Ex. 537, Baren 30(b)(6) 43:5-14. |
| 16. | In 2003 or 2004, Reddam made a personal loan of about $21 million to | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 58:24- |

| | | |
|---|---|---|
| | CashCall. | 59:3; Ex. 528, 2011/2012 Financials, p. 20.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 17. | CashCall initially loaned only to customers in California. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam 37:25-38:5.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. While CashCall initially loaned to borrowers in California, Plaintiff misstates the cited testimony, which does not support the "fact" that CashCall initially loaned only in California. Rather, the cited testimony also states that CashCall "might have [loaned in] a couple of other states."<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation and misstates the cited testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants do not dispute the fact offered. For additional evidentiary support, *see also* Ex. 536, Baren Dep. 28:6-12 ("When [CashCall's consumer lending] started out in 2003, it had only a California license.") |
| 18. | The scope of CashCall's market changed in 2006, when Merrill Lynch conditioned further financing on CashCall's diversification of its default risk by expanding its lending nationwide. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam Dep. 59:25-60:15; Ex. 503, Baren Dep. 47:3-18.<br>**<u>Defendants' Response:</u>** |

| | | |
|---|---|---|
| | | Disputed. Defendants dispute this "fact" on the basis that none of the evidence cited makes any reference to "[t]he scope of CashCall's market," nor does it suggest that Merrill Lynch "conditioned further financing on CashCall's diversification of its default risk by expanding its lending nationwide." Moreover, "[t]he scope of CashCall's market" is vague and ambiguous and not referenced in the cited testimony.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation and misstates the cited testimony.<br><br>**Plaintiff's Reply:**<br><br>Baren testified that CashCall moved to the "bank model" in 2006 because "our lenders wanted us to maintain geographic diversity in our servicing portfolio . . ." Ex. 536, Baren Dep. 45:25-46:9.<br><br>Reddam testified (in the testimony cited above) that in 2005, "Merrill Lynch was considering giving CashCall a financing facility. And they said they thought the biggest risk of CashCall's business, at that time, was it didn't have geographic diversity in its portfolio. . . So they were very adamant that CashCall had too much of its business in California and ultimately should buy loans |

| | | |
|---|---|---|
| | | from other parts of the country to diversify that risk." Ex. 500, Reddam 59:25-60:15 |
| 19. | CashCall could not expand its business by obtaining licenses to lend in additional states, because "in many of those states, the usury laws would not permit [CashCall] to make or service loans at the rates [CashCall] deemed necessary to make a profit." | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 48:2-14.<br>**Defendants' Response:**<br>Disputed. The cited testimony is taken out of context. The testimony makes clear that CashCall chose not to pursue certain options available to it.<br>**Evidentiary Objection:**<br>The supporting deposition testimony is vague and ambiguous. The proffered fact lacks foundation and violates the rule of completeness, as it is mischaracterized and taken out of context.<br>**Plaintiff's Reply:**<br>The cited testimony specifically states that CashCall chose not to pursue other options available to it "*because in those states, in many of those states, the usury laws would not permit you to make or service loans at the rates that we deemed necessary to make a profit or to not go out of business.*" Defendants have offered no further "context" that would change or dispute this fact. |
| 20. | Instead, CashCall expanded its business by paying two state-chartered federally- | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 28:13-29:9. |

| | | |
|---|---|---|
| | regulated banks to make loans that CashCall then purchased and serviced. | **Defendants' Response:**<br>Disputed. The cited testimony provides no support for the "fact" that CashCall "pa[id] two state-chartered federally-regulated banks to make loans," and CashCall disputes this "fact." As the testimony reflects, CashCall "started purchasing paper and servicing that paper that it did not originate" from "two state chartered federally regulated banks." (AMF ¶ 320.)<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and misstates the cited testimony.<br>**Plaintiff's Reply:**<br>Defendants' response is nonsensical. It is unclear how CashCall purchased and serviced "paper" (i.e., loans) but that somehow that did not involve paying the banks for that paper. |
| 21. | This model of lending was "a smashing success" for CashCall until the two state-chartered banks withdrew from the arrangement under pressure from the FDIC. | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 32:4-18; 33:14-34:13.<br>**Defendants' Response:**<br>Disputed. The testimony reflects Baren's characterization of the program, and the metric for "success" is not identified. Moreover, the testimony is not a company position or admission on any measure of success of the lending program. Further disputed |

| | | |
|---|---|---|
| | | as the testimony reflects that CashCall also stopped purchasing loans from the two state banks due to the financial crisis, in addition to regulatory issues. (AMF ¶ 286.)<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact mischaracterizes the cited testimony. The phrase "a smashing success" in the proffered fact and supporting testimony is vague and ambiguous.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Baren's characterization of the program is relevant here, where he is a member of CashCall's executive team (Ex. 536, Baren Dep. 143:17-144:14) and testified from his personal knowledge.<br><br>*See also* Ex. 536, Baren Dep. 34:14-35:5 (explaining that the banks stopped selling loans to CashCall because of pressure from the FDIC) |
| **III.** | **Replacing the rent-a-bank scheme with the tribal-lending scheme** | |
| 22. | After CashCall lost its arrangement with the state-chartered banks, the lawyer who had designed and executed the rent-a-bank model, Claudia Callaway, told CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 503, Baren Dep. 32:10-33:6.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. Defendants dispute that CashCall "lost its arrangement with the state-chartered banks." As Baren testified, the business relationship between CashCall and state-chartered banks ended because "[t]he banks didn't want |

| | | |
|---|---|---|
| | the contract rate, and the loans would not be subject to state regulation." | to originate these loans anymore," and thus "there was nothing to buy from them." (AMF ¶ 279.) Defendants dispute the use of the term "rent-a-bank model," as the characterization is pure argument.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation and misstates the cited testimony. The phrase "rent-a-bank model" is an argumentative mischaracterization.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants' dispute cherry-picks the testimony, which supports the fact as proffered. *See also* Ex. 503, Baren Dep. 33:10-35:5 (explaining that the banks stopped selling loans to CashCall because of pressure from the FDIC); original testimony cited makes clear that Callaway brought the tribal model to CashCall to replace the bank model, whereby the loans would not be subject to state regulation. |
| 23. | Baren described the tribal lending model as "almost identical to the [state-chartered] bank model." | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 503, Baren Dep. 33:1-6.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. The statement is taken out of context. The cited testimony by Baren was recounting what CashCall's regulatory counsel had told him about certain features of the tribal lending model, not Baren's own description, or the |

| | | |
|---|---|---|
| | | company position.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact violates the rule of completeness and lacks foundation as it is mischaracterized and taken out of context.<br>**<u>Plaintiff's Reply:</u>**<br>No context provided (or available) disputes this fact. Baren's testimony on this point, Ex. 503, Baren Dep. 32:22-33:6: "I have a recollection of several conversations where [Callaway] said this [tribal model] was now the model that she was recommending to her clients; that . . . under federal Indian law the tribal lender could make these loans, and they could sell the loans to a nontribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation. Almost identical to the bank model."<br>*See also* Ex. 503 Baren 49:6-7 ("[I]t operated the same way as the bank model.") |
| 24. | CashCall established the "tribal lending model" so that a tribal lender could "transfer … loans to CashCall, and CashCall could then service the loans at … higher interest rates" than otherwise allowed under state law. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 49:2-13.<br>**<u>Defendants' Response:</u>**<br>Disputed. Defendants dispute the characterization that CashCall "established" the tribal lending model, as the testimony reflects |

| | | |
|---|---|---|
| | | that CashCall's regulatory counsel recommended that CashCall purchase consumer loans from a tribal member. CashCall did not devise or create the "tribal lending" model. Defendants further dispute that the fact is taken out of context as it omits the statement that "the bank or the tribal lender could make loans that were exempt from state usury requirements," which would determine the rates at which the loans were serviced.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation and violates the rule of completeness as the cited testimony is mischaracterized and taken out of context.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Nothing in Defendants' response or any proffered facts supports their statement above that "CashCall's regulatory counsel recommended that CashCall purchase consumer loans from a tribal *member*." Rather, Baren described the program – as described to him by counsel – as follows: "it operated the same way as the bank model. Meaning the bank *or tribal lender* could make loans that were exempt from state usury requirements and could transfer those loans to CashCall . . ." |

| | | |
|---|---|---|
| | | Furthermore, outside counsel for CashCall did not *establish* any program at CashCall. This is facially invalid: an outside attorney could not "establish" a business model – rather, *CashCall* purchased and serviced loans from the Western Sky – and therefore "established" the program. |
| 25. | Callaway introduced Baren to Martin "Butch" Webb. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 37:25-38:18.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 26. | Mr. Webb was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota, and who had started two or three previous payday lending companies that used the tribal lending model. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 39:13-25; Answer ¶ 19.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. Disputed to the extent "previous" implies that Western Sky was also a payday lending company. As Webb testified, the Western Sky loans were not payday loans, but were installment loans. (AMF ¶ 321.)<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the cited testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' response does not dispute the fact as offered. |
| 27. | The CRST has no substantial relationship to CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 64-71; Ex. |

| | | |
|---|---|---|
| | | 504, Baren 30(b)(6) Dep. 7:18-21.<br>**Defendants' Response:**<br>Disputed. This "fact" is a legal conclusion. The choice-of-law doctrine looks for a "substantial relationship" or "reasonable basis" between the parties or the transaction, and the chosen forum of the choice-of-law provision. A reasonable basis for the choice of law exists when parties choose the law of the place where a party has its principal place of business, or where the contract is formed so long as its formation there is not "wholly fortuitous." Second Restatement § 187(2) cmt. e; *accord Hodas v. Morin*, 442 Mass. 544, 550 (2004) ("place of partial performance considered to be sufficient to establish a reasonable basis for the parties' choice of law"). Here, the parties were Western Sky and the consumers, and there is both a substantial relationship and reasonable basis for selecting CRST law to govern. Whether the CRST has a substantial relationship *to CashCall* is irrelevant for such an analysis.<br>**Evidentiary Objection:**<br>Proffered fact calls for a legal conclusion, is irrelevant and lacks foundation.<br>**Plaintiff's Reply:** |

| | | |
|---|---|---|
| | | Defendants' response does not dispute the fact as offered. |
| 28. | CashCall's executive team met frequently to discuss CashCall business issues. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 142:7-9; 143:17-144:5; Ex. 504, Meeks Dep. 69:13-21.<br>**<u>Defendants' Response:</u>**<br>Disputed. The time period is undefined, the statement is vague and ambiguous as to the terms "frequently" and "CashCall business issues," and the cited testimony does not support the statement. As Meeks testified, meetings of CashCall's executives occurred "[a]s needed" and certain executives informally interacted on a daily basis.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the cited testimony and is vague and ambiguous.<br>**<u>Plaintiff's Reply:</u>**<br>For additional support for this fact, that the executive team met – either formally or informally – on a regular basis, *see* Ex. 512 (Reddam Dep.) 27:17-22 (listing the department heads who reported directly to Reddam); Ex. 510 (Meeks Dep.) 69:8-21; Ex. 508 (Baren Dep.) 146:1-10. |
| 29. | CashCall is not controlled by the CRST. | **<u>Plaintiff's Evidentiary Support:</u>** |

| | | |
|---|---|---|
| | | Ex. 506, CashCall RFA 68.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 30. | The CRST has never held any voting rights in CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 67.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 31. | CashCall is not nor has ever been owned or controlled, in whole or in part, by a member of the CRST. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 69-70.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 32. | CashCall was not established under the laws of the CRST. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 71.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 33. | Webb discussed forming a tribal lending entity that would eventually sell "paper," meaning loans, to CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 39:9-12.<br>**<u>Defendants' Response:</u>**<br>Undisputed, to the extent this fact describes a discussion arranged by Claudia Callaway ("Callaway") that included Martin A. Webb ("Webb"), Baren, and Callaway and other attorneys from Katten. |
| 34. | CashCall did not consider any other partner besides Mr. Webb for the "tribal model." | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 43:23-44:2.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |

| | | |
|---|---|---|
| 35. | Webb formed Western Sky Financial ("Western Sky") in late 2009 with CashCall in mind. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 45:9-12; 45:22-46:2.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 36. | Western Sky was a South Dakota Limited Liability Company, and Webb was its sole owner. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 96:20-22; Answer ¶ 19.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 37. | Webb's plan was to use the money that he made with Western Sky as venture capital to expand his own payday loan company, which was called Lakota Cash. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 45:19-21.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 38. | Baren considered WS Funding's purchase of the loans from Western Sky as the same as CashCall purchasing the loans, since CashCall was WS Funding's parent. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 119:5-20.<br>**<u>Defendants' Response:</u>**<br>Disputed. The testimony, which was in reference to a specific question that stated that CashCall purchased the loans from Western Sky, is taken out of context. The generalization of this testimony, outside of the context of the specific question asked, is unsupported by the evidence.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact violates the rule of completeness and lacks foundation as it mischaracterizes the |

| | | |
|---|---|---|
| | | testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' response does not provide context or evidence that disputes this fact. Baren testifies later, by way of explanation: "CashCall is the parent company. CashCall has dozens and dozens of what are called special-purpose entities that are subsidiaries owned by CashCall. WS Funding was one such subsidiary that was created for the purpose of purchasing the loans that were originated by Western Sky." Ex. 536, Baren Dep. 122:15-123:2.<br>In further support of this proposition, Meeks testified in his individual and corporate representative capacity that WS Funding and CashCall were one in the same for financial purposes. Ex. 534, Meeks Dep. 24:13-22 ; Ex. 535, Meeks 30(b)(6) Dep. 13:22-14:8. |
| 39. | WS Funding was a wholly owned subsidiary of CashCall, and was a pass-through for Western Sky Loans. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 502, Meeks 30(b)(6) Dep. 40:1-8.<br>**<u>Defendants' Response:</u>**<br>Disputed. The statement misstates the testimony, which does not support the contention that WS Funding was a "pass-through for Western Sky loans." The cited testimony reflects that there was no functional difference between |

| | | |
|---|---|---|
| | | CashCall's ownership of Western Sky loans as compared to WS Funding's ownership.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact violates the rule of completeness and lacks foundation as it mischaracterizes the testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Additional supporting evidence for the stated fact: Ex. 535, Meeks 30(b)(6) Dep. 13:22-14:8 (testifying that WS Funding does not have its own books, that WS Funding's financial performance was included in CashCall's financial statements, and that WS Funding is not segregated out as part of those statements.)<br><br>Ex. 534, Meeks Dep. 24:13-22 ("There was no accounting for WS Funding. It was purchased the loans [*sic*]. It was an in-and-out transaction. Q [D]oes it mean that there are no expenses that would be attributable to WS Funding as opposed to CashCall . . .? A. Yes."<br><br>Ex. 501: Meeks Dep. 79:21-81:12 (explaining how consumer loans are reported in the financials, and making no distinction between CashCall originated loans and loans purchased from Western Sky);<br><br>Ex. 528, 2011/2012 Financials at p. 15 (making no distinction |

| | | |
|---|---|---|
| | | between CashCall originated loans and loans purchased from Western Sky). |
| **IV.** | **The structure of CashCall's arrangement with Western Sky** | |
| 40. | CashCall and Western Sky formalized their relationship in two agreements signed by Reddam and Webb on behalf of their companies: (1) an assignment agreement, and (2) a service agreement. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 134:1-136:6.<br>**<u>Defendants' Response:</u>**<br>Undisputed, but Defendants clarify that four agreements were executed, but two were revised to correct a typographical error, resulting in an operative Services Agreement and an operative Agreement for Assignment and Purchase of Promissory Notes ("Purchase Agreement"). (AMF ¶ 68.) |
| 41. | There was an "Agreement for Service" ("Services Agreement") between CashCall and Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 3; Services Agreement.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 42. | The Services Agreement was signed by J. Paul Reddam on behalf of CashCall, and by Martin "Butch" Webb on behalf of Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 2.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 43. | The Services Agreement was in effect throughout the period of time beginning on January 9, 2010, and ending on August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 3.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |

| | | |
|---|---|---|
| 44. | There was an Assignment Agreement between WS Funding and Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 134:1-13; 135:1-136:1; Ex. 19, Assignment Agreement.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 45. | Reddam signed the Assignment Agreement between Western Sky and WS Funding on February 1, 2010. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 507, Reddam RFA 6, 7.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 46. | These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 136:2-6;<br>Ex. 504, Baren 30(b)(6) Dep. 7:25-8:17.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The proffered evidence does not bear on the duration of the two agreements.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br>**<u>Plaintiff's Reply:</u>**<br>In further support of this statement, Plaintiff cites Ex. 506 CashCall RFA No. 3, in which CashCall admits the Services Agreement was in effect throughout the period of January 9, 2010, and ending on August 31, 2013. Plaintiff further replies that given the above-referenced RFA |

| | | |
|---|---|---|
| | | response, Defendants' Response is in bad faith. |
| 47. | Under the assignment agreement, signed in February 2010, CashCall, through WS Funding, agreed to buy loans from Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 19, Assignment Agreement.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. Plaintiff characterizes the language of the Purchase Agreement, which speaks for itself. Of relevance here, WS Funding was "only . . . obligated to purchase Notes which [were] approved and executed by Western Sky Financial," and which conformed to the representations and warranties made by Western Sky pursuant to the Purchase Agreement.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the Purchase Agreement, which speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>The Assignment and Purchase Agreement (Ex. 19) states, at ¶ 2, "Company hereby agrees to purchase from Western Sky Financial *all loans* made through www.westernsky.com as evidenced by the Notes." While the Agreement contains other provisions, including representations by Western Sky (Ex. 19 at ¶ 7), nothing in the agreement disputes the provision |

| | | |
|---|---|---|
| | | in ¶ 2. |
| 48. | CashCall bought all of Western Sky's loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 81:6-17; Ex. 503, Baren Dep. 123:23-124:1; Ex. 505, Webb Dep. 58:19-21; Ex. 502, Meeks 30(b)(6) Dep. 53:6-9; Ex. 19, Assignment Agreement, ¶ 2.<br>**Defendants' Response:**<br>Undisputed. |
| 49. | CashCall bought Western Sky's loans before consumers made any payments on the loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 111:17-112:7.<br>**Defendants' Response:**<br>Undisputed. |
| 50. | To fund the Western Sky loans, CashCall set up a reserve account for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. | **Plaintiff's Evidentiary Support:**<br>Ex. 502, Meeks 30(b)(6) Dep. 55:11-17; 72:10-23; Ex. 19, Assignment Agreement, ¶ 9; Ex. 505, Webb Dep. 52:1-17.<br>**Defendants' Response:**<br>Disputed in part. Defendants dispute that "CashCall set up a reserve account for Western Sky," as CashCall did not set up the account from which loans were funded. (AMF ¶ 298.) Defendants do not dispute that Western Sky funded loans from a Western Sky account it maintained at Wells Fargo that was funded in part by monies lent by CashCall pursuant to a promissory note. (AMF ¶ |

| | | |
|---|---|---|
| | | 288.)<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Regardless of who physically set up the reserve account at Wells Fargo (the Assignment Agreement states that it was CashCall's responsibility to set that up, Ex. 19 at ¶ 9), it is undisputed that to fund the Western Sky loans, a reserve account was set up for Western Sky, into which CashCall deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 509 (Webb Dep.) 52:1-17. |
| 51. | The amount loaned to the borrower through Western Sky's account was held on CashCall's books as an account receivable. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 502, Meeks 30(b)(6) Dep. 55:18-21.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. The cited testimony is mispresented and taken out of context. The proffered response by Meeks refers to how a loan made by CashCall to Western Sky was accounted for by CashCall, not how amounts loaned to borrowers were accounted for. (AMF ¶ 281.)<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation |

| | | |
|---|---|---|
| | | and violates the rule of completeness as the cited testimony is mischaracterized and taken out of context.<br><br>**Plaintiff's Reply:**<br><br>Loans were funded by Western Sky's funding account held at Wells Fargo Bank. That account was funded by CashCall, averaging two days of funding of loans, represented on CashCall's books as a continual note receivable from Western Sky, which was then adjusted for the loans purchased by CashCall three days after funding from the Western Sky funding account. Ex. 353, Meeks 30(b)(6) Dep. 55:1-56:11 |
| 52. | Western Sky used this money to make loans. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 505, Webb Dep. 52:1-17.<br><br>**Defendants' Response:**<br><br>Disputed in part. The phrase "this money" is vague and ambiguous. To the extent this statement refers to money held in a bank account by Western Sky, Defendants do not dispute that Western Sky funded loans from a Western Sky account it maintained at Wells Fargo that was funded in part by monies lent by CashCall pursuant to a promissory note. (AMF ¶ 288.)<br><br>**Evidentiary Objection:** |

| | | |
|---|---|---|
| | | The phrase "this money" in the proffered fact is vague and ambiguous.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Plaintiff does not dispute the clarification offered by Defendants. The statement is still undisputed and accurate as written. |
| 53. | Three days after a loan was funded, Western Sky sold it to CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 502, Meeks 30(b)(6) Dep. 55:22-56:11; Ex. 505, Webb Dep. 46:3-17.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. The evidence shows that a minimum period of three days elapsed before Western Sky sold a Western Sky loan to WS Funding. (AMF ¶ 289.)<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Plaintiff does not dispute the clarification offered by Defendants. The statement is still undisputed and accurate as written. |
| 54. | CashCall paid Western Sky for the full face value of the loans, plus 5.145%. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 19, Assignment Agreement, Ex. 502, Meeks 30(b)(6) Dep. 67:4-11; Ex. 505, Webb Dep. 48:10-13.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. "Full face value of the loans" is vague and |

| | | |
|---|---|---|
| | | ambiguous, and the statement does not indicate what value is used for the 5.145% calculation. CashCall paid Western Sky the amount disbursed to the borrower under the loan agreement, and a premium of 5.145% based off of the principal loan amount for some loan products, and off of the amount disbursed to the borrower for other loan products. (AMF ¶ 290.)<br><br>**Evidentiary Objection:**<br><br>The phrase "full face value of the loans" in the proffered fact is vague and ambiguous and lacks foundation.<br><br>**Plaintiff's Reply:**<br><br>Plaintiff does not dispute the clarification offered by Defendants. The statement is still undisputed and accurate as written. |
| 55. | CashCall also guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 19, Assignment Agreement, ¶¶ 3, 5; Ex. 502, Meeks 30(b)(6) Dep. 67:12-68-14; 69:2-7, Ex. 505, Webb Dep. 48:17-19; 50:5-12.<br><br>**Defendants' Response:**<br><br>Disputed in part. "[A]lso" is vague and ambiguous and does not specify the referenced payment. Defendants do not dispute that pursuant to the Purchase |

| | | |
|---|---|---|
| | | Agreement, CashCall paid Western Sky the greater of 5.145% of the amount disbursed to borrowers under the loan agreements, or a guaranteed minimum payment of $100,000 per month. CashCall also paid Western Sky a monthly administration fee of $10,000.<br><br>**Evidentiary Objection:**<br><br>The phrase "also" in the proffered fact is vague and ambiguous.<br><br>**Plaintiff's Reply:**<br><br>Plaintiff does not dispute the clarification offered by Defendants. The statement is still undisputed and accurate as written. |
| 56. | Western Sky agreed to sell loans to CashCall before any payments on them had been made. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 19, Assignment Agreement; Ex. 503, Baren Dep. 111:17-112:7.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 57. | Borrowers who took out Western Sky loans remitted all payments to CashCall. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 503, Baren Dep. 111:17-112:7; Ex. 52, Baren Decl. ¶ 9.<br><br>**Defendants' Response:**<br><br>Disputed in part. The statement implies, without support, that borrowers made all payments due pursuant to the loan agreements. Defendants do not dispute that |

| | | |
|---|---|---|
| | | once a loan was sold from Western Sky to CashCall, any payments remitted by borrowers were made to CashCall.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the cited testimony and declaration.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Pursuant to the Assignment Agreement, all Western Sky loans were purchased by CashCall a minimum of three days after being funded. Ex. 66 (Meeks Dep.) 56:18-21; Ex. 68 (Baren Dep.) 105:2-9; 119:14-20.<br><br>According to Baren: "the first payment wasn't due until at least 15 days, usually, miminum, after the loan was originated. So the loan would have been sold to CashCall at that point. So CashCall as the . . . CashCall through its subsidiary [WS Funding] as the owner and CashCall as the servicer would be the one tracking the payments" from borrowers. Ex. 503, Baren Dep. 111-22-112:7 |
| 58. | Once Western Sky sold a loan to CashCall all economic risks and benefits of the transaction passed to CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 505, Webb Dep. 46:6-8; 84:7-23.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. |

| | | |
|---|---|---|
| 59. | The default risk, which CashCall's Chief Financial Officer identified as its most serious risk, was borne by CashCall. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 103:8-12.<br>**Defendants' Response:**<br>Disputed. Neither the statement, nor the supporting testimony, indicates that this fact relates to loans originated and funded by Western Sky.<br>**Evidentiary Objection:**<br>Proffered "fact" lacks foundation and mischaracterizes the evidence<br>**Plaintiff's Reply:**<br>Defendants' response cites no evidence that supports its contention that the fact would *not* relate to loans originated and funded by Western Sky as well as those that CashCall originated itself. CashCall as a business has with integrated financials that do not distinguish between Western Sky loans and CashCall-originated loans (*see* Ex. 528, 2011/2012 Financials at p.15) – and did not differentiate in its financial statements or elsewhere between default risk from Western Sky loans and other loans. Rather, the evidence is clear that CashCall risked default on a loan regardless of which entity originated it. *See also* Ex. 534, Meeks Dep. 103:13-19 (explaining what he meant when he said the biggest risk was default on a loan). |

| | | |
|---|---|---|
| 60. | The regulatory risk, which Reddam identified as CashCall's most serious risk, was also borne by CashCall, given CashCall's agreement to indemnify Western Sky for all civil, criminal, or regulatory penalties, including legal fees. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 58:8-10; Ex. 19, Assignment Agreement, ¶ 11; Ex. 503, Baren Dep. 184:12-21.<br>**Defendants' Response:**<br>Disputed in part. Neither the statement, nor the supporting testimony, indicates that this fact relates to loans originated and funded by Western Sky. Undisputed that, pursuant to the Purchase Agreement, CashCall agreed to indemnify Western Sky "for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the cited testimony.<br>**Plaintiff's Reply:**<br>The question posed just before the cited testimony is: "Q. Was the charge-off . . . rate for unsecured consumer loans, was that a significant risk for CashCall? A. Yes. Q. Would you say it was the most significant business risk for CashCall's unsecured consumer |

| | | |
|---|---|---|
| | | loan business? A. No. Q. What was the biggest risk? A. I'm not trying to be a smart aleck, but regulatory risk is the biggest risk."<br><br>Ex. 533, Reddam Dep. 57:25-58:18. Furthermore, the above-cited testimony was preceded by a discussion of Western Sky-originated loans. *See* Ex. 533, Reddam Dep. 55:2-57:24 |
| 61. | CashCall agreed to reimburse Western Sky for any repair, maintenance, and update costs associated with Western Sky's server. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 19, Assignment Agreement, ¶ 5.<br><br>**Defendants' Response:**<br><br>Undisputed, but Defendants clarify that such agreement is reflected in Paragraph 6 of the Purchase Agreement.<br><br>**Evidentiary Objection:**<br><br>Proffered fact is not supported by the cited declaration paragraph.<br><br>**Plaintiff's Reply:**<br><br>Evidentiary support should read Ex. 19 (Assignment Agreement), ¶ 6. |
| 62. | CashCall reimbursed Western Sky for its marketing expenses, office and personnel costs, and bank fees. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 505, Webb Dep. 60:4-6; Ex. 502, Meeks 30(b)(6) Dep. 70:9-19.<br><br>**Defendants' Response:**<br><br>Disputed in part. The testimony confirms that not all such costs were reimbursed. Undisputed that |

| | | |
|---|---|---|
| | | CashCall reimbursed Western Sky for its marketing expenses, some, but not all, office costs, some, but not all, personnel costs, and bank fees.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants' Response does not offer support for their dispute. The fact does not say "all" and the testimony supports the fact as proffered. |
| 63. | CashCall also agreed to indemnify Western Sky for any legal expenses arising out of civil, criminal, or administrative litigation, agreed to pay fines, penalties, and costs imposed in any jurisdiction, and agreed to pay Western Sky's attorney's fees in connection with such litigation. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 500, Reddam Dep. 58:8-10; Ex. 19, Assignment Agreement, ¶ 11; Ex. 503, Baren Dep. 184:12-21.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. The Purchase Agreement speaks for itself, pursuant to which CashCall agreed to indemnify Western Sky "for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."<br><br>**<u>Evidentiary Objection:</u>** |

| | | |
|---|---|---|
| | | Proffered fact lacks foundation and mischaracterizes the evidence as the Purchase Agreement speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>It is unclear what portion of the proffered fact Defendants' dispute, as their response supports, rather than disputes, the factual assertion. Defendants' dispute of the proffered fact is in bad faith. |
| 64. | Under the Service Agreement between CashCall and Western Sky, CashCall licensed Western Sky's name, tradename, trademarks, and logos, for purposes of advertising Western Sky loans online and in other media. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 38, Services Agreement, p. 1.<br>**<u>Defendants' Response:</u>**<br>Disputed. The Agreement for Service between Western Sky and CashCall granted CashCall "a non-exclusive license, to reproduce the name, trade name, trademarks, and logos of Western Sky Financial" but CashCall did not use such a license. CashCall assisted Western Sky in drafting certain marketing materials and Western Sky hired marketing firm Kovel Fuller, which devised advertising and marketing materials for Western Sky in coordination with CashCall and Western Sky. (AMF ¶ 322.)<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the evidence as the Agreement for Service between Western Sky and |

| | | |
|---|---|---|
| | | CashCall speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants do not dispute that pursuant to the Services Agreement, CashCall had "a non-exclusive license, to reproduce the name, trade name, trademarks, and logos of Western Sky Financial." Further, Reddam testified that CashCall helped Western Sky with their advertising, including that the advertising agency that CashCall used, Kovel Fuller, prepared advertising for Western Sky with Reddam's input. Ex. 533, Reddam Dep. 88:20-89:13. |
| 65. | CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, assignment of a toll-free phone number, and to handle electronic communications with customers. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 38, Services Agreement, p. 2.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. Pursuant to the Agreement for Service between Western Sky and CashCall, Western Sky agreed to engage CashCall to provide those services, but not all such services were provided as described in the contract. (AMF ¶ 282.)<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the evidence as the Agreement for Service between Western Sky and CashCall speaks for itself.<br>**<u>Plaintiff's Reply:</u>** |

| | | |
|---|---|---|
| | | Defendants' response does not dispute the proffered fact. |
| 66. | In exchange for these services, CashCall deducted 2.02% from the margin that it paid to purchase the Western Sky loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 38, Services Agreement, pp. 3-4.<br>**Defendants' Response:**<br>Disputed. Pursuant to the Agreement for Service between Western Sky and CashCall, Western Sky paid CashCall 2.02% of the face value of each loan transaction for services rendered. (AMF ¶ 283.)<br>**Evidentiary Objection:**<br>The phrase "these services" is vague and ambiguous and the proffered fact lacks foundation as it mischaracterizes the evidence as the Agreement for Service between Western Sky and CashCall speaks for itself.<br>**Plaintiff's Reply:**<br>It is unclear what Defendants dispute, as the parties agree that Western Sky paid CashCall 2.02% of the face value of each loan for services rendered. *See* AMF ¶ 283. The phrase "these services" refers to the services described in paragraph 65. To the extent Defendants rely on their objection that the relevant agreement speaks for itself, it contradicts AMF ¶ 283 which they support with their own statements beyond the agreement. |

| | | |
|---|---|---|
| 67. | CashCall developed underwriting criteria for its unsecured consumer loans, which guided how it would evaluate a borrower's credit before making a loan. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 42:20-43:6.<br>**Defendants' Response:**<br>Undisputed, but Defendants clarify that the testimony refers to underwriting guidelines developed for use on loans *made by CashCall*, not Western Sky. |
| 68. | Webb also developed underwriting criteria for Western Sky, but in practice CashCall would not purchase a loan from Western Sky unless it met CashCall's underwriting criteria. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 40:15-22.<br>**Defendants' Response:**<br>Disputed. The testimony is mischaracterized and does not support the statement. The testimony referred to CashCall's loan purchase criteria, not underwriting criteria, and the use of "our" and "we" does not directly refer to CashCall. Western Sky drafted and revised Western Sky underwriting guidelines, with input from CashCall. Ex. 8 (Webb) at 28:22-29:23; Ex. 2 (Baren) at 61:12-62:7.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br>**Plaintiff's Reply:**<br>Meeks testified, in the testimony cited above: "Western Sky would have underwriting guidelines, but *CashCall would only buy those loans which met our criteria that we determined on these loans.*" |

| | | |
|---|---|---|
| | | There is no other explanation offered or comprehensible that Meeks would be referring to anyone or anything other than CashCall in that statement. He did not personally buy loans or develop criteria for buying loans, and the statement explicitly refers to both Western Sky and CashCall. To the extent Defendants dispute because WS Funding purchased the loans (though they do not offer this nor offer support for this potential assertion), the pass-through nature of WS Funding belies their attempted distinction. *See* UF ¶¶ 8, 9, 39. |
| 69. | In July 2010, Baren sent Webb an email attaching underwriting guidelines, which he asked Webb to put on Western Sky letterhead if he approved them, and send back to him. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 65:21-67:5; Ex. 530, Baren to Webb Email.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The attachment to the referenced email has not been proffered as evidence nor has it been properly authenticated.<br>**<u>Evidentiary Objection:</u>**<br>Reference to attachment in Baren to Webb email lacks foundation as attachment was not properly authenticated and proffered as evidence.<br>**<u>Plaintiff's Reply:</u>**<br>The attachment to the referenced email is not critical to proving this |

| | | |
|---|---|---|
| | | fact. Rather, in the July 7, 2010, email, Baren states: "Here are the underwriting guidelines for the trial program. Can you review and, if approved, put these on Western Sky letterhead. Thanks." The face of the email references an attachment bearing the filename "Western Sky Guidelines (2).xls." |
| 70. | Three days later, Webb signed underwriting criteria for a $700 loan on Western Sky letterhead and, three days after that, faxed them to Baren. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 89:4-90:14; Ex. 531, Underwriting Criteria.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The reference to "[t]hree days later" does not indicate the event that occurred at that earlier time, and the reference to "Western Sky letterhead" is vague and ambiguous. Undisputed that in a fax dated July 12, 2010, a sender identified as Butch Webb sent to the attention of Dan Baren "Western Sky Financial, LLC loan underwriting criteria." The attachment to the fax cover letter identifies "the loan underwriting criteria as set forth by Western Sky Financial, LLC . . . for loans in the amount of $700.00," signed by Butch Webb on behalf of Western Sky.<br>**<u>Evidentiary Objection:</u>**<br>The phrases "[t]hree days later" and "Western Sky letterhead" are vague and ambiguous. The |

| | | |
|---|---|---|
| | | proffered fact lacks foundation and mischaracterizes the Underwriting Criteria document, which speaks for itself<br><br>**<u>Plaintiff's Reply:</u>**<br><br>The exhibit (Ex. 531) shows a fax was sent by Webb on July 12, 2010, bearing a letter with underwriting criteria dated July 9, 2010. While the fax was sent 5 days after the above-referenced email, rather than three as stated, it is not critical to the fact at issue. |
| 71. | The only dispute Webb recalls ever having with CashCall about underwriting guidelines was when Webb wanted to stop lending in Maryland because of legal action in that state, and CashCall wanted to continue lending there. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 505, Webb Dep. 97:6-98:9.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed, but Defendants clarify that CashCall had other disputes with Webb throughout the course of the business relationship. (AMF ¶ 340.) |
| 72. | In its 2011 and 2012 financial statements, CashCall did not differentiate the Western Sky loans from other unsecured consumer loans that it made without tribal involvement. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 501, Meeks Dep. 79:21-81:12; Ex. 528, 2011/2012 Financials.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. "[M]ade without tribal involvement" is vague and ambiguous and does not accurately describe the unsecured consumer loans reflected in the CashCall Financial Statements. The proffered evidence does not provide support for the statement. |

| | | |
|---|---|---|
| | | **<u>Evidentiary Objection:</u>**<br>The phrase "made without tribal involvement" is vague and ambiguous. The proffered fact lacks foundation and mischaracterizes the cited testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' response ignores the testimonial evidence, which makes clear that for accounting purposes, CashCall accounts for its unsecured consumer loans without differentiating those made through Western Sky. *See also* Ex. 535, Meeks 30(b)(6) Dep. 14:2-8. |
| **V. The Lending Process For Western Sky Loans** | | |
| 73. | Consumers applied for Western Sky loans two ways: by telephone or online. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 73:3-14.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 74. | Consumers did not have to go to the CRST reservation in South Dakota to apply for, negotiate, or enter into loans. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 73:3-14.<br>**<u>Defendants' Response:</u>**<br>Undisputed, but clarified that consumers did not have to be physically present on the Reservation to apply for, negotiate, or enter into loans as the loans were applied via the Internet. Further clarified that borrowers agreed that CRST law governed their loan agreements. |

| | | |
|---|---|---|
| | | (GDMF ¶ 109; see also Exs. 41-50 (Western Sky loan agreement samples) at 1.)<br>**<u>Plaintiff's Reply:</u>**<br>Plaintiff disputes Defendants' contention, above, that "CRST law governed their loan agreements." |
| 75. | If a customer called a toll-free number advertised as being for Western Sky loans, they could be connected to a CashCall loan agent. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam Dep. 90:24-91:6, 99:4-100:7; Ex. 503, Baren Dep. 106:12-107:13; Ex. 521, Ellard Decl. ¶ 4.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. "[A]dvertised as being for Western Sky loans" implies that the toll-free number was not directed to Western Sky, which it was. Undisputed that following a recorded disclaimer played to the caller stating that CashCall had been hired to help process applications, a caller might be directed to a CashCall loan agent. (AMF ¶ 323.)<br>**<u>Evidentiary Objection:</u>**<br>The phrase "advertised as being for Western Sky loans" lacks foundation and mischaracterizes the evidence.<br>**<u>Plaintiff's Reply:</u>**<br>For some period of time, phone inquiries were handled by loan agents at CashCall. Ex. 505, Webb Dep. 75:17-21 |

| | | |
|---|---|---|
| 76. | A former CashCall loan agent, Jeremiah Ellard, recalled that for a year or more after TV ads for Western Sky loans began to run, he was not aware of any functioning Western Sky entity in South Dakota. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶ 18.<br>**Defendants' Response:**<br>Disputed. "[F]unctioning Western Sky entity" is vague and ambiguous, and the statement is contrary to evidence establishing that Western Sky was granted a business license to operate on May 13, 2009, had offices located on the Reservation, had employees beginning in January 2010 that performed all final underwriting, funded loans made by Western Sky, and ultimately grew to employ more than 100 people. Western Sky also constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance.<br>(Ex. 20; Ex. 22; Ex. 8; AMF ¶ 347.)<br>**Evidentiary Objection:**<br>Declaration and proffered fact lack personal knowledge, lack foundation, are speculative and vague and ambiguous. The phrase "functioning Western Sky entity" in the proffered fact and declaration is vague and ambiguous.<br>**Plaintiff's Reply:**<br>Defendants offer no evidence to support their response beyond the |

| | | |
|---|---|---|
| | | Western Sky business license. Declarant is testifying about his personal knowledge, which is established in his declaration; cited AMF does not support any statement set forth in the Defendants' response; Ex. 8 is a deposition, with no citation to testimony; and Tawny Lawrence was hired by Western Sky in 2011. |
| 77. | All Western Sky calls during this time period appeared to go to CashCall loan officers, based in CashCall's offices. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶¶ 4, 19.<br>**Defendants' Response:**<br>Disputed. "[T]his time period" is vague and ambiguous, and the statement is contrary to evidence establishing that over the course of the program, a growing number of Western Sky loan agents on the Reservation handled calls from loan applicants. (AMF ¶ 329.)<br>**Evidentiary Objection:**<br>Lacks foundation, and proffered fact is unsupported by the cited testimony and the phrase "this time period" is vague and ambiguous.<br>**Plaintiff's Reply:**<br>Citation to AMF does not support Defendants' response. Declarant is testifying about his personal knowledge, which is established in his declaration. Defendants' response does not refute that for |

| | | |
|---|---|---|
| | | some period of time, calls went to CashCall. Ex. 505, Webb Dep. 75:17-21 |
| 78. | CashCall loan agents processed Western Sky loan applications in essentially the same way as other CashCall loan applications. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶¶ 4, 19.<br>**Defendants' Response:**<br>Disputed. "[P]rocessed . . . in essentially the same way" is vague and ambiguous, and the proffered evidence does not support the statement. Ellard's general use of "we" and "loan officer" does not support a "fact" that applies to all "CashCall loan agents." Western Sky loan applications were processed pursuant to Western Sky guidelines formulated by Western Sky. (AMF ¶ 361.) Moreover, the underwriting guidelines for CashCall's unsecured loans differed from those applied to the Western Sky loans. (AMF ¶ 348.)<br>**Evidentiary Objection:**<br>Declaration and proffered fact lacks personal knowledge, lacks foundation, are speculative and vague and ambiguous. The phrase "processed . . . in essentially the same way" in the proffered fact and declaration is vague and ambiguous.<br>**Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is |

| | | |
|---|---|---|
| | | established in his declaration. |
| 79. | CashCall loan agents used the same initial screening standards for CashCall and Western Sky loans, and forwarded Western Sky loans to the CashCall underwriting department. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 521, Ellard Decl. ¶¶ 4, 19.<br>**<u>Defendants' Response:</u>**<br>Disputed. "[S]ame initial screening standards" and the act of "forward[ing] Western Sky loans" are vague and ambiguous, and the proffered evidence does not support the statement. Ellard's general use of "we" and "loan officer" does not support a "fact" that applies to all "CashCall loan agents." Moreover, the evidence establishes that over time, "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." (AMF ¶ 292.) Furthermore, the underwriting guidelines for CashCall's unsecured loans differed from those applied to the Western Sky loans. (AMF ¶ 348.)<br>**<u>Evidentiary Objection:</u>**<br>Declaration and proffered fact lacks personal knowledge, lacks foundation, are speculative and vague and ambiguous. Phrases "same initial screening standards" and the act of "forward[ing] Western Sky loans" in the proffered fact and declaration are vague and ambiguous. |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is established in his declaration. |
| 80. | Consumers who passed an initial screening were asked to upload certain documents online for review in the underwriting process. | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 73:25-74:9.<br>**Defendants' Response:**<br>Undisputed. Defendants clarify that the testimony establishes that consumers were asked to provide certain documents, and could do so by uploading them or sending them by fax.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br>**Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is established in his declaration. |
| 81. | Ellard was trained to tell loan applicants, if they asked, that he worked for CashCall and that CashCall was hired to take overflow calls for Western Sky. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶ 29.<br>**Defendants' Response:**<br>Disputed. The proffered evidence does not support any contention about the training provided to Ellard.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**Plaintiff's Reply:** |

| | | |
|---|---|---|
| | | Declarant is testifying about his personal knowledge, which is established in his declaration. Ellard states that he "both received and observed the training of CashCall loan officers." Ex. 521, Ellard Decl. ¶ 28. In the cited evidence, Ellard states that he "was instructed to tell applicants, if they asked," that he worked for CashCall. |
| 82. | This bothered him because he took the majority of calls for Western Sky. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶ 29.<br>**Defendants' Response:**<br>Disputed. The statement is vague and ambiguous as to "him" and "this." Assuming the statement refers to Ellard and his contention about training, further disputed to the extent the proffered evidence does not support any contention about what constituted "the majority" of calls.<br>**Evidentiary Objection:**<br>Declaration and proffered fact lacks personal knowledge, lacks foundation, are speculative and vague and ambiguous. The word "him" is vague and ambiguous in the proffered fact.<br>**Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is established in his declaration. |

| | | |
|---|---|---|
| 83. | Some loan applicants who Ellard spoke with were bothered to learn that he worked for CashCall, because they thought they were doing business only with Western Sky. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶ 29.<br>**Defendants' Response:**<br>Disputed. The proffered evidence does not provide any admissible support regarding the responses of third-party loan applicants or their beliefs regarding whether they were speaking with a CashCall employee or a Western Sky employee. Further disputed as "doing business only with Western Sky" is vague and ambiguous. Further disputed as the evidence contradicts the CFPB's contention that a loan applicant would not have been aware of CashCall's involvement in the loan origination process. (AMF ¶ 275.)<br>**Evidentiary Objection:**<br>Declaration and proffered fact constitute inadmissible hearsay, the evidence lacks foundation, is speculative and vague and ambiguous. The phrase "doing business only with Western Sky" in the proffered fact is vague and ambiguous.<br>**Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is established in his declaration. Plaintiff states that it inadvertently misstated the testimony, as clarified in its response to AMF |

| | | |
|---|---|---|
| | | ¶ 275. |
| 84. | Even after Western Sky expanded its facilities and took customer phone calls at maximum capacity, most calls were still routed to CashCall loan agents, so that the total number of loan applications processed by Western Sky employees was a small fraction of the total number of Western Sky loan applications. | **Plaintiff's Evidentiary Support:**<br>Ex. 521, Ellard Decl. ¶ 30.<br>**Defendants' Response:**<br>Disputed. The time period is undefined, vague, and ambiguous, and the proffered evidence does not support the statement. In fact, the evidence establishes the contrary, that over time "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." (AMF ¶ 292.)<br>**Evidentiary Objection:**<br>Declaration and proffered fact lacks personal knowledge, lacks foundation, are speculative and vague and ambiguous. The phrases "computer system" and "structure" in the declaration are vague and ambiguous.<br>**Plaintiff's Reply:**<br>Declarant is testifying about his personal knowledge, which is established in his declaration. Defendants offer no evidence, as there is none, to support a conclusion that at any time, a majority of calls were routed to Western Sky as opposed to CashCall. |

| | | |
|---|---|---|
| 85. | Western Sky did not have the infrastructure in place to allow for on-site underwriting, incoming call queuing, or other functions necessary for broad-scale lending. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 521, Ellard Decl. ¶ 31.<br>**<u>Defendants' Response:</u>**<br>Disputed. The time period is undefined, "broad-scale lending" is vague and ambiguous, and the statement is not supported by the evidence, which merely provides the unsubstantiated assertion that, to Ellard, "[i]t did not appear that Western Sky had in place the necessary infrastructure." Further disputed as the statement is contradicted by evidence showing that Western Sky had offices located on the Reservation, had employees beginning in January 2010 that performed all final underwriting and funded loans made by Western Sky, ultimately grew to employ more than 100 people, and constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. (Ex. 22; Ex. 8; AMF ¶ 347.)<br>**<u>Evidentiary Objection:</u>**<br>Declaration and proffered fact lack personal knowledge, lack foundation, are speculative. The phrase "broad-scale lending" in the declaration and proffered fact is vague and ambiguous.<br>**<u>Plaintiff's Reply:</u>**<br>Declarant is testifying about his |

| | | |
|---|---|---|
| | | personal knowledge, which is established in his declaration. Further, Declarant states that "a typical CashCall employee would generate over 100 loans per month" as opposed to "10-15 loans per month" by a Western Sky loan officer. |
| 86. | Western Sky employees used CashCall's Method software system, which was located in Anaheim, California, to handle the loan approval process. | **Plaintiff's Evidentiary Support:**<br>Ex. 505, Webb Dep. 70:1-16.<br>**Defendants' Response:**<br>Disputed. The statement is taken out of context, nonsensical insofar as it purports to describe the location of a software program, and contradicted by testimony explaining Western Sky's use of the Method software system. As Webb testified, CashCall licensed the use of its proprietary software, Method, to Western Sky, for data collection purposes. The Western Sky employees in the call center on the Reservation used the software for auditing, and for funding. (AMF ¶ 295.)<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation, mischaracterizes the evidence, violates the rule of completeness and is vague and ambiguous. The phrase "software system" in the proffered fact is vague and ambiguous.<br>**Plaintiff's Reply:** |

| | | |
|---|---|---|
| | | Deposition testimony cited above supports the proposition that Western Sky employees used software to approve loans that "were connected to the Method software system in Anaheim." |
| 87. | The Western Sky website was hosted by CashCall on a server in California, using Cogility software, which is a company that CashCall contracted with. | **Plaintiff's Evidentiary Support:**<br>Ex. 505, Webb Dep. 73:10-17; Ex. 500, Reddam Dep. 19:12-23, 22:4-20; Ex. 502, Meeks 30(b)(6) Dep. 85:11-86:3<br>**Defendants' Response:**<br>Disputed in part. The proffered evidence does not provide support for the statement. Undisputed that CashCall housed the files supporting the Western Sky website on its servers, though CashCall and Western Sky had separate websites, with separate application files, and separate SSL certificates. (AMF ¶ 296.)<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>It is unclear which part of the proffered fact is disputed. |
| 88. | CashCall's IT team uploaded any changes to the Western Sky website, and ensured the website was running properly. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 80.<br>**Defendants' Response:**<br>Disputed. The statement is incomplete and does not include |

| | | |
|---|---|---|
| | | the fact that changes were only made at the direction of Western Sky.<br><br>**<u>Evidentiary Objection:</u>**<br><br>CashCall RFA No. 80 does not constitute the best evidence of its contents. Proffered fact lacks foundation and violates the rule of completeness.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants' response does not dispute the fact proffered. Plaintiff does not dispute the clarification added by Defendants' response, but finds it irrelevant. |
| 89. | A potential borrower can input personal information to apply for a loan, which is uploaded to CashCall's Method software system, in California. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 505, Webb Dep. 29:18-30:4 and 74:13-15.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. The proffered evidence does not support the statement that the software is located in California; the testimony states that data input into the Method software system was assessed on the Reservation. (AMF ¶ 297.) Undisputed that applicants for Western Sky loans provided personal information as part of their loan applications.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact is vague and ambiguous, lacks foundation, and violates the rule of completeness |

| | | |
|---|---|---|
| | | as it mischaracterizes the evidence. The phrases "software system" and "potential borrower" in the proffered fact are vague and ambiguous.<br>**Plaintiff's Reply:**<br>For additional support for the proffered fact, *see*<br>Ex. 509 (Webb Dep.) 70:1-16; 73:10-17; Ex. 512 (Reddam Dep.) 19:12-23, 11:4-20; Ex. 511 (Meeks 30(b)(6) Dep.) 85:11-86:3 (Western Sky used CashCall's servers and systems to handle loan approval process and host its website). |
| 90. | If a borrower pressed this link, the information would go to CashCall or Western Sky. | **Plaintiff's Evidentiary Support:**<br>Ex. 505, Webb Dep. 74:16-75:3.<br>**Defendants' Response:**<br>Disputed in part. "[T]his link" is vague and ambiguous. Assuming that "this link" refers to a button that would appear on the Western Sky website stating, "I want a loan agent to contact me," Defendants do not dispute that borrowers pressing this link would either transmit their information to loan agents on the Reservation, or to loan agents at CashCall pursuant to the Services Agreement.<br>**Evidentiary Objection:**<br>The phrase "this link" in the proffered fact is vague and |

| | | |
|---|---|---|
| | | ambiguous.<br>**<u>Plaintiff's Reply:</u>**<br>The testimony refers to the link discussed immediately prior to the cited testimony, Ex. 505, Webb Dep. 74:16-20. |
| 91. | When Western Sky started up, all calls to these numbers went to CashCall loan agents in California. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 75:17-20; Ex. 521, Ellard Decl. ¶ 4.<br>**<u>Defendants' Response:</u>**<br>Undisputed.<br>**<u>Evidentiary Objection:</u>**<br>The phrase "these numbers" in the proffered fact is vague and ambiguous, and the proffered fact mischaracterizes the cited Ellard Decl. ¶ 4, which lacks foundation. |
| 92. | The loan agreements purported to be governed by CRST law, and subject to CRST jurisdiction. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 529, Webb Loan Agreement.<br>**<u>Defendants' Response:</u>**<br>Undisputed that the loan agreements were governed by CRST law and subject to CRST jurisdiction.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br>**<u>Plaintiff's Reply:</u>** |

| | | |
|---|---|---|
| | | Statement is undisputed. The evidentiary support refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 93. | The Western Sky loan agreements stated that the loans were subject to CRST law and "no other state or federal law." | **Plaintiff's Evidentiary Support:**<br>Ex. 529, Webb Loan Agreement.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br>**Plaintiff's Reply:**<br>Statement is undisputed. The evidentiary support refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement produced by Webb at his |

| | | |
|---|---|---|
| | | deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 94. | CashCall employees also communicated with some applicants for Western Sky loans via email. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 8.<br>**Defendants' Response:**<br>Undisputed. |
| 95. | When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. | **Plaintiff's Evidentiary Support:**<br>Ex. 503, Baren Dep. 55:25-56:15, 57:12-58:2, 70:2-21.<br>**Defendants' Response:**<br>Disputed in part. While CashCall employees "verified the applicant's employment, performed a fraud check, and performed an automated credit check" on behalf of a Western Sky loan applicant, the evidence makes clear that depending on the loan at issue, these functions were also performed by a Western Sky employee on the Reservation. Moreover, Plaintiff misstates the cited testimony, which states that some employment verification took place on the Reservation. (AMF ¶ 293; Ex. 8 (Webb) at 69:10-25 (Webb testimony that "[e]very loan came through their – that office, they would open up the file on every loan and review for accuracy for the documents that were obtained. And then if |

| | | |
|---|---|---|
| | | everything was in place, they would audit – or not audit – they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."); Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands. Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans."); Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that "Western Sky had their own system . . . [B]ased on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if the loan was to be funded or not."); Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 ("Q. Did CashCall know the parameters by which Western Sky evaluated loans in deciding to approve them |

| | | |
|---|---|---|
| | | or not? A. We know their underwriting guidelines, but we don't know exactly why they approve or why they don't approve. That's their call."); Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16)).<br><br>**<u>Evidentiary Objection:</u>**<br><br>The proffered fact lacks foundation and misstates the cited testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Plaintiff disputes Defendants' AMF ¶ 293 and response here to the extent that *only* Western Sky employees performed these functions, which misstates the evidence. The evidence supports the statement that CashCall employees primarily performed the functions listed, and at times Western Sky employees may have performed them as well. (See Plaintiff's Reply to AMF ¶ 293.) |
| 96. | CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 503, Baren Dep. 59:8-16.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. Defendants clarify that the CashCall review described in this "fact" was in addition to Western Sky's independent review of the loan. (AMF ¶ 293; Ex. 8 (Webb) at 69:10-25 (Webb |

| | | |
|---|---|---|
| | | testimony that "[e]very loan came through their – that office, they would open up the file on every loan and review for accuracy for the documents that were obtained. And then if everything was in place, they would audit – or not audit – they would approve it. Once it was approved, they also funded them from there. In Western Sky Financial we wired the money, so they would do the wiring."); Ex. 2 (Baren) at 102:8-104:10 (Baren testimony that "once [an applicant's file] got to the reservation and to Western Sky, it was out of CashCall's hands. Meaning it was up to Western Sky to review those final loans, make sure all the promissory notes were – were in order, make sure the final underwriting was done, take it from that site, final underwriting over to funding and fund the loans."); Ex. 1 (Meeks Rule 30(b)(6)) at 49:17-50:1 (Meeks testimony that "Western Sky had their own system . . . [B]ased on parameters established by Western Sky, if it was a Western Sky loan, that would then go through the initial gate that would say if a borrower qualified for a loan or not and then it was passed on to underwriting at Western Sky, and then they would gather documents, underwrite the loan and then make the determination if |

| | | |
|---|---|---|
| | | the loan was to be funded or not."); Ex. 1 (Meeks Rule 30(b)(6)) at 51:20-25 ("Q. Did CashCall know the parameters by which Western Sky evaluated loans in deciding to approve them or not? A. We know their underwriting guidelines, but we don't know exactly why they approve or why they don't approve. That's their call."); Ex. 3 (CashCall's Response to Plaintiff's First Set of Interrogatories at Resp. to Rog. 16)).<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br>**Plaintiff's Reply:**<br>Fact is undisputed. |
| 97. | CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 7.<br>**Defendants' Response:**<br>Undisputed. Defendants clarify that CashCall provided these preliminary underwriting functions during the loan origination process on Western Sky's behalf and subject to Western Sky's approval.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**Plaintiff's Reply:** |

| | | |
|---|---|---|
| | | Fact is undisputed. |
| 98. | According to Baren, "it would be very, very rare, in fact, probably impossible" for a loan applicant to know that CashCall was involved in the loan origination process, even though CashCall was always performing some tasks on behalf of Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 110:23-111:6<br>**<u>Defendants' Response:</u>**<br>Disputed. The cited testimony is the opposite of Plaintiff's misquote: "Given that CashCall is involved in that [loan application] process, it would be very, very rare, in fact, probably impossible . . . that the – an applicant would not know of CashCall's involvement in the loan origination process, regardless of the channel that they came through." The CFPB attorney at the deposition sought and received clarification of Baren's position in her next question: "Q. I think what you told me clarifies what I thought you were saying before. So it sounded like that there—it was possible for consumers not to know [o]f CashCall's involvement until CashCall bought the loan. **But am I understanding you correctly that that would be a very rare occurrence, from your understanding? A. High -- very highly unlikely."** (AMF ¶ 275) (emphasis added).<br>**<u>Evidentiary Objection:</u>**<br>The proffered fact misquotes the cited testimony.<br>**<u>Plaintiff's Reply:</u>** |

| | | |
|---|---|---|
| | | Plaintiff agrees that cited testimony was inadvertently misquoted. |
| 99. | Consumers authorized Western Sky (in fact, CashCall) to withdraw their loan payments by electronic funds transfer (“EFT”) from their bank accounts. | **Plaintiff’s Evidentiary Support:**<br>Ex. 529, Webb Loan Agreement, p. 5.<br>**Defendants’ Response:**<br>Disputed. “Western Sky (in fact, CashCall)” is vague, ambiguous and unintelligible. To the extent that Plaintiff seeks to state as a “fact” that consumers authorized CashCall to withdraw their loan payments via EFT, the proffered evidence, an undefined document, does not provide any support for that statement.<br>**Evidentiary Objection:**<br>The phrase “Western Sky (in fact, CashCall)” in the proffered fact is vague, ambiguous and unintelligible. The proffered fact lacks foundation and misstates and mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined “Webb Loan Agreement.”<br>**Plaintiff’s Reply:**<br>The evidentiary support refers to a document defined as “Loan Agreement” in the table on the first page of Plaintiff’s Undisputed Facts. For additional clarity, the loan agreement refers to a Western |

| | | |
|---|---|---|
| | | Sky sample loan agreement produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529.<br><br>That document, as well as Ex. 41-49, all contain a paragraph bearing the heading, "ELECTRONIC FUNDS AUTHORIZATION AND DISCLOSURE" on p. 5 of the agreement, or a similar provision regarding payment. Borrowers authorized Western Sky to withdraw funds automatically from the borrower's bank account.<br><br>Pursuant to the Assignment Agreement, all Western Sky loans were purchased by CashCall a minimum of three days after being funded. Ex. 66 (Meeks Dep.) 56:18-21; Ex. 68 (Baren Dep.) 105:2-9; 119:14-20.<br><br>According to Baren: "the first payment wasn't due until at least 15 days, usually, miminum, after the loan was originated. So the loan would have been sold to CashCall at that point. So CashCall as the . . . CashCall through its subsidiary [WS Funding] as the owner and CashCall as the servicer would be the one tracking the payments" from borrowers. Ex. 503, Baren |

| | | |
|---|---|---|
| | | Dep. 111-22-112:7<br>Therefore, *CashCall*, and not Western Sky, withdrew funds electronically from borrowers' accounts – presumably under the authorization provided by the loan agreements. |
| 100. | Three days after the loan was funded, the borrower received notice that the loan would be serviced by CashCall. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Decl. ¶ 9.<br>**<u>Defendants' Response:</u>**<br>Disputed. While CashCall does not dispute that "[u]pon the sale of a loan from Western Sky to WS Funding, the borrower was provided a notice of assignment, informing him or her that WS Funding now owned the loan, and that they should remit all payments to CashCall as servicer," the proffered evidence does not provide any support for the statement that this notification was sent "[t]hree days after the loan was funded."<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**<u>Plaintiff's Reply:</u>**<br>All Western Sky loans were purchased by CashCall a minimum of three days after being funded. Ex. 66 (Meeks Dep.) 56:18-21; Ex. 68 (Baren Dep.) 105:2-9; 119:14-20. |

| | | |
|---|---|---|
| | | According to Baren, "Upon the sale of a loan from Western Sky to WS Funding, the borrower was provided a notice of assignment, informing him or her that WS Funding now owned the loan, and that they should remit all payments to CashCall as servicer," Ex. 52, Baren Decl. ¶ 9 |
| 101. | CashCall and WS Funding informed borrowers that they should remit all payments to CashCall as servicer of the loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 52, Baren Decl. ¶ 9.<br>**Defendants' Response:**<br>Disputed. The "fact" is taken out of context as it omits the statement that clarifies that CashCall and WS Funding informed borrowers to remit payments to CashCall as servicer upon the sale of a loan from Western Sky to WS Funding.<br>**Evidentiary Objection:**<br>Proffered fact violates the rule of completeness and lacks foundation as it is taken out of context and mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>Defendants' response does not dispute the fact – Plaintiff does not dispute the clarification provided but disagrees that it amounts to a disputed fact. |
| 102. | One loan product was a $2,600 loan with an APR of 139.34%. | **Plaintiff's Evidentiary Support:**<br>Ex. 532, Western Sky Loan Agreements, B-1. |

| | | |
|---|---|---|
| | | **Defendants' Response:**<br>Undisputed. |
| 103. | A typical CashCall customer who had borrowed $2,600 would pay over $8,000 in interest and fees over the life of the loan. | **Plaintiff's Evidentiary Support:**<br>Ex. 532, Western Sky Loan Agreements, B-1, B-3, B-4, B-5, B-6, B-7, B-8, B-9, B-10.<br>**Defendants' Response:**<br>Disputed. The cited loan agreements do not purport to describe the "typical" CashCall borrower, but merely contain the Truth in Lending Act Disclosure Statement which outlines the amount paid "after all payments are made as scheduled" according to the terms of the loans, but do not consider early payments made by customers, or customers who default on payments.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>Plaintiff provides nine sample loan agreements that outline the terms of a $2,600 loan from Western Sky and purchased by CashCall, and the stated terms of those loan agreements, including payment period and total amount paid if paid according to the terms of the loans. |
| 104. | Another loan product was a $700 loan with an APR of 318.52%. | **Plaintiff's Evidentiary Support:**<br>Ex. 532, Western Sky Loan |

| | | |
|---|---|---|
| | | Agreements, B-2.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 105. | The Western Sky loans also included $5,000 and $10,000 loans. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam Dep. 55:14-22; Ex. 502, Meeks 30(b)(6) Dep. 21:16-19.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 106. | For each loan, the origination fee was rolled into the loan principal. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 529, Webb Loan Agreement, p. 2.<br>**<u>Defendants' Response:</u>**<br>Disputed. Plaintiff's use of the term "rolled into" is vague, ambiguous and unintelligible and requires Defendants to speculate as to the meaning of this fact.<br>**<u>Evidentiary Objection:</u>**<br>The phrase "rolled into" in the proffered fact is vague, ambiguous and unintelligible. The proffered fact lacks foundation and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br>**<u>Plaintiff's Reply:</u>**<br>The stated terms of the loans as set forth on the first and second pages of the loan agreement document (*see also* Ex. 41-50) includes an "Itemization of Amount Financed," followed immediately |

| | | |
|---|---|---|
| | | by a provision including "Amount Paid to Borrower Directly" and "Prepaid Finance Charge/Origination Fee" – which are added together in the following paragraph stating how much the borrower agrees to repay.<br><br>The evidentiary support offered initially refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement for a $2,600 loan, produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 107. | The typical CashCall borrower had a lower-than-average FICO score. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 504, Baren 30(b)(6) Dep. 42:21-25.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. |
| 108. | Over 90% of the Western Sky loan applications were rejected, due to applicants' insufficient income or employment. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 505, Webb Dep. 99:14-23.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. While Defendants do not dispute that approximately 90% of loan applications were rejected, the |

| | | |
|---|---|---|
| | | cited testimony does not provide support for the statement that the "loan applications were rejected, due to applicants' insufficient income or employment."<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br><br>**Plaintiff's Reply:**<br><br>*See also* Ex. 538, Webb Dep. 100:9-16 |
| 109. | The loan agreement for a Western Sky loan informed the borrower that it was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." | **Plaintiff's Evidentiary Support:**<br><br>Ex. 529, Webb Loan Agreement, p. 1.<br><br>**Defendants' Response:**<br><br>Undisputed.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br><br>**Plaintiff's Reply:**<br><br>The evidentiary support offered initially refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement for a $2,600 loan, produced by Webb at his deposition and exchanged with |

| | | |
|---|---|---|
| | | Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 110. | In another portion of the agreement, titled "Governing Law," the borrower was informed that "[t]his Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America." | **Plaintiff's Evidentiary Support:**<br>Ex. 529, Webb Loan Agreement, p. 3.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br>**Plaintiff's Reply:**<br>The evidentiary support offered initially refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement for a $2,600 loan, produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 111. | In another section the borrower is informed that Western Sky "may assign or transfer this Loan Agreement or any | **Plaintiff's Evidentiary Support:**<br>Ex. 529, Webb Loan Agreement, p. 3. |

| | | |
|---|---|---|
| | of our rights under it at any time to any party." | **Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically to an undefined "Webb Loan Agreement."<br>**Plaintiff's Reply:**<br>The evidentiary support offered initially refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement for a $2,600 loan, produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 112. | The loan agreement identified Western Sky Funding, LLC, as the lender. | **Plaintiff's Evidentiary Support:**<br>Ex. 529, Webb Loan Agreement, p. 1.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence and violates the rule of completeness by citing generically |

| | | |
|---|---|---|
| | | to an undefined "Webb Loan Agreement."<br><br>**Plaintiff's Reply:**<br><br>The evidentiary support offered initially refers to a document defined as "Loan Agreement" in the table on the first page of Plaintiff's Undisputed Facts. For additional clarity, the loan agreement refers to a Western Sky sample loan agreement for a $2,600 loan, produced by Webb at his deposition and exchanged with Defendants prior to the parties' filing their motions for summary judgment. It is included as Ex. 529. |
| 113. | If a borrower was approved for a Western Sky loan and chose to accept it, the borrower would go onto the Western Sky website and electronically sign the loan agreement. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 503, Baren Dep. 94:1-8.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 114. | A person at Western Sky would then press a button and the loan proceeds would be transferred from the Western Sky's account to the borrower's account. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 503, Baren Dep. 52:21-53:5.<br><br>**Defendants' Response:**<br><br>Disputed in part to the extent that "press a button" is vague and ambiguous, and an incomplete, colloquial description of a technical process. Undisputed that a Western Sky employee located on the Reservation made the final decision of whether to fund the loans and, in all but a few very rare circumstances, effected |

| | | |
|---|---|---|
| | | disbursement of money to the borrowers. (AMF ¶ 360.)<br>**<u>Evidentiary Objection:</u>**<br>The phrase "press a button" in the proffered fact is vague and ambiguous.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' dispute that "press a button" was vague and ambiguous and instead clarified that most of the time, a Western Sky employee "effected disbursement." Baren's testimony cited in support of the fact is accurate, and he repeats that a "funder" at Western Sky would "press the button" to move the loan from the funding queue to the funded queue. Ex. 536, Baren Dep. 53:20-55:2 (at 54:17). |
| 115. | Western Sky disbursed loan proceeds to borrowers using CashCall's money. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 505, Webb Dep. 19:7-19.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The phrase "CashCall's money" is vague and ambiguous. Defendants do not dispute that Western Sky funded loans from a Western Sky account it maintained at Wells Fargo that was funded in part by monies lent by CashCall pursuant to a promissory note. (AMF ¶ 288.)<br>**<u>Evidentiary Objection:</u>**<br>The phrase "CashCall's money" in the proffered fact is vague and |

| | | |
|---|---|---|
| | | ambiguous.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants' response does not dispute the proffered fact. Plaintiff does not dispute Defendants' clarification. |
| 116. | All of the Western Sky loans, as well as all of CashCall's other consumer loans, were funded electronically. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 503, Baren Dep. 53:1-5.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. |
| 117. | If a Western Sky loan became so delinquent that CashCall decided to charge it off, meaning that it was heavily delinquent, the loan was transferred to Delbert for collection. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 501, Meeks Dep. 20:21-25.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. While Defendants do not dispute that Delbert performed servicing on loans that were charged off by CashCall and other third-party entities, the cited testimony does not provide support for any other parts of the "fact."<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Meeks testified that CashCall determined when to charge off the loans it purchased. Ex. 534, Meeks Dep. 74:19-75:1;<br><br>CashCall only transferred loans it deemed in default and charged off, and no other loans, to Delbert for |

| | | |
|---|---|---|
| | | collection. Ex. 535, Meeks 30(b)(6) 42:19-43:1 |
| 118. | The charge-off date varied over time, from 120 to 150 days delinquent. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 501, Meeks Dep. 74:19-75:1.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 119. | Consumers relied on the stated terms of the loans. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 527, Viera Decl. ¶ 15; Ex. 524, Barboza Aff. ¶ 12; Ex. 526, Melo Aff. ¶ 12; Ex. 525, Melanson Aff. ¶ 10.<br>**<u>Defendants' Response:</u>**<br>Disputed. There is no mention of consumer reliance in the cited evidence. Instead, Bureau's evidence consists entirely of duplicative statements from four loan borrowers that "I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan." (Melanson Aff. ¶ 10 ("I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan"); Barboza Aff. ¶ 12 ("I was under the impression that I was obligated to pay back the full amount of my loan. I do not recall ever being told by anyone at CashCall that I was not obligated to pay back all or some of my loan."); Melo Aff. ¶ 12 ("From the |

| | | |
|---|---|---|
| | | beginning I was led to believe that I was obligated to repay my loan in full. Aside from the May 2013 phone call wherein they said that they are not presently collecting from Massachusetts' residents, I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan."); Viera Decl. ¶ 15 ("Until I received this letter, I was led to believe that I was obligated to repay my loan in full. I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan.")).<br><br>**Evidentiary Objection:**<br><br>Proffered fact mischaracterizes the cited declarations.<br><br>**Plaintiff's Reply:**<br><br>Borrowers' statements are evidence of their reliance on the statements made in the loan agreements. |
| 120. | CashCall's customers faced a substantial risk of default on loans. CashCall spent a great deal of time trying to minimize the risk of default. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 501, Meeks Dep. 58:12-59:10; 66:18-67:5; 103:8-12.<br><br>**Defendants' Response:**<br><br>Disputed. Vague and ambiguous as to "CashCall's customers" as the testimony differentiates between "Western-Sky originated |

| | | |
|---|---|---|
| | | loans" and "CashCall-originated loans."<br>**Evidentiary Objection:**<br>The phrase "CashCall's customers" in the proffered fact lacks foundation and is vague and ambiguous.<br>**Plaintiff's Reply:**<br>The testimony makes clear that CashCall closely evaluated default rates for Western Sky loans as well as CashCall-originated loans, and took steps to decrease the rate of default for both groups of borrowers. Defendants cite no basis in their response for the dispute. |
| 121. | According to CashCall's 2012 financial statement, the value of loans that CashCall charged off, meaning that CashCall assigned a value of zero to the loan because it had been in default for more than 150 days, was approximately a fifth of the value of loans funded that year. | **Plaintiff's Evidentiary Support:**<br>Ex. 528, 2011/2012 Financials, p. 15.<br>**Defendants' Response:**<br>Undisputed. |
| 122. | According to CashCall, most of these defaults occurred during the first six months after the loan was funded. | **Plaintiff's Evidentiary Support:**<br>Ex. 528, 2011/2012 Financials, p. 15.<br>**Defendants' Response:**<br>Undisputed. |

| | | |
|---|---|---|
| **VI. Reddam's Involvement With The Western Sky Loans** | | |
| 123. | In a 2009 sworn filing with the | **Plaintiff's Evidentiary Support:** |

| | | |
|---|---|---|
| | Connecticut Department of Banking, which Reddam signed, he attached a resume stating that all of CashCall's department heads report directly to him. | Ex. 522, Reddam CT Statement.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. Defendants dispute Plaintiff's characterization that Reddam personally attached the resume to the Connecticut Department of Banking statement. Reddam testified that he has not "personally prepared" his resume since at least 2000 and does not "remember ever submitting" his "resume to a state banking department for any reason." (AMF ¶ 287.)<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation and mischaracterizes the evidence.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants dispute foundation because of Reddam's testimony that he does not remember the document; however, the dispute is disingenuous. Reddam is responsible for the contents of a filing with Connecticut banking regulators that he admitted to signing under penalty of perjury and having notarized (Ex. 533, Reddam Dep. 10:5-18; Ex. 522 Reddam CT Statement). The filing attached his resume, the contents of which he generally admitted but said some statements were "an exaggeration." Ex. 533, Reddam Dep. 11:1-18:5; 24:20-25:24; 26:8-27:2; 30:3-31:21; 33:20- |

| | | |
|---|---|---|
| | | 36:15. |
| 124. | Reddam also stated that he "is responsible for devising and implementing all major company policies — including its various loan programs and interest rates." | **Plaintiff's Evidentiary Support:**<br>Ex. 522, Reddam CT Statement.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>Statement is undisputed. Defendants object on the grounds of foundation because of Reddam's testimony that he does not remember the document; however, the objection is meritless. Reddam is responsible for the contents of a filing with Connecticut banking regulators that he admitted to signing under penalty of perjury and having notarized (Ex. 533, Reddam Dep. 10:5-18; Ex. 522 Reddam CT Statement). The filing attached his resume, the contents of which he generally admitted but said some statements were "an exaggeration." Ex. 533, Reddam Dep. 11:1-18:5; 24:20-25:24; 26:8-27:2; 30:3-31:21; 33:20-36:15. |
| 125. | Reddam stated that he "coordinates all marketing and advertising, and determines where advertising should be directed." | **Plaintiff's Evidentiary Support:**<br>Ex. 522, Reddam CT Statement.<br>**Defendants' Response:** |

| | | |
|---|---|---|
| | | Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>Statement is undisputed. Defendants object on the grounds of foundation because of Reddam's testimony that he does not remember the document; however, the objection is meritless. Reddam is responsible for the contents of a filing with Connecticut banking regulators that he admitted to signing under penalty of perjury and having notarized (Ex. 533, Reddam Dep. 10:5-18; Ex. 522 Reddam CT Statement). The filing attached his resume, the contents of which he generally admitted but said some statements were "an exaggeration." Ex. 533, Reddam Dep. 11:1-18:5; 24:20-25:24; 26:8-27:2; 30:3-31:21; 33:20-36:15. |
| 126. | In Delbert's application for a debt collector license to the Massachusetts Division of Banks, filed in January 2010, Delbert attached a business plan that identified Reddam as its CEO, a member of its management team, and a member of Delbert's Board of Directors. | **Plaintiff's Evidentiary Support:**<br>Ex. 523, Begin Aff., Attach. G, p. 3.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and mischaracterizes the evidence. |

| | | |
|---|---|---|
| 127. | The filing notes that Reddam and Baren "have the principal responsibility for fulfillment of the company's mission and the legal accountability for its operations." | **Plaintiff's Evidentiary Support:**<br>Ex. 523, Begin Aff., Attach. G, p. 3.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and mischaracterizes the evidence. |
| 128. | Reddam personally guaranteed CashCall's loans from hedge funds, which CashCall used to finance the Western Sky loans and its other consumer loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 136:24-137:7; 138:17-22; Ex. 501, Meeks Dep. 106:19-108:25.<br>**Defendants' Response:**<br>Disputed. Disputed as the time period is undefined, the "loans from hedge funds" are not specified, and the cited testimony does not support the statement. The cited evidence purports to support only the proposition that Reddam personally guaranteed "CCL 2010 NLP SPE's loan of money from Bayberry Consumer Financial Fund." The characterization that CashCall used loans personally guaranteed by Reddam "to finance the Western Sky loans and its other consumer loans" is disputed; the Western Sky loans were originated and funded by Western Sky Financial, LLC, and subsequently purchased by CashCall's subsidiary WS Funding. (Ex. 5 |

| | | |
|---|---|---|
| | | (Reddam's Response to Plaintiff's Request for Admission No. 3)); Ex. 9 (John Paul Reddam Deposition ("Reddam")) at 65:11-16; Ex. 52 (Baren Declaration) at ¶ 8; Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC.)<br><br>**Evidentiary Objection:**<br><br>Lacks foundation as it mischaracterizes the evidence.<br><br>**Plaintiff's Reply:**<br><br>To the extent that Defendants' response merits a reply, Plaintiff offers the additional supporting undisputed factual support for its proffered fact:<br><br>To fund the Western Sky loans, a reserve account was set up for Western Sky, into which CashCall deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 |

| | | |
|---|---|---|
| | | Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17.<br><br>CashCall received financing from hedge funds to fund its operations from at least 2010, including to fund its unsecured consumer loan operation, in the form of loans. Ex. 533, Reddam Dep. 39:14-18, 151:8-17; 151:24-152:9.<br><br>Reddam signed personal guaranties for some of the loans from hedge funds, when the funds required it as part of the financing. Ex. 536, Baren Dep. 186:2-5. |
| 129. | Reddam hired an advertising agency that created advertising campaigns for CashCall, and also the Western Sky loans. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 500, Reddam Dep. 33:20-34:19, 88:20-25; Ex. 505, Webb Dep. 60:4-6.<br><br>**Defendants' Response:**<br><br>Disputed. CashCall, not Reddam, hired the advertising agency to create advertising campaigns for CashCall (AMF ¶ 284.) Further, the cited testimony does not support the proposition that Reddam hired an advertising agency to create advertising campaigns for Western Sky.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the testimony.<br><br>**Plaintiff's Reply:**<br><br>Reddam testified to interfacing with the advertising agency and |

| | | |
|---|---|---|
| | | providing input. |
| 130. | Reddam was a member of CashCall's executive team, along with Baren and Meeks, which was involved in negotiating the agreement with Western Sky. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 503, Baren Dep. 142:3-12.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The phrase "negotiating the agreement with Western Sky" is vague and ambiguous and taken out of context from the cited testimony. The cited testimony states that "the decision to enter into the Western Sky transaction was a collaborative effort based primarily on the advice we received from counsel." Further, additional CashCall employees have served on the executive team since 2009, including Louis Ochoa, Hilary Holland, and Jonathan Williams. (AMF ¶ 285.)<br>**<u>Evidentiary Objection:</u>**<br>The phrase "negotiating the agreement with Western Sky" is vague and ambiguous. Proffered fact lacks foundation and violates the rule of completeness as it is taken out of context and mischaracterizes the testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Reddam testified to being a part of the executive team (Ex. 512 (Reddam Dep.) 27:17-22) and signed the agreement (Ex. 19), which he does not dispute (Ex. 533, Reddam Dep. 65:8-10. |

| | | |
|---|---|---|
| 131. | Reddam approved CashCall's purchase of the Western Sky loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 82:20-83:2.<br>**Defendants' Response:**<br>Undisputed.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation and violates the rule of completeness as it is taken out of context and mischaracterizes the cited testimony. |
| 132. | Reddam discussed the terms of the assignment agreement that governed Western Sky's sale of the Western Sky loans with his general counsel, Baren. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 70:4-7.<br>**Defendants' Response:**<br>Undisputed. |
| 133. | Reddam had the authority to approve agreements that CashCall or its subsidiaries entered into with other companies, including WS Funding's purchase of the Western Sky loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 76:15-77:2.<br>**Defendants' Response:**<br>Undisputed. |
| 134. | Reddam made the decision to wind down the Western Sky loan program in the face of "regulatory problems." | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 115:12-21; 116:2-15.<br>**Defendants' Response:**<br>Disputed in part. The cited testimony makes clear that the decision was for CashCall to stop purchasing loans from Western Sky, not "to wind down the Western Sky loan program."<br>**Evidentiary Objection:**<br>Proffered fact mischaracterizes the |

| | | |
|---|---|---|
| | | cited testimony.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' response does not offer evidence that contradicts the proffered fact. Plaintiff does not dispute the clarification provided in Defendants' response. |
| 135. | Reddam discussed the status of CashCall's litigation over the Western Sky loans with Baren frequently. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam Dep. 128:19-129:6.<br>**<u>Defendants' Response:</u>**<br>Undisputed.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the testimony. |
| 136. | Reddam had the authority to control all of CashCall's acts, and to decide when and whether to transfer delinquent CashCall loans to Delbert, the collection company that Reddam also founded. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 501, Meeks Dep. 21:19-25; 41:15-16; 46:11-15; 74:19-75:12; Ex. 522, Reddam CT Statement.<br>**<u>Defendants' Response:</u>**<br>Disputed. This statement is unsupported by the cited testimony, which states only that Delbert was created by the "executive team" and owned by Reddam, and that the "executive team" determined the date at which a loan was "charged off for CashCall financial purposes."<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the evidence. |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Reddam testified to being a part of the executive team (Ex. 512 (Reddam Dep.) 27:17-22), and Meeks testified that the executive team made the decision to change the date at which a loan would be considered in default. Ex. 501, Meeks Dep. 74:19-75:12. |
| 137. | Reddam had the authority to approve CashCall's transaction with Western Sky, and participated in the transaction by signing the two governing agreements with Western Sky, the assignment agreement and the service agreement, on behalf of CashCall and WS Funding. Reddam claimed, in a sworn filing, that all CashCall managers reported directly to him, and that he had authority over CashCall's day-to-day activities. | **Plaintiff's Evidentiary Support:**<br>Ex. 522, Reddam CT Statement.<br>**Defendants' Response:**<br>Disputed in part. The statement mischaracterizes the "Reddam CT Statement" as it does not speak to Reddam's "authority to approve CashCall's transaction with Western Sky," nor any purported participation in the transaction on behalf of CashCall and WS Funding.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>For additional support for the proffered statement, *see* Ex. 19 (Assignment Agreement), p. 5; Ex. 38 (Services Agreement), p. 8 (Reddam's signature) |
| 138. | Reddam claimed similar authority over Delbert in another filing. | **Plaintiff's Evidentiary Support:**<br>Ex. 523, Begin Aff., Attach. G, p. 3 |

| | | |
|---|---|---|
| | | **Defendants' Response:**<br>Disputed. The phrase "claimed similar authority" is vague and ambiguous and "another filing" is undefined. Further, the purported fact is unsupported by the cited evidence.<br>**Evidentiary Objection:**<br>The phrase "claimed similar authority" is vague and ambiguous and "another filing" is undefined. Proffered fact lacks foundation as it mischaracterizes the evidence.<br>**Plaintiff's Reply:**<br>The cited supporting evidence is a Delbert Services business plan filed with a license application to the Massachusetts Division of Banks. It states that Reddam and Baren make up the Board of Directors, "and they have the principal responsibility for fulfillment of the company's mission and the legal accountability for its operations." |
| 139. | Reddam knew that CashCall, rather than Western Sky, was the true lender behind the Western Sky loans, because he knew how the transaction between CashCall and Western Sky was created. | **Plaintiff's Evidentiary Support:**<br>Ex. 500, Reddam Dep. 55:14-22; 65:11-22; 67:6-12; 67:18-68:12; 75:1-8.<br>**Defendants' Response:**<br>Disputed. The proposition that "CashCall . . . was the true lender" calls for a legal conclusion and is unsupported by the evidence. The loans purchased from Western Sky |

| | | |
|---|---|---|
| | | were originated and funded by Western Sky. (Ex. 5 (Reddam's Response to Plaintiff's Request for Admission No. 3); Ex. 9 (John Paul Reddam Deposition ("Reddam")) at 65:11-16; Ex. 52 (Daniel Baren November 7, 2013 Declaration ("Baren Declaration")) at ¶ 8; Ex. 18 (October 28, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); Ex. 19 (February 1, 2010 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Funding, LLC); Ex. 51 (December 28, 2009 Agreement for the Assignment and Purchase of Promissory Notes between Western Sky Financial, LLC and WS Financial, LLC.) Defendants also dispute the characterization that Reddam knew that CashCall "was the true lender" because "he knew how the transaction between CashCall and Western Sky was created" as unsupported by the evidence; moreover, Reddam testified that he "wasn't the one who designed the mechanics of . . . these loan purchases." (Reddam) at 67:24-68:12.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation, calls for a legal conclusion and |

| | | |
|---|---|---|
| | | mischaracterizes the cited testimony<br><br>**Plaintiff's Reply:**<br><br>Reddam testified that he signed the relevant agreements, was a member of the executive team, and that he was "aware, generally, that WS Funding was technically the vehicle that loans were purchased into," and how the arrangement with Western Sky worked. (cited testimony above.) |
| 140. | Reddam knew that despite what the Western Sky loan agreement said, their loan would be serviced by CashCall. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 500, Reddam Dep. 50:9-51:2<br><br>**Defendants' Response:**<br><br>Disputed. The statement is unsupported by the cited testimony, which does not discuss Western Sky loan agreements or Reddam's mental state regarding such agreements.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation and mischaracterizes the cited testimony.<br><br>**Plaintiff's Reply:**<br><br>Reddam testified that he signed the relevant agreements, was a member of the executive team, and that he was "aware, generally, that WS Funding was technically the vehicle that loans were purchased into," and how the arrangement with Western Sky |

| | | |
|---|---|---|
| | | worked. Ex. 500, Reddam Dep. 55:14-22; 65:11-22; 67:6-12; 67:18-68:12; 75:1-8. |
| 141. | Reddam avoided lending to consumers in West Virginia, for fear of regulators there, and testified that in his view, CashCall's biggest business risk was the risk that it would be shut down by state or federal regulators. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 500, Reddam Dep. 58:8-10; 123:13-124:2.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. The statement is unsupported by the cited testimony. Reddam states that "[w]e did not want to buy loans from . . . West Virginia" because "[w]e had litigation there." Defendants further dispute the purported fact as it is taken out of context. Reddam testified that "regulatory risk" could also include "extract[ing] some penalty."<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact violates the rule of completeness, lacks foundation and misstates the cited testimony.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>The question posed just before the cited testimony is: "Q. Was the charge-off . . . rate for unsecured consumer loans, was that a significant risk for CashCall? A. Yes. Q. Would you say it was the most significant business risk for CashCall's unsecured consumer loan business? A. No. Q. What was the biggest risk? A. I'm not trying to be a smart aleck, but |

| | | |
|---|---|---|
| | | regulatory risk is the biggest risk."<br><br>As additional support for the fact that regulatory action caused Reddam to decide not to make loans to borrowers in West Virginia is Baren's testimony that "at that point West Virginia was known as a hotbed of regulatory activity" and CashCall had received a subpoena regarding the bank charter model. Ex. 503, Baren Dep. 86:22-87:4. |
| 142. | The transaction with Western Sky was structured almost exactly like the transaction Reddam had previously structured with state-chartered banks, and he was forced to terminate that transaction due to regulatory pressure. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 503, Baren Dep. 33:1-6.<br><br>**Defendants' Response:**<br><br>Disputed. Reddam did not structure the transaction with the state-chartered banks. (AMF ¶ 328.) Defendants further dispute the characterization of the cited testimony and dispute the purported fact as unsupported. Baren testified that "CashCall stopped purchasing loans from . . . two state chartered banks in November 2008" because of the financial crisis and because the banks' "regulator, the FDIC, was putting a lot of pressure on them . . . to get out of the marketing partnerships." (AMF ¶ 286.)<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation and mischaracterizes the cited testimony. |

| | | |
|---|---|---|
| | | **<u>Plaintiff's Reply:</u>**<br>Defendants' Response mistakenly cites AMF ¶ 328 rather than ¶ 330. Defendants rely on the fact that counsel for CashCall structured the relationships with Western Sky and the state-chartered banks, which is disputed (*see* Pl. Resp. to AMF ¶ 330) and unavailing. *See also* UF ¶ 21. |
| **VII. Scope Of The Western Sky Loan Arrangement** | | |
| 143. | At the outset, CashCall's agreement with Western Sky involved loans made to borrowers throughout the United States, with the exception of California (where CashCall was already making loans), South Dakota (because Webb did not want to compete with a bank that he was president of, and because he did not want to lend to anyone he knew), and West Virginia, which Baren considered a "hotbed of regulatory concern." | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 501, Meeks Dep. 60:11-17 (nationwide); Ex. 503, Baren Dep. 86:7-88:4; Ex. 500, Reddam Dep. 122:20-124:2; Ex. 505, Webb Dep. 82:1-17.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 144. | After Reddam decided to wind down the Western Sky loan program in 2013, CashCall notified Western Sky that it would stop purchasing Western Sky loans during the first week of September 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 500, Reddam Dep. 115:12-118:1; Ex. 503, Baren Dep. 92:23-93:4.<br>**<u>Defendants' Response:</u>**<br>Disputed in part. The cited testimony makes clear that the decision was for CashCall to stop purchasing loans from Western Sky, not "to wind down the Western Sky loan program."<br>**<u>Plaintiff's Reply:</u>** |

| | | |
|---|---|---|
| | | Defendants' response is inappropriate where the testimony supports the fact that the program was in fact wound down. Reddam testified regarding a meeting between only him and Ms. Callaway: "Q. Okay. And what about it? A. Well, there had started to be some regulatory issues in a few states, and so she was there to discuss that, and she said that the regulatory environment was in general getting very hostile, and so we discussed whether it would be a good idea to wind down the program." (Ex. 500, Reddam Dep. 115:15-21);<br><br>Later in the cited testimony, Reddam stated that he spoke with Webb and told him "to let his people know within the month that we were going to have to discontinue buying the loans, tried to give everyone a proper notice." (Ex. 500, 117:17-20)<br><br>Defendants' dispute suggests either that they do not credit Reddam's testimony or that it should be ignored. |
| 145. | When the Western Sky loan program began, the number of loans that CashCall purchased from Western Sky was small compared to the loans that CashCall originated directly, but as the program grew, CashCall purchased more Western Sky loans, until they exceeded the number of loans that CashCall originated | **Plaintiff's Evidentiary Support:**<br><br>Ex. 501, Meeks Dep. 37:23-38:5.<br><br>**Defendants' Response:**<br><br>Undisputed. |

| | | |
|---|---|---|
| | directly. | |
| 146. | In its 2012 financial statement, CashCall reported funding $537,896,000 in unsecured consumer loans that year, without differentiating Western Sky and CashCall loans. | **Plaintiff's Evidentiary Support:**<br>Ex. 528, 2011/2012 Financials, p. 15.<br>**Defendants' Response:**<br>Undisputed. |

| | |
|---|---|
| **VIII. The Subject States** | |
| **A. Alabama** | |

| | | |
|---|---|---|
| 147. | Alabama law voids loans of $1,000 or less that are made without a license, and a lender has no right to collect, receive, or retain any principal, interest, or charges on such loans. | **Plaintiff's Evidentiary Support:**<br>Ala. Code §§ 5-18-4(a), (d).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff accurately characterized the statute, and Defendants' response and objection are in bad faith. Relevant portions of the cited statute are quoted below:<br>*(a) License required*. No person shall engage in the business of lending in amounts of less than one thousand dollars ($1,000) and contract for, exact or receive, directly or indirectly, on or in connection with any such loan, |

| | | |
|---|---|---|
| | | any charges whether for interest, insurance, compensation, consideration, or expense, which in the aggregate are greater than the interest that the lender would be permitted by law to charge for a loan of money if he were not a licensee under this chapter, except as provided in and authorized by this chapter and without first having obtained a license from the supervisor. For the purpose of this section, a loan shall be deemed to be in the amount of less than one thousand dollars ($1,000) if the net amount or value advanced to or on behalf of the borrower, after deducting all payments for interest, expenses, and charges of any nature taken substantially contemporaneously with the making of the loan, is less than one thousand dollars ($1,000).<br><br>(d) *Penalties*. . . . Any contract of loan in the making or collection of which any act shall have been done which violates this section shall be void, and the lender shall have no right to collect, receive, or retain any principal, interest, or charges whatsoever. |
| 148. | Western Sky did not hold a license in Alabama. | **Plaintiff's Evidentiary Support:**<br><br>Answer ¶ 28.<br><br>**Defendants' Response:**<br><br>Undisputed. |

| | | |
|---|---|---|
| 149. | CashCall did not have the license to make loans of $1,000 or less in Alabama from January 1, 2010 – March 5, 2011. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 28.<br>**Defendants' Response:**<br>Undisputed. Defendants clarify that from March 6, 2011 to August 18, 2014, CashCall held a Consumer Lender License in Alabama. (Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5.) |
| 150. | Western Sky loans were made of $1,000 or less. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 38:6-23.<br>**Defendants' Response:**<br>Undisputed. |
| 151. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Alabama on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 26.<br>**Defendants' Response:**<br>Undisputed. |
| **B. Arizona** | | |
| 152. | Arizona law voids covered loans of $10,000 or less that are made without a license, and the lender has no right to collect, receive or retain any principal, finance charges, or other fees in connection with such loans. | **Plaintiff's Evidentiary Support:**<br>Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-603(A), 6-613(B).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself. |

| | | |
|---|---|---|
| | | **Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statutes.<br>Ariz. Rev. Stat. § 6-601, a definitional statute, provides in relevant part:<br>"5. 'Consumer lender' means a person that advertises to make or procure, solicits or holds itself out to make or procure, or makes or procures consumer lender loans to consumers in this state.<br>"6. 'Consumer lender loans' means consumer loans, consumer revolving loans and home equity revolving loans.<br>"7. 'Consumer loan' means the direct closed end loan of money in an amount of ten thousand dollars or less that is subject to a finance charge. For the purpose of determining whether a consumer loan is ten thousand dollars or less only the principal amount of the loan shall be considered and not any finance charges or other fees allowed pursuant to § 6-635."<br>Ariz. Rev. Stat. § 6-603 provides in relevant part:<br>**"A.** Unless exempt under § 6-602, a person, whether located in this |

| | | |
|---|---|---|
| | | state or in another state, shall not engage in the business of a consumer lender without first being licensed as a consumer lender by the superintendent.”<br><br>Ariz. Rev. Stat. § 6-613 provides in relevant part:<br><br>“B. Any consumer lender loan that is made by a person who is required to be licensed pursuant to this chapter but who is not licensed is void, and the person making that consumer lender loan has no right to collect, receive or retain any principal, finance charges or other fees in connection with that consumer lender loan.” |
| 153. | Western Sky did not hold a license in Arizona. | **Plaintiff’s Evidentiary Support:**<br><br>Answer ¶ 28.<br><br>**Defendants’ Response:**<br><br>Undisputed. |
| 154. | CashCall did not have the license to make loans of $10,000 or less in Arizona from January 1, 2010 – August 31, 2013. | **Plaintiff’s Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 31.<br><br>**Defendants’ Response:**<br><br>Undisputed. |
| 155. | Western Sky loans were made of $10,000 or less. | **Plaintiff’s Evidentiary Support:**<br><br>Ex. 501, Meeks Dep. 38:6-23.<br><br>**Defendants’ Response:**<br><br>Undisputed. |
| 156. | CashCall serviced loans funded by Western Sky and purchased by WS | **Plaintiff’s Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 29. |

| | | |
|---|---|---|
| | Funding of less than $10,000, which were applied for by borrowers who provided an address located in Arizona on their loan applications during the period of time beginning on February 1, 2010 and ending on August 31, 2013. | **Defendants' Response:**<br>Undisputed. |
| **C. Arkansas** | | |
| 157. | Arkansas law provides that all contracts with an interest rate above 17% per annum are void as to principal and interest. | **Plaintiff's Evidentiary Support:**<br>Ark. Const. Amendment 89, §§ 3, 6(b).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself. Furthermore, Defendants note that the interest rate limit cited by Plaintiff applies to "all bonds issued and loans made after the effective date of this amendment," which is January 1, 2011. (AMF ¶ 275.)<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff properly characterized Arkansas law, which reads as follows:<br>"All contracts under Section 3 having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest and the General Assembly shall |

| | | |
|---|---|---|
| | | prohibit the same by law." Ark. Const. Amendment 89, § 6(b).<br><br>"The maximum lawful rate of interest on loans or contracts not described in Sections 1 and 2 shall not exceed seventeen percent (17%) per annum." *Id.* § 3.<br><br>Additionally, though the current law became effective January 1, 2011, it is unchanged in substance from prior law which read as follows: "All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the General Assembly shall prohibit the same by law." Ark. Const. Art. 19, § 13 (*repealed by* Ark. Const. Amend. 89) |
| 158. | Collection of principal and interest on loans with interest rates exceeding the lawful limit of 17% per annum is prohibited. | **Plaintiff's Evidentiary Support:**<br><br>Ark. Const. Amendment 89, § 6(b).<br><br>**Defendants' Response:**<br><br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself. Furthermore, Defendants note that the interest rate limit cited by Plaintiff applies to "all bonds issued and loans made after the effective date of this amendment," which is January 1, 2011. (AMF ¶ 275.) |

| | | |
|---|---|---|
| | | **Evidentiary Objection:** Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself. **Plaintiff's Reply:** Plaintiff properly characterized Arkansas law, which is found in the Arkansas Constitution, and reads as follows: "All contracts under Section 3 having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest and the General Assembly shall prohibit the same by law." Ark. Const. Amendment 89, § 6(b). "The maximum lawful rate of interest on loans or contracts not described in Sections 1 and 2 shall not exceed seventeen percent (17%) per annum." *Id.* § 3. Additionally, though the current law became effective January 1, 2011, it is unchanged in substance from prior law which read as follows: "All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the General Assembly shall prohibit the same by law." Ark. Const. Art. 19, § 13 (*repealed by* Ark. Const. Amendment 89). |

| | | |
|---|---|---|
| 159. | The Western Sky loans made in Arkansas had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 13.<br>**Defendants' Response:**<br>Undisputed. |
| 160. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Arkansas on their loan applications during the period of time beginning on February 1, 2010 and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 12.<br>**Defendants' Response:**<br>Undisputed. |
| **D. Colorado** | | |
| 161. | In Colorado, a lender's or assignee's failure to obtain the requisite license removes the consumer's obligation to pay finance charges to the lender or assignee. | **Plaintiff's Evidentiary Support:**<br>Colo. Rev. Stat. §§ 5-1-301(17), (47); 5-2-301(1)(a), (b).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff properly characterized Colorado law.<br>Colo. Rev. Stat. § 5-1-301 is a definitional statute, and provides the following relevant definitions:<br>"(17) "Creditor" means the seller, |

| | | |
|---|---|---|
| | | lessor, lender, or person who makes or arranges a consumer credit transaction and to whom the transaction is initially payable, or the assignee of a creditor's right to payment, but use of the term does not in itself impose on an assignee any obligation of his or her assignor. . .<br><br>"(47) "Supervised loan" means a consumer loan, including a loan made pursuant to a revolving credit account, in which the rate of the finance charge exceeds twelve percent per year as determined according to the provisions on finance charges contained in section 5-2-201."<br><br>Colo. Rev. Stat. §5-2-301 states, in relevant part:<br><br>"(1) Unless a person is a supervised financial organization or has first obtained a license from the administrator authorizing him or her to make supervised loans, he or she shall not engage in the business of:<br><br>"(a) Making supervised loans or undertaking direct collection of payments from or enforcement of rights against consumers arising from supervised loans he or she has previously made; or<br><br>"(b) Taking assignments of and undertaking direct collection of payments from or enforcement of rights against consumers arising |

| | | |
|---|---|---|
| | | from supervised loans . . .” |
| 162. | Colorado law also relieves the consumer of the obligation to pay any charge excessive under the law. | **Plaintiff's Evidentiary Support:**<br>Colo. Rev. Stat. § 5-5-201(2).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff properly characterized Colorado law.<br>Colo. Rev. Stat. § 5-5-201(2) states, in relevant part:<br>“(2) A consumer is not obligated to pay a charge in excess of that allowed by this code, and if a consumer has paid an excess charge he or she has a right to a refund. . . .” |
| 163. | Colorado prohibits annual interest above 12% on unpaid balances for unlicensed loans. | **Plaintiff's Evidentiary Support:**<br>Colo. Rev. Stat. §§ 5-1-301(46), (47); 5-2-201(1).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, |

| | | |
|---|---|---|
| | | which speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>Plaintiff has accurately characterized the statute.<br>Colo. Rev. Stat. § 5-1-301 states, in relevant part:<br>"(46) 'Supervised lender' means a person authorized to make or take assignments of supervised loans under a license issued by the administrator or as a supervised financial organization.<br>"(47) 'Supervised loan' means a consumer loan, including a loan made pursuant to a revolving credit account, in which the rate of the finance charge exceeds twelve percent per year as determined according to the provisions on finance charges contained in section 5-2-201."<br>Colo. Rev. Stat. § 5-2-201 states, in relevant part:<br>"(1) With respect to a consumer loan other than a supervised loan, including a revolving loan, a lender may contract for and receive a finance charge calculated according to the actuarial method not exceeding twelve percent per year on the unpaid balance of the amount financed." |
| 164. | "Supervised lender" is defined as a person authorized to make or take assignments of supervised loans under a | **<u>Plaintiff's Evidentiary Support:</u>**<br>Colo. Rev. Stat. § 5-1-301 (46). |

| | | |
|---|---|---|
| | license issued by the administrator or as a supervised financial organization. | **Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statute.<br>Colo. Rev. Stat. § 5-1-301 states, in relevant part:<br>"(46) 'Supervised lender' means a person authorized to make or take assignments of supervised loans under a license issued by the administrator or as a supervised financial organization." |
| 165. | Colorado prohibits a "supervised lender" or "seller," which includes an assignee of the seller's right to payment, from receiving a finance charge exceeding the equivalent of the greater of either of the following: (a) the total of 36% on unpaid balances of $1,000 or less, 21% on unpaid balances between $1,000.01 and $3,000, and 15% on unpaid balances greater than $3,000; or (b) 21% a year on unpaid balances. Colo. Rev. Stat. § 5-2-201(2). | **Plaintiff's Evidentiary Support:**<br>Colo. Rev. Stat. §§ 5-1-301 (42), (46); 5-2-201(2).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately |

| | | |
|---|---|---|
| | | characterized the statutes.<br><br>Colo. Rev. Stat. § 5-1-301 states, in relevant part:<br><br>"(42) 'Seller', except as otherwise provided, includes an assignee of the seller's right to payment, but use of the term does not in itself impose on an assignee any obligation of the seller with respect to events occurring before the assignment.<br><br>"(46) 'Supervised lender' means a person authorized to make or take assignments of supervised loans under a license issued by the administrator or as a supervised financial organization."<br><br>Colo. Rev. Stat. 5-2-201 states, in relevant part:<br><br>"(2) With respect to a supervised loan or a consumer credit sale . . . a supervised lender or seller may contract for and receive a finance charge . . . not exceeding the equivalent of the greater of either of the following:<br><br>"(a) The total of:<br><br>"(I) Thirty-six percent per year on that part of the unpaid balances of the amount financed that is one thousand dollars or less;<br><br>"(II) Twenty-one percent per year on that part of the unpaid balances of the amount financed that is more than one thousand dollars but does not exceed three |

| | | |
|---|---|---|
| | | thousand dollars; and<br>"(III) Fifteen percent per year on that part of the unpaid balances of the amount financed that is more than three thousand dollars; or<br>"(b) Twenty-one percent per year on the unpaid balances of the amount financed." |
| 166. | Western Sky did not hold a license in Colorado. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 28.<br>**Defendants' Response:**<br>Undisputed. |
| 167. | The Western Sky loans made in Colorado had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 25.<br>**Defendants' Response:**<br>Undisputed. |
| 168. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Colorado on their loan applications during the period of time beginning on February 1, 2010 and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 24.<br>**Defendants' Response:**<br>Disputed in part. The CFPB omits that from September 5, 2003 to March 16, 2016, CashCall held a Colorado Supervised Lender License. (Ex. 3 (CashCall's Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 5.)<br>**Plaintiff's Reply:**<br>Defendants' response does not dispute the proffered fact, and the clarification added does not render |

| | | |
|---|---|---|
| | | the factual assertion incorrect or disputable. |
| **E. Illinois** | | |
| 169. | Illinois law voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013, without a license, and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan. | **<u>Plaintiff's Evidentiary Support:</u>**<br>205 ILCS 670/1, 670/20(d).<br>**<u>Defendants' Response:</u>**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>Plaintiff has accurately characterized the statutes.<br>205 ILCS 670/1 states, in relevant part:<br>"§ 1. License required to engage in business. No person, partnership, association, limited liability company, or corporation shall engage in the business of making loans of money in a principal amount not exceeding $40,000, and charge, contract for, or receive on any such loan a greater rate of interest, discount, or consideration therefor than the lender would be permitted by law to charge if he were not a licensee hereunder, except as authorized by this Act after first obtaining a license from the Director of |

| | | |
|---|---|---|
| | | Financial Institutions (hereinafter called the Director). . . ."<br><br>205 ILCS 670/20 states, in relevant part:<br><br>"§ 20. Penalties for violation.<br><br>(d) Notwithstanding any other provision of this Section, if any person who does not have a license issued under this Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." |
| 170. | Western Sky did not hold a license in Illinois. | **Plaintiff's Evidentiary Support:**<br><br>Answer ¶ 28.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 171. | CashCall did not have the license to make loans of $40,000 or less in Illinois from January 1, 2013 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 34.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 172. | Western Sky loans were made of $10,000 or less. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 501, Meeks Dep. 38:6-23.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 173. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by | **Plaintiff's Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 32. |

| | | |
|---|---|---|
| | borrowers who provided an address located in Illinois on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Defendants' Response:**<br>Undisputed. |
| **F. Indiana** | | |
| 174. | Indiana law voids loans, except loans in an amount of not less than $50 and not more than $550 which otherwise meet the statutory definition of "small loan," if those loans are made without a license. The debtor has no obligation to pay either the principal or finance charges on such loans. | **Plaintiff's Evidentiary Support:**<br>Ind. Code §§ 24-4.5-3-502(3), 24-4.5-5-202(2), 24-4.5-7-104.<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself. Furthermore, under *Wertz v. Asset Acceptance, LLC*, 5 N.E. 3d 1175 (Ind. Ct. App. 2014), a license is required for an out of state business only if that business has a physical location within the state of Indiana. Thus, there can be no liability for violation of licensing since none was required.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff properly characterized the law, which is unaffected by *Wertz*.<br>The starting point here is the law voiding loans made without authority. The statute reads in relevant part as follows:<br>"If a creditor has violated the |

| | | |
|---|---|---|
| | | provisions of this Article applying to authority to make consumer loans (24-4.5-3-502) the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." Ind. Code § 24-4.5-5-202(2). This Code provision specifically voids loans made where the lender does not have authority to "make" loans, and applies then to assignees of the lender.<br><br>The internally cited provision relating to authority to make a loan, 24-4.5-3-502(3), requires both a lender and any assignee to be licensed, and reads in relevant part as follows:<br><br>"A person that does not qualify under subsection (1) or (2) shall acquire and retain a license under this article in order to regularly engage in Indiana in the following actions with respect to consumer loans that are not mortgage transactions: (a) The making of consumer loans. (b) Taking assignments of consumer loans. |

| | | |
|---|---|---|
| | | (c) Undertaking direct collection of payments from or enforcement of rights against debtors arising from consumer loans." 24-4.5-3-502(3).<br><br>Defendants admit that neither Defendants nor Western Sky had a license to make loans in Indiana. Defendants merely cite to an irrelevant case holding that assignees—as opposed to lenders—do not need a license unless they have a physical presence in Indiana. *See Wertz v. Asset Acceptance, LLC*, 5 N.E. 3d 1175 (Ind. Ct. App. 2014) (stating "legislature's intent to reach all potential creditors that demonstrate sufficient minimum contacts with Indiana" and giving deference to state Department of Financial Institutions ("DFI") guidance that the licensure requirement applies "to the assignee of a nonmortgage consumer loan only when that entity has a physical situs within Indiana); *see also* DFI guidance at http://www.in.gov/dfi/files/Who_needs_a_loan_license_7-01-2012.pdf (last visited July 15, 2016) (lender license required if lender regularly makes consumer loans in-state, while assignee license required if assignee based in Indiana).<br><br>Because the loans were made by an unlicensed entity, section 24- |

| | | |
|---|---|---|
| | | 4.5-5-202(2), renders them void. They cannot be saved by later assignment. |
| 175. | The Western Sky loans made in Indiana had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:** Ex. 506, CashCall RFA 36. **Defendants' Response:** Undisputed. |
| 176. | Western Sky did not hold a license in Indiana. | **Plaintiff's Evidentiary Support:** Answer ¶ 28. **Defendants' Response:** Undisputed. |
| 177. | CashCall did not hold a license to make loans in Indiana from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:** Ex. 506, CashCall RFA 37. **Defendants' Response:** Undisputed. |
| 178. | CashCall serviced loans funded by Western Sky and purchased by WS Funding, which were applied for by borrowers who provided an address located in Indiana on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:** Ex. 506, CashCall RFA 35. **Defendants' Response:** Undisputed. |
| **G. Kentucky** | | |
| 179. | Kentucky law voids loans of $15,000 or less if the interest rate exceeds 8% and the loan is made without a license, and the lender has no right to collect any principal, charges, or recompense whatsoever on such loans. | **Plaintiff's Evidentiary Support:** Ky. Rev. Stat. Ann. §§ 286.4-991(1), 286.4-420, 360.010(1). **Defendants' Response:** Disputed. Defendants dispute |

| | | |
|---|---|---|
| | | Plaintiff's characterization of the statute, which speaks for itself.<br>**<u>Evidentiary Objection:</u>**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**<u>Plaintiff's Reply:</u>**<br>Plaintiff has accurately characterized the statutes.<br><u>Ky. Rev. Stat. Ann. § 286.4-991</u> states in relevant part:<br>"(1). . . Any loan contract made in violation of this subtitle shall be void and the lender shall have no right to collect any principal, charges or recompense whatsoever.<br><u>Ky. Rev. Stat. Ann. § 286.4-420</u> defines what fees and interest may be collected by a person or entity licensed under the Consumer Loan Companies Act.<br><u>Ky. Rev. Stat. Ann. § 360.010</u> states in relevant part:<br>"(1) The legal rate of interest is eight percent (8%) per annum, but any party or parties may agree, in writing, for the payment of interest in excess of that rate as follows: (a) at a per annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve |

| | | |
|---|---|---|
| | | District where the transaction is consummated or nineteen percent (19%), whichever is less, on money due or to become due upon any contract or other obligation in writing where the original principal amount is fifteen thousand dollars ($15,000) or less, and (b) at any rate on money due or to become due upon any contract or other obligation in writing where the original principal amount is in excess of fifteen thousand dollars ($15,000); and any such party or parties, and any party or parties who may assume or guarantee any such contract or obligation, shall be bound for such rate of interest as is expressed in any such contract, obligation, assumption, or guaranty, and no law of this state prescribing or limiting interest rates shall apply to any such agreement or to any charges which pertain thereto or in connection therewith; provided, however, nothing herein contained shall be construed to amend, repeal, or abrogate any other law of this state pertaining to any particular types of transactions for which the maximum rate of interest is specifically prescribed or provided. |
| 180. | The Western Sky loans made in Kentucky had interest rates that | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 39. |

| | | |
|---|---|---|
| | exceeded 80% per annum. | **Defendants' Response:**<br>Undisputed. |
| 181. | Western Sky did not hold a license in Kentucky. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 28.<br>**Defendants' Response:**<br>Undisputed. |
| 182. | CashCall did not hold a license to make loans in Kentucky from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 40.<br>**Defendants' Response:**<br>Undisputed. |
| 183. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $15,000, which were applied for by borrowers who provided an address located in Kentucky on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 38.<br>**Defendants' Response:**<br>Undisputed. |
| **H. Massachusetts** | | |
| 184. | Massachusetts law voids loans of $6,000 or less if interest and expenses on the loan exceed 12% per annum and the loan is made or purchased without a license, and the lender or purchaser has no right to collect money in repayment of such loans. | **Plaintiff's Evidentiary Support:**<br>Mass. Gen. Law. ch. 140, §§ 96, 110.<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself. |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statutes.<br>Mass. Gen. Law. ch. 140, § 96 states in relevant part:<br>"No person shall directly or indirectly engage in the business of making loans of six thousand dollars or less, if the amount to be paid on any such loan for interest and expenses exceeds in the aggregate an amount equivalent to twelve per cent per annum upon the sum loaned, without first obtaining from the commissioner of banks . . ."<br>Mass. Gen. Law ch. 140, § 110 states in relevant part:<br>"Any loan made or note purchased or endorsement or guarantee furnished by an unlicensed person in violation of said sections [Mass. Gen. Law ch. 140 §§ 96 through 111] shall be void." |
| 185. | The Western Sky loans made in Massachusetts had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 42.<br>**Defendants' Response:**<br>Undisputed. |
| 186. | Western Sky did not hold a license in Massachusetts. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 28.<br>**Defendants' Response:**<br>Undisputed. |

| | | |
|---|---|---|
| 187. | CashCall did not hold a license to make loans in Massachusetts from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 43.<br>**Defendants' Response:**<br>Undisputed. |
| 188. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $6,000, which were applied for by borrowers who provided an address located in Massachusetts on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 41.<br>**Defendants' Response:**<br>Undisputed. |
| **I. Minnesota** | | |
| 189. | Minnesota law voids loans of $1,000 or less that are made without a license, and the borrower is not obligated to pay any amounts owing on such loans. | **Plaintiff's Evidentiary Support:**<br>Minn. Stat. § 47.601, subdiv. 1(d), subdiv. 6(b)(1).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statute.<br>Minn. Stat. § 47.601, subdiv. 1(d) defines "Consumer short term loan" as "a loan to a borrower which has a principal amount, or an advance on a credit limit, of |

| | | |
|---|---|---|
| | | $1,000 or less and requires a minimum payment within 60 days of loan origination or credit advance of more than 25 percent of the principal balance or credit advance. . . ."<br><br>Minn. Stat. § 47.601, subdiv. 6(b)(1) provides in relevant part:<br><br>"In addition to the remedies provided in paragraph (a), a loan is void, and the borrower is not obligated to pay any amounts owing if the loan is made: (1) by a consumer short-term lender who has not obtained an applicable license from the commissioner." |
| 190. | Minnesota also voids:<br><br>1. Consumer short term loans, which are those made to consumers in an amount under $1,000 and which require "a minimum payment within 60 days of loan origination or credit advances of more than 25 percent of the principal balance or credit advance," are "void and the borrower is not obligated to pay any amounts owing" if the effective interest rate exceeds the allowable amount or if the loan contract contains "a provision selecting a law other than Minnesota law under which the contract is construed or enforced."<br><br>and<br><br>2. Loans for which the written loan contract has an interest rate | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Minn. Stat. §§ 47.601, subdiv. 1(d), subdiv. 2(a)(1), (b), subdiv. 6(b); 334.01, subdiv. 1; 334.03.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed. Defendants dispute Plaintiff's characterization of the statute, which speaks for itself.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Plaintiff has accurately characterized the statutes.<br><br>The relevant portion of Minn. Stat. § 47.601, subdiv. 1(d) is excerpted immediately above (UF 189). |

| | | | |
|---|---|---|---|
| | | exceeding eight percent, if the loans do not meet the definition of "consumer short term loans," and except as to a holder in due course. | Minn. Stat. § 47.601 subdiv. 2 states in relevant part:<br><br>"**Consumer short-term loan contract.** (a) No contract or agreement between a consumer short-term loan lender and a borrower residing in Minnesota may contain the following:<br><br>(1) a provision selecting a law other than Minnesota law under which the contract is construed or enforced . . .<br><br>(b) Any provision prohibited by paragraph (a) is void and unenforceable."<br><br>Minn. Stat. § 47.601 subdiv. 6(b) states in relevant part:<br><br>"In addition to the remedies provided in paragraph (a), a loan is void, and the borrower is not obligated to pay any amounts owing if the loan is made:<br><br>(1) by a consumer short-term lender who has not obtained an applicable license from the commissioner;<br><br>(2) in violation of any provision of subdivision 2 or 3; or<br><br>(3) in which interest, fees, charges, or loan amounts exceed the interest, fees, charges, or loan amounts allowable under sections 47.59, subdivision 6, and 47.60, subdivision 2."<br><br>Minn. Stat. § 334.01, subdiv. 1 |

| | | |
|---|---|---|
| | | provides, in relevant part:<br>"No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action, than $8 on $100 for one year."<br>Minn. Stat. § 334.03 provides in relevant part:<br>"All bonds, bills, notes, mortgages, and all other contracts and securities . . . except such instruments which are taken or received in accordance with and in reliance upon the provisions of any statute, shall be void . . ." |
| 191. | The Western Sky loans made in Minnesota had interest rates and APRs that both exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 16.<br>**Defendants' Response:**<br>Undisputed. |
| 192. | Western Sky did not hold a license in Minnesota. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 28.<br>**Defendants' Response:**<br>Undisputed. |
| 193. | CashCall did not hold a license to make loans in Minnesota from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 44.<br>**Defendants' Response:**<br>Undisputed. |
| 194. | CashCall serviced loans funded by | **Plaintiff's Evidentiary Support:** |

| | | |
|---|---|---|
| | Western Sky and purchased by WS Funding of less than $1,000, which were applied for by borrowers who provided an address located in Minnesota on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | Ex. 506, CashCall RFA 15.<br>**Defendants' Response:**<br>Undisputed. |
| **J. Montana** | | |
| 195. | Montana law voids loans in any amount that are made, or for which any compensation is contracted for, charged, or received directly or indirectly, by a person without a license, and the person does not have the right to collect, receive, or retain any principal, interest, fees, or other charges on such loans, | **Plaintiff's Evidentiary Support:**<br>Mont. Code Ann. § 32-5-103(1), (4).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, Mont. Code Ann. § 32-5-103(1), (4), which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff accurately characterized the statute.<br>Mont. Code Ann. § 32-5-103 provides in relevant part:<br>"(1) Except as provided in subsection (5), a person may not engage in the business of making consumer loans in any amount and contract for, charge, or receive directly or indirectly on or in connection with any loan any compensation, whether for |

| | | |
|---|---|---|
| | | interest, fees, other consideration, or expense, except as provided in and authorized by this chapter.<br>"(4) Any loan made or collected in violation of subsection (1) by a person other than a licensee or a person exempt under subsection (5) is void, and the person does not have the right to collect, receive, or retain any principal, interest, fees, or other charges.<br>"(5) The following are not required to comply with the provisions of this chapter:<br>(a) a regulated lender, as defined in 31-1-111 [which includes a consumer loan licensee] . . ." |
| 196. | Western Sky did not hold a license in Minnesota. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Answer ¶ 28.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 197. | CashCall did not hold a license to make loans in Montana from January 1, 2010 – August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 46.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 198. | CashCall serviced more than four Western Sky loans per calendar year, which were applied for by borrowers who provided an address located in Montana on their loan application, during the period of time beginning on January 1, 2010, and ending on August 31, 2010. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 45.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |

| **K. New Hampshire** | | |
|---|---|---|
| 199. | New Hampshire law voids loans of $10,000 or less that are made without a license, and the lender has no right to collect such loans. | **Plaintiff's Evidentiary Support:**<br>N.H. Rev. Stat. §§ 399-A:1(XIV), 399-A:2(I), (IV).<br>**Defendants' Response:**<br>Disputed. N.H. Rev. Stat. § 399A:1(XIV) pertains to "payday loan lender[s]," and the loans in question are installment loans. (AMF ¶ 321.) Defendants also dispute the characterization of N.H. Rev. Stat. §§ 399-A:2(I), (IV), which speak for themselves.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Defendants appear to use a Westlaw version of the New Hampshire statutes that has been renumbered from the statutes in place during the relevant period and at least until January 1, 2016. The statutes as cited by the Plaintiff may still be found, as hyperlinked here, on an official New Hampshire website.<br>New Hampshire Stat. § 399A:2 specifies, at (I), that "[n]o person shall engage in the business of a small loan lender in this state or with consumers located in this state without first obtaining a |

| | | |
|---|---|---|
| | | license from the commissioner as provided in this chapter."<br>Section 399A:1(XIV) defines small loan, and 399A:1(XV) defines small loan lender, for purposes of § 399A:2. |
| 200. | New Hampshire law voids any "closed-end loan" to New Hampshire borrowers with an annual interest rate exceeding 36%, except loans which are the result of an accidental or bona fide error, and the lender has no right to collect any principal, charges, or recompense on such loans. | **Plaintiff's Evidentiary Support:**<br>N.H. Rev. Stat. Ann. §§ 399-A:11, V; 399-A:12, I.<br>**Defendants' Response:**<br>Disputed. This statement is unsupported by N.H. Rev. Stat. § 399-A:11, which refers to "Record Keeping Requirements," and N.H. Rev. Stat. § 399-A:12, which refers to "Consumer Inquiries."<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Defendants appear to use a Westlaw version of the New Hampshire statutes that has been renumbered from the statutes in place during the relevant period and at least until January 1, 2016. The statutes as cited by the Plaintiff may still be found on LexisNexis and, as hyperlinked here (and below), on an official New Hampshire website.<br>The cited statute sections fully support the Plaintiff's factual |

| | | |
|---|---|---|
| | | statement, and read in relevant part as follows:<br>"For any closed-end loan in the amount of $10,000 or less, a lender may lend in money, goods, or things of value upon such security not forbidden by RSA 399-A:11, VIII as may be agreed upon, and in connection with any such loan, may contract for, exact, or receive, directly or indirectly, charges, whether for interest, compensation, brokerage, endorsement fees, consideration, expense, or otherwise, on the entire principal of the loan, for which the annual percentage rate (APR) shall not exceed 36 percent." N.H. Rev. Stat. § 399a:12.<br>and<br>"If charges in excess of those permitted by this chapter shall be charged, contracted for, or received except as a result of an accidental or bona fide error the contract of loan shall be void and the lender shall have no right to collect or receive any principal, charges, or recompense whatsoever." N.H. Rev. Stat. § 399A:11 (emphasis added). |
| 201. | All Western Sky loans to New Hampshire borrowers fall within the definition of "Closed-end loan" as used in N.H. Rev. Stat. § 399-A:12, I. | **Plaintiff's Evidentiary Support:**<br>*See* N.H. Rev. Stat. §§ 399 A:1, II, IX; 399-A:12, I.<br>**Defendants' Response:** |

| | | |
|---|---|---|
| | | Disputed. This statement is unsupported by N.H. Rev. Stat. § 399-A:12, I, which refers to "Consumer Inquiries," and is otherwise unsupported by the cited statutes.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br><br>**Plaintiff's Reply:**<br><br>Defendants do not explain how this factual statement, which is supported by the statute and relates simply to a definition of "closed-end loan" used throughout the statute, is disputable. All Subject Loans fall within the statutory definition of "closed-end loan," which is as follows:<br><br>"Closed-end loan means a loan other than an open-end loan." And "Open-end loan means an open-end credit arrangement pursuant to which a creditor may permit a borrower from time to time to obtain loans from the creditor as described in RSA 358-K:1, XI." N.H. Rev. Stat. §§ 399 A:1, II, IX.<br><br>If Defendants' only basis for objection is their belief in a mis-citation of the support as opposed to the correctness of the underlying fact, they are incorrect in that regard also. Defendants appear to use a Westlaw version of |

| | | |
|---|---|---|
| | | the New Hampshire statutes that has been renumbered from the statutes in place during the relevant period and at least until January 1, 2016. The statutes as cited by the Plaintiff may still be found on LexisNexis and, as hyperlinked here, on an official New Hampshire website. |
| 202. | Western Sky loans were made of $10,000 or less. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 38:6-23.<br>**Defendants' Response:**<br>Undisputed. |
| 203. | The Western Sky loans made in New Hampshire had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 19.<br>**Defendants' Response:**<br>Disputed. Plaintiffs mischaracterize the cited evidence, which states that loans applied for by borrowers who provided an address located in New Hampshire on their loan application had interest rates that exceeded 80% per annum.<br>**Plaintiff's Reply:**<br>Defendants' response clarifies that Western Sky loans were made to borrowers *in* New Hampshire, but does not dispute that those loans had interest rates that exceeded 80% per annum. Under New Hampshire law, Defendants' dispute is not relevant. |

| | | |
|---|---|---|
| 204. | Western Sky did not hold a license in New Hampshire. | **<u>Plaintiff's Evidentiary Support:</u>** Answer ¶ 28. **<u>Defendants' Response:</u>** Undisputed. |
| 205. | CashCall did not hold a license to make loans in New Hampshire from January 1, 2010 – August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>** Ex. 506, CashCall RFA 47. **<u>Defendants' Response:</u>** Undisputed. |
| 206. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $10,000, which were applied for by borrowers who provided an address located in New Hampshire on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>** Ex. 506, CashCall RFA 18. **<u>Defendants' Response:</u>** Undisputed. |
| **L. New Jersey** | | |
| 207. | New Jersey law voids consumer loans of $50,000 or less that are made without a license, and the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good faith error. | **<u>Plaintiff's Evidentiary Support:</u>** N.J.S.A. §§ 17:11C-2, 17-11C-3, 17-11C-33(b). **<u>Defendants' Response:</u>** Disputed. Defendants dispute Plaintiff's characterization of the statute, N.J.S.A. §§ 17:11C-2, 1711C-3, 17-11C-33(b), which speak for themselves. **<u>Evidentiary Objection:</u>** Lacks foundation as it mischaracterizes the statute, which speak for themselves. |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statutes.<br>N.J.S.A. § 17:11C-2 defines, among other terms, "consumer lender," "consumer loan," and "consumer loan business," as follows:<br>"Consumer lender" means a person licensed, or a person who should be licensed, under P.L.1996, c. 157 (C.17:11C-1 et al.) to engage in the consumer loan business.<br>"Consumer loan" means a loan of $50,000 or less made by a consumer lender, payable in one or more installments, pursuant to the terms of P.L.1996, c. 157 (C.17:11C-1 et al.), and not a residential mortgage . . .<br>"Consumer loan business" means the business of making loans of money, credit, goods or things in action, which are to be used primarily for personal, family or household purposes, in the amount or value of $50,000 or less and charging, contracting for, or receiving a greater rate of interest, discount or consideration therefor than the lender would be permitted by law to charge if he were not a licensee hereunder, except as authorized by this act and without first obtaining a license from the commissioner. Any person |

| | | |
|---|---|---|
| | | directly or indirectly engaging in the business of soliciting or taking applications for such loans of $50,000 or less, or in the business of negotiating or arranging or aiding the borrower or lender in procuring or making such loans of $50,000 or less, or in the business of buying, discounting or endorsing notes, or of furnishing, or procuring guarantee or security for compensation in amounts of $50,000 or less, shall be deemed to be engaging in the consumer loan business."<br><br>N.J.S.A. § 17-11C-3 states in relevant part: "a. No person shall engage in business as a consumer lender or sales finance company without first obtaining a license or licenses under this act."<br><br>N.J.S.A. § 17-11C-33(b) states in relevant part: "b. A consumer lender who violates or participates in the violation of any provision [of consumer lending sections]. . . shall be guilty of a crime of the fourth degree. A contract of a loan not invalid for any other reason, in the making or collection of which any act shall have been done which constitutes a crime of the fourth degree under this section, shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a |

| | | |
|---|---|---|
| | | good faith error . . ." |
| 208. | Western Sky loans were made of $10,000 or less. | **Plaintiff's Evidentiary Support:** Ex. 501, Meeks Dep. 38:6-23. **Defendants' Response:** Undisputed. |
| 209. | Western Sky did not hold a license in New Jersey. | **Plaintiff's Evidentiary Support:** Answer ¶ 28. **Defendants' Response:** Undisputed. |
| 210. | CashCall did not hold a license to make loans in New Jersey from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:** Ex. 506, CashCall RFA 50. **Defendants' Response:** Undisputed. |
| 211. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $50,000, which were applied for by borrowers who provided an address located in New Hampshire on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:** Ex. 506, CashCall RFA 48. **Defendants' Response:** Disputed. The cited evidence does not provide support for this statement. **Evidentiary Objection:** Misstates the cited evidence. **Plaintiff's Reply:** Fact should read New *Jersey*, not New Hampshire. Factual evidence cited (Ex. 506, CashCall RFA 48) supports this statement. |
| **M. New Mexico** | | |
| 212. | New Mexico law voids loans of $2,500 | **Plaintiff's Evidentiary Support:** |

| | | |
|---|---|---|
| | or less made by a person with no license, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever on such loans. | N.M. Stat. Ann. § 58-15-3.<br><br>**Defendants' Response:**<br><br>Disputed. Disputed as to the characterization of the statute, N.M. Stat. Ann. § 58-15-3, which speaks for itself.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br><br>**Plaintiff's Reply:**<br><br>Plaintiff accurately characterizes the statute. N.M. Stat. Ann. § 58-15-3 states in relevant part:<br><br>"A. A person shall not engage in the business of lending in amounts of two thousand five hundred dollars ($2,500) or less for a loan without first having obtained a license from the director. . . .<br><br>"E. . . . A contract or loan in the making or collection of which an act is done that violates Subsection A or D of this section is void and the lender has no right to collect, receive or retain any principal, interest or charges whatsoever." |
| 213. | Western Sky loans were made of $2,500 or less. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 501, Meeks Dep. 38:6-23.<br><br>**Defendants' Response:**<br><br>Disputed. The statement mischaracterizes the evidence as it is taken out of context; Western |

| | | |
|---|---|---|
| | | Sky made loans of varying amounts up to $10,000.<br><br>**<u>Evidentiary Objection:</u>**<br><br>Proffered fact lacks foundation as it mischaracterizes the evidence.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>Defendants do not dispute the factual assertion, and the evidence cited does support the fact as offered. In addition, CashCall admitted "that it serviced loans funded by Western Sky and purchased by WS Funding of less than $2,500, which were applied for by borrowers who provided an address located in New Mexico on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013." (Ex. 506 CashCall RFA 51) |
| 214. | Western Sky did not hold a license in New Mexico. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Answer ¶ 28.<br><br>**<u>Defendants' Response:</u>**<br><br>Undisputed. |
| 215. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $2,500, which were applied for by borrowers who provided an address located in New Mexico on their loan application during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br><br>Ex. 506, CashCall RFA 51.<br><br>**<u>Defendants' Response:</u>**<br><br>Disputed in part. Plaintiff omits that from July 23, 2003 to the present, CashCall has held a New Mexico Small Loan License. (SS ¶ 165.) |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Defendants' response does not dispute the fact proffered, which tracks CashCall's admission as cited above. |
| **N. New York** | | |
| 216. | New York law voids any loan made with an interest rate exceeding the legal limit. | **Plaintiff's Evidentiary Support:**<br>N.Y. Gen. Oblig. Law § 5-511(1), (2); *Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void *ab initio* . . . .").<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, N.Y. Gen. Oblig. Law §§ 5-511(1), (2), which speaks for itself, and *Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986), which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statute and holding of *Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986).<br>N.Y. Gen. Oblig. Law § 5-511 provides in relevant part:<br>"1. All bonds, bills, notes . . . all |

| | | |
|---|---|---|
| | | other contracts or securities whatsoever . . . whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forbearance of any money, goods or other things in action, than is prescribed in section 5-501, shall be void . . .<br><br>"2. Except as provided in subdivision one, whenever it shall satisfactorily appear by the [evidence], that any bond, bill, note . . . contract, security or any evidence of debt, has been taken or received in violation of the foregoing provisions, the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled." |
| 217. | New York's applicable interest-rate limit is 16% per annum. | **Plaintiff's Evidentiary Support:**<br><br>N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1).<br><br>**Defendants' Response:**<br><br>Disputed. Defendants dispute Plaintiff's characterization of the statutes, N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1), which speak for themselves.<br><br>**Evidentiary Objection:**<br><br>Lacks foundation as it mischaracterizes the statutes, which speak for themselves. |

| | | |
|---|---|---|
| | | **Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statutes, which provide in relevant part as follows.<br>N.Y. Gen. Oblig. Law § 5-501(1): "The rate of interest, as computed pursuant to this title, upon the loan or forbearance of any money, … shall be six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law."<br>N.Y. Banking Law § 14-a(1): "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum." |
| 218. | New York law also prohibits any person or corporation not licensed by the state of New York from directly or indirectly, charging, taking or receiving on a loan any interest at a rate exceeding 16% per annum, and loans that exceed the rate are void. | **Plaintiff's Evidentiary Support:**<br>N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a(1).<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statutes, N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a(1), which speak for themselves.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speak for themselves.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately |

| | | |
|---|---|---|
| | | characterized the statutes, and the relevant voiding provision reads in part as follows.<br><br>N.Y. Gen. Oblig. Law §§ 5-501, 5-511:<br><br>"1. All bonds, bills, notes, assurances, conveyances, all other contracts or securities whatsoever, … whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forbearance of any money, goods or other things in action, than is prescribed in section 5-501, shall be void….<br><br>"2. Except as provided in subdivision one, whenever it shall satisfactorily appear by the admissions of the defendant, or by proof, that any bond, bill, note, assurance, pledge, conveyance, contract, security or any evidence of debt, has been taken or received in violation of the foregoing provisions, the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled." |
| 219. | The Western Sky loans made in New York had interest rates that exceeded 80% per annum. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 21.<br><br>**Defendants' Response:**<br><br>Disputed. Plaintiff mischaracterizes the cited evidence, which states that loans |

| | | |
|---|---|---|
| | | applied for by borrowers who provided an address located in New York on their loan application had interest rates that exceeded 80% per annum.<br><br>**Plaintiff's Reply:**<br><br>Defendants' response clarifies that Western Sky loans were made to borrowers *in* New York, but does not dispute that those loans had interest rates that exceeded 80% per annum. Under New York law, Defendants' dispute is not relevant. |
| 220. | Western Sky did not hold a license in New York. | **Plaintiff's Evidentiary Support:**<br><br>Answer ¶ 28.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 221. | CashCall did not hold a license to make loans in New York from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 54.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| 222. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $25,000, which were applied for by borrowers who provided an address located in New York on their loan application. | **Plaintiff's Evidentiary Support:**<br><br>Ex. 506, CashCall RFA 20.<br><br>**Defendants' Response:**<br><br>Undisputed. |
| **O. North Carolina** | | |
| 223. | North Carolina law voids loans of $15,000 or less that are made or secured for repayment without a license, except | **Plaintiff's Evidentiary Support:**<br><br>N.C. Gen. Stat. § 53-166(a), (d). |

| | | |
|---|---|---|
| | as a result of accidental or bona fide error of computation, and any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans. | **Defendants' Response:**<br><br>Disputed. Defendants dispute Plaintiff's characterization of the statute, N.C. Gen. Stat. § 53-166(a), (d), which speaks for itself.<br><br>**Evidentiary Objection:**<br><br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br><br>**Plaintiff's Reply:**<br><br>Plaintiff has accurately characterized the statute. N.C. Gen. Stat. § 53-166 states in relevant part:<br><br>"(a) Scope. No person shall engage in the business of lending in amounts of fifteen thousand dollars ($15,000) or less and contract for, exact, or receive, directly or indirectly, on or in connection with any such loan, any charges whether for interest, compensation, consideration, or expense, or any other purpose whatsoever, which in the aggregate are greater than permitted by Chapter 24 of the General Statutes, except as provided in and authorized by this Article, and without first having obtained a license from the Commissioner. . . .<br><br>"(d) Additional Penalties. Any contract of loan, the making or collecting of which violates any |

| | | |
|---|---|---|
| | | provision of this Article, or regulation thereunder, except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan. . . ." |
| 224. | North Carolina law caps the allowable interest rate at eight percent for lenders not licensed in the state. | **Plaintiff's Evidentiary Support:**<br>N.C. Gen. Stat. Ann § 24-1.<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, N.C. Gen. Stat. § 53-166(a), (d), which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statute, which is titled, "Legal rate is eight percent," and states: "The legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more." |
| 225. | North Carolina law imposes a tiered set of interest-rate limits with a maximum of 30% per annum on loans below $15,000, repayable between 12 and 96 months, | **Plaintiff's Evidentiary Support:**<br>N.C. Gen. Stat. §§ 53-166(d), 53-176(a). |

| | | |
|---|---|---|
| | and made by a lender licensed in North Carolina. Loans that violate this provision are void, and the lender has no right to collect, receive, or retain any principal or charges with respect to such loans. | **Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statutes, N.C. Gen. Stat. §§ 53-166(d), 53-176(a), which speak for themselves.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statutes, which speak for themselves.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statutes.<br>N.C. Gen. Stat. § 53-166 provides in relevant part:<br>"(d) Additional Penalties. Any contract of loan, the making or collecting of which violates any provision of this Article, or regulation thereunder, except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan.<br>N.C. Gen. Stat. § 53-176(a) provides tiers of interest rates for licensees. |
| 226. | Western Sky loans were made of $10,000 or less. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 38:6-23.<br>**Defendants' Response:** |

| | | |
|---|---|---|
| | | Undisputed. |
| 227. | The Western Sky loans made in North Carolina had interest rates that exceeded 80% per annum. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 23.<br>**<u>Defendants' Response:</u>**<br>Disputed. Plaintiff mischaracterizes the cited evidence, which states that loans applied for by borrowers who provided an address located in North Carolina on their loan application had interest rates that exceeded 80% per annum.<br>**<u>Plaintiff's Reply:</u>**<br>Defendants' response clarifies that Western Sky loans were made to borrowers *in* North Carolina, but does not dispute that those loans had interest rates that exceeded 80% per annum. Under North Carolina law, Defendants' dispute is not relevant. |
| 228. | Western Sky did not hold a license in North Carolina. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Answer ¶ 28.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 229. | CashCall did not hold a license to make loans in North Carolina from January 1, 2010 – August 31, 2013. | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 55.<br>**<u>Defendants' Response:</u>**<br>Undisputed. |
| 230. | CashCall serviced loans funded by Western Sky and purchased by WS | **<u>Plaintiff's Evidentiary Support:</u>**<br>Ex. 506, CashCall RFA 22. |

| | | |
|---|---|---|
| | Funding of less than $15,000, with terms between 6 and 84 months, which were applied for by borrowers who provided an address located in North Carolina on their loan application, during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Defendants' Response:**<br>Undisputed. |
| **P. Ohio** | | |
| 231. | Ohio law voids loans of $5,000 or less that are made without a license, and the lender has no right to collect, receive, or retain any principal, interest, or charges on such loans. | **Plaintiff's Evidentiary Support:**<br>Ohio Rev. Code Ann. § 1321.02.<br>**Defendants' Response:**<br>Disputed. Defendants dispute Plaintiff's characterization of the statute, Ohio Rev. Code Ann. § 1321.02, which speaks for itself.<br>**Evidentiary Objection:**<br>Proffered fact lacks foundation as it mischaracterizes the statute, which speaks for itself.<br>**Plaintiff's Reply:**<br>Plaintiff has accurately characterized the statute. Ohio Rev. Code Ann. § 1321.02 provides in relevant part:<br>"No person shall engage in the business of lending money, credit, or choses in action in amounts of five thousand dollars or less, or exact, contract for, or receive, directly or indirectly, on or in connection with any such loan, any interest and charges that in the aggregate are greater than the interest and charges that the lender |

| | | |
|---|---|---|
| | | would be permitted to charge for a loan of money if the lender were not a licensee, without first having obtained a license from the division of financial institutions under sections 1321.01 to 1321.19 of the Revised Code." |
| 232. | Western Sky loans were made of $5,000 or less. | **Plaintiff's Evidentiary Support:**<br>Ex. 501, Meeks Dep. 38:6-23.<br>**Defendants' Response:**<br>Undisputed. |
| 233. | Western Sky did not hold a license in Ohio. | **Plaintiff's Evidentiary Support:**<br>Answer ¶ 28.<br>**Defendants' Response:**<br>Undisputed. |
| 234. | CashCall did not hold a license to make loans in Ohio from January 1, 2010 – August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 58.<br>**Defendants' Response:**<br>Undisputed. |
| 235. | CashCall serviced loans funded by Western Sky and purchased by WS Funding of less than $5,000, which were applied for by borrowers who provided an address located in Ohio on their loan application, during the period of time beginning on February 1, 2010, and ending on August 31, 2013. | **Plaintiff's Evidentiary Support:**<br>Ex. 506, CashCall RFA 56.<br>**Defendants' Response:**<br>Undisputed. |
| **DEFENDANTS' ADDITIONAL MATERIAL FACTS** | | |
| 274. | Delbert was "created by the executive team of CashCall" which was comprised of Meeks, Reddam, the head of | **Defendants' Support**<br>Ex. 66 (Delbert Meeks Deposition ("Meeks")) at 21:19-21:25; 46:8- |

| | | |
|---|---|---|
| | servicing, the head of underwriting, the head of production, the head of risk, the head of IT, and the head of marketing. | 15.<br>**Plaintiff's Reply:**<br>UNDISPUTED. |
| 275. | "It would be very, very rare, in fact, probably impossible" that an applicant for a Western Sky loan "would not know of CashCall's involvement in the loan origination process" regardless of whether they applied via Internet or telephone. | **Defendants' Support**<br>Ex. 68 (Daniel Baren Deposition ("Baren")) at 106:12-107:23; 109:22-25; 110:11-111:16 (the CFPB attorney at the deposition sought and received clarification of this fact in her next question: "Q. I think what you told me clarifies what I thought you were saying before. So it sounded like that there—it was possible for consumers not to know [o]f CashCall's involvement until CashCall bought the loan. ***But am I understanding you correctly that that would be a very rare occurrence, from your understanding***? A. ***High -- very highly unlikely***." Baren also stated, "[customers] were aware of CashCall's involvement from the moment they started the transaction" and "[customers] would be notified via e-mail ***that CashCall was assisting Western Sky*** …[I]f CashCall was assisting in the application, then you would be notified throughout the process that CashCall was involved."). He also stated "it would be ***very rare for an application to go all the way from start to finish without some communication from the loan agent***, even if you are applying online." (emphasis |

| | | |
|---|---|---|
| | | added).<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 276. | CashCall maintained an office located in Anaheim, California between 2009 and 2013. | **Defendants' Support**<br>Ex. 67 (Delbert Meeks Rule 30(b)(6) Deposition ("Meeks Rule 30(b)(6)")) at 16:2-04;<br>ECF No. 27 (FAC).<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 277. | CashCall had "maybe 10 state licenses" and "only us[ed] five or six of them to make loans." | **Defendants' Support**<br>Ex. 68 (Baren) at 46:13-15.<br>**Plaintiff's Reply:**<br>DISPUTED because CashCall made loans to borrowers as the true lender of the Western Sky-originated loans, because CashCall bore the financial risk of the Western Sky loans. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004).<br>To fund the Western Sky loans, a reserve account was set up for Western Sky, into which CashCall deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 278. | The declaration of Jeremiah Ellard states that he "worked at CashCall" as a "loan officer/loan agent" and that "I spent most | **Defendants' Support**<br>Ex. 70 (Declaration of Jeremiah Ellard, Document No. 26 of the |

| | | |
|---|---|---|
| | of my time processing applications for small-dollar loans, which included loans below about $2,600." | parties' Joint Stipulation of Authenticity in Support of Parties' Motions for Summary Judgment) ¶¶ 3-4.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 279. | The business relationship between CashCall and state-chartered banks ended because "[t]he banks didn't want to originate these loans anymore," and thus "there was nothing to buy from them." | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 35:14-16.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the reason the business model ended. The state-chartered business model was abandoned after the two state-chartered banks withdrew from the arrangement under pressure from the FDIC. Ex. 508 (Baren Dep.) 33:14-35:5. |
| 280. | Four agreements were executed between Western Sky, CashCall, WS Funding, or WS Financial, LLC, but two were revised to correct a typographical error, resulting in an operative Agreement for Service and an operative Agreement for the Assignment and Purchase of Promissory Notes. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 125:11-19; 134:18-25.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 281. | Loans made by CashCall to Western Sky were accounted for on CashCall's books represented by a note receivable from Western Sky on CashCall. | **<u>Defendants' Support</u>**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 55:07-21.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED in that the fact as written is confusing and the testimony is incomplete. Loans were funded by Western Sky's funding account held at Wells Fargo Bank. That account was funded by CashCall, averaging |

| | | |
|---|---|---|
| | | two days of funding of loans, represented on CashCall's books as a continual note receivable from Western Sky, which was then adjusted for the loans purchased by CashCall three days after funding from the Western Sky funding account. Ex. 535, Meeks 30(b)(6) Dep. 55:1-56:11 |
| 282. | Pursuant to the Agreement for Service between Western Sky and CashCall, Western Sky agreed to engage CashCall to provide certain services, but not all such services were provided as described in the contract. | **Defendants' Support**<br>Ex. 71 (CashCall's Responses to Plaintiff's First Set of Requests for Admissions) at RFA Nos. 4, 5, 6, 8.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 283. | Pursuant to the Agreement for Service between Western Sky and CashCall, Western Sky paid CashCall 2.02% of the face value of each loan transaction for services rendered. | **Defendants' Support**<br>Ex. 68 (Baren) at 120:24-122:2.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 284. | CashCall hired an advertising agency to create advertising campaigns for CashCall. | **Defendants' Support**<br>Ex. 72 (John Paul Reddam Deposition ("Reddam")) at 35:23-36:7.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 285. | Since 2009, the CashCall executive team was comprised of Baren, Meeks, Reddam, Louis Ochoa, Hilary Holland, and Jonathan Williams. | **Defendants' Support**<br>Ex. 66 (Meeks) at 46:8-15; Ex. 68 (Baren) at 144:6-14.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 286. | Baren testified that "CashCall stopped purchasing loans from . . . two state chartered banks in November 2008" | **Defendants' Support**<br>Ex. 68 (Baren) at 33:10-24. |

| | | |
|---|---|---|
| | because of the financial crisis and because the banks' "regulator, the FDIC, was putting a lot of pressure on them . . . to get out of the marketing partnerships." | **Plaintiff's Reply:**<br>UNDISPUTED |
| 287. | Reddam has not "personally prepared" his resume since at least 2000 and does not "remember ever submitting" his "resume to a state banking department for any reason." | **Defendants' Support**<br>Ex. 72 (Reddam) at 11:1-11.<br>**Plaintiff's Reply:**<br>DISPUTED to the extent that this statement is being used to support the fact that Reddam is not responsible for the contents of a filing with Connecticut banking regulators that he admitted to signing under penalty of perjury and having notarized, Ex. 533, Reddam Dep. 10:5-18; Ex. 522 Reddam CT Statement, which attached his resume, the contents of which he generally admitted but said some statements were "an exaggeration." Ex. 533, Reddam Dep. 11:1-18:5; 24:20-25:24; 26:8-27:2; 30:3-31:21; 33:20-36:15. |
| 288. | Western Sky funded loans from a Western Sky account it maintained at Wells Fargo that was funded in part by monies lent by CashCall pursuant to a promissory note. | **Defendants' Support**<br>Ex. 68 (Baren) at 53:16-54:2; 134:18-135:8;<br>Ex. 87 (December 28, 2009 Promissory Note entered into by Western Sky and WS Financial, LLC);<br>Ex. 67 (Meeks Rule 30(b)(6)) at 55:7-21<br>**Plaintiff's Reply:**<br>DISPUTED to the extent that the statement suggests that Western Sky funded the loan. CashCall was |

| | | |
|---|---|---|
| | | the true lender in the Western Sky arrangement, because it bore the financial risk of the Western Sky loans. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004).<br><br>To fund the Western Sky loans, a reserve account was set up for Western Sky, into which CashCall deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 289. | A minimum period of three days elapsed before Western Sky sold a Western Sky loan to WS Funding. | **<u>Defendants' Support</u>**<br>Ex. 66 (Meeks) at 56:18-21;<br><br>Ex, 68 (Baren) 105:02-09; 119:14-20.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED to the extent that this statement suggests that Western Sky originated and sold loans.<br><br>CashCall was the true lender in the Western Sky arrangement, because it bore the financial risk of the Western Sky loans. *Easter v. Am. W. Fin.*, 381 F.3d 948, 955 (9th Cir. 2004). As such, CashCall did not perform services *for* Western Sky.<br>CashCall employees completed many of the steps of loan origination:<br>When a consumer applied for a Western Sky loan, CashCall |

| | | |
|---|---|---|
| | | employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, 70:2-21.<br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br>CashCall conducted preliminary underwriting functions on Western Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7).<br>To fund the Western Sky loans, a reserve account was set up for Western Sky, into which it deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 290. | CashCall paid Western Sky the amount disbursed to the borrower under the loan agreement, and a premium of 5.145% based off of the principal loan amount for some loan products, and off of the amount disbursed to the borrower for other loan products. | **Defendants' Support**<br>Ex. 68 (Baren) at 119:21-120:25.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 291. | Over the course of the program, a growing number of Western Sky loan agents on the reservation handled calls from loan applicants. | **Defendants' Support**<br>Ex. 68 (Baren) at 59:17-24; 70:02-10.<br>**Plaintiff's Reply:** |

| | | |
|---|---|---|
| | | UNDISPUTED |
| 292. | Over time, "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." | **Defendants' Support**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 46:25-47:03.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 293. | When a consumer applied for a Western Sky loan, Western Sky employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. | **Defendants' Support**<br>Ex. 68 (Baren) at 55:25-56:15, 57:12-58:2; 70:2-21.<br>**Plaintiff's Reply:**<br>DISPUTED to the extent this statement suggests that *only* Western Sky employees performed these functions. This statement misstates the evidence. The evidence supports the statement that CashCall employees *primarily* performed those functions, and at times some Western Sky employees *may* have performed that function in addition to CashCall employees (Baren was not certain).<br>*e.g.*, Ex. 508, Baren Dep. 55:25-56:15 (Q. "What did the employment verification entail? A. . . . [W]e would call up your human resources department . . . Q. When you say "we," who . . . would actually do that employment verification? A. There were a group of people in CashCall's offices. At least at the start, all of that happened in CashCall's offices. By 2013, some of that function could have been |

| | | |
|---|---|---|
| | | happening on the reservation. I'm not certain. But throughout most of the program that happened by a CashCall employee at CashCall's offices.")<br><br>In addition, CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16. |
| 294. | CashCall licensed the use of its proprietary software, Method, to Western Sky, for data collection purposes. | **<u>Defendants' Support</u>**<br>Ex. 69 (Martin A. Webb Deposition ("Webb")) at 29:18-23; 30:09-23.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>UNDISPUTED |
| 295. | The Western Sky employees on the Reservation used the software in the call center, for auditing, and for funding. | **<u>Defendants' Support</u>**<br>Ex. 69 (Webb) at 29:18-23; 30:09-23.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>UNDISPUTED |
| 296. | CashCall housed the files supporting the Western Sky website on its servers, though CashCall and Western Sky had separate websites, with separate application files, and separate SSL certificates. | **<u>Defendants' Support</u>**<br>Ex. 71 (CashCall's Responses to Plaintiff's First Set of Requests for Admissions) at RFA No. 4.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>UNDISPUTED |
| 297. | Data input into the Method software system was assessed on the Reservation. | **<u>Defendants' Support</u>**<br>Ex. 69 (Webb) at 121:15-24.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED insofar as it is vague and ambiguous what "assessed" means in this context. If this is a |

| | | |
|---|---|---|
| | | typo and the word should be "accessed," UNDISPUTED.<br>**Objections:** vague and ambiguous |
| 298. | CashCall did not set up the account from which loans were funded. | **<u>Defendants' Support</u>**<br>Ex. 75 (WS Funding Supplemental Responses to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 10;<br>Ex. 68 (Baren) at 53:20-54:20.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as incomplete. CashCall funded the account that was set up from which Western Sky provided loans to consumers. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 509 (Webb Dep.) 52:1-17 |
| 299. | Reddam never reviewed or approved the CashCall employment handbook. | **<u>Defendants' Support</u>**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 93:14-19.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED – Reddam testified that he "had an active hand in major company policies." Ex. 533, Reddam Dep. 30:3-18 |
| 300. | Reddam never reviewed or edited CashCall's loan servicing policies and procedures. | **<u>Defendants' Support</u>**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 95:8-12.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED – Reddam testified that he "had an active hand in major company policies." Ex. 533, Reddam Dep. 30:3-18 |

| | | |
|---|---|---|
| 301. | Reddam never reviewed CashCall's IT policies and procedures. | **<u>Defendants' Support</u>**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 97:25-98:2.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 302. | Reddam performed no functions relating to day-to-day operations as officer of WS Funding. | Ex. 67 (Meeks Rule 30(b)(6)) at 39:16-19.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED to the extent this statement suggests that WS Funding had day-to-day operations. It did not – rather, it served as a pass-through for CashCall's purchase of Western Sky's loans. Ex. 534, Meeks Dep. 24:13-22 ("There was no accounting for WS Funding. It was purchased the loans [*sic*]. It was an in-and-out transaction. Q [D]oes it mean that there are no expenses that would be attributable to WS Funding as opposed to CashCall . . .? A. Yes." |
| 303. | Professor Todd J. Zywicki ("Professor Zywicki") evaluated the Western Sky loan documents and opined that "a reasonable consumer would likely be able to understand the material terms of these installment contracts, including the choice of law term." | **<u>Defendants' Support</u>**<br>Ex. 76 (Expert Report of Professor Todd J. Zywicki ("Zywicki Report")) ¶¶ 106-10.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED (i) because Professor Zywicki has not disclosed an opinion on the choice of law clause in the contracts, which is titled "Governing Law," but instead on a sentence in the preamble (UF 110), and (ii) to the extent that Defendants incorrectly |

| | | |
|---|---|---|
| | | claim that Professor Zywicki's opinion reaches the issue of whether a reasonable consumer would understand that the choice of law term in a Western Sky loan contract was invalid, and the loan was void under state law.<br><br>**Objections:** the opinion expressed is neither relevant nor admissible under FRE 401 and 402, and the witnesses' statements are excludable under FRE 702, 703 and *Daubert***.** |
| 304. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. J. Howard Beales III ("Dr. Beales"), has stated that the CFPB has not "allege[d] any barrier to consumer sovereignty"—that is, where "free market decisions are unjustifiably hindered"—because CFPB "does not challenge the adequacy of the disclosure of the cost or repayment of the terms of the loans, and it alleges no barrier that prevents competing lenders from offering better terms." | **<u>Defendants' Support</u>**<br>Ex. 77 (Expert Report of Dr. Howard J. Beales III ("Beales Report")) ¶¶ 15-16.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the content of Defendants' recitation of Dr. Beales' statements because the Defendants misstate Dr. Beales' legal conclusion of the scope of general "barrier[s] to consumer sovereignty." Additional dispute as to the underlying legal and other conclusions in the proffered fact. *See*, *e.g.*, First Am. Compl. ¶¶ 37-50, 58-71.<br><br>**Objections:** improper expert testimony under FRE 702, 703 and *Daubert*, lacks relevance and is inadmissible under FRE 401 and 402, and expert report is inadmissible hearsay under FRE 801 and 802. |

| | | |
|---|---|---|
| 305. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. Beales, has stated: "[f]rom the perspective of the consumer, the impact of the challenged conduct—attempting to collect on the Western Sky loans —is precisely the same in the 34 states that do not have the usury or licensing requirements the Bureau seeks to enforce, but it is not alleged to constitute substantial consumer injury in those states." | **<u>Defendants' Support</u>**<br>Ex. 77 (Beales Report) ¶ 17.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions in the proffered fact. The attempts to collect on Western Sky loans represent that the debt is valid, which it is not in the 16 Subject States that render such loans void.<br>**Objections:** improper expert testimony under FRE 702, 703 and *Daubert*, lacks relevance and is inadmissible under FRE 401 and 402, and expert report is inadmissible hearsay under FRE 801 and 802. |
| 306. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. Beales, has stated: "[i]f it is not unfair to enforce the contract despite the state law, then there is nothing material to disclose. Of course, if state law does not apply, then attempting to collect on the contract is not improper, let alone unfair or deceptive. . . . It is not an 'unfair' practice to assert and attempt to enforce a reasonable legal proposition through litigation or otherwise." | **<u>Defendants' Support</u>**<br>Ex. 77 (Beales Report) ¶¶ 12, 21.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions in the proffered fact.<br>**Objections**: improper expert testimony under FRE 702, 703 and *Daubert*, lacks relevance and is inadmissible under FRE 401 and 402, statement is incomplete under FRE 106 insofar as witnesses' assumptions are replaced with ellipses or omitted, and expert report is inadmissible hearsay under FRE 801 and 802. |
| 307. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. Beales, has stated: "The complaint alleges no barrier to consumer sovereignty in this case. It does not | **<u>Defendants' Support</u>**<br>Ex. 77 (Beales Report) ¶ 16.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions |

| | | |
|---|---|---|
| | challenge the adequacy of the disclosure of the cost or repayment terms of the loans, and it alleges no barrier that prevents competing lenders from offering better terms. To be sure, the loans at issue are relatively expensive, but they provide offsetting benefits to the consumers who receive them in the form of credit that may otherwise be unavailable. Moreover, absent any barrier to competition, consumers could reasonably have avoided any injury by borrowing elsewhere, or not borrowing. Finally, each of the Western Sky loan contracts I reviewed contained several explicit and conspicuous disclosures that the governing law was the law of the Cheyenne River Sioux Tribe. In contrast to the Credit Practices rulemaking, the complaint contains no allegations that would suggest these standard form contracts are anything other than the product of market forces." | in the proffered fact.<br><br>**Objections**: improper expert testimony under FRE 702, 703 and *Daubert*, lacks relevance and is inadmissible under FRE 401 and 402, and expert report is inadmissible hearsay under FRE 801 and 802. |
| 308. | Professor Zywicki has stated: "consumers could reasonably avoid any harm allegedly suffered by contracting with Western Sky by dealing with a traditional installment lender or some other type of lender offering some other loan product entirely" but that "the most plausible explanation for consumers' decisions to enter into an agreement with Western Sky is because it provided the highest quality product at the lowest possible price available to the consumer at the time of entering into the loan." | **Defendants' Support**<br>Ex. 76 (Zywicki Report) ¶¶ 14, 23-24, 111-23.<br>**Plaintiff's Reply:**<br><br>DISPUTED because the data upon which Zywicki relies is not verified, and disputed to the extent that Defendants and Zywicki misstate the alleged harm and cause of harm to relevant consumers.<br><br>**Objections:** statement lacks relevance and is inadmissible under FRE 401 and 402, and improper expert testimony under |

| | | |
|---|---|---|
| | | FRE 702, 703 and *Daubert*. |
| 309. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. Beales, has stated: "the loans at issue are relatively expensive . . . they provide offsetting benefits to the consumers who receive them in the form of credit that may otherwise be unavailable. . . . Here, the Bureau's actions would deny consumers an option that many consumers chose." | **Defendants' Support**<br>Ex. 77 (Beales Report) ¶¶ 16, 20.<br>**Plaintiff's Reply:**<br>DISPUTED as to the conclusions in the proffered fact, except as to the statement that the loans at issue are relatively expensive.<br>**Objections:** improper expert testimony under FRE 702, 703 and *Daubert*, statement is incomplete under FRE 106 insofar as witnesses' assumptions are replaced with ellipses or omitted, lacks relevance and is inadmissible under FRE 401 and 402, and expert report is inadmissible hearsay under FRE 801 and 802. |
| 310. | Professor Zywicki has stated: "[t]he installment loans in this case meet an important consumer need and many consumers would suffer harm if they were deprived of access to these loans." | **Defendants' Support**<br>Ex. 76 (Zywicki Report) ¶¶ 14, 22.<br>**Plaintiff's Reply:**<br>DISPUTED as to the conclusions in the proffered fact.<br>**Objections:** lacks relevance and is inadmissible under FRE 401 and 402, and improper expert testimony under FRE 702, 703 and *Daubert*. |
| 311. | Professor Zywicki summarized research establishing that "many of those who borrow from traditional installment lenders do so because they are unable to acquire additional credit from more mainstream lenders, such as credit card | **Defendants' Support**<br>Ex. 76 (Zywicki Report) ¶ 36.<br>**Plaintiff's Reply:**<br>DISPUTED as to the conclusions in the proffered fact. |

| | | |
|---|---|---|
| | issuers" and that "demand for personal installment loans has increased in recent years as a result of tightness in access to credit in the wake of the financial crisis, the subsequent recession, and enactment of the Credit CARD Act of 2009, which resulted in the widespread loss of access to credit cards and credit card lines of credit for many consumers in the upper tier of the subprime borrowing sector." | **Objections:** lacks relevance and is inadmissible under FRE 401 and 402, improper expert testimony under FRE 702, 703 and *Daubert*, and statement contains inadmissible hearsay under FRE 801, 802**.** |
| 312. | Professor Zywicki has stated that copious research establishes that "imposing APR ceilings on interest rates below the rate that would prevail in a competitive market tends to reduce access to credit (especially for higher-risk borrowers), to increase the average maturity of loans, to increase the average loan size, and to lead to the adjustment of other non-rate terms (such as requiring co-signers or contracting for and using swifter and harsher remedies upon default)" and thus "economists have reached a general consensus that usury regulations are welfare-reducing for consumers and generally result in net harm to the very consumers that they are intended to benefit." | **<u>Defendants' Support</u>**<br>Ex. 76 (Zywicki Report) ¶¶ 65-71, 73-76.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to Defendants' characterization of Zywicki's statement, and as to the legal and other conclusions in the proffered fact.<br><br>**Objections:** statement lacks relevance and is inadmissible under FRE 401 and 402, improper expert testimony under FRE 702, 703 and *Daubert*, and witness' statement contains inadmissible hearsay under FRE 801 and 802**.** |
| 313. | Professor Zywicki has stated: "residents of states with low-rate usury ceilings often find certain consumer finance products to be unavailable to them, leaving them without access to credit or forced to turn to inferior substitutes, such as pawn shops or illegal loan sharks" so that "when consumers are aware that a desired product is available in a neighboring state they will often cross the border to enter into a transaction with | **<u>Defendants' Support</u>**<br>Ex. 76 (Zywicki Report) ¶¶ 90-104.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions in the proffered fact, and to the extent this suggests that Western Sky borrowers did anything other than access Western Sky's website from respective resident states to |

| | | |
|---|---|---|
| | the lender in the neighboring state." | obtain a loan.<br><br>**Objections:** lacks relevance and is inadmissible under FRE 401 and 402, improper expert testimony under FRE 702, 703 and *Daubert***.** |
| 314. | Professor Zywicki has stated: subprime consumers "unable to obtain these installment loans might have turned to expensive alternatives that likely would have been more expensive or otherwise less attractive, such as overdraft protection or pawn shops, or might have suffered other harms and expense such as bounced checks (with resulting fees and other costs) or personal costs that could arise from a failure to be able to meet one's financial obligations[.]" | **Defendants' Support**<br>Ex. 76 (Zywicki Report) ¶ 125.<br><br>**Plaintiff's Reply:**<br><br>DISPUTED – the proffered fact is a completely hypothetical statement.<br><br>**Objections:** witness lacks personal knowledge of the facts, lacks relevance and is inadmissible under FRE 401 and 402, and improper expert testimony under FRE 702, 703 and *Daubert***.** |
| 315. | Professor Zywicki has stated: "it is well-established that increased competition in consumer lending markets tends to result in lower prices and greater selection for consumers, including for installment loans" so that "borrowers who actually obtained loans from Western Sky benefited from the increased access to lenders (as opposed to having to use a payday lender, for example)" and "consumers who contracted with another lender or for another product, likely benefited as a result of the entry of a new company with a new business model to compete with existing suppliers." | **Defendants' Support**<br>Ex. 76 (Zywicki Report) ¶ 105.<br><br>**Plaintiff's Reply:**<br><br>DISPUTED as to the conclusions set forth in the proffered fact; DISPUTED as to the suggestion that borrowers benefited from having loans serviced and collected on that were void or otherwise not payable under state law.<br><br>**Objections**: witness lacks personal knowledge of the facts, lacks relevance and is inadmissible under FRE 401 and 402, and improper expert testimony under FRE 702, 703 and |

| | | |
|---|---|---|
| | | *Daubert*. |
| 316. | Professor Zywicki has stated: "CashCall reported performing Western Sky loans to credit bureaus, thereby enabling the consumer to increase their credit score. When combined with the absence of a prepayment penalty for early payoff, this ability to improve one's credit standing through positive payment performance can be extremely beneficial to the consumer." | **<u>Defendants' Support</u>**<br>Ex. 76 (Zywicki Report) ¶ 84.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions that CashCall in all instances reported performing Western Sky loans to credit bureaus; it is also disputed that consumers received a benefit if and when CashCall furnished payment information of borrowers from whom collected on void or otherwise not payable loans.<br>**Objections:** witness lacks personal knowledge of the facts, , lacks relevance and is inadmissible under FRE 401 and 402, foundation, and improper expert testimony under FRE 702, 703 and *Daubert*. |
| 317. | Former Director of the Bureau of Consumer Protection at the FTC, Dr. Beales, has stated: "[i]f asserting and defending a contested legal position is not unfair, then it is difficult to see how that conduct 'takes unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service'" and "if state law does not apply, then a consumer's understanding of the operation of state law is irrelevant." | **<u>Defendants' Support</u>**<br>Ex. 77 (Beales Report) ¶¶ 13, 14.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the (ultimate) legal conclusions offered in the proffered fact; the conclusion is also a hypothetical statement that should be rejected.<br>**Objections**: improper expert testimony under FRE 702, 703 and *Daubert*, lacks relevance and is inadmissible under FRE 401 and 402, and expert report is inadmissible hearsay under FRE |

| | | |
|---|---|---|
| | | 801 and 802. |
| 318. | Professor Zywicki has stated: "public interest organizations have touted installment loans such as the ones at issue in this case as a preferred alternative to payday loans," because "installment loans are welfare-improving for consumers because of their lower periodic payment requirements, lack of a balloon payment, longer maturity periods, and self-amortizing features." | **<u>Defendants' Support</u>**<br>Ex. 76 (Zywicki Report) ¶¶ 85-89.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions; it is also disputed that public interest organizations touted loans that were void or not payable under state law, or that public interest organizations opined on "loans such as the ones at issue in this case;" it is also disputed because the quoted portion of the report is inaccurate, insofar as the witness used the word "some" referring to the public interest organizations, but Defendants omitted that qualifier (*see* Zywicki Report) ¶ 85.<br>**Objections:** vague as to which loans are like the "ones at issue in this case;" lacks relevance and is inadmissible under FRE 401 and 402, and improper expert testimony under FRE 702, 703 and *Daubert***.** |
| 319. | Reddam "wasn't the one who designed the mechanics of . . . these loan purchases." | **<u>Defendants' Support</u>**<br>Ex. 72 (Reddam) at 67:21-68:12.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED – Reddam testified that he signed the relevant agreements, was a member of the executive team, and that he was "aware, generally, that WS Funding was technically the vehicle that loans were purchased |

| | | |
|---|---|---|
| | | into," and how the arrangement with Western Sky worked. Ex. 500, Reddam Dep. 55:14-22; 65:11-22; 67:6-12; 67:18-68:12; 75:1-8. |
| 320. | CashCall "started purchasing paper and servicing that paper that it did not originate" from "two state chartered federally regulated banks." | **Defendants' Support** Ex. 68 (Baren) at 28:6-16.<br>**Plaintiff's Reply:**<br>DISPUTED as to time when this was in effect. |
| 321. | The Western Sky loans were not payday loans, but were installment loans. | **Defendants' Support** Ex. 69 (Webb) at 124:4-9.<br>**Plaintiff's Reply:**<br>DISPUTED – the term "payday loans" is vague and ambiguous, and not defined by the law nor in the cited testimony.<br>**Objection:** vague and ambiguous as to the term "payday loans" and how those differ from "installment loans" |
| 322. | The Agreement for Service between Western Sky and CashCall granted CashCall "a non-exclusive license, to reproduce the name, trade name, trademarks, and logos of Western Sky Financial" but CashCall did not use such a license. | **Defendants' Support** Ex. 72 (Reddam) at 88:20-89:13; Ex. 68 (Baren) at 121:10-21; 130:24-132:3.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 323. | Following a recorded disclaimer played to the caller stating that CashCall had been hired to help process applications, a caller might be directed to a CashCall loan agent. | **Defendants' Support** Ex. 69 (Webb) at 75:5-14.<br>**Plaintiff's Reply:**<br>UNDISPUTED |
| 324. | CashCall assisted Western Sky in drafting certain marketing materials and | **Defendants' Support** Ex. 72 (Reddam) at 88:20-89:13; |

| | | |
|---|---|---|
| | Western Sky hired marketing firm Kovel Fuller, which devised advertising and marketing materials for Western Sky in coordination with CashCall and Western Sky. | Ex. 68 (Baren) at 121:10-21; 130:24-132:3.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 325. | Loan applicants were notified via email that CashCall was assisting Western Sky. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 107:14-23.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED to the extent this statement suggests that applicants were automatically or affirmatively notified by email that CashCall was assisting Western Sky. |
| 326. | CashCall had its own Internet server on the Reservation from January 2010 through September 2013. | **<u>Defendants' Support</u>**<br>Ex. 69 (Webb) at 53:16-18; 53:23-54:3; 121:15-122:3.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED to the extent this suggests that Western Sky did not utilize other servers. Western Sky used CashCall's servers and systems to handle loan approval process and host its website.<br>Ex. 509 (Webb Dep.) 70:1-16; 73:10-17; Ex. 512 (Reddam Dep.) 19:12-23, 11:4-20; Ex. 511 (Meeks 30(b)(6) Dep.) 85:11-86:3. |
| 327. | In CashCall's First Set of Interrogatories to Plaintiff, CashCall issued an interrogatory stating: "Do YOU contend that CASHCALL is the true lender of WS LOANS? If so, set forth all material facts RELATING TO this contention." Plaintiff responded, "The Bureau objects to this interrogatory on the grounds that | **<u>Defendants' Support</u>**<br>Ex. 73 (CashCall's First Set of Interrogatories to Plaintiff) at Rog. 21;<br>Ex. 78 (Plaintiff's First Supp. Resp. to CashCall's First Set of Interrogatories) at Supp. Resp. to |

| | | |
|---|---|---|
| | it is vague as to the term "true lender." The Bureau further objects to this interrogatory as unduly burdensome insofar as it is a premature contention interrogatory not appropriate for the earliest stages of merits discovery. A complete answer to this interrogatory depends on merits discovery of defendants, which the Bureau has yet to obtain. The Bureau reserves its right to supplement its answer to this interrogatory after merits and expert discovery have concluded." Plaintiff did not supplement this interrogatory response. | Rog. 21 (referred to by Plaintiff as Rog. 23).<br><br>**<u>Plaintiff's Reply:</u>**<br><br>UNDISPUTED. Plaintiff made objections in good faith and has continued to seek and receive discovery in this action. The legal definition has continued to evolve, and such legal conclusion is the proper province of the court. |
| 328. | In WS Funding's First Set of Interrogatories to Plaintiff, WS Funding issued an interrogatory stating: "Do YOU contend that WS FUNDING is the true lender of WS LOANS? If so, set forth all material facts RELATING TO this contention." Plaintiff responded, "The Bureau objects to this interrogatory on the grounds that it is vague as to the term "true lender." The Bureau further objects to this interrogatory as unduly burdensome insofar as it is a premature contention interrogatory not appropriate for the earliest stages of merits discovery. A complete answer to this interrogatory depends on merits discovery of defendants, which the Bureau has yet to obtain." Plaintiff did not supplement this interrogatory response. | **<u>Defendants' Support</u>**<br>Ex. 81 (WS Funding's First Set of Interrogatories to Plaintiff) at Rog. 11;<br><br>Ex. 82 (Plaintiff's First Supp. Resp. to WS Funding's First Set of Interrogatories) at Supp. Resp. to Rog. 11.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>UNDISPUTED. Plaintiff made objections in good faith and has continued to seek and receive discovery in this action. The legal definition has continued to evolve, and such legal conclusion is the proper province of the court. |
| 329. | In response to a request for admission stating, "Admit that Western Sky Financial, LLC was the true lender of the WS LOANS," Plaintiff responded, "[t]he | **<u>Defendants' Support</u>**<br>Ex. 80 (Plaintiff's Answers to CashCall's First Set of Requests for Admissions) at RFA No. 3. |

| | | |
|---|---|---|
| | Bureau objects to this request on the grounds that the phrase "true lender" is not defined and the legal definition of the phrase "true lender" is an evolving concept, rendering this Request for Admission vague and unanswerable." | **<u>Plaintiff's Reply:</u>**<br>UNDISPUTED. Plaintiff made objections in good faith. The legal definition has continued to evolve, and such legal conclusion is the proper province of the court. |
| 330. | Reddam did not structure the transaction with the state-chartered banks. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 32:4-18.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED to the extent that the testimony offered is evidence of the fact stated. Rather, the testimony states: "Ms. Callaway was the lawyer who brought us [the bank model], introduced us to the banks, designed the bank model, and executed on it." This is false on its face: an outside attorney could not "execute" on a business model – rather, *CashCall* purchased and serviced loans from the state-chartered banks – and therefore "executed" the model. |
| 331. | The affidavit of John A. Melo states: "On the same day, I called Western Sky at the advertised phone number. A man answered the phone. After a brief conversation wherein I stated that I wanted a loan, he immediately transferred me to another man. This man identified himself as working for CashCall." | **<u>Defendants' Support</u>**<br>Ex. 74 (Affidavit of John A. Melo, Document No. 28 of the parties' Joint Stipulation of Authenticity in Support of Parties' Motions for Summary Judgment) ¶ 4.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 332. | Adverse action notices were sent to borrowers from the Reservation. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 93:13-24; 99:17-22. |

| | | |
|---|---|---|
| | | **<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 333. | CashCall formed WS Funding to serve as a holding company for loans funded by, and then purchased from, Western Sky. | **<u>Defendants' Support</u>**<br>Ex. 71 (CashCall's Responses to Plaintiff's First Set of Requests for Admissions) at RFA No. 11.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED to the extent that the statement suggests Western Sky funded the loans**.**<br>To fund the Western Sky loans, a reserve account was set up for Western Sky, into which CashCall deposited enough money to fund two days of notes, calculated on the previous month's daily average. Ex. 511 (Meeks 30(b)(6) Dep.) 55:11-17; 72:10-23; Ex. 19 Assignment Agreement, ¶ 9; Ex. 509 (Webb Dep.) 52:1-17. |
| 334. | Loan agreements entered into between Western Sky and consumers do not explicitly identify a state of repayment. | **<u>Defendants' Support</u>**<br>Exs. 41-50 (Western Sky loan agreement iterations).<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED in 9 of the 10 exhibits proffered. On p. 5 of each the loan agreement iterations except one (Ex. 50), under the heading "Electronic Funds Authorizations and Disclosure," or "Payment," the agreements specify that electronic funds transfer (EFT) from the borrower's checking account (or, in some iterations, the bank account provided on the |

| | | |
|---|---|---|
| | | application, *see* Ex. 47-49) would be used for repayment, unless the borrower opted out. Ex. 41-49, at p. 5.<br><br>UNDISPUTED that Ex. 50, one of ten loan agreements offered by Defendants, does not specify a place of repayment. |
| 335. | Professor Gavin Clarkson ("Professor Clarkson") has stated: "CRST law should be applied for the additional reason that the states do not have a materially greater interest than the tribe and its members in the determination of these issues. Indeed, the public policy consequences of disregarding tribal law would be devastating." | **<u>Defendants' Support</u>**<br>Ex. 79 (Expert Report of Professor Gavin Clarkson ("Clarkson Report")) ¶ 23.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions contained in the statement.<br><br>**Objections:** improper expert witness testimony under FRE 702, 703 and Daubert; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 336. | Professor Clarkson has stated, "Access to capital for tribes and individual Indian entrepreneurs is a significant and pressing problem. Businesses and consumers entering into commercial contracts rely heavily on consistency and predictability in contracting, including when the parties mutually agree to apply tribal law to resolve disputes. Uniform interpretation and enforcement of such agreements are critical to ensuring continued investment in tribal businesses. With over one-quarter of American Indians living in poverty, | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 24.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions contained in the statement, and as to the suggestion that Defendants were or are tribal businesses.<br><br>**Objections:** improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 |

| | | |
|---|---|---|
| | nearly twice the national average, it has never been more important to promote confidence in the American Indian economy. *See* Suzanne Macartney et al., Poverty Rates for Selected Detailed Race and Hispanic Groups by State and Place: 2007–2011, U.S. Census Bureau (ACSBR/11-17 2013), http://www.census.gov/prod/2013pubs/acsbr11-17.pdf. This confidence is threatened when courts do not give full force and effect to contracting parties' desire to resolve their private disputes using tribal law." | and 402. |
| 337. | Professor Clarkson has also stated: "Indeed, the alternative – where tribal members are forced to apply the law of the state where the consumer is located – is costly, difficult to administer, and will have a chilling effect on tribal transactions. Each state has its own public policy. South Dakota, for example, does not have a usury law, but other states do. Tribal companies should not have to conduct a state-by-state inquiry when engaged in interstate commerce, including electronic commerce; they should be able to rely on the choice of law provisions in their contracts." | **Defendants' Support**<br>Ex. 79 (Clarkson Report) ¶ 25.<br>**Plaintiff's Reply:**<br>DISPUTED as to the conclusions contained in the statement, and the suggestion that Defendants are tribal companies or that these were tribal transactions.<br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 338. | Professor Clarkson has also stated: "American Indian economic development – whether driven by tribally-owned businesses or those owned by individual tribal members located in tribal communities – depends upon fair treatment and interpretation of contracts between American Indian | **Defendants' Support**<br>Ex. 79 (Clarkson Report) ¶ 26.<br>**Plaintiff's Reply:**<br>DISPUTED as to the conclusions contained in the statement, and as to the suggestion that Defendants were or are tribal businesses |

| | | |
|---|---|---|
| | entities and their partners and customers. Parties contracting with American Indian businesses regularly agree to applicable law, specific venues, and arbitration to resolve contract disputes. There is no reason in law or policy to treat these contractual provisions with any less respect than courts throughout the country have accorded other contracts selecting unique bodies of law or specially designed dispute resolution procedures." | conducting business in tribal communities.<br><br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 339. | Professor Clarkson has also stated: "Nor is there any reason to treat an Internet-based transaction, whereby consumers choose to do business with a tribal company by visiting the tribal company's website, any differently than if the consumer physically entered the reservation. Requiring a non-Indian to enter the reservation in order for tribal law to apply to the transaction would have adverse consequences and reduce opportunities for tribal electronic commerce. The ability of tribes and tribal members to engage in electronic commerce on equal footing with their off-reservation counterparts is critical to tribal economic development in the modern era. Otherwise, any state's laws could be applied to online transactions involving its residents to the exclusion of other sovereigns with even greater interests at stake. It would also mean that tribal sovereignty is a nullity online, a regressive view that conflicts with ongoing congressional efforts to promote tribal economic development and self- | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 27.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions contained in the statement, and as to the suggestion that Defendants were or are tribal companies engaging in online commerce on their own behalves.<br><br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |

| | | |
|---|---|---|
| | sufficiency. Treating consumers who visit the tribal company online differently than consumers who visit the tribe in person would have a particularly adverse effect upon tribes like the CRST that are geographically isolated." | |
| 340. | CashCall and Western Sky engaged in some disputes relating to reconciliation discrepancies throughout the business relationship. | **<u>Defendants' Support</u>**<br>Ex. 67 (Meeks Rule 30(b)(6)) at 56:23-57:10.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 341. | Professor Clarkson has stated: "Tribal communities are often historically disadvantaged, geographically isolated, and struggling with long-standing cycles of poverty. Just as with other emerging markets, the need for economic development on tribal lands remains acute and affects nearly every aspect of reservation life. Large portions of Indian Country lack basic infrastructure, posing a daunting barrier to tribal leaders' attempts to develop their economies. Such realities highlight the importance of stimulating economic development to create economic opportunity for tribal members." | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 30.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions contained in the statement.<br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 342. | Professor Clarkson has also stated: "Nowhere is this need [for the stimulation of economic development] more critical than among the CRST. The Reservation is in a remote rural location and suffers from extreme poverty and lack of opportunities. According to the Bureau of Indian Affairs' 2005 American Indian Population and Labor Force Report, the unemployment rate is | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 31.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions contained in the statement.<br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE |

| | | |
|---|---|---|
| | 88% (as compared to 3.8% for South Dakota as a whole), and prior to Western Sky's operations, 100% of those who were employed were still below the poverty level. *See* U.S. Dep't of the Interior, Bureau of Indian Affairs, 2005 American Indian Population and Labor Force Report 8 (2005); U.S. Dep't of Labor, Bureau of Labor Statistics, *Unemployment Rates by State, Not Seasonally Adjusted: Annual 2005*. In 2013, the Bureau of Indian Affairs issued an updated report showing the CRST median civilian job employment rate of 44.4% in 2010. *See* U.S. Dep't of the Interior, Office of the Assistant Secretary – Indian Affairs, 2013 American Indian Population and Labor Force Report 41 (2014). These employment rates are startlingly low when compared to the over 96% employment rate in South Dakota during the same time period. *See* U.S. Dep't of Labor, Bureau of Statistics, *Local Area Unemployment Statistics*." | 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 343. | Professor Clarkson has also stated: "While approximately 44.6% of the total population of Ziebach County – which is contained entirely within the Reservation – is below the poverty level, 71.9% of tribal families with children under 5 years of age are currently living below the poverty level, a rate that rises to 88.5% in homes with only a female as the head of household. U.S. Census Bureau, *QuickFacts, Ziebach County, South Dakota*; U.S. Census Bureau, *2006-2010 American Community Survey Selected Economic Characteristics*. By | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 32.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions contained in the statement.<br>**Objections:** improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |

| | | |
|---|---|---|
| | comparison, the National Center for Children in Poverty estimates that approximately 17% of children in South Dakota live in poverty (21% nationally). National Center for Children in Poverty, South Dakota Demographics of Poor Children, http://www.nccp.org/profiles/state_profile.php?state=SD&id=7. The per capita income for American Indians in Ziebach County is $6,999 with a family median income of $19,074, as compared to $27,334 and $62,982, respectively, for the total United States population. U.S. Census Bureau, 2006-2010 American Community Survey Selected Economic Characteristics." | |
| 344. | Professor Clarkson has also stated: "Such grinding poverty also leads to other social tragedies at the Reservation. The life expectancy for CRST members is only 48 years. Hawkwing, Inc., About hawkwing, http://www.hawkwing.org/#!about/cjzs. The short life expectancies of American Indians are likely "because of inadequate education, disproportionate poverty, discrimination in the delivery of health services, and cultural differences." Indian Health Service, Disparities Fact Sheet (2016), https://www.ihs.gov/newsroom/factsheets/disparities/." | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 33.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the legal conclusions contained in the statement.<br>**Objections:** improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 345. | Professor Clarkson has also stated: "The ability for e-commerce ventures such as Western Sky to succeed is vital to the CRST's economic well-being. Due to the Reservation's rural location, the CRST does not have the opportunity to obtain | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 35.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED as to the conclusions contained in the statement, and as |

| | | |
|---|---|---|
| | revenue from gaming or other activities available to tribes situated near population centers. CRST desperately needs more tribal entrepreneurship." | to the statement that Western Sky is or was an e-commerce venture and the suggestion that Defendants are or were tribal companies.<br><br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 346. | Professor Clarkson has also stated: "Only about 15% of CRST members obtain higher education degrees. U.S. Census Bureau, Census 2000 American Indian and Alaska Native Summary File, Profile of Selected Social Characteristics: 2000. Western Sky provided not only financial support for employees to earn their GED or college degrees, but also provided them with flexible work schedules to give employees the time to pursue their educational goals." | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 37.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions contained in the statement.<br><br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 347. | Professor Clarkson has also stated: "Reservation-based entities participating in the online financial services industry have used this opportunity to create jobs and invest in tribal nation building activities, including health care, education and infrastructure improvements. Many tribal entities and tribal member-owned businesses participating in tribal lending have few other options in the wake of federal funding shortfalls and shrinking tribal budgets, and most of them invest their | **<u>Defendants' Support</u>**<br>Ex. 79 (Clarkson Report) ¶ 48.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED as to the conclusions contained in the statement, and as to any suggestion that Defendants were tribal entities or owned by a member of any Native American tribe.<br><br>**Objections**: improper expert witness testimony under FRE 702, 703 and *Daubert*; expert report is |

| | | |
|---|---|---|
| | lending revenues in a manner similar to the tribal nation building activities of tribes with gaming. Indeed, my understanding is that Western Sky's goal was to eventually have almost all of the operations on the Reservation and the company was making great strides toward that goal." | inadmissible hearsay under FRE 801 and 802; lacks relevance and is inadmissible under FRE 401 and 402. |
| 348. | Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 53:20-54:20;<br>Ex. 69 (Webb) at 68:23-69:16.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 349. | The underwriting guidelines for CashCall's unsecured loans differed from those applied to the Western Sky loans. | **<u>Defendants' Support</u>**<br>Ex. 66 (Meeks) at 53:18-54:9.<br>**<u>Plaintiff's Reply:</u>**<br>UNDISPUTED |
| 350. | CashCall had the "option" to "not buy any [loans] . . . or only one-half or a certain number" and CashCall "could purchase elsewhere." | **<u>Defendants' Support</u>**<br>Ex. 69 (Webb) at 59:1-11.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED in part. The Assignment and Purchase Agreement (Ex. 19) states, at ¶ 2, "Company hereby agrees to purchase from Western Sky Financial *all loans* made through www.westernsky.com as evidenced by the Notes." While the Agreement contains other provisions, including representations by Western Sky (Ex. 19 at ¶ 7), nothing in the agreement disputes the provision in ¶ 2. Furthermore, there is no evidence that supports Webb's |

| | | |
|---|---|---|
| | | understanding of the agreement.<br><br>Plaintiff does not dispute that CashCall could purchase loans from other sources. |
| 351. | Each iteration of the Western Sky loan agreement stated: "We may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." | **Defendants' Support**<br>Exs. 41-50 (Western Sky loan agreement iterations).<br><br>**Plaintiff's Reply:**<br><br>UNDISPUTED |
| 352. | At the conference of counsel pursuant to L.R. 7-3 prior to the filing of the Parties' motions for summary judgment, counsel for the CFPB provided three bases for its Motion. First, that the choice-of-law provision in the loan agreements at issue is ineffective, and the laws of the sixteen states identified as Subject States in the First Amended Complaint should apply to the loans. Counsel for the CFPB explained its anticipated argument that under those state laws, the loan agreements would be void or partially void either due to violation of usury or licensing laws, and attempting to collect on those loans is an unfair, deceptive or abusive act or practice in violation of the Consumer Financial Protection Act, 12 U.S.C. §§ 5536(a)(1)(B), 5531(c)(1). Second, that Mr. Reddam is individually liable as a participant in the alleged conduct, and not solely based on his corporate position. Third, that a tribal sovereign immunity defense is unavailable to Defendants because the Defendants are not a tribe or members of the tribe, and any tribal sovereignty considerations are inapplicable. Counsel | **Defendants' Support**<br>Contemporaneously filed Declaration of Thomas J. Nolan ("Nolan Declaration") ¶¶ 4-5.<br><br>**Plaintiff's Reply:**<br><br>DISPUTED in part. Specifically, Plaintiff's dispute the last sentence of the proffered fact.<br><br>In the L.R. 7-3 Conference on June 23, 2016, counsel for the Bureau specifically mentioned the decision issued that day by Maryland's highest court concerning CashCall. Counsel then mentioned in particular the Maryland court's conclusion that CashCall was the "de facto lender" in its arrangement with two state-chartered banks, and ensured that portion of the conversation was captured in the parties' joint statement pursuant to L.R. 7-3.<br><br>Decl. of Owen Martikan, filed herewith ("7.18.2016 Martikan |

| | | |
|---|---|---|
| | for the CFPB did not mention any "true lender" argument when he explained the three anticipated arguments. | Decl."), ¶¶ 2-4; Parties' 7-3 Statement (DE 138) at 3:18-20. |
| 353. | After counsel for the CFPB concluded his summary of the basis for and arguments in support of the Motion, Defendants' counsel provided a detailed outline of the grounds for Defendants' contemplated motion for summary judgment. In discussing the basis for Defendants' tribal sovereignty argument, Defendants' counsel asked whether counsel for the CFPB had seen a Supreme Court opinion issued that day, *Dollar General Corp. v. Mississippi Band of Choctaw Indians*, 2016 WL 3434397 (U.S. June 23, 2016). Counsel for the CFPB said that he had not but noted that he had seen "the Maryland decision" concerning CashCall decided that day. Although counsel for the CFPB did not identify the case by name, Defendants' counsel assumed it was *CashCall, Inc. v. Maryland Commissioner of Financial Regulation*, No. 80 (Md. June 23, 2016). Other than noting that the Maryland decision had come down that day, there was no further mention of the Maryland decision. Specifically, at no time during the L.R. 7-3- telephonic conference did any attorney for the CFPB advise that "the Maryland decision" would have any relevance to their Motion. | **<u>Defendants' Support</u>**<br>Nolan Declaration ¶ 6.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED in part. Specifically, Plaintiff's dispute the last two sentences of this statement. Counsel for the Bureau not only raised the decision in a manner that would allow counsel to identify the case, but also made a point to raise the Maryland court's conclusion that CashCall was the "de facto lender" in its arrangement with two state-chartered banks. The telephonic conference was for the sole purpose of discussing the parties' summary judgment theories.<br>Counsel also ensured that portion of the conversation was captured in the parties' joint statement pursuant to L.R. 7-3.<br>7.18.2016 Martikan Decl. ¶¶ 2-4; Parties' 7-3 Statement (DE 138) at 3:18-20. |
| 354. | Because the referenced Maryland case concerned loans made by a state bank, and did not involve a tribal lender, and counsel for the CFPB did not raise it when discussing the CFPB's intended | **<u>Defendants' Support</u>**<br>Nolan Declaration ¶ 7.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED. Counsel for the |

| | | |
|---|---|---|
| | arguments, nor suggest that it had any relevance to their Motion, Defendants' counsel did not have any reason to think that it was relevant to the CFPB's Motion. | CFPB did raise the argument and suggested that it was relevant to their Motion. 7.18.2016 Martikan Decl. ¶¶ 3-4; Parties' 7-3 Statement (DE 138) at 3:18-20. |
| 355. | At no time during the L.R. 7-3 conference did counsel for the CFPB state that it intended to move for partial summary judgment on a de facto lender theory. | **<u>Defendants' Support</u>**<br>Nolan Declaration ¶ 8.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED. Counsel specifically stated that the CFPB may raise a de facto lender theory in its motion, and evidenced the same in the L.R. 7-3 Statement. 7.18.2016 Martikan Decl. ¶ 4; Parties' 7-3 Statement (DE 138) at 3:18-20. |
| 356. | During the L.R. 7-3 conference, counsel for the Parties did not discuss the substance of the true lender argument that appears in the Motion as-filed. | **<u>Defendants' Support</u>**<br>Nolan Declaration ¶ 9.<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED. As set forth more fully in the 7.18.2016 Martikan Decl., counsel for the CFPB raised the true lender argument. 7.18.2016 Martikan Decl. ¶ 4; Parties' 7-3 Statement (DE 138) at 3:18-20. |
| 357. | The Office of the Comptroller of the Currency defines table-funding as: "a practice whereby a mortgage loan is funded at settlement by an advance of loan funds and a contemporaneous assignment of the loan is made to the person advancing the funds." | **<u>Defendants' Support</u>**<br>Ex. 85 (OCC, Interpretive Letter # 1002, August 2004).<br>**<u>Plaintiff's Reply:</u>**<br>DISPUTED. The exhibit does not contain OCC's current definition or explanation, but instead contains a May 2004 definition and explanation. Moreover, the quoted portion is incomplete. The |

| | | |
|---|---|---|
| | | complete context is available in the exhibit, and the complete excerpt is as follows: "We note that this situation is distinguishable from 'table funding' arrangements, however. 'Table funding' refers to a practice whereby a mortgage loan is funded at settlement by an advance of loan funds and a contemporaneous assignment of the loan is made to the person advancing the funds. We consider a national bank that provides funding and takes assignment of a loan pursuant to a 'table funding' arrangement to be the lender.'" (*citing* 12 C.F.R. § 22.2(l), 12 C.F.R. § 3500.2(b))<br><br>**Objections:** irrelevant, inadmissible. |
| 358. | The Opinion & Award of Arbitrator, *Johnson v. CashCall, Inc.*, held that the bank that originated and funded the loan should be treated as the lender for purposes of determining whether state law applies to the loans. | **Defendants' Support**<br>Ex. 84 (Opinion & Award of Arbitrator, *Johnson v. CashCall, Inc.*, 51 434 E 00892 11 (Am. Arb. Ass'n)).<br><br>**Plaintiff's Reply:**<br><br>DISPUTED: The description of the arbitral award is incorrect in at least two respects. *First*, the arbitrator held simply that the claimant failed to meet her burden of proof as to CashCall being the true lender; and, *second*, the arbitrator considered the issue for purposes of determining which state's laws applied, and not as to |

| | | |
|---|---|---|
| | | whether state law applied in the first instance.<br><br>**Objections:** irrelevant, inadmissible hearsay. |
| 359. | The Opinion & Award of Arbitrator, *Teager v. CashCall, Inc*., held that the bank that originated and funded the loan should be treated as the lender for purposes of determining whether state law applies to the loans. | **<u>Defendants' Support</u>**<br>Ex. 83 (*Teager v. CashCall, Inc*., 51 434 E 00894 11 (Am. Arb. Ass'n)).<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED. The description of the arbitral award is incorrect in at least two respects. *First*, the arbitrator stated that the claimant failed "to identify any actual formal test that would help" with the true-lender determination and, based on that failure, the adoption of CashCall's proposed test, and the limited evidence introduced, held that the state-chartered bank was the true lender; and, *second*, the arbitrator considered the issue for purposes of determining which state's laws applied, and not as to whether state law applied in the first instance.<br><br>**<u>Objections</u> –** Irrelevant, inadmissible, hearsay. |
| 360. | A Western Sky employee located on the Cheyenne River Indian Reservation made the final decision of whether to fund the Western Sky loans and, in all but a few very rare circumstances, effected disbursement of money to the borrowers of the Western Sky loans. | **<u>Defendants' Support</u>**<br>Ex. 86 (CashCall's First Resp. to Plaintiff's First Set of Interrogatories) at Resp. to Rog. 3.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED that a Western Sky employee made the "final" decision to fund the loan. |

| | | |
|---|---|---|
| | | CashCall purchased all loans that Western Sky funded. (UF 47, 48)<br><br>UNDISPUTED that someone at Western Sky "presses a button" to fund the loan, that causes an EFT to a borrower's bank account. Ex. 508 (Baren Dep.) 52:21-53:5. |
| 361. | Western Sky loan applications were processed pursuant to Western Sky guidelines formulated by Western Sky. | **<u>Defendants' Support</u>**<br>Ex. 68 (Baren) at 60:12-61:4;<br><br>Ex. 69 (Webb) at 25:25-26:14.<br><br>**<u>Plaintiff's Reply:</u>**<br><br>DISPUTED to the extent the statement implies that Western Sky took the lead with respect to the loan application process.<br><br>CashCall employees completed many of the steps of loan origination:<br><br>When a consumer applied for a Western Sky loan, CashCall employees verified the applicant's employment, performed a fraud check, and performed an automated credit check. Ex. 508 (Baren Dep.) 55:25-56:15, 57:12-58:2, and 70:2-21.<br><br>CashCall employees reviewed the documentation submitted by borrowers for Western Sky loans to see if it met program criteria. Ex. 508 (Baren Dep.) 59:8-16.<br><br>CashCall conducted preliminary underwriting functions on Western |

| | | |
|---|---|---|
| | | Sky loans during the loan origination process. Ex. 506 (CashCall RFA 7.)<br><br>Webb developed underwriting criteria for Western Sky, but in practice CashCall would not purchase a loan from Western Sky unless it met CashCall's underwriting criteria. Ex. 510 (Meeks Dep.) 40:15-22.<br><br>Ex. 508 (Baren Dep.) 59:17-24 ("At the beginning of the program, all of the loan agents were CashCall employees . . . By the end of the program in the summer of 2013, there were 75 or so loan agents . . . as Western Sky employees."); 70:2-10 (mostly CashCall loan agents ran credit of consumers). |
| **PLAINTIFF'S SUPPLEMENTAL UNCONTROVERTED FACTS (FOR REPLY)** | | |
| 362. | During the parties' Local Rule 7-3 conference, the Bureau alerted defense counsel to a Maryland case involving CashCall and Reddam that was decided that very day, and expressly noted that court's holding that CashCall was the "de facto lender" in its rent-a-bank relationship with state-chartered banks. | 7.18.2016 Martikan Decl. ¶ 3 |
| 363. | Webb testified that he didn't know why he held the loans for three days before selling them. | Ex. 505, Webb Dep. 46:14-17 |
| 364. | CashCall's general counsel, Baren, expressed concern in 2010 about the need to "shore up" Western Sky's | Ex. 517, March 2010 email chain among Claudia Callaway, Dan Baren, and Cheryl Bogue |

| | | |
|---|---|---|
| | apparent tribal status so that hedge funds would continue to fund the loan program. | |
| 365. | Outside counsel, Claudia Callaway, recommended having Western Sky (a South Dakota company) organized under CRST law to "give confidence" to hedge fund lenders and "to respond to state regulators." | Ex. 517, March 2010 email chain among Claudia Callaway, Dan Baren, and Cheryl Bogue |
| 366. | The CRST code criminalizes usury. | ECF 173-1 (Attachment to Pl. Req. for Judicial Notice, filed July 11, 2016) |

Dated: July 18, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
E-mail: owen.martikan@cfpb.gov
Christina S. Coll (CA Bar #250712)
christina.coll@cfpb.gov
Leanne E. Hartmann (CA Bar #264787)
leanne.hartmann@cfpb.gov
Barry E. Reiferson (NY Bar #4343893)
barry.reiferson@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau