OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN SUPPORTING COMBINED STATEMENT OF FACTS AND REPLY TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

**EXCERPTED DEPOSITION TESTIMONY OF DANIEL BAREN**

28:2-12

2 **Q. And between July 2003 and present, did the**
3 **company's consumer installment lending business**
4 **change?**
5 A. Yes.
6 **Q. And how did it change?**
7 A. It's obtained -- when it started out in
8 2003, it had only a California license. It
9 obtained several other lending licenses in 2004,
10 2005, and subsequent years. And then beginning in
11 2006, the company started purchasing paper and
12 servicing that paper that it did not originate.

34:14-35:5

14 **Q. I'm sorry. Which bank was that**
15 **conversation with?**
16 A. It was the First Bank of Delaware.
17 **Q. And I think you just said this, but for**
18 **the other -- for the South Dakota bank, why did**
19 **that relationship end with CashCall?**
20 A. Sure. They called me and said that the --
21 they were getting a lot of pressure from their
22 regulator, which I assumed was the FDIC, and that
23 the regulator had stated that it would be difficult
24 for them to pass their safety and soundness
25 examination if they continued in these marketing

35
1 partnerships. And so that scared them off to where
2 they told us they unfortunately would have to stop
3 their marketing programs. And we were one of maybe
4 three or four other entities that they were selling
5 paper to.

45:20-46:9
20 **Q. And from your perspective at that time, so**
21 **early 2009, if that's the right time period, what**
22 **were the advantages for CashCall to the -- using**
23 **the tribal lending model to purchase loans?**
24 A. I really didn't think of advantages or
25 disadvantages. I knew that our lenders wanted us
46
1 to maintain geographic diversity in our servicing
2 portfolio, which was the reason for going into the
3 bank model back in 2006. But my view was, well, we
4 can find another bank, just because these two banks
5 don't want to do it anymore, and that's what
6 Ms. Callaway and I focused our attention on. And
7 until she said, "I don't think we are going to find
8 another bank. You should really look at the tribal
9 model. This is what I'm directing clients to."

53:20-55:2
20 **Q. -- with Mr. Webb. When you ultimately did**

**go into business with Mr. Webb, how were those loans funded?**

A. Sure. Over the next 10 months, what -- what was -- eventually Western Sky was able to open a bank account with Wells Fargo. And the loan

54

funding process was through that Wells Fargo account that was owned and operated by Western Sky. There were initially two types of employees. There were more than two, but for purposes of this -- this question, there's two types of employees on the reservation employed by Western Sky. There is the underwriters and there's the funders. The process, at that point, was the underwriter would review all of the loans that were set to fund on that particular day and provide a final approval for those loans. And that would entail moving the loans from what was called an underwriting queue into the funding account, funding queue.

And then subsequent to that, another Western Sky employee who was the funder, would go through and perform a final audit and, like I said, press the button to move the -- move the loan from a -- the funding queue to a funded queue, which would instruct Wells Fargo Bank to wire $2600 to this person's bank account.

They were all done in one fell swoop at --

22 I think it was 1:00 or 1:30 p.m. Mountain Time. But
23 they got loaded from underwriting into funding and
24 then someone on the reservation had the authority to
25 press the button to fund those loans. I'm
55
1 simplifying it, but that was my understanding of how
2 it got done.

122:15-123:2
15 **Q. Okay. What -- remind me the relationship**
16 **between CashCall and WS Funding.**
17 A. Oh, WS Funding. Okay.
18 **Q. Yeah.**
19 A. Sure.
20 **Q. Sorry.**
21 A. Yeah, there is a lot of overlap. CashCall
22 is the parent company. CashCall has dozens and
23 dozens of what are called special-purpose entities
24 that are subsidiaries owned by CashCall. WS
25 Funding was one such subsidiary that was created
123
1 for the purpose of purchasing the loans that were
2 originated by Western Sky.

143:17-144:14
17 **Q. Just -- we were just mentioning the**
18 **executive team. Who was on CashCall's executive**

19 **team? Who is currently on CashCall's executive**
20 **team?**
21 A. Probably just Paul Reddam, Del Meeks, and
22 myself. In certain instances Paul would bring in
23 other people to an executive team, depending on the
24 subject matter. And that would include head of
25 servicing, possibly Mike Chiang at risk, possibly
144
1 the head of marketing. But those were made --
2 those decisions were made on an ad hoc basis. But
3 I would say right now, as the company has shrunk,
4 the core of the executive team would be those three
5 people.
6 **Q. Aside from the ad hoc participants in an**
7 **executive team meeting, since 2009 have there been**
8 **any other members of the executive team for**
9 **CashCall?**
10 A. Yes.
11 **Q. Who is that?**
12 A. Louis Ochoa would have been on the
13 executive team for some period, Hilary Holland,
14 Jonathan Williams, I believe.

186:2-5
2 **Q. Did Mr. Reddam provide a personal guaranty**
3 **in connection with any of the financing by hedge**
4 **funds?**

5 A. Yes.

DATED: July 18, 2016

Respectfully submitted,

/s/ Owen Martikan

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov