OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
BARRY E. REIFERSON (NY Bar #4343893)
barry.reiferson@cfpb.gov
Admitted pro hac vice
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff,

v.

CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM,

Defendants.

CASE NO.: 2:15-cv-07522-JFW (RAOx)

**PLAINTIFF'S EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM SUPPORTING COMBINED STATEMENT OF FACTS AND REPLY TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: August 1, 2016
Time: 1:30pm
Court: Hon. John F. Walter
Courtroom 16

## EXCERPTED DEPOSITION TESTIMONY OF J. PAUL REDDAM

10:5-18

5 **Q. Okay. Let's go to page 2, and these are**
6 **printed on both sides of the page, by the way. Is**
7 **that your signature on page 2?**
8 A. Yes.
9 **Q. Your notarized signature?**
10 A. Yes.
11 **Q. Do you remember filling out a business and**
12 **-- a personal and business history statement for**
13 **the Connecticut Department of Banking for Delbert**
14 **Services Corporation?**
15 A. No.
16 **Q. I would ask you to look at page 3. Is**
17 **that your resume?**
18 A. Yes.

11:1-18:5

1 **Q. Okay. Have you prepared your resume?**
2 MR. NOLAN: At any time?
3 MR. MARTIKAN: Ever.
4 **Q. Since --- since 2000, let's put it that**
5 **way.**
6 A. I don't think I've personally prepared it,
7 no.
8 **Q. Okay. Do you remember ever submitting**
9 **your resume to a state banking department for any**

**reason?**

A. I don't remember doing so, no.

**Q. All right. Do you remember -- well, let's -- let's just go through -- what's on this document. Looking at the first page -- well, first of all, is that your name and either current or former address up there?**

A. Yes.

**Q. Okay. Under experience, is that an accurate, reflect your academic experience?**

MR. NOLAN: So now you're referring to what follows under category entitled "Education"?

MR. MARTIKAN: I am.

A. Okay. Yes.

BY MR. MARTIKAN:

**Q. Do you have any academic experience in**

12

**finance or lending?**

A. No.

**Q. Were you an associate professor of logic and philosophy at California State University of Los Angeles from 1979 to 1985?**

A. Yes.

**Q. Okay. From June 1985 to February 1986, were you a secondary marketing manager at Capital Mortgage Corporation, Farmington Hills, Michigan?**

A. Yes.

**Q. And what were your job responsibilities there?**

A. Forming mortgage-backed security pools, setting interest rates.

**Q. Forming them in order to be sold onto the secondary market?**

A. Or swap to -- in the MBS market, yes, mortgage-backed securities market.

**Q. Okay. Now, did you create pools of nonmortgaged-backed loans --**

A. No.

**Q. -- or are these just mortgages?**

A. Just mortgages.

**Q. Okay. From February 1986 to January 1987, were you the vice president of the United – Union**

**13**

**National Mortgage Corporation in Southfield, Michigan?**

A. Yes.

**Q. What were your job responsibilities there?**

A. Secondary marketing and loan origination supervision.

**Q. When you say "secondary marketing," do you mean again of mortgaged-backed securities?**

A. Well, Union National was really a much smaller company, so it didn't do mortgaged-backed securities. It sold loans to other mortgage

companies that, in some cases, would have securitized those loans.

**Q. So these were all mortgage loans?**

A. Yes.

**Q. Or -- okay. And then you said loan origination was another part of your job responsibility?**

A. Yes.

**Q. Okay. Is that just mortgage loans?**

A. Yes.

**Q. All right. From January 1987 to June 1988, did you work as executive vice president of CBI Mortgage Company in Orange, California?**

A. Yes.

14

**Q. What were your -- your job responsibilities there?**

A. Well, initially, I was hired to be secondary marketing manager, and gradually the duties expanded to running the office.

**Q. And what kind of -- how big an office was it?**

A. It was small. When I started up the company, there was, oh, perhaps 30 people, and when my duties expanded, they had shrunk quite a bit, to maybe 12 or so.

**Q. Were all those people involved in mortgage**

13 **lending?**
14 A. Yes.
15 **Q. Okay. And you supervised all of them?**
16 A. Yes.
17 **Q. Were there any other offices of this**
18 **company or was that just their sole office?**
19 A. That was the sole office.
20 **Q. From June 1988 to December 1994, were you**
21 **the founder and president of SC Funding Corporation**
22 **in Costa Mesa, California?**
23 A. Yes.
24 **Q. What kind of a company was that?**
25 A. That was a mortgage lender.
15
1 **Q. Okay. Just mortgages?**
2 A. Just mortgages.
3 **Q. All right. And as the president, you're**
4 **basically the manager of -- of the entire**
5 **operation?**
6 A. Well, the operation ultimately answered to
7 me, yes.
8 **Q. Okay. From January 1995 until April 1999,**
9 **were you the founder and president of DiTech**
10 **Funding Corporation in Irvine, California?**
11 A. Yes.
12 **Q. And what kind of a company was DiTech**
13 **Funding?**

A. Same kind of company, mortgage lender.
**Q. All right. Was DiTech involved in any kind of unsecured lending?**
A. No.
**Q. Ultimately, how many people were employed by DiTech Funding Corporation?**
A. I don't know the exact number. An estimate would be seven, 800.
**Q. All right. Ultimately, were you in charge of the entire operation?**
A. Yes.
**Q. From April 1999 to May 2000, were you a**

16

**senior vice president at GMAC Mortgage in Costa Mesa, California?**
A. Yes.
**Q. And what were your responsibilities there?**
A. The GMAC had purchased the assets and operations of DiTech Funding, and I was in charge of that division of GMAC.
**Q. So would it be fair to say that you continued your duties from when DiTech was an independent company to when it was a -- a division of GMAC?**
A. Well, partially. I also had to report to -- I reported to the people at GMAC in Horsham, Pennsylvania.

**Q. Is that their headquarters --**
A. Yes.
**Q. -- or was that their headquarters?**
A. It was, yes.
**Q. Was GMAC involved in any unsecured lending?**
A. Not that had any connection to me, that I knew of.
**Q. Okay. So if they did, then that wasn't a business that you oversaw; is that fair?**
A. Right. I don't know if they did or

17

didn't.
**Q. All right. So from May 2000 until the present, have you been the president of CashCall, Inc.?**
A. Well, I'm going to have to expand a little bit on this answer. It was Relantis for a couple of years and then ultimately changed its name to CashCall. So it wasn't CashCall in 2000. And Relantis was a company that bought and sold houses, but it wasn't very active in it.
**Q. So was Relantis's business mortgage lending or was it flipping houses?**
A. It didn't do any lending.
**Q. Okay. So when you bought -- did you buy Relantis from someone else or did you found**

16 **Relantis?**
17 A. No, it was de novo when it started in
18 2000.
19 **Q. De novo meaning you started Relantis?**
20 A. Yes.
21 **Q. As a company to buy and sell houses?**
22 A. Yes.
23 **Q. All right. And then at some point, you**
24 **changed the focus of the business to lending; is**
25 **that correct?**
18
1 A. Yes.
2 **Q. When did that happen?**
3 A. Well, the actual lending started in the
4 middle of 2003. Prior to that period, for about a
5 year or so, it had developed software.

24:20-25:24
20 **Q. Let me turn to the last page of Exhibit 1,**
21 **part, entitled "Biography."**
22 **This biographical statement, have you read**
23 **it? Have you had a chance to look at it yet?**
24 A. I can read it now.
25 **Q. Okay. Why don't you read it and tell me**
**25**
1 **if you recognize that.**
2 A. Okay. (Reading document.) I don't

recognize this particular biography. I -- the things that are stated in it, I recognize.

**Q. Are the things that are stated in this section true, this biography?**

A. Well, some of it, I suppose, is relative, you know. How successful is the track record, that's subjective. But it's -- there's nothing else ostensibly false in it.

**Q. All right. Let me just go through a couple of specifics. The first sentence; is that true, the first sentence of the biography?**

A. Yes.

**Q. The second sentence, "Mr. Reddam runs the day-to-day operations of CashCall, which currently originates and services unsecured loans of $10,000." Is that true?**

A. Well, that's not completely true now, but might have been true when this was written, meaning -- I'm sorry?

MR. NOLAN: No, continue.

A. Meaning that when CashCall started, its only loan amount was $10,000.

26:8-27:2

**Q. Well, I'll ask you this way: When -- when was it true that you ran the day-to-day operations of CashCall? Can you give me a time frame?**

11 A. Well --
12 MR. NOLAN: Objection. Vague and
13 ambiguous.
14 BY MR. MARTIKAN:
15 **Q. Have you ever run the day-to-day**
16 **operations of CashCall?**
17 MR. NOLAN: Same objection.
18 BY MR. MARTIKAN:
19 **Q. You can answer.**
20 A. Well, when the company started, it was
21 very small. I think we started with less than 10
22 people. And so, yes, in the beginning, I would
23 have run the day-to-day operations, and then as it
24 grew, there were managers and managers of managers,
25 et cetera, and people would report up to me. So I
27
1 would have responsibility for the operations, but
2 wouldn't necessarily be running them.

30:3-33:13
3 **Q. Let me go to the next sentence of this**
4 **biography. It states, "He is responsible for**
5 **devising and implementing all major company**
6 **policies, including its various loan programs and**
7 **interest rates." Is that a true statement with**
8 **respect to you?**
9 A. This is what -- what period of time?

10 **Q. Is it true now?**
11 A. No.
12 **Q. Was it true in 2009?**
13 A. The -- I would say I had an active hand in
14 major company policies, but I would say it's an
15 exaggeration to say that I devised and implemented
16 all -- all policies. For example, human resources
17 dealt with -- some combination of Del and Dan would
18 devise those policies.
19 **Q. So on page 2 of this the document, where**
20 **your signature is, there's a notarized date of**
21 **October 14th, 2011. Actually, your signature is**
22 **dated -- is that October 20th, 2009?**
23 A. That's what it looks like.
24 **Q. Okay. So in October of 2009, was -- was**
25 **it true that you were responsible for devising and**
**31**
1 **implementing all major company policies for**
2 **CashCall?**
3 A. I think that would be an exaggeration.
4 **Q. Who was responsible for devising and**
5 **implementing all major company policies in October**
6 **2009?**
7 A. Well, whoever the relative heads of
8 whatever department we're talking about would --
9 would develop their policies, but they would --
10 they would report to me, and just in the course of

business sometimes, and I'm sure we would have discussed them and sometimes not.

**Q. Did you have final approval over any policy that one of your department heads reported to you?**

A. Well, what I'm saying is that I wouldn't necessarily know what their policies were, but certainly as someone's boss, if they came in and said I want to do X, what do you think of X, and I -- I would have had some influence over it potentially.

MR. NOLAN: Counsel, I want to interject a foundation objection. The document that's been marked as Exhibit 1 does not bear a Bates number or an identification, and we don't know the source of

32

it.

The reason why I ask is -- and I -- I admit that I have not seen this document -- is that you have presented an exhibit that has a resume of J. Paul Reddam stapled to the application. And I just don't know whether or not that was obtained in the -- in the format from where you got it. And I don't believe that this has been -- and I'll check during the lunch break -- whether or not this has been produced by CFPB to us in response to a document request.

The other thing I'll point out -- just so that we're a little bit -- to make it a little more clear is: The company name on the personal and business history statement is a company -- this form is submitted on behalf of Delbert Services Corporation as the company name. And so the sense that -- the inference that all of the suggestions regarding, you know, these two documents may not align.

I just -- I know I'm not entitled to speaking objections, I apologize, but I just want -- I wanted to raise that. There's some confusion as to the foundation of this document. It appears to refer to a Delbert Services Corporation license application

33

in the Department of Banking for the State of Connecticut.

MR. MARTIKAN: Right. And I see it says, "Attached" -- "See attached resume on page 1." So my questions for the witness are whether he's seen these -- this document or not.

MR. NOLAN: Right. I just want to point it out so in case there's any confusion out of respect. But if you could identify for us maybe later, the source of this document, because I don't believe we've seen it in this -- in this format from you.

13 MR. MARTIKAN: All right.

33:20-36:15

20 **Q. So the next sentence says, "He coordinates**
21 **all marketing and advertising and determines where**
22 **advertising should be directed."**
23 **Is it true that in 2009, October 2009 to be**
24 **more specific, you coordinated all marketing and**
25 **advertising for CashCall and determined where**
34
1 **advertising should be directed?**
2 A. Well, in one sense it's true, in another
3 sense not, in that we use an outside advertising
4 agency named Kovel/Fuller, and they would actually
5 direct where advertising was done and what it
6 looked like, et cetera. And then sometimes I would
7 interface with them.
8 **Q. Did you, at CashCall, have final say over**
9 **any ad campaign that Kovel/Fuller put together?**
10 MR. NOLAN: Objection. Lack of
11 foundation. Calls for speculation.
12 A. Not exactly.
13 BY MR. MARTIKAN:
14 **Q. Did you hire Kovel/Fuller to do**
15 **advertising campaigns for CashCall?**
16 A. Yes.
17 **Q. All right. Did Kovel/Fuller develop**

**advertising campaigns for CashCall?**

A. Yes.

**Q. Did they present them to you for your approval?**

MR. NOLAN: Objection. Vague and ambiguous as to the use of the pronoun "you," contrasting his individual status or as a representative of CashCall.

35

BY MR. MARTIKAN:

**Q. When I say "you," I'm going to say you, J. Paul Reddam. Did they come to you and say, "Hey, look at this advertising campaign we put together. What do you think?"**

A. Well, actually, they would get input from me sometimes, but Dan Baren was the one who ultimately approved the advertising, and he had authority over me that way. Because as a company, we need to make sure that what was being stated in the ads was correct and legal.

MR. NOLAN: Now, with the clarification of the definition of the -- of the "you" pronoun, you'd asked Mr. Reddam whether or not he -- or whether or not you had hired this agency. And with that new definition, I'd ask you to re-ask Mr. Reddam whether or not he hired them individually or was it maybe retained by CashCall.

19 MR. MARTIKAN: Well --
20 MR. NOLAN: Because I think the definition
21 has now changed.
22 BY MR. MARTIKAN:
23 **Q. Well, I'm not -- I assume CashCall is**
24 **hiring Kovel/Fuller; right?**
25 A. Correct.
36
1 **Q. So the check that gets cut and pays for**
2 **Kovel/Fuller says "CashCall." It's from the**
3 **CashCall account; correct?**
4 A. Yes.
5 **Q. And -- but as president -- you are**
6 **president of CashCall; right?**
7 A. Yes.
8 **Q. As president of CashCall, you made that**
9 **decision, A, to hire Kovel/Fuller; is that right?**
10 A. Yes.
11 **Q. And B, to keep on using them as opposed to**
12 **saying, "Forget it, I don't want to use this agency**
13 **anymore"; correct?**
14 A. Yes.
15 **Q. Okay.**

39:14-18
14 **Q. All right. In 2010, what was the source**
15 **of financing for CashCall's unsecured consumer**

16 **loans?**
17 A. Well, at different points in the year it
18 obtained financing from different hedge funds.

55:2-58:18
2 **Q. Well, let's start with the ones that you**
3 **purchased from Western Sky. All right?**
4 **What was the most popular loan product that**
5 **you -- that CashCall purchased from Western Sky?**
6 A. Most popular among Western Sky's
7 customers, you mean?
8 **Q. Correct, that became CashCall's customers.**
9 **Right.**
10 MR. NOLAN: Objection. Vague and
11 ambiguous.
12 A. Yeah, I don't -- I don't know.
13 BY MR. MARTIKAN:
14 **Q. Well, you purchased -- CashCall purchased**
15 **a range of loan products from Western Sky; correct?**
16 A. Yes.
17 **Q. What were they?**
18 A. Well, they were -- there was a -- are we
19 talking about -- there was a 10,000 dollar --
20 approximately $10,000 loan, $5,000 loan, $2600
21 loan, $1500 loan. For a while, I think there was
22 an 850.
23 **Q. All right.**

A. You know, it's just -- I don't want to guess.

56

**Q. I don't want you to guess.**

A. Yeah.

**Q. But, do you know if any one of those particular loan products was more popular among borrowers than others?**

MR. NOLAN: Objection as to the term "popular."

MR. MARTIKAN: Most often chosen?

A. I don't -- well, I don't -- no, I don't, I guess is the actual answer.

BY MR. MARTIKAN:

**Q. Do you know what the charge-off rates were for those various products?**

MR. NOLAN: Objection. Lack of foundation as to which period of time.

BY MR. MARTIKAN:

**Q. I'm talking about 2010 to 2013, the Western Sky loan products. Do you know what the charge-off rates were for those loans?**

A. No.

**Q. Do you have any idea, or would you be speculating?**

A. I would be speculating, yeah. I -- I mean, I guess the correct answer is no, I don't

25 know.

57

1 **Q. Did the charge-off rates play an important**
2 **role in CashCall's bottom line?**
3 A. Well, yes.
4 **Q. Did the -- do you know if the charge-off**
5 **rates for those loan products that we were just**
6 **talking about varied over time, or was it fairly**
7 **constant from 2010 through 2013?**
8 A. I don't know.
9 **Q. Was that part of the information that was**
10 **reported in the Cognos report?**
11 A. What the actual charge-off rates would be,
12 yes, would be reported; sure.
13 **Q. So for -- did you look at CashCall's**
14 **financial statements, annual financial statements?**
15 A. Yes.
16 **Q. All right. Do you know what the effect**
17 **or -- do you know by how much charge-off loans**
18 **reduced CashCall's income in 2010, for example?**
19 A. No. The CFO would -- would be a better
20 source, sir.
21 **Q. All right. Was that important information**
22 **for you?**
23 A. Well -- I'm sorry. Could you repeat what
24 information you're asking about? I'm sorry.
25 **Q. Was the charge-off late -- rate for**

58

1 **unsecured consumer loans, was that a significant**
2 **business risk for CashCall?**
3 A. Yes.
4 **Q. Would you say it was the most significant**
5 **business risk for CashCall's unsecured consumer**
6 **loan business?**
7 A. No.
8 **Q. What was the biggest risk?**
9 A. I'm not trying to be a smart aleck, but
10 regulatory risk is the biggest risk.
11 **Q. All right. Where -- what about -- was it**
12 **the second biggest risk?**
13 A. It and liquidity would be pretty close.
14 **Q. And by "regulatory risk," you mean the**
15 **risk that some federal or state regulator would**
16 **find what you were doing violated some law and try**
17 **to shut it down. Is that what you mean?**
18 A. Or extract some penalty or something, yes.

65:8-10

8 **Q. Is that your signature on the last page of**
9 **the document?**
10 A. It's kind of faded, but I would think so.

88:20-89:13

20 **Q. Agreed with. Do you know if CashCall ever**

21 **agreed to advertise on Western Sky Financial's**
22 **behalf?**
23 A. It -- I think the characterization would
24 be, did it ever help Western Sky with its
25 advertising. And the answer to that would be yes.
89
1 **Q. How did CashCall help Western Sky**
2 **Financial with its advertising?**
3 A. Well, our -- the advertising agency that
4 CashCall used, Kovel/Fuller, prepared advertising,
5 specifically -- or more specifically, television
6 cable advertising, that it went back and forth with
7 Butch Webb on, the look and feel of it, and so on.
8 And sometimes I would have described to
9 Kovel/Fuller the general purpose of -- of why
10 borrowers would borrow this kind of money. So
11 they -- they would take ideas that I would give --
12 would give them, turn those into prospect ads, and
13 then go back and forth with, you know, Western Sky.

96:13-19
13 **Q. Are you familiar with a company called**
14 **Delbert Services Corporation?**
15 A. Roughly, yes.
16 **Q. What was your involvement with that**
17 **company?**
18 A. Well, I think that I owned it. It was a

19 collection company.

147:4-148:4

4 **Q. So CashCall, does CashCall have an office**
5 **in Anaheim?**
6 A. No. It's in Orange.
7 **Q. Okay. Is that where you work?**
8 A. Yes.
9 **Q. Did CashCall ever have an office in**
10 **Anaheim?**
11 A. Yes.
12 **Q. All right. When did --- when did that**
13 **office close down; I assume it's closed down;**
14 **right?**
15 A. Yes.
16 **Q. Okay.**
17 A. Well, yes. We moved, yes.
18 **Q. Okay. Oh, you moved. All right. So when**
19 **did you move from Anaheim to Orange?**
20 A. Well, we -- there was a period where we
21 had space in both Anaheim and Orange --
22 **Q. Okay.**
23 A. -- and I think my office moved at the
24 beginning of 2013. And ultimately after we had
25 these series of problems with having to close
148
1 buying Western Sky loans and the Freddie Mac issue,

2 and we shrunk quite a bit and eventually moved out
3 of the Anaheim office, and ultimately the landlord
4 leased it to someone else.

151:8-17
8 **Q. Okay. Who is Hudson Cove?**
9 A. Hudson Cove is a hedge fund. I think
10 they're located in New Jersey.
11 **Q. Did they provide -- did they provide**
12 **financing to CashCall?**
13 A. Yes.
14 **Q. Did they provide financing to CashCall in**
15 **connection with the Western Sky loans?**
16 A. I'm not 100 percent certain, but I believe
17 so.

151:24-152:9
24 **Q. Are you aware of any other entities, other**
25 **than the ones we've talked about today, that**
152
1 **provided financing to CashCall in connection with**
2 **the Western Sky loans from 2010 to 2013?**
3 A. Yes.
4 **Q. What are those entities?**
5 A. I don't know the long formal name, but
6 BasePoint.
7 **Q. Okay. And is BasePoint a hedge fund?**

8 A. I don't know if they technically call
9 themselves a hedge fund, but for our purposes, yes.

DATED: July 18, 2016

Respectfully submitted,

*/s/ Owen Martikan*

Owen Martikan (CA Bar #177104)
*Attorney for Plaintiff*

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788
e-mail: owen.martikan@cfpb.gov