**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | | |
|---|---|---|
| Case No. | **CV 15-7522-JFW (RAOx)** | Date: August 31, 2016 |
| Title: | Consumer Financial Protection Bureau -v- CashCall, Inc., et al. | |

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Shannon Reilly | None Present |
| Courtroom Deputy | Court Reporter |

| | |
|---|---|
| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
| None | None |

| | |
|---|---|
| **PROCEEDINGS (IN CHAMBERS):** | **ORDER GRANTING PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S MOTION FOR PARTIAL SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 144];** |
| | **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [filed 6/30/2016; Docket No. 139]** |

   On June 30, 2016, Plaintiff Consumer Financial Protection Bureau ("Plaintiff" or "CFPB") filed a Motion for Partial Summary Judgment.  On July 11, 2016, Defendants CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corporation ("Delbert Services"), and J. Paul Reddam ("Reddam") (collectively, "Defendants") filed their Opposition.  On July 18, 2016, Plaintiff filed a Reply.

   On June 30, 2016, Defendants filed a Motion for Summary Judgment. On July 11, 2016, Plaintiff filed its Opposition.  On July 18, 2016, Defendants filed a Reply.

   Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found these matters appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's August 15, 2016 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

I.  **FACTUAL AND PROCEDURAL BACKGROUND**[1]

   A.  **The Defendants**

Defendant CashCall, a California corporation, is a lender to consumers and small businesses. Defendant Reddam is the founder, CEO, sole owner, and President of CashCall. Defendant WS Funding is a wholly-owned subsidiary of CashCall, which was formed to purchase loans made by non-party Western Sky Financial.[2] Defendant Delbert Services is a Nevada corporation which was formed to service loans that CashCall deemed in default, or "charged-off", and to provide collection services for other, unrelated clients.

   B.  **CashCall's Consumer Loan Business**

CashCall entered the unsecured consumer lending market in 2003 to provide a lower cost alternative to payday loans for credit-impaired borrowers and small businesses. Before 2006, CashCall primarily (if not exclusively) made loans to customers in California. In 2006, CashCall decided to expand its business beyond California. However, it opted not to obtain licenses to lend in other states because "in many of those states, the usury laws would not permit [CashCall] to make or service loans at the rates [CashCall] deemed necessary to make a profit." Instead, CashCall expanded its business by paying two state-chartered federally-regulated banks to make loans that CashCall then purchased and serviced. The Maryland Court of Appeals recently referred to CashCall's arrangement with the state-chartered banks as a "'rent-a-bank' scheme" designed to take advantage of a federally-insured bank's exemption from state usury limits. *CashCall, Inc. v. Maryland Comm'r of Fin. Regulation*, 139 A.3d 990, 995 n.12 (Md. 2016). This lending model was successful for CashCall until the two state-charted banks withdrew from the arrangement under pressure from the FDIC.

After the two state-chartered banks withdrew from the arrangement, counsel Claudia Callaway of Katten Muchin Rosenman LLP ("Katten") advised CashCall's general counsel, Dan Baren, that she was recommending that her clients move to a "tribal model," and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." Baren described the "tribal model" as "almost identical to the [state-chartered] bank model."

Callaway introduced Baren to Martin Webb, who was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota and who had founded two or three previous payday lending companies that used the tribal lending model. Webb and Baren discussed forming a tribal lending entity through which Webb would sell loans to CashCall.

---

[1] To the extent any of these facts are disputed, they are not material to the disposition of this motion. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

[2] References to CashCall in this Order include WS Funding.

As a result of those discussions, in 2009, Webb formed Western Sky Financial ("Western Sky") with CashCall in mind. Western Sky was a South Dakota limited liability company and was licensed to do business by the CRST. Webb was Western Sky's sole owner. Western Sky's offices were located in Timber Lake and Eagle Butte, on the CRST Reservation in South Dakota. Western Sky constructed new facilities on the Reservation, including a call center and office, and communication infrastructure with CashCall's assistance. Between January 2010 and August 2013, Western Sky was one of the largest private employers on the Reservation, employing more than 100 employees.

### C. CashCall and Western Sky's Agreements and Business Relationship

CashCall and Western Sky entered into two agreements signed by Reddam and Webb on behalf of their respective companies: (1) an Agreement for the Assignment and Purchase of Promissory Notes (the "Assignment Agreement"), and (2) an Agreement for Service (the "Service Agreement"). These agreements remained in effect from the time they were signed until Western Sky ceased doing business in September 2013.

Pursuant to the Assignment Agreement, signed in February 2010, CashCall, through its wholly-owned subsidiary WS Funding, agreed to "purchase from Western Sky Financial all loans made through www.westernsky.com as evidenced by the Notes." CashCall's purchase obligation was "subject to the accuracy and correctness of Western Sky's representations and warranties contained in the Agreement," including that borrowers satisfy "the criteria as set by Western Sky Financial from time to time, as shown more fully in the Criteria Appendix provided by Western Sky Financial." To fund the Western Sky loans, a reserve account was established for Western Sky, into which CashCall deposited enough money to fund two days of loans, calculated on the previous month's daily average. Western Sky used this money to fund consumer loans. CashCall purchased all of Western Sky's loans after waiting a minimum of three days after the funding of each loan. CashCall never declined to purchase a loan made by Western Sky.

CashCall paid Western Sky the full amount disbursed to the borrower under the loan agreement plus a premium of 5.145% (either of the principal loan amount or the amount disbursed to the borrower). CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Western Sky agreed to sell the loans to CashCall before any payments had been made by the borrowers. Accordingly, borrowers made all of their loan payments to CashCall, and did not make a single payment to Western Sky. Once Western Sky sold a loan to CashCall, all economic risks and benefits of the transaction passed to CashCall.

CashCall agreed to reimburse Western Sky for any repair, maintenance and update costs associated with Western Sky's server. CashCall also reimbursed Western Sky for all of its marketing expenses and bank fees, and some, but not all, of its office and personnel costs. In addition, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Pursuant to the Service Agreement between CashCall and Western Sky, Western Sky granted CashCall a "non-exclusive license, to reproduce the name, trade name, trademarks, and

logos of Western Sky Financial." CashCall agreed to provide Western Sky with customer support, marketing, website hosting and support, assignment of a toll-free phone number, and to handle electronic communications with customers (although not all of these services were ultimately provided). In exchange for these services, Western Sky paid CashCall 2.02% of the face value of each loan that it sold to CashCall.

### D. The Lending Process for Western Sky Loans

Consumers applied for Western Sky loans by telephone or online. When Western Sky commenced operations, all telephone calls from prospective borrowers were routed to CashCall agents in California. As the business developed, a growing number of Western Sky loan agents on the Reservation handled calls from prospective borrowers. Over time, "[l]oan agents for CashCall only handled the overflow for Western Sky applicants or borrowers calling in, should the staff at Western Sky not be able to handle the amount of calls." CashCall loan agents were instructed to tell loan applicants that CashCall was hired to handle overflow calls for Western Sky.

Western Sky developed the underwriting criteria for its loans with input from CashCall. Although Western Sky employees reviewed, audited, and approved loans from the Western Sky offices on the Reservation, CashCall employees also independently reviewed the documentation submitted by borrowers to determine if it met program criteria and performed other loan origination and underwriting functions.

A borrower approved for a Western Sky loan would electronically sign the loan agreement on Western Sky's website, which was hosted by CashCall's servers in California. The loan proceeds would be transferred from Western Sky's account to the borrower's account. After a minimum of three days had passed, the borrower would receive a notice that the loan had been assigned to WS Funding, and that all payments on the loan should be made to CashCall as servicer. Charged-off loans were transferred to Delbert Services for collection.

The loan agreement for a Western Sky loan identified Western Sky Funding, LLC as the lender, and informed the borrower, in bold type, that it was "**subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" In the "Governing Law" section of the agreement, the borrower was informed that:

> This Agreement is governed by the Indian Commerce Provision of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America.

In a separate section of the loan agreement, the borrower was informed that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." The interest rate on the Western Sky loans was clearly and prominently disclosed on the first page of the loan agreement.

Western Sky's loan products included a $2,600 loan with an APR of 134.34%, a $700 loan with an APR of 318.52%, and $5,000 and $10,000 loans. The typical CashCall borrower had a

lower-than-average FICO score.

### E. This Action

In its First Amended Complaint filed on March 21, 2014, Plaintiff CFPB alleges that that Defendants have engaged in unfair, deceptive, and abusive acts and practices ("UDAAP") in violation of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a)(1)(B), by servicing and collecting full payment on loans that state-licensing and usury laws had rendered wholly or partially void or uncollectible.

The CFPB moves for partial summary judgment as to the liability of Defendants under the CFPA. The CFPB's liability theory is dependent on the Court reaching the following four conclusions: (1) CashCall, and not Western Sky, was the "true lender;" (2) the laws of the borrowers' home states applies to the loan agreements, despite the tribal choice-of-law provision in the loan agreements; (3) the Western Sky loan agreements are void or uncollectible under the laws of 16 states; and (4) CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing

Defendants move for summary judgment in relevant part on the grounds that: (1) the CFPB has exceeded the authority granted it under the CFPA by predicating its claims solely upon violations of state law; (2) the CFPB seeks to establish a usury limit, which is expressly prohibited by the CFPA; (3) the loan agreements are not void because the laws of the CRST apply in accordance with the choice-of-law provision in those loan agreements; (4) the Defendants' conduct was not unfair, deceptive, or abusive as a matter of law under the CFPA; (5) the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice of what conduct is prohibited; and (6) the CFPB's structure is unconstitutional.

## II. LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not

speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37. In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III. DISCUSSION

### A. The Court will apply the law of the 16 subject states.

The CFPB's theory as to Defendants' liability rests entirely on its argument that the Court should disregard the tribal choice-of-law provision in the loan agreements, and apply the law of the borrowers' home states. Accordingly, the Court must first determine whether the loan agreements are governed by CRST law, as provided by the choice-of-law provision, or the law of the borrowers' home states.

Because the Court's jurisdiction is premised on federal question jurisdiction, federal common law supplies the choice-of-law rules. *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding that, where jurisdiction is not premised on diversity of citizenship, federal common law governs). "Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws." *Huynh*, 465 F.3d at 997. Pursuant to section 187(2) of the Restatement (Second) of Conflict of Laws ("Restatement"), "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, . . ., unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2). The Court concludes that the CRST choice-of-law provision fails both of these tests, and that the law of the borrowers' home states applies to the loan agreements.

### 1. CashCall, not Western Sky, is the "true" or "de facto" lender.

In order to properly apply the choice-of-law principles set forth in Restatement § 187(2), the Court must determine the identity of the parties to the loan agreements. Although Western Sky is identified as the lender in the loan agreements, the CFPB argues that the Court should consider the substance, not the form, of the transaction and determine that CashCall is the "true" or "de

facto" lender.[3] Neither the Court nor the parties have discovered any binding precedent on this issue. However, after reviewing all of the relevant case law and authorities cited by the parties, the Court agrees with the CFPB and concludes that it should look to the substance, not the form, of the transaction to identify the true lender. *See Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (after conducting an extensive review of the relevant case law, noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); *Eastern v. American West Financial*, 381 F.3d 948, 957 (9th Cir. 2004) (applying the de facto lender doctrine under Washington state law, recognizing that "Washington courts consistently look to the substance, not the form, of an allegedly usurious action")*; CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W.Va. May 30, 2014) (unpublished) (looking at the substance, not form, of the transaction to determine if the loan was usurious under West Virginia law); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,* 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function.").[4] "In short, [the Court] must determine whether an animal which looks like a duck, walks like a duck, and quacks like a duck, is in fact a duck." *In re Safeguard Self-Storage Trust*, 2 F.3d 967, 970 (9th Cir. 1993).

In identifying the true or de facto lender, courts generally consider the totality of the circumstances and apply a "predominant economic interest," which examines which party or entity has the predominant economic interest in the transaction. *See CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *14 (W.D. Va. May 30, 2014) (affirming the lower court's application of the "predominant economic interest" test to determine the true lender, which examines which party has the predominant economic interest in the loans); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,* 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is the 'true lender,' with the key factor being 'who had the predominant economic interest' in the transactions.); *cf.* Ga. Code Ann. § 16-17-2(b)(4) ("A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or maintains a predominant economic interest in the revenues generated by the loan.").

---

[3]Defendants argue that the Court should not consider the CFPB's "true lender" theory because it was not alleged in the First Amended Complaint and they have been unfairly surprised. However, not only is the "true lender" theory not a claim that must be pled in the First Amended Complaint, the Court concludes that Defendants had fair notice of the CFPB's theory. *See* First Amended Complaint [Docket No. 27] at ¶ 21 ("Under these agreements, WS Loans were made in Western Sky's name, but were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall, Delbert, or both."); Joint Statement Re: Local Rule 7-3 Conference of Counsel Prior to Filing of Motion [Docket No. 138] ("The Bureau also referenced the decision concerning CashCall released that day by Maryland's highest court, noting the portion of that decision holding that CashCall was the de facto lender in its dealings with a state-chartered bank.").

[4]*But see Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1367-1369 (D. Utah 2014); *Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060 (S.D. Ind. May 30, 2002).

The key and most determinative factor is whether Western Sky placed its own money at risk at any time during the transactions, or whether the entire monetary burden and risk of the loan program was borne by CashCall. *See, e.g., Eastern*, 381 F.3d at 957 ("[T]he touchstone for decision here is whether licensed or unlicensed parties were placing their own money at risk at any time during the transactions."); *Morrisey*, 2014 WL 2404300 at *7 (in reaching its conclusion that CashCall was the true or de facto lender, the lower court found that "numerous provisions of CashCall's agreements with FB & T placed the entire monetary burden and risk of the loan program on CashCall, and not on FB & T."). Indeed, as the Ninth Circuit stated in *Eastern*, "a lender is one who puts money at risk." *Eastern*, 381 F.3d at 957.

Based on the totality of the circumstances, the Court concludes that CashCall, not Western Sky, was the true lender. CashCall, and not Western Sky, placed its money at risk. It is undisputed that CashCall deposited enough money into a reserve account to fund two days of loans, calculated on the previous month's daily average and that Western Sky used this money to fund consumer loans. It is also undisputed CashCall purchased *all* of Western Sky's loans, and in fact paid Western Sky more for each loan than the amount actually financed by Western Sky. Moreover, CashCall guaranteed Western Sky a minimum payment of $100,000 per month, as well as a $10,000 monthly administrative fee. Although CashCall waited a minimum of three days after the funding of each loan before purchasing it, it is undisputed that CashCall purchased each and every loan *before* any payments on the loan had been made. CashCall assumed all economic risks and benefits of the loans immediately upon assignment. CashCall bore the risk of default as well as the regulatory risk. Indeed, CashCall agreed to "fully indemnify Western Sky Financial for all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties . . . [and] all reasonable attorneys fees and legal costs associated with a defense of such claim or action."

Accordingly, the Court concludes that the entire monetary burden and risk of the loan program was placed on CashCall, such that CashCall, and not Western Sky, had the predominant economic interest in the loans and was the "true lender" and real party in interest. The Court will now apply the principles set forth in Restatement § 187(2), in light of the Court's determination of the real parties in interest to the loan agreement, i.e., CashCall and the borrower.

> 2. <u>The Cheyenne River Sioux Tribe has no substantial relationship to the parties or the transactions and there is no other reasonable basis for the parties' choice of CRST law.</u>

The Court concludes that the CRST has no substantial relationship to the parties or the transactions and that there is no other reasonable basis for the parties' choice of CRST law. *See* Restatement § 187(2)(a).

As indicated in the comments to Restatement § 187(2), a state has a substantial relationship to the parties or the transaction when, for example, "this state is that where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties." Restatement § 187(2), comment f.

In light of CashCall's status as the true lender, the Court concludes that the CRST does not have a substantial relationship to the parties or the transactions. Indeed, CashCall, the true lender, is a California corporation domiciled in Orange County that the CRST neither owns or manages. The borrowers do not reside on the Reservation and, in fact, never entered CRST lands to apply for loans. They applied for their loans online, and made all of their payments from their home states. Although a borrower electronically signed the loan agreement on Western Sky's website, that website was, in fact, hosted by CashCall's servers in California. While Western Sky performed loan origination functions on the Reservation, the Court finds these contacts are insufficient to establish that the CRST had a *substantial* relationship to the parties or the transaction, especially given that CashCall funded and purchased all of the loans and was the true lender. *Cf. Ubaldi v. SLM Corp.*, 2013 WL 4015776, at *6 (N.D. Cal. Aug. 5, 2013) ("If Plaintiffs' *de facto* lender allegations are true, then Oklahoma does not have a substantial relationship to Sallie Mae or Plaintiffs or the loans.").

The Court also finds that there is no other "reasonable basis" for the parties' choice of CRST law. Indeed, it is clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws. Accordingly, after applying the principles of Restatement § 187(2)(a), the Court concludes that the tribal choice of law provision is unenforceable.

        3.       <u>Fundamental public policy disfavors the choice of CRST law.</u>

In addition, even if the parties had a reasonable basis for choosing CRST law under Restatement § 187(2)(a), the Court concludes that the tribal choice-of-law provision would still be unenforceable under Restatement § 187(2)(b). Specifically, the Court concludes that application of CRST law "would be contrary to a fundamental policy of a state which has a materially greater interest than the [CRST] in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2)(b).

> (a) *Application of CRST law would be contrary to a fundamental public policy of sixteen states, and those states have a materially greater interest than CRST in the application of their laws.*

The Court concludes that sixteen states (Alabama, Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, and Ohio) (the "Subject States") have expressed a fundamental public policy in protecting its citizens from usurious loans and unlicensed lenders by enacting statutes that render contracts that violate those policies void and/or uncollectible. *See* Restatement § 187 comment g ("[A] fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining strength."). Although not every statute expresses a state's fundamental policy, statutes that render contracts void are certainly much more likely to express that state's fundamental policy.

Moreover, each of these Subject States has a materially greater interest than the CRST in determining the validity of the Western Sky loan agreements. Indeed, the CRST does not have a

significant interest in the application of its law when Western Sky is neither a tribally-owned corporation, nor the true lender. Moreover, as a district court in Colorado noted in describing the Western Sky loan transactions, "[t]he borrowers do not go to the reservation in South Dakota to apply for, negotiate or enter into loans. They apply for loans in Colorado by accessing defendants' website. They repay the loans and pay the financing charges from Colorado; Western Sky is authorized to withdraw the funds electronically from their bank accounts. The impact of the allegedly excessive charges was felt in Colorado." *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011).

Although Defendants argue that the CRST has a strong interest in the application of its laws (based on Western Sky's involvement in the loan transactions), Defendants never address whether the CRST has a strong interest in the application of its laws specifically as they relate to interest rates and licensing. As the Restatement counsels, the Court must weigh the interests of the CRST and the Subject States in "the determination of the *particular* issue." Defendants fail to present evidence regarding what, if any, CRST laws apply to these transactions. Of course, the lack of a usury law or licensing law does not necessarily mean that the CRST has a less substantial concern than the Subject States in interest rates and licensing. Indeed, the lack of such laws may instead merely "reflect a choice to favor individual contract decisions and the free flow of capital." *See Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1213 (9th Cir. 2001). However, as the CFPB points out, the CRST has enacted laws that *criminalize* usury,[5] suggesting that the CRST does not have any interest in protecting these types of transactions.

Accordingly, the Court concludes that application of CRST law would be contrary to a fundamental policy of the Subject States, and that the Subject States have a materially greater interest than the CRST in the enforcement of its usury and licensing laws.

> (b) *Absent an effective choice-of-law provision, the Subject States' laws apply.*

Pursuant to Restatement § 188, absent an effective choice of law provision by the parties, courts apply the local law of the state which "has the most significant relationship to the transaction and the parties." Restatement § 188(1). In making this determination, courts consider the

---

[5]Defendants contend that the tribal council's adoption of the Uniform Commercial Code in 1997 and, specifically, its enactment of CRST UCC § 16-3-112 somehow superseded the CRST's criminal usury law. However, this argument is simply wrong. *See* Unif. Comm. Code § 3-112 cmt 2. ("The purpose of subsection (b) is to clarify the meaning of 'interest' in the introductory provision of Section 3-104(a). It is not intended to validate a provision for interest in an instrument if that provision violates other law."); 6B Anderson U.C.C. § 3-112:4 (3d. ed.) ("The authorization of interest by Revised Article 3 does not address whether the rate so specified is, or is not, usurious. The purpose of this section is simply to make clear that the interest term of an instrument does not affect the negotiability of the instrument and to authorize various rates of interest. Nothing in the Uniform Commercial Code is intended to have any effect upon the non-Code law governing usury, which law therefore continues in effect.").

following factors: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* at § 188(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

In light of the CashCall's status as true lender, these factors weigh in favor of the application of the law of the borrowers' home states.  The borrowers were citizens or residents of the addresses listed on their loan applications (i.e., their home states), the borrowers applied for the loans from their home states, the funds were received by the borrowers in their home states, and the borrowers made payments on their loans from their home states.   In addition to the home states of the borrowers, California also has significant contacts to the loan transactions.  CashCall is a California corporation domiciled in Orange County. In order to apply for the loan, the borrowers visited Western Sky's website, which was hosted by CashCall's servers in California. In addition, the funds for the loans were provided by CashCall in California (albeit initially funneled through Western Sky's bank accounts).  Moreover, although some loan origination functions took place on the Reservation, some also took place in California. Although California, the CRST, and the borrowers' home states each have *some* interest in the loan transactions, the Court is required to determine which state has the *most* significant relationship to the transaction and the parties.  After weighing all of the factors, the Court concludes that the borrowers' home states have the most significant relationship to the transactions.[6]

The Court's conclusion is consistent with Restatement § 195, which specifically governs the "Contracts for the Repayment of Money Lent." Section 195 provides in relevant part: "The validity of a contract for the repayment of money lent and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that repayment be made . . . ."  However, Restatement § 195 only applies "when the contract requires that the loan be repaid in a particular state. It is necessary either that the place of repayment be explicitly stated in the contract, or that it can be determined by necessary inference from the contract's terms, or lastly, that repayment in a particular place is required by business usage. The rule does not apply when the loan can be repaid in any one of two or more states." Restatement § 195, comment a.  In this case, nine of the ten sample loan agreements provided to the Court authorized Western Sky (and in reality, CashCall) to withdraw the borrower's loan payments by electronic funds transfer from the borrower's bank account, unless the borrower opted out.  Thus, repayment was generally required to be made by EFT from or in the borrowers' home states.

Accordingly, the Court concludes that, absent an effective choice-of-law provision, the law of the borrowers' home states applies to the loan agreements.

---

[6]Although California has a significant relationship to the parties and the transactions (and certainly a more significant relationship than the CRST), the Court concludes that the law of the borrowers' home states should apply, especially in light of the fact that the borrowers would have had no expectation that California law would apply.  *See* Restatement § 6 (listing "the protection of justified expectations" as one of the key principles to consider in determining what law to apply).

For the foregoing reasons, where Western Sky loans were made to borrowers in the Subject States, the Court concludes that the tribal choice of law provision is unenforceable and the Court will apply the laws of the Subject States.

### B. Western Sky loans are void or uncollectible under the laws of most of the Subject States.

Because the CFPB has established that CashCall is the true lender and that the laws of the Subject States apply to the loan agreements, the Court must now determine whether the CFPB has demonstrated that the loans are void or uncollectible under the laws of the Subject States. In absence of any meaningful briefing by the Defendants on this issue, the Court concludes that Defendants do not seriously dispute the CFPB's argument.

The Court concludes that the CFPB has established that the Western Sky loans are void or uncollectible under the laws of most of the Subject States.[7] *See* CFPB's Combined Statement of Facts [Docket No. 190] ("CFPB's CSF") at ¶¶ 147 - 235. Indeed, CashCall has admitted that the interest rates that it charged on Western Sky loans exceeded 80%, which substantially exceeds the maximum usury limits in Arkansas, Colorado, Minnesota, New Hampshire, New York, and North Carolina. (Arkansas's usury limit is 17%; Colorado's usury limit is 12%; Minnesota's usury limit is 8%; New Hampshire's usury limit is 36%; New York's usury limit is 16%; and North Carolina's usury limit is 8%). A violation of these usury laws either renders the loan agreement void or relieves the borrower of the obligation to pay the usurious charges. In addition, all but one of the sixteen Subject States (Arkansas) require consumer lenders to obtain a license before making loans to consumers who reside there. Lending without a license in these states renders the loan contract void and/or relieves the borrower of the obligation to pay certain charges. CashCall admits that, with the exception of New Mexico and Colorado, it did not hold a license to make loans in the Subject States during at least some of the relevant time periods.[8]

### C. CashCall and Delbert Services violated the CFPA by servicing and collecting on loans where payments were not due and owing.

After resolving these preliminary issues, the Court is finally able to address the gravamen of the CFPB's claims – whether Defendants' conduct violates the CFPA. Under section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person "to engage in any unfair, deceptive, or abusive

---

[7]The Court cannot, on this record, determine exactly which loans are void or uncollectible under the Subject States' laws, given, for example, that CashCall held licenses in some states during at least some of the relevant time periods.

[8]The CFPB apparently contends that the Court should find that Western Sky loans made to borrowers in New Mexico and Colorado are void under those state's licensing laws, even though CashCall held a license to make loans in those states. The CFPB appears to rely on the fact that Western Sky was not licensed in those states. The Court finds that the CFPB's position is disingenuous in light of its argument that CashCall, not Western Sky, is the true lender.

act or practice." 12 U.S.C. § 5536(a)(1)(B).[9] "An act or practice is deceptive if: (1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (quotations and citations omitted). "Deception may be found based on the 'net impression' created by a representation." *Id.* (quotations and citations omitted).

Based on the undisputed facts, the Court concludes that CashCall and Delbert Services engaged in a deceptive practice prohibited by the CFPA. By servicing and collecting on Western Sky loans, CashCall and Delbert Services created the "net impression" that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements. As discussed *supra*, that impression was patently false -- the loan agreements were void and/or the borrowers were not obligated to pay.

The Court concludes that the false impression created by CashCall's and Delbert Services' conduct was likely to mislead consumers acting reasonably under the circumstances. Indeed, the intentionally complicated and sham structure of the Western Sky loan program would have made it impossible for reasonable consumers to know that CRST law did not govern the loan agreements, and thus that their loans were void and/or not payable under the laws of their home states. Not surprisingly, the CFPB has presented evidence that borrowers were, in fact, misled. *See* CFPB's Exh. 524 (Affidavit of Karen Barboza) at ¶ 12 ("I was under the impression that I was obligated to pay back the full amount of my loan. I do not recall ever being told by anyone at CashCall that I was not obligated to pay back all or some of my loan."); Exh. 526 (Affidavit of John A. Melo) at ¶ 12 ("From the beginning I was led to believe that I was obligated to repay my loan in full. Aside from the May 2013 phone call wherein they said that they are not presently collecting from Massachusetts' residents, I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan."); Exh. 527 (Declaration of Stephen J. Viera) at ¶ 15 ("Until I received this letter, I was led to believe that I was obligated to repay my loan in full. I do not recall being told by anyone at CashCall or Western Sky that my loan was void or that I was not obligated to repay all or some of the loan."). And, not surprisingly, Defendants have presented no evidence to the contrary.

Lastly, the Court easily concludes that the false impression created by CashCall's and Delbert Services' conduct is material. *See F.T.C. v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1372 (D. Nev. 2014) *(*"The number of finance charges, the total amount owed, the existence of an automatic renewal plan, and the procedure for declining the renewal plan are material terms of a loan contract."). Accordingly, CashCall and Delbert Services engaged in a deceptive practice under the CFPA.

Defendants fail to make any meaningful arguments to the contrary. For example,

---

[9] A "covered person" is "any person that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). A "financial product or service" includes "extending credit and servicing loans, including acquiring, purchasing, selling, brokering, or other extensions of credit". 12 U.S.C. § 5481(15)(A)(i). CashCall, WS Funding, and Delbert Services -- by acquiring and servicing consumer loans -- are all "covered persons" under the CFPA.

Defendants argue that their conduct was not deceptive, as a matter of law, because every loan agreement contained a prominent choice-of-law provision and a prominent interest rate disclosure. In other words, Defendants contend that their conduct was not deceptive because they were merely enforcing the express terms of their agreements with the borrowers. However, this argument is entirely irrelevant and misplaced given the CFPB's theory of liability and the Court's ultimate conclusion that the loan agreements were void and/or not payable. Defendants completely and utterly fail to explain how the alleged (and now proven) conduct at issue (i.e., servicing and collecting on loans where no payment is due) was not deceptive under the CFPA.

Defendants also argue, without citation to any relevant authority, that, "where, as here, a UDAAP claim is predicated on the resolution of an underlying legal question, such as whether the loans on which Defendants collected are void, a defendant's reasonable belief on that question serves as a complete defense to liability." Defendants' Memorandum [Docket No. 139] at 21. However, a mistake of law is not typically a defense to liability, no matter how reasonable that mistake. *See Jerman v. Carlisle, McNellie, Rini,Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds that ignorance of the law will not excuse any person, either civilly or criminally."). Defendants fail to point to any language in the CFPA that alters this general rule. Accordingly, the Court declines Defendant's invitation to re-write the CFPA to include a general mistake-of-law defense. *Id.* ("[W]hen Congress has intended to provide a mistake-of-law defense to civil liability, it has often done so more explicitly . . . ..").

Because the Court concludes that CashCall and Delbert Services' conduct was deceptive, the Court finds it unnecessary to address whether their conduct was also unfair and abusive.

### D. Reddam is individually liable under the CFPA.

The Court concludes that Reddam is individually liable under the CFPA.

"An individual may be liable for corporate violations if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016) (quotations and citations omitted).

The Court concludes that Reddam both participated directly in and had the authority to control CashCall's and Delbert Services' deceptive acts. Reddam is the founder, sole owner, and president of CashCall, the president of CashCall's wholly-owned subsidiary WS Funding, and the founder, owner, and CEO of Delbert Services. He had the complete authority to approve CashCall's agreement with Western Sky and, in fact, approved CashCall's purchase of the Western Sky loans. He signed both the Assignment Agreement and the Service Agreement on behalf of WS Funding and CashCall. In addition, as a key member of CashCall's executive team, he had the authority to decide whether and when to transfer delinquent CashCall loans to Delbert Services. Furthermore, he made the ultimate decision to wind down the Western Sky loan program in the face of "regulatory problems," and he frequently discussed the status of CashCall's many lawsuits involving Western Sky loans with CashCall's general counsel, Dan Baren.

Reddam does not seriously dispute that he participated in and had the authority to control CashCall's implementation of the Western Sky loan program based upon the tribal lending model, which was intentionally designed to avoid state usury limits and licensing laws. Instead, he argues that the CFPB has failed to demonstrate that he had the requisite knowledge, or that he was recklessly indifferent to the wrongdoing, which is necessary to hold him individually liable under the CFPA. Specifically, Reddam argues that, based on the legal advice provided by Katten,[10] he did not have actual knowledge of any potential UDAAP violations because "his understanding was that the Western Sky loans were not subject to state interest rate and licensing restrictions, and would be valid and enforceable if assigned to CashCall." Defendants' Memorandum [Docket No. 139] at 5. In other words, Reddam claims that he believed that the loans were payable and fully collectible based on the advice of his counsel.

However, "[r]eliance on advice of counsel is not a valid defense on the question of knowledge required for individual liability." *Federal Trade Commission v. Grant Connect, LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quotations and citations omitted) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally."). In this case, the Court concludes that the undisputed facts demonstrate that Reddam had the requisite factual knowledge to subject him to individual liability under the CFPA, e.g., he knew of and approved of the tribal lending model to avoid state usury limits and licensing laws; he knew that CashCall would fund Western Sky's loans and bear the entire financial risk of the loan program; he knew that CashCall, through its wholly owned-subsidiary, WS Funding, would purchase all of Western Sky's loans at a premium; he knew that CashCall and Delbert Services would attempt to collect on such loans; and he knew that borrowers would believe that they were obligated to pay such loans in accordance with their loan agreements. At the very least, these facts demonstrate that Reddam was recklessly indifferent to the wrongdoing.

Accordingly, based on the undisputed facts, the Court concludes that Reddam is individually liable under the CFPA.

### E. Defendants' Other Arguments

Defendants argue that they cannot be held liable under the CFPA, in relevant part, because the CFPB's claims are predicated upon state law violations and Congress did not authorize the CFPB to transform a state law violation into a violation of federal law. Defendants raised the identical argument in their prior Motion for Judgment on the Pleadings [Docket No. 104], which was rejected by the Court. The Court concludes that there is no basis to reconsider its prior ruling. As

---

[10]Katten issued several opinions to both CashCall and its lenders on the enforceability of the choice-of-law provision in the loan agreements, concluding that "we are of the opinion, although the issue is not free from doubt and significant litigation risk exists, that a court of competent jurisdiction interpreting applicable federal and state law . . . should conclude that [federal consumer protection laws, or state laws limiting interest rates] would not apply to the loan agreements" because those states will "enforce the choice of CRST law set forth in the loan agreements," and further, "upon assignment, CashCall, as assignee, will be entitled to the . . . choice of law rights held by Western Sky."

the Court previously held, while Congress did not intend to turn every violation of state law into a violation of the CFPA, that does not mean that a violation of a state law can never be a violation of the CFPA. *See* Order [Docket No. *110*]; *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 537 (6th Cir. 2014). The proper question is whether the CFPB has alleged, and proven, that Defendants have engaged in conduct that falls within the broad range of conduct prohibited by the CFPA. The Court concludes that Defendants' conduct, i.e., servicing and collecting on Western Sky loans where payments were not due and owing, satisfies the requisite elements of a UDAAP violation under the CFPA.[11]

Defendants also repeat another argument raised in their Motion for Judgment on the Pleadings, i.e, that the CFPB is seeking to establish a usury limit, which is expressly prohibited by the CFPA, 12 U.S.C. § 5517(o). The Court again concludes that there is no basis to reconsider its prior ruling. As the Court previously held, the CFPB is not seeking to establish a usury limit, but is instead seeking to enforce a prohibition on collecting amounts that consumers do not owe.

The Court also rejects Defendants' arguments that the CFPB is violating Defendants' due process rights by seeking to penalize them for UDAAP violations without fair notice, especially in light of the CFPA's use of language or terms that have established meanings under other consumer-protection statutes. *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n.7 (9th Cir. 2016) ("The term 'deceptive act or practice' has an established meaning in the context of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and Congress used very similar phrasing in § 5536(a)(1)(B)."); *CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015) ("Because the CFPA itself elaborates the conditions under which a business's conduct may be found abusive – and because agencies and courts have successfully applied the term as used in closely related consumer protection statutes and regulations – we conclude that the language in question provides at least the minimal level of clarity that the due process provision demands of non-criminal economic regulation.").

Finally, for the reasons stated in *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-1092, the Court rejects Defendants' challenges to the constitutionality of the CFPB's structure.

## IV.  CONCLUSION

For the foregoing reasons, the CFPB's Motion for Partial Summary Judgment is **GRANTED** and Defendants' Motion for Summary Judgment is **DENIED.**

IT IS SO ORDERED.

---

[11]The Court's conclusion is further supported by the fact that, when a "covered person" under the CFPA violates the Federal Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, that covered person also violates the CFPA. *See* 12 U.S.C. §§ 5536(a)(1)(A); 5481(12)(H), (14). The FDCPA prohibits using "any false, deceptive, or misleading representation or means in connection with the collection of any debt", including falsely representing "the legal status of any debt," as well as using "unfair or unconscionable means to collect or attempt to collect any debt", including attempting to collect amounts not permitted by law. *See* 15 U.S.C. §§ 1692e, 1692e(2)(A), 15 U.S.C. § 1692f, 15 U.S.C. § 1692f(1).