| | |
|---|---|
| Case No.   **CV 15-07522-JFW (RAOx)** | Date: January 19, 2018 |

Title:   Consumer Financial Protection Bureau -v- CashCall, Inc. et al.

**PRESENT:**
   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   Shannon Reilly                            None Present
   Courtroom Deputy                      Court Reporter


**ATTORNEYS PRESENT FOR PLAINTIFF:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                                        None

**PROCEEDINGS (IN CHAMBERS):**        **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

   Plaintiff Consumer Financial Protection Bureau (the "CFPB") brings this action under the Consumer Financial Protection Act (the "CFPA") against CashCall, Inc. ("CashCall"), WS Funding, LLC ("WS Funding"), Delbert Services Corporation ("Delbert Services"), and J. Paul Reddam ("Reddam") (collectively, "Defendants"). On August 31, 2016, the Court granted the CFPB's Motion for Partial Summary Judgment finding Defendants violated the CFPA.[1] The remaining issues to be tried came before the Court for a non-jury trial on October 17, 2017. Owen P. Martikan, Leanne E. Hartmann, and Christina S. Coll appeared on behalf of the CFPB. Thomas J. Nolan of Latham & Watkins LLP and Caroline Van Ness, Joseph L. Barloon, Allen L. Lanstra, Julia M. Nahigian, and Kasonni M. Scales of Skadden, Arps, Slate, Meagher & Flom LLP appeared on behalf of Defendants. Post-trial briefing was completed on November 30, 2017.

   After considering the testimony presented at trial, the exhibits admitted, the parties' written submissions, and the applicable law, the Court makes the following findings of fact and conclusions of law:

---

   [1] In the Court's Order granting the CFPB's Motion for Partial Summary Judgment, it was unnecessary for the Court to discuss in detail the history of CashCall's business or its consumer lending practices. However, in light of the damage theories advanced by the CFPB and Defendants' defenses to those theories, it has become necessary for the Court to make extensive findings of fact regarding CashCall's business and lending practices.

# Findings of Fact[2]

### A. The Parties

The CFPB is a federal agency that was created by Congress in 2010 when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. The CFPB acts as both the rule-making body and the federal enforcement agency for federal consumer law previously entrusted to multiple agencies. The CFPB enforces the provisions of the CFPA, which became effective on July 21, 2011.

CashCall is an S-corporation organized under California law. CashCall began doing business as a consumer lender in 2003 to provide a lower-cost alternative to payday loans for individual borrowers and, a few years later, for small businesses. Daniel Baren ("Baren") is CashCall's General Counsel and has served in that position since 2003. Delbert O. Meeks ("Meeks") has been CashCall's Chief Financial Officer since 2004.

Reddam is CashCall's President and Chief Executive Officer. Reddam has approximately 30 years of experience in consumer lending. Reddam also owned Delbert Services and served as its CEO from January 1, 2010 until August 13, 2013. Before Delbert Services ceased operations in 2015, it serviced, for a fee, charged-off loans owned by CashCall and other unrelated companies.

WS Funding is a wholly owned subsidiary of CashCall that was established as a holding company to purchase consumer loans. Reddam is the President of WS Funding. WS Funding operates as a pass-through entity and, therefore, it does not separately report its financial results.

### B. CashCall's Initial Unsecured Consumer Loan Business

Reddam founded CashCall to meet a perceived need in the market between payday loans and second mortgage loans. Specifically, Reddam determined there was a gap in the market for people who were employed with good-paying jobs but who had an immediate need for a few thousand dollars to help them through a financial "pinch." Through CashCall, Reddam sought to offer consumer installment loans that mimicked second mortgages except that they were unsecured. CashCall analyzed borrowers' credit scores and incomes in its overall evaluation of the borrowers' ability to repay the loans and targeted consumers who were employed but were not necessarily the most conservative with their use of money. In Reddam's view, these consumers were most likely to find themselves in an occasional financial "pinch" with an immediate need for cash, and, thus, Reddam developed a business plan whereby CashCall would loan money to these consumers quickly and easily via telephone or the Internet.

---

[2] The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact. *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

In 2003, CashCall began making unsecured loans to California residents under a California lender license that it obtained from the California Department of Corporations.[3] Initially, CashCall offered only one product—an unsecured $10,000 loan at an annual prime interest rate of 24% with a 10 year term. However, Reddam believed there was an opportunity to serve consumers in the sub-prime market because very few applicants could satisfy the strict underwriting guidelines required to obtain prime interest rate loans. As a result, CashCall began offering an assortment of loan products with interest rates that varied according to borrowers' creditworthiness.

From its inception, CashCall's loan portfolio was geographically concentrated in California. In the fall of 2005, Merrill Lynch, which was considering providing financing to CashCall, and its counsel recommended that CashCall diversify its portfolio nationally. Merrill Lynch's counsel suggested that CashCall should contact Claudia Callaway, a regulatory attorney who, at that time, was a partner at Paul, Hastings, Janofsky & Walker LLP in its Washington D.C. office. Baren subsequently met with Callaway, and she represented herself as someone who could "facilitate relationships" and provide opportunities for CashCall to diversify and structure a lending model within requirements of law to "avoid enforcement actions by state and federal regulators."

Based on these discussions, CashCall and Reddam retained Callaway. Callaway, working with Baren, assisted CashCall with structuring its Bank Lending Model by partnering with First Bank & Trust of Milbank ("FBT"), a federally insured state-chartered bank in South Dakota. Pursuant to the partnership, CashCall created a national lending program whereby CashCall received out-of-state loan applications, which were accepted and sent to FBT. FBT then underwrote and funded the loans from South Dakota, complying with South Dakota's laws governing interest rates and other terms. Three days after FBT funded the loans, they were purchased by CashCall. In October of 2006, CashCall entered into a similar relationship with First Bank of Delaware ("FBD"). Because CashCall believed that FBD could handle more volume than FBT, it eventually wound down its relationship with FBT, and it relied exclusively on FBD to fund the loans.

As CashCall became heavily involved in loans originated under the Bank Lending Model, its relationship with Callaway expanded. Because Baren was not an expert in regulatory compliance, he relied on Callaway's expertise in its direct consumer lending business. When Callaway moved to Manatt, Phelps & Phillips, LLP ("Manatt"), CashCall retained Manatt to handle more of its regulatory and litigation work. By the middle of 2007, Callaway and Manatt were handling all of CashCall's lending-related business and litigation.

In June of 2008, FBD informed CashCall that it was terminating its partnerships with all non-bank assignees due to pressure from the Federal Deposit Insurance Corporation ("FDIC"). Callaway advised Baren that the global financial crisis had severely impacted the ability of the

---

[3] CashCall also obtained lending licenses in fourteen other states, including licenses in three states—New Mexico, Colorado, and Arizona—that are on the list of Subject States in this action. Although Alabama was originally on the list of Subject States, the CFPB removed it from the list because CashCall had obtained a lending license in Alabama by July 21, 2011, which was the date the CFPA became effective.

banks to engage in any lending activity, including partnerships with unsecured consumer lenders. Although Callaway attempted to find other banks to partner with CashCall, she was ultimately unsuccessful. Accordingly, CashCall purchased its last loan under the Bank Lending Model from FBD in November of 2008.

### C. CashCall Begins Mortgage Loan Business

In 2009, because the financial crisis had a detrimental effect on CashCall's unsecured consumer lending business, Reddam decided to focus on CashCall's prime mortgage loan business. According to Reddam, CashCall began selling loans to conduits like "Citi and Wells Fargo" and established lines of credit with several large banks. By August of 2011, CashCall largely resold mortgage loans to Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). CashCall's mortgage business was very successful and quickly outpaced its consumer installment lending business. At the beginning of 2015, CashCall's mortgage business was sold to Impac Mortgage Holdings, Inc.

### D. The Western Sky Loan Program

In January of 2009, Callaway advised CashCall that the Bank Lending Model was no longer viable because of pressure from regulators and, therefore, she was advising her consumer lending clients to switch to a similar business model, which involved partnering with an Indian tribal entity or member who would act in the same capacity as a state-chartered bank (the "Tribal Lending Model"). According to Callaway, under the Tribal Lending Model, a lender operating on a reservation would make loans to borrowers, after which the loans would be assigned to a non-tribal financial services company, like CashCall, for servicing and collection. Callaway also advised that the Tribal Lending Model contemplated two structures: "Arm of the Tribe Lending" and "Tribe Member Lending." In the Arm of the Tribe Lending structure, the lending entity would be incorporated under tribal law and operated by the tribe. In the Tribe Member Lending structure, the lending entity would be owned by a tribe member and may or may not be incorporated under tribal law. Callaway further advised that because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided.

#### 1. CashCall Adopts the Tribal Lending Model

After several discussions with Callaway, CashCall expressed an interest in switching to the Tribal Lending Model. Specifically, CashCall wanted to continue to diversify its lending geographically without regard to the usury and licensing laws of borrowers' home states. Baren asked Callaway to recommend a potential tribal partner. In response, Callaway introduced Baren and Reddam to Martin A. "Butch" Webb, who was a member of the Cheyenne River Sioux Tribe ("CRST") in South Dakota. At the time, Webb was President of Western Dakota Bank and had operated payday lending companies from the CRST Reservation for several years using the Tribal Lending Model. In April of 2009, Baren met with Webb on the CRST Reservation to discuss a potential partnership and business terms. During the visit, Baren also met with Webb's counsel, Cheryl Bogue ("Bogue") of Bogue & Bogue, who specialized in CRST law. Bogue elaborated on

the Tribal Lending Model and advised Baren that an assignee of the loans would be able to enforce loans made by a tribal member.

During their discussions, Baren told Webb that CashCall was not interested in merely purchasing payday loans made by Webb's companies. Instead, CashCall wanted to focus on longer-term, fully-amortized, unsecured consumer loans. Although this business plan was different from Webb's other operations, Webb was receptive to becoming involved with these types of loans. According to Webb, the unemployment rate on the CRST Reservation was very high and a partnership with CashCall would allow him to reduce the unemployment rate. Webb informed Baren that he would need CashCall's assistance with training employees for the new venture. Baren and Webb ultimately reached an agreement on the business terms of an arrangement pursuant to which a new lending entity would be created and owned by Webb—ultimately called Western Sky Financial, LLC ("Western Sky")—and it would make loans to consumers, and the loans would be purchased by WS Funding three days after they were originated (the "Western Sky Loan Program"). After agreeing on the business terms, Webb and Barren relied on counsel to structure the relationship, which included the creation of new entities (WS Funding and Western Sky) and the structuring of the Tribal Lending Model.

The parties agreed to the Tribe Member Lending structure in large part because of the absence of any CRST law that would allow for the incorporation or creation of a new lending entity. As a result, on May 13, 2009, Webb's counsel formed Western Sky, a limited liability corporation, under the laws of South Dakota. Webb was the sole member of Western Sky, and it obtained a general business license from the CRST.

In July of 2009, Callaway joined the law firm of Katten Muchin & Rosenman LLP ("Katten"), and Baren agreed to move all of CashCall's regulatory work—including work related to the Western Sky Loan Program—as well as CashCall's corporate work and a few pending litigation matters to Katten.

### 2. Western Sky Loan Program Operations

In 2010, the Western Sky Loan Program became fully operational and consumers could apply for loans via the website www.westernsky.com. At the beginning of 2010, CashCall formed WS Funding, a wholly owned subsidiary, to serve as a holding company to purchase the unsecured loans originated by Western Sky. In February of 2010, Western Sky originated its first unsecured consumer installment loans and sold the loans to WS Funding pursuant to an Agreement for the Assignment and Purchase of Promissory Notes ("Assignment Agreement"). Pursuant to the Assignment Agreement, WS Funding paid Western Sky the amount disbursed to the borrower and a premium of 5.145% depending on the nature of the loan.

In addition, Western Sky and CashCall entered into an Agreement for Services ("Services Agreement"). Pursuant to the Services Agreement, Western Sky engaged CashCall to provide certain services related to the Western Sky Loan Program. In exchange, CashCall received 2% of the face value of each loan transaction. Among the services that Cash Call provided were: inbound and outbound customer service support, underwriting review, marketing services, website

hosting, use of a toll free phone number and fax number, electronic communications with borrowers, security monitoring, and complaint resolution.

At the beginning of the Western Sky Loan Program, Western Sky had very limited staff. As a result, CashCall handled Western Sky's loan applicant calls from its offices in Orange County, California. Final underwriting and funding of the loans, however, was done from Western Sky's facilities on the CRST Reservation. As Western Sky added more employees, it was able to handle a larger number of calls from the call center located on the CRST Reservation. Eventually, CashCall handled only overflow calls from loan applicants.

After the origination process was complete and Western Sky had funded the loans, WS Funding purchased the loans pursuant to the terms in the Assignment Agreement, within three business days after the loan was funded. When a loan was sold to WS Funding, the borrower was provided with a notice of assignment informing the borrower that WS Funding now owned the loan and that all payments on the loan must be made to CashCall. The notice of assignment also provided the borrower with a thirty-day window upon receipt of the notice to dispute the validity of the debt.

During the course of the program, Western Sky offered six loan products: $700, $850, $1,500, $2,600, $5,075, and $10,000, with interest rates between 89% and 169%. Neither Bogue nor Callaway expressed any concern about the high interest rates charged for the loans or CashCall's servicing of loans with these interest rates.

### 3. Western Sky Consumer Loan Agreements and Disclosures to Consumers

Every borrower who entered into a loan transaction with Western Sky executed a document called the "Western Sky Consumer Loan Agreement" ("Consumer Loan Agreement"), which contained numerous written disclosures, including the key terms that governed the loan transaction. Although Baren prepared the initial draft of the Consumer Loan Agreement using the agreement that had governed loans subject to the Bank Lending Model as a template, he solicited and received advice from Callaway and Bogue before the Consumer Loan Agreement was finalized.

The very first page of every Consumer Loan Agreement provided (in bolded language):

> This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation. By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound by the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and further agree that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

Exhibit 503, A–J, at 1.

In addition, every Consumer Loan Agreement contained a "Choice of Law" provision that identified the governing law. This provision stated:

> This Agreement is governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe. We do not have a presence in South Dakota or any other states of the United States. Neither this Agreement nor Lender is subject to the laws of any state of the United States of America.

Exhibit 503, A–J, at 3.

Every Consumer Loan Agreement also contained a provision that clearly disclosed, (pursuant to the Truth in Lending Act) the Annual Percentage Rate on the loan, the amount financed, the dollar amount of the finance charge, and the dollar amount of the total amount of payments the borrower would have paid after all scheduled payments were made. In addition, every Consumer Loan Agreement contained a payment schedule that outlined the amount of all required payments. Every Consumer Loan Agreement also explained that borrowers would be charged a late fee each time a payment was not made within 15 days of the due date, as well as a fee if a payment was returned due to insufficient funds.

Exhibit 503, A–J, at 1.

The Western Sky loans could be paid off at any time without any penalty for early repayment and every Consumer Loan Agreement contained a provision that fully explained the right to pay off the loan at any time. Moreover, Western Sky specifically encouraged borrowers to pay the loans off early to avoid incurring the high interest charges. For example, the loan agreements executed by borrowers between February 2010 and July 2010 and October 2010 and August 2013 contained a provision that provided (in bolded language):

> THIS LOAN CARRIES A VERY HIGH INTEREST RATE. YOU MAY BE ABLE TO OBTAIN CREDIT UNDER MORE FAVORABLE TERMS ELSEWHERE. EVEN THOUGH THE TERM OF THE LOAN IS 42 MONTHS, WE STRONGLY ENCOURAGE YOU TO PAY OFF THE LOAN AS SOON AS POSSIBLE. YOU HAVE THE RIGHT TO PAY OFF ALL OR ANY PORTION OF THE LOAN AT ANY TIME WITHOUT INCURRING ANY PENALTY. YOU WILL, HOWEVER, BE REQUIRED TO PAY ANY AND ALL INTEREST THAT HAS ACCRUED FROM THE FUNDING DATE UNTIL THE PAYOFF DATE.

*E.g.*, Exhibit 503, A at 5.

Western Sky also charged a loan origination fee. This fee was subtracted from the proceeds disbursed to the borrower when the loan was funded. The origination fee became part of the overall note and was not paid until the borrower paid more than the amount that was disbursed. This fee was disclosed and described to borrowers as a "Prepaid Finance Charge." Indeed, every Consumer Loan Agreement contained a section that identified the amount financed, the amount paid to a borrower directly, and the amount of the pre-paid finance charge/origination

fee. For example, a provision in a Consumer Loan Agreement for a $2,600 loan clearly stated:

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| Amount Financed: | $2,525.00 |
| Amount Paid to Borrower Directly: | $2,525.00 |
| Prepaid Finance Charge/Origination Fee: | $75.00 |

*E.g.*, Exhibit 503, A at 2. The Consumer Loan Agreement also provided: "You promise to pay to the order of Western Sky or any subsequent holder of this Note the sum of **$2,600**, together with interest calculated at **135.00%** per annum and any outstanding charges or late fees, until the full amount of this Note is paid." Exhibit 503, A at 2. The Consumer Loan Agreement further provided, "The Prepaid Finance Charge disclosed above is fully earned upon loan origination and is not subject to rebate upon prepayment or acceleration of this Note." Exhibit 503, A at 2.

Every Consumer Loan Agreement also contained an assignment provision. This provision advised the borrower that Western Sky "may assign or transfer this Loan Agreement or any of our rights under it at any time to any party." *E.g.*, Exhibit 503, A–J, at 3. Although none of the variations of the Consumer Loan Agreement stated that the loan would be assigned to WS Funding or contained any specific references to WS Funding or CashCall, within three days of a loan being sold to WS Funding, borrowers received a notice of assignment informing them that WS Funding now owned the loan and that all payments should be submitted to CashCall.

In addition to the disclosures in the Consumer Loan Agreement, borrowers received other oral and written disclosures regarding CashCall's involvement in the Western Sky Loan Program. For example, during the period of time that CashCall assisted with processing loan applications, a recorded disclaimer was played to individuals calling Western Sky who were routed to CashCall loan agents explaining that CashCall had been hired to help Western Sky process the loan applications. Loan applicants were also notified via email that CashCall was assisting Western Sky.

Moreover, twenty-four hours after a loan was sold to WS Funding, a notice of assignment was sent to the borrower, notifying the borrower that WS Funding now owned the loan, and that all payments must be remitted to CashCall. The notice of assignment gave the borrower a thirty-day window after receiving the notice to dispute the validity of the debt. The notice of assignment also stated that if a borrower did not dispute the validity of the assignment during the thirty-day time frame, CashCall would assume the debt to be valid. The notice of assignment was sent after a borrower had received the loan proceeds but before any payment was due on the loan.

Many borrowers who obtained Western Sky loans were repeat customers, meaning that once they paid off one Western Sky loan after it had been sold to WS Funding and serviced by CashCall, they applied for and received an additional loan from Western Sky. Indeed, over the course of the Western Sky Loan Program, over 15% of the loans issued to consumers were made to borrowers who had previously borrowed from Western Sky and repaid the loan, notwithstanding the assignment to WS Funding.

### E. Third Party Financing and Defense of the Tribal Lending Model

In order for CashCall to purchase the Western Sky loans pursuant to the Assignment Agreement, it required substantial outside funding from third-party lenders. In September of 2009, CashCall approached Jefferies & Company ("Jefferies"), an investment banking firm, and other lenders about entering into a financing agreement to provide necessary funds for CashCall's mortgage loan business as well as its purchase of Western Sky loans. CashCall retained Callaway's law firm to prepare an opinion letter regarding the Western Sky Loan Program that could be shared with prospective financing partners. Callaway prepared an initial draft opinion letter, which was provided to Baren and Jefferies for their review. In the draft letter, Callaway discussed the tribal immunity doctrine and opined that because Western Sky was "chartered by the CRS[T] and [was] not completely independent of the tribe", the "Loan Agreements [would] not be subject to United States federal consumer protection law, or state limiting rates." Callaway also advised that she was aware of two state appellate decisions in which state regulatory authorities had unsuccessfully attempted to enforce state licensing laws against Indian tribal lenders. At the time, both appellate courts had instructed the relevant trial courts to determine whether the named lenders qualified as "arms of the tribe" and were, therefore, entitled to tribal immunity protection.

Jefferies' counsel reviewed the draft opinion letter and, on September 6, 2009, raised several concerns about the Tribal Lending Model and its ability to withstand attack from courts and regulators. Jefferies' counsel advised that she wanted the final draft of the opinion letter to directly address three concerns. First, Jefferies' counsel pointed out that the Supreme Court had previously held that although the doctrine of sovereign immunity protects Indian tribes, it does not protect individual tribal members or agents of the tribes. Thus, Jefferies' counsel wanted Callaway's opinion letter to directly opine on whether the doctrine of sovereign immunity would protect non-Indian tribe third parties that may assist tribes in activities that violate state law. Jefferies' counsel also pointed out that Callaway's statement in the draft opinion letter that the "Loan Agreements [would] not be subject to United States federal consumer protection law, or state limiting rates" needed additional substantiation. According to Jefferies' counsel's research of Supreme Court case law, "even if Western Sky successfully" asserted the doctrine of sovereign immunity as a "defense to suit, federal and state law would likely still apply to the Loan Agreements" which meant that "Western Sky could not enforce a contract that [did] not comply with applicable state or federal law in court." Finally, Jefferies' counsel noted that Callaway's draft opinion assumed that Western Sky, for purposes of the sovereign immunity doctrine, would be recognized as an Indian tribe by the United States, and it questioned whether there was any support from any federal court or a state supreme court for the proposition that Western Sky would enjoy tribal sovereign immunity in the same way as a recognized Indian tribe.

Baren also reviewed Callaway's initial draft opinion letter, and he advised Callaway that her letter contained several errors, including the erroneous statement that Western Sky was "organized under the laws of the CRS[T]." Callaway advised Baren that the draft opinion letter had included a "wish list" of assumptions—e.g., that Western Sky would be organized under the laws of the CRST, not South Dakota—and she promptly revised the letter to accurately state that Western Sky "is owned exclusively by Butch Webb, an enrolled Cheyenne River Sioux Nation member." In the revised draft, Callaway also removed the discussion of the Indian sovereign immunity doctrine and, instead, added an opinion that the Choice of Law provision in the Consumer Loan Agreement

stating that CRST law governed the transaction would be enforceable in 46 states as well as the District of Columbia and Puerto Rico.

Although Jefferies was unable to financially close the transaction with CashCall, Baren moved forward with the Western Sky Loan Program relying on Callaway's advice that state usury and licensing laws would not govern the loans made by Western Sky.

In October of 2009, after Callaway had additional discussions with Bogue about the Tribal Lending Model and, specifically, the issue of whether Indian-owned businesses would be subject to state usury and licensing laws, Bogue sent Callaway a memorandum explaining the Tribal Lending Model in more detail. After receiving Bogue's memorandum, Callaway advised Baren that "for belts and suspenders" Webb's company should be a tribal corporation so that they could represent that it was an "arm of the tribe". Callaway also encouraged Bogue to organize Western Sky under CRST law, but Bogue could not do so because there was no mechanism for such organization or incorporation under tribal law. Bogue indicated to Callaway, however, that such a mechanism may be "in the works".

In March of 2010, Callaway advised Bogue and Baren that she wanted to revisit restructuring the Western Sky Loan Program to quell CashCall's lenders' concerns about the Tribe Member Lending structure. According to Callaway, moving to an Arm of the Tribe Lending structure would facilitate CashCall's ability to obtain future financing and also allow Katten to represent to state regulators that Western Sky was organized under tribal law. Despite Callaway's suggestion that CashCall should consider restructuring to an Arm of the Tribe Lending structure, she never advised CashCall that the Tribe Member Lending structure was no longer defensible, and she never withdrew her opinion that the CRST choice of law provision was valid and enforceable. Indeed, in April of 2010, Katten issued an opinion letter to third-party lender Centurion Credit Resources stating that the choice of law provision designating CRST as the applicable law was enforceable in 48 states as well as the District of Columbia and Puerto Rico. In addition, in May of 2010, Callaway advised Baren that there was "good law" supporting the proposition that state and federal laws would not apply to transactions entered into with a tribal member's business entity.

On May 14, 2010, Western Sky's counsel, Bogue, also opined that CRST law applied to the Western Sky loans and that the loans were enforceable. Exhibit 502, A. According to Bogue, Western Sky was an "entity duly and lawfully licensed by the [CRST] to make and issue such loans" and, therefore, the provisions in the Consumer Loan Agreement stating that CRST law applied were enforceable. Exhibit 502, A.

As the Western Sky Loan Program grew, CashCall became involved in many financing transactions whereby sophisticated third-party lenders—including financial services companies, investment funds, and speciality finance companies—provided hundreds of millions of dollars in financing to CashCall to facilitate WS Funding's purchase of loans from Western Sky. Katten regularly issued two opinion letters for each of the transactions: a general corporate opinion and a regulatory opinion. The regulatory opinion focused on the legality of CashCall's ability to purchase and enforce the loans issued by Western Sky at the very high interest rates and terms stated in the loan agreements. In addition, Bogue issued opinions—which were referenced in and relied on in

Katten's opinion letters—that opined on Western Sky's ability to make loans under CRST law and transfer the loans to CashCall and on CashCall's ability to collect or enforce the loans. Indeed, Bogue provided multiple opinion letters stating that the "fees and rates contained within [the Western Sky loans] are in compliance with any applicable requirements of the Cheyenne River Sioux Tribe." Exhibits 502a–502m. In addition, both Bogue and Callaway continued to maintain that CRST law applied to the loan agreements and that CashCall was able to enforce the terms of the loan agreements.

Although Callaway advised Baren in February of 2011 that she "felt more strongly than ever that Western Sky" needed to "firm up its structure to fit in the arm of the tribe box", she never withdrew or changed her opinion that the Tribe Member Lending structure was legally defensible or specifically advised CashCall that it was absolutely necessary to change to an Arm of the Tribe Lending structure. Although Baren agreed that Western Sky "should be formed with the tribe for 100 different reasons" and he stated that he expected "to have that done in a week or so," he testified that he did not think the "arm of the tribe" issue was crucial to CashCall's ability to adequately respond to inquiries by state regulators. Callaway generally agreed with Baren's assessment and indicated that her concern about the "arm of the tribe" issue was really "about the longevity of the product" and the "domino effect" that a negative finding may have on CashCall.

Indeed, Callaway continued to opine that the choice of law provision in the Consumer Loan Agreement was enforceable. For example, on December 31, 2012, Katten issued an opinion letter to several third-party lenders stating the choice of law provision in the Consumer Loan Agreement designating CRST law as the applicable law was enforceable and that, pursuant to the Assignment Agreement, CashCall would acquire all rights Western Sky enjoyed as the lender. In the letter, Katten also relied on an opinion from Bogue, dated December 28, 2012, stating that the loans were not subject to state or federal law. Similarly, in connection with a financing transaction that CashCall entered into with third-party lenders on January 31, 2013, Katten, again, issued an opinion letter stating that the choice of law provision in the Consumer Loan Agreement designating CRST law as the applicable law was enforceable and that, pursuant to the Assignment Agreement, CashCall would acquire all rights Western Sky enjoyed as the lender. In the letter, Katten also referenced and relied on Bogue's opinion letter, dated January 30, 2012, opining that the loans were not subject to state or federal law.[4]

### F. Regulatory Actions Against Defendants and the Winding Down of the Western Sky Loan Program

In August of 2011, the state of Washington filed an enforcement action against CashCall, alleging violations of Washington state law, based on CashCall's servicing of Western Sky loans.[5]

---

[4] During cross-examination, Baren understandably could not locate Bogue's January 30, 2012 letter because it was not offered by either party. However, Baren testified that the January 30, 2012 letter was probably a "cookie cutter" of Bogue's December 12, 2011 letter.

[5] By this time, regulators had also commenced lawsuits against Western Sky and Webb challenging whether they were protected by Indian sovereign immunity. On January 27, 2011, the

Regulators in several other states subsequently filed similar actions against CashCall. As a result, beginning in 2012, CashCall decided to stop purchasing Western Sky loans issued to borrowers who resided in those states.

On March 6, 2013, Reddam and Baren met with Callaway and two other lawyers at Katten to discuss the increasing number of regulatory investigations and litigation challenging CashCall's Tribal Lending Model. During the meeting, Callaway reassured Baren and Reddam that she believed that the Tribal Lending Model was legally sound despite the unfavorable shift in the regulatory climate.

On March 25, 2013, Callaway contacted Baren via e-mail to suggest possible changes to the Tribal Lending Model. Callaway explained that in her experience, states were "accepting [of] an arm-of-the-tribe lending model" because they acknowledged "that they cannot regulate tribes or their arms." Exhibit 528 (internal quotation marks omitted). Callaway explained, however, that CashCall's business competitors were challenging the "arm-of-the-tribe" lending model and suggesting that service providers using this model be challenged for "aiding and abetting illegal lending." Exhibit 528 (internal quotation marks omitted). As a result, Callaway recommended that CashCall limit its lending activities to one of three areas: (1) lending funds to the tribe to make the loans; (2) providing services to the tribe (e.g., marketing, underwriting, software, collections overflow); or (3) purchasing a participation interest in the loans made by the tribe so that the tribe retained ownership of the loans and would be able to argue for sovereign immunity based on its ownership. Exhibit 528. Notwithstanding that advice, Callaway never specifically withdrew or modified her previous opinion that the Tribal Lending Model was defensible and that the Choice of Law provision in the Consumer Loan Agreement was enforceable. Indeed, Katten and Callaway continued to represent CashCall in several pending and subsequently filed lawsuits involving the Western Sky Loan Program and vigorously defended the Tribe Member Lending structure.

In August of 2013, CashCall became increasingly concerned about the viability of the Western Sky Loan Program. Accordingly, Baren consulted with Dr. Gavin Clarkson—an expert in Indian Law, Tribal Entrepreneurship, and Indian Finance—regarding the structure of the Western Sky Loan Program. Dr. Clarkson opined that because Western Sky was owned by a member of the CRST, it was entitled to the rights and immunities of a tribal member, including protection from state regulation. Dr. Clarkson further opined that Western Sky's sales of the loans to WS Funding did not change the character of the loans or his view that state laws were not applicable. Dr. Clarkson's opinions were entirely consistent with the advice provided by Callaway and Bogue.

---

Attorney General of Colorado filed a lawsuit in Colorado state court naming Western Sky and Webb, alleging that Western Sky's issuance of installment loans to Colorado consumers violated state laws because Western Sky had failed to obtain a lender license and the interest on the loans exceeded the maximum rate allowed under Colorado law. In addition, on February 15, 2011, the Commissioner of Financial Regulations in Maryland filed an administrative action against Western Sky, Webb, and three payday lending companies owned by Webb. Like Colorado, Maryland alleged that Western Sky and Webb violated state law by failing to obtain a lender license and making loans with interest rates exceeding the rates allowed under state law.

In August of 2013, the New York Attorney General (the "NYAG") filed a high-profile lawsuit naming CashCall, Reddam, and WS Funding and alleging violations of New York's usury and licensing laws. The NYAG sought penalties and restitution of all loan payments made by New York residents who had obtained loans from Western Sky. Although Callaway and Bogue continued to defend the Tribal Lending Model, the number of regulatory actions convinced Reddam that it was in CashCall's best interest to end the program. Specifically, Baren and Reddam credibly testified that the publicity surrounding the NYAG's lawsuit was extremely detrimental to CashCall's mortgage lending business, which was separate from the Western Sky Loan Program. Baren further testified that Freddie Mac immediately terminated its relationship with CashCall, and CashCall ultimately voluntarily suspended sales to Fannie Mae in light of pressure from the NYAG lawsuit. As a result of the NYAG's action and other regulatory actions filed in other states, CashCall made a business decision to discontinue purchasing loans from Western Sky. Accordingly, in September of 2013, CashCall notified Western Sky that it would stop purchasing all Western Sky loans and the Western Sky Loan Program ended.

### G. Defendants Terminate Their Relationship with Katten and Callaway

On September 30, 2013, Callaway prepared a memorandum to Baren attempting to memorialize that Baren had told Katten "that the Western Sky entity structure was to be an arm of the tribe structure" and that both Callaway and Katten had repeatedly urged Baren, orally and in writing, to "have the structure changed." According to Baren's e-mail response to Callaway, he was "shocked" at the sudden change in Callaway's position. Baren concluded that Callaway was being dishonest given that she had introduced him to Webb and knew that Western Sky could not be structured as an "arm of the tribe" entity under CRST law. As a result, CashCall terminated Callaway and Katten and hired another law firm to take over of CashCall's litigation matters.

### H. The CFPB Files This Action

The CFPB filed this action against Defendants on December 16, 2013. It filed the First Amended Complaint ("FAC") on March 21, 2014. In the FAC, the CFPB alleges that Defendants have engaged in unfair, deceptive, and abusive acts and practices in violation of the CFPA. On June 30, 2016, the CFPB filed a Motion for Partial Summary Judgment as to liability only. On August 31, 2016, the Court granted the CFPB's Motion finding Defendants violated the CFPA.

## Conclusions of Law

### I. Jurisdiction and Venue

The Court has subject matter jurisdiction over this action because it presents a federal question and is brought by an agency of the United States. *See* 28 U.S.C. §§ 1331, 1345. The Central District of California is the appropriate venue because a substantial part of the events that gave rise to this action occurred here and Defendants do business here. 28 U.S.C. §§ 1391(b)(2), 5564(f).

## II. Discussion

In the FAC, the CFPB alleged that Defendants have engaged in unfair, deceptive, and abusive acts and practices in violation of the CFPA. Under Section 5536(a)(1)(B) of the CFPA, it is unlawful for any covered person "to engage in any unfair, deceptive, or abusive act or practice." Pursuant to the CFPA, an "act or practice is deceptive if: (1) there is a misrepresentation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (internal citation and quotation marks omitted). In its Order granting the CFPB's Motion for Partial Summary Judgment, the Court held that CashCall was the true lender and, therefore, CashCall, WS Funding, and Delbert engaged in a deceptive practice within the meaning of the CFPA when servicing and collecting on Western Sky loans by creating the false impression that the loans were enforceable and that borrowers were obligated to repay the loans in accordance with the terms of their loan agreements. The Court also held that Reddam is individually liable under the CFPA because he participated directly in and had the ability to control CashCall's, Delbert's, and WS Funding's deceptive acts. Accordingly, the sole issue remaining for trial was the appropriate remedy for Defendants' violation of the CFPA. The CFPB seeks restitution in the amount of $235,597,529.74, a statutory penalty in the amount of $51,614,708, and a permanent injunction.

### A. Restitution

The Court has "broad authority to impose appropriate remedies", including restitution, "for any violations" of the CFPA. 12 U.S.C. § 5565(a). However, a Court is not required to award restitution merely because a defendant violates the CFPA. *See Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, at *1, 11 (N.D. Cal. Sept. 8, 2017). Rather, the CFPB bears the burden of proving that restitution is an appropriate remedy and that the amount of restitution it seeks represents a defendant's unjust gains. *Id.* Based on the testimony and exhibits received in evidence at trial, the Court concludes that the CFPB did not satisfy its burden of proving that restitution is an appropriate remedy in this action.

#### 1. The CFPB Did Not Show that Restitution Is an Appropriate Remedy In this Action

At trial, the CFPB attempted to prove that restitution is an appropriate remedy because Defendants engaged in a deliberate scheme to evade consumer protection laws with loans that were deceptive towards consumers in violation of the CFPA. CFPB's Post-Trial Brief at 1–2. The CFPB also claims that Defendants concealed their involvement in the Western Sky Loan Program from consumers so that borrowers would not realize that CashCall was the true lender and, therefore, the loans were illegal and potentially uncollectible. *Id.* at 4. According to the CFPB, restitution is appropriate when a contract is procured by fraud or is otherwise unenforceable. *Id.* at 2. Because Defendants collected interest and fees on Western Sky loans that may have been void or unenforceable under state usury and licensing laws, the CFPB argues that fairness dictates that Defendants return this money to consumers. *Id.* at 3. However, although the CFPB advances several arguments in support of restitution, it failed to prove by a preponderance of the credible evidence that restitution is appropriate.

The CFPB did not show that Defendants intended to defraud consumers or that consumers did not receive the benefit of their bargain from the Western Sky Loan Program. The majority of case law in the Ninth Circuit addressing the CFPA and the appropriateness of restitution stems from cases in which a defendant has engaged in a type of fraud that is akin to what is commonly referred to as that of a "snake oil salesman." *See Nationwide*, 2017 WL 3948396, at *11. In these cases, a defendant's scheme to defraud typically uses fraudulent misrepresentations to dupe consumers into believing they are purchasing something other than what they actually receive. *See F.T.C. v. Figgie, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("the seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some . . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds for each [product] that is not useful to them."). However, these cases are inapposite. The CFPB failed to present any evidence that Defendants set out to deliberately mislead consumers as to the nature of the Western Sky Loan Program or otherwise intended to defraud them or that consumers anticipated receiving a benefit that they did not actually receive under the loan agreements. Although the CFPB attempts to equate Defendants' actions with those of the defendants in *Figgie* by arguing that Defendants' concealment of the true lender of the Western Sky loans tainted borrowers' decisions to enter into the loans, it did not present any evidence to establish this fact. Indeed, the CFPB did not present testimony from a single consumer that suggests that a borrower would not have entered into a loan transaction if they had known that CashCall—not Western Sky—was the true lender.

The CFPB relied heavily on evidence that Defendants created the Western Sky Loan Program to avoid state licensing and usury laws in an attempt to prove that Defendants acted fraudulently; however, this evidence is not sufficient to meet its burden of proof. Indeed, companies frequently structure business operations and transactions to minimize exposure to unfavorable laws and regulations. *See Ratzlaf v. United States*, 510 U.S. 135, 146 (1994) ("Courts have noted many occasions on which persons, without violating any law, may structure transactions in order to avoid the impact of some regulation or tax.") (internal citation and quotation marks omitted); *see also Costa v. Keppel Singmarine Dockyard PTE, Ltd.*, 2003 WL 24242419, at *11 (C.D. Cal. April 24, 2003) ("Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion, and performance of all contracts in Kansas. Beech has not afforded itself the benefits and protections of the laws of Texas, but instead has calculatedly avoided them"). For example, businesses commonly seek to avoid unfavorable tax laws by structuring transactions to minimize tax liability. As the Supreme Court has stated, businesses are generally free to structure their affairs as they see fit, including using lawful structuring, such as creating holding companies, to minimize taxes, which is analogous to what Defendants did in this case. *See CIR v. First Sec. Bank of Utah NA*, 405 US 394, 400 (1972).

There simply was no evidence that Defendants decided to embark on an unlawful scheme to structure the Western Sky Loan Program to defraud borrowers. On the contrary, Reddam saw a legitimate need for these types of loans and set out to establish a program that would permit Defendants to lawfully enter this market. The evidence presented demonstrated that Baren and Reddam only agreed to participate in the Western Sky Loan Program after consulting with prominent legal counsel and receiving advice that the structure of the Western Sky Loan Program was not unlawful. Although this Court has previously held that advice of counsel is not a defense

to liability, it is relevant to the determination of whether restitution is an appropriate remedy. *See Chase v. Trs. of W. Conference of Teamsters Pension Tr. Fund*, 753 F.2d 744, 753 (9th Cir. 1985) ("The trustees' reliance on counsel's determination that owner-drivers were eligible to participate in the plan weighs against restitution."). In this case, the uncontradicted testimony established that Reddam and Baren relied on Callaway's advice when structuring the Western Sky Loan Program, which was virtually identical to the unchallenged Bank Lending Model, and that they continued to rely on her advice throughout the duration of the program. Notwithstanding the extensive cross-examination of Baren by the CFPB's counsel, Baren consistently and credibly defended the Western Sky Loan Program and CashCall's reliance on outside counsel in adopting the Tribal Lending Model. Specifically, during cross-examination, Baren acknowledged that several early drafts of Callaway's opinion letters contained errors but also pointed out that by the time the program was ready to launch, those errors, with the exception of one minor mistake—that Western Sky was recognized as an Indian Tribe by the United States of America—had been corrected.

Moreover, the evidence established that it was reasonable for CashCall to rely on Callaway's advice because at the time, no court had ruled on the Tribal Lending Model or concluded that it was unlawful. Indeed, it was not until this Court's true lender determination that Defendants could have known that the program violated the CFPA. As Defendants' point out, the CFPB's theory of enforcement in this action is "unique", and the Court's finding of liability was premised solely on its determination of the discrete issue that CashCall was the true lender under the structure of the Western Sky Loan Program.

In addition, the CFPB contends that the terms of the loan agreements were deceptive and that the deceptive terms, themselves, constitute additional fraud in the selling of the product, which justifies restitution. However, the CFPB did not present credible evidence to support this assertion. For example, there was no testimony from consumers that they were confused about the terms of the loans or the fees. In contrast, Defendants presented credible and persuasive evidence that they made every effort to inform consumers about all material aspects of the loans. For instance, every Consumer Loan Agreement clearly and plainly disclosed the terms of the loans—including the exorbitant interest rates and relevant fees. In addition, every Consumer Loan Agreement also stated that Western Sky may assign the loans and once WS Funding purchased the loans, consumers received a notice of assignment informing them that their loans had been sold and would be serviced by CashCall.

Finally, the evidence indicated quite clearly that consumers received the benefit of their bargain—i.e., the loan proceeds. As previously discussed, Defendants plainly and clearly disclosed the material terms of the loans to consumers—including fees and interest rates—before the loan were funded. Accordingly, the Court cannot conclude that Defendants acted in bad faith, resorted to trickery or deception, or have been guilty of fraud in connection with the origination of the loans that are issue in this case. As a result, the Court finds that the CFPB did not carry its burden of proving that restitution is appropriate in this case.

## 2. The CFPB Did Not Prove that the Amount of Restitution It Seeks Is Appropriate

The Court also concludes that even if the CFPB could have established that restitution is an appropriate remedy (which it did not), the CFPB did not show that the amount of restitution it seeks is appropriate. The Ninth Circuit has adopted a two-step burden shifting framework for calculating restitution awards under the Federal Trade Commission Act ("FTCA") and has applied this test to actions brought under the CFPA. *See Gordon*, 819 F.3d at 1195. First, the CFPB must prove that the amount it seeks in restitution reasonably approximates the defendant's unjust gains. *Id.* If the CFPB makes this threshold showing, the burden shifts to the defendant to demonstrate that the net revenue figure overstates the defendant's unjust gains. *Id.*

The CFPB seeks an enormous restitution award in the amount of $235,597,529.74. However, the CFPB failed to present credible evidence demonstrating this is the appropriate amount of restitution. Indeed, its only witness, Ryan Thomas, specifically admitted that he did not make any attempt to determine whether this amount was appropriate for restitution. Trial Tr. 410:21–24, 411:21–25. Nevertheless, the CFPB argues that the Court should simply accept this amount because it represents the total interest and fees Defendants collected on the void loans at issue in this case, less any previous settlement payments. Although a "district court may use a defendant's net revenues as a basis for measuring" restitution, there was no credible evidence that this number represents Defendants' net revenues from the loans issued through the Western Sky Loan Program to borrowers in the relevant states. *See Gordon*, 819 F.3d at 1195. In fact, Thomas admitted on cross-examination that he did not believe that the CFPB's proposed restitution amount was netted to account for expenses. Trial Tr. 419:7–24.

In addition, the CFPB also failed to present any evidence that its proposed restitution approximates Defendants' unjust gains. *See F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016) (explaining that when analyzing whether the amount of a restitution award is appropriate, a court should not focus on what a consumer lost, but rather, the defendants' unjust gains.); *F.T.C. v. Zamani*, 2011 WL 2222065, at *13 (C.D. Cal. June 5, 2011) ("it is error to simply conclude that the total amount paid by consumers constitutes [a] defendant's unjust enrichment without accounting for refunds and actual services rendered.") (internal citation and quotation marks omitted). As Thomas admitted on cross-examination, he did not examine or even review the relevant states' usury laws or undertake any analysis of the payment status of individual loans. Trial Tr. 420:8–19, 421:1–12. Thomas also conceded that he did not attempt to analyze whether the CFPB's proposed restitution award would create a windfall for borrowers, including those who may not have made any payments on their loans. Trial Tr. 421:23–422:2, 437:4–12. Indeed, it is clear from Thomas's testimony that he did not perform any analysis of the data presented to him. In a telling admission, Thomas testified that he simply "was just adding up total amount of principal that someone paid, the amount of interest that someone paid, and the amount of fees that someone paid" without any consideration of the underlying data. Tr. Transcript 441:12–16. In contrast, Defendants presented substantial credible evidence that the CFPB's proposed restitution award does not approximate Defendants' unjust gains. Accordingly, the Court concludes that the CFPB did not meet its burden of proving that the amount of restitution it requests represents Defendants' unjust gains.

## B. Statutory Penalties

The CFPA provides: "Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty . . . ." 12 U.S.C. § 5565(c)(1).[6] The statute provides three tiers of penalties and the amount of the penalty imposed depends on a defendant's level of culpability. The First Tier, which imposes a penalty of no more than $5,000 (later adjusted for inflation to $5,526 by regulation) for each day that a violation continues, does not require a mental state. The Second Tier, which imposes a penalty of no more than $25,000 (later adjusted for inflation to $27,631 by regulation) for each day that a violation continues, applies where a defendant acts recklessly in violating the CFPA. The Third Tier, which imposes a penalty of no more than $1,000,000 (later adjusted for inflation to $1,105,241 by regulation) for each day that a violation continues, applies where a defendant knowingly violates the CFPA. In determining the amount of the penalty, a court should also consider the following mitigating factors: (1) the size of financial resources and good faith of the person charged; (2) the gravity of the violation or failure to pay; (3) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided; (4) the history of previous violations; and (5) such other matters as justice may require.

The CFPB contends that Defendants knowingly violated the CFPA. However, after taking into account mitigating factors, the CFPB only requests that the Court impose the maximum Second Tier penalty of $27,631 per day for the 1,861 days Defendants violated the CFPA (July 21, 2011 through August 31, 2016), for a total penalty of $51,614,708. The Court declines to impose the Second Tier penalty and concludes that, based on all of the evidence, a First Tier penalty in the amount of $10,283,886 is appropriate.

Although the CFPA does not define the terms "knowingly" or "recklessly", the FTCA provides some guidance.[7] In the context of the FTCA, the term "knowing" means "actual knowledge or knowledge fairly implied . . . on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); *Consumer Fin. Prot. Bureau v. D&D Mktg.*, 2016 WL 8849698, at *12 (C.D. Cal. Nov. 17, 2016). The term recklessness refers to conduct that leads to "an unjustifiably high risk of harm that is either known

---

[6] When drafting the CFPA, Congress stated that courts "may" grant restitution for a violation of the statute and that a monetary civil penalty "shall" be imposed on anyone that violates the statute. *See* 12 U.S.C. §§ 5565(a), (c). Accordingly, in light of its finding that Defendants violated the CFPA, although the Court may refuse to award restitution, it does not have discretion and must impose a civil penalty.

[7] The Ninth Circuit has recognized the FTCA as an important analog for interpreting undefined terms in the CFPA. *See Gordon*, 819 F.3d at 1193 n.7 (9th Cir. 2016) (adopting the meaning of "deceptive act or practice" from the FTCA in recognition of Congress' reliance on the FTCA in drafting the CFPA); *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1072 n.3 (9th Cir. 2016) (recognizing that the CFPB shares concurrent federal authority with the Federal Trade Commission to enforce the FTCA and that the missions of the laws overlap).

or so obvious that it should be known." *D&D Mktg.*, 2016 WL 8849698, at *12 n.3 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007)).

After a careful review of all of the evidence in the record, the Court concludes that the CFPB failed to prove by a preponderance of the evidence that Defendants knowingly violated the CFPA. The evidence at trial failed to demonstrate that Defendants knew at the time they decided to implement the Western Sky Loan Program that the structure of the program would subject them to liability under the CFPA. Indeed, at its inception, there was nothing inherently unlawful about the Western Sky Loan Program. It was not until this Court found that CashCall—not Western Sky—was the true lender that Defendants could have understood that they may be liable under the CFPA.

In addition, the uncontroverted testimony results in the conclusion that Defendants did not recklessly violate the CFPA. As discussed in greater detail above, although Defendants clearly sought at the outset to avoid state licensing requirements and usury laws, there was no evidence they decided to create and implement an unlawful scheme to defraud consumers, which would have been relatively easy to accomplish given their sophistication and experience in the lending business. Instead, Defendants sought out highly regarded regulatory counsel to assist them with structuring the Western Sky Loan Program to lawfully accomplish this objective. At the time, there was no case law that clearly established that the Tribal Lending Model was not a lawful model or that any attempt to adopt and implement the Tribal Lending Model would subject Defendants to liability under the CFPA. Indeed, Defendants secured multiple formal and informal opinions from both Callaway and Bogue opining that the structure of the Western Sky Loan Program was viable and would provide Defendants with Indian sovereign immunity, precluding the enforcement of state and federal laws. The evidence also showed that Callaway and Bogue never revoked their opinions. Even when the regulatory climate had dramatically shifted and regulators began to closely scrutinize the Tribal Lending Model, Callaway and Bogue did not change their original opinions that Defendants would not be subject to relevant state and federal laws. Although both Reddam and Baren are very sophisticated individuals, they are not regulatory experts. Thus, the Court cannot conclude that Defendants should have known that the structure of the Western Sky Loan Program would subject them to liability under the CFPA or that it was obvious they would be subject to such liability. At best, the CFPB established that Defendants were willing to accept the business risks associated with structuring a lending model that would avoid relevant state and federal laws and employed legal counsel to assist with this endeavor. Accordingly, the Court finds that a Tier One penalty is appropriate. Although Defendants argue there are mitigating factors that should reduce the amount of the Tier One penalty, the Court does not find Defendants' argument or evidence persuasive in light of their willingness to continue the Western Sky Loan Program in the face of increased regulatory pressure and advice from their counsel that the model was becoming increasingly susceptible to attack. Accordingly, the Court concludes the maximum Tier One penalty, in the amount of $10,283,886.00, is appropriate and that Defendants are jointly and severally liable for payment of the penalty.[8]

---

[8] $10,283,886.00 represents the maximum amount of the Tier One penalty ($5,526) for the 1,861 days Defendants violated the CFPA.

### C. Injunctive Relief

"As a general rule, past wrongs are not enough for the grant of an injunction; an injunction will only issue if the wrongs are ongoing or likely to recur." *F.T.C. v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). Although the CFPB argues that there is a cognizable danger that Defendants will violate the CFPA in the future, the CFPB did not present any evidence to support this assertion. Indeed, there was no evidence that Defendants are currently purchasing loans from Western Sky or continuing to service those loans. Even if, as the CFPB points out, Defendants informed a few borrowers after this Court's August 31, 2016 Order that their loans were governed by the CRST, which Baren testified was inadvertent, that does not merit a permanent injunction because there was no evidence that Defendants are continuing to collect on the loans. Accordingly, upon reviewing the totality of the evidence presented, the Court does not find that Defendants' conduct warrants the requested injunctive relief.

## III. Conclusion

In light of the foregoing, the Court concludes that the CFPB failed to meet its burden of proving that either restitution or a permanent injunction is an appropriate remedy and, therefore, the Court will not award restitution or impose a permanent injunction. The Court also concludes that a Tier One statutory penalty in the amount of $10,283,886 is appropriate. Accordingly, the Court issues judgment in favor of the CFPB in the amount of $10,283,886 and finds that Defendants are jointly and severally liable. Counsel for the parties are ordered to meet and confer and prepare a joint proposed Judgment which is consistent with this Order. The parties shall file the proposed Judgment with the Court by **January 26, 2018**. In the unlikely event that counsel are unable to agree upon a joint proposed Judgement, the parties shall each submit separate versions of a proposed Judgment along with a Joint Statement setting forth their respective positions no later than **January 26, 2018**.

IT IS SO ORDERED.