OWEN P. MARTIKAN (CA Bar #177104)
owen.martikan@cfpb.gov
CHRISTINA S. COLL (CA Bar #250712)
christina.coll@cfpb.gov
LEANNE E. HARTMANN (CA Bar #264787)
leanne.hartmann@cfpb.gov
CONSUMER FINANCIAL PROTECTION BUREAU
1700 G Street NW
Washington, DC 20552
Telephone: (415) 844-9790
Facsimile: (415) 844-9788

Attorneys for Plaintiff
Consumer Financial Protection Bureau

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> CASHCALL, INC., WS FUNDING, LLC, DELBERT SERVICES CORPORATION, and J. PAUL REDDAM, <br><br> Defendants. | CASE NO.: 2:15-cv-07522-JFW (RAOx) <br><br> **PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND** <br><br> Hearing:    Nov. 16, 2022, 8:00 am <br> Court:     Hon. John F. Walter <br>           Courtroom 7A |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ...................................................................................................1

3   STATEMENT OF FACTS ......................................................................................1

4   ARGUMENTS AND AUTHORITIES ...................................................................3

5   I. The Court should assess a $33,276,274 penalty to account for CashCall's

6       recklessness.....................................................................................................3

7       A. The Ninth Circuit's mandate supports a $33,276,264 penalty. ...........4

8       B. CashCall waived its objection to the Court's refusal to mitigate the penalty. .....4

9   II. Restitution is an appropriate remedy for CashCall's deceptive scheme. ..................5

10      A. The CFPA supports restitution to return to borrowers the money that they paid

11      but did not owe. ....................................................................................5

12      1. The CFPA supports remediating consumers harmed by deceptive practices........5

13      2. Restitution promotes transparency in the marketplace for consumer

14      financial products and services.................................................................7

15      B. Denying restitution would conflict with CFPA objectives................................8

16  III. CashCall is liable to repay consumers the $197,357,689 that it wrongfully took

17      from them........................................................................................................9

18      A. The Bureau met its burden to establish CashCall's net revenues........................9

19      B. CashCall did not meet its burden of proving that net revenues overstated

20      its unjust gains. ...................................................................................12

21      C. The Supreme Court's *Liu* decision does not affect restitution here. ..................14

22  CONCLUSION.........................................................................................................15

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

Cases                                                                                                Page(s)

*AMG Cap. Mgt., LLC v. FTC*,
  141 S. Ct. 1341 (2021) ...................................................................................................6

*CFPB v. CashCall*,
  No. CV 15-07522 JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ....................1,2,6

*CFPB v. CashCall*,
  No. CV 15-07522 JFW, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018).......................1, 3, 5

*CFPB v. CashCall*,
  35 F.4th 734 (9th Cir. 2022) ................................................................................... Passim

*CFPB v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016)....................................................................................2, 15

*CFPB v. Mortg. Law Grp.*,
  No. 14-CV-513-WMC, 2022 WL 3027031 (W.D. Wis. Aug. 1, 2022)........................15

*FTC v. Commerce Planet, Inc.*,
  815 F.3d 593 (9th Cir. 2016)...........................................................................................6

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009)..........................................................................................15

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000)..........................................................................................3

*Liu v. SEC*,
  140 S. Ct. 1936 (2020) ........................................................................................12, 14, 15

*McGregor v. Paul Revere Life Ins. Co.*,
  369 F.3d 1099 (9th Cir. 2004)..........................................................................................5

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946)........................................................................................................15

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

Statutes

12 U.S.C. § 5511(b)(5)..................................................................................7

12 U.S.C. § 5565(a) ...................................................................................14

12 U.S.C. § 5565(a)(2).................................................................................5

12 U.S.C. § 5565(c)(2).................................................................................3

12 U.S.C. § 5565(c)(3).................................................................................4


Regulations

12 CFR §1083.1 ..........................................................................................4


Other Authorities

Restatement (Third) of Restitution and Unjust Enrichment §1 (Am. Law Inst. 2011).......6

Restatement (Third) of Restitution and Unjust Enrichment §6 (Am. Law Inst. 2011).......6

Restatement (Third) of Restitution and Unjust Enrichment §49 (Am. Law Inst. 2011).....6

1 Dan B. Dobbs, *Law of Remedies* § 4.1(1) (2d ed. 1993)..............................................6, 7

Webster's New International Dictionary (2002) ..................................................................8

**INTRODUCTION**

The Ninth Circuit issued its mandate in this case on July 15, 2022, and the time to petition for writ of certiorari has expired. Consistent with the Ninth Circuit's opinion, the Bureau asks the Court to amend its findings of fact and conclusions of law, and its judgment, to address the following three issues: (1) how much the defendants (collectively, "CashCall") should pay as a civil money penalty; (2) whether CashCall should pay restitution to consumers; and (3) if so, how much CashCall should pay. The Court need not reopen the record to decide these issues.

The Court should amend its civil money penalty award to account for the Ninth Circuit's conclusion that CashCall's conduct was reckless for almost three years, which justifies an amended total penalty of $33,276,264. The Court should also amend its order and judgment to require restitution to consumers. It is well established that a party who wrongfully takes money from another must repay it. Restitution is consistent with the statute that CashCall violated and denying it here would conflict with that statute. Restitution will make whole consumers whom CashCall deceived and will redress payments that CashCall collected from consumers on the pretense that its loans were enforceable under tribal law when in fact they were void. In calculating restitution, the Court should find that the Bureau met its burden of proving the amount of CashCall's net revenues from Western Sky loans, which amount to $197,357,689.89, and that CashCall failed to meet its burden of proving that these net revenues overstated its unjust gains.

**STATEMENT OF FACTS**

The facts of this case are set forth in detail in this Court's summary-judgment opinion and findings of fact and conclusions of law, and in the Ninth Circuit's opinion. *CFPB v. CashCall,* 35 F.4th 734 (9th Cir. 2022); No. CV 15-07522 JFW, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018); 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016). In short, the CashCall defendants entered into an arrangement with a privately owned company located on tribal land, Western Sky Financial LLC, to make small-dollar loans that

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

1  CashCall intended to insulate from state usury and licensing laws. 35 F.4th at 739. This

2  Court granted partial summary judgment in the Bureau's favor, finding that the loans

3  made to borrowers in certain Subject States[1] were void under those states' laws, and that

4  the CashCall defendants had engaged in deceptive acts and practices in violation of the

5  Consumer Financial Protection Act (CFPA). 2016 WL 4820635, *9-10.

6      The Court held a bench trial to determine remedies, after which it awarded the

7  Bureau a tier-one civil money penalty of $10,283,886, but denied the Bureau's claims for

8  restitution and injunctive relief. Both parties appealed. The Ninth Circuit affirmed in part

9  and reversed in part the Court's judgment, and remanded the case for further proceedings

10  consistent with its mandate. 35 F.4th at 751. With respect to the Court's tier-one penalty

11  award, the Ninth Circuit held that CashCall's conduct was reckless beginning in

12  September 2013, which would require a tier-two penalty award for violations beginning

13  that month. 35 F.4th at 748.

14      With respect to the Court's decision that restitution was not an appropriate remedy,

15  the Ninth Circuit held that it was legal error for the Court to consider whether CashCall

16  acted in bad faith, and whether consumers received the benefit of their bargain. 35 F.4th

17  at 751. The Ninth Circuit remanded for the Court to revisit its decision in a manner

18  consistent with the CFPA. *Id*. The Ninth Circuit also held that in calculating the

19  appropriate restitution amount, the Court should consider the principles set forth in *CFPB*

20  *v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) and related precedent.

21

22

23

24

25

26  [1] The Subject States are Arizona, Arkansas, Illinois, Indiana, Kentucky, Massachusetts,
    Minnesota, Montana, New Hampshire, New Jersey, New York, North Carolina, and

27  Ohio. Trial Ex. 219a.

28

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

## ARGUMENTS AND AUTHORITIES

**I.    The Court should assess a $33,276,274 penalty to account for CashCall's recklessness.**

The Ninth Circuit vacated the Court's penalty award, holding that it did not account for CashCall's recklessness during the last three years of the Western Sky loan program. 35 F.4th at 749. The Ninth Circuit concluded that "from September 2013 on, the danger that CashCall's conduct violated the statute 'was so obvious that [CashCall] must have been aware of it.'" *Id.* (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000)).

The Court initially awarded a penalty of $10,283,886, which it held "represents the maximum amount of the Tier One penalty ($5,526) for the 1,861 days Defendants violated the CFPA." 2018 WL 485963 at *15 n.8. But the Ninth Circuit held that by September 2013 CashCall's conduct was reckless, which would require a tier-two penalty for violations between September 1, 2013, and August 31, 2016, rather than the tier-one penalty that the Court awarded. 35 F.4th at 748. The Ninth Circuit accordingly instructed the Court to reassess the civil penalty, "with the penalty for the period beginning in September 2013 being based on tier two." *Id.* at 749.

The CFPA imposes penalties in three tiers depending on the defendant's level of culpability. 12 U.S.C. § 5565(c)(2). A first-tier penalty requires no showing of scienter; a second-tier penalty applies to "any person that recklessly engages in a violation" of the CFPA; and a third-tier penalty applies to "any person that knowingly violates" the CFPA. *Id.* § 5565(c)(2)(A)–(C). Each penalty tier provides a maximum penalty "for each day during which [a] violation continues," and each maximum penalty is periodically adjusted for inflation. When enacted, the CFPA set the maximum tier-one penalty at $5,000 per day, and the maximum tier-two penalty at $25,000 per day. For civil penalties assessed after January 15, 2022, based on violations that occurred on or after November 2, 2015, the maximum tier-one penalty is $6,323 for each day a violation continues, and

3

the maximum tier-two penalty is $31,616 for each day a violation continues. 12 CFR §1083.1.

### A.    The Ninth Circuit's mandate supports a $33,276,264 penalty.

Given the Court's previous calculation and the Ninth Circuit's guidance, a straightforward formula yields the revised civil-money penalty that the Court should assess. The Court counted each day of the Western Sky program during which the CFPA's penalty provisions were effective—July 21, 2011 through August 31, 2016—and imposed a maximum tier-one penalty per violation for that time period. The Ninth Circuit did not change this calculation for the 773 days beginning on July 21, 2011, and ending on August 31, 2013 (inclusive). The unadjusted maximum tier-one penalty, $5,000, multiplied by 773 days yields $3,865,000.

Under the Ninth Circuit's mandate, the Court must impose a tier-two penalty from September 1, 2013, through August 31, 2016. Consistent with its earlier decision to impose a maximum penalty, the Court should impose a maximum tier-two penalty of $25,000 per day from September 1, 2013 through November 1, 2015, and an inflation-adjusted maximum tier-two penalty of $31,616 per day from November 2, 2015, through August 31, 2016. There are 792 days between September 1, 2013, and November 1, 2015, inclusive, and 304 days between November 2, 2015, and August 31, 2016, inclusive. Using these numbers and penalty amounts, the total tier-two penalty for September 1, 2013, through November 1, 2015, is $19,800,000, and the total tier-two penalty for November 2, 2015, through August 31, 2016, is $9,611,264. Thus, the total penalty that the Court should impose for CashCall's violations is $33,276,264.

### B.    CashCall waived its objection to the Court's refusal to mitigate the penalty.

The CFPA requires the Court to take various factors into account when determining the appropriate penalty amount, but the Court rejected CashCall's mitigation arguments when it imposed the penalty and CashCall did not appeal that ruling. 12

4

1  U.S.C. §5565(c)(3), 2018 WL 485963 at *15, 35 F.4th at 748 (addressing the civil money

2  penalty). Objections to district-court rulings that a party fails to appeal are waived.

3  *McGregor v. Paul Revere Life Ins. Co.*, 369 F.3d 1099, 1102 (9th Cir. 2004).

4       Moreover, CashCall told the Court through counsel at trial that it did not contest its

5  ability to pay a civil-money penalty. Reporter's Transcript, vol. 3, p.367.

6  **II.   Restitution is an appropriate remedy for CashCall's deceptive scheme.**

7       The Ninth Circuit remanded to this Court to reconsider whether restitution was an

8  appropriate remedy in this case, but held that the Court's decision "must be made

9  consistent with the statute" that provides the remedy, which is the CFPA. 35 F.4th at 750.

10  The Ninth Circuit then listed CFPA objectives that are consistent with awarding

11  restitution in this case: to "ensure that consumers are protected from unfair, deceptive, or

12  abusive acts practices;" and to "promote transparency in the markets for consumer

13  financial products and services." *Id.* The Ninth Circuit also noted that the CFPA

14  "authorizes the Bureau to initiate civil litigation and seek remedies to achieve those

15  objectives," and that "[r]estitution is one of those remedies, and it serves to ensure that

16  consumers are made whole when they have suffered a violation of the statute." *Id.* The

17  CFPA offers a broad range of remedies that the Bureau may seek for consumers "without

18  limitation," such as "refund of moneys," "damages or other monetary relief,"

19  "compensation for unjust enrichment," and restitution. 12 U.S.C. §5565(a)(2).

20       **A.   The CFPA supports restitution to return to borrowers the money that**

21            **they paid but did not owe.**

22            **1.   The CFPA supports remediating consumers harmed by deceptive**

23                 **practices.**

24       The Ninth Circuit emphasized that restitution is one of several remedies that the

25  CFPA authorizes the Bureau to seek to achieve its objectives of protecting consumers

26  from deceptive practices and to promote transparency in the markets for consumer

27

28                                           5

1 financial products and services. 35 F.4th at 750. In particular, restitution "serves to ensure

2 that consumers are made whole when they have suffered a violation of the statute." *Id*.

3      CashCall's deceptive conduct caused consumers to pay money that they did not

4 actually owe, by presenting its loans as governed by tribal law and exempt from state

5 usury and other restrictions, when in fact they were not. Because of this scheme, which

6 violated the CFPA, consumers paid interest and fees to CashCall that they had no legal

7 obligation to pay, and CashCall continued to collect interest and fees from consumers

8 until this Court granted partial summary judgment on August 31, 2016. *Id.*

9      Restitution ensures that payments illegally collected on void loans are returned to

10 consumers using a remedy that the CFPA expressly gives the Bureau the authority to

11 pursue and that is a traditional remedy for victims of another's unjust enrichment. It is

12 black-letter law that "[a] person who is unjustly enriched at the expense of another is

13 subject to liability in restitution." Restatement (Third) of Restitution and Unjust

14 Enrichment §1 (Am. Law Inst. 2011); *see also FTC v. Commerce Planet, Inc.*, 815 F.3d

15 593, 603 (9th Cir. 2016) (explaining that "the purpose of [a restitution] award is 'to

16 prevent the defendant's unjust enrichment by recapturing the gains the defendant secured

17 in a transaction'" (quoting 1 Dobbs, *Law of Remedies* § 4.1(1), at 552)), *abrogated on

18 other grounds by AMG Cap. Mgt., LLC v. FTC*, 141 S. Ct. 1341 (2021). A person who

19 pays money that "was not due" is generally entitled to restitution. Restatement, §6; *see

20 also id*. § 49, cmt. c ("Unjust enrichment resulting from a direct payment by the claimant

21 to the recipient ordinarily leads to a prima facie liability in the amount of the payment.").

22 The remedy is available for "[p]ayments resulting from a misunderstanding of the extent

23 or existence of a valid contractual obligation." *Id.*, §6, cmt. c. Thus, if a consumer pays

24 late fees that are properly authorized by a contract but are in fact "illegal and

25 unenforceable" under local law, the consumer can generally recover restitution of those

26 fees. *Id.*, §6, Ill. 21.

27

28

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

The Ninth Circuit explained that restitution is legal in nature when the plaintiff cannot show title to particular property but can show grounds to recover money for some benefit that the defendant received, but equitable in nature when the plaintiff identifies particular property or funds in the defendant's possession that belong, in good conscience, to the plaintiff. 35 F.4th at 750. Here, the Bureau seeks restitution that is legal in nature because the Bureau seeks a money judgment, rather than the return of particular property. In cases seeking such a legal remedy, courts have historically awarded the remedy "as a matter of course" when "the right [is] established." Dobbs §1.2 at 12.

### 2.    Restitution promotes transparency in the marketplace for consumer financial products and services.

The Ninth Circuit highlighted the CFPA's express objective of promoting transparency in the markets for consumer financial products and services. 35 F.4th at 750 (citing 12 U.S.C. §5511(b)(5)). CashCall's conduct here threatened transparency in the consumer-financial-product market by cloaking loans in an alleged tribal exemption from state restrictions to charge usurious interest rates, sometimes exceeding 160% APR, on loans that were void and unenforceable. Id. at 739. As the Ninth Circuit noted, "CashCall led borrowers to believe that they had an obligation to pay, when in fact under their States' laws they did not." 35 F.4th at 747. To mislead borrowers, CashCall constructed a scheme in which Western Sky "amounted to little more than a shell" that "had no purpose other than to create the appearance that the transactions had a relationship to the Tribe." 35 F.4th at 745. And that apparent but illusory relationship caused CashCall to "demand[ ] payment from consumers under the pretense that the consumers had a valid obligation to pay." Id. at 746. In truth, though, consumers had no valid obligation to pay because the loan contracts were void under controlling state law.

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

1      It is quite consistent with the CFPA objective of promoting transparency to return

2   to consumers the interest and fees that they paid to CashCall as part of a deceptive

3   scheme to collect on void loans through a structure that the Ninth Circuit found

4   deliberately opaque. The dictionary definition of *deceptive* as "to cause to believe the

5   false," in the Ninth Circuit's view, "easily encompasses leading a consumer to believe

6   that an invalid debt is actually a legally enforceable obligation." 35 F.4th at 746 (citing

7   Webster's New International Dictionary 584-85 (2002)). Simply put, CashCall hid this

8   material fact from consumers in order to collect interest and fees from them.

9      At trial, CashCall argued that its loans were transparent because their terms were

10  "fully disclosed" to borrowers in the loan agreement, and borrowers voluntarily entered

11  into them. *E.g.,* Defendants' Supp. Brief Re: Restitution, ECF 300, at 8-9. But as the

12  Ninth Circuit emphasized in rejecting this and similar "benefit of the bargain" arguments,

13  the argument misses the point: "The Bureau did not allege that the consumers were

14  denied the loan proceeds or that they entered into the loan agreements against their will.

15  Rather, the Bureau alleged that CashCall harmed consumers by deceiving them about a

16  major premise underlying their bargain: that the loan agreements were legally

17  enforceable." 35 F.4th at 751. This harm can be measured in the amount of interest and

18  fees that consumers paid CashCall that they did not actually owe.

19      **B.     Denying restitution would conflict with CFPA objectives.**

20      Denying restitution—and allowing CashCall to keep the amounts it collected that

21  consumers did not actually owe—would not be "consistent with the statute," *CashCall,*

22  *35 F.4th at 750*. The Ninth Circuit made clear that one of the CFPA's goals is to

23  "compensate[e] consumers who suffer[] harm on account of … deceptive practices." *Id.*

24  *at 751*. Denying restitution would conflict with that goal.

25      Moreover, denying restitution in this case would do nothing to further the CFPA's

26  goal of protecting consumers from deceptive conduct, as it would give wrongdoers a

27  perverse incentive to engage in deceptive conduct by allowing them—rather than the

28                                                          8

1  innocent victim—to keep the proceeds of a void transaction. It would also undermine the

2  laws of the Subject States that seek to deter usurious or non-licensed lenders by declaring

3  their loans void and prohibiting lenders in violation of their laws from collecting or

4  retaining interest or fees in connection with those loans. These statutes would be hollow

5  indeed if lenders could violate them—even recklessly—and then retain all the interest

6  and fees that they had illegally collected from unknowing consumers.

7  **III.    CashCall is liable to repay consumers the $197,357,689 that it wrongfully took**

8  **from them.**

9  The Ninth Circuit reiterated its well-established "two-step burden-shifting

10  framework for calculating restitution." 35 F.4th at 751. Under that framework, the Bureau

11  bears the burden at step one of "proving that the amount it seeks in restitution reasonably

12  approximates the defendant's unjust gains." *Id.* (quotation marks omitted).  And "net

13  revenues" can be "a basis for measuring unjust gains." *Id.* (brackets and quotation marks

14  omitted). Once the Bureau has made a threshold showing of these amounts, "the burden

15  shifts to the defendant to demonstrate that the net revenues figure overstates the

16  defendant's unjust gains." *Id.*

17  The Bureau met its burden at the first step of this framework by proving

18  CashCall's net revenues—a reasonable approximation of CashCalls' unjust gains—with

19  the evidence that it presented at trial. The trial record contains uncontested evidence of

20  consumers' fee and interest payments to CashCall in the Subject States, less refunds that

21  CashCall has already paid to consumers in those states. This evidence shifted the burden

22  to CashCall to prove that net revenues would overstate its unjust gains. CashCall has not

23  met its burden, so the Court should order restitution of the $197,357,689.89 that CashCall

24  wrongfully took from consumers.

25  **A.    The Bureau met its burden to establish CashCall's net revenues.**

26  The Bureau met its burden under the burden-shifting framework by establishing

27  CashCall's net revenues—that is, "the amount consumers paid for the product or service

28  9

minus refunds and chargebacks," *CashCall*, 35 F.4th at 751. CashCall considered interest and fees as revenue. Meeks Decl. ¶18 (ECF 271). Evidence at trial showed that consumers paid CashCall $218,394,771.89 in interest and $3,722,561.74 in fees on subject loans made on or after July 21, 2011, in 13 Subject States.[2] Plaintiff's Proposed FFCL, ¶48 (ECF 309-1). And consumers paid $8,849,800.00 in origination fees on subject loans made on or after July 21, 2011, in 13 Subject States. *Id*. at ¶49.

These amounts come from business records that CashCall produced under oath in response to interrogatories, that set forth interest, fee, and origination fee amounts as CashCall accounted for them.[3] At trial, CashCall's CFO Delbert Meeks testified that CashCall amortized its loans according to an amortization table that was attached to each loan agreement, and that CashCall would allocate payments of principal, interest, and fees according to that table. TR 311:12-312:7. Accordingly, the interest and fee payments presented at trial and set forth here are consistent with CashCall's representations to consumers in their loan agreements. *Id*., See, e.g., Trial Ex. 41, Bates No. ZYW000317. The Bureau presented evidence of CashCall's "refunds," in the form of restitution payments already made to consumers in Subject States to settle state-level proceedings. Joint Pre-Trial Order, ECF 280-1, at 2. CashCall stipulated to these amounts, which totaled $33,609,444.13 across six states. *Id*.

At trial and on appeal, CashCall disputed that all origination fees should be paid back as restitution, as some borrowers never actually paid the origination fee because CashCall did not account for the origination fee on a particular loan as paid until all principal on that loan had been repaid. E.g., Meeks Decl., ¶20 (ECF 271). Evidence at trial showed that the total amount of paid origination fees on subject loans was

---

[2] Plf.'s Proposed FFCL, ¶¶50-121 (ECF 309-1), as well as Trial Exhibit 219a, break these amounts down by individual Subject State, and Trial Exhibit 219 breaks these amounts down by individual borrower.
[3] Trial Ex. 219.

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

$8,849,800.26 and unpaid origination fees totaled $15,557,525. The Bureau agrees that only paid fees should be included in restitution, which results in net revenue of $197,357,689.89.

The following chart lists interest, fee, and origination fee payments, and refunds where relevant, by Subject State, using data from Trial Exhibit 219:[4]

| State | Interest | Fees | Orig. Fee | Refunds |
|---|---|---|---|---|
| AZ | $23,143,842.02 | $362,248.61 | $890,170.19 | |
| AR | 9,253,734.47 | 160,676.81 | 357,069.85 | ($500,000.00) |
| IL | 5,812,447.28 | 82,805.13 | 203,494.53 | |
| IN | 21,090,738.32 | 368,191.41 | 928,177.52 | (1,000,000.00) |
| KY | 9,267,988.59 | 161,904.47 | 414,588.15 | |
| MA | 4,529,429.15 | 70,555.09 | 125,896.92 | (2,400,000.00) |
| MN | 14,797,596.69 | 234,496.79 | 569,797.22 | (4,500,000.00) |
| MT | 2,492,707.19 | 43,680.04 | 98,457.96 | |
| NH | 2,670,952.34 | 47,101.79 | 99,296.55 | |
| NJ | 28,448,273.05 | 449,837.27 | 1,040,032.09 | |
| NY | 31,572,234.31 | 506,363.86 | 1,015,118.52 | (16,184,444.13) |
| NC | 33,502,536.00 | 687,052.26 | 1,597,672.62 | (9,025,000.00) |
| OH | 31,812,292.48 | 547,648.21 | 1,510,028.14 | |
| Totals: | $218,394,771.89 | $3,722,561.74 | $8,849,800.26 | ($33,609,444.13) |

[4] The Bureau used CashCall's data to calculate the paid origination fees by comparing the principal paid, the loan amount, and the origination fee in Trial Ex. 219. For consumers whose principal paid was more than their loan amount less the origination fee, the Bureau calculated that the consumer had paid part or all of the origination fee. For 182 Subject Loans, CashCall's data indicates consumers paid more in principal than the total loan amount, which accounts for a total overpayment of $26,385. The Bureau has not included those excess principal amounts in its restitution calculation.

11

1  **B.    CashCall did not meet its burden of proving that net revenues**

2       **overstated its unjust gains.**

3       As the Ninth Circuit noted, "[p]erhaps net revenues would overstate CashCall's

4  unjust gains, but if so, that was CashCall's burden to prove." 35 F.4th at 751. CashCall

5  has not met that burden. At trial and on appeal, CashCall argued that the Bureau's net

6  revenues calculation overstated its unjust gains for five reasons: (1) the Court should only

7  take its profits into account when calculating unjust gains, and it made no profit on the

8  Western Sky loans; (2) the Bureau should not have included in revenues origination fees

9  that CashCall deemed unpaid; (3) the Bureau's calculations did not account for borrowers

10 who defaulted or otherwise failed to pay back their loans in full; (4) amounts paid by

11 consumers who paid "implied interest rates" that were lower than state usury limits

12 should not be included; and (5) the Bureau hadn't shown that CashCall borrowers could

13 have gotten a better loan elsewhere. E.g., Defendants' Proposed FFCL, ¶¶288, 336, 344,

14 345 (ECF 310-1).These arguments all fail.

15      With respect to CashCall's first argument, the Ninth Circuit made clear in this case

16 that net revenues are an appropriate and commonplace measure of restitution in consumer

17 cases. 35 F.4th at 751 ("[R]estitution may be measured by the full amount lost by

18 consumers rather than limiting damages to a defendant's profits." (quotation marks

19 omitted)). The Ninth Circuit wrote that the Court's statement that the "proposed

20 restitution amount [should be] netted to account for expenses" was "inconsistent with our

21 precedent." *Id.* And, as explained below, the Supreme Court's decision in *Liu v. SEC*, 140

22 S. Ct. 1936 (2020), does not change the applicable law. There is thus no basis for

23 CashCall to claim that the Bureau's calculation overstates their unjust enrichment merely

24 because it is based on their revenues rather than their purported profits.

25      CashCall's second argument is moot because the Bureau's restitution claim

26 excludes unpaid origination fees, as described above.

27

28                                   12

Third, CashCall errs in contending that the restitution award should be reduced to account for borrowers who did not repay their loans in full. If CashCall means to suggest that restitution should be reduced by the full amount of principal that CashCall paid out but did not recoup, they effectively ask the Court to deduct their expense of making the loans. As explained above, no deduction for expenses is appropriate. And to the extent that CashCall contends that restitution should not include interest and fees paid by any consumer who paid CashCall less than the consumer had received in the first place, that is mistaken because the Subject States prohibited CashCall even from collecting principal on illegal loans. See Plaintiff's Proposed FFCL, ¶¶260-293 (ECF 309-1). But even if such a deduction were warranted, CashCall would still be liable for $134,058,600 in restitution.[5] Such an award would return consumers to their status before borrowing from CashCall.

CashCall's fourth argument misses the point that the Western Sky loans are void and unenforceable. Whether consumers ultimately paid less interest than they were initially charged doesn't matter when CashCall had no right to enforce the loans to begin with.

Finally, CashCall faulted the Bureau for failing to present evidence that consumers could have gotten a better loan elsewhere, or any loan at all. Defendant's Proposed FFCL, ¶288 (ECF 310-1). This argument is contrary to the Ninth Circuit's holding that "whether consumers received the benefit of their bargain is not relevant." 35 F.4th at 751. But it misses a more fundamental point: these consumers were harmed by CashCall's material deception regarding the validity of their loans because they paid interest and fees that they legally did not owe. Id. at 747 ("CashCall led borrowers to believe that they had an obligation to pay, when in fact under their States' laws they did not. That is the

_____

[5] This total can be readily calculated from the records in Trial Ex. 219, but CashCall did not meet its burden to do so. The Bureau offers the calculation for the Court's convenience.

13

PLAINTIFF'S MOTION TO AMEND FINDINGS, CONCLUSIONS, AND JUDGMENT ON REMAND
CASE NO. 15-CV-07522 JFW (RAOx)

1   deceptive act pursued by the Bureau, and it falls within the prohibition of the statute.”).

2   How these borrowers might have been treated by other lenders is beside the point.

3   **C.      The Supreme Court's *Liu* decision does not affect restitution here.**

4   On appeal, CashCall claimed that *Liu v. SEC*, 140 S. Ct. 1936 (2020), required that

5   restitution awards like the one the Bureau seeks be limited to profits. CashCall is wrong.

6   *Liu* held that the SEC was authorized under its statute to obtain disgorgement of profits

7   but that such awards must generally deduct the defendant's legitimate business expenses.

8   Disgorgement of profits, however, is a different remedy from the measure of restitution

9   that the Bureau seeks here, which merely requires CashCall to return to consumers

10  money that they wrongfully took. *See generally* 35 F.4th at 751 (“[T]here are instances in

11  which a defendant does not ultimately reap any profits from his wrongful conduct, and

12  others where even though the defendant obtained some profit, the loss suffered by the

13  victim is greater than the unjust benefit received by the defendant.”).

14  *Liu* itself makes clear that the remedy at issue there was the profits-based measure

15  known as disgorgement. The Supreme Court described the question presented as

16  “whether, and to what extent, the SEC may seek ‘disgorgement.’” 140 S. Ct. at 1940. It

17  thus analyzed the contours of that “profit-based measure of unjust enrichment” under the

18  securities laws. *Id*. at 1943 (quotation marks omitted). In doing so, it emphasized that its

19  subject was the “disgorgement of profits,” “the profits-recovery remedy,” an “accounting

20  for profits,” “profits-based relief,” “the profits remedy,” a “profits-focused remedy,” etc.

21  In clarifying the limits on disgorgement of profits under the securities laws, *Liu* did

22  not say or even hint that it was setting down new rules for other measures of redress,

23  including the measure of restitution that the Bureau seeks here, which is not based on

24  CashCall's profits.[6] That measure, again, has been routinely approved by the Ninth

25  _____

26  [6] This relief could also be considered “refund of moneys,” “payment of damages,” or
    “other monetary relief,” each of which the CFPA authorizes the Bureau to recover, 12

27  U.S.C. § 5565(a).

28                                               14

1  Circuit. *See, e.g.*, *CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016); *FTC v.*

2  *Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009). It has also been approved by the Supreme

3  Court, which upheld a similar award in *Porter v. Warner Holding Co.*, 328 U.S. 395,

4  396-97 (1946), a case cited with approval in *Liu*, *see* 140 S. Ct. at 1943.

5       *Liu* is particularly inapposite to the restitution award the Bureau seeks here

6  because, as discussed above, the Bureau is seeking legal restitution. In assessing the

7  limits on disgorgement in *Liu*, the Court considered what relief was "*typically* available

8  in equity" and consulted "works on equity jurisprudence" to determine what "equitable

9  relief" was available. *Id.* at 1942-43. Those considerations simply do not apply to a

10 request for legal relief. *See CFPB v. Mortg. Law Grp.*, No. 14-cv-513 WMC, 2022 WL

11 3027031, *3 (W.D. Wis. Aug. 1, 2022) (finding *Liu* inapplicable to legal restitution).

**CONCLUSION**

13      For the afore-mentioned reasons, the Court should amend its findings of fact,

14 conclusions of law, and judgment to order CashCall to pay a civil money penalty of

15 $33,276,264, and restitution in the amount of $197,357,689.89.

17 Dated: September 19, 2022                    Respectfully submitted,

19                                              /s/ Owen Martikan
                                                Owen Martikan (CA Bar #177104)
20                                              Christina S. Coll (CA Bar #250712)
                                                Leanne E. Hartmann (CA Bar #264787)
21                                              Consumer Financial Protection Bureau
22                                              1700 G Street, NW
                                                Washington, DC 20552
23                                              Telephone: (415) 844-9790
                                                Facsimile: (415) 844-9788
24

25                                              Attorneys for Plaintiff
26                                              Consumer Financial Protection Bureau