**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | No. 23-55259 |
| *Plaintiff-Appellee*, | D.C. No. 2:15-cv-07522-JFW-RAO |
| v. | |
| CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORPORATION; J. PAUL REDDAM, | OPINION |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted March 20, 2024
San Francisco, California

Filed January 3, 2025

Before: John B. Owens, Ryan D. Nelson, and Eric D.
Miller, Circuit Judges.

Opinion by Judge Miller;
Concurrence by Judge R. Nelson

## SUMMARY[*]

### Seventh Amendment / Restitution Award

The panel affirmed the district court's judgment, on remand from this court, ordering CashCall, Inc. to pay more than $134 million in legal restitution.

The Consumer Financial Protection Bureau brought an action alleging that CashCall had engaged in an "unfair, deceptive, or abusive act or practice" in violation of 12 U.S.C. § 5536(a)(1)(B), by attempting to collect interest and fees to which it was not legally entitled. In this appeal, CashCall primarily contended that the district court's order of legal restitution triggered its Seventh Amendment right to a jury trial.

Assuming without deciding that CashCall had a Seventh Amendment right to a jury trial, the panel concluded that it had waived that right. CashCall made an express, knowing, and voluntary waiver of its right to trial by jury. Although CashCall contended that it waived its jury trial right only in reliance on the Bureau's incorrect characterization of the relief it was seeking as equitable, rather than legal, CashCall was not confused about the substance of that relief, and a party need not demonstrate a correct understanding of the law for its waiver to be effective. After CashCall voluntarily participated in the first bench trial, it did not object to the second bench trial, and even if it had, an objection on remand could not have revived its jury right.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in concluding that the doctrines of judicial estoppel and waiver did not preclude the Bureau from seeking an award of legal restitution. Also, the district court did not overstate CashCall's unjust gains. The district court properly used CashCall's net revenues as a basis for measuring unjust gains. Finally, the panel rejected CashCall's contention that the Bureau's statutory funding mechanism is inconsistent with the Appropriations Clause.

Concurring, Judge R. Nelson agreed that CashCall waived any Seventh Amendment jury trial right on the Bureau's claims for restitution. But even if CashCall had not waived a jury, it still would have not been entitled to one under *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 602 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), which diluted the jury trial right, and which this court should reconsider en banc.

---

**COUNSEL**

Kevin E. Friedl (argued), Senior Counsel; Kristin Bateman, Assistant General Counsel; Steven Y. Bressler, Deputy General Counsel; Seth Frotman, General Counsel; Consumer Financial Protection Bureau, Washington, D.C.; Owen P. Martikan, Assistant United States Attorney; Consumer Financial Protection Bureau, San Francisco, California; for Plaintiff-Appellee.

4                          CFPB v. CASHCALL, INC.

Paul D. Clement (argued), Joseph J. DeMott, and Matthew
D. Rowen, Clement & Murphy PLLC, Alexandria, Virginia;
Reuben C. Cahn and Gregory M. Sergi, Keller Anderle LLP,
Irvine, California; Thomas J. Nolan, Law Office of Thomas
J. Nolan, Pasadena, California; for Defendants-Appellants.

---

## OPINION

MILLER, Circuit Judge:

CashCall, Inc., a consumer lender, returns to us
following our remand to the district court in a prior appeal.
*See CFPB v. CashCall, Inc.* (*CashCall I*), 35 F.4th 734 (9th
Cir. 2022). Last time, we agreed with the Bureau that
CashCall had engaged in an "unfair, deceptive, or abusive
act or practice," in violation of 12 U.S.C. § 5536(a)(1)(B),
by attempting to collect interest and fees to which it was not
legally entitled. 35 F.4th at 743–47. We also held that the
district court's order denying restitution rested on a legal
error, so we vacated and remanded for further proceedings.
*Id.* at 749. On remand, the district court ordered CashCall to
pay more than $134 million in legal restitution.

CashCall appeals again. Its primary contention is that the
district court's order of legal restitution triggered its Seventh
Amendment right to a jury trial. But CashCall waived that
right during the initial district court proceedings, in which it
voluntarily participated in a bench trial. Because CashCall's
other challenges to the district court's order also lack merit,
we affirm.

I

CashCall is a California corporation that makes unsecured, high-interest loans to consumers. *See generally CashCall I*, 35 F.4th at 738–40. In an effort to expand its operations to other States while avoiding state usury laws, it set up a lender incorporated under the laws of the Cheyenne River Sioux Tribe. That lender issued loans whose terms included choice-of-law provisions stating that they would be governed by tribal law. CashCall then purchased the loans and collected payments from consumers.

The Bureau believed that CashCall's attempts to collect payments were illegal because the loans—including the choice-of-law provisions—were invalid under state law, so they did not create legally enforceable obligations. In 2013, the Bureau brought an enforcement action against CashCall, its CEO, and several affiliated companies, alleging that CashCall's lending scheme was an "unfair, deceptive, or abusive act or practice," in violation of 12 U.S.C. § 5536(a)(1)(B). CashCall filed an answer to the complaint, in which it demanded a jury trial.

Thereafter, the district court granted partial summary judgment to the Bureau on liability, and, after the parties filed a joint status report stating that they "agreed to waive their right to a jury," the court conducted a bench trial to determine the appropriate remedy. In addition to a civil penalty, the Bureau sought restitution in the amount of the total interest and fees paid on the void loans. The district court imposed a civil penalty of $10.3 million but declined to order restitution. *CashCall I*, 35 F.4th at 738.

Both sides appealed. CashCall contested the finding of liability, and the Bureau argued that the civil penalty should have been larger and that it was entitled to restitution.

*CashCall I*, 35 F.4th at 738. While the appeal was pending, the Supreme Court decided *Liu v. SEC*, in which it surveyed principles of equity jurisprudence and explained that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains" but "restricted the remedy to an individual wrongdoer's net profits." 591 U.S. 71, 79 (2020). In the wake of *Liu*, CashCall argued that because the Bureau had sought equitable restitution, any award of restitution would have to be limited to its net profits. Despite having previously characterized the restitution it sought as equitable, the Bureau responded by asserting that "in substance the restitution that we . . . sought here was legal restitution, not equitable restitution."

We affirmed the district court's finding of liability but vacated the civil penalty and remanded with instructions for the district court to impose a higher penalty based on a determination that CashCall had acted recklessly. *CashCall I*, 35 F.4th at 749. We also vacated the denial of restitution, holding that the district court had relied on impermissible considerations in denying restitution. We expressly declined to resolve "whether the Bureau has waived a claim to legal restitution or how, if at all, *Liu* might limit equitable restitution." *Id.* at 750. Instead, we left those issues for the district court to consider on remand. *Id.*

On remand, the parties disputed whether the district court could order legal as opposed to equitable restitution. As it had argued in this court, the Bureau insisted that "the nature of the restitutionary remedy that [it] has sought throughout this lawsuit is legal" because it sought only the return of "consumer losses, measured by the interest and fees that CashCall had illegally collected." CashCall replied that, based on what the Bureau said during the initial proceedings, the court could award only equitable restitution, and that an

award in excess of net profits is "beyond a court's equitable powers and necessarily then implicates a defendant's Seventh Amendment rights." But CashCall did not object to a bench trial, nor did it challenge the validity of the jury-trial waiver that it had made during the initial proceedings before the district court.

The district court determined that the Bureau was not precluded from seeking legal restitution, explaining that whether relief "qualifies as legal or equitable depends not on the [Bureau]'s characterization, but rather on the nature of the underlying remedies sought." The district court reasoned that the Bureau "has continuously sought, what by its nature is, legal restitution." And it concluded that "[b]ecause the Supreme Court's decision in *Liu* did not purport to limit the scope of legal restitution," it was unnecessary to "limit the restitution in this case to net profits."

The district court then applied this court's two-step burden-shifting framework to calculate the restitution award. *CashCall I*, 35 F.4th at 751. Under that framework, the Bureau "bears the burden of proving that the amount it seeks in restitution reasonably approximates the defendant's unjust gains." *Id.* (quoting *CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016)). If the Bureau makes such a showing, then "the burden shifts to the defendant to demonstrate that the net revenues figure overstates the defendant's unjust gains." *Id.* (quoting *Gordon*, 819 F.3d at 1195).

At step one, the district court concluded that the Bureau had "met its initial burden." After deducting payments CashCall had already made to consumers in state proceedings, the court concluded that CashCall's unjust gains could reasonably be approximated as $197 million. At step two, however, the district court found that CashCall had

shown that this figure overstated its unjust gains. The amount of restitution, the court explained, "should not include the interest and fees paid by any consumer who paid CashCall less than that consumer received in principal." After making the necessary adjustments, the district court ordered CashCall to pay more than $134 million in restitution. Because "[r]estitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits,'" the court declined to deduct any expenses that CashCall incurred in administering its lending scheme. *CashCall I*, 35 F.4th at 751 (alteration in original) (quoting *Gordon*, 819 F.3d at 1195).

## II

The Seventh Amendment guarantees the right to a jury trial "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. "In construing this language," the Supreme Court has "noted that the right is not limited to the 'common-law forms of action recognized' when the Seventh Amendment was ratified." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Curtis v. Loether*, 415 U.S. 189, 193 (1974)). The right to a jury trial "extends to a particular statutory claim if the claim is 'legal in nature,'" considered in light of "the cause of action and the remedy it provides." *Id.* at 2128–29 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). "[T]he remedy [is] the 'more important' consideration." *Id.* at 2129 (quoting *Tull v. United States*, 481 U.S. 412, 421 (1987)); *see also FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 602 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021).

The parties debate whether this case involves legal remedies that are within the scope of the Seventh Amendment guarantee. Our precedent suggests that the answer is no: In *Commerce Planet*, we stated that "restitution is an equitable remedy for Seventh Amendment purposes, without drawing any distinction between the legal and equitable forms of that relief"—in other words, no form of restitution triggers the right to a jury trial. 815 F.3d at 602. But CashCall argues that *Commerce Planet* does not apply outside of its specific statutory context (the Federal Trade Commission Act) and, in any event, that it has been abrogated by more recent decisions of the Supreme Court, including *Liu*. We need not resolve that debate here. Instead, assuming without deciding that CashCall had a Seventh Amendment right to a jury trial, we conclude that it waived that right.

Like other constitutional rights, the Seventh Amendment right can be waived. *United States v. Moore*, 340 U.S. 616, 621 (1951). To be valid, a waiver "must be made knowingly and voluntarily based on the facts of the case." *Palmer v. Valdez*, 560 F.3d 965, 968 (9th Cir. 2009) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007)).

Here, CashCall made an express, knowing, and voluntary waiver of its right to trial by jury. At the pretrial hearing, the Bureau stated that it intended to "seek restitution of interest and fees." The Bureau explained that such an award would be "an equitable remedy that, unless the Court wanted to give it to an advisory jury, . . . would be the Court's remedy to decide," adding that, based on the Bureau's "discussion with defense counsel," the parties "would be willing to waive [a] jury for any further proceedings." For its part, CashCall stated that it "generally

agree[d] with everything that [the Bureau] has represented
to the Court." The district court said, "I don't know and I
haven't done the research to know whether or not [CashCall
is] entitled to a jury trial," and it requested a joint status
report setting out the parties' position on a jury-trial waiver.
That joint status report stated, in no uncertain terms, that
"[t]he parties have agreed to waive their right to a jury and
proceed with a bench trial to determine the appropriate relief,
should trial be necessary."

Thereafter, in a supplemental brief, the Bureau again
explained the nature of the remedy that it sought: It believed
that "[r]estitution of the full amount lost by
consumers [was] necessary to achieve complete
justice . . . because [CashCall's] deceptive conduct caused
consumers to pay interest and fees on loans that were legally
void." According to the Bureau, that meant that consumers
"are all entitled to restitution based on the total amount of
interest and fees paid." CashCall responded by contesting
the Bureau's calculation methodology, arguing that the
proposed restitution "calculation would create an
impermissible windfall for" borrowers who defaulted or paid
less in interest and fees than they received in loan funds.
Further, CashCall argued that the Bureau was seeking "an
equitable monetary award" that did "not account for the
expenses incurred by CashCall to run" its lending program—
which, in CashCall's view, inappropriately transformed the
proposed remedy into a punitive sanction. *See* 12 U.S.C.
§ 5565(a)(3) (disallowing punitive damages).

At no point before trial did CashCall suggest that it was
entitled to a jury trial or seek to withdraw its waiver. The
case proceeded to a bench trial, in which CashCall
participated without objection.

CashCall does not dispute that it waived its jury trial right but insists that it did so only in reliance on the Bureau's statements that the Bureau was seeking equitable restitution. As subsequent developments in the law have revealed, the Bureau's characterization of the remedy it sought was incorrect.

Restitution may be either legal or equitable, and "whether it is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (alteration in original) (quoting *Reich v. Continental Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994)). In general, "restitution is legal when the plaintiff cannot 'assert title or right to possession of particular property,'" but it "is equitable 'where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.'" *CashCall I*, 35 F.4th at 750 (quoting *Great-West Life*, 534 U.S. at 213).

In *Liu*, which was decided during the pendency of the first appeal in this case, the Supreme Court acknowledged that "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names." 591 U.S. at 79. But, the Court explained, traditional principles of equity do not permit "an equitable remedy in excess of a defendant's net profits from wrongdoing." *Id.* at 85. Although the Court made that statement in the context of disgorgement, we agree with the Seventh Circuit that "*Liu*'s reasoning is not limited to disgorgement; instead, the opinion purports to set forth a rule applicable to all categories of equitable relief, including restitution." *CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 710 (7th Cir. 2021).

*Liu* suggests that the Bureau was incorrect to characterize the restitution it sought as equitable. Instead, because that restitution was not limited to CashCall's net profits and did not seek "to restore to the [consumers] particular funds or property in [CashCall]'s possession," it was more properly characterized as legal. *Great-West Life*, 534 U.S. at 214.

The Bureau's error was perhaps understandable because the Supreme Court had not "previously drawn [a] fine distinction between restitution at law and restitution in equity." *Great-West Life*, 534 U.S. at 214. More importantly, it was a legal error shared by both parties: CashCall told the district court that it "generally agree[d] with everything" the Bureau had said about the remedy it was seeking—including that it would be "an equitable remedy that . . . would be the Court's remedy to decide." And CashCash separately told the district court that it understood the Bureau to be seeking "an equitable monetary award." It made those statements not because it was confused about the *substance* of the relief the Bureau was seeking—restitution in the form of the "total amount of interest and fees paid" by consumers on invalid loans—but because it shared the Bureau's mistaken understanding of the appropriate characterization of that relief. (Of course, it may also have made a strategic judgment that, having been found liable for employing deceptive practices to victimize thousands of consumers, it might fare poorly before a jury.)

CashCall's waiver was valid even if CashCall would not have made it absent the parties' mistaken characterization of the relief the Bureau sought. We have never held that a party's legal error can vitiate its waiver of a jury-trial right, or that a party must demonstrate a correct understanding of the law for its waiver to be effective. Such a rule would be

inconsistent with the settled understanding that a party can waive the right to a jury trial simply by doing nothing: Federal Rule of Civil Procedure 38 provides that a party who wants a jury trial must demand one in writing "no later than 14 days after the last pleading directed to the issue is served," and that "[a] party waives a jury trial unless its demand is properly served and filed." Fed. R. Civ. P. 38. Applying that rule, we have held that "'oversight or inadvertence,'" including "a good faith mistake of law," does not excuse the failure to make a timely jury-trial demand. *Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d 1080, 1086 (9th Cir. 2002) (quoting *Pacific Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd.*, 239 F.3d 1000, 1002 (9th Cir. 2001)). And even after a party complies with Rule 38, its "knowing participation in a bench trial without objection is sufficient to constitute a jury waiver." *Palmer*, 560 F.3d at 968 (quoting *White v. McGinnis*, 903 F.2d 699, 703 (9th Cir. 1990) (en banc)).

CashCall invokes *Connolly v. United States*, in which we held that the defendants were entitled to a new trial after they waived a jury and then, for the first time in closing argument, the government said that it was seeking a statutory penalty. 149 F.2d 666, 668 (9th Cir. 1945). We explained that the defendants "could not waive their right to a jury trial on a law point not in issue." *Id.* at 669. That rule does not help CashCall, which was aware all along of the relief that the Bureau was seeking but simply misunderstood how the Seventh Amendment might apply to it. An effective waiver requires only that a party "knowingly and voluntarily" waive its jury-trial right "based on the *facts* of the case." *Palmer*, 560 F.3d at 968 (emphasis added) (quoting *Tracinda Corp.*, 502 F.3d at 222). CashCall did so here.

After CashCall voluntarily participated in the first bench trial, an objection on remand could not have revived its jury right. *See* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2321, at 334 (4th ed. 2020) ("Once the opportunity to demand a jury trial has been waived, the right is not revived by a reversal on appeal or by the grant of a new trial."). But even on remand—after *Liu* had been decided, after the Bureau reiterated that the relief it sought was the return of "consumer losses, measured by the interest and fees that CashCall had illegally collected," and after the Bureau expressly denied that it "sought equitable relief such as the return of particular funds or property . . . or disgorgement of profits, or an accounting for profits"—CashCall still did not demand a jury trial or otherwise object to participating in the second bench trial. At oral argument in this appeal, when asked about the position it took on remand, CashCall answered that it had demanded a jury trial "in sort of a back-handed way" by arguing that an award in excess of net profits would implicate its Seventh Amendment rights. That argument was both too little and too late to undo CashCall's waiver.

III

CashCall also contends that the doctrines of judicial estoppel and waiver should have precluded the Bureau from seeking an award of legal restitution. According to CashCall, because the Bureau initially said that it wanted an award of equitable restitution, it is estopped from seeking—or has waived any entitlement to—an award of legal restitution. The district court rejected both theories, and we review its decision for abuse of discretion. *See Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 558 (9th Cir. 2016) (judicial estoppel); *Gordon*, 819 F.3d at 1187 (waiver). We see none.

CFPB v. CASHCALL, INC.                    15

Judicial estoppel is an equitable doctrine based on the principle that, once a party takes a certain position, it "may not thereafter . . . assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). The Supreme Court has set out three factors to guide courts in applying the doctrine. First, a "party's later position must be 'clearly inconsistent' with its earlier position." *Id.* at 750 (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)). Second, the court should consider "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" *Id.* (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)). And third, the court should determine "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

None of those factors favors CashCall for the simple reason that the Bureau's position has remained consistent throughout this case. The district court recognized that the Bureau had indeed labeled its preferred remedy as "equitable" throughout the initial proceedings. But it also noted that whether the relief being sought was equitable or legal "depends not on the [Bureau's] characterization, but rather on the nature of the underlying remedies sought." That was correct. The Supreme Court in *Liu* warned against "elevat[ing] form over substance" in distinguishing between legal and equitable remedies. 591 U.S. at 76 n.1 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004)). And

here, the nature of the remedy is—and always has been—
legal restitution: a money judgment to compensate
borrowers for the money that CashCall collected but
borrowers did not owe.

For much the same reason, CashCall's waiver argument
fails as well. The Bureau has consistently asserted its right
to the same remedy. It did not waive the right to seek that
remedy simply because it—like CashCall—attached the
wrong label to that remedy during the initial proceedings
below.

IV

CashCall argues that even if some award of legal
restitution was appropriate, the district court overstated
CashCall's unjust gains. The basis of its argument is that the
district court's award of $134 million does not restore
consumers to the status quo because some consumers who
received loans did not repay all the principal they received
from CashCall. Those unpaid amounts were reflected on
CashCall's ledgers as a loss of $93 million—a loss that
CashCall insists should be deducted from any award of
restitution.

We have stated that restitution awards are reviewed for
abuse of discretion, *see CashCall I*, 35 F.4th at 749, but we
have not specifically addressed the standard for legal
restitution. CashCall argues that such awards are subject to
de novo review. Assuming without deciding that de novo
review applies, we conclude that CashCall's argument fails
nonetheless.

As we have explained, equitable remedies must be
capped at net profits—meaning that "courts must deduct [a
defendant's] legitimate expenses" from any award of

equitable restitution. *Liu*, 591 U.S. at 91; *see also Consumer First*, 6 F.4th at 710. But the same is not true of legal restitution, in which a plaintiff seeks to recover a defendant's unjust gains. *See Great-West Life*, 534 U.S. at 213 (explaining that restitution at law allows a plaintiff to "recover[] money to pay for some benefit the defendant had received from him" (quoting 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 4.2(1), at 571 (2d ed. 1993))). Legal "[r]estitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits.'" *CashCall I*, 35 F.4th at 751 (quoting *Gordon*, 819 F.3d at 1195). That means that a "district court may use a defendant's net revenues as a basis for measuring unjust gains." *Id.* (quoting *Gordon*, 819 F.3d at 1195).

That is exactly what the district court did here. At step one of the two-step burden-shifting framework set out in *Gordon*, it found that the Bureau had met its initial burden of demonstrating "a reasonable approximation of [CashCall's] unjust gains, i.e., net revenues." After deducting amounts CashCall had already paid in state enforcement actions, the district court concluded that the Bureau could request $197 million. The burden then shifted to CashCall to prove that this overstated its unjust gains—a burden that the district court concluded CashCall met. *See CashCall I*, 35 F.4th at 751. The Bureau had argued that the restitution award should include any interest and fees paid by *any* consumer, including those who paid CashCall less than what they received in the form of loan principal. This amount would be in addition to the interest and fees that other consumers paid in excess of the amount of loan principal CashCall disbursed to them. The district court agreed with CashCall's challenge to that approach, noting our statement in the prior appeal: "Restitution . . . serves to

ensure that consumers *are made whole*," not to grant them a windfall. *Id.* at 750 (emphasis added). But the district court also concluded that it did not need to deduct anything else, including CashCall's expenses.

CashCall now argues that this was error. It insists that the district court should have deducted "the initial outlays of loan principal" that CashCall disbursed to consumers but which some consumers never fully repaid—an amount totaling $93 million. But deducting the $93 million in unpaid principal would serve to deduct one of CashCall's expenses, which is necessary only when restitution is awarded in equity, not at law. *See Liu*, 591 U.S. at 91–92. Furthermore, the amount of unjust gains that CashCall received from consumers who paid more than they got in loan proceeds has nothing to do with the success or failure of CashCall's dealings with *other* borrowers. If CashCall had $100 in unjust gains from a transaction with consumer A, it should pay $100 in restitution. It should not get away with paying less just because it lost $50 in a separate transaction with consumer B.

A restitution award "should be measured to reflect the substantive law purpose that calls for restitution in the first place." Restatement (Third) of Restitution and Unjust Enrichment § 49, Comment *a* (2011) (quoting 1 Dobbs § 4.5(1), at 629). Here, one of the purposes of the statute is "to ensure that 'consumers are protected from unfair, deceptive, or abusive acts and practices.'" *CashCall I*, 35 F.4th at 750 (quoting 12 U.S.C. § 5511(b)(2)). The reduction in the award that CashCall seeks would frustrate that purpose by ensuring that borrowers who paid CashCall more than they received are not made whole.

V

Finally, CashCall contends that all the Bureau's actions in this case were unlawful because the Bureau does not receive annual appropriations from Congress but instead is authorized to draw from the Federal Reserve System whatever amount it deems "reasonably necessary to carry out" its duties, a funding scheme that CashCall says violates the Appropriations Clause. 12 U.S.C. § 5497(a)(1); U.S. Const. art. I, § 9, cl. 7. That argument is squarely foreclosed by recent Supreme Court precedent holding that the Bureau's statutory funding mechanism is consistent with the Appropriations Clause. *See CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024).

**AFFIRMED.**

R. NELSON, Circuit Judge, concurring:

I agree that CashCall, Inc. waived any Seventh Amendment right to a jury trial on the Consumer Financial Protection Bureau's claims for restitution. Op. at 9–10. But even if CashCall had not waived a jury, it still would not have been entitled to one under our precedent. In *FTC v. Commerce Planet, Inc.*, we held that claims for restitution, even when understood as actions at law, never trigger the Seventh Amendment's guarantee. 815 F.3d 593, 602 (9th Cir. 2016), *abrogated on other grounds by AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021); *see* U.S. Const. amend. VII ("preserv[ing]" the right to trial by jury "[i]n Suits at common law"). *Commerce Planet* was wrong the day it was decided. And its flaws have become even clearer since. I write separately to explain why *Commerce Planet*

diltes the jury trial right, and why, in the appropriate case,
we should reconsider it en banc.

## I

## A

The civil jury right was not always a given. The original
Constitution, as ratified in 1788, guaranteed a jury only in
criminal cases. *See* U.S. Const. art. III, § 2, cl. 3. Debates
about extending the same right to civil matters colored much
of the ratification period, with the Anti-Federalists insisting
that juries promote "an open and public discussion of all
causes" free from "secret and arbitrary proceedings." *SEC
v. Jarkesy*, 144 S. Ct. 2117, 2144 (2024) (Gorsuch, J.,
concurring) (quoting Letter from a Federal Farmer (Jan. 18,
1788), *in* 2 The Complete Anti-Federalist 320 (H. Storing
ed. 1981)); *see also Parsons v. Bedford*, 28 U.S. (3 Pet.) 433,
446 (1830) ("One of the strongest objections originally taken
against the constitution of the United States, was the want of
an express provision securing the right of trial by jury in civil
cases."). Some Federalists were more skeptical. Despite the
jury's importance in the criminal context, the Federalists
doubted "the essentiality of" a civil jury right, at least as a
matter of federal constitutional law. The Federalist No. 83
(Alexander Hamilton); *see In re U.S. Fin. Sec. Litig.*, 609
F.2d 411, 420 (9th Cir. 1979). That view did not carry the
day for long. By 1791, the Anti-Federalists had prevailed,
and the right to civil trial by jury was enshrined in the
Seventh Amendment as part of the Bill of Rights.

Although the Seventh Amendment "preserve[s]" the
"right of trial by jury" in "[s]uits at common law," it has been
interpreted to extend beyond the "common-law forms of
action recognized" in 1791. *Curtis v. Loether*, 415 U.S. 189,
192–93 (1974) (quoting U.S. Const. amend. VII).    The

Amendment equally applies to statutory actions that are "legal in nature," rather than claims that traditionally arose in equity. *Jarkesy*, 144 S. Ct. at 2128 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). In determining whether a suit is "legal in nature," courts "consider the cause of action and the remedy it provides." *Id.* at 2129; *see Tull v. United States*, 481 U.S. 412, 417–18 (1987). The second factor—the remedy—is "more important." *Jarkesy*, 144 S. Ct. at 2129 (quoting *Tull*, 481 U.S. at 421). Put simply, the Constitution "preserves the right to trial by jury of all legal claims," including those that are statutory. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 170 (9th Cir. 1989). But "no right to a jury exists" for equitable claims. *Id.*

B

The Supreme Court, for much of its history, described restitution as arising in equity. In *Mertens v. Hewitt Associates*, the Court noted that restitution is "a remedy traditionally viewed as 'equitable.'" 508 U.S. 248, 255 (1993). And in *Teamsters v. Terry*, the Court characterized "damages as equitable when they are restitutionary." 494 U.S. 558, 570 (1990); *see also, e.g.*, *Tull*, 481 U.S. at 424 (restitution "traditionally considered an equitable remedy"). Thus, the Supreme Court, until 20 years ago, generally characterized restitution as equitable relief.

Then came *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204 (2002). *Great-West* addressed whether a provision of the Employee Retirement Income Security Act (ERISA) authorizing "appropriate equitable relief" includes claims for restitution. 534 U.S. at 209, 212 (quoting 29 U.S.C. § 1132(a)(3)(B)). The Court explained that while restitution often sounds in equity, that is not

always the case. *Id.* at 212. "In the days of the divided
bench, restitution was available in certain cases at law, and
in certain others in equity." *Id.* (citing 1 D. Dobbs, Law of
Remedies § 1.2, at 11 (2d ed. 1993)). Legal restitution
involved cases in which a plaintiff lacked title over a piece
of property but could "show just grounds for recovering
money to pay for some benefit the defendant had received
from him." *Id.* at 213 (quoting 1 Dobbs § 4.2(1), at 571).
On the other hand, a plaintiff could seek equitable restitution
where money or objects that the plaintiff owned "could
clearly be traced to particular funds or property in the
defendant's possession." *Id.*

The Court clarified that the test for whether restitution
"is legal or equitable" ultimately "depends on the basis for
the plaintiff's claim and the nature of the underlying
remedies sought." *Id.* (quoting *Reich v. Cont'l Cas. Co.*, 33
F.3d 754, 756 (7th Cir. 1994)) (cleaned up). That's the same
test for invoking the Seventh Amendment right. *See, e.g.*,
*Jarkesy*, 144 S. Ct. at 2129 ("To determine whether a suit is
legal in nature, we directed courts to consider the cause of
action and the remedy it provides."). These similarities were
not lost on the Court. Parsing the "law-equity dichotomy,"
it explained, "is an inquiry . . . that we are accustomed to
pursuing, and will always have to pursue, in other contexts,"
including the Seventh Amendment's right to a civil jury.
*Great-W.*, 534 U.S. at 217 (citing *Curtis*, 415 U.S. at 192).
As others have recognized, "neither the correctness nor the
persuasiveness of *Great-West Life*'s description of
restitution at law and in equity turns on the particular context
in which Justice Scalia performed it." *United States v. ERR,
LLC*, 35 F.4th 405, 414 (5th Cir. 2022); *see also Liu v. SEC*,
591 U.S. 71, 81 (2020) (invoking the Supreme Court's
"'transsubstantive guidance on broad and fundamental'

equitable principles" (quoting *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 217 (2020))). So while *Great-West* happened to involve ERISA, its discussion of legal and equitable restitution illustrates the scope of the Seventh Amendment right. After all, claims for legal restitution are, in their nature, suits "at common law." So they guarantee a jury trial. Claims for equitable restitution trigger no such guarantee.

II

We decided *Commerce Planet* against this backdrop. You wouldn't know it though, considering how little weight our decision gave to *Great-West*. Rather than grapple with the difference between legal and equitable restitution, as the Supreme Court did, *Commerce Planet* asserted that the Court has labeled *all* restitution as equitable relief that necessarily falls outside the Seventh Amendment's scope. 815 F.3d at 602. Thus, the restitution remedy—in any form—"confers no right to a jury trial." *Id.* That could not be further from the truth.

A

First, *Commerce Planet* anchored its holding not in the *Great-West* majority opinion, but in Justice Ginsburg's dissent. According to the panel, the Supreme Court "has consistently stated that restitution is an equitable remedy *for Seventh Amendment purposes*, without drawing any distinction between the legal and equitable forms of that relief." *Id.* (citing *Great-W.*, 534 U.S. at 229 (Ginsburg, J., dissenting)) (emphasis added). Only part of that statement is correct. Granted, Justice Ginsburg recognized, like the *Great-West* majority, that the Supreme Court historically "described restitutionary relief as 'equitable' without even mentioning, much less dwelling upon, the ancient

classifications" between the remedy's legal and equitable
forms. *Great-W.*, 534 U.S. at 229 (Ginsburg, J., dissenting);
*see id.* at 214–15 (maj. op.) ("Admittedly, our cases have not
previously drawn this fine distinction between restitution at
law and restitution in equity . . . ."). But Justice Ginsburg
then acknowledged that the majority's test for distinguishing
between legal and equitable restitution is also used "in the
context of the Seventh Amendment." *Id.* at 232
(Ginsburg, J., dissenting). She even cited the majority's
invocation of the Seventh Amendment as an example of the
legal-equitable dichotomy at work. *Id.* (citing 534 U.S. at
217). With *Great-West* holding that there's a difference
between legal and equitable restitution, and Justice Ginsburg
conceding that the majority's test for teasing out that
difference coincides with the Seventh Amendment analysis,
not even the *Great-West* dissent supports *Commerce Planet*.

*Commerce Planet* also relied on the Supreme Court's
decision in *Teamsters*. There, the Court noted that "we have
characterized damages as equitable where they are
restitutionary." 494 U.S. at 570. That sentence, according
to *Commerce Planet*, "strongly suggests" that restitution "is
considered equitable under the Seventh Amendment even if
imposed as a merely personal liability upon the defendant."
815 F.3d at 602. Whatever the meaning of the line from
*Teamsters*, it's hardly a definitive statement about how to
understand a constitutional right. And in any event, it was
expressly disclaimed in—wait for it—*Great-West*. As the
majority explained, "[W]hile we noted" in *Teamsters* that
"'we have characterized damages as equitable where they
are restitutionary,' we did not (and could not) say that *all*
forms of restitution are equitable." *Great-W.*, 534 U.S. at
218 n.4 (quoting *Teamsters*, 494 U.S. at 570). *Commerce
Planet* simply ignores that language.

To sum up: *Commerce Planet* bucks the Supreme Court's decision in *Great-West*. And its reliance on *Teamsters* is also misplaced. We practically conceded as much; the panel wrote that the Supreme Court's prior precedent on restitution and the Seventh Amendment "may need to be reconsidered in light of *Great-West*'s holding." *Com. Planet*, 815 F.3d at 602. Although the panel viewed "that as a matter the Supreme Court must resolve," *id.*, it's hard to see how the *Great-West* majority could have been clearer: "[N]ot all relief falling under the rubric of restitution is available in equity," 534 U.S. at 212; *see id.* at 217 (analogizing to the Seventh Amendment analysis). Yes, earlier cases suggested that restitution is an exclusively equitable remedy. *See, e.g.*, *id.* at 214–16. But our job is to ensure that our law tracks *current* Supreme Court precedent.[1] *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). And when the Court makes a clear statement distinguishing its prior cases—as it did in

---

[1] That is not to say we can treat Supreme Court precedent as "implicitly overruled." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation omitted). "As a circuit court, even if recent Supreme Court jurisprudence has perhaps called into question the continuing viability of its precedent, we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court." *Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011) (en banc) (cleaned up). That rule does not apply here. *Great-West* was clear that existing precedent only told part of the story when it comes to legal versus equitable restitution. 534 U.S. at 214–15 ("[O]ur cases have not previously drawn this fine distinction between restitution at law and restitution in equity, *but neither have they involved an issue to which the distinction was relevant*." (emphasis added)). So *Great-West* did not overrule or cabin those cases, implicitly or otherwise. *See id.* at 215 ("*Mertens* did not purport to change the well-settled principle that restitution is 'not an *exclusively* equitable remedy' . . . .") (quoting *Reich*, 33 F.3d at 756)). It merely developed another nuance that the Court had not considered.

*Great-West*—we cannot bury our head in the sand until the Justices have been even clearer.

### B

Recent cases highlight *Commerce Planet*'s flaws. In *Liu*, the Supreme Court performed the "familiar" task of distinguishing equitable remedies, concluding that traditional equity courts could not award relief that exceeded "a defendant's net profits from wrongdoing." 591 U.S. at 78, 85. And as we hold today, *Liu*'s reasoning applies "to all categories of equitable relief, including restitution." Op. at 11 (quoting *CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 710 (7th Cir. 2021)). It follows from *Liu* that when claims for restitution exceed net profits, that restitution is "more properly characterized as legal." Op. at 12. Yet *Commerce Planet* treats legal and equitable restitution the same under the Seventh Amendment, declining to address the distinction that the Supreme Court reaffirmed in *Liu*. 815 F.3d at 602.

The Supreme Court's recent decision in *Jarkesy* is even more instructive. The issue in *Jarkesy* was whether the Seventh Amendment is implicated when the Securities and Exchange Commission seeks civil penalties against a defendant in an in-house adjudication. 144 S. Ct. at 2127. Answering yes, the Court found that the remedy in that case (civil penalties) was "all but dispositive." *Id.* at 2129. By seeking a "prototypical common law remedy," the Court reasoned, the SEC triggered the civil jury right. *Id.* at 2129–30; *see Tull*, 481 U.S. at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). Legal restitution, like a civil penalty, is a "prototypical common law remedy." As the Court explained in *Great-West*, the right to legal restitution "derived from the

common-law writ of assumpsit." 534 U.S. at 213 (citing 1 Dobbs § 4.2(1), at 571). Putting all this together, if *Jarkesy* counsels that a request for common law remedies "effectively decides" the Seventh Amendment question, and if *Great-West* says that legal (not equitable) restitution is a common law remedy, then *Commerce Planet*'s Seventh Amendment holding cannot stand. *See Jarkesy*, 144 S. Ct. at 2130.

C

Finally, *Commerce Planet* puts us at odds with the Fifth Circuit, which interprets *Great-West* to require a jury trial on statutory claims for legal restitution. In *ERR*, the Fifth Circuit addressed whether the Seventh Amendment guarantees a jury trial on the government's claims for removal costs under the Oil Pollution Act. 35 F.4th at 407. Pointing to *Great-West*'s distinction between legal and equitable restitution, the court held that oil removal costs "are most analogous to restitution at law." *Id.* at 412–13 (emphasis removed). The court expressly rejected the argument—so central to *Commerce Planet*—that "restitution *always* sounds in equity." *Id.* at 416 (citing *Hatco Corp. v. W.R. Grace & Co. Conn.*, 59 F.3d 400, 412 (3d Cir. 1995)). "Whatever the truth of that premise" before 2002, the court explained, "it has been squarely foreclosed by subsequent Supreme Court precedent." *Id.* (citing *Great-W.*, 534 U.S. at 212, 215); *see id.* at 414 ("[W]e're obligated to follow *Great-West Life*.").

The Fifth Circuit concluded that *Great-West* thus compelled a jury trial on the government's claims, given that the Supreme Court conducted "the exact same inquiry [its] precedent requires for the Seventh Amendment." *Id.* at 414; *see also Pereira v. Farace*, 413 F.3d 330, 340 (2d Cir. 2005)

("Like our sister circuits, we are compelled to read *Great-West* as broadly as it is written."). The Fifth Circuit got it right.

### III

The Seventh Amendment right is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right" must "be scrutinized with the utmost care." *Jarkesy*, 144 S. Ct. at 2128 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)). *Commerce Planet* did not scrutinize the Seventh Amendment carefully. And the Supreme Court has whittled away at *Commerce Planet*. *See AMG Cap. Mgmt*., 593 U.S. at 71, 75 (abrogating *Commerce Planet*'s holding regarding restitution awards as "ancillary relief"); *see also FTC v. AMG Cap. Mgmt., LLC*, 910 F.3d 417, 437 (9th Cir. 2018) (O'Scannlain, J., specially concurring) ("Our decision in *Commerce Planet* is therefore a relic of that *ancien regime* that the Court over the last few decades has expressly and repeatedly repudiated."), *rev'd*, 593 U.S. 67 (2021). It's time to put the final nail in the coffin.

This is not the case for that final nail since CashCall waived a jury trial. *See* Op. at 9–10. But in the right case, the en banc court should get rid of *Commerce Planet* root and branch. In the meantime, future three-judge panels should not extend its defective reasoning.