Reuben Camper Cahn, S.B.N. 255158
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701
Email: rcahn@bklwlaw.com

*Attorneys for Defendants*
CashCall, Inc. and J. Paul Reddam

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> v. <br><br> CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORPORATION; and J. PAUL REDDAM, <br><br> Defendants. | Case No. 2:15-cv-07522-JFW (RAOx) <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE POST-REMAND JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(5) AND, IN THE ALTERNATIVE, RULE 60(b)(6); AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> *Filed concurrently with the Declarations of R. Cahn, D. Baren, and D. Scharf; and [Proposed] Order* <br><br> Assigned to Hon. John F. Walter <br><br> <u>Hearing Information:</u> <br> Date: September 14, 2026 <br> Time: 1:30 p.m. <br> Dept: 7A |

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF
FROM THE POST-REMAND JUDGMENT

**TO THE COURT, ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on September 14, 2026, at 1:30 p.m., or as soon thereafter as may be heard before the Honorable John F. Walter in Courtroom 7A of the above captioned court, located at 350 West First Street, Los Angeles, California 90012, Defendants CashCall Inc. and J. Paul Reddam, (collectively, "CashCall" or "Defendants") will and hereby do respectfully move under Federal Rule of Civil Procedure 60(b)(5) and, in the alternative, Rule 60(b)(6), for relief from the post-remand judgment entered against them on the Bureau's amended remedies on February 2, 2023.

This Motion is made pursuant to Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6), and is based on this Notice; the accompanying memorandum of points and authorities; the concurrently filed declarations of counsel and exhibits; all pleadings and records on file; and upon such other oral and/or documentary evidence as may be presented at the time of the hearing and any other matter which the Court chooses to consider in ruling on the motion.

This Motion is made after the conference of counsel under L.R. 7-3.

Respectfully submitted,

Dated:  July 8, 2026

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**

By: _____
Reuben Camper Cahn

*Attorneys for Defendants*
*CashCall, Inc. and J. Paul Reddam*

Case No. 2:15-cv-07522-JFW (RAOx)

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF
FROM THE POST-REMAND JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................1

    A.    The Original Judgment and Its Satisfaction. ....................................3

    B.    The Bureau Appealed, Reversed Its Remedial Theory, and Obtained the Post-Remand Judgment. .................................................4

    C.    Intervening Authority and the Bureau's Repudiation of the Enforcement Theory at Issue. ............................................................5

    D.    The Initiated and Then Abandoned Consent-Decree Negotiations. .............7

LEGAL STANDARD ......................................................................................................9

    A.    Rule 60(b)(5) ........................................................................................9

    B.    Rule 60(b)(6) ......................................................................................10

ARGUMENT ................................................................................................................11

I.    RULE 60(b)(5) AUTHORIZES RELIEF ON EACH OF THREE INDEPENDENT GROUNDS. .................................................................11

    A.    The Bureau's Original Judgment Has Been Satisfied, and the Post-Remand Judgment Is "Based On" a Judgment That Was Vacated. ..............11

    B.    Continued Prospective Enforcement of the Post-Remand Judgment Is "No Longer Equitable." ....................................................12

        1.    Intervening Change in Controlling Law. ..........................................14

        2.    The Bureau Has Formally Repudiated the Enforcement Theory That Produced This Judgment. ........................................16

        3.    The Parties Negotiated and Reached a Settlement Framework Aligned with the Bureau's Stated Priorities, and the Bureau Then Abandoned It, Creating Grounds for Equitable Estoppel. ........20

II.    IN THE ALTERNATIVE, RULE 60(b)(6) PROVIDES INDEPENDENT GROUNDS FOR VACATUR. ..............................................22

    Case No. 2:15-cv-07522-JFW (RAOx)

TABLES OF CONTENTS AND AUTHORITIES

A.    The Phelps/Henson Factors Favor Relief.....................................................23

B.    The Bureau's Mid-Litigation Reversal on Remedial Theory and Abandonment of Settlement Negotiations Independently Constitute "Extraordinary Circumstances."................................................................24

C.    The Equities Favor Relief. ...........................................................................25

CONCLUSION ...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton*,

521 U.S. 203 (1997)..................................................................................................10, 13

*Bellevue Manor Assocs. v. United States*,

165 F.3d 1249 (9th Cir. 1999) .................................................................................20, 22

*Buck v. Davis*,

580 U.S. 100 (2017)..................................................................................................11, 23

*Carroll v. Trump*,

175 F.4th 100,114 fn. 26 (2nd Cir. 2026)......................................................................16

*CFPB v. CashCall, Inc.*, 124 F.4th 1209

(9th Cir. Jan. 3, 2025) ........................................................................................ *Passim*

*CFPB v. CashCall, Inc.*,

35 F.4th 734 (9th Cir. 2022) ................................................................................5, 8, 12

*CFPB v. CashCall, Inc.*,

2018 WL 485963 (C.D. Cal. Jan. 19, 2018)...................................................... *Passim*

*CFPB v. CashCall, Inc.*,

2016 WL 482063 (C.D. Cal. Aug. 31, 2016) ...............................................................4, 9

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

467 U.S. 837 (1984)............................................................................................................6

*Collins v. Yellen*,

594 U.S. 220 (2021)............................................................................................................15

*Community Financial Services Ass'n of Am., Ltd.*,

601 U.S. 416 (2024)..................................................................................................1, 6, 15

*Compton v. Alton S.S. Co.*,

608 F.2d 96 (4th Cir. 1979) .............................................................................................11

*Curtis Pub. Co. v. Butts*,

    388 U.S. 130 (1967)...................................................................................16

*FTC v. Hewitt*,

    68 F.4th 461 (9th Cir. 2023) ..............................................10, 14, 23, 24

*Gonzalez v. Crosby*,

    545 U.S. 524 (2005)...................................................................................11

*Henson v. Fidelity National Financial, Inc.*,

    943 F.3d 434 (9th Cir. 2019) .......................................................... *Passim*

*Horne v. Flores*,

    557 U.S. 433 (2009)......................................................................... *Passim*

*In re Pacific Far East Lines, Inc.*,

    889 F.2d 242 (9th Cir. 1989) .................................................................21

*Jeff D. v. Kempthorne*,

    365 F.3d 844 (9th Cir. 2004) ..................................................10, 13, 17

*Johnson v. Zerbst*,

    304 U.S. 458 (1938)..................................................................................16

*Klapprott v. United States*,

    335 U.S. 601 (1949).............................................................................11, 26

*Liljeberg v. Health Services Acquisition Corp.*,

    486 U.S. 847 (1988)........................................................................11, 12, 23

*Loper Bright Enterprises v. Raimondo*,

    603 U.S. 369 (2024).............................................................................1, 6, 15

*Oklahoma Press Pub. Co. v. Walling*,

    327 U.S. 186 (1946).....................................................................................9

*Phelps v. Alameida*,

    569 F.3d 1120 (9th Cir. 2009) ........................................................ *Passim*

*Rufo v. Inmates of Suffolk County Jail*,

    502 U.S. 367 (1992)..................................................................10, 13, 17

TABLES OF CONTENTS AND AUTHORITIES

*SEC v. Jarkesy*,
    603 U.S. 109 (2024)......................................................................................1, 6, 16

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)......................................................................................1, 6, 15

*Stokes v. Williams*,
    475 F.3d 732 (6th Cir. 2007) ...................................................................................3

*Twelve John Does v. D.C.*,
    841 F.2d 1133 (D.C. Cir. 1988)..............................................................................14

*United States v. Asarco Inc.*,
    430 F.3d 972 (9th Cir. 2005) .................................................................................10

*United States v. Baus*,
    834 F.2d 1114 (1st Cir. 1987).....................................................................12, 23, 25

*United States v. Olano*,
    507 U.S. 725 (1993).................................................................................................16

*United States v. Sparks*,
    685 F.2d 1128 (9th Cir. 1982) ...............................................................................11

**Statutes**

12 U.S.C. § 5517(o) .......................................................................................................7, 18

12 U.S.C. § 5536(a)(1)(B) ..................................................................................................15

12 U.S.C. § 5563(b)(3)........................................................................................................19

12 U.S.C. § 5565(c)(2)(A) ....................................................................................................4

Cal. Penal Code § 532..........................................................................................................9

**Rules**

Federal Rule of Civil Procedure 60(b)...........................................................................*Passim*

## **INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6), Defendants CashCall, Inc., WS Funding, LLC, Delbert Services Corporation, and J. Paul Reddam (collectively, "CashCall" or "Defendants") respectfully move for relief from the February 2, 2023, post-remand judgment entered against them on the Consumer Financial Protection Bureau's (the "Bureau" or the "CFPB") amended remedies request. The motion is grounded in four interlocking developments: (i) Defendants' satisfaction of the original $10,283,886 judgment entered by this Court, *see CFPB v. CashCall, Inc.*, 2018 WL 485963 (C.D. Cal. Jan. 19, 2018); (ii) the Bureau's post-trial about-face to seek legal not equitable restitution; (iii) a series of intervening Supreme Court decisions—*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); *SEC v. Jarkesy*, 603 U.S. 109 (2024); *CFPB v. Community Financial Services Ass'n of Am., Ltd.*, 601 U.S. 416 (2024); and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)—that have materially altered the doctrinal foundation on which the Bureau's liability and remedial theories were constructed; and (iv) the Bureau's own substantive engagement, across nearly a year of discussions, culminating in the Bureau's acceptance of a settlement framework which it then abandoned in bad faith.  The Bureau's willingness to settle in exchange for a Bureau-supervised redress process is itself a meaningful concession such that continued prospective enforcement of the Judgment as entered is no longer equitable.

Compounding those developments, the Bureau has publicly and formally repudiated the enforcement posture that produced this case. On April 16, 2025, the Bureau's Chief Legal Officer Mark R. Paoletta issued a memorandum (the "Paoletta Memorandum") *rescinding* all prior enforcement and supervision priority documents and announcing that the Bureau will (i) "respect Federalism" and avoid duplicating state enforcement, (ii) decline to "pursue supervision under novel legal theories," (iii) "shift resources away from" nonbank enforcement and toward redress of "tangible harm" by returning money to consumers rather than imposing penalties, and (iv) decline to engage in "price controls." Mem. from Mark R. Paoletta, Chief Legal Officer, CFPB, *2025 Supervision and*

1

MEMORANDUM OF POINTS AND AUTHORITIES

*Enforcement Priorities* (Apr. 16, 2025). Consistent with that revised posture, the Bureau has, since January 2025, voluntarily dismissed enforcement actions or vacated settlements against SoLo Funds, Navy Federal Credit Union, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, and Reliant Holdings. In several of those matters, the Bureau also *returned money to defendants* that earlier leadership had collected. In short, the Bureau has expressly disclaimed the type of action it brought and obtained judgment on here.

Against that backdrop, Defendants and the Bureau entered into resolution discussions beginning in December 2025 directed at a consent disposition under which (a) the Bureau would retain the $10.3 million penalty already paid, (b) the parties would notify the court that they had settled the case, and (c) any consumer relief would be administered through a Bureau-supervised redress process. For instance, on March 5, 2026, Victoria Dorfman, a detailee from the Office of Management and Budget to the Bureau, expressed not only interest in hearing about a settlement proposal but "engag[ing] on the substance of all terms." Scharf Decl. ¶ 6 & Ex. A. By April 1, 2026, the Bureau was actively discussing terms of a settlement. See Scharf Decl. ¶ 7 & Ex. B (stating "we nonetheless offered several accommodations: [ ] Giving the remainder of redress that does not go to consumers back to CashCall, instead of the Treasury [ ] Waiving court-ordered prejudgment interest, which should result in $24M savings to CashCall [ ] Reducing the amount of the civil penalty from $33M by $10M[ ] All these are very substantial savings and concessions to CashCall."). There was extensive back-and-forth between CashCall's counsel and the CFPB. This included multiple in-person meetings in Washington, D.C., e.g., CashCall's counsel arranging to meet with Mr. Paoletta and Ms. Dorfman on February 23, 2026 and additional dates. *See* Ex.'s A & D.

Those discussions culminated in an agreement reflecting agreement to resolve the case in a manner consistent with the policy edicts of the Paoletta Memo, including Defendants' acceptance of the Bureau's demand that the claims commission be administered by a third party of the Bureau's choosing. The discussions were not

Case No. 2:15-cv-07522-JFW (RAOx)
MEMORANDUM OF POINTS AND AUTHORITIES

preliminary or informal; they were advanced through written submissions and meetings with senior Bureau personnel beginning in February 2026. The agreed-upon resolution was consistent with the express terms of the Paoletta Memo but was abruptly abandoned by the Bureau, notwithstanding the parties' agreement in principle, on May 1, 2026. Scharf Decl. ¶ 10 & Ex. C. The Bureau has since maintained an enforcement posture against CashCall that is inconsistent with its position in every materially comparable matter resolved during the same period, acting in disregard of the Paoletta Memo.

The combined effect of those developments—the satisfied original judgment, the Bureau's mid-stream pivot on remedial theory, the supervening Supreme Court authority, the Bureau's own formal repudiation of its prior enforcement priorities, the parallel disposition of comparable actions, and the unexplained abandonment of a settlement—presents the changed legal and factual landscape that Rule 60(b)(5)'s "no longer equitable" clause was designed to address and, in the alternative, the kind of extraordinary circumstances Rule 60(b)(6) reserves for the rare case in which finality must yield to "the incessant command of the court's conscience that justice be done." *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009) (quoting *Stokes v. Williams*, 475 F.3d 732, 736 (6th Cir. 2007)). The Court should grant the motion, vacate the post-remand judgment, and set the matter for a status conference to consider any remaining live issues following vacatur.

## BACKGROUND

### A.    The Original Judgment and Its Satisfaction.

On August 31, 2016, this Court granted summary judgment to the Bureau on liability under the Consumer Financial Protection Act ("CFPA"). *CFPB v. CashCall, Inc.*, No. 2:15-7522-JFW (RAOx), 2016 WL 4820635, at *10 (C.D. Cal. Aug. 31, 2016). Following a bench trial on remedies, the Court rejected each of the Bureau's requests for enhanced penalties and equitable restitution, and on January 19, 2018, awarded the Bureau a Tier I civil penalty of $10,283,886—the floor authorized by 12 U.S.C. § 5565(c)(2)(A) for non-reckless conduct. *CFPB v. CashCall, Inc.*, 2018 WL 485963, at *11–12 (C.D. Cal. Jan. 19, 2018). The Court expressly found that Defendants "did not knowingly violate the CFPA,"

MEMORANDUM OF POINTS AND AUTHORITIES

that the evidence "failed to demonstrate that Defendants knew at the time they decided to implement the Western Sky Loan Program that the structure of the program would subject them to liability," that Defendants relied on the advice of "highly regarded regulatory counsel," and that the borrowers "received the benefit of their bargain." *Id.* at *3–8. Restitution was denied on those findings. *Id.* at *9–10. In doing so, the Court expressly rejected the Bureau's core remedial theory that the borrowers were owed restitution. It held that the Bureau "did not carry its burden of proving that restitution is appropriate," finding that the consumers "received the benefit of their bargain—i.e., the loan proceeds," that Defendants "plainly and clearly disclosed the material terms of the loans," and that there was no "fraud," "trickery or deception" in the origination of the loans. *Id.* at *7–10. Any restitution award would therefore have conferred a windfall on borrowers who had suffered no cognizable loss.

Defendants paid the $10,283,886 judgment to the Bureau in March 2018. The judgment was satisfied and discharged within the meaning of Rule 60(b)(5).

**B.    The Bureau Appealed, Reversed Its Remedial Theory, and Obtained the Post-Remand Judgment.**

Notwithstanding satisfaction of the judgment, the Bureau appealed. Having paid the judgment in March 2018 in the expectation that the matter was at an end, Defendants filed their protective cross-appeal only in April 2018, after and in direct response to the Bureau's notice of appeal; absent the Bureau's decision to reopen a judgment it had already collected upon, Defendants would not have sought further review. On May 23, 2022, the Ninth Circuit affirmed liability but vacated the Tier I civil penalty determination and the denial of restitution, remanding for reconsideration. *CFPB v. CashCall, Inc.* ("*CashCall I*"), 35 F.4th 734 (9th Cir. 2022).

Critical to the present motion: at the trial level, the Bureau had affirmatively represented that the restitution it sought was *equitable* in nature and justiciable only by bench trial. The parties so stipulated, and the District Court conducted the remedies phase as a bench proceeding on that shared understanding. On appeal, the Bureau changed its

MEMORANDUM OF POINTS AND AUTHORITIES

position, directly contradicting its representations to this Court, asserting for the first time that the restitution it sought was *legal* in nature—a category of relief that would have triggered a Seventh Amendment jury-trial right and a fundamentally different procedural posture. The Bureau *conceded* that it "did not make this argument below," *see CashCall I*, 35 F.4th at 758 & n.18, but pressed it on appeal and obtained reversal on that very basis.

On remand, this Court awarded the Bureau approximately $23 million in additional penalties and $134 million in legal restitution, see *CFPB v. CashCall, Inc.*, No. 2:15-cv-07522 (C.D. Cal. Feb. 2, 2023) (the "Post-Remand Judgment"), and the Ninth Circuit affirmed in *CFPB v. CashCall, Inc.* ("*CashCall II*"), 124 F.4th 1209 (9th Cir. Jan. 3, 2025), opinion amended and superseded on denial of reh'g, 135 F.4th 683 (9th Cir. April 24, 2025), cert. denied *sub nom*. *CashCall, Inc. v. CFPB*, 224 L. Ed. 2d 160 (Mar. 2, 2026).

On appeal, the Ninth Circuit enforced the jury-trial waiver Defendants made in reliance on the Bureau's representation that it sought only equitable relief. *CashCall II*. To appeal that judgment, Defendants were required to post a supersedeas bond in excess of $175 million, supported in large part by Mr. Reddam's assets and personal residences. A bond which has remained in place until today. Scharf Decl. ¶ 2.

**C.      Intervening Authority and the Bureau's Repudiation of the Enforcement Theory at Issue.**

Between the entry of the Post-Remand Judgment and the present motion, the Supreme Court has issued four decisions that bear directly on the doctrinal foundation of the judgment:

First, *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), struck the for-cause removal provision in the Bureau's organic statute and characterized the Bureau as wielding "significant administrative and enforcement authority, including the power to seek daunting monetary penalties against private parties in federal court," *id.* at 199. Second, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and required courts to exercise independent judgment in interpreting statutes that agencies administer. Third, *SEC v.*

MEMORANDUM OF POINTS AND AUTHORITIES

*Jarkesy*, 603 U.S. 109 (2024), held that the Seventh Amendment entitles a defendant to a jury trial when a federal agency seeks civil penalties for fraud, and clarified that when an agency seeks *legal* monetary relief, the action is one to which "the Seventh Amendment extends . . . if the claim is 'legal in nature,'" *Id.* at 122. And fourth, *CFPB v. Community Financial Services Ass'n of Am., Ltd.*, 601 U.S. 416 (2024), addressed the constitutionality of the Bureau and again confirmed the Bureau's status as an enforcement, rather than insulated rulemaking, agency.

Collectively, these decisions undermine the agency-favorable interpretive presumptions that encouraged deference to the Bureau's "CashCall theory" which bootstrapped state-law violations into federal Unfair and Deceptive Acts or Practices ("UDAAP") liability and undermine the Ninth Circuit's view of the validity of CashCall's waiver of the right to a jury trial.

On April 16, 2025, the Bureau formally repudiated the enforcement priorities that produced this case. The Paoletta Memorandum expressly rescinds "all prior enforcement and supervision priority documents," redirects the Bureau away from nonbank enforcement and toward direct consumer redress. It disclaims "price controls," reliance on "novel legal theories," and duplication of state enforcement. In the months that followed, the Bureau voluntarily dismissed enforcement actions or unwound settlements against, among others, SoLo Funds, Navy Federal Credit Union, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, and Reliant Holdings—and, in certain instances, returned funds previously collected. The conduct alleged against Defendants in this matter sits squarely within each of the categories the Bureau has now disclaimed: it is a nonbank action, premised on a self-described "novel legal theory," brought to police state-law usury and licensing limits the Bureau is statutorily forbidden from imposing directly, *see* 12 U.S.C. § 5517(o), and parallel to enforcement actions filed by sixteen sovereign states.

**D.      The Initiated and Then Abandoned Consent-Decree Negotiations.**

Beginning on July 23, 2025, Defendants engaged with senior Bureau personnel, including counsel and advisors to the Acting Director, regarding a consensual disposition

MEMORANDUM OF POINTS AND AUTHORITIES

of this matter consistent with the Paoletta Memo and with the Bureau's contemporaneous treatment of comparable defendants. The parties exchanged written submissions, including a July 25, 2025 letter from Defendants' General Counsel transmitting a proposed framework under which the Bureau would retain the $10.3 million already paid and the parties would jointly seek vacatur of the Post-Remand Judgment under Rule 60(b). (See Declaration of Dan Baren ("Baren Decl.") ¶ 8, Ex. B.)

On December 11, 2025, when Defendants' representatives met with the Bureau's Chief Legal Officer, Mark Paoletta, and his deputy, Victoria Dorfman, Paoletta told Defendants' counsel that he "never would have brought this case," and encouraged submission of a formal proposal. (Baren Decl. ¶ 11.) On December 12, 2025, CashCall's attorney submitted a proposal to resolve the enforcement matter by having CashCall create a $20.3 million fund (inclusive of the $10.3 million already paid to the Bureau) to pay potential victims. The Bureau responded the next day, indicating it would review the proposal and respond to CashCall. Over the ensuing months, the parties negotiated, and the Bureau provisionally accepted a settlement framework. Ms. Dorfman confirmed in emails that high-level settlement terms had been agreed upon and that the Bureau was moving through the approval process for the settlement. The Bureau then unexpectedly became unresponsive. (See Declaration of Y. David Scharf ("Scharf Decl.") ¶¶ 3-7 & Ex. A, B, & C.)

On May 1, 2026—the last business day before the date on which the Bureau would have been positioned to move against the collateral securing Defendants' supersedeas bond—Mr. Paoletta informed Defendants' counsel by electronic mail that the Bureau would not proceed with the agreed-upon vacatur and intended instead to commence collection on the Post-Remand Judgment. Mr. Paoletta's response to CashCall's counsel, *see* Scharf Decl. ¶ 9 & Ex. D, is replete with misrepresentations. First, Paoletta's response states that CashCall was "repeatedly warned" by its lawyers that "the loans it was making were void under the laws of more than a dozen states." Paoletta cites the Ninth Circuit's *CashCall I* opinion at page 748. Yet his construal of the Ninth Circuit's opinion is as sloppy as it is

MEMORANDUM OF POINTS AND AUTHORITIES

wrong. CashCall's lawyers never "warned" CashCall that its loans "were void under the laws of more than a dozen states[.]" Ex. C. Further, that is not what the Court stated or implied. What the Court said was "[c]ounsel had told CashCall that its plan faced 'significant' risk, and one expert advised that the plan 'should work but likely won't' because the 'lower courts will shun our model and ... if we reach the Supreme Court, ... we will lose.'" *CashCall I*, 35 F.4th 734, 748. Counsel advised on CashCall's risk; they never expressed the opinion that CashCall's practices were illegal. In fact, the Ninth Circuit stated that "CashCall had 'secured multiple formal and informal opinions' from legal counsel stating, 'that the structure of the Western Sky Loan Program was viable.'" *Id*. "Viable" is the opposite of "void". Only upon *CashCall I*'s choice-of-law finding did CashCall have notice that its loans were unenforceable. *CashCall I*, 2016 WL 4820635, *supra* at *5-9 (determining tribal law ineffective, applying subject states' law, and determining loans were void).

Second, Mr. Paoletta states that CashCall "demanded payment from consumers under the (false) pretense that the consumers had a valid obligation to pay." This is a gross implication, namely that CashCall committed the crime of false pretenses. Cal. Penal Code § 532. Put aside the fact that CashCall obviously lacked the *mens rea* given the Ninth Circuit's finding that it acted recklessly after 2013 (and not before then)—not with "knowing[ ] or designed[ ]" conduct, *id*.—the fact that the soon-to-be-head of the CFPB, *see e.g.*, A.J.S. Dhaliwal et al., *CFPB Positions Mark Paoletta to Succeed Russell Vought,* NAT'L L. REV., (June 4, 2026),https://natlawreview.com/article/cfpb-positions-mark-paoletta-succeed-russel-vought?amp  would imply that an enforcement target engaged in criminal acts is repugnant conduct by a lawyer and arbitrary and abusive conduct by a federal agency. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 218 (1946) ("[e][xcessive use or abuse of authority can not only destroy man's instinct for liberty but will eventually undo the administrative processes themselves.'"). As further evidence of Mr. Paoletta's theme of criminalizing CashCall, while the Court found that the loans were "void," *CashCall I*, 35 F.4th at 741, Mr. Paoletta described CashCall's

MEMORANDUM OF POINTS AND AUTHORITIES

products as "illegal loans". Ex. C. Only upon the Court's choice-of-law ruling did CashCall have notice that its loans were unenforceable. See *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *5–9 (C.D. Cal. Aug. 31, 2016).

No policy basis—either in the Paoletta Memorandum or otherwise—has been articulated for distinguishing this matter from the actions the Bureau has dismissed or unwound in the same period. Nor has the Bureau identified any factual or legal development between its provisional acceptance of the settlement framework and its May 1, 2026 reversal that would explain its abandonment of an agreement it had itself elicited.

## LEGAL STANDARD

### A.    Rule 60(b)(5)

Rule 60(b)(5) permits a court to relieve a party from a final judgment on any of three independent grounds: the judgment "(i) has been satisfied, released, or discharged; (ii) is based on an earlier judgment that has been reversed or vacated; or (iii) applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Horne v. Flores*, 557 U.S. 433, 447 (2009); *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380–84 (1992). The Ninth Circuit reviews orders on Rule 60(b)(5) motions for abuse of discretion. *Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004); *United States v. Asarco Inc.*, 430 F.3d 972, 978 (9th Cir. 2005).

The "no longer equitable" clause permits courts to "take account of changed circumstances or new law." *Horne*, 557 U.S. at 447. A party seeking relief under that clause needs only to show that "a significant change either in factual conditions or in law" renders "continued enforcement" of the judgment "'detrimental to the public interest.'" *Id.* at 447 (quoting *Rufo*, 502 U.S. at 384). The Ninth Circuit applies a "flexible standard" to such motions, especially in matters affecting the public interest. *Jeff D.*, 365 F.3d at 853–54. While the Ninth Circuit has, in *FTC v. Hewitt*, 68 F.4th 461, 466 (9th Cir. 2023), described certain equitable monetary judgments as lacking "prospective application," *Hewitt* did not foreclose Rule 60(b)(5) relief on the first two grounds (satisfaction; reliance on a reversed earlier judgment), did not address a judgment whose enforcement requires ongoing

MEMORANDUM OF POINTS AND AUTHORITIES

administrative implementation (here, the distribution of a $134 million legal-restitution fund to defined consumer classes through a court-supervised process), and did not consider the unique circumstances of a government party that has formally repudiated, by published memorandum, the enforcement priorities underlying the judgment. The clearest evidence that continued enforcement is no longer equitable comes from the enforcing party itself: the very agency that obtained this judgment has since vociferously repudiated nearly every legal theory it deployed to secure it. Where the government party that procured a public-interest judgment has disavowed the enforcement theory underlying it, the presumption favoring finality is at its weakest, and the "no longer equitable" inquiry is satisfied not by speculation but by the Bureau's own published and litigated positions.

## B.    Rule 60(b)(6)

Rule 60(b)(6) is a "catchall provision" that permits vacatur for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The Supreme Court has long described the rule as a "grand reservoir of equitable power." *Klapprott v. United States*, 335 U.S. 601, 614–15 (1949) (plurality); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 106 (4th Cir. 1979); *United States v. Sparks*, 685 F.2d 1128, 1130 (9th Cir. 1982) (Rule 60(b)(6) is to be "liberally applied to accomplish justice"). Relief is reserved for "extraordinary circumstances." *Buck v. Davis*, 580 U.S. 100, 123 (2017); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988); *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

The Ninth Circuit applies the multifactor test of *Phelps v. Alameida*, 569 F.3d 1120, 1135–40 (9th Cir. 2009), to evaluate motions predicated on intervening developments. The relevant considerations include: (1) the nature of the change in the law; (2) the diligence of the movant; (3) the parties' reliance on the finality of the judgment; (4) the delay between finality and the motion; (5) the closeness of the relationship between the prior decision and the intervening decision; and (6) any comity concerns. *Id.*; *Henson v. Fidelity National Financial, Inc.*, 943 F.3d 434, 444 (9th Cir. 2019) (applying *Phelps* outside the habeas context). The list is not exhaustive; courts must "evaluate the circumstances surrounding the specific motion" and ensure that "justice [is] done in light of all the facts." *Phelps*, 569

F.3d at 1133, 1135; *Henson*, 943 F.3d at 444.

The Ninth Circuit has further recognized that Rule 60(b)(6) "'affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice,'" *Henson*, 943 F.3d at 444 (relying upon *Liljeberg*, 486 U.S. at 864), and that "extraordinary circumstances" may include the conduct of an opposing party that, viewed in light of the totality of the litigation, renders enforcement of the judgment fundamentally unjust, *see, e.g.*, *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987) (60(b)(6) relief warranted where government materially breached settlement understanding).

## ARGUMENT

### I.    RULE 60(b)(5) AUTHORIZES RELIEF ON EACH OF THREE INDEPENDENT GROUNDS.

#### A.    The Bureau's Original Judgment Has Been Satisfied, and the Post-Remand Judgment Is "Based On" a Judgment That Was Vacated.

Rule 60(b)(5)'s first two clauses are textual and self-executing. Defendants paid the original $10,283,886 judgment in March 2018, and the Bureau acknowledged satisfaction. The Post-Remand Judgment is the direct lineal product of the Ninth Circuit's decision in *CashCall I,* vacating the original civil penalty and restitution determinations. *See* 35 F.4th at 749–51. By its own terms, the Post-Remand Judgment is "based on an earlier judgment that has been . . . vacated" Fed. R. Civ. P. 60(b)(5), with the  Ninth Circuit's prior vacatur being remedial, rather than determinative on liability. That is sufficient to authorize relief. Defendants do not contend that satisfaction of the original judgment, standing alone, forecloses the Bureau's appeal or the Post-Remand Judgment; the Bureau was, of course, free to appeal. Defendants satisfied the only penalty this Court actually entered after trial (the Tier I penalty). To the extent enforcement rests on that judgment, it has been satisfied. The larger post-remand monetary judgment now sought to be enforced derives from the appellate vacatur of the original remedy and rests on a remedial theory the Bureau

MEMORANDUM OF POINTS AND AUTHORITIES

disclaimed; hence, applying the judgment prospectively is no longer equitable. The satisfaction and vacated-predicate clauses thus operate together with—not in place of—the "no longer equitable" showing developed below.

Where the underlying liability finding has not been disturbed, but the remedial component has been, the text of Rule 60(b)(5) counsels that the derivative remedial judgment may be revisited consistent with the equitable principles that govern the rule. *See* Part I.B.*, supra* (discussing *Rufo* and *Horne*).

**B.    Continued Prospective Enforcement of the Post-Remand Judgment Is "No Longer Equitable."**

Rule 60(b)(5)'s third clause authorizes relief where "applying [a judgment] prospectively is no longer equitable." The Supreme Court has repeatedly explained that this clause is not a narrow procedural device but a vehicle for ensuring that judicial decrees keep pace with "changed circumstances or new law." *Horne*, 557 U.S. at 447–48; *Agostini*, 521 U.S. at 215; *Rufo*, 502 U.S. at 380–84. The clause applies whenever the judgment has prospective effects—including ongoing administrative implementation, ongoing supervised distribution, and ongoing collateral consequences—and a significant change in factual or legal conditions renders continued enforcement detrimental to the public interest. *See Horne*, 557 U.S. at 447–48; *Jeff D.*, 365 F.3d at 853–54.

The Post-Remand Judgment has substantial prospective effects. The $134 million legal-restitution award is not a simple money judgment payable from the defendant's general accounts. It is administered through a court-supervised distribution process to a defined consumer class, with claims administration, residual-funds disposition (with any residual funds to be paid not to additional consumer relief but to the United States Treasury—an inequitable diversion away from the consumer class the Bureau's remedial theory ostensibly serves), and ongoing reporting obligations to the Bureau and the Court. A CFPB restitution judgment is not a simple money judgment payable from the defendant's general accounts; it imposes an ongoing, Bureau-supervised administrative regime. *See e.g.,* Stipulated Final Judgment & Order ¶¶ 35–36, 38–42, 45, 55, 71, 76, *CFPB v. Freedom Debt*

MEMORANDUM OF POINTS AND AUTHORITIES

*Relief, LLC*, No. 3:17-cv-06484-EDL (N.D. Cal. July 9, 2019), ECF No. 91 ("Freedom Debt Relief").

That distinguishes this matter from the simple "order to pay money" at issue in *Hewitt*, 68 F.4th at 467, where the equitable monetary judgment "involved no court supervision . . . other than ordering [defendant] to pay the money awarded." *Id.* The presence of ongoing court-supervised distribution machinery places this judgment within the "prospective application" heartland of Rule 60(b)(5). *See Twelve John Does v. D.C.*, 841 F.2d 1133, 1138 (D.C. Cir. 1988) (per curiam) (Rule 60(b)(5) prospective-application clause encompasses judgments with ongoing supervisory or administrative components). Note further that nearly 13 years have passed since CashCall made its last loan. Tens of millions of dollars in restitution will never be claimed by consumers and will escheat to the United States Treasury as an additional, unwarranted penalty against Defendants. Further, any federal consumer relief will be in addition to the full compensation consumers have received as a result of CashCall's state settlements and class judgments.

These prospective features also render the restitutionary remedy acutely inequitable in operation. More than thirteen years have elapsed since the last Western Sky loan was made in 2013. In the intervening period, members of the consumer class have died, relocated, or become untraceable, and it is virtually certain that a substantial portion of the $134 million fund will never be claimed. Under the Judgment's residual-funds mechanism, those unclaimed sums do not revert to Defendants or reach any consumer; they escheat to the United States Treasury—operating as a further, multimillion-dollar penalty on Defendants under the guise of restitution. The court-supervised distribution will also predictably direct funds to claimants who suffered no loss and, given the passage of time, invites fraudulent and erroneous claims by persons not entitled to recover. And a significant number of the borrowers who do recover have already been made whole through the parallel state settlements and private class actions on the very same loans—the matters for which Defendants paid more than $140 million. For those borrowers, a further distribution is not restitution at all but a double recovery and an undeserved windfall, precisely the result this

MEMORANDUM OF POINTS AND AUTHORITIES

Court foreclosed when it found that the consumers "received the benefit of their bargain." *CashCall*, 2018 WL 485963, at *7–8.

Even if the Court were to conclude that the monetary award lacks prospective application under *Hewitt*, the Post-Remand Judgment also imposes the recklessness-based Tier II civil penalty as recalibrated on remand—a forward-looking determination of culpability with continuing collateral consequences in licensing, regulatory disclosure, and corporate-governance contexts. Such reputational and regulatory consequences are squarely prospective. *See* Freedom Debt Relief, *supra*.

Three categories of changed circumstances render continued prospective enforcement of the Post-Remand Judgment "no longer equitable."

### 1.    *Intervening Change in Controlling Law.*

The Post-Remand Judgment rests on three doctrinal pillars, each of which has been materially altered since the judgment was entered.

First, the liability determination rests on the "CashCall theory"—the bootstrapping of state-law usury and licensing violations into federal UDAAP liability under 12 U.S.C. § 5536(a)(1)(B). That theory depended on deferential statutory interpretation of the CFPA in the Bureau's favor and on the Ninth Circuit's deference to the Bureau's construction of the predicate state laws. *Loper Bright*, 603 U.S. at 411–13, has now eliminated *Chevron* deference and requires courts to exercise independent judgment in statutory interpretation. The Bureau's expansive reading of § 5536(a)(1)(B)—a reading the Bureau itself describes as "novel," *see* Paoletta Mem. (Apr. 16, 2025)—cannot now claim the interpretive presumption that informed its acceptance by the trial and appellate courts. *See Phelps*, 569 F.3d at 1135–36 (Rule 60(b) relief warranted where intervening authority repudiates the interpretive premises of the prior judgment); *Henson*, 943 F.3d at 444–55 (same).

Second, *Seila Law*, 591 U.S. at 218–32, and *Community Financial Services Ass'n*, 601 U.S. at 419–25, have reshaped the constitutional and structural posture of the Bureau itself, *see also Collins v. Yellen*, 594 U.S. 220 (2021), and confirm the Bureau's status as an enforcement agency whose extraction of legal monetary relief from private parties is the

MEMORANDUM OF POINTS AND AUTHORITIES

very "daunting" exercise of executive power *Seila Law* identified, 591 U.S. at 199. That doctrinal shift directly informs the Seventh Amendment analysis in *Jarkesy* and reinforces the inequity of continuing enforcement under the procedural posture obtained below.

Third, the procedural posture by which the Bureau secured legal restitution—a bench trial on a remedy the Bureau later relabeled as legal in nature—has been called into serious question by *Jarkesy*, 603 U.S. at 122–28. *Jarkesy* confirms that when an agency seeks legal monetary relief, the Seventh Amendment attaches, *id.* at 122, and that the relevant inquiry is the substance of the remedy, not the agency's label, *id.* at 123–24. The Bureau here obtained *$134 million in legal restitution* from a bench trial it secured by representing the remedy as *equitable*. Although *CashCall II* held that Defendants' jury-waiver stipulation foreclosed the Seventh Amendment objection on direct appeal, the post-*Jarkesy* framework throws into relief the inequity of binding Defendants to a waiver predicated on a representation the Bureau has since disavowed. *See, e.g., United States v. Olano*, 507 U.S. 725, 733 (1993) (waiver requires the intentional relinquishment of a *known* right). *Olano's* "known right" formulation supports the observation that a purported waiver cannot be a knowing relinquishment of a right that *Jarkesy* later clarified, because at the time the right was not clearly established. *See* "Background" subpart C., *supra* at 11.

That conclusion finds support in recent appellate authority. Dissenting from the denial of rehearing en banc in *Carroll v. Trump*, Judge Menashi explained that "[w]hen an intervening change in law alters the availability of a claim or a defense, an earlier failure to invoke that claim or defense cannot operate as a waiver," because "an effective waiver must . . . be one of a 'known right or privilege.'" *Carroll v. Trump*, 175 F.4th 100, 114 fn. 26 (2nd Cir. 2026) (Menashi, J., dissenting from denial of rehearing en banc) (quoting *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143 (1967), and *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Judge Menashi reached the Seventh Amendment dimension of the denial of a jury trial even though it had not been developed by the parties on appeal, recognizing that a court's resort to a non-jury determination to resolve contested facts "raises Seventh Amendment concerns" and "invaded the province of the jury." *Id.* at 119. That a judge would reach the

MEMORANDUM OF POINTS AND AUTHORITIES

jury-trial question notwithstanding its omission from the appellate presentation confirms that the Seventh Amendment right is not lightly deemed surrendered, and it casts doubt on the premise on which *CashCall II* rested—that Defendants' stipulation effected a knowing and valid waiver of that right. The jury-trial protection *Jarkesy* clarified was not a "known right" available to Defendants when they agreed to a bench trial on a remedy the Bureau then represented as equitable; it crystallized only when *Jarkesy* recharacterized agency suits seeking legal monetary relief as triggering the jury-trial guarantee. Defendants' stipulation, therefore, cannot be treated as a knowing relinquishment of a right they had no reason to know was available. Whatever its operation on direct review, that doctrinal transformation is a paradigmatic "significant change . . . in law" for purposes of Rule 60(b)(5). *Horne*, 557 U.S. at 447.

> ### 2. The Bureau Has Formally Repudiated the Enforcement Theory That Produced This Judgment.

"[C]hanged circumstances" for Rule 60(b)(5) purposes are not limited to changes in the law; changes in the policy of the government party that procured the judgment are equally cognizable. *See Horne*, 557 U.S. at 447–48 (changed factual conditions, including changes in governing policies and circumstances, may render enforcement inequitable); *Rufo*, 502 U.S. at 384 (consent decrees may be modified where "changed factual conditions make compliance with the decree substantially more onerous" or where enforcement is "detrimental to the public interest"); *Jeff D.*, 365 F.3d at 854 (flexible standard applies to government party where public interest is implicated).

The Paoletta Memo *rescinded* the Bureau's prior enforcement priorities and committed the agency to (i) respecting federalism by minimizing duplicative state-law enforcement, (ii) declining to pursue "novel legal theories," (iii) shifting resources away from nonbank enforcement, (iv) declining to engage in price controls, and (v) prioritizing tangible-harm redress over agency-fund-replenishing penalties. Consistent with the foregoing, the Bureau's Chief Legal Officer expressly informed Defendants' counsel during their first meeting that this case would not have been brought under the Bureau's current

MEMORANDUM OF POINTS AND AUTHORITIES

administration. Baren Decl. ¶ 11. Each prong is directly incompatible with the enforcement posture that produced the Post-Remand Judgment:

a. The case is built on *novel* use of UDAAP authority to enforce state-law usury and licensing limits, *see* Pl.'s Compl. ¶¶ 51-54; 56-59; 61-64 (alleging that consumer harm from state-law invalidity provides the predicate for the UDAAP claim); the Bureau publicly identified this as "the CashCall theory." This is inconsistent with Priority 8 of the Paoletta Memo.

b. Sixteen sovereign states had concurrent authority and concurrent claims over the same conduct; eight elected to bring their own actions and recovered; eight elected not to. Defendants paid more than $140 million to states and private claimants on the same underlying loans.

c. Defendants are nonbank lenders—*precisely* the class of enforcement targets the Bureau has now committed to deprioritize. The second priority announced in the Paoletta Memo is that "[t]he Bureau's focus will shift back to depository institutions, as opposed to non-depository institutions. In 2012, 70% of the Bureau's supervision focused on banks and depository institutions and 30% on nonbanks. Now that proportion has completely flipped, with over 60% on nonbanks and less than 40% on banks and depository institutions. The Bureau must seek to return to the 2012 proportion and focus on the largest banks and depository institutions." CashCall was a classic nonbank lender.

d. The legal-restitution figure tied to consumer interest payments operates as an interest-rate cap by another name and implements the price control the CFPA itself forbids, *see* 12 U.S.C. § 5517(o), and the Paoletta Memo disclaims.

e. This Court found, as a matter of fact, that the borrowers "received the benefit of their bargain," *CashCall*, 2018 WL 485963, at *7–8—a finding the Bureau has not disturbed and that places this matter outside the "tangible harm" redress the Bureau now prioritizes.

MEMORANDUM OF POINTS AND AUTHORITIES

The Bureau's subsequent conduct reinforces these principles. In the same months that the Bureau maintained the Post-Remand Judgment against Defendants, it voluntarily dismissed enforcement actions and unwound settlements against materially indistinguishable defendants. *See* CFPB Press Releases (Feb.–Apr. 2025) (SoLo Funds, Capital One, Walmart, Zelle, Rocket Homes, Heights Financial, Townstone Financial, Reliant Holdings); CFPB Termination Notice, Navy Federal Credit Union (July 1, 2025) (waiving non-compliance and reducing or eliminating fine). Other cases closely parallel the facts of the Bureau's enforcement action against CashCall.

In a Bureau enforcement action similar to its action in *CashCall*, the Bureau issued an order against Enova International, Inc., a publicly traded online small-dollar lender headquartered in Chicago, Illinois, that markets, provides, and services loans under the brand names CashNetUSA (CNU) and NetCredit. In 2023, the Bureau issued a Consent Order against Enova based on the Bureau's finding that Enova violated the Consumer Financial Protection Act by debiting consumers' bank accounts without authorization and failing to honor loan extensions it granted to consumers. Pursuant to its authority under 12 U.S.C. § 5563(b)(3), the Bureau terminated the order on September 2, 2025. *See* Order Terminating the Consent Order, In the Matter of Enova International, Inc., File No. 2023-CFPB0014 (September 2, 2025), https://files.consumerfinance.gov/f/documents/cfpb_enova-international-2023_termination-consent-order_2025-09.pdf.

In several matters, the Bureau *returned* funds previously collected. The Bureau has articulated no principled basis for distinguishing Defendants—and, on information and belief, no such basis exists in any Bureau policy directive, internal memorandum, or public statement. In announcing those dismissals, current Bureau leadership repeatedly and publicly characterized the prior administration's enforcement program as a "weaponization" of the consumer-protection laws that "must end," describing matters in which the Bureau had "shockingly" sought to "destroy" defendants that incurred substantial legal fees and were forced to lay off significant portions of their workforce. The action against Defendants—a nonbank prosecuted on an admittedly novel theory, after a finding

MEMORANDUM OF POINTS AND AUTHORITIES

of no fraud, for conduct already addressed by sovereign States—is a paradigmatic example of the very weaponization the Bureau's current leadership has disavowed.

The post-remand judgment enforces legal theories and remedial approaches that the CFPB has since formally repudiated, thereby enforcing rights that no longer exist under the agency's current interpretation of its statutory authority. Under *Bellevue Manor Associates*, the Ninth Circuit recognized that enforcement of rights that the Supreme Court does not recognize and that the statute no longer permits provides good reason for Rule 60(b)(5) modification. *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249 (9th Cir. 1999). In *Horne v. Flores*, 557 U.S. 433 (2009), the Supreme Court established that Rule 60(b)(5) provides relief when a significant change in law renders continued enforcement detrimental to the public interest, emphasizing that courts must take a flexible approach to changed circumstances and consider whether underlying violations have been remedied through policy shifts. Here, the CFPB's 2025 Paoletta Memo explicitly disclaimed the type of enforcement action brought against defendants, committing the agency to respect federalism, decline novel legal theories, shift away from nonbank enforcement, decline price controls, and prioritize tangible-harm redress. Each element directly contradicts the enforcement theory underlying the post-remand judgment. The Bureau's subsequent conduct of voluntarily dismissing similar enforcement actions against other defendants reinforces that the agency no longer recognizes the legal foundation for this type of enforcement. Continued enforcement of a judgment based on legal theories the enforcing agency has formally abandoned creates the precise scenario *Bellevue Manor* identified as warranting equitable relief. [1]

---

[1] The Bureau has itself advocated the appropriateness of vacating judgments pursuant to Rule 60(b) where changed enforcement priorities and other circumstances render continued enforcement inequitable.  See, e.g.,  Cahn Decl. ¶  , Ex. B, Joint Rule 60(B)(6) Motion for Relief from and Vacatur of the Stipulated Final Judgment and Order, filed March 26, 2025, Dkt. 145, *Bureau of Consumer Financial Protection v. Townstone Financial, Inc., et al.*, Case No 1:20-cv-04176 (N.D. Ill.) ("[P]arties jointly move this Court under Rule 60(b)(6) to set aside the judgment . . . as the judgment is inequitable and undermines confidence in the judicial process.").)

MEMORANDUM OF POINTS AND AUTHORITIES

### 3.    The Parties Negotiated and Reached a Settlement Framework Aligned with the Bureau's Stated Priorities, and the Bureau Then Abandoned It, Creating Grounds for Equitable Estoppel.

Beginning in July 2025, the Bureau—following CashCall's initiating contact with the Office of the Acting Director and the opening of a dialogue opened by the Acting Director's advisor and counsel—engaged with Defendants in resolution discussions structured to produce exactly the kind of consent disposition the Paoletta Memo contemplated and that the Bureau accepted in other matters. As detailed in the Background, the Bureau requested and received supplemental information, the parties negotiated over the better part of a year, and the Bureau provisionally accepted a complete settlement framework on terms it itself prescribed—before abandoning that framework, on the eve of moving against Defendants' collateral, without any articulated policy basis.

Standing alone, an abandoned negotiation does not provide a Rule 60(b)(5) ground. *See In re Pacific Far East Lines, Inc.*, 889 F.2d 242, 250 (9th Cir. 1989). These discussions, however, were neither preliminary nor unfinished. The parties negotiated a complete settlement framework with no open terms—including Defendants' acceptance of the Bureau's own demand regarding third-party administration of the claims commission—which the Bureau provisionally accepted and then abandoned. But the Bureau's engagement and abrupt withdrawal is probative on two distinct points relevant to the "no longer equitable" inquiry: (i) the Bureau's own staff, including individuals authorized to act on the Bureau's behalf, concluded the matter warranted reopening on terms favorable to Defendants—reflecting the Bureau's informed assessment that continued enforcement is not aligned with its current priorities; and (ii) the absence of any articulated policy basis for the subsequent withdrawal, in light of the Bureau's contemporaneous treatment of comparable matters, supports the inference that continued enforcement reflects considerations extrinsic to the Bureau's legitimate consumer-protection mandate and is punitive and malicious in character.

MEMORANDUM OF POINTS AND AUTHORITIES

Independent of changes in law or policy, Defendants assert an equitable estoppel defense grounded in the Bureau's substantive engagement with Defendants across nearly a year of settlement discussions, its tentative acceptance of a settlement framework on terms the Bureau itself prescribed, and its abrupt abandonment of that framework on the eve of execution against Defendants' posted collateral. The relevant facts, set out in more detail in the Background, are as follows. Beginning in July 2025, *Defendants* approached senior Bureau personnel regarding a consensual resolution consistent with the Paoletta Memo and the Bureau's contemporaneous treatment of comparable defendants. Defendants transmitted, by letter dated July 25, 2025, a proposed framework under which the Bureau would retain the $10.3 million already paid and the parties would jointly move under Rule 60(b) for vacatur of the Post-Remand Judgment. The Bureau requested, and Defendants furnished, supplemental information regarding the structure of the proposed disposition and Defendants' prior payments to sovereign states and private claimants on the same underlying conduct. On December 11, 2025, Defendants' representatives met with senior Bureau officials and presented a concrete offer of compromise; the Bureau thereafter became unresponsive. On February 22, 2026, Defendants' counsel David Scharf reached out to officials at the White House and met with the Bureau's Chief Legal Officer, Mark Paoletta, and discussions resumed. Over the ensuing two months, the parties negotiated, and the Bureau provisionally accepted, a settlement framework that included Defendants' affirmative acceptance of the Bureau's demand that any consumer-relief claims commission be administered by a third party of the Bureau's choosing. The Bureau then again became unresponsive, and on May 1, 2026—the last business day before the Bureau would have been positioned to move on the collateral securing Defendants' supersedeas bond—Mr. Paoletta wrote that the Bureau would not proceed with the agreed-upon vacatur and would commence collection.

Throughout the nearly eleven-month period of these discussions, Defendants reasonably relied on the Bureau's representations and conduct: they maintained at substantial ongoing cost the $175 million-plus supersedeas bond secured in significant part

MEMORANDUM OF POINTS AND AUTHORITIES

by Mr. Reddam's personal assets and residences; they refrained from pursuing alternative avenues of relief that the negotiations were intended to obviate; and they expended significant resources structuring the disposition on the terms the Bureau itself dictated. The Bureau's abandonment of a settlement framework of its own design, on the eve of execution and without articulated policy basis, is the asymmetric and unexplained governmental conduct equity will not countenance and that the courts have considered probative when evaluating Rule 60(b) relief. *Accord Horne v. Flores*, 557 U.S. at 447–48; *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249 (9th Cir. 1999); *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987).

## II.    IN THE ALTERNATIVE, RULE 60(b)(6) PROVIDES INDEPENDENT GROUNDS FOR VACATUR.

If the Court concludes that Rule 60(b)(5) does not reach the relief sought, Rule 60(b)(6) supplies a separate and sufficient basis. Defendants do not rest on any single development. The aggregate of (i) the Bureau's mid-litigation reversal of its own remedial theory, (ii) the Supreme Court's intervening reshaping of the doctrinal landscape, (iii) the Bureau's formal repudiation of its enforcement priorities, (iv) the parallel disposition of materially indistinguishable matters, and (v) the Bureau's bad-faith abandonment, on the eve of execution against Defendants' collateral, of a concluded settlement framework of its own design, presents the kind of "extraordinary circumstances" the rule was designed to address. *Buck*, 580 U.S. at 123; *Liljeberg*, 486 U.S. at 864; *Phelps*, 569 F.3d at 1133–40; *Henson*, 943 F.3d at 444–55.

### A.    The Phelps/Henson Factors Favor Relief.

*1. Nature of the change in law.* Multiple Supreme Court decisions—*Loper Bright*, *Jarkesy*, *Community Financial Services Ass'n*, and *Seila Law*—have collectively reordered the deference framework, the Seventh Amendment framework for agency remedial actions, and the constitutional posture of the Bureau itself. This is not the case of a single interpretive shift in an isolated area, *cf. Hewitt*, 68 F.4th at 467, but a coordinated doctrinal transformation directly bearing on the foundations of the judgment. The first *Phelps* factor

strongly favors relief.

2. *Diligence.* Defendants pursued every available avenue of direct review, including a motion for reconsideration in the Ninth Circuit following *CashCall II* and preparation of a petition for a writ of certiorari filed with the Supreme Court following the Ninth Circuit's January 3, 2025 affirmance (filed September 19, 2025, certiorari denied March 2, 2026). Defendants engaged in resolution discussions with the Bureau beginning in 2025 in good faith and at the Bureau's invitation. Where the moving party has pursued every reasonable avenue of relief, the diligence factor weighs in favor of (b)(6) relief. *See Phelps*, 569 F.3d at 1138; *Henson*, 943 F.3d at 450–52.

3. *Reliance on finality.* The Bureau cannot credibly claim a settled reliance interest in the Post-Remand Judgment. Its own published priorities disclaim the type of action; it engaged Defendants in talks aimed at vacatur; it has unwound settlements and dismissed cases on comparable facts. *Compare Henson*, 943 F.3d at 452 (reliance factor weighs against relief only where opposing party has materially relied on judgment), *with Hewitt*, 68 F.4th at 464 (FTC retained reliance interest because it had not repudiated the enforcement theory).

4. *Delay.* This motion is filed promptly after the relevant developments—within months of the Paoletta Memo, the Ninth Circuit's January 2025 affirmance and April 2025 denial of reconsideration, the issuance of *Loper Bright* (June 28, 2024) and *Jarkesy* (June 27, 2024), and the Bureau's May 2026 abandonment of settlement negotiations. The delay factor accordingly weighs in favor of relief. *See Phelps*, 569 F.3d at 1138 & n.21.

5. *Closeness of relationship between governing decisions.* The intervening decisions do not merely touch the doctrinal periphery of this judgment. *Loper Bright* directly governs how the Bureau's statutory authority must be construed; *Jarkesy* directly governs the remedy framework the Bureau invoked on remand; *Seila Law* and *Community Financial Services Ass'n* directly govern the Bureau's structural posture. The closeness factor accordingly weighs heavily in favor of relief. *See Henson*, 943 F.3d at 452–54.

Case No. 2:15-cv-07522-JFW (RAOx)

MEMORANDUM OF POINTS AND AUTHORITIES

*6. Comity.* Comity concerns of the kind that animate the habeas factor in *Phelps* are absent here. *See Phelps*, 569 F.3d at 1139 (comity factor inapplicable where motion is directed not at the merits of habeas relief but at correcting an erroneous procedural disposition). The opposite consideration applies—federalism interests favor relief, because the Bureau used federal UDAAP authority to enforce predicate state-law obligations in a manner that bypassed sovereign-state enforcement choices. *Cf. Horne*, 557 U.S. at 448 (federalism concerns may make continued enforcement inequitable).

**B.     The Bureau's Mid-Litigation Reversal on Remedial Theory and Abandonment of Settlement Negotiations Independently Constitute "Extraordinary Circumstances."**

Even setting aside the changes in controlling law, two features of the Bureau's conduct independently warrant relief under Rule 60(b)(6).

First, the Bureau secured the bench trial on remedies in this Court by representing that the restitution it sought was equitable in character. Only after this Court denied that relief on the merits did the Bureau pivot to a legal-restitution theory—a theory it expressly conceded had not been raised below. *See CashCall I*, 35 F.4th at 758 & n.18. The Bureau then obtained on appeal what it had been denied at trial, by means of a recharacterization of the very remedy it had earlier disclaimed. That maneuver—procuring a judgment on a theory contradictory to the one on which the procedural posture was secured—is the kind of agency conduct that supports Rule 60(b)(6) relief. *See United States v. Baus*, 834 F.2d at 1124. The Bureau itself conceded, in *CashCall II*, that the parties' jury-waiver stipulation rested on a "shared understanding" that the remedy was equitable—an understanding the Bureau later abandoned to its own benefit. *See CashCall II,* at 1216.

Second, the Bureau's abandonment of resolution discussions—initiated by its own senior personnel, advanced through written submissions consistent with the agency's declared priorities and aligned with the disposition of comparable matters in the same period—presents the very kind of asymmetric, unexplained governmental conduct courts have considered when evaluating extraordinary-circumstances claims. *See Baus*, 834 F.2d

MEMORANDUM OF POINTS AND AUTHORITIES

at 1124 (governmental backtracking on settlement understandings may warrant (b)(6) relief).

## C.     The Equities Favor Relief.

Defendants have already paid $10,283,886 to the Bureau on the very claims at issue here and paid an additional $140 million to sovereign states and private claimants on the same underlying loans—amounts that, in combination, exceed the highest restitution figure the Bureau ever credibly identified at trial. The trial Court found, as a matter of fact, that the consumers "received the benefit of their bargain" and that there was "no fraud or deception." *CashCall*, 2018 WL 485963, at *7–8. Enforcement of an additional $23 million in additional penalties and $134 million in legal restitution—obtained through procedural maneuvers the Bureau has since publicly disclaimed—would impose an outcome the Bureau itself would not now select.

The "grand reservoir of equitable power" the Supreme Court has reposed in this Court under Rule 60(b)(6) was designed for the case in which finality, properly cherished, must give way to the more fundamental command that the public's confidence in the just operation of the courts not be sacrificed to the formal closure of a final judgment. *Klapprott*, 335 U.S. at 614–15. This is such a case.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion under Federal Rule of Civil Procedure 60(b)(5) and, in the alternative, Rule 60(b)(6); vacate the Post-Remand Judgment in its entirety; and set the matter for a status conference to address any issues remaining following vacatur. In the further alternative, Defendants respectfully request an evidentiary hearing to develop the record concerning the Bureau's conduct, the abandonment of settlement discussions, and the inequity of continued prospective enforcement.

MEMORANDUM OF POINTS AND AUTHORITIES

Respectfully submitted,

Dated:  July 8, 2026

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**

By: _____

Reuben Camper Cahn

*Attorneys for Defendants*
*CashCall, Inc. and J. Paul Reddam*

MEMORANDUM OF POINTS AND AUTHORITIES