Reuben Camper Cahn, S.B.N. 255158
**BIENERT KATZMAN**
**LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile  (949) 369-3701
Email: rcahn@bklwlaw.com

*Attorneys for Defendants*
CashCall, Inc. and J. Paul Reddam

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | Case No. 2:15-cv-07522-JFW (RAOx) |
| Plaintiff, | **DECLARATION OF REUBEN CAMPER CAHN IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE POST-REMAND JUDGMENT** |
| v. | |
| CASHCALL, INC.; WS FUNDING, LLC; DELBERT SERVICES CORPORATION; and J. PAUL REDDAM, | *Filed concurrently with Defendants' Notice of Motion and Motion for Relief from Post-Remand Judgment; and [Proposed] Order* |
| Defendants. | Assigned to Hon. John F. Walter |

DECLARATION OF REUBEN CAMPER CAHN

## DECLARATION OF REUBEN CAMPER CAHN

I, Reuben Camper Cahn, declare as follows:

1.      I am a partner at Bienert Katzman Littrell Williams LLP, counsel for record for defendants CashCall, Inc. and Mr. Reddam in this case.  I have personal knowledge of the facts set forth in this declaration, unless the facts are stated on information or belief, and as to those matters, I am informed and believe them to be true. If called upon to do so, I could and would testify to those facts under oath.

2.      Pursuant to Central District of California Local Rule 7-3, on June 15, 2026, I met and conferred by Teams videoconference with counsel for the CFPB regarding the relief sought in this Motion.

3.      In advance of our meeting, I provided a draft of the motion for counsel's review.

4.      The parties were unable to reach agreement on the relief requested.  Counsel for Plaintiff asked that their position be stated as follows:  Counsel for the Bureau stated that Federal Rule of Civil Procedure 60(b)(5) and its related case law do not support Defendants' motion. Counsel for the Bureau stated that Federal Rule of Civil Procedure 60(b)(6) and its related case law also do not support Defendants' motion.

5.      Plaintiff's counsel further advised that because the only remaining member of the original trial team expected to be on leave from June 17 through July 6, the Bureau requested an extension of its time to reply until July 27, 2026.

6.      A true and correct copy of the June 15, 2026 email from the Bureau's counsel, Christina Coll, to undersigned is attached hereto as Exhibit A.

7.      Undersigned counsel has scheduled a prepaid vacation from July 24, 2026 through August 16, 2026, and so would be unable to reply to . For these reasons, and in view of the Court's available civil motion dates, Defendants have noticed this motion for September 14, 2026.

8.      Attached hereto as Exhibit B is a true and correct copy of the Joint Rule 60(b)(6) Motion for Relief from and Vacatur of the Stipulated Final Judgment and Order,

1

Case No. 2:15-cv-07522-JFW (RAOx)

filed March 26, 2025, Dkt. 145, *Bureau of Consumer Financial Protection v. Townstone Financial, Inc., et al.*, Case No 1:20-cv-04176 (N.D. Ill.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of July 2026, at San Clemente, California.

_____
Reuben Camper Cahn

# EXHIBIT A

## Reuben Camper Cahn

| | |
|---|---|
| **From:** | Coll, Christina (CFPB) <Christina.Coll@cfpb.gov> |
| **Sent:** | Monday, June 15, 2026 1:43 PM |
| **To:** | Reuben Camper Cahn |
| **Cc:** | Dorfman, Victoria (Detailee); Lake, Joseph (CFPB) |
| **Subject:** | CFPB v. CashCall - meet and confer |

Reuben—

Here is an insert for the statement regarding our meet and confer call earlier today:

> Counsel for the Bureau stated that Federal Rule of Civil Procedure 60(b)(5) and its related case law do not support Defendants' motion. Counsel for the Bureau stated that Federal Rule of Civil Procedure 60(b)(6) and its related case law also do not support Defendants' motion.

We appreciate your and your client's agreement on today's call that the CFPB will have a three-week extension for the due date of its opposition motion. Here is a summary of what we shared on today's call regarding the extension:

> The only remaining long-time counsel for the CFPB in *CFPB v. CashCall* will be on leave from June 17 through July 6, and other counsel in the case are no longer at the CFPB. In addition, the individuals who will review and finalize the CFPB's opposition brief will be unavailable for the week of June 29. The parties therefore request an extension until July 27 for the CFPB to file its opposition to the motion.

I would also like to introduce you to my colleague, Joe Lake (copied here), who has not been involved with this matter but is kindly stepping in to monitor the case while I am out of the country. Please include Joe on correspondence going forward.

--Christina

Christina Coll
Assistant Litigation Deputy
Enforcement
Mobile: (202) 309-9704

Consumer Financial Protection Bureau
**consumerfinance.gov**

Confidentiality Notice: If you received this email by mistake, you should notify the sender of the mistake and delete the e-mail and any attachments. An inadvertent disclosure is not intended to waive any privileges.

1

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Bureau of Consumer Financial Protection, | Case No. 1:20-cv-04176 |
| Plaintiff, | |
| v. | Judge Franklin U. Valderrama |
| | Magistrate Judge Heather K. McShain |
| Townstone Financial, Inc. and Barry Sturner, | |
| Defendants. | |

## JOINT RULE 60(B)(6) MOTION FOR RELIEF FROM AND VACATUR OF THE STIPULATED FINAL JUDGMENT AND ORDER

Pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Bureau of Consumer Financial Protection ("Bureau") and Defendant Townstone Financial, Inc. ("Townstone") jointly move the Court to relieve Townstone from the November 7, 2024 Stipulated Final Judgment and Order, ECF No. 138, and to vacate that Judgment and Order in its entirety. The parties have submitted a proposed Order and respectfully ask that the Court enter it. Upon this Court's grant of Rule 60(b)(6) relief, all parties to this action stipulate to the dismissal with prejudice of all claims against Townstone and Mr. Sturner pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), (B).

1

Dated: March 26, 2025.


Respectfully submitted,

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU** | **TOWNSTONE FINANCIAL, INC., AND BARRY STURNER** |
| /s/ Mark Paoletta | /s/ Steven M. Simpson |
| MARK PAOLETTA (DC Bar # 422746) | STEVEN M. SIMPSON |
| Chief Legal Officer | DC Bar No. 462553 |
| Mark.Paoletta@cfpb.gov | ASHLEY TORKELSON LEVINE |
| Tel: (771) 959-6080 | AZ Bar No. 032544 |
| VICTORIA DORFMAN (DC Bar # 487567) | Pacific Legal Foundation |
| (NY Bar # 4656625) | 3100 Clarendon Boulevard, Suite 1000 |
| Victoria.Dorfman@cfpb.gov | Arlington, VA, 22201 |
| DANIEL SHAPIRO | Tel: (202) 888-6881 |
| (FL Bar # 1011108) | SSimpson@pacificlegal.org |
| Daniel.Shapiro@cfpb.gov | ALevine@pacificlegal.org |
| | |
| 1700 G Street NW | OLIVER J. DUNFORD |
| Washington, DC 20552 | FL Bar No. 017991 |
| | Pacific Legal Foundation |
| *Attorneys for Plaintiff* | 4440 PGA Boulevard, Suite 307 |
| | Palm Beach Gardens, FL 33410 |
| | Tel: (916) 503-9060 |
| | ODunford@pacificlegal.org |
| | |
| | SEAN P. BURKE |
| | RAY BIEDERMAN |
| | Mattingly Burke Cohen & Biederman LLP |
| | 155 E. Market St. Suite 400 |
| | Indianapolis, IN 46204 |
| | |
| | MARX DAVID STERBCOW |
| | The Sterbcow Law Group LLC |
| | 824 Elmwood Park Boulevard, Suite 205 |
| | New Orleans, LA 70123 |
| | |
| | *Attorneys for Defendants* |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 26, 2025, I electronically filed the

foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a

copy to be served upon counsel of record.

/s/ Mark Paoletta
MARK PAOLETTA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Bureau of Consumer Financial Protection, | Case No. 1:20-cv-04176 |
| Plaintiff, | |
| v. | Judge Franklin U. Valderrama |
| | Magistrate Judge Heather K. McShain |
| Townstone Financial, Inc. and Barry Sturner, | |
| Defendants. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR RELIEF FROM AND VACATUR OF THE STIPULATED FINAL JUDGMENT AND ORDER</u>

## I.  INTRODUCTION

This Court is familiar with the facts of this case, as they were presented by the parties during its pendency.  As explained below and in the attached Declaration of Dan Bishop, Senior Advisor to the Consumer Financial Protection Bureau ("Bureau" or "CFPB"), there were significant undisclosed problems with the Bureau's treatment of this case, resulting in unmerited investigation and litigation and the infringement of the Defendants' First Amendment rights, which warrant relief under Rule 60(b).

On July 15, 2020, the Bureau brought this action against Townstone and Barry Sturner for allegedly engaging in acts or practices discouraging on a prohibited basis prospective applicants from seeking credit, in violation of *(i)* the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f; *(ii)* its implementing Regulation B, 12 C.F.R. § 1002.4(b); and *(iii)* the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a)(1)(A).  On November 25, 2020, the Bureau filed an amended complaint adding a claim for fraudulent transfer.  The Court dismissed on statutory grounds on February 3, 2023, but the Seventh Circuit reversed.  On remand, the parties entered into a consent decree that required Townstone to pay a $105,000 fine.  The Court entered the Final Judgment on November 7, 2024.

On January 20, 2025, the newly inaugurated President of the United States ordered the agency heads to "identify and take appropriate action to correct past misconduct by the Federal Government related to censorship of [constitutionally] protected speech" and "to review the activities of … agencies exercising civil and criminal enforcement authority … and identify any instances" reflecting improper targeting of enforcement actions "oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives."  Exec. Order No. 14149 § 2(d), 90 Fed. Reg. 8,243 (Jan. 20, 2025); Exec. Order No. 14147 §§ 1, 3, 90

Fed. Reg. 8,235 (Jan. 20, 2025). Declaration of Dan Bishop ("Decl.") ¶ 1. Pursuant to the President's directive, the Bureau's new leadership undertook a review of agency records concerning recent enforcement actions, including this one. Decl. ¶ 3. The Bureau discovered within its internal case files indications that the Bureau commenced and continued its investigation and litigation without a substantial predicate of actionable facts and targeted co-defendants Townstone and Townstone President and CEO, Barry Sturner, based on constitutionally protected speech. Decl. ¶ 4. This action should not have been filed. Decl. ¶ 4.

At the time the suit was pending and before entering into the consent decree, the Defendant could not have known about the analytical deficiencies within the agency's processes or the extent of the targeting on the basis of his viewpoints. Neither did the Court, which drew lines in the discovery process to prevent the Bureau from abusing First Amendment values. Order at 13, ECF No. 104. Nonetheless, it is now clear the Bureau did precisely that. Decl. ¶ 4. Accordingly, the parties jointly move this Court under Rule 60(b)(6) to set aside the judgment and the consent decree, as the judgment is inequitable and undermines confidence in the judicial process.

## II.     LEGAL STANDARD

### RULE 60(B)(6) ALLOWS THE COURT TO SET ASIDE THE JUDGMENT FOR "ANY REASON THAT JUSTIFIES RELIEF."

Rule 60(b)(6) "vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klapprott v. United States*, 335 U.S. 601, 615 (1949) (granting motion to set aside judgment). Rule 60(b)(6) is "open-ended" and "flexible," such that the Court has "wide discretion" when entering a ruling. *See Pearson v. Target Corp.*, 893 F.3d 980, 984 (7th Cir. 2018) (citing *Buck v. Davis*, 137 S. Ct. 759, 777

2

(2017)) (granting Rule 60(b)(6) motion to vacate judgment).

Where the motion is joint, the constraints on Rule 60(b)(6) relief are relaxed.  For example, this Court's sister district certified to the Seventh Circuit willingness to grant a Rule 60(b)(6) motion where the "motion was jointly filed by the parties due to recent settlement." *Cummins v. Illinois*, No. 02-CV-4201-JPG, 2010 WL 334514, at *2 (S.D. Ill. Jan. 25, 2010).  In such circumstances, the court noted, "[a]bsent is the general concern that Rule 60(b)(6) 'is not an appropriate vehicle for addressing simple legal error, for rehashing old arguments, or for presenting arguments that should have been raised before the Court made its decision.'"  *Id.* (quoting *O'Neil v. Acevedo*, Case No. 03–cv–838–JPG, 2008 WL 3382627, at *2 (S.D. Ill. Aug. 11, 2008)).  Likewise, in *Marcus A. T. v. Comm'r of Soc. Sec.*, No. 3:21-CV-273-DWD, 2023 WL 3304727, at *2 (S.D. Ill. May 8, 2023), the court granted an unopposed motion:

> Here, after considering Plaintiff's arguments on appeal and attending a court-ordered mediation, Defendant reconsidered her appellate strategy.  The parties now agree it is appropriate to vacate the Court's [judgment]. . . . *See* Fed. R. Civ. P. 60(b)(6); *Kemp v. United States*, 142 S. Ct. 1856, 1861 (2022); *Braun v. Vill. Of Palatine*, 56 F.4th 542, 554 (7th Cir. 2022); *Pearson*, 893 F.3d at 984; *see also Manjarrez v. Berryhill*, No. 17-cv-300, 2019 WL 2710271, *1 (N.D. Ind. Apr. 9, 2019) (in case presenting the same procedural posture, granting Defendant's unopposed motion for relief under Rule 60(b)(6)).

*See also, e.g.*, *Mayes v. City of Hammond, Ind.*, 631 F. Supp. 2d 1082, 1088 (N.D. Ind. 2008) (granting joint request for vacatur, citing in part "the joint nature of the request for vacatur"); *cf.* *Orlowski v. Eriksen*, No. 07-C-4015, 2010 WL 2401938 (N.D. Ill. Jun. 10, 2010) (granting unopposed Rule 60(b)(6) motion).

Giving weight to the parties' unanimity in the motion flows from the nature of Rule 60(b)(6), which "is fundamentally equitable," *Ramirez v. United States*, 799 F.3d 845, 851 (7th Cir. 2015) (citations omitted).  Thus, although Rule 60(b)(6) is an extraordinary remedy, the Court's latitude is wide enough to take into account the parties' mutual posture:  The Court is

3

"guided by the array of equitable factors of justice and hardship traditionally balanced by district courts in considering requests for Rule 60(b) relief," such as "the public interests in precedent, preclusion, and judicial economy and the circumstances, hardships, and interests of private parties." *Mayes*, 631 F. Supp. 2d at 1088; *see also Stryker Spine v. Spine Group of Wisconsin, LLC*, 2018 WL 1054386, at *2–3 (E.D. Wis. Feb. 26, 2018) (citing cases). Among the "many factors" the court considers are the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process. *See Braun*, 56 F.4th at 554 (quoting *Buck*, 137 S. Ct. at 778); *see also Marcus A. T.*, 2023 WL 3304727, at *1–2 (citing cases).

Finally, with respect to a consent decree, which is the subject of this Joint Motion, Rule 60(b) supplies an even more "flexible standard" for a District Court to adjust its final judgment or order, to harmonize it with changed circumstances in law or fact. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380, 393 (1992); *see also O'Sullivan v. City of Chicago*, 396 F.3d 843, 866 (7th Cir. 2005) (similar); *South Suburban Housing Ctr. v. Berry*, 186 F.3d 851, 855 n.1 (7th Cir. 1999) ("A court of equity has the power to modify a consent decree to adapt for changed circumstances."). This is especially the case where the sought-after adjustment "relates to the vindication of a constitutional right." *Rufo*, 502 U.S. at 389 n.7.

### III. ARGUMENT

**THE JOINT MOTION SHOULD BE GRANTED IN THE INTEREST OF JUSTICE**

Once new CFPB leadership undertook the review of the history of this case, it became clear from the totality of internal evidence that this case has suffered from deficiencies on the merits and Townstone was targeted because of its protected speech. The Bureau identified this small business and initiated investigation and then litigation under the Equal Credit Opportunity Act without substantial evidence of discrimination and based on the expressed political views of

Mr. Sturner, Townstone's principal. Decl. ¶ 5. As this Court is aware, during the pendency of the case, Defendant did raise First Amendment issues and received significant support from several amici.

The First Amendment issues were not reached in four years of litigation, which followed three years of investigation. But, neither Defendant, nor its amici, nor this Court could fully fathom how egregious the First Amendment issues were without access to the Bureau's internal files, and so the Defendant ended up agreeing to a consent decree with the Bureau to put an end to the costly litigation in the wake of the Seventh Circuit reversing this Court's dismissal on statutory grounds. Had Defendant been able to access the internal agency records demonstrating that the Bureau failed to wrestle with the deficiencies in this case and that it was targeted, it would have been able to advance a more strongly supported First Amendment, viewpoint-based targeting defense against the Bureau. Indeed, Defendants sought discovery regarding CFPB's "interpretation of Townstone's statements, including any documents concerning the political and social views" of the Defendants, *see* Mot. Compel, ECF No. 89; Mem. Supp. Mot. Compel, ECF No. 90, but CFPB refused to produce any such information, and the magistrate judge sided with CFPB. Order at 15, ECF No. 104.[1] What the Bureau has now uncovered and summarizes in the Bishop declaration justifies vacatur.

The Amended Complaint relies on postings on both Facebook and Twitter (now X) to provide examples of the Defendant's speech regarding the real-life facts confronting the people of Chicago. The Bureau then used these statements as predicates for the ECOA enforcement action.

> Starting at least as early as 2014, the Townstone Financial Show was conducted
> weekly on AM radio and reached the entire Chicago MSA. A weekly podcast of

---

[1] Defendants filed objections to the Magistrate's ruling with the District Court, *see* ECF No.105, but those objections were not ruled upon when the District Court dismissed the case in November 2024.

the radio show has been available exclusively online.  Townstone Financial Show radio broadcasts and podcasts have been available on the Townstone website.  Both the radio show and podcast have been streamed on Facebook Live and then advertised on Facebook, Twitter, and LinkedIn.

Am. Compl.  at ¶ 29.

The Amended Complaint does not tell the whole story, however.  The Bureau used a variety of undisclosed tactics to gain access to this information, which further emboldened it to pursue this enforcement action and to continue to litigate it through appeal and, ultimately, drive Townstone into a consent decree to put an end to crushing pre-litigation and litigation expenses.  Decl. ¶ 8.  Among other tactics, the Bureau used "an audio analytics mining software called Nexidia" to term-search 78.5 hours of Townstone's live-recorded content — 31 hour-long Townstone radio programs on Saturday AM talk radio together with 95 30-minute Townstone podcasts published on Thursdays on social media.  Decl. ¶ 8.  A memo from the fair lending staff to then-senior leadership at the Bureau observed that "[m]uch of the content of the show is overtly political, and often highly critical of the Bureau," with only a perfunctory notation that this was "irrelevant" to the investigation.  Decl. ¶ 8.  From the recordings, CFPB's radio-show "mining" identified six comments by Townstone hosts, appearing in one radio show and five podcasts —16 minutes of the total recorded content (one-third of one percent) — that, according to CFPB staff, were "disconcerting" and "could be interpreted as inappropriate, incorrect, or insensitive."  Decl. ¶ 8.

But the CFPB's own assessment of the results of its first-stage investigation (1) identified only a handful of allegedly "discouraging" comments, none of which were explicitly and unambiguously hostile on a prohibited basis; (2) recognized that racial statistical disparities in its lending did not appear to be explained by Townstone's office location, any targeted marketing

area or advertising, or business methodology or plan; (3) recognized that Townstone encouraged the use of programs to help disadvantaged populations and hired racial and language minority loan-officers; (4) identified no prospective applicants who complained about the statements or were even aware of them; and (5) speculated that Townstone's use of an AM talk radio station for its weekly show could innocently limit its exposure to prospective black and Hispanic loan applicants. Decl. ¶ 9, 12(b). Nevertheless, CFPB staff proposed to keep investigating to "provide an opportunity for further investigation into Townstone's views on race and racism." Decl. ¶ 9. Indeed, for the rest of this saga, up until the settlement, the Bureau continued to target Townstone based on the political views of its owner. Decl. ¶ 9–10. This was not information that Defendant had at the time, and it has only come to light now.[2]

The Bureau's targeting based on the protected speech persisted notwithstanding this Court's discovery ruling. In a December 12, 2022 Order, this Court **denied** on Rule 26(b)(1) grounds the Bureau's Motion to Compel Discovery (ECF No. 87), insofar as it asked this Court to compel Mr. Sturner to turn over "all communications with his friends, family and associates touching upon his racial, religious, gender-based, or age-based biases, if he had any," as well as "all of his communications about Mexicans or Canadians, or about particular neighborhoods." Order at 13, ECF No. 104. This Court specifically found that the relevance of the Bureau-sought discovery to Townstone's treatment of prospective credit applicants was "[not] central enough to the case to warrant the privacy invasion that would result from compelled production of every

---

[2] Indeed, had the CFPB not conducted the recent internal investigation, the evidence presented herein may never have come to light. Defendants were repeatedly denied this information in discovery because the CFPB viewed the evidence as irrelevant, and in some cases, privileged. *See* Mem. Supp. Mot. Compel at 3–4, ECF No. 90; Order at 15–16, ECF No. 104.

Sturner [communication]." *Id.* at 14.  In crafting that discovery order, this Court clearly acted to protect First Amendment values.

Nevertheless, based on what has been brought to light from the internal case file review conducted by the Bureau over the course of the last month, the parties agree that the Bureau sought to infringe, rather than protect, First Amendment values.  Decl. ¶ 11–12.  From the investigation to the litigation, and ultimately to the settlement, the Bureau focused on the Defendant's protected speech and repeatedly disregarded governing case law that did not support the Bureau's actions.  The overall review of the Bureau's internal files confirms that, based on the totality of circumstances, this entire action constituted an effort on the part of the Bureau to "'excis[e] certain ideas [and] viewpoints from the public dialogue'" to which Townstone and Sturner in particular had regularly contributed.  *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).

The Bureau targeted Townstone Financial, on deficient grounds, and based on protected speech, especially on social media.  The Supreme Court and the Seventh Circuit have repeatedly held that the government cannot use its coercive powers, directly or indirectly, to punish speech it disagrees with, by a threat of prosecution, let alone by launching an actual prosecution.  Most recently, in *National Rifle Association of America v. Vullo*, the Court reaffirmed that a government official cannot "use the power of the State to punish or suppress disfavored expression."  602 U.S. 175, 188 (2024).

The Court in *National Rifle Ass'n of Am. v. Vullo* relied on *Bantam Books v. Sullivan*, 372 U.S. 58 (1963).  There, a state commission used its power to investigate and recommend criminal prosecution to censor publications that, in its view, were "objectionable" because they threatened "youthful morals."  *National Rifle Ass'n of Am.*, 602 U.S. at 188 (quoting *Bantam*

8

*Books*, 372 U.S. at 59–62, 71). But "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion … to achieve the suppression' of disfavored speech." *Id.* at 189 (quoting *Bantam Books*, 372 U.S. at 67). "Although the commission lacked the 'power to apply formal legal sanctions,' the distributor 'reasonably understood' the commission to threaten adverse action, and thus the distributor's 'compliance with the [c]ommission's directives was not voluntary.'" *Id.* (quoting *Bantam Books*, 372 U.S. at 66–68). "Ultimately, *Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly: A government official cannot … coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 190.

Likewise, in *303 Creative LLC*, the Court held that Colorado sought to put a citizen to an impermissible choice: "If she wishes to speak, she must either speak as the State demands or face sanctions for expressing her own beliefs, sanctions that may include compulsory participation in 'remedial ... training,' filing periodic compliance reports as officials deem necessary, and paying monetary fines." 600 U.S. at 592. This amounted to a First Amendment violation.

The Seventh Circuit's decision in *Backpage.com, LLC v. Dart*, illustrates these principles: "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." 807 F.3d 229, 230-31 (7th Cir. 2015). Thus, a sheriff was barred from "using the power of his office to threaten legal sanctions against . . . credit-card companies for facilitating future speech." *Id.; see also, e.g.*, *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam) (holding that a

9

religious group stated a First Amendment claim against a borough president who wrote a letter "contain[ing] an implicit threat of retaliation" against a billboard company displaying the group's disfavored message).

In sum, the civil enforcement action here, based as it was on protected speech, is prohibited: "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *National Rifle Ass'n of Am.*, 602 U.S. at 187. And vindicating this principle, the Supreme Court "has also recognized that no public accommodations law is immune from the demands of the Constitution." *303 Creative LLC*, 600 U.S. at 592.

Yet, the Bureau's internal view on the First Amendment issues in this case was to brush them aside. Despite observing from the beginning that "the content of [Townstone's] radio show is overtly political," investigators declared that it was "not protected" because it was "commercial speech." Decl. ¶ 15. In so concluding, they relied on two cases from the 1980s, and entirely failed to address four decades of relevant and binding First Amendment precedent that makes clear that the speech here is indeed protected by the First Amendment. Decl. ¶ 15. For example, in *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 365 (2010), the Supreme Court held that "[t]he Government may not suppress political speech on the basis of the speaker's corporate identity." In *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011), the Supreme Court held the government may not suppress truthful commercial speech just because it is controversial or not to the government's liking. And "[c]ommercial speech is no exception" to the viewpoint-discrimination doctrine. *Id.* at 566; *see also Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."). In *Nat'l Inst. Of Family & Life Advocates v. Becerra*, 585 U.S. 755, 768–69 (2018),

10

the Supreme Court rejected an attempt to carve out a lesser-protected category of "professional speech"; the Court explained that to the extent commercial speech receives lesser protection, that category is limited to factual disclosures and regulation of professional conduct incidentally involving speech. Since the speech here is neither factual disclosures nor regulation of professional conduct incidentally involving speech, the speech is fully protected by the First Amendment.

Here, Defendants were subjected to the serious hardship of a lengthy, groundless investigation and then of defending a suit, and ultimately paying a $105,000 fine, where the CFPB targeted them based on the viewpoints of Townstone's owner, used improper tactics, and did so without disclosing investigators' motivations. The CFPB supports vacating the consent judgment entered in this action and the stipulated dismissal of all claims in order to permit the agency to return to Townstone the civil penalty it paid.

In light of how the proceedings against Townstone unfolded, the parties respectfully ask the Court to exercise its discretion and to set the judgment aside under Rule 60(b)(6). Allowing this judgment to stand undermines the public's faith in the system, given the use of governmental powers to persecute citizens for protected activities. It is in the interest of justice to set aside this judgment. Indeed, it is squarely within this Court's "'discretion piled on discretion'" to vacate and relieve Townstone from the Final Judgment pursuant to Rule 60(b)(6). *Wehrs v. Wells*, 688 F.3d 886, 890 (7th Cir. 2012) (quoting *Swaim v. Moltan Co.*, 73 F.3d 711, 722 (7th Cir. 1996)).

## IV. CONCLUSION

The parties jointly and respectfully ask the Court to vacate and relieve Defendants from the Stipulated Final Judgment and Order, ECF No. 138. Upon this Court's grant of Rule 60(b)(6) relief, all parties to this action stipulate to the dismissal with prejudice of all claims

11

against Townstone and Mr. Sturner pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii),

(B).

Dated: March 26, 2025.


Respectfully submitted,


**CONSUMER FINANCIAL
PROTECTION BUREAU**
/s/ Mark Paoletta
MARK PAOLETTA (DC Bar # 422746)
Chief Legal Officer
Mark.Paoletta@cfpb.gov
Tel: (771) 959-6080
VICTORIA DORFMAN (DC Bar # 487567)
(NY Bar # 4656625)
Victoria.Dorfman@cfpb.gov
DANIEL SHAPIRO
(FL Bar # 1011108)
Daniel.Shapiro@cfpb.gov

1700 G Street NW
Washington, DC 20552

*Attorneys for Plaintiff*

**TOWNSTONE FINANCIAL, INC.,
AND BARRY STURNER**
/s/ Steven M. Simpson
STEVEN M. SIMPSON
DC Bar No. 462553
ASHLEY TORKELSON LEVINE
AZ Bar No. 032544
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 1000
Arlington, VA, 22201
Tel: (202) 888-6881
SSimpson@pacificlegal.org
ALevine@pacificlegal.org

OLIVER J. DUNFORD
FL Bar No. 017991
Pacific Legal Foundation
4440 PGA Boulevard, Suite 307
Palm Beach Gardens, FL 33410
Tel: (916) 503-9060
ODunford@pacificlegal.org

SEAN P. BURKE
RAY BIEDERMAN
Mattingly Burke Cohen & Biederman LLP
155 E. Market St. Suite 400
Indianapolis, IN 46204

MARX DAVID STERBCOW
The Sterbcow Law Group LLC
824 Elmwood Park Boulevard, Suite 205
New Orleans, LA 70123

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 26, 2025, I electronically filed the

foregoing document with the Clerk of the Court via the CM/ECF system, which will cause a

copy to be served upon counsel of record.

/s/ Mark Paoletta<br>
MARK PAOLETTA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Bureau of Consumer Financial Protection, | Case No. 1:20-cv-04176 |
| Plaintiff, | |
| v. | Judge Franklin U. Valderrama |
| | Magistrate Judge Heather K. McShain |
| Townstone Financial, Inc and Barry Sturner, | |
| Defendants. | |

## DECLARATION OF DAN BISHOP IN SUPPORT OF JOINT MOTION FOR RELIEF FROM AND VACATUR OF THE STIPULATED FINAL JUDGMENT AND ORDER

I, Dan Bishop, declare as follows under penalty of perjury:

1. On January 20, 2025, the newly inaugurated President of the United States ordered the agency heads to "identify and take appropriate action to correct past misconduct by the Federal Government related to censorship of [constitutionally] protected speech" and "to review the activities of … agencies exercising civil and criminal enforcement authority … and identify any instances" reflecting improper targeting of enforcement actions "oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives." Exec. Order No. 14149 § 2(d), 90 Fed. Reg. 8,243 (Jan. 20, 2025); Exec. Order No. 14147 §§ 1, 3, 90 Fed. Reg. 8,235 (Jan. 20, 2025).

2. I am employed as Senior Advisor to the Office of Management and Budget and detailed part time to the Plaintiff ("CFPB"). In both capacities, I serve under the direct supervision of Russell T. Vought, who is the Senate-confirmed Director of OMB and Acting Director of CFPB.

3. Director Vought directed me to undertake a general review of the supervisory and enforcement activities of CFPB and to examine the agency's handling of this matter. To perform

1

this task, I arranged for personal access to the agency's electronic records, which are maintained in SharePoint and can be browsed and searched through that interface and custom software tools.

4. To preserve agency enforcement prerogatives and privileges to the greatest extent possible consistent with fundamental fairness, I set forth below details that I have observed in agency records but am forbearing to place the referenced documents themselves on public record.[1] The documents I reviewed make clear that the CFPB lacked a sufficient factual predicate for the seven-year saga to which it subjected Defendant Townstone. Those documents also make clear that agency lawyers misled their superiors in enforcement decisions and were affected by animus toward the publicly expressed viewpoints of Townstone's owner. This Declaration cites authorities solely to illustrate how investigative and prelitigation decisions turned on misstatements and omissions of requested information about law and fact and, at key points, on Defendant's expressed political viewpoints. The Motion explains why this targeting was impermissible.

THE BEGINNING OF THE INVESTIGATION

5. CFPB's Townstone investigation commenced following a May 5, 2017 memo reporting that a research team had run a "redlining screen" on Home Mortgage Disclosure Act (HMDA) data, identifying "more than 22,000 institution/MSA combinations" to consider for investigation. To reduce that number, researchers used "characteristics" such as "fewer than 500 applications overall," an "average loan amount [ ] greater than $1M," and a "shortfall" in the "number of applications needed to reach parity [i.e. quota] with peers in majority-minority areas" less than 30. This produced 75 potential targets, further reduced, by certain "qualitative research"

---

[1] Defendants' counsel likewise only reviewed this Declaration and were not disclosed the underlying referenced documents.

factors, to 17. The memo did not address whether the selection of "characteristics" or "qualitative research" biased the statistical disparities data.

6. The memo described Townstone as "small," having "application volume under 1K," 876 total over the three-year period, but not low enough to be culled by the minimum of 500. Townstone's "shortfall" of applications was 60 — 31 shy of escaping scrutiny.

7. The memo also noted Townstone was "founded by people with a background in real estate" who "work closely with real estate agents and host a local radio show." Without any articulated suspicion of a practice that caused the statistical disparity, CFPB initiated a civil investigative demand (CID).

THE INVESTIGATIVE DEMAND

8. In an April 2018 memo, CFPB's fair lending staff recommended to leadership that Townstone should continue to be investigated, reporting these additional details:

a. It "generated the vast majority of its business through radio outreach."

b. It received significant repeat and referral applications, which "may explain why" it had few from African-American and Hispanic consumers.

c. Its "single office in downtown Chicago," limited billboard advertising, "targeted marketing areas, and business methodology or plan, do not appear to have any significant impact on Townstone's lending in majority-minority areas."

d. Sole owner Barry Sturner "encouraged" Townstone's "7 active loan officers" to promote and use "mortgage products geared toward … low-income applicants."

e. Townstone had employed Chinese- and Spanish-speaking ethnic minority loan officers to do outreach to non-English-speaking communities, though "Townstone has never had an African-American loan officer."

3

f. CFPB professed to see a "possib[ility]" that Townstone's "choice of [radio] stations and corresponding demographics … limit[s] awareness … among African-American and Hispanic consumers."

g. CFPB used "an audio analytics mining software called Nexidia" to term-search 78.5 hours of Townstone's live-recorded content — 31 hour-long Townstone Saturday AM radio programs coupled with 95 30-minute Townstone podcasts published on social media. "Much of the content of the show is overtly political, and often highly critical of the Bureau …" CFPB "mined" six remarks by Townstone hosts out of just one radio show and five podcasts. The mined remarks occurred within 16 audio minutes, 0.33 percent of the total recorded content. The remarks were "disconcerting" and "could be interpreted as inappropriate, incorrect, or insensitive." Two of the remarks were referenced in the Complaint (referring to "hoodlum weekend" and police presence being the sole factor preventing an urban area from descending into a "war zone" and describing the "Jungle Jewel on Division"). The others were similar.

9. In sum, CFPB's own assessment of the results of its investigation (1) identified six comments that were politically controversial; but recognized that (2) racial disparity in lending statistics did not appear to be explained by Townstone's office location, any targeted marketing area or advertising, or business methodology or plan; (3) Townstone encouraged the use of programs to help disadvantaged populations and hired racial and language minority loan-officers; and (4) Townstone's use of an AM talk radio station could explain its applicant demographics. Nevertheless, CFPB staff proposed to keep pressing ahead on the matter to "provide an opportunity for further investigation into Townstone's views on race and racism": "[G]iven the gravity of intentional discrimination in the consumer financial marketplace (here, potentially with animus)

4

there is strong need for deterrence."

10. After taking testimony from all loan officers, CFPB enforcement attorneys submitted a recommendation memo to "settle or sue" in April 2019. The only new evidence was testimonial admissions by Townstone's owner that one or more of the statements "could have" or "would possibly" discourage a prospective black loan applicant. To this, agency attorneys added their conclusory assertions that the remarks "could have been perceived as insulting to African-American and Hispanic listeners." They furnished no evidence of actual consumers offended.

11. Nevertheless, the memo advised the Director:

a. That "[t]he investigation revealed direct evidence" of discrimination in the six remarks.

b. That CFPB had "a strong case" of violation of Reg B under ECOA, which forbids "[a] creditor [to] make any oral or written statement, in advertising or otherwise, ... that would discourage on a prohibited basis a reasonable person from making ... an application." 12 C.F.R. § 1002.4(b). The memo flagged Townstone's argument that six isolated remarks could not have caused the "shortfall" in applications but countered that "[a]ny statement that 'would discourage' a single prospective applicant violates Regulation B, regardless of whether the statement significantly impacts the lender's application volume."

c. That "circumstantial evidence also could support the conclusion that Townstone engaged in acts or practices ... that discouraged" applicants from minority neighborhoods, specifically that: (1) Townstone received fewer mortgage applications from high-minority census tracts than group of unspecified "peers," and (2) Townstone had no race-conscious marketing to or hiring of blacks.

d. That CFPB should seek race-conscious remedies by settlement: loan subsidies "up to

5

$250,000," "financial-education programs" "up to $15,000," advertising "up to $30,000," "targeted recruitment of African-American" loan officers, incentive compensation "for generating applications from [black communities]," "radio shows" touting "Townstone's plan to increase its lending in African-American communities"; plus, a "penalty of $1,000,000." To explain the penalty amount, the memo calculated the maximum per-day civil penalty for a reckless violation ($28,906) times four years (1,460 days): $28,906 x 1460 = $42,202,760, and then stated $1 million would be "appropriate" because of "Townstone's small size." The $250,000 loan subsidies target also tied to the theory of a four-year calculation.

12. The "sue or settle" memo omitted to disclose and/or misstated:

a. Reg B reaches only "oral or written statement[s]" that "would discourage on a prohibited basis." 12 C.F.R. § 1002.4(b). To be actionable, statements must express an explicit racial preference. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 912 (5th Cir. 2019) (ads stating landlord does not accept Section 8 vouchers not a violation because no explicit racial preference expressed; "the supposition that [] an ordinary reader would infer a racial preference … is entirely speculative and unwarranted"). The six identified statements did not communicate a racial preference.

b. If Reg B had been violated, damages would be limited to those caused by specific statements. *See Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907-08 (2d Cir. 1993) (allowing $2,500, no punitives, for distress to each plaintiff who viewed ads with racial messaging). The memo recited no evidence that any person heard or was affected by the selected Townstone remarks.

c. Outside Reg B, stray remarks disconnected from a credit decision do not constitute "direct evidence" of discrimination. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709-10 (7th Cir. 2013).

d. Nor is a circumstantial case of racial discrimination alleged by pairing a statistical disparity in mortgage applications to isolated remarks that could not even be characterized as bigoted. Even if they could have been, "[b]igotry, *per se*, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse [ ] action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). No reported evidence tended to prove a causal connection between suspected bigotry and the loan application "shortfall."

e. The tabulation of damages over a continuous four-year period was baseless — as was the assertion that Townstone merited a civil penalty for recklessness. The memo stated that Townstone's owner admitted to recklessness, but as described elsewhere, he in fact only admitted in retrospect a possibility that one or more remarks "could possibly" be offensive to blacks, not that the words were spoken with conscious disregard to the risk of giving offense at the time.

f. Remedies in discrimination cases should be designed "to eliminate racial disparities through race-neutral means." *Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015). Remedies "that impose racial targets or quotas might raise more difficult constitutional questions." *Id.*

13. Upon receipt of the memo, the Director asked what was known about the audience demographics of the radio station that aired Townstone's show and drove most of its loan applications. The Director also asked for guidance about race-conscious remedies. On May 31,

7

2019, investigators responded that they had no information about the demographics and did not assess the obvious possibility that that could explain Townstone's "application shortfall." Investigators reported that the race-conscious remedies were consistent with agency practice but again omitted to advise of Supreme Court guidance that they are to be avoided where possible.

14. On August 23, 2019, Townstone submitted 165 pages of detailed analysis of the allegations, a survey of black respondents by a consumer testing firm of the remarks CFPB singled out, and a statistical analysis by a mortgage industry compliance firm comparing Townstone's mortgage applications and originations to specified peers. Per the consumer survey, black respondents found no offense in the program remarks singled out by CFPB, and the statistical analysis concluded Townstone was not an outlier in lending activity concerning black applicants.

15. Two business days later, CFPB investigators dismissed Townstone's arguments without seriously engaging them. Most significantly, investigators devoted just three sentences and a footnote to Townstone's seven pages of argument that the CFPB's enforcement posture threatened Townstone's First Amendment interests. Despite observing from the beginning that "the content of [Townstone's] radio show is overtly political," investigators declared that it was "not protected" because it was "commercial speech." Citing only two cases from the 1980s, they failed to address 40 years of relevant First Amendment precedent, including *Citizens United v. Federal Election Comm'n,* 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."), *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) (the government may not suppress truthful commercial speech just because it is controversial or not to the government's liking), and *Nat'l Inst. Of Family & Life Advocates v. Becerra*, 585 U.S. 755, 768-69 (2018) (rejecting category of "professional speech"; narrowing commercial speech to factual disclosures and regulation of professional conduct incidentally

involving speech) — all incompatible with that blanket assertion.

16. At a September 23, 2019 briefing, all of this prompted questions from the Director, as summarized in drafts of an agency response:

> The Director requested broader context regarding prior ECOA cases, including what types of evidence are typically relied on in those cases, what novel issues may be present here in an action against a non-depository lender, and more context about the "reasonable person" standard under Regulation B discouragement claims.

For the ensuing <u>seven</u> months (until late April 2020), Enforcement and Legal Division staffs wrote and circulated dozens of drafts of a response to these questions — but never to the Director.

17. CFPB employees saved captures of tweets posted by Townstone's owner in the course of unrest following the May 25, 2020 death of George Floyd. A pdf capture of the account profile page is filenamed "Townstone Fin Tweets BS posts that he was victim of police.pdf." Another capture, bearing a last modified date of June 8, 2020, and filenamed "Townstone tweet from June 2.pdf," features Townstone's owner expressing opposition to looting.

THE SUIT AGAINST TOWNSTONE

18. Without a resolution of the questions posed by the Director, on July 6, 2020, the Director of Enforcement advised other senior officials by email that he had "provided my recommendation that the Bureau should pursue an enforcement action in the Townstone matter," referencing an impending limitations deadline. On Friday, July 10 at 2:58 PM, he emailed again that he had advised the Director of CFPB that "I see no factual or legal impediment to proceeding to suit," and that the Director had "asked to listen to the Markham call."

19. Sixteen minutes later, the Director of the Office of Fair Lending and Equal Opportunity ("OFLEO") emailed the Director, complaining that the Townstone matter had "languish[ed]" since the Fall and that her office was "unable to obtain copies of any briefing or background materials" and urging "consider[ation of] authorizing Enforcement to file the Townstone lawsuit." (In

9

apparent contradiction, on April 15, 2020, at 4:19 PM, an Enforcement lawyer had emailed the draft memo circulating among Enforcement and Legal Division staff to the OFLEO Senior Counsel, who acknowledged receipt.) The Director responded to the OFLEO Director within 30 minutes, acknowledging her input to multiple senior agency leaders but not announcing any decision.

20. The following Monday, July 13, the Enforcement Director emailed senior Enforcement officials, "The Director has authorized us to file suit on Townstone …." CFPB sued Townstone on July 15.

21. The final four years of Townstone's saga are largely of record in this action.[2] Considering that record and the revelations in this declaration, the CFPB supports vacating the consent judgment, dismissing the claims, and permitting the agency to return to Townstone the civil penalty Townstone paid.

This 26th day of March, 2025.

_____
Dan Bishop

---

[2] Two more disclosures from agency records are relevant to the Court's review at this juncture and to restoring fairness. One year after filing suit, CFPB contracted to pay $1,380,420 to "consumer behavior experts" to survey consumers about Townstone's broadcast remarks. In March 2022, CFPB's Director established a "cross-cutting priority" of "racial equity" and communicated to the enforcement division that it was "endemic to all areas of our focus." The Townstone matter was tagged in that effort.